THE REPUBLIC OF IRAQ, including as
PARENS PATRIAE in behalf of the
CITIZENS of the REPUBLIC OF IRAQ

By MANEY & PURRINGTON
711 Louisiana, Suite 3100
Houston, Texas 77002
(713) 654-8001
Mark Maney (not yet admitted in District)
Roliff Purrington (not yet admitted in District)

By LAW OFFICES OF STEPHEN ALBRIGHT
368 Veterans Memorial Highway, 2nd Floor
Commack, New York 11725
(631) 864-4967 Telephone
(631) 864-4972 Facsimile
Stephen Albright (SA-4979)

COUNSEL FOR THE REPUBLIC OF IRAQ

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

                                                         x

THE REPUBLIC OF IRAQ, including as           :
PARENS PATRIAE in behalf of the              :
CITIZENS of the REPUBLIC OF IRAQ,            :
                                             :
          Plaintiff.                          :
                                             :
v.                                           :
                                             :
                                             :
ABB AG, ABB AUTOMATION,                      :
ABB ELEKTRIC SANAYI AS,                      :
ABB INDUSTRIE AC MACHINES,                   :
ABB INDUSTRIE CHAMPAGNE,                     :
ABB NEAR EAST TRADING LTD.,                  :
ABB SOLYVENT-VENTEC, AGCO                    :
DENMARK A/S, AGCO S.A.,                      :
VALTRA DO BRAZIL, AIR                        :
LIQUIDE ENGINEERING, AKZO                    :
NOBEL N.V., N.V. ORGANON,                    :
INTERVET INTERNATIONAL B.V.,                 :
ASTRA ZENECA AB., MAIS CO.                   :
FOR MEDICAL PRODUCTS, ATLAS                  :
COPCO AIRPOWER N.V., ATLAS                   :
COPCO CMT, AWB, LTD., B. BRAUN               :
MEDICAL FRANCE, B. BRAUN                     :
MELSUNGEN A.G., B. BRAUN MEDICAL             :
INDUSTRIES SDN BHD (MALAYSIA),               :
AESCULAP AG AND KG, AESCULAP                 :
MOTRIC S.A., AESCULAP SURGICAL               :

'08 CIV 5951



Case No._____ :

ORIGINAL COMPLAINT

INSTRUMENTS SDN, BOSTON                    :
SCIENTIFIC S.A., BNP PARIBAS USA,          :
BNP PARIBAS (SUISSE) SA, BNP               :
PARIBAS HONG KONG, BNP PARIBAS             :
PARIS, BNP PARIBAS UK HOLDINGS             :
LIMITED, BNP PARIBAS LONDON                :
BRANCH, BNP PARIBAS (SUISSE) SA,           :
BUHLER LTD., DAVID B. CHALMERS,            :
JR., CHEVRON CORP., DAEWOO                 :
INTERNATIONAL CORP., DAIMLER-              :
CHRYSLER AG, DOW AGROSCIENCES,             :
EASTMAN KODAK S.A., EBEWE                  :
PHARMA GES M.B.H., ELI-LILLY               :
EXPORT S.A., EL PASO CORP.,                :
EVAPCO (AUSTRIA), EVAPCO                    :
EUROPE S.R.L., FIAT AVIO,                  :
FLOWSERVE CORP., FLOWSERVE                 :
POMPES, FLOWSERVE B.V.,                    :
GLAXOSMITHKLINE WALLS HOUSE                :
GLAXOSMITHKLINE EGYPT SAE                  :
GLAXO WELLCOME EXPORT LTD.                 :
GLAXO WELLCOME SA (SOUTH                   :
AFRICA) (PRY) LTD., SMITHKLINE             :
BEECHAM INTERNATIONAL, ABG                 :
ALLGEMEINE BAUMASCHINEN-                   :
GESELLSCHAFTMBH DRESSER                    :
INTERNATIONAL INGERSOLL-                   :
RAND ITALIANA, SPA., THERMO                :
KING IRELAND LIMITED,                      :
INGERSOLL-RAND BENELUX, N.V.,              :
INGERSOLL-RAND WORLD TRADE                 :
LTD., CILAG AG INTERNATIONAL,              :
JANSSEN PHARMACEUTICAL,                    :
KIA MOTORS, LIEBHERR EXPORT                :
AG, LIEBHER FRANCE, SA, SERONO             :
PHARMA INTERNATIONAL, MERIAL,              :
NOVO NORDISK, PAUWELS, RAILTECH            :
INTERNATIONAL, F. HOFFMAN LA               :
ROCHE, ROCHE DIAGNOSTICS GMBH,             :
ROHM AND HAAS FRANCE, S.A.,                :
SECALT S.A., SIEMENS S.A.A. OF             :
FRANCE, SIEMENS SANAYI VE                  :
TICARET A.S. OF TURKEY, OSRAM              :
MIDDLE EAST FZE, SOLAR TURBINES            :
EUROPE, ST. JUDE MEDICAL EXPORT            :
GMBH, SULZER BUCKHARDT                     :
ENGINEERING WORKS LTD., SULZER             :
PUMPEN DEUTSCHLAND GMBH,                   :
SULZER TURBO LTD., TEXTRON, INC.,          :
UNION PUMP S.A.S., FORMERLY                :
KNOWN AS DAVID BROWN                       :
GUINARD PUMPS S.A.S., DAVID                :

BROWN TRANSMISSIONS OF            :
FRANCE S.A., RENAULT TRUCKS       :
SAS, RENAULT AGRICULTURE          :
& SONALIKA INTERNATIONAL,         :
RENAULT V.I., VOLVO               :
CONSTRUCTION EQUIPMENT AB,        :
A SUCCESSOR COMPANY TO            :
VOLVO CONSTRUCTION EQUIPMENT      :
INTERNATIONAL, THE WEIR GROUP,    :
OSCAR S. WYATT, JR., VITOL, S.A., :
WOODHOUSE INTERNATIONAL,          :
YORK AIR CONDITIONING             :
AND REFRIGERATION FZE,            :
                                  :
    Defendants.                   :
                                  :
_____ x

### THE REPUBLIC OF IRAQ'S ORIGINAL COMPLAINT

The Republic of Iraq in its sovereign capacity and, as parens patriae, in behalf of the people of Iraq complains of the Defendants as follows:

#### *Summary*

1.     The Corruption of the United Nations Oil-for-Food Programme (the "OFFP") has been described as the largest financial fraud in human history, but its impact on the people of Iraq went far beyond financial loss. The corruption of the OFFP affected the very lives and health of the Iraqi people.

2.     During the period of the OFFP, billions of dollars in cash, goods, and services were diverted from their humanitarian purposes to enrich the Defendants here, the Saddam Hussein and his representatives (the "Former Hussein Regime"), and other individuals and companies.

3.     The nature and extent of the systematic fraud and corruption has been extensively studied and substantiated in numerous reports, but most notably in the Report of the Independent Inquiry Committee into the United Nations Oil for Food Programme, "Manipulation of the Oil

for Food Programme by the Iraqi Regime," October 27, 2005 (the "UN Report"). The UN Report, conducted under the auspices of Paul A. Volcker, is a detailed analysis of the scope and means of the conspiracy to manipulate the OFFP. It is incorporated by reference.

4.      This Complaint raises claims arising from the Defendants' participation in the conspiracy to corrupt the OFFP and the resulting damages to the Republic of Iraq and the Iraqi people. While the corruption was designed and instigated by the former Former Hussein Regime, the Defendants individually decided to join the conspiracy in order to reap the economic benefits of trading under the OFFP. Without the Defendants' knowing participation, the Former Hussein Regime's corruption of the OFFP would not have been possible.

5.      Billions of dollars were lost, all of which was directly translatable into food, medicine and other humanitarian goods that were supposed to reach the Iraqi people. The resulting damage in human suffering caused to the Republic of Iraq and to the people of Iraq is virtually incalculable.

### *Jurisdiction and Venue*

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this Complaint raises claims under federal statutes.

7.      This Court has venue pursuant to 18 U.S.C.A. § 1965(a) and (b) and 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise the claims presented herein in this District, including most notably, the fact that OFFP was administered in New York, all of the funds of the Programme were supposed to pass through an escrow account in New York, and all contracts under the Programme were approved in New York.

*Parties*

*The Plaintiff – the Republic of Iraq*

8.     The Republic of Iraq brings this action in its own right and, in parens patriae, for the benefit of the Iraqi people.

9.     Sovereignty was returned to the Iraqi people and to the Government of the Republic of Iraq on June 28, 2004.

*The Defendants*

10.     The Defendants are:

     (1)     ABB AG,

     (2)     ABB Automation,

     (3)     ABB Elektric Sanayi AS,

     (4)     ABB Industrie AC Machines,

     (5)     ABB Industrie Champagne,

     (6)     ABB Near East Trading Ltd.,

     (7)     ABB Solyvent-Ventec,

     (8)     AGCO Denmark A/S,

     (9)     AGCO S.A.,

     (10)     Valtra do Brazil,

     (11)     Air Liquide Engineering,

     (12)     Akzo Nobel N.V.,

     (13)     N.V. Organon ("Organon"),

     (14)     Intervet International B.V. ("Intervet"),

(15)   Astra Zeneca AB.,

(16)   Mais Co. for Medical Products,

(17)   Atlas Copco Airpower N.V.,

(18)   Atlas Copco CMT,

(19)   AWB, Ltd.,

(20)   B. Braun Medical France,

(21)   B. Braun Melsungen A.G.,

(22)   B.Braun Medical Industries SDN BHD (Malaysia),

(23)   Aesculap AG and KG,

(24)   Aesculap Motric S.A.,

(24)   Aesculap Surgical Instruments SDN,

(25)   Boston Scientific S.A.,

(26)   BNP Paribas USA,

(27)   BNP Paribas (Suisse) SA,

(28)   BNP Paribas Hong Kong,

(29)   BNP Paribas Paris,

(30)   BNP Paribas UK Holdings Limited,

(31)   BNP Paribas London Branch,

(32)   BNP Paribas (Suisse) SA

(33)   Buhler Ltd.,

(34)   David B. Chalmers, Jr.,

(35)   Chevron Corp., including as successor to Texaco Corp.,

(36)   Daewoo International Corp.,

(37)    Daimler-Chrysler AG

(38)    Dow Agrosciences,

(39)    Eastman Kodak S.A.,

(40)    Ebewe Pharma Ges M.B.H.,

(41)    Eli-Lilly Export S.A.,

(42)    El Paso Corp. (successor to Coastal Corp.),

(43)    Evapco (Austria),

(44)    Evapco Europe S.R.L.,

(45)    Fiat Avio,

(46)    Flowserve Corp.

(47)    Flowserve Pompes (formerly Ingersoll-Dresser Pompes)

(48)    Flowserve B.V.,

(49)    GlaxoSmithKline Walls House

(50)    Glaxo Smithkline Egypt SAE

(51)    Glaxo Wellcome Export Ltd.

(52)    Glaxo Wellcome SA (South Africa) (PRY) Ltd.

(53)    SmithKline Beecham International

(54)    ABG Allgemeine Baumaschinen-GesellschaftmbH

(55)    Dresser International

(56)    Ingersoll-Rand Italiana, SPA.,

(57)    Thermo King Ireland Limited,

(58)    Ingersoll-Rand Benelux, N.V.,

(59)    Ingersoll-Rand World Trade Ltd.,

(60)    Cilag AG International,

(61)    Janssen Pharmaceutical,

(62)    Kia Motors,

(63)    Liebherr Export AG,

(64)    Liebher France, SA,

(65)    Serono Pharma International,

(66)    Merial,

(67)    Novo Nordisk,

(68)    Pauwels,

(69)    Railtech International,

(70)    F. Hoffman la Roche,

(71)    Roche Diagnostics GMBH,

(72)    Rohm and Haas France, S.A.,

(73)    Secalt S.A.,

(74)    Siemens S.A.A. of France,

(75)    Siemens Sanayi ve Ticaret A.S. of Turkey,

(76)    Osram Middle East FZE,

(77)    Solar Turbines Europe,

(78)    St. Jude Medical Export GMBH,

(79)    Sulzer Buckhardt Engineering Works Ltd.,

(80)    Sulzer Pumpen Deutschland GMBH,

(81)    Sulzer Turbo Ltd.,

(82)    Textron, Inc.,

(83)   Union Pump S.A.S., fka David Brown Guinard Pumps S.A.S.,

(84)   David Brown Transmissions France S.A.,

(85)   Renault Trucks SAS,

(86)   Renault Agriculture & Sonalika International,

(87)   Renault V.I.,

(88)   Volvo Construction Equipment AB, a successor company to Volvo Construction Equipment International,

(89)   The Weir Group,

(90)   Oscar S. Wyatt, Jr.,

(91)   Vitol, S.A.,

(92)   Woodhouse International,

(93)   York Air Conditioning and Refrigeration FZE.

### Factual Background

#### The United Nations OFFP

11.     On August 2, 1990, the Former Hussein Regime ordered the invasion of Kuwait. Four days later, the United Nations imposed economic sanctions on the Former Hussein Regime, prohibiting member states from trading in any Iraqi commodities or products.

12.     Shortly thereafter, the Iraqi people began suffering shortages of food, medicine and other necessities as a result of the economic sanctions.

13.     As a result, in 1991, the United Nations proposed the OFFP to provide a UN-controlled and administered vehicle by which Iraqi oil would be sold and the proceeds used to aid the Iraqi people.  The United Nations and the Former Hussein Regime, however, did not

come to an agreement of the terms of the OFFP until 1995, so the Iraqi people continued to suffer.

14.     By 1995, the situation for the average Iraqi citizen was dire.  The UN reported that the average Iraqi's food intake was about 1,275 calories per day, compared with the standard requirement of 2,100 calories.

15.     In the face of the growing humanitarian crisis, in April of 1995, the UN Security Council passed Resolution 986 establishing the OFFP as the sole vehicle for the sale and lifting of Iraqi crude and for direct financial transactions with the Former Hussein Regime.  Resolution 986 permitted the former Former Hussein Regime to sell Iraqi oil under strict conditions designed to ensure that the proceeds were used for humanitarian goods for the benefit of the Iraqi people and, in later periods of the Programme, to purchase supplies to support oil production, so that there would be sufficient funds to obtain the needed humanitarian goods.

16.     After more than a year of negotiations, in May of 1996, the former Former Hussein Regime entered into a Memorandum of Understanding with the United Nations concerning implementation and administration of the OFFP under Security Council Resolution 986 (the "MOU").  The OFFP was to be administered by the United Nations Office of Iraq Programme, Oil-for-Food.

### The UN OFFP Escrow Account

17.     Achieving the humanitarian aims of the OFFP required that all proceeds from sales of Iraqi oil be deposited into a UN Escrow Account controlled and monitored by the United Nations.  The UN OFFP Escrow Account was established at BNPNY in Manhattan (the "UN OFFP Escrow Account").  The sales price for the oil was also to be set by the United Nations at a

fair market price, and United Nations' approval was also required to spend the funds held in the UN OFFP Escrow Account.

18.     UN Resolution 986 and MOU expressly required that all funds related to the Programme pass through the UN OFFP Escrow Account; that is, all oil proceeds were to be deposited into the UN OFFP Escrow Account, and all payments for goods sold under the Programme were to be made exclusively from the UN OFFP Escrow Account. As a general rule, direct financial transactions with the Former Hussein Regime were not permitted under the OFFP.

19.     In addition, during the term of the UN Sanctions against the former Former Hussein Regime, United States federal law prohibited United States companies and individuals from executing contracts and engaging in a variety of transactions with the Former Hussein Regime unless they received a license issued by the Department of Treasury's Office of Foreign Assets Control.

***Purchases under the OFFP***

20.     In December of 1996, the Former Hussein Regime began selling and exporting crude pursuant to the OFFP. Between that date and December 2002, the Security Council of the United Nations adopted a series of resolutions that reauthorized the OFFP for approximately thirteen 180-day phases of operation. Throughout each of these phases, the price at which Iraqi oil was sold under the OFFP – known as the Official Selling Price ("O.S.P.") – was established by a committee made up of member states of the Security Council in Manhattan upon the recommendation of a rotating group of United Nations oil overseers. The United Nations sought to set a price for Iraqi oil at the highest rate bearable by the market in order to maximize the

revenue generated by the OFFP. This, in turn, would increase the amount of humanitarian goods that could be purchased through the OFFP for the Iraqi people.

21.     Over the course of the OFFP, the Former Hussein Regime sold approximately $64.2 billion of Iraqi crude oil, and purchased approximately $37 billion in humanitarian goods.

22.     Pursuant to the agreement between the Former Hussein Regime and the United Nations, approximately two-thirds of UN OFFP Escrow Account funds was allocated for purchasing medicine, health supplies, food, and other essential humanitarian goods.

23.     A company wishing to sell humanitarian goods under the Programme contracted with the appropriate Iraqi Ministry or State-Owned Enterprise or, for goods destined for northern Iraq, with on the UN-related agencies. The contract was then forwarded by the United Nations in New York through the company's home country mission to the United Nations. The proposed contract was reviewed by the Contracts and Processing Division of the Office of Iraqi Programme (the "OIP") for pricing and value. If the OIP approved the contract and supporting paperwork, the 661 Committee then reviewed and approved it under a "no objection" procedure, which meant that the contract was approved if no member of the 661 Committee raised a timely objection.

24.     Once the contract was approved, the goods could be transported to Iraq, where they were required to be certified by UN-hired border inspectors at one of four border inspection points.

25.     Once the UN inspectors certified the goods, the escrow bank (BNPNY) paid the goods supplier from the UN OFFP Escrow Account.

26.     Completing this process necessarily entailed extensive use of the mails and wires, including telephone, fax, e-mail and wire transfers. The contract had to be negotiated and

executed with the Former Hussein Regime.  It then had to be approved by the United Nations. Delivery had to be arranged, confirmed, and payment requested.  Payment from the UN OFFP Escrow Account was issued by wire transfer.

### Corruption of the Purchasing Side of the OFFP

27.     According to the agreement between the Former Hussein Regime and the United Nations, Iraq retained the right to choose the parties from which it would purchase goods.  The Former Hussein Regime utilized this power as the means to induce participation in a corrupt scheme to divert funds from their humanitarian purposes.

### The Inland Transportation Fees

28.     Beginning in May of 1999, the start of Phase VI of the OFFP, the Former Hussein Regime began to systematically seek to obtain funds outside of the UN OFFP Escrow Account. At first, the Former Hussein Regime characterized the scheme as a means of paying for transportation costs from the borders to the final destination.  The vast majority of these "transportation fees" were actually kickbacks made through front companies that did not provide legitimate transportation services.

29.     In June of 1999, the Former Hussein Regime issued a directive requiring all Ministries to impose non-negotiable "transportation fees" on all goods requiring inland delivery. The Economic and Affairs Committee of the Former Hussein Regime assigned the fees, and the Ministry of Transportation oversaw their collection.

30.     The Former Hussein Regime did not require suppliers to pay these fees from their own funds.  Instead, the Regime allowed suppliers to include the transportation fees in their contract prices.

31.     The payment of those fees and their inclusion in the contract price were, however, hidden from the United Nations.  The basic process was as follows.  First, the Former Hussein Regime and the supplier would agree on a unit price for the goods to be purchased under the OFFP.  Then, the Regime would inform the supplier of the transportation fee it would be required to pay in connection with the contract.  The Regime would also inform the supplier that it would have to pay that fee directly to the Iraqi Regime.  If the supplier agreed, the previously negotiated unit price would be revised upward to include the agreed payments, and the revised price would be included in the final version of the contract.

32.     The revised contract, which included a higher unit price to cover direct payments to the Former Hussein Regime, would then be submitted to the United Nations for approval and funding from the UN OFFP Escrow Account.

33.     Except in rare cases, however, the contracts did not disclose the promise to make direct payments to the Former Hussein Regime or the fact that the unit price reflected in the contract was higher than the supplier was willing to accept.

34.     After UN approval, the supplier was required to pay the "transportation fees" directly to the Former Hussein Regime before the goods were allowed to enter Iraq, which triggered payment from the UN OFFP Escrow Account.  Thus, the suppliers generally had to pay the kickback to the Former Hussein Regime before they received payment from the UN OFFP Escrow Account.

35.     This process violated the requirements of the OFFP and made the representations made by the Former Hussein Regime and the suppliers to the United Nations (necessary to obtain the approvals for the contract and for payment) fraudulent.

36.     This illicit kickback scheme also allowed the Former Hussein Regime to obtain escrow funds directly for its own purposes, in direct contravention of the core purpose of the OFFP. Because the kickbacks were incorporated into the supplier's unit price, the suppliers had no incentive to reduce the amount of the kickback.

37.     Not surprisingly, the "transportation fees" were far higher than the actual costs of transportation and therefore created cash unrelated to any humanitarian purpose as required by the OFFP.

38.     In the words of the UN Report, the payments were a "de facto kickback."

*The after-sales-service fees (or "ASSF")*

39.     Beginning in August of 2000, the Former Hussein Regime decided to impose an "after-sales-service fee" on all contracts under the OFFP. The after-sales-fee significantly increased its kickbacks on its purchases under the OFFP.

40.     The United Nations Report concludes that the ASSF was illicit and a "mandatory kickback."

41.     Initially, this fee was supposed to be limited to 2-5% of food and medicine (but not medical equipment) and 5-10% for everything else, but within a few months, the Regime raised the minimum after-sales-fee to 10% and instructions to Iraqi Ministries and Agencies were informed that imposition of fees above 10% would be "commendable."

42.     From October 2000 to the end of the OFFP in 2003, most contracts carried a 10% surcharge, but the surcharge could be as high as 30%.

43.     Unlike the earlier "transportation fee," the ASSF did not even purportedly relate to actual transportation costs, but rather equaled a minimum 10% of the original contract value,

regardless of where the goods entered Iraq or where they were destined. There were no guidelines that dictated the amount of the fee.

44. Setting and payment of the fee, however, was very similar to the transportation fees, so a potential supplier would negotiate a unit price for its goods, and then would submit an inflated price, which included the agreed fee, to the United Nations for approval. The "after-sales-service fee" would then be paid directly to the supplier at the direction of special representatives of Saddam Hussein.

45. There was no negotiation of this fee; it was set by the Former Hussein Regime. The seller's only choice was whether to join the conspiracy to make the sale or refuse and lose the business. Since the kickback was funded by an inflated sales price paid out of OFFP funds, the seller was not economically disadvantaged. Only the Iraqi people suffered the loss.

46. The contracts delivered to the United Nations varied in their treatment of the "after-sales-service fee." The fee was incorporated into the unit price, actually denominated as a separate fee, or disguised as something else, such as a performance bond or training expense.

47. At the beginning of the conspiracy, suppliers and representatives of the Former Hussein Regime generally executed written side agreements that set forth the parties' agreement to pay the fees. After the scheme had become institutionalized with a particular supplier, side agreements were no longer needed; the supplier simply increased its sales price by 10% to cover the kickback.

48. After imposition of the after-sales-fee, the Former Hussein Regime also substantially increased the inland transportation fee by as much as 250%.

49. These fees were paid in one of three ways: cash, bank transfers to accounts controlled by the Former Hussein Regime, and payments to front companies, also controlled by

individuals or companies in turn controlled by the Former Hussein Regime. Generally, accumulated payments were transferred to Iraq in cash, usually by diplomatic pouch.

50.     By March of 2003, representatives of Saddam Hussein had withdrawn $1.5 billion in kickbacks from its various accounts for transfer, in cash, to Iraq.

### Supply of Substandard Products

51.     Notably, the Former Hussein Regime was reluctant to impose high kickbacks on oil production equipment, because of fears that it would receive substandard equipment, which might curtail production.

52.     The Regime apparently had no such concerns about the humanitarian goods being purchased for the Iraqi people, so the majority of the kickbacks were extracted from the purchase of humanitarian goods. As a result, many of those critical goods were substandard or outdated.

53.     Furthermore, once the process became corrupted, suppliers and Former Hussein Regime became more focused on profit than on the humanitarian purposes of the OFFP, which also lead to substandard humanitarian goods being delivered to the Iraqi people. .

54.     Substandard products included wheat, medicine, animal feed, chemicals, and vehicles. Iraq received spoiled and outdated goods, but the Former Hussein Regime nonetheless approved them to receive the kickbacks. The problem was persistent.

### Overpriced Goods

55.     As reported in the UN Report, over the course of the OFFP, there was a growing and substantial difference between the expected price of the humanitarian goods (based on available market data) and the prices paid through the UN OFFP Escrow Account. The price gap widened over the course of the Programme.

56.     A United Nations review of 1,600 humanitarian contracts (about one-third of the total value of all contracts under the Programme) concluded that, even "adjusting generously for the suppliers' obligation to assume the cost of transporting goods to Iraq," the prices paid under the Programme "markedly exceeded best estimates of adjusted market prices."   UN Report, Chapter III, at 298.

57.     The United States Defense Contract Audit Agency and Defense Contract Management Agency also reviewed prices under the OFFP.   The analysis of 759 already approved and funded contracts found approximately $656 million in potential overpricing on contracts with a total value of $3.1 billion, or more than 20%.

58.     Food contracts were found to be the most susceptible to overpricing, where almost 90% of the contracts examined showed potential overpricing, at an average of 22%.

59.     Applying the 20% figure to the $34.5 billion in purchases indicates that more than $7 billion worth of humanitarian goods were lost in overpricing.

### *Diversion of Goods from Humanitarian Purposes*

60.     Corruption of the humanitarian purposes also extended to diverting goods from the Iraqi people to other purposes within the Former Hussein Regime, including items transferred to the Ministry of Defense, the Ministry of Military Industrialization, the General Security Directive, and the Presidential Diwan.

61.     In some cases, these ministries negotiated with the supplier directly, despite the fact they could not legally participate in the OFFP.   In other cases, the goods were simply assumed by one of these ministries.

62.     According to the UN Report and its supporting documentation, commonly diverted items included trucks (particularly a truck that could pull artillery), tires, batteries, and forklifts.

63.     In a particularly telling example, date palm excavators were taken from the Iraqi people so that palm trees could be moved to Hussein's Presidential Palaces.

64.     Approximately, $1.9 billion in humanitarian goods intended to benefit the Iraqi people were diverted to Iraqi ministries that were ineligible to participate in the OFFP, including $1.4 billion to the Ministry of Defense, $29 million to the Offices of the President and Vice President, $19 million to the Ministry of Military Industrialization.

### *Resale of Humanitarian Goods*

65.     The Former Hussein Regime also appears to have resold some of the humanitarian goods purchased under the OFFP.  According to data collected by the United Nations Commodity Trade Statistics Database, known as Comtrade, during the period of the Programme, Iraq exported approximately $286 million in goods (excluding oil), some of which are not known to be made in Iraq.

66.     The amount of the resold goods is not known at this time.

### *Illicit Surcharges on Sales of Oil under the OFFP*

67.     Pursuant to the MOU between the Former Hussein Regime and the UN, the Former Hussein Regime could choose to whom it sold oil.  At first, the Former Hussein Regime utilized this control solely to reward perceived friends of the Regime, but quickly a second goal surfaced – the generation of illicit income that would not have to be used for humanitarian purposes.

68.     To generate that income, the Former Hussein Regime simply demanded that anyone who wanted to purchase oil under the Programme make payments (surcharges) to bank accounts owned or controlled by the Former Hussein Regime.

69.     The Former Hussein Regime began demanding the surcharges in the fall of 2000. Initially, the surcharge was $0.10 per barrel.  Thereafter, the amount ranged from a short-lived attempt to impose a $0.50 surcharge, to $0.25 to $0.30, and finally $0.15 towards the end of the scheme.   A separate government bureaucracy was created within the State Oil Marketing Organization ("SOMO") to ensure that the surcharges were collected from all purchasers.

70.     In addition, at times, the Former Hussein Regime required the payment of unauthorized fees before cargo ships would be permitted to load oil at Iraqi ports.  Payment of these so-called "port fees" was not made to the Oil-for-Food Bank Account and therefore violated UN regulations.

71.     The surcharge requirement was an "open secret" within the oil industry.  The Former Hussein Regime made it clear that any company that failed to pay the surcharges would be banned from future sales, so all purchasers knew that their conduct was part of larger conspiracy.   The use of intermediaries was merely a means to conceal the payments; the Defendants knew or were reckless in not knowing that surcharges were being paid.

72.     Even though there was general awareness of the requirement to pay surcharges, if there had been formal disclosure of the payments to the United Nations, the contracts could not have been approved.

73.     Thus, to purchase oil under the Programme, therefore, a purchaser had to agree to join the Former Hussein Regime's illegal conspiracy by agreeing to pay the surcharge and other improper charges and to file false statements to the UN overseers of the OFFP.

74.     Entry into the conspiracy necessitated multiple illegal acts, including wire and mail fraud. The illicit system set up by the Former Hussein Regime, a purchase of oil required multiple communications over the phones and wires, including e-mails and faxes. The contracts had to be negotiated and executed, the oil had to be shipped, and surcharges had to be made. In addition, UN approval had to be sought, requiring fraudulent transmissions by fax, e-mail or mail to the UN in New York.

75.     Most of the surcharges were paid by wire transfer.

76.     Participants in the scheme, including El Paso, Wyatt and Chalmers, transmitted by means of wire communication in interstate and foreign commerce, communications for the purpose of furthering the conspiracy to corrupt the OFFP.

### David B. Chalmers, Jr.

77.     Chalmers was the sole shareholder of Bayoil (USA), Inc., an oil company based in Houston, Texas, and Bayoil Supply & Trading Limited, a Bahamian company (together "Bayoil").

78.     From about April 2001 through September 2001, Chalmers, on behalf of Bayoil, paid millions of dollars of secret illegal surcharges to the Former Hussein Regime. These secret illegal surcharge payments covered oil purchased from mid-2000 through early 2001.

79.     To conceal these illegal surcharge payments, Chalmers would pay inflated commission prices to unnecessary intermediaries, with the knowledge and expectation that the necessary surcharges would be paid to the Former Hussein Regime. The surcharge payments were made by wire transfer.

*Chevron*

80.     Chevron purchased $78 million in Iraqi oil under the OFFP. Illegal surcharge payments of approximately $20 million were paid by third parties as a part of those transactions.

81.     Chevron knew or was reckless in not knowing that such surcharges were being paid.

82.     As described above, Texaco also paid financed illegal surcharges.

*Coastal and Wyatt*

83.     Wyatt created Coastal, now El Paso, a Houston-based oil company. Until January 2001, he was its Chairman of the Board.

84.     In recognition of his strong personal relationship with Saddam Hussein, in December 1996, Wyatt and Coastal were the recipients of the first allocation of oil sold under the OFFP. The initial allocation was approximately approximately 11.35 million barrels.

85.     Following El Paso's acquisition of Coastal in January of 2001, Wyatt utilized other entities to transact business under the Programme.

*Vitol*

86.     Vitol has pleaded before a New York State Court to Grand Larceny in the First Degree in connection with the surcharge scheme. Vitol conceded in its plea that it paid $13 million in illegal surcharges to the Former Hussein Regime and that it allowed false representations to be made to the United Nations that no such payments were paid.

*Actions of the Escrow Bank and its Affiliates*

87.     In 1996, the United Nations selected BNP, a French bank, to serve as the escrow bank under the OFFP.

### *The Banking Agreement*

88.     On September 12, 1996, the UN and BNP executed an Agreement for Banking Services, setting forth BNP's role (the "Banking Agreement").   The Banking Agreement obligated BNP to, among other things:

(1) establish and manage the Escrow Account;

(2) issue letters of credit for the purchase of humanitarian goods under the OFFP;

(3) confirm letters of credit issued by banks retained by buyers of oil under the OFFP, and

(4) conform its conduct to Resolution 986, the agreement between the Former Hussein Regime and the UN, and the rules and procedures for review and approval of transactions under the Programme.

The Banking Agreement was signed by the Chief Executive Officer of BNPNY.

89.     BNPNY earned an estimated $142 million in fees for its services pursuant to the Banking Agreement.

90.     The Banking Agreement was a binding agreement and part of a humanitarian relief program intended to benefit the Republic of Iraq and the Iraqi people.   Indeed, the sole purpose of the Banking Agreement was to protect the interests of the Republic of Iraq and the Iraqi people from corrupt and wrongful intentions of the Former Hussein Regime.

91.     Over the course of the OFFP, BNPNY confirmed all of the letters of credit for the $64.2 billion in oil purchases under the Programme, the proceeds of which were deposited into the Escrow Account, and issued all of the letters of credit for the purchase of $34.5 billion in humanitarian goods, paid for out of the Escrow Account.

### *Issuing of Letters of Credit for Oil Purchasers – the Conflict of Interest*

92.     In addition to confirming letters of credit for oil purchases, the Banking Agreement also allowed BNP to issue letters of credit in behalf of the purchasers of oil.

93.     BNP availed itself of this opportunity and ultimately issued approximately 75% of all letters of credit for oil transactions during the course of the OFFP, which equated to the issuance of $45.7 billion in letters of credit to oil purchasers.

94.     BNP earned an estimated $30 million for issuing these letters of credit to oil purchasers.    In addition to the $30 million, BNP benefited from solidifying its business relationship with the oil purchasers, generally large companies.

95.     The financial opportunities to BNP from issuing letters of credit to oil purchasers, however, created the real and substantial possibility of a conflict of interest between BNPNY's duties as holder and manager of the Escrow Account and its duties to its other customers, the oil purchasers.

### *Agreements to Withhold Information from the United Nations*

96.     In many cases, purchases of oil under the OFFP were made through intermediaries and financed by larger, more established companies.  This was done for a variety of reasons, including that (a) the holder of the right to buy oil did not have the credit to finance the transaction and (b) to hide the payment of the illegal surcharges, or, in cases, both.

97.     The mere fact that an intermediary was involved in the oil transactions was a material fact, because the presence of an intermediary almost universally means that the seller is not getting full market value (the intermediary is getting a part of the gain).  For this reason, most large sellers of oil deal exclusively with the end users.

98.     In order to further the interests of its commercial customers, and therefore its own commercial interests, however, BNP agreed with many of its customers to hide the fact that they were financing purchase of oil under the OFFP by others.   For example, in May of 2001, BNP Geneva agreed with Vitol to keep its participation in a purchase nominally made by Al-Rasheed International Cooperation.  So, BNP Geneva failed to disclose Vitol's involvement to the UN and to BNPNY.

99.     BNP also cooperated in direct breaches of UN regulations governing the OFFP. For example, in 2001, BNP agreed with Glencore International AG ("Glencore") to hide Glencore's participation in a transaction nominally involving the Council for Trade and Economic Cooperation with Middle East and North Africa Countries ("ACTEC"), which had received an oil allocation jointly with "Russia – Communist Party."   Glencore wrote to BNP: "We repeat that Glencore International AG's name must not appear on any correspondence sent to third parties …. We remind you that there must be absolutely no mention of the name Glencore International AG."

100.     During this and similar transactions, BNP knew that misleading disclosures were being made to the UN to obtain approvals for the transaction, but agreed to participate in the violation.

101.     Moreover, BNP's own disclosures to the United Nations were false and misleading; they failed to disclose the real parties in interest.

102.     BNP also agreed with Glencore to include a term in the Letter of Credit issued in the name of ACTEC that the letter of credit was not assignable and not transferrable.   This condition was required by the UN regulations.  BNP, however, knew that Glencore's concealed

participation was essentially a transfer of the letter of credit, and therefore, that the regulations and their purposes were being violated.

103.    The ACTEC/Glencore transaction, alone, accounted for more than $1.1 million in illicit surcharges being paid to the Former Hussein Regime, money that should have went for humanitarian goods.

### Breach of the Banking Agreement

104.    As noted above, the Banking Agreement required BNPNY to comply with Resolution 986 and the other UN policies and regulations governing the OFFP.

105.    In particular, BNPNY was required to maintain transparency of the transactions in which it participated. Resolution 986 required in part: "Approval by the Committee established by resolution 661 (1990), in order to ensure the transparency of each transaction and its conformity with the other provisions of this resolution ..., including details of the purchase price at fair market value ...."

106.    The Banking Agreement stated that the "procedures and requirements set forth in SCR 986, the Memorandum of Understanding and the 661 Committee Procedures constitute essential and fundamental terms and conditions of this Agreement."

107.    The Banking Agreement also stated that BNPNY "undertakes to provided the Services ... with respect to Letters of Credit ... in accordance with SCR 986, the Memorandum of Understanding, the 661 Committee Procedures ...."

108.    BNPNY breached the Banking Agreement by, among other things, concealing material information from its disclosures to the UN, including the actual purchasers of oil, that surcharges were being paid, and that intermediaries were profiting from the humanitarian

Programme. BNP's agreement to keep material information from the UN violated its contractual duties.

109. As concluded in the UN Report, "the failure to disclose the name of the third-party purchasers of oil resulted in a lack of transparency between BNP offices, as well as between BNP and the United Nations. This was contrary to the obligations to the United Nations imposed on the Bank by the Banking Agreement." UN Report at 443.

### BNP's Participation in the Illicit Surcharges

110. BNP was involved in the transfer of approximately $10 million in illicit surcharges paid to the Former Hussein Regime.

111. BNP failed to adequately review those transactions and either knew or should have known that the transfers were wrongful.

### BNPNY's Fiduciary Duties

112. As holder and manager of the Escrow Account and pursuant to the terms of the Banking Agreement, BNPNY owed fiduciary duties to the Republic of Iraq and the Iraqi people.

113. BNPNY also owed fiduciary duties to the United Nations. The Republic of Iraq and the Iraqi people were third-party beneficiaries of the duties owed the United Nations, because the duties were created by a binding contract expressly intended to benefit directly and principally the Republic of Iraq and the Iraqi people.

114. As described above, BNPNY breached those duties when it allowed its conflicts of interest to subvert its duties to the Republic of Iraq and when it placed the aims, including the illicit aims, of its commercial customers over those of the Republic of Iraq.

115. As manager of the UN OFFP Escrow Account, BNPNY had the fiduciary duty to disclose all material information in its possession to the United Nations. This duty included the

obligation to disclose information about any known fraud or other illicit conduct being committed in relation to the OFFP.

116.    In brief, BNPNY had the duty to communicate to the United Nations all knowledge acquired in the course of its agency with respect to material facts that might have affected the United Nations' decision as to any transaction under the Programme.

117.    BNPNY knew that the United Nations and, to an even greater extent, the Iraqi people were relying on BNPNY's protection from illicit conduct of the Former Hussein Regime.

118.    BNPNY wholly failed to fulfill its duty to disclose.   In particular, BNP's agreements with its commercial customers to keep information from the UN violated BNPNY's disclosure duties.  The other BNP Defendants aided and participated in those breaches.

119.    BNPNY has denied that it owed any fiduciary duties to the Republic of Iraq or the Iraqi people.

120.    Until the publishing of the UN Report in October of 2005, the Republic of Iraq and the Iraqi people had no way of knowing that BNPNY rejected its fiduciary duties under the Banking Agreement and that it had breached its fiduciary duties.

### *Chevron's Participation and Inducement of BNPNY's Breaches of Fiduciary Duty*

121.    In February 2001, the Former Hussein Regime granted a concession to lift two million barrels of Iraqi oil to Bulf Drilling and Oil Servicii ("Bulf").

122.    Bulf, through an agent, turned to Texaco Inc. (now Chevron, so hereinafter referred to as Chevron) to finance the purchase.

123.    In March of 2001, Chevron requested that BNPNY open a line of credit for the purchase of one million barrels of oil.  The letter of credit, however, was to be in the name of

Bulf, despite the fact that Chevron had been granted the full authority to move and dispose of the oil.

124.    This transfer of authority to Chevron violated the provisions of Programme's regulations, which prohibited transfers of oil allocations absent UN approval.

125.    BNP opened two letters of credit for Chevron, in March and April of 2001.  In both cases, Chevron requested that BNP issue the letters of credit Bulf's name alone.

126.    BNP and Chevron knew those letters of credit were being forwarded to the United Nations, so that the underlying transaction could be approved and knew that those letters of credit were materially misleading.  The United Nations was never advised of Chevron's role.

127.    From February 8, 2001 and November 25, 2001, these transactions involved the payment of $490,790 in illicit surcharges being paid to the Former Hussein Regime and therefore reduced the humanitarian assistance to the Republic of Iraq

### *Knowledge of the Defendants*

128.    The Defendants knew or consciously avoided knowing that the after-sales-fee and inland transportation fees were being paid to representatives of the Former Hussein Regime and were therefore illicit.  All transportation with Iraq was supplied and controlled by the Former Hussein Regime.  The costs were uniformly added to the contract price, and were uniform despite the nature of the goods to be transported or the ultimate destination.

129.    The Defendants' knowledge is also demonstrated by the efforts made to disguise the payments, including the use of accounts in the names of individuals (usually an official of the Former Hussein Regime appointed by Saddam Hussein) and front companies and the misleading descriptions of the payments in the contracts presented for UN approval.  If the payments had not been illicit, these subterfuges would not have been necessary.

*Conspiracy*

130.    The Defendants were informed by the Iraqi Regime that the illicit payments were a requirement of doing business with the Regime under the OFFP.

131.    The Defendants were therefore put to a stark choice – agree to enter into an illegal and fraudulent conspiracy to divert humanitarian funds from the UN OFFP Escrow Account (and thus the Iraqi people) or forego the opportunity to profit from sales under the Programme.

132.    All of the Defendants chose to join the conspiracy.

133.    Since the Defendants knew that the fees were a necessary part of participating in the OFFP, they also had to understand that the scope of the conspiracy went beyond their individual circumstance and probably encompassed all aspects of the OFFP.  In other words, although the Defendants might not know the entire scope of the conspiracy, they knew they were assisting (for profit) in the corruption of a Program that was intended to benefit the Iraqi people.

134.    The Defendants are therefore responsible for the losses they helped inflict.

135.    The Defendants knew or were reckless in not knowing that the conspiracy encompassed all aspects of the OFFP.

136.    At a minimum, the Defendants who paid kickbacks knew of the conspiracy to extract those payments, and the Defendants who paid surcharges knew of that conspiracy.

137.    BNPNY and Chevron conspired to conceal Chevron's participation in the surcharge scheme.

138.    BNPNY and Vitol conspired to conceal Vitol's participation in the  scheme.

139.    The individual defendant groups (e.g., the Volvo Defendants) conspired together.

*Damages*

40.    The conspiracy to corrupt the OFFP had serious consequences for the Republic of Iraq and the Iraqi people.

**Financial damages from the kickback scheme**

141.    By the Spring of 2003, the Former Hussein Regime, with the assistance of the defendants and others like them, had siphoned off more than $1 billion from the UN OFFP Escrow Account through the use of the "after-sale-fee."   Another $500 million was diverted under the transportation fee scheme, bringing the total to more than $1.5 billion diverted from its intended use to purchase humanitarian goods.

142.    The delivery of substandard goods cost an estimated $7 billion.

143.    Another $1.9 billion in goods were diverted to other purposes.

144.    Thus, the kickback scheme directly deprived the Iraqi people of more than $10 billion in necessary food, medicine and other humanitarian goods that should have been paid from the UN OFFP Escrow Account.

**Financial damages from the oil surcharge**

145.    Over the course of the OFFP, the Former Hussein Regime diverted approximately $228.8 million from the surcharges.   That entire sum was diverted from the Iraqi people.

146.    The corruption of the system and the necessary use of middlemen (in part to hide the payments of surcharges but also to serve the Former Hussein Regime's political ends) meant that profits were being garnered by individuals and entities that were providing no real benefit to the transaction.   Given the surreptitious and illegal nature of the transactions, those unnecessary profits were also exaggerated, all of which directly reduced the funds available to purchase humanitarian goods.

147.   To pay all of the unnecessary participants and illegal payments, the Former Hussein Regime had to sell its oil at below market rates. This fact is demonstrated by the fact that following the UN's adoption, in October 2001, of "retroactive pricing" of Iraqi crude – which set the price for oil at the time it was lifted – the  surcharge scheme quickly diminished and eventually disappeared, because a fair market price made it impossible the excessive profits needed to keep the conspiracy active.

### Non-financial damage

148.   The greatest damage to the Iraqi people, however, was not this wholesale theft, but the loss of the benefits of the humanitarian goods themselves. The OFFP was designed to provide critically needed food, medicine and other goods to Iraqi people. The loss of those goods in those trying times was far more costly than merely financial loss.

### Damage to the UN Sanctions

149.   The Defendants' facilitation of the corruption of the OFFP also severely damaged the United Nations' ability to use economic sanctions as a nonviolent means of inducing change in tyrannical regimes. The Defendants' willingness to mislead the United Nations and violate the rules of the OFFP eviscerated the effectiveness of the sanctions Programme and allowed the Former Hussein Regime to stay in power.

150.   While perhaps not calculable as a direct damage, the weakening of the UN sanctions should at least be considered in the imposition of punitive damages.

*Payments by the Individual Defendants*

151.    The ABB Defendants (ABB AG, ABB Automation, ABB Elektric Sanayi  ABB Industrie AC Machines, ABB Industrie Champagne, ABB Near East Trading Ltd., and ABB Solyvent-Ventec) paid at least $717,000 in illicit kickbacks in order to sell more than $4,839,000 in goods under the OFFP.

152.    ABB AG paid at least 3,865 in illicit kickbacks in order to sell about $31,000 in goods.

153.    ABB Automation paid at least $10,000 in illicit kickbacks in order to sell about $113,000 in goods.

154.    ABB Elektric Sanayi paid at least $159,797 in illicit kickbacks in order to sell about $1,832,874 in goods.

155.    ABB Industrie AC Machines paid at least $43,234 in illicit kickbacks in order to sell about $489,000 in goods.

156.    ABB Industrie Champagne paid about $112,000 in illicit kickbacks in order to sell about $1,230,000 in goods.

157.    ABB Near East Trading Ltd. paid at least $309,365 in illicit kickbacks in order to sell more than $3.3 million in goods.

158.    ABB Solyvent-Ventec paid about $80,000 in illicit kickbacks in order to sell about $835,000 in goods.

159.    Together, the AGCO Defendants (AGCO Denmark, AGCO S.A., and Valtra do Brazil) paid more than $5 million in illicit kickbacks in order to sell more than $75 million in goods under the OFFP.

160.    AGCO Denmark A/S paid at least $1,279,854 in illicit kickbacks in order to sell more than $15 million.

161.    AGCO S.A. paid at least $4,648,184 in illicit kickbacks in order to sell more than $57 million in sales of agricultural machinery.

162.    Valtra do Brazil S.A. paid at least $181,316 in illicit kickbacks in order to sell more than $3 million in sales of tractors and spare parts.

163.    Air Liquide paid at least $34,272 in illicit kickbacks in order to sell about $370,000 in goods under the OFFP.

164.    Together, the AkzoNobel Defendants (Organon and Intervet) paid approximately $279,491 in illicit kickbacks in order to sell about $2.8 million in goods under the OFFP.

165.    Organon paid $240,750 in illicit kickbacks in order to sell $2 million in goods.

166.    Intervet paid $38,741 in illicit kickbacks in order to sell $815,000 in goods.

167.    Astra Zeneca AB paid about $162,571 in illicit kickbacks in order to sell about $1,788,000 in medicine under the OFFP.

168.    Mais Co. for Medical Products is part of the AstraZeneca group of companies. It admitted to the Independent Inquiry Committee that it made illicit payments. Mais Co. for Medical Products paid at least $231,737 in order to sell more than $2.4 million in medicine under the OFFP.

169.    Atlas Copco Airpower N.V. paid more than $1.3 million in illicit kickbacks in order to sell more than $15.6 million in goods.

170.    AWB was the largest provider of humanitarian goods under the OFFP. From 1997 to 2003, AWB sold a total of $6.8 million tons of wheat for more than $2.3 billion in payments from the UN OFFP Escrow Account.

171.    AWB was also paid the highest amounts of kickbacks to the Former Hussein Regime, totaling more than $221.7 million in kickbacks, in order to make those sales.

172.    AWB's participation in the OFFP has been extensively studied and reviewed by both the United Nations Committee and by the Australian Government (Report of the Inquiry into certain Australian companies in relation to the UN OFFPme (November 2006)).    These reports are incorporated by reference.

173.    Together, the B. Braun Defendants (Aesculap  AG and KG, Aesculap Motric S.A., Surgical Instruments SDN, B. Braun Medical, B. Braun Melsungen A.G., and B. Braun Medical Industries SDN BHD) paid at least $3.25 million in illicit kickbacks in order to sell more than $40 million in goods under the OFFP.

174.    Aesculap AG and KG paid about $265,000 in illicit kickbacks in order to sell about $2.9 million in goods under the OFFP.

175.    Aesculap Motric S.A. paid about $288,250 in illicit kickbacks in order to sell about $3.17 million in goods under the OFFP.

176.    Aesculap Surgical Instruments SDN paid at least $733,504 in illicit kickbacks in order to sell more than $11 million in goods under the OFFP and.

177.    B. Braun Medical France paid $1.3 million in illicit kickbacks in order to sell more than $14 million in goods under the OFFP.

178.    B. Braun Melsungen A.G. paid at least $569,750 in illicit kickbacks in order to sell about $6.5 million in goods under the OFFP.

179.    B. Braun Medical Industries SDN BHD paid at least $99,254 in illicit kickbacks in order to sell about $2.4 million in goods under the OFFP.

180.    Boston Scientific S.A. paid at least $28,717 in illicit kickbacks in order to sell about $315,911 in goods under the OFFP.

181.    Buhler paid $3,375,917 in illicit kickbacks in order to sell more than $38 million in goods under the OFFP.

182.    Daewoo International Corp. paid at least $230,533 in illicit kickbacks in order to sell about $2,353,000 in goods under the OFFP.

183.    DaimlerChrysler paid at least DM 13,589 in illicit kickbacks in order to sell about DM 135,895 under the OFFP.

184.    DaimlerChrysler put its agreement to pay the kickbacks in a written contract, stating: "DaimlerChrysler AG undertakes to pay to the Oil Products Distribution Company a sum of DM 13.589,50 equivalent to 10% of the total amount of the DM 135.895 …."

185.    Dow Agrosciences paid at least $127,999 in illicit kickbacks in order to sell about $1 million in pesticides, herbicides and insecticides.

186.    Eastman Kodak, S.A. paid at least $16,713 in illicit kickbacks in order to sell about $183,854 in medical supplies under the OFFP.

187.    Ebewe paid at least $145,897 in illicit kickbacks to obtain sales of about $1.2 million in medicine under the OFFP.

188.    Eli-Lilly Export S.A. paid at least $343,191 in illicit kickbacks to sell more than $3 million in medical supplies.

189.    Evapco (Austria) paid about $827,478 in illicit kickbacks in order to sell more than $9 million in oil production equipment. Evapco also paid an unknown amount of kickbacks disguised as inland transportation costs.

190.    Evapco Europe paid about $8,000 in illicit kickbacks in order to sell about $92,000 in goods under the OFFP.

191.    Fiat Avio paid at least $79,962 in illicit kickbacks, but the amount is believed to be far higher. Fiat Avio made those payments in order to obtain contracts of more than $11.5 million in sales.

192.    Flowserve Pompes paid approximately $604,651 in kickbacks in connection with fifteen contracts.

193.    Flowserve B.V. paid $41,836 in kickbacks on one contract for the supply of water pump spare parts.

194.    Together, the GlaxoSmithKline Defendants paid about $2 million in illicit surcharges in order to sell almost $22 million of medicine under the OFFP.

195.    GlaxoSmithKline Walls House paid at least $834,390 in illicit surcharges in order to sell more than $9 million of medicine under the OFFP.

196.    GlaxoSmithKline Egypt SAE paid about $54,000 in illicit surcharges in order to sell about $600,000 of medicine under the OFFP.

197.    Glaxo Wellcome Export Ltd. paid at least $257,596 in illicit surcharges to sell more than $2.8 million in medicine under the OFFP.

198.    Glaxo Wellcome SA (South Africa) (PRY) Ltd. paid about $20,000 in illicit surcharges to sell about $220,000 in medical supplies.

199.    Smithkline Beecham International paid at least $834,390 in illicit surcharges in order to sell more than $9.1 million of medicine under the OFFP.

200.    In total, Ingersoll-Rand Defendants (described below) directly and indirectly made kickbacks of approximately $963,148 and authorized additional payments of $544,697.

201.    Ingersoll-Rand's German subsidiary ABG entered into a total of six contracts involving ASSF payments. The first two of these were contracts for the sale of approximately $3.2 million in road construction equipment. In late November 2000, as the agreements were being negotiated, an ABG Sales Manager met with officials of the Former Hussein Regime in Baghdad, where he was given revised contracts prepared by the Regime.

202.    The revisions included 10% price markups to be kicked back in cash to the Former Hussein Regime. The kickback totaled $292,578.

203.    Ingersoll-Rand's Italian subsidiary, I-R Italiana (part of the Ingersoll-Rand Defendants), paid a total of $473,302 in kickbacks on four contracts.

204.    I-R Italiana signed at least two side letters committing to the demanded kickbacks. One of the side letters explicitly acknowledges that the fictitious purchase order description used to conceal the kickback did not represent an actual performance obligation on I-R Italiana's part: "the item … piping, installation and commissioning, has been added only to pay the client, Baiji Refinery, the amount of [$181,032], and [I-R Italiana] is not obliged to meet this type of requirement."

205.    Ingersoll-Rand's Belgian subsidiary, I-R Benelux (part of the Ingersoll-Rand Defendants), paid a kickback of $260,787.

206.    Dresser International Group (part of the Ingersoll-Rand Defendants) paid at least $117,140 in illicit kickbacks, but the amount is believed to be higher. The kickbacks were paid to sell about $800,000 in oilfield equipment.

207.    Ingersoll-Dresser Pompes (part of the Ingersoll-Rand Defendants) paid at least $23,117 in illicit kickbacks in order to gain contracts to sell more than $3 million in goods. The amount of kickbacks is believed to be higher.

208.     The Janssen/Cilag Defendants paid at least $857,000 in illicit kickbacks in order to sell almost $10 million of medicine under the OFFP.

209.     Cilag paid at least $509,092 in illicit surcharges in order to sell more than $6 million of medicine under the OFFP.

210.     Janssen Pharmaceutical paid at least $348,295 in illicit surcharges in order to sell about $3.75 million in medicine.

211.     Kia Motors paid at least $695,424 in illicit kickbacks to sell about $8 million in buses under the OFFP.

212.     Liebherr France paid $1,950,503 in illicit kickbacks to sell more than $20 million in goods under the OFFP.

213.     Liebherr Export Aggeneral (Switzerland) paid $918,258 in illicit kickbacks to sell more than $10 million in goods under the OFFP.

214.     Serono Pharma International paid at least $859,001 in illicit kickbacks to sell about $10 million in medical supplies under the OFFP.

215.     Merial paid at least $124,561 in illicit kickbacks to sell about $1.5 million in veterinary medical supplies under the Programme.

216.     Novo Nordisk paid at least $1,437,946 in illicit kickbacks in order to sell more than $16 million in medicine under the OFFP.

217.     Pauwels International N.V. paid more than $1 million to obtain more than $11 million in sales under the OFFP.

218.     Railtech International paid at least $135,583 in illicit kickbacks in order to obtain about $1,387,000 in sales under the Programme.

219.    F.Hoffman la Roche paid at least $296,225 in illicit kickbacks in order to sell about $3.4 million worth of medicine under the OFFP.

220.    Roche Diagnostics GMBH paid at least $184,618 in order to sell about $1.7 million in medical equipment under the OFFP.

221.    Rohm and Haas France, S.A. paid about $64,000 in illicit kickbacks in order to sell about $700,000 in chemicals under the OFFP.

222.    Secalt, S.A. paid at least $351,522 in illicit kickbacks in order to sell more than $4 million in goods under the Programme.

223.    Together the Siemens Defendants (France, Turkey, and Osram) paid at least $1.5 million in illegal kickbacks.

224.    Siemens-France paid at least $321,256 in kickbacks.

225.    Siemens-Turkey obtained 20 contracts under the OFFP and agreed to pay more than $6.1 million in kickbacks to obtain them.  At least, $1.2 million of that amount was actually paid, and if the process worked normally, all $6.1 million was paid.

226.    Siemens-Osram paid approximately $85,673 in kickbacks in connection with six contracts under the OFFP.  More may have been paid in the form of inland transportation fees.

227.    The Medical Solution division of Siemens AG also paid small amounts in kickbacks.

228.    Solar Turbines Europe, S.A. paid at least $510,056 in illicit kickbacks in order to sell more than $4 million in goods under the OFFP.

229.    St. Jude paid at least $642,983 in illicit kickbacks denominated as ASSF's in order to sell more than $7.6 million in medical supplies, including heart valves, under the OFFP.

230. Sulzer Buckhardt Engineering Works Ltd. paid at least $13,130 in illicit kickbacks in order to sell $155,358 in goods under the OFFP.

231. Sulzer Pumpen Deutschland GMBH paid at least $236,354 in illicit kickbacks in order to sell more than $3 million in goods under the OFFP.

232. Sulzer Turbo Ltd. paid at least $256,760 in illicit kickbacks in order to sell about $3 million in goods under the OFFP.

233. DB Guinard Pumps and DB Transmissions France (the Textron Defendants) made approximately $650,539 in kickbacks in connection with the sale of humanitarian goods under the OFFP.

234. The profits on these contracts were $1,936,926.

235. DB Transmissions France made more than $531,000 in illicit ASSF payments through the consultant in connection with nine of its ten Programme contracts.

236. DB Transmissions France authorized, but did not pay, an additional $35,000 in connection with a tenth sales contract.

237. Together, the Volvo Defendants (Volvo Construction and Renault) paid approximately $6,206,331 in kickback payments to the Former Hussein Regime.

238. Volvo Construction paid more than $300,000 to sell approximately $11.8 million of equipment under the OFFP.  This number is believed to be higher.

239. Renault sold more than $77 million in tractors, equipments and spare parts under the Programme and paid nearly $7 million in kickbacks.

240. In July of 2004, the Weir Defendants announced the result of an internal investigation that uncovered "payments made in addition to normal commissions were made" in

connection with Weir's contracts.  The Weir Defendants concede that its contracts under the OFFP were inflated by a total of £4.2 million.

241.    The UN Report concludes that the Weir Defendants "knowingly paid kickbacks in connection with sixteen of its contracts under the Programme [calculated to total about] $4.5 million in illicit payments to the Iraqi regime."

242.    Woodhouse International paid at least $593,000 in illicit kickbacks to sell more than $15 million in oil equipment under the OFFP.

243.    York FXE paid approximately $647,110 in illicit kickbacks.

### Claims for Relief

244.    Based on the foregoing facts, incorporated by reference, the Republic of Iraq raises the following claims for relief:

### First Claim for Relief – RICO Section 1963(c)

245.    The conduct described above violates the provisions of 18 U.S.C. § 1962(c).

246.    The enterprise was the OFFP or, alternatively, the association in fact enterprise comprised of the Programme, the Former Hussein Regime, the Defendants, and the other participants in the corruption of the Programme.  The enterprise had a distinct purpose and structure.

247.    The systematic bribery by the Defendants is a "racketeering activity."  18 U.S.C. § 1961(1)("racketeering activity" means (A) any act or threat involving ... bribery ....").

248.    The racketeering activities also include at least mail and wire fraud (18 U.S.C. §§ 1341 and 1343), violations of the Travel Act (18 U.S.C. § 1952), and money laundering (18 U.S.C. §§ 1956 and 1957).

249.    The Defendants' scheme necessarily involved multiple violations of the mail and wire fraud statutes, because, as explained above, the scheme could not have functioned without phones, faxes, e-mails and wire transfers.

250.    The Defendants violated the Travel Act by traveling in interstate or foreign commerce and by using facilities of interstate and foreign commerce (including, without limitation, mail, wire, e-mail, and courier services) with the intent to promote, manage, establish, carry on, and facilitate the promotion of bribery in violation of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-2, and the New York commercial bribery statute, N.Y. Penal Law §§ 180.00 and 180.05.

251.    The Defendants committed money laundering each time they received payment from the UN OFFP Escrow Account that included sums covering an illegal kickback.   The Money Laundering Control Act, 18 U.S.C. §§ 1956, 1957, prohibits the use or movement through the United States of proceeds of certain unlawful activity with the intent to promote the unlawful activity.   Unlawful activity includes, among other matters, violations of the Foreign Corrupt Practices Act, which encompasses the kickback scheme.

252.    The Defendants' racketeering activity constituted a pattern in that the conduct had a central purpose of diverting funds from their intended humanitarian purposes to the Former Hussein Regime and the Defendants.   The racketeering acts were also focused and organized by the processes of the OFFP: the Defendants all had to agree to make the illicit payments with the Former Hussein Regime, mislead the UN into approving payments from the UN OFFP Escrow Account, and then make and conceal the improper payments.

253.    At the insistence of the Former Hussein Regime and the acquiescence of the Defendants, this pattern became the regular means of conducting the OFFP.

254.    The pattern of racketeering activity began shortly after the creation of the OFFP and continued uninterrupted until the Programme's end, following the United State's invasion of Iraq.

255.    As set forth above, The Defendants intentionally became associated with the OFFP, the enterprise, which was engaged in interstate and foreign commerce, to participate, directly and indirectly, in the conduct of the Oil-for-Food's affairs through a pattern of racketeering activity.

256.    As described above, each defendant committed at least two acts of racketeering.

*Second Claim for Relief – RICO 1963(d)*

257.    The Defendants conspired to make the violations described immediately above.

258.    The Defendants also agreed to the unlawful purpose of the conspiracy – to divert funds from the humanitarian purposes of the Programme.

259.    Each of the Defendants knew of the existence of OFFP, which acted in interstate commerce. Each Defendant knowingly joined the conspiracy to participate in the conduct of the affairs of OFFP in a illegal and illicit manner. Each Defendant participated in the conduct of the affairs of the OFFP. Each Defendant did so through a pattern of racketeering by agreeing to commit, and in fact committing, at least two acts of mail or wire fraud, violations of the Travel Act, and/or money laundering.

*Third Claim for Relief – Section 2(c) of the Robinson Patman Act*

260.    The Defendants' conduct described above violates the prohibitions against commercial bribery of section 2(c) of the Robinson Patman Act. 15 U.S.C. § 13(c).

261.    The Defendants induced, and participated in, breaches of fiduciary duties owed by the officials of the Former Hussein Regime to the Republic of Iraq and to the Iraqi people. The

Defendants induced, and participated in, those breaches of duties by making, and agreeing to make, or actively concealing, illicit payments outside of the OFFP.

262.    The Republic of Iraq is entitled to treble its actual damages, attorney's fees, and all other relief provided for under federal law, including pursuant to 15 U.S.C. §§ 13(c) and 15(a).

**Fourth Claim for Relief – Fraud**

263.    The Defendants' material false statements to the United Nations were fraudulent. The Republic of Iraq and the Iraqi people were direct victims of that fraud.

264.    The Republic of Iraq and the people of Iraq are entitled to their actual damages and punitive or exemplary damages.

265.    The Defendants, including the BNP Defendants, conspired among themselves and with others (most notably with the Former Hussein Regime) to commit this fraud.

**Fifth Claim for Relief – Breach of Fiduciary Duty and Participation in, or Inducement of, Breach of Fiduciary Duty**

266.    This claim is raised against the BNP Defendants, Chevron, and Vitol.

267.    BNPNY breached its fiduciary duties to the Republic of Iraq and the Iraqi people.

268.    The various BNP entities participated in and induced the breaches of BNPNY's fiduciary duties.

269.    Chevron and Vitol separately participated in and induced BNPNY's breach of its fiduciary duties.

270.    The Republic of Iraq is entitled to forfeiture of the fees made by the BNPNY under the Banking Agreement (approximately $142 million), its actual damages, punitive damages, and any other relief to which it may be entitled.

271.   The other BNP Defendants, Chevron, and Vitol are jointly and severally liable for BNPNY's breaches of fiduciary duty.

### Sixth Claim for Relief (against the BNP Defendants) – Breach of Contract

272.   BNP breached the Banking Agreement, including without limitation, the incorporated provisions of Resolution 986.   BNP breached the Banking Agreement through negligence and intentional conduct.

273.   The Republic of Iraq, as a third party beneficiary of the contract, is entitled to recover its actual damages and all other relief to which it is entitled to under the law and the contract.

### Request for Equitable Remedies – Alter Ego Liability and Piercing the Corporate Veil

274.   The BNP Defendants utilized their corporate separateness as a means of justifying and perpetuating a fraud on the UN and a breach of their fiduciary duties.   The use of technical distinctions to avoid fiduciary duties violates the Principles of Equity, and therefore, the BNP Defendants should be considered as one entity and their corporate separateness ignored.

### Joint and Several Liability

275.   Having knowingly joined and participated in a conspiracy, the Defendants are jointly and severally liable with other members of the conspiracy.

distinctions to avoid fiduciary duties violates the Principles of Equity, and therefore, the BNP Defendants should be considered as one entity and their corporate separateness ignored.

### Joint and Several Liability

275.   Having knowingly joined and participated in a conspiracy, the Defendants are jointly and severally liable with other members of the conspiracy.

### Prayer for Relief

The Republic of Iraq prays for itself, its agencies and instrumentalities, and in parens patriae, for the people of Iraq that this Court award it all the relief to which it is entitled under law or equity.

Dated: June 27, 2008.

MANEY & PURRINGTON

By: _____
Mark Maney
(not yet admitted in District)
Roliff Purrington
(not yet admitted in District)
711 Louisiana, Suite 3100
Houston, Texas 77002
713.654.8001
713.654.8818

LAW OFFICES OF STEPHEN ALBRIGHT

By: _____
Stephen Albright (SA-4979)
368 Veterans Memorial Highway, 2nd Floor
Commack, New York 11725
(631) 864-4967 Telephone
(631) 864-4972 Facsimile

COUNSEL FOR THE REPUBLIC OF IRAQ