UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE REPUBLIC OF IRAQ, including as
PARENS PATRIAE on behalf of the
CITIZENS of the REPUBLIC OF IRAQ,

Plaintiff,

-against-

ABB AG; ABB AUTOMATION; ABB
ELEKTRIC SANAYI AS; ABB INDUSTRIE
AC MACHINES; ABB INDUSTRIE
CHAMPAGNE; ABB NEAR EAST
TRADING LTD.; ABB SOLYVENT-
VENTEC; AGCO DENMARK A/S; AGCO
S.A.; VALTRA DO BRAZIL; AIR LIQUIDE
ENGINEERING; AKZO NOBEL N.V.; N.V.
ORGANON; INTERVET INTERNATIONAL
B.V.; ASTRA ZENECA AB.; MAIS CO. FOR
MEDICAL PRODUCTS; ATLAS COPCO
AIRPOWER N.V.; ATLAS COPCO CMT;
AWB, LTD.; B. BRAUN MEDICAL FRANCE;
B. BRAUN MELSUNGEN A.G.; B. BRAUN
MEDICAL INDUSTRIES SDN BHD
(MALAYSIA); AESCULAP AG AND KG;
AESCULAP MOTRIC S.A.; AESCULAP
SURGICAL INSTRUMENTS SDN; BOSTON
SCIENTIFIC S.A.; BNP PARIBAS USA; BNP
PARIBAS (SUISSE) SA; BNP PARIBAS
HONG KONG; BNP PARIBAS PARIS; BNP
PARIBAS UK HOLDINGS LIMITED; BNP
PARIBAS LONDON BRANCH; BNP
PARIBAS (SUISSE) SA; BUHLER LTD.;
DAVID B. CHALMERS, JR.; CHEVRON
CORP.; DAEWOO INTERNATIONAL
CORP.; DAIMLER-CHRYSLER AG; DOW
AGROSCIENCES; EASTMAN KODAK S.A.;
EBEWE PHARMA GES M.B.H.; ELI-LILLY
EXPORT S.A.; EL PASO CORP.; EVAPCO
EUROPE S.R.L.; FIATAVIO; FLOWSERVE

*(caption cont'd)*

08 Civ. 5951 (GEL)

JURY TRIAL DEMANDED

THE REPUBLIC OF IRAQ'S
FIRST AMENDED COMPLAINT

The Republic of Iraq's First Amended Complaint – page i

CORP.; FLOWSERVE POMPES;
FLOWSERVE B.V.; GLAXOSMITHKLINE
WALLS HOUSE; GLAXOSMITHKLINE
EGYPT SAE; GLAXO WELLCOME
EXPORT LTD.; GLAXO WELLCOME SA
(SOUTH AFRICA) (PRY) LTD.;
SMITHKLINE BEECHAM
INTERNATIONAL; ABG ALLGEMEINE
BAUMASCHINEN-GESELLSCHAFTMBH
DRESSER INTERNATIONAL INGERSOLL-
RAND ITALIANA, SPA.; THERMO KING
IRELAND LIMITED; INGERSOLL-RAND
BENELUX, N.V.; INGERSOLL-RAND
WORLD TRADE LTD.; CILAG AG
INTERNATIONAL; JANSSEN
PHARMACEUTICAL; KIA MOTORS;
LIEBHERR EXPORT AG; LIEBHER
FRANCE, SA; SERONO PHARMA
INTERNATIONAL; MERIAL; NOVO
NORDISK; PAUWELS; RAILTECH
INTERNATIONAL; F. HOFFMAN LA
ROCHE; ROCHE DIAGNOSTICS GMBH;
ROHM AND HAAS FRANCE, S.A.; SECALT
S.A.; SIEMENS S.A.A. OF FRANCE;
SIEMENS SANAYI VE TICARET A.S. OF
TURKEY; OSRAM MIDDLE EAST FZE;
SOLAR TURBINES EUROPE; ST. JUDE
MEDICAL EXPORT GMBH; SULZER
BURCKHARDT ENGINEERING WORKS
LTD.; SULZER PUMPEN DEUTSCHLAND
GMBH; SULZER TURBO LTD.; TEXTRON,
INC.; UNION PUMP S.A.S., FORMERLY
KNOWN AS DAVID BROWN GUINARD
PUMPS S.A.S.; DAVID BROWN
TRANSMISSIONS OF FRANCE S.A.;
RENAULT TRUCKS SAS; RENAULT
AGRICULTURE & SONALIKA
INTERNATIONAL; RENAULT V.I.; VOLVO
CONSTRUCTION EQUIPMENT AB, A
SUCCESSOR COMPANY TO VOLVO
CONSTRUCTION EQUIPMENT
INTERNATIONAL; THE WEIR GROUP;

*(caption cont'd)*

OSCAR S. WYATT, JR.; VITOL., S.A.;
WOODHOUSE INTERNATIONAL; YORK
AIR CONDITIONING AND
REFRIGERATION FZE,

            Defendants.

# THE REPUBLIC OF IRAQ'S FIRST AMENDED COMPLAINT

BURFORD & MANEY PC
700 Louisiana, Suite 4600
Houston, Texas 77002
(713) 237-1111 Telephone
(713) 222-1475 Facsimile
Mark Maney (not yet admitted in District)
(mmaney@burfordmaney.com)
Roliff Purrington (not yet admitted in District)
(rpurr@burfordmaney.com)

BERNSTEIN LIEBHARD LLP
10 East 40th Street
NY, NY 10016
(212) 779-1414 Telephone
(631) 864-4972 Facsimile
Stanley Bernstein (bernstein@bernlieb.com)
Rebecca Katz (katz@bernlieb.com)
Christian Siebott (siebott@bernlieb.com)
Brian Lehman (lehman@bernlieb.com)

COUNSEL FOR THE REPUBLIC OF IRAQ

# *Table of Contents*

I.    Summary of Action ....................................................................................................... 1

II.   Jurisdiction and Venue ................................................................................................ 4

III.  Relevant Parties and Entities ...................................................................................... 4

    A.    The Plaintiff – The Republic of Iraq ................................................................ 4

    B.    The Defendants ................................................................................................ 5

           1.    The ABB Defendants ............................................................................ 5

           2.    The AGCO Defendants .......................................................................... 6

           3.    Air Liquide Engineering ........................................................................ 7

           4.    The Akzo Nobel Defendants ................................................................. 7

           5.    AstraZeneca AB .................................................................................... 8

           6.    The Atlas Copco Defendants ................................................................. 8

           7.    AWB, Ltd. ............................................................................................ 9

           8.    The B. Braun Defendants ...................................................................... 9

           9.    Boston Scientific S.A. ......................................................................... 10

           10.   The BNP Defendants .......................................................................... 10

           11.   Buhler Ltd. ......................................................................................... 12

           12.   David B. Chalmers, Jr. ........................................................................ 12

           13.   Chevron Corp., including as successor to Texaco Corp. .................... 12

           14.   Daewoo International Corp. ................................................................ 12

           15.   Daimler-Chrysler AG .......................................................................... 13

           16.   Dow AgroSciences SAS ...................................................................... 13

           17.   Eastman Kodak S.A. ........................................................................... 13

           18.   Ebewe Pharma Ges M.B.H. ................................................................ 13

           19.   Eli-Lilly Export S.A. ............................................................................ 14

20.    El Paso Corp. (successor to Coastal Corp.) ............................................14

21.    The Evapco Defendants ....................................................................14

22.    FiatAvio ....................................................................................15

23.    The Flowserve Defendants................................................................15

24.    The GSK Defendants......................................................................16

25.    The Ingersoll-Rand Defendants.........................................................17

26.    The Johnson & Johnson Defendants....................................................18

27.    Kia Motors Corp. .........................................................................19

28.    The Liebherr Defendants.................................................................19

29.    The Merck Defendants....................................................................19

30.    Novo Nordisk ..............................................................................20

31.    Pauwels International N.V................................................................20

32.    Railtech International SA .................................................................21

33.    The Roche Defendants ...................................................................21

34.    Rohm and Haas France S.A.S. ..........................................................21

35.    Secalt S.A...................................................................................22

36.    The Siemens Defendants .................................................................22

37.    Solar Turbines Europe S.A................................................................23

38.    St. Jude Medical Export GmbH .........................................................23

39.    The Sulzer Defendants....................................................................23

40.    The Textron Defendants .................................................................24

41.    Vitol, S.A....................................................................................25

42.    The Volvo Defendants....................................................................25

43.    The Weir Group ...........................................................................26

44.    Woodhouse International LLC............................................................26

45.  Oscar S. Wyatt, Jr. .................................................................26

46.  York Air Conditioning and Refrigeration FZE ...................................26

C.  The United Nations, the Security Council, and the 661 Committee ...........27

D.  The Hussein Regime ........................................................................28

1.  The Hussein Regime was not a legitimate government......................28

2.  The wrongful actions of the Hussein Regime are established............29

3.  The United States declares the Hussein Regime a State Sponsor of Terrorism and seeks to depose the Regime......................30

4.  The United States terminates diplomatic relations with the Hussein Regime.............................................................................32

IV.  UN Sanctions and the Programme.....................................................................32

A.  The Invasion of Kuwait and UN Sanctions against the Hussein Regime ...................32

1.  The UN Security Council sanctions the Hussein Regime and forms a special committee (the 661 Committee) to run the Iraq Sanctions Program.......................................................32

2.  The United States adopts economic sanctions in support of the Iraq Sanctions Program. .................................................33

B.  The Suffering of the Iraqi People and the Need for Humanitarian Relief .................34

1.  In 1991, UN Missions to Iraq find extensive human suffering among the Iraqi population. ................................................34

2.  Security Council adopts Resolution 687 to allow the sale of food to Iraq. ..................................................................35

3.  To pressure the UN, the Hussein Regime for years refuses to agree to a humanitarian program. .............................................35

C.  The United Nations' Oil-for-Food Programme .............................................36

1.  The Security Council creates the Programme in Security Council Resolution 986. .......................................................36

2.  Following another year of negotiations and suffering, the Husssein Regime finally agrees to a Memorandum of Understanding to implement the Programme. .....................................37

|   |   | 3. | The UN establishes a UN Escrow Account to protect the interests of the Iraqi people. | 38 |

    D.    Interrelation of the Programme and the Iraq Sanctions Program ................................39

    E.    The Goal of the Hussein Regime – Undermine the Programme and the Iraq Sanctions Program ...................................................................................41

    F.    General Operation of the Programme ...........................................................42

        1.    The Programme was conducted in thirteen Phases. ...........................42

        2.    Distribution Plans were approved by the UN for each Phase. ..........43

        3.    The 661 Committee was tasked with administering the Programme. ...................................................................................45

        4.    Iraqi oil was supposed to be sold at the highest available price. ...................................................................................45

        5.    The Oil Purchasing Defendants had to agree to participate in the Programme subject to all Programme rules. ...................................46

        6.    The Vendor Defendants had to agree to participate in the Programme, subject to all Programme rules. .........................................47

        7.    Contract approval and payments required extensive use of the mails and wires. ...................................................................48

V.    Illicit Surcharges on Sales of Oil under the OFFP ...................................................52

    A.    The Hussein Regime's Control Over Choosing Oil Purchasers ...................................52

    B.    Oil Vouchers as Bribes .........................................................................53

    C.    The Hussein Regime's Demand for Kickbacks on Oil Sales. .................................54

        1.    The Hussein Regime demands surcharge payments on oil sales. ...................................................................................54

        2.    The Oil Purchasing Defendants knew the conspiracy extended to all oil sales under the Programme. ...................................55

        3.    The Oil Purchasing Defendants defrauded the UN regarding the surcharges. ...................................................................56

        4.    The Oil Purchasing Defendants defrauded the UN as to the OSP. ...................................................................................57

5.   The Oil Purchasing Defendants breached their contractual commitments. ........................................................................ 58

D.   Actions of the Individual Oil Purchasing Defendants ................................. 59

    1.   David B. Chalmers, Jr. admits to joining the conspiracy. .................. 59

        (a)   Chalmers' Guilty Plea ............................................................ 59

        (1)   Use of mails and wires ........................................................ 59

        (2)   Conspiracy ............................................................................ 60

        (b)   Additional Factual Background .............................................. 61

        (1)   UN Contract M/08/40 .......................................................... 61

        (2)   Chalmers Jump Starts the Scheme ...................................... 62

        (3)   Other Purchases through Allocation Holders ...................... 63

        (4)   Chalmers' Surcharges .......................................................... 63

    2.   Chevron admits to joining the conspiracy. ........................................ 65

        (a)   Chevron's Admissions ............................................................ 65

        (b)   Chevron's Knowledge ............................................................ 66

        (c)   Chevron's Purchases .............................................................. 66

        (d)   Chevron's Payment of Illegal Surcharges .............................. 67

    3.   El Paso admits to joining the conspiracy. .......................................... 70

        (a)   El Paso's Admissions .............................................................. 70

        (b)   Coastal .................................................................................... 71

        (c)   El Paso's Contracts and Knowledge ...................................... 72

        (d)   El Paso's Profits ...................................................................... 73

    4.   Vitol admits to joining the conspiracy. .............................................. 73

        (a)   Vitol's Guilty Plea .................................................................. 73

        (b)   Additional Allegations ............................................................ 74

    5.   Wyatt admits to joining the conspiracy. ............................................ 81

|   |   | (a) | Wyatt's Guilty Plea ...................................................................... 81 |
|   |   | (b) | Wyatt's Actions ............................................................................. 81 |
|   |   | (c) | Wyatt's Close Relationship with Saddam Hussein ................. 82 |
|   |   | (d) | Wyatt Agrees to Pay Surcharges in a "Bent" Manner ........... 84 |
|   |   | (e) | The Surcharge Payments on Wyatt's Contract M/08/72 ......................................................................... 84 |
|   |   | (f) | Programme Phases IX to XII .................................................... 86 |
|   |   | (g) | "Wyatt's Conduct was Shameless". ........................................ 89 |

VI.    Corruption of the Humanitarian Side of the Programme. ........................................... 90

     A.    The Hussein Regime's Control Over Humanitarian Purchases .................................... 90

     B.    The Inland Transportation Fees. ...................................................................... 90

         1.    The Hussein Regime imposed improper transportation fees to siphon money from the Programme. .................................... 90

         2.    The transportation fees were funded through the UN Escrow Account. ........................................................................ 91

         3.    Payment of the transportation fees defrauded the UN. ................. 92

         4.    The transportation fees were kickbacks. ................................. 93

         5.    The Hussein Regime collected about $530 million in "transportation fees." ....................................................... 94

     C.    The After-Sales-Service Fees (or "ASSFs") ............................................................ 95

         1.    The ASSF kickbacks were as high as 30%. .......................... 95

         2.    The ASSFs were kickbacks. ................................................. 96

         3.    The ASSFs required side agreements with the Hussein Regime, which were not disclosed to the UN and which required direct financial transactions with the Regime. ...................... 97

         4.    Some Vendor Defendants disguised their payments by using third parties. ..................................................................... 98

         5.    Paying the ASSFs defrauded the UN. ..................................... 99

6.    Some Vendor Defendants made affirmative
      misrepresentations to the UN. ...................................................102

      (a)    Woodhouse and Ingersoll-Rand ...........................................102

      (b)    The Atlas Copco Defendants ...................................................102

      (c)    AWB ...........................................................................................103

7.    The Defendants voluntarily joined the conspiracy to corrupt
      the Iraq Sanctions Program and the Programme. ...........................104

8.    The Hussein Regime collected more than $1 billion in ASSF
      kickbacks. ...........................................................................................105

9.    The Defendants made unconscionable profits. ..................................108

D.    Supply of Substandard Products .................................................................109

E.    Overpriced Goods ..........................................................................................111

F.    Diversion of Goods from Humanitarian Purposes ......................................112

G.    Resale of Humanitarian Goods ....................................................................113

H.    Judicial Admissions of Particular Vendor Defendants ................................113

      1.    The Akzo Nobel Defendants admit joining the conspiracy. ............113

            (a)    Akzo Nobel's Agreement with the United States DOJ .......113

            (b)    Knowledge of the Scope of the Conspiracy ...........................114

            (c)    Transactions by Intervet ..........................................................114

            (d)    Transactions by Organon ........................................................114

      2.    AWB admits joining the conspiracy. ..................................................115

      3.    The Flowserve Defendants admit joining the conspiracy. ................115

            (a)    The Flowserve Defendants' Agreement with the
                   United States DOJ ...................................................................115

            (b)    Flowserve Pompes ....................................................................116

            (c)    Flowserve B.V. ..........................................................................117

      4.    The Ingersoll-Rand Defendants admit joining the conspiracy. .........117

|   | (a) | The Ingersoll-Rand Defendants' Agreement with the United States DOJ................................................117 |
|---|---|---|
|   | (b) | I-R Italiana ......................................................119 |
|   | (c) | Thermo King Ireland .........................................119 |
|   | (d) | ABG................................................................120 |
|   | (e) | I-R Benelux.......................................................120 |
|   | (f) | Dresser International ..........................................121 |

5. Novo Nordisk admits joining the conspiracy. ...................121

6. The Siemens Defendants admit joining the conspiracy. ...................122

|   | (a) | The Siemens' Guilty Plea....................................122 |
|---|---|---|
|   | (b) | Siemens' History of Corrupt Payments....................122 |
|   | (c) | Siemens' Knowledge of, and Participation in, the Conspiracy ......................................................123 |
|   | (d) | Siemens France .................................................123 |
|   | (e) | Siemens Turkey.................................................123 |
|   | (f) | Siemens-Osram .................................................124 |

7. The Textron Defendants admit joining the conspiracy....................124

|   | (a) | The Textron Defendants' Agreement with the United States DOJ ....................................................124 |
|---|---|---|
|   | (b) | DB Guinard Pumps ............................................125 |
|   | (c) | DB France ........................................................125 |
|   | (d) | Textron's History of Corrupt Payments .................126 |

8. The Volvo Defendants admit joining the conspiracy.........................127

|   | (a) | The Volvo Defendants' Agreement with the United States DOJ ....................................................127 |
|---|---|---|
|   | (b) | Volvo Construction............................................128 |
|   | (c) | Renault Trucks ..................................................130 |

9.   The Weir Group admits joining the conspiracy. ................................131

10.  York admits joining the conspiracy. ..........................................131

     (a)   York's Agreement with the United States DOJ ..................131

     (b)   York's History of Corrupt Payments....................................133

I.   Kickbacks and Contracts of the Individual Vendor Defendants...............133

1.   The ABB Defendants paid at least $717,000 in illicit
     kickbacks. ....................................................................................133

     (a)   ABB AG .................................................................................133

     (b)   ABB Automation....................................................................133

     (c)   ABB Elektric Sanayi.............................................................134

     (d)   ABB Industrie AC Machines ...............................................134

     (e)   ABB Industrie Champagne ...................................................135

     (f)   ABB Near East Trading Ltd. ...............................................135

     (g)   ABB Solyvent-Ventec ...........................................................135

2.   The AGCO Defendants paid more than $5 million in
     kickbacks. ....................................................................................136

     (a)   AGCO Danmark....................................................................136

     (b)   AGCO S.A. .............................................................................136

     (c)   Valtra do Brazil ....................................................................137

3.   Air Liquide paid at least $34,272 in kickbacks. ..............................137

4.   The Akzo Nobel Defendants paid about $279,000 in
     kickbacks. ....................................................................................138

     (a)   Intervet..................................................................................138

     (b)   Organon.................................................................................138

5.   Astra Zeneca paid about $162,571 in kickbacks.................................138

6.   The Atlas Copco Defendants paid more than $1.3 million in
     kickbacks. ....................................................................................139

7.    AWB paid more than $221.7 million in kickbacks...............................140

8.    The B. Braun Defendants paid at least $3.25 million in
      kickbacks. .........................................................................................141

      (a)    Aesculap AG and KG.............................................................141

      (b)    Aesculap Motric S.A...............................................................142

      (c)    Aesculap Surgical Instruments SDN .......................................142

      (d)    B. Braun Medical France ........................................................143

      (e)    B. Braun Medical Industries SDN BHD ................................143

      (f)    B. Braun Melsungen A.G. ......................................................144

9.    Boston Scientific S.A. paid at least $28,717 in kickbacks.................144

10.   Buhler Ltd. paid at least $3,375,000 in kickbacks............................144

11.   Daewoo International Corp. paid at least $230,000 in
      kickbacks. .........................................................................................145

12.   Daimler paid at least $7,000 in kickbacks. ......................................146

13.   Dow AgroSciences paid at least $127,999 in kickbacks. ...................146

14.   Eastman Kodak paid about $17,000 in kickbacks.............................146

15.   Ebewe Pharma paid at least $145,897 in kickbacks. .........................147

16.   Eli-Lilly Export paid at least $343,191 in kickbacks. ........................147

17.   The Evapco Defendants paid more than $800,000 in
      kickbacks. .........................................................................................147

      (a)    Evapco (Austria)....................................................................148

      (b)    Evapco Europe......................................................................148

18.   FiatAvio paid at least $80,000 in kickbacks......................................148

19.   The Flowserve Defendants paid more than $645,000 in
      kickbacks. .........................................................................................149

      (a)    Flowserve Pompes ................................................................149

      (b)    Flowserve B.V........................................................................150

20.   The GSK Defendants paid about $2 million in kickbacks. ..............150

    (a)   GlaxoSmithKline Walls House.................................................150

    (b)   GlaxoSmithKline Egypt SAE...................................................151

    (c)   Glaxo Wellcome Export Ltd. .................................................151

    (d)   Glaxo Wellcome SA (South Africa) (PRY) Ltd. ..................151

    (e)   Smithkline Beecham International..........................................152

21.   The Ingersoll-Rand Defendants paid about $1.5 million in
kickbacks. ........................................................................................152

    (a)   ABG.........................................................................................152

    (b)   Dresser International ..............................................................153

    (c)   I-R Italiana ..............................................................................153

    (d)   Thermo King Ireland ..............................................................153

    (e)   Ingersoll-Rand Benelux ..........................................................153

    (f)   Ingersoll-Rand World Trade....................................................154

22.   The Johnson & Johnson Defendants paid about $857,000 in
kickbacks. ........................................................................................154

    (a)   Cilag........................................................................................154

    (b)   Janssen Pharmaceuticals ..........................................................154

23.   Kia Motors paid about $695,000 in kickbacks.....................................155

24.   The Liebherr Defendants paid more than $2.8 million in
kickbacks. ........................................................................................155

    (a)   Liebherr Export AG ................................................................155

    (b)   Liebherr France.......................................................................156

25.   The Merck Defendants paid about $1 million in kickbacks. ............156

    (a)   Serono Pharma International....................................................156

    (b)   Merial......................................................................................157

26.   Novo Nordisk paid about $1.4 million in kickbacks. .........................157

27.   Pauwels International N.V. paid more than $1 million in
      kickbacks. ...................................................................................158

28.   Railtech International paid at least $135,000 in kickbacks. ..............158

29.   The Roche Defendants paid at least $780,000 in kickbacks. ............159

      (a)   F. Hoffman La Roche ...........................................................159

      (b)   Roche Diagnostics GmbH ....................................................160

30.   Rohm and Haas France S.A. paid about $64,000 in kickbacks. .......160

31.   Secalt S.A. paid at least $351,522 in kickbacks....................................160

32.   The Siemens Defendants paid at least $1.5 million in
      kickbacks. ...................................................................................160

      (a)   Siemens-France .....................................................................161

      (b)   Siemens-Turkey......................................................................161

      (c)   Siemens-Osram ......................................................................162

33.   Solar Turbines Europe S.A. paid about $510,000 in kickbacks.......162

34.   St. Jude paid at least $642,983 in kickbacks..........................................163

35.   The Sulzer Defendants paid about $505,000 in kickbacks...............163

      (a)   Sulzer Burckhardt ..................................................................163

      (b)   Sulzer Pumpen ......................................................................164

      (c)   Sulzer Turbo Ltd. ...................................................................164

36.   The Textron Defendants paid about $650,539 in kickbacks. ...........164

      (a)   DB Guinard Pumps ...............................................................164

      (b)   DB France ..............................................................................165

37.   The Volvo Defendants.....................................................................165

      (a)   Renault Trucks.......................................................................165

      (b)   Renault A&S...........................................................................166

      (c)   Volvo Construction................................................................166

|       | 38. | The Weir Group paid about $4.5 million in kickbacks | 167 |

|       | 39. | Woodhouse paid at least $593,000 in kickbacks | 167 |

|       | 40. | York paid about $650,000 in kickbacks. | 168 |

VII.    Wrongful Actions of the Escrow Bank and its Affiliates........................168

A.      The Banking Agreement.........................................................168

1.      The Banking Agreement sets forth BNP's agreement to participate in the Programme. ...........................................169

2.      The Banking Agreement obligated BNP to enforce all Programme rules. .......................................................170

3.      BNP agreed to ensure that the Escrow Account would be managed according to all Programme rules. .......................170

4.      BNP's US license to deal with assets of a State Sponsor of Terrorism also restricted its ability to act outside Programme guidelines. ......................................................171

5.      The Banking Agreement required BNP to maintain transparency on all Programme transactions. ......................172

B.      Issuing of Letters of Credit for Oil Purchasers – the Conflict of Interest ..............174

C.      BNP's Entry into the Conspiracy to Withhold Information from the UN..............175

D.      Breach of the Banking Agreement.................................................178

E.      BNP's Participation in the Illicit Surcharges ...................................180

F.      BNP's Breach of its Fiduciary Duties.............................................180

G.      BNP's Participation in the Conspiracy to Corrupt the Programme ..........................181

H.      BNP's Earnings – More than $200 million ..................................182

VIII.   Conspiracy and Interrelation Among the Defendants .........................182

A.      The Defendants' Participation in the Programme..............................182

B.      The Conspiracy Among the Defendants and the Hussein Regime ..........................183

1.      The Oil Purchasing and Vendor Defendants agreed to join the conspiracy...................................................183

2.      BNP agreed to join the conspiracy.......................................184

3.   The Defendants understood the scope of the conspiracy. ..............184

4.   The Defendants also entered into separate conspiracies. ................185

5.   The Defendants are responsible for their alter egos. .........................186

IX.   Effect of the Defendants' Conduct.................................................................................187

A.   Financial Losses to the Escrow Account – at least $10 billion....................................187

1.   Proceeds from the sale of Iraq's oil were diverted from the
Programme.................................................................................187

2.   The amount paid for humanitarian purchases was inflated to
fund kickbacks. ..........................................................................188

3.   The diversions from the Escrow Account total at least $10
billion. ......................................................................................189

B.   Non-Financial Damage................................................................................189

1.   The money diverted to the Hussein Regime damaged the
Iraqi people and nation. ..............................................................189

2.   The loss of humanitarian supplies damaged the Iraqi people
and nation..................................................................................190

3.   The Defendants' corruption damaged the UN Sanctions.................192

X.   Claims for Relief.......................................................................................................192

A.   First Claim for Relief – RICO Section 1962(c)............................................192

1.   The Enterprise was the Programme.......................................................192

2.   The Defendants conducted or participated, directly or
indirectly, in the conduct of the Enterprise's affairs through
racketeering activity..........................................................................193

(a)   Mail and Wire Fraud (all Defendants) .....................................193

(b)   Money Laundering (all Defendants) .........................................193

(c)   The Travel Act (all Defendants)...............................................194

(d)   Bribery (all Defendants but BNP)............................................194

3.   The Defendants' racketeering activity formed a pattern. ...................195

B.   Second Claim for Relief – RICO 1962(d)....................................................195

C.     Third Claim for Relief – Fraud ............................................................... 196

D.     Fourth Claim for Relief – Civil Conspiracy to Commit Fraud ................................. 196

E.     Fifth Claim for Relief – Breach of Fiduciary Duty and Participation in, or Inducement of, Breach of Fiduciary Duty ................................................... 197

F.     Sixth Claim for Relief – Participation in, or Inducement of, Breach of Fiduciary Duty ........................................................................................ 198

G.     Seventh Claim for Relief -- Breach of Contract ............................................. 198

    1.     BNP breached the Banking Agreement ............................................... 198

    2.     The Vendor Defendants breached their contracts ................................. 199

    3.     The Oil Purchasing Defendants breached their contracts ....................... 199

    4.     The Republic of Iraq is entitled to rescission ....................................... 199

H.     Eighth Claim for Relief – Unjust Enrichment ............................................... 200

I.     Ninth Claim for Relief -- Section 2(c) of the Robinson Patman Act ......................... 200

J.     Tenth Claim for Relief -- Violations of the FCPA (against the Vendor and Oil Purchasing Defendants) ...................................................................... 201

XI.     Jury Demand ................................................................................... 201

XII.     Prayer for Relief ............................................................................. 202

The Republic of Iraq, in its sovereign capacity and, as parens patriae, on behalf of the people of Iraq, complains of the Defendants as follows:

## I.    Summary of Action

1.    The corruption of the United Nations Oil-for-Food Programme (the "Programme" or "OFFP") has been described as the largest financial fraud in human history, but its impact on the people of Iraq went far beyond financial loss. The corruption of the Programme affected the lives, security, and freedom of the Iraqi people.

2.    In brief, the Defendants and others like them conspired with Saddam Hussein and his representatives (the "Hussein Regime") to pervert a United Nations' humanitarian program from a means of aiding the Iraqi people into a tool of their continued domination and exploitation.

3.    The conspiracy diverted billions of dollars in cash, goods, and services from their humanitarian purposes to enrich the Defendants and to entrench the illicit power of the Hussein Regime.

4.    While the corruption was designed and instigated by the Hussein Regime, each Defendant willfully conspired with the Hussein Regime to reap the economic benefits of trading under the Programme. Without the Defendants' knowing participation, the Hussein Regime's corruption of the Programme would have been impossible and, without that corruption, the Hussein Regime's continued oppression of the Iraqi people would have faltered under the weight of the Iraq Sanctions Program.

5.    The nature and extent of the systematic fraud and corruption surrounding the Programme have been extensively studied and substantiated in numerous reports, most notably in the Report of the Independent Inquiry Committee into the United Nations Oil for Food Programme, "Manipulation of the Oil for Food Programme by the Iraqi Regime," October 27, 2005

The Republic of Iraq's First Amended Complaint – page 1

(the "UN Report"). The UN Report resulted from an extensive world-wide investigation conducted by a Committee headed by Paul A. Volcker (the "Volcker Committee"). Proceeds from the sale of Iraqi oil funded that investigation. The resulting UN Report is a detailed analysis of the scope and means of the conspiracy to manipulate the OFFP.

6.      Another significant report is that conducted by the Australian government, called the Report of the Inquiry into certain Australian companies in relation to the UN OFFP (November 2006)(the "Australian Report").

7.      From the perspective of the Hussein Regime, the main goal of the conspiracy was to undermine UN sanctions and the US laws prohibiting transactions with State Sponsors of Terrorism, which were aimed at denying Hussein the foreign currency he needed to maintain control over the Iraqi people.    With the Defendants' assistance, purchased with money designated for humanitarian aid, Hussein achieved that goal and remained in power until finally ousted by military force.

8.      The Defendants' goal was more straightforward. They wanted money. To collect that money, they conspired with the Hussein Regime to siphon billions of dollars in oil revenues from a UN humanitarian program. The Defendants' actions were directly contrary to the requirements and core purposes of the Programme, requirements that all of the Defendants had promised to follow when they agreed to be participants in the Programme.

9.      The lost oil revenues were directly translatable into lost food, medicine and other humanitarian goods and services that were supposed to alleviate the suffering of the Iraqi people in those trying times.

10.     The human suffering caused by the Defendants' conduct is staggering.

11.     The Defendants sold their allegiance to the Hussein Regime knowing that they were helping to divert humanitarian aid from a suffering population, knowing that they were providing

financial assistance to a declared State Sponsor of Terrorism and an oppressive tyrant over his own people, and knowing that they were violating their own direct commitments to the United Nations and to the Programme.

12.    In the words of the United States Attorney for the Southern District of New York in regard to the sentencing of Defendant Oscar Wyatt, Jr., the Defendants' choice was "breathtakingly immoral:"

> The OFFP was an idealistic program. It was designed to help the hungry and the sick, many of whom were children – and over the years in which it was in existence the OFFP directed billions of dollars in aid to needy Iraqis.

> At the same time as it sought to aid the vulnerable, the OFFP was structured to keep Iraq's oil wealth from being used by the Hussein regime. Saddam Hussein's actions as the Iraqi head of state were as appalling as they were widely known. Among other things: Saddam Hussein was a dictator who came to power in a vicious military coup; without provocation, Saddam Hussein's armies invaded and conquered Kuwait, and then fired missiles into civilian areas of Israeli cities; Saddam Hussein's armed forces used chemical weapons during March of 1988 to murder Iraqi civilians in their homes; and Saddam Hussein's armies invaded Iran on September 22, 1980 – the resulting Iran-Iraq war lasted approximately eight years and cost, on most published estimates, about a million lives.

> The list could go on, but the essential point is only this: In exploiting the OFFP as he did, Oscar Wyatt was making a choice that was, simply put, breathtakingly immoral. Wyatt helped to divert oil wealth that should have been used for the benefit of the hungry and the sick of Iraq into the hands of their oppressor – a dictator whose regime was known for its persistent violence toward its neighbors; its casual murderousness toward its own people; and its hostility toward the United States.

13.    Each of the Defendants was faced with the same clear choice: provide illegal support to the Hussein Regime or forego substantial profits.

14.    Each of the Defendants chose profits over morality and legality.

## II.    Jurisdiction and Venue

15.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), because this Complaint raises claims under federal statutes.

16.    This Court has venue pursuant to 18 U.S.C.A. § 1965(a) and (b) and 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the claims presented herein occurred in this District, including most notably, that the Programme was administered in New York, all of the funds of the Programme were supposed to pass through an escrow account in New York, and all contracts under the Programme were approved by the United Nations in New York.

## III.    Relevant Parties and Entities

### A.    The Plaintiff – The Republic of Iraq

17.    The Republic of Iraq brings this action in its own right and, as parens patriae, for the benefit of the Iraqi people.

18.    The Republic of Iraq includes its political subdivisions.

19.    Sovereignty was returned to the Iraqi people and to the Government of the Republic of Iraq on June 28, 2004.

20.    Even after the transfer of sovereignty, the process of building a functioning, constitutional, and democratic government has been arduous due to the unstable political and social conditions, including the ongoing violent conflict in Iraq.

21.    Transitional governments managed governmental services for nearly two years.  The Iraqi Interim Government assumed its duties on June 28, 2004.  It was replaced by the Iraqi Transitional Government on May 30, 2005.

22.    Against the backdrop of a persistent insurgency, it was not until October 15, 2005, that the Iraqi people were able to adopt a Constitution as the foundation for their permanent governmental institutions.

23.    Following the adoption of the Constitution, general elections were held in December 2005 to elect the permanent constitutional government.

24.    The constitutional government took over from the caretaker government (the Iraqi Transitional Government) on May 20, 2006.

## B.    *The Defendants*

25.    The Defendants are as follows:

### 1.    *The ABB Defendants*

26.    The ABB Defendants are as follows:

    (a)    ABB AG, also known as ABB Austria,

    (b)    ABB Automation SA,

    (c)    ABB Elektrik Sanayi A.Ş.,

    (d)    ABB Industrie AC Machines,

    (e)    ABB Industrie Champagne,

    (f)    ABB Near East Trading Ltd., and

    (g)    ABB Solyvent-Venteć SAS.

27.    The ABB Defendants are subsidiaries, divisions, branches and offices of the ABB Group.

28.    The ABB Group was formed through the 1988 merger of Asea AB and BBC Brown Boveri AG to create what is now ABB AG. A 1999 reconfiguration of the group established a single parent holding company, ABB Ltd., which is the ultimate parent company of the ABB Group.

The Republic of Iraq's First Amended Complaint – page 5

29.    ABB Ltd., a Swiss corporation, is one of the largest engineering and conglomerate companies in the world. ABB Ltd. has operations in around 100 countries and is comprised of 254 consolidated operating and holding subsidiaries.

30.    ABB AG, also known as ABB Austria, is a subsidiary of ABB Ltd. and the holding company of the group's Austrian operations. ABB AG manufactures power equipment.

31.    ABB Automation SA, located in Massy, France and part of ABB's Automation Division, manufactures and distributes electrical motors, generators and transformers.

32.    ABB Elektrik Sanayi A.Ş., located in Istanbul, Turkey, is a subsidiary of ABB Ltd.

33.    ABB Industrie AC Machines, located in Turgi, Switzerland is a division that distributes ABB products to various locations.

34.    ABB Industrie Champagne, located in Champagne-Sur-Seine, France, develops, manufactures and markets electrical machines for customers world-wide. The company is part of ABB's Automation Division.

35.    ABB Near East Trading Ltd. is an ABB Group subsidiary and part of the Automation Products division. It is based in Amman, Jordan.

36.    During the relevant periods, ABB Solyvent-Ventec SAS was an ABB Group subsidiary based in France engaged in the production of thermal, ventilation and refrigeration equipment. In 2001 the company was sold and changed its name to Fläkt Solyvent-Ventec.

37.    The ABB Defendants are part of the Vendor Defendants.

2.    *The AGCO Defendants*

38.    The AGCO Defendants are as follows:

(a)    AGCO Danmark A/S,

(b)    AGCO SA, and

(c)    Valtra do Brazil Ltda.

39.    The AGCO Defendants are all subsidiaries of AGCO Corp., a United States corporation and the third largest manufacturer and distributor of agricultural equipment in the world with operations in over 140 countries.

40.    AGCO Danmark A/S, located in Denmark, is a distributor of agricultural machinery.

41.    AGCO SA, located in France, is a distributor of agricultural machinery.

42.    Valtra do Brazil Ltda. manufactures agricultural tractors and has exports to more than 60 countries.

43.    The AGCO Defendants are part of the Vendor Defendants.

3.    *Air Liquide Engineering*

44.    Air Liquide Engineering, based in France, is a subdivision of Air Liquide, a French corporation with operations in more than 75 countries. Air Liquide Engineering is chiefly involved in the design, construction and installation of Air Liquide plants.

45.    Air Liquide Engineering is one of the Vendor Defendants.

4.    *The Akzo Nobel Defendants*

46.    The Akzo Nobel Defendants are as follows:

(a)    Akzo Nobel N.V.,

(b)    N.V. Organon ("Organon"), and

(c)    Intervet International B.V. ("Intervet").

47.    Akzo Nobel N.V., a Netherlands corporation, is a Fortune 500 company with operations in more than 80 countries. Akzo Nobel manufactures and sells human and animal health care products, coatings, and chemicals. Two of Akzo Nobel's subsidiaries were involved in sales to Iraq under the OFFP: Organon and Intervet.

48.    During the relevant time periods, Organon was a wholly-owned subsidiary of Akzo Nobel. Located in the Netherlands, Organon manufactured and sold prescription medicines. In September 2007, Akzo Nobel agreed to sell Organon to Schering Plough.

49.    During the relevant time period, Intervet was a wholly-owned subsidiary of Akzo Nobel. Located in the Netherlands, it manufactured and sold veterinary vaccines and animal pharmaceuticals. Like Organon, Intervet was sold to Schering Plough in September 2007.

50.    The Akzo Nobel Defendants are part of the Vendor Defendants.

### 5.    *AstraZeneca AB*

51.    AstraZeneca AB is one of the world's largest pharmaceutical companies with healthcare sales of more than $31 billion. AstraZeneca AB employs over 66,000 people worldwide.

52.    AstraZeneca is one of the Vendor Defendants.

### 6.    *The Atlas Copco Defendants*

53.    The Atlas Copco Defendants are as follows:

    (a)    Airpower N.V. and

    (b)    CMT (Construction Mining Technique) Sweden AB.

54.    The Atlas Copco Defendants are part of the Atlas Copco Group, an international industrial group headquartered in Stockholm, Sweden. The Group's ultimate parent is Atlas Copco AB. The Atlas Copco Group produces and markets construction, mining, and other equipment. The Group has 83 production facilities in 23 countries.

55.    Atlas Copco Airpower N.V. is a division of the Atlas Copco Group located in Antwerp, Belgium. Its facility is the world's largest manufacturing site for compressors.

56.    Atlas Copco CMT (Construction Mining Technique) Sweden AB is a division of the Atlas Copco Group located in Stockholm, Sweden. It develops, manufactures, and markets equipment for the construction and mining business.

57. The Atlas Copco Defendants are part of the Vendor Defendants.

7. *AWB, Ltd.*

58. AWB, Ltd. ("AWB") is an Australian company that oversees the export of Australian grain, particularly wheat. Until July 1999, when it became a private company, AWB was a government body known as the Australian Wheat Board. AWB exports Australian grain to more than 50 countries, including wheat exports worth up to $5 billion per year.

59. AWB is one of the Vendor Defendants.

8. *The B. Braun Defendants*

60. The B. Braun Defendants are as follows:

    (a) Aesculap AG & Co. KG,

    (b) Aesculap Motric S.A.,

    (c) Aesculap Surgical Instruments SDN BHD,

    (d) B. Braun Medical S.A.S.,

    (e) B. Braun Melsungen A.G., and

    (f) B. Braun Medical Industries SDN BHD (Malaysia).

61. The B. Braun Defendants are part of B. Braun, a multi-national healthcare organization, ranked among the world's largest medical products companies. The company has presence in over 50 countries and employs 38,000 professionals. B. Braun's corporate headquarters is in Germany.

62. Aesculap AG & Co. KG, also known as Aesculap AG, is a division of B. Braun Melsungen AG that focuses on products and services for core processes in operative medicine. Aesculap AG & Co. KG is based in Germany.

63.     Until February 2005, Aesculap Motric S.A. was part of B. Braun.  Today, the former Aesculap production is an independent enterprise.  Under new management and the new name METEC Motric S.A. Medizintechnik, the company manufactures surgical instruments.

64.     Aesculap Surgical Instruments SDN BHD, located in Penang, Malaysia, is a subsidiary of B. Braun that produces a broad range of medical products.

65.     B. Braun Medical S.A.S. is a subsidiary of B. Braun Melsungen AG located in Boulogne, France.  The company engages in marketing and distribution of healthcare equipment.

66.     B. Braun Melsungen A.G. is a German medical and pharmaceutical company, which has offices and facilities in 50 countries.  Its headquarters is located in Melsungen, Germany.

67.     B. Braun Medical Industries SDN BHD (Malaysia) merged with Aesculap in October 1998.  Since then, the merged companies have operated as one company in Malaysia.  The combined operation employs 5,000 people and is one of the largest B. Braun manufacturing sites outside of Europe.

68.     The B. Braun Defendants are part of the Vendor Defendants.

*9.*     *Boston Scientific S.A.*

69.     Boston Scientific S.A., a French corporation, is a subsidiary of Boston Scientific Corporation, a United States corporation.  Boston Scientific Corporation is a Fortune 500 company with operations in 45 countries.  Boston Scientific S.A. is a developer, manufacturer, and marketer of medical devices.

70.     Boston Scientific is one of the Vendor Defendants.

*10.*     *The BNP Defendants*

71.     The BNP Defendants are as follows:

(a)     BNP Paribas USA,

(b)     BNP Paribas Hong Kong,

(c)    BNP Paribas Paris,

(d)    BNP Paribas UK Holdings Limited,

(e)    BNP Paribas London Branch, and

(f)    BNP Paribas (Suisse) SA.

72.    The BNP Defendants are subsidiaries or divisions of Banque Nationale de Paris ("BNP"), a public company listed on the Paris Stock Exchange since 1993. BNP is licensed to do business in New York ("BNPNY").

73.    Over the course of the Programme, BNP grew through acquisitions and a merger, both of which increased its profile in oil trade finance and heightened its degree of participation in aspects of the Programme. First, in 1998, BNP acquired United European Bank in Geneva, and, in 2000, it merged with another significant French bank, Banque Paribas, to form BNP Paribas SA.

74.    As a result, BNP Paribas became one of the largest banks in Europe. The BNP Paribas Group has a presence in more than 85 countries and has 172,300 employees worldwide.

75.    BNP Paribas USA is headquartered in New York.

76.    BNP Paribas Hong Kong is a subsidiary of BNP Paribas based in Hong Kong.

77.    BNP Paribas UK Holdings Limited is a subsidiary of BNP Paribas based in London, United Kingdom.

78.    BNP Paribas London Branch is a branch of BNP Paribas located in London, United Kingdom.

79.    BNP Paribas (Suisse) SA is a subsidiary of the parent company of the BNP Paribas.

80.    The activities of the BNP Defendants are set out in Section VII, below.

### 11. *Buhler Ltd.*

81.    Buhler Ltd. is a worldwide engineering group active in the design and construction of plants and equipment, with headquarters in Switzerland. Buhler supplies systems and plant equipment for a variety of industries.

82.    Buhler is one of the Vendor Defendants.

### 12. *David B. Chalmers, Jr.*

83.    David B. Chalmers, Jr. ("Chalmers") is incarcerated in a federal prison in Texas. Before his imprisonment for the actions that form the basis of this suit, Chalmers lived in Houston, Texas.

84.    Chalmers was the sole shareholder of Bayoil (USA), Inc., an oil company based in Houston, Texas, and Bayoil Supply & Trading Limited, a Bahamian company (together "Bayoil").

85.    Chalmers is one of the Oil Purchasing Defendants.

### 13. *Chevron Corp., including as successor to Texaco Corp.*

86.    Chevron Corp. ("Chevron"), a United States company, is one of the world's largest integrated energy companies. It is headquartered in San Ramon, California. In 2001, Chevron and Texaco merged to form ChevronTexaco. The company's name was changed to Chevron in 2005.

87.    Chevron is one of the Oil Purchasing Defendants.

### 14. *Daewoo International Corp.*

88.    Daewoo International Corp. is Korea's second-largest trading company. Based in Seoul, South Korea, it trades and invests primarily in steel, metals, chemicals, and textiles. Daewoo International was formed in 2000, when Daewoo Corporation split into three companies.

89.    Daewoo International is one of the Vendor Defendants.

### 15.   *Daimler-Chrysler AG*

90.    Daimler-Chrysler AG ("Daimler-Chrysler") was a German automobile manufacturer founded in 1998 when Mercedez-Benz manufacturer Daimler-Benz merged with the US-based Chrysler Corporation.  In May 2007, Daimler-Chrysler sold Chrysler to a United States private equity firm. In October 2007, Daimler-Chrysler was renamed Daimler AG.

91.    Daimler-Chrysler is part of the Vendor Defendants.

### 16.   *Dow AgroSciences SAS*

92.    Dow AgroSciences SAS is a French subsidiary of Dow AgroSciences LLC, a wholly-owned subsidiary of the Dow Chemical Company.  Dow AgroSciences LLC is based in Indianapolis, Indiana and provides pest management, agriculture and crop biotechnology products and solutions.

93.    Dow AgroSciences is part of the Vendor Defendants.

### 17.   *Eastman Kodak S.A.*

94.    Eastman Kodak S.A., now known as Eastman Kodak Sarl, is a Switzerland-based subsidiary of Eastman Kodak, an American Fortune 500 company with over 20,000 employees. Eastman Kodak S.A. manufactures imaging products.

95.    Eastman Kodak is one of the Vendor Defendants.

### 18.   *Ebewe Pharma Ges M.B.H.*

96.    Ebewe Pharma Ges M.B.H. is an Austrian Pharmaceutical company.  From 1956 to 2001, the company was an affiliate of the BASF Group, Germany, and, briefly, of ABBOTT, USA. Since 2001, it has been an independent Austrian pharmaceutical company.  Ebewe Pharma specializes in specialty pharmaceuticals.

97.    Ebewe Pharma is one of the Vendor Defendants.

### 19.    *Eli-Lilly Export S.A.*

98.    Eli-Lilly Export S.A. is a wholly-owned subsidiary of Eli-Lilly and Company, the 10th largest pharmaceutical company in the world, with approximately 42,000 employees and net sales of more than $18 billion.  Eli-Lilly and Company is a United States corporation.  Eli-Lilly Export is located in Switzerland.

99.    Eli-Lilly Export is part of the Vendor Defendants.

### 20.    *El Paso Corp. (successor to Coastal Corp.)*

100.    El Paso Corp. is primarily engaged in gas transportation and storage, oil and gas exploration and production, and gas gathering and processing.  It is a United States corporation headquartered in Houston, Texas.

101.    In January 2001, El Paso acquired Coastal Corp., a United States company based in Houston, Texas and founded by Oscar S. Wyatt, Jr.

102.    El Paso is one of the Oil Purchasing Defendants.

### 21.    *The Evapco Defendants*

103.    The Evapco Defendants are as follows:

(a)    EVAPCO Kälte und Klimatechnik GmbH ("Evapco Austria") and

(b)    Evapco Europe S.R.L. ("Evapco Europe").

104.    Evapco Austria, located in Vienna, Austria, is the local representative of Evapco in Austria.  During the Programme, Evapco Austria provided water cooling towers and spare parts.

105.    Evapco Europe, located in Milan, Italy, is part of the Evapco Group, headquartered in Tanneytown, Maryland.  During the Programme, Evapco Europe provided water cooling towers and spare parts.

106.    The Evapco Defendants are part of the Vendor Defendants.

*22.    FiatAvio*

107.    FiatAvio, now known as Avio S.p.A., is an Italian manufacturer of subsystems for military and civil propulsion systems. In September 2003, Avio, formerly the aerospace arm of FiatAvio SpA, was acquired by The Carlyle Group and Finmeccanica. During the relevant time period, FiatAvio was involved in sales to Iraq under the OFFP through its affiliate FiatAvio Power Services, a joint venture between Siemens and FiatAvio. The company became known as Gas Turbine Technologies in 2003, and, in September 2006, was established as a subsidiary of Siemens SpA Italy under the name TurboCare SpA.

108.    FiatAvio is one of the Vendor Defendants.

*23.    The Flowserve Defendants*

109.    The Flowserve Defendants are as follows:

    (a)    Flowserve Corp.,

    (b)    Flowserve Pompes S.A.S., formerly known as Ingersoll-Dresser Pompes, and

    (c)    Flowserve B.V.

110.    Flowserve Corp. is a New York corporation headquartered in Irving, Texas. Flowserve Corp. was formed in 1997 through the merger of Durco International and BW/IP, Inc. Flowserve is the world's second largest producer of industrial pumps and valves. Two of Flowserve's subsidiaries were involved in sales to Iraq under the OFFP: Flowserve Pompes S.A.S. and Flowserve B.V.

111.    Flowserve Pompes S.A.S., formerly known as Ingersoll-Dresser Pompes, was acquired by Flowserve Corp. in September 2001. Located in France, it is a wholly-owned subsidiary of Flowserve's Pump Division. During the Programme, Flowserve Pompes provided pumps and spare parts.

112.    Flowserve B.V., a wholly-owned subsidiary of Flowserve's Flow Solutions Division, is located in the Netherlands.  During the Programme, Flowserve B.V. provided seals and spare parts for pumps.

113.    The Flowserve Defendants are part of the Vendor Defendants.

### 24.    *The GSK Defendants*

114.    The GSK Defendants are as follows:

 (a) Glaxo SmithKline Walls House,

 (b) GlaxoSmithKline Egypt S.A.E. ("GSK Egypt"),

 (c) Glaxo Wellcome Export Ltd.,

 (d) GlaxoWellcome SA (South Africa) (PRY) Ltd., and

 (e) SmithKline Beecham International.

115.    The GSK Defendants are part of GlaxoSmithKline ("GSK"), a pharmaceutical and healthcare company with its global headquarters in the United Kingdom.  GSK was formed in December 2000 through the merger of GlaxoWellcome (formed from the mergers of Burroughs Wellcome & Company and Glaxo Laboratories) and SmithKline Beecham (from the merger of Beecham and SmithKline).

116.    Glaxo SmithKline Walls House is a division of GSK.

117.    GSK Egypt is the Egyptian subsidiary of GSK.  GSK Egypt resulted from the 2001 merger between Glaxo Wellcome Egypt and Smithkline Beecham.

118.    Glaxo Wellcome Export Ltd. is a subsidiary of GSK based in United Kingdom.

119.    GlaxoWellcome SA (South Africa) (PRY) Ltd. is the South African subsidiary of GSK.  Its primary role is the production and sale of pharmaceuticals.

120.    SmithKline Beecham International is a subsidiary of SmithKline Beecham Holdings Corporation, a United States corporation, which itself is a subsidiary of GSK.

121.   The GSK Defendants are part of the Vendor Defendants.

*25.    The Ingersoll-Rand Defendants*

122.   The Ingersoll-Rand Defendants are as follows:

    (a)   ABG Allgemeine Baumaschinen-GesellschaftmbH ("ABG"),

    (b)   Dresser International Group,

    (c)   Ingersoll-Rand Italiana, SPA ("I-R Italiana"),

    (d)   Thermo King Ireland Limited,

    (e)   Ingersoll-Rand Benelux, N.V. ("I-R Benelux"), and

    (f)   Ingersoll-Rand World Trade Ltd. ("I-R World Trade").

123.   At all relevant times, the Ingersoll-Rand Defendants were part of Ingersoll-Rand, a global diversified industrial company and one of the largest companies in the United States.

124.   During the relevant periods, ABG was a global manufacturer and supplier of road and construction equipment. ABG was headquartered in Germany and maintained operations in a number of foreign countries. Prior to 2007, ABG was a wholly-owned subsidiary of Ingersoll-Rand. In April 2007, Ingersoll sold its Road Development business unit, which included ABG, to AB Volvo.

125.   Dresser International Group is believed to be a subsidiary of Ingersoll-Rand through Dresser-Rand.

126.   I-R Italiana is a wholly-owned Italian subsidiary of Ingersoll-Rand. The company, whose principal manufacturing facility is in Vignate, Italy, manufactures air compressors under the brand name Centac.

127.   Thermo King Ireland Limited is a wholly-owned Irish subsidiary of Ingersoll-Rand. The company manufactures and sells refrigeration equipment for trucks, buses and rail cars.

128.    During the relevant periods, I-R Benelux was a wholly-owned Belgian subsidiary of Ingersoll-Rand. The company manufactures construction vehicles. In 2007, Ingersoll-Rand sold its compact construction equipment units to Doosan Infracore (formerly Daewoo Heavy Industries & Machinery), a South Korean company and part of the Doosan Group. This acquisition resulted in the change of I-R Benelux's name to Doosan Benelux SA.

129.    During the relevant periods, I-R World Trade, based in Fribourg, Switzerland, was a trading subsidiary of Ingersoll-Rand. The company handled contract administration for many of Ingersoll-Rand's manufacturing subsidiaries. I-R World Trade's responsibilities included obtaining UN authorization for the OFFP contracts as well as obtaining export control permits.

130.    The Ingersoll-Rand Defendants are part of the Vendor Defendants.

### 26.    The Johnson & Johnson Defendants

131.    The Johnson & Johnson defendants are as follows:

(a)     Cilag AG International ("Cilag") and

(b)     Janssen Pharmaceutical Inc. ("Janssen").

132.    The Johnson & Johnson Defendants are subsidiaries of Johnson & Johnson, an American pharmaceutical and consumer goods manufacturer, headquartered in New Brunswick, New Jersey. Johnson & Johnson is comprised of more than 250 affiliated companies, located in 57 countries. Two of the Johnson & Johnson subsidiaries were involved in sales to Iraq under the OFFP: Cilag and Janssen.

133.    Cilag is a pharmaceutical company located in Switzerland that sold prescription medicines and drugs to Iraq during the OFFP.

134.    Janssen is a pharmaceutical company located in Titusville, New Jersey, that focuses on research and development of drugs for mental health patients.

135.    The Johnson & Johnson Defendants are part of the Vendor Defendants.

The Republic of Iraq's First Amended Complaint – page 18

*27.    Kia Motors Corp.*

136.    Kia Motors Corp. ("Kia Motors") is an automobile company based in South Korea. It is South Korea's second largest automobile manufacturer. Kia Motors sells its automobiles in 172 countries.

137.    Kia Motors is one of the Vendor Defendants.

*28.    The Liebherr Defendants*

138.    The Liebherr Defendants are as follows:

      (a)    Liebherr France, SA and

      (b)    Liebherr Export AG.

139.    The Liebherr Defendants are part of the Liebherr Group, one of the world's largest manufacturers of construction machinery.

140.    Liebherr France, SA is a production affiliate of the Liebherr Group located in Colmar, France. It manufactures excavators.

141.    Liebherr Export AG is a sales company of Liebherr Group located in Switzerland. It sells and distributes construction and mining machinery.

142.    The Liebherr Defendants are part of the Vendor Defendants.

*29.    The Merck Defendants*

143.    The Merck Defendants are as follows:

      (a)    Serono Pharma International S.A. and

      (b)    Merial S.A.S.

144.    Serono Pharma International S.A., located in Vaumarcus, Switzerland, was a division of Ares Trading S.A., a wholly-owned subsidiary of Serono S.A. In 2007, Serono S.A. was acquired by Merck, a global pharmaceutical and chemical company headquartered in Germany. This acquisition established Merck Serono, a division of Merck KGaA, the parent company of the Merck

Group. Merck Serono, the division for prescription pharmaceuticals of Merck, is the group's largest division. Currently Merck Serono operates in 44 countries, with manufacturing facilities in eight countries and sales in over 90 countries.

145. Merial S.A.S. manufactures veterinary pharmaceuticals and vaccines. The company is based in France and operates as a subsidiary of Merial Limited. In August 1997, Merial was founded through the joint venture between MSD AgVet (a subsidiary of Merck & Co., Inc.) and Rhone Merieux (a subsidiary of Rhone-Poulenc). Merial has about 5,400 employees and is present in more than 150 countries.

146. The Merck Defendants are part of the Vendor Defendants.

### 30. *Novo Nordisk*

147. Novo Nordisk is headquartered in Denmark, but its stock is publicly traded on the NYSE.

148. Novo Nordisk is an international maker of insulin, medicine, and other pharmaceutical supplies. Novo Nordisk has more than 27,000 employees worldwide. It operates in 179 countries.

149. Novo Nordisk is one of the Vendor Defendants.

### 31. *Pauwels International N.V.*

150. Pauwels International N.V. is the holding company of The Pauwels Group. The Pauwels Group is a wholly-owned subsidiary of Crompton Greaves Limited, India's largest private sector enterprise, which manufactures electrical products. Pauwels International, based in Mechelen, Belgium, manufactures power transformers.

151. Pauwels International is one of the Vendor Defendants.

### 32.    *Railtech International SA*

152.    Railtech International SA, part of the Railways Division of the Delachaux Group, is a wholly-owned subsidiary of HRT France SAS, which is a subsidiary of Delachaux SA, the ultimate parent company of the group.  Based in France, the group is a major manufacturer of products for transportation and electrical systems.

153.    Railtech International is one of the Vendor Defendants.

### 33.    *The Roche Defendants*

154.    The Roche Defendants are as follows:

        (a)    F. Hoffmann la Roche Ltd. and

        (b)    Roche Diagnostics GmbH.

155.    F. Hoffmann la Roche Ltd. is a global health-care company that operates under two divisions: pharmaceuticals and diagnostics.  Its headquarters is located in Basel, Switzerland.

156.    Roche Diagnostics GmbH is one of several of Roche's sites in Germany, located in Mannheim.

157.    The Roche Defendants are part of the Vendor Defendants.

### 34.    *Rohm and Haas France S.A.S.*

158.    Rohm and Haas France S.A.S is a French subsidiary of Rohm and Haas Company, an international Fortune 500 company based in Philadelphia that creates and develops specialty chemicals and electronic materials.  On April 1, 2009, Rohm and Haas became a wholly-owned subsidiary of The Dow Chemical Company, a multinational corporation based in Midland, Michigan. Dow is the world's largest producer of plastics, as well as a major producer of various chemicals and agricultural products.

159.    Rohm and Haas France is one of the Vendor Defendants.

*35.    Secalt S.A.*

160.    Secalt S.A. is a division of Tractel Group Inc., located in Luxembourg.    It manufactures suspended working platforms.

161.    Secalt is one of the Vendor Defendants.

*36.    The Siemens Defendants*

162.    The Siemens Defendants are as follows:

(a)    Siemens S.A.A. of France ("Siemens-France"),

(b)    Siemens Sanayi ve Ticaret A.S. of Turkey ("Siemens-Turkey"), and

(c)    Osram Middle East FZE ("Siemens-Osram").

163.    The Siemens conglomerate is more than one hundred years old and is now the 28th largest company in the world, with about 500,000 employees.

164.    The Siemens Defendants are part of the massive Siemens organization, which is a matrix-like structure with both operating groups and regional companies, organized by location. The functions of its operating groups and regional companies often overlap, though each operates independently with minimal centralized reporting mechanisms beyond financial reporting. There are over 1,800 legal entities within the Siemens group of companies.

165.    Siemens-France is Siemens' regional company in France.

166.    Siemens-Turkey is Siemens' regional company in Turkey.

167.    Siemens-Osram was the United Arab Emirates-based subsidiary of Osram GmbH, which is a wholly-owned subsidiary of Siemens.

168.    The Siemens Defendants are part of the Vendor Defendants.

### 37.    Solar Turbines Europe S.A.

169.    Solar Turbines Europe S.A. ("Solar Turbines") is the European Division of Solar Turbines Incorporated, headquartered in San Diego, California. It is a producer of industrial gas turbines. Solar Turbines Incorporated is a wholly-owned subsidiary of Caterpillar Inc.

170.    Solar Turbines is part of the Vendor Defendants.

### 38.    St. Jude Medical Export GmbH

171.    St. Jude Medical Export GmbH, an Austrian corporation, imports and exports products manufactured by its ultimate parent company St. Jude Medical of the United States.

172.    St. Jude Medical Export is part of the Vendor Defendants.

### 39.    The Sulzer Defendants

173.    The Sulzer Defendants are as follows:

      (a)    Sulzer Burckhardt Engineering Works Ltd. ("Sulzer Burckhardt"),

      (b)    Sulzer Pumpen Deutschland GmbH ("Sulzer Pumpen"), and

      (c)    Sulzer Turbo Ltd.

174.    During the relevant periods, the Sulzer Defendants were part of the Sulzer, Ltd., a Swiss engineering and manufacturing company. The company is comprised of four divisions: Sulzer Pumps, Sulzer Metco, Sulzer Chemtech, and Sulzer Turbo Services. It has offices in over 120 locations throughout the world.

175.    Sulzer Burckhardt was a subsidiary of Sulzer, Ltd. that manufactured industrial compressors until April 2002, when Sulzer Burckhardt's management bought the company. It now exists as Burckhardt Compression AG, independent of Sulzer, Ltd. Burckhardt Compression is one of the world's largest manufacturers of reciprocating compressors.

176.    Sulzer Pumpen is the German arm of Sulzer Pumps, which manufactures centrifugal pumps. It is one of the four main subsidiaries of Sulzer, Ltd.

177.    Sulzer Turbo Ltd., a manufacturer of turbo machinery and rotating equipment, was a subsidiary of Sulzer Ltd. In May 2001, MAN Turbomaschinen AG GHH BORSIG, a subsidiary of the commercial vehicle and mechanical engineering company MAN, took over Sulzer's turbo machine activities. The acquisition created the MAN TURBO group of companies, which consists of three legally independent core companies in Germany (headquarters), Switzerland and Italy. The Swiss company, MAN Turbo AG Schweiz, is located in Zurich. Both Sulzer Turbo Ltd. and its successor, MAN Turbo AG Schweiz, were involved in sales to Iraq through the OFFP.

178.    The Sulzer Defendants are part of the Vendor Defendants.

### 40.    *The Textron Defendants*

179.    The Textron Defendants are as follows:

(a)    Textron, Inc. ("Textron"),

(b)    Union Pump S.A.S., f/k/a David Brown Guinard Pumps S.A.S. ("DB Guinard Pumps"), and

(c)    David Brown Transmissions France S.A. ("DB France").

180.    At all relevant times, Textron was a global, multi-industry company that operated in four business segments. Textron is a Delaware corporation.

181.    Textron is the 173rd largest company in the United States.

182.    Textron's Industrial Segment was comprised of numerous subsidiaries, including several under the name "David Brown." Within the Industrial Segment, the David Brown subsidiaries were part of Textron's Fluid and Power Business Unit.

183.    Union Pump S.A.S., formerly known as David Brown Guinard Pumps, acquired by Textron in 1999, was a wholly-owned, fifth-tier French subsidiary of Textron that was part of the company's Industrial Segment. DB Guinard Pumps manufactured industrial pumps for the oil, gas and petrochemical industries.

184.    DB France, acquired by Textron in November 1998, was a wholly-owned, fifth-tier French subsidiary of Textron that was part of the company's Industrial Segment. DB France designed and manufactured industrial gears, transmissions and other items.

185.    The Textron Defendants are part of the Vendor Defendants.

*41.    Vitol, S.A.*

186.    Vitol, S.A. ("Vitol") is an energy trading and refining company, based in Geneva, Switzerland. Vitol operates as a subsidiary of the Vitol Group.

187.    Vitol is one of the Oil Purchasing Defendants.

*42.    The Volvo Defendants*

188.    The Volvo Defendants are as follows:

    (a)    Renault Trucks SAS,

    (b)    Renault Agriculture & Sonalika International ("Renault A&S"),

    (c)    Renault V.I., and

    (d)    Volvo Construction Equipment AB, a successor company to Volvo Construction Equipment International ("Volvo Construction").

189.    The Volvo Defendants are all subsidiaries of AB Volvo, the parent company of the Volvo Group. The Volvo Group has about 100,000 employees, production facilities in 19 countries, and sales in some 180 countries.

190.    Renault V.I., currently called Renault Trucks SAS, is a wholly-owned subsidiary of AB Volvo located in Lyon, France ("Renault Trucks"). Renault Trucks was purchased by AB Volvo in January 2001, and its name was changed to Renault Trucks SAS in January 2005.

191.    Renault A&S, during the relevant time period, was a wholly-owned French subsidiary of AB Volvo. In 2003, the CLAAS Group (a German manufacturer of agricultural equipment)

became a majority shareholder in the company. In 2008, CLAAS bought all the shares of Renault Agriculture, and the company's name was changed to CLAAS Tractor SAS.

192.    Volvo Construction Equipment International was a wholly-owned Swedish subsidiary of AB Volvo headquartered in Eskilstuna, Sweden. In January 2006, Volvo Construction Equipment International merged into Volvo Construction Equipment AB. These entities are called "Volvo Construction."

193.    The Volvo Defendants are part of the Vendor Defendants.

### 43.    *The Weir Group*

194.    The Weir Group PLC is a British engineering services company with headquarters in Glasgow, Scotland. It has subsidiaries and operations around the globe, including ten locations in the United States.

195.    The Weir Group is part of the Vendor Defendants.

### 44.    *Woodhouse International LLC*

196.    Woodhouse International LLC ("Woodhouse") is an oil drilling supply company with locations in Abu Dhabi, Baghdad, Tripoli, and a main office in Dubai. It has operated in the Gulf Region since 1995.

197.    Woodhouse is part of the Vendor Defendants.

### 45.    *Oscar S. Wyatt, Jr.*

198.    Oscar S. Wyatt, Jr. ("Wyatt") is an individual residing in Houston, Texas.

199.    Wyatt is one of the Oil Purchasing Defendants.

### 46.    *York Air Conditioning and Refrigeration FZE*

200.    York Air Conditioning and Refrigeration FZE ("York") is a wholly-owned subsidiary of York Air Conditioning and Refrigeration, Inc., a Delaware Corporation.

201.    York is one of the Vendor Defendants.

## C.    *The United Nations, the Security Council, and the 661 Committee*

202.    The Charter of the United Nations (or "UN") was ratified on October 24, 1945.

203.    The United States was one of the original member nations of the United Nations.

204.    Iraq was also one of the earliest members of the United Nations, joining on December 21, 1945.

205.    Each of the Defendants is from a UN member nation.

206.    The UN Headquarters in New York dates from June 26, 1947, when representatives of the United States and the United Nations signed an agreement at Lake Success, New York. The UN General Assembly approved the agreement on October 31, 1947.

207.    Pursuant to the agreement between the United States and the United Nations, wrongs committed within the UN Headquarters are subject to the laws and judicial jurisdiction of the United States: "Except as otherwise provided in this agreement or in the General Convention, the federal, state and local law of the United States shall apply within the headquarters district."

208.    The headquarters agreement also states: "Except as otherwise provided in this agreement or in the General Convention, the federal, state and local courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district as provided in applicable federal, state and local laws."

209.    Neither the headquarters agreement nor the UN Charter removes jurisdiction from United States courts for the wrongs set forth in this Complaint.

210.    An important subset of the UN is the Security Council, which played a central role in the subject matter of this action.

211.    The UN Security Council has fifteen members, including five permanent members – China, France, Russia, the United Kingdom and the United States – collectively known as the "P-5."

212.    The UN Security Council has authority under the UN Charter to impose a "complete or partial interruption of economic relations" when necessary to "maintain or restore international peace and security."

213.    According to the UN Charter, UN member states are bound to "accept and carry out the decisions of the Security Council."

214.    As to the Hussein Regime, the Security Council created a specialized committee to deal with the Sanctions Program against the Hussein Regime. The Committee was called the 661 Committee after Security Council Resolution 661, which created it. A more detailed description of the 661 Committee's role is set forth below.

## D.    The Hussein Regime

215.    The final principal player in this matter is the Hussein Regime.

### 1.    The Hussein Regime was not a legitimate government.

216.    On July 17, 1979, Saddam Hussein's party took control of Iraq in a military coup.

217.    To solidify his power, he systematically removed all opposition, executing many and forcing others into exile and hiding.

218.    He then installed officials under his direct control in all areas of the government.

219.    The Hussein Regime controlled Iraq until Saddam Hussein was deposed in 2003.

220.    While the Hussein Regime was in *de facto* control of the nation, it was not a *de jure* or legitimate government. The Hussein Regime took control in violation of the Iraqi Constitution of the time and maintained control in violation of the Iraqi Constitution and international and domestic legal norms.

221.    Opposition to the Hussein Regime was harshly suppressed. Imprisonment and execution were common tools.

222.    When actions of the Hussein Regime were declared unconstitutional, the Regime either removed and imprisoned the jurists who made such pronouncements or ignored the judicial pronouncements or, more commonly, did both.

223.    In other words, Saddam Hussein was a tyrant, not a legitimate governmental ruler, and the Hussein Regime did not act as a legitimate government, but as a group of corrupted government officials. While some Regime officials were enthusiastic participants, lured by power and wealth, others were forced to choose between the personal security of themselves and their families and the proper functioning of their duties. The Defendants helped Hussein to force that draconian choice by providing him with the foreign currency he needed to maintain power.

### 2.    *The wrongful actions of the Hussein Regime are established.*

224.    The wrongful acts of the Hussein Regime have been established.

225.    In October of 1998, the United States Congress made official findings setting forth some of the Regime's most well-known wrongs:

> (1) On September 22, 1980, Iraq invaded Iran, starting an 8 year war in which Iraq employed chemical weapons against Iranian troops and ballistic missiles against Iranian cities.

> (2) In February 1988, Iraq forcibly relocated Kurdish civilians from their home villages in the Anfal campaign, killing an estimated 50,000 to 180,000 Kurds.

> (3) On March 16, 1988, Iraq used chemical weapons against Iraqi Kurdish civilian opponents in the town of Halabja, killing an estimated 5,000 Kurds and causing numerous birth defects that affect the town today.

> (4) On August 2, 1990, Iraq invaded and began a 7 month occupation of Kuwait, killing and committing numerous abuses against Kuwaiti civilians, and setting Kuwait's oil wells ablaze upon retreat. ....

> (6) In April 1993, Iraq orchestrated a failed plot to assassinate former President George Bush during his April 14-16, 1993, visit to Kuwait. ....

> (8) On August 31, 1996, Iraq suppressed many of its opponents by helping one Kurdish faction capture Irbil, the seat of the Kurdish regional government.

(9) Since March 1996, Iraq has systematically sought to deny weapons inspectors from the United Nations Special Commission on Iraq (UNSCOM) access to key facilities and documents, has on several occasions endangered the safe operation of UNSCOM helicopters transporting UNSCOM personnel in Iraq, and has persisted in a pattern of deception and concealment regarding the history of its weapons of mass destruction programs. ....

(11) On August 14, 1998, President Clinton signed Public Law 105–235, which declared that "the Government of Iraq is in material and unacceptable breach of its international obligations" and which urged the President "to take appropriate action, in accordance with the Constitution and relevant laws of the United States, to bring Iraq into compliance with its international obligations."

226.    On December 12, 2006, the Cassation Chamber of the Iraqi High Tribunal affirmed the conviction and death sentence against Saddam Hussein, finding, among other matters, that Saddam Hussein was guilty of the crime of genocide in part for the "systematic and widespread attack against the civilian population of the town of al-Dujail that occurred with his knowledge."

### 3.    The United States declares the Hussein Regime a State Sponsor of Terrorism and seeks to depose the Regime.

227.    On September 13, 1990, the United States Department of State made the official determination that Iraq, through the Hussein Regime, was a state sponsor of international terrorism. 55 Fed. Reg. 37793 (Sept. 13, 1990). The only other nations so designated were Cuba, Iran, Libya, North Korea, and Syria.

228.    On November 5, 1990, Congress independently determined that Iraq was then "a country which has repeatedly provided support for acts of international terrorism, a country which grants sanctuary from prosecution to individuals or groups which have committed an act of international terrorism, and a country which otherwise supports international terrorism." Iraq Sanctions Act of 1990 (ISA), Pub. L. No. 101-513, § 586F(c)(1), 104 Stat. 2051.

229.    The Iraq Sanctions Act mandated application to Iraq of all "provisions of law that impose sanctions against a country which has repeatedly provided support for acts of international terrorism."

230.    The terrorism designation has significant consequences under United States law and gives notice that transactions (particularly financial transactions) with the designated state or entity are in almost all cases forbidden. In particular, the designation blocked all Iraqi funds held in the United States. This included funds held by the Programme at the Escrow Account at BNP. Transfers of the Programme funds were subject to both the Programme rules and policies and United States laws related to blocked assets of terrorist organizations.

231.    Iraq's designation as a State Sponsor of Terrorism was not removed until after the Programme's end.

232.    Due to the Hussein Regime's tyrannical practices and designation as a supporter of terrorism, from October 1998 until the fall of the Hussein Regime, the official policy of the United States was to effect regime change within Iraq; that is, to depose the Hussein Regime in favor of a *de jure* and legitimate government.

233.    On May 1, 1998, President Clinton signed Public Law 105-174, which made $5 million available to assist Iraqi democratic opposition to the Hussein Regime, including for organization, training, and communication for opposition groups, and compiling information to support the indictment of Iraqi officials for war crimes.

234.    On October 31, 1998, President Clinton signed the Iraq Liberation Act, Public Law 105-338, which declared: "It should be the policy of the United States to support efforts to remove the regime headed by Saddam Hussein from power in Iraq and to promote the emergence of a democratic government to replace that regime."

235.    The Iraq Liberation Act, codified at 22 U.S.C. § 2151, urged the President to request the United Nations to establish an international criminal tribunal for the purpose of "indicting, prosecuting, and imprisoning Saddam Hussein and other Iraqi officials who are responsible for crimes against humanity, genocide, and other criminal violations of international law."

236.    In view of these public findings and statutes, after November 1990, the Defendants cannot deny that when they transferred funds to the Hussein Regime, they were financially aiding a designated sponsor of international terrorism.

237.    The Defendants were undeterred by the vile nature of the Regime with which they dealt, conspired and supported.

### 4.    *The United States terminates diplomatic relations with the Hussein Regime.*

238.    On January 12, 1991, four days before the start of Operation Desert Storm, the United States severed diplomatic ties with the Regime and closed its Embassy in Baghdad.

## IV.    *UN Sanctions and the Programme*

## A.    *The Invasion of Kuwait and UN Sanctions against the Hussein Regime*

239.    On August 2, 1990, the Hussein Regime ordered the invasion of Kuwait.

240.    Four days later, the UN Security Council sanctioned the Hussein Regime, prohibiting member states from trading in any Iraqi commodities or products and prohibiting any financial transactions with the Regime.

### 1.    *The UN Security Council sanctions the Hussein Regime and forms a special committee (the 661 Committee) to run the Iraq Sanctions Program.*

241.    On August 6, 1990, the UN Security Council adopted Security Council Resolution 661, which prohibited the provision of "funds or any other financial or economic resources" to Iraq.

242.    The sanctions included the freezing of Iraqi assets abroad, including the assets within the United States, and a ban on trade (imports and exports) with both Iraq and Kuwait. To further restrain trade, Security Council Resolution 665 called for naval interdiction of vessels leaving or arriving in Iraq, and Security Council Resolution 670 banned flights to and from Iraq.

243.    Thus, the Iraq Sanctions Program endeavored to place the Hussein Regime under complete economic isolation.

The Republic of Iraq's First Amended Complaint – page 32

244.    A Committee of the Security Council (called the 661 Committee) was formed to oversee and implement the sanctions policy. It was tasked with complete oversight of the embargo and any requests to trade with Iraq.

245.    Security Council Resolution 661 did allow food, medicine and other humanitarian aid to be delivered to Iraq, but only upon findings by the 661 Committee of certain humanitarian circumstances, which were not made in the original Resolution.

### 2.    The United States adopts economic sanctions in support of the Iraq Sanctions Program.

246.    In keeping with the requirements of Security Council Resolution 661, which stated that "all States shall prevent" trade in violation of the sanctions imposed against the Hussein Regime, the United States government also imposed sanctions against the Hussein Regime.

247.    Since all member States are required by the UN Charter to "accept and carry out the decisions of the Security Council," on information and belief, the member States of each of the Defendants did the same.

248.    Even before the Security Council acted, on August 3, 1990, the first President Bush issued Executive Order 12,722, which found that "the policies and actions of the Government of Iraq constitute an unusual and extraordinary threat to the national security and foreign policy of the United States and hereby declare a national emergency to deal with that threat."

249.    The finding of a national emergency was not rescinded until after the Programme was terminated.

250.    Based on that finding, Executive Order 12,722 blocked all assets of the Hussein Regime in the United States and prohibited all trade for economic gain with the Regime.

251.    On August 13, 1990, President Bush issued Executive Order No. 12,724 in order to align the sanctions imposed by the United States with Security Council Resolution 661.

252.    These provisions, coupled with the legal effect of Iraq's designation as a State Sponsor of Terrorism, conformed United States law with the UN policy of imposing strict economic isolation on the Hussein Regime.

253.    Significantly, under United States law, once Iraq's assets had been blocked, the United States Treasury's Office of Foreign Asset Control (or "OFAC") had to approve any transfers of such assets within or from the United States. Pursuant to that statute, transfers made without prior authorization or in breach of any restrictions within the authorization granted were void.

254.    Ultimately, all funds of the Programme held at BNP were subject to these provisions of US law, because the Programme funds were property of Iraq held in the United States.

## B.    The Suffering of the Iraqi People and the Need for Humanitarian Relief

255.    Because the UN sanctions targeted the Hussein Regime and not the Iraqi population, the United Nations implemented procedures designed to protect the population from adverse effects of the sanctions policies and from the Hussein Regime itself.

### 1.    In 1991, UN Missions to Iraq find extensive human suffering among the Iraqi population.

256.    One month after the imposition of sanctions, the UN Security Council on September 13, 1990, passed Resolution 666, which established a procedure to determine if circumstances existed justifying the provision of humanitarian supplies to "relieve human suffering" in Iraq.

257.    To protect the Iraqi population while maintaining the effectiveness of the sanctions against the Hussein Regime, Security Council Resolution 666 noted that "foodstuffs should be provided through the United Nations ... in order to ensure that they reach the intended beneficiaries ...."

258.    On March 1, 1991, the UN Secretary-General Pérez de Cuéllar announced two missions to Iraq to assess the humanitarian needs of the Iraqi people.

259.    Both missions found immense suffering among the Iraqi people and concluded that immediate and substantial financial resources had to be made available to avert a deepening human catastrophe.  UN Under-Secretary General Maati Ahtisaari declared that the "recent conflict has wrought near-apocalyptic results" on the Iraqi people.

260.    According to one mission report, "the Iraqi people may soon face a further imminent catastrophe, which could include epidemic and famine, if massive life-supporting needs are not rapidly met."

261.    Following the submission of the mission reports, on March 22, 1991, the 661 Committee made "a general determination that humanitarian circumstances apply with respect to the entire civilian population of Iraq in all parts of Iraq's national territory."

2.    *Security Council adopts Resolution 687 to allow the sale of food to Iraq.*

262.    On April 3, 1991, the Security Council adopted Resolution 687, which noted the Security Council's "grave concern of the reports by the Secretary General on 20 March and 28 March 1991, and conscious of the necessity to meet urgently the humanitarian needs in Kuwait and Iraq …."

263.    Accordingly, the Security Council resolution allowed for the export of foodstuffs to Iraq, so long as the UN had no objection.

264.    Despite the humanitarian needs of the Iraqi people, the Hussein Regime would not agree on the terms of a humanitarian program to ease the suffering, so the Security Council's Resolution was never effective.

3.    *To pressure the UN, the Hussein Regime for years refuses to agree to a humanitarian program.*

265.    Instead of focusing on the needs of the Iraqi population, the Hussein Regime used the suffering of the innocent as a negotiating tool in an attempt to end the Iraq Sanctions Program that threatened the continued power of the Hussein Regime.

The Republic of Iraq's First Amended Complaint – page 35

266.     In Hussein's view, the more the Iraqi people suffered, the greater the pressure on the UN to lift the Iraq Sanctions Program.

267.     Therefore, the Hussein Regime rejected the two initial Security Council Resolutions in 1991 that authorized the Hussein Regime to sell Iraqi oil in return for food and medicine.

268.     The Hussein Regime's attempts to force the end of the Iraq Sanctions Program with the threat of more human suffering delayed the final agreement between the UN and the Regime on the contours of the humanitarian program until 1996, five years after the first reports of tragic human suffering within Iraq.

269.     By that time, the situation for the average Iraqi citizen was dire. The UN reported in 1995 (a year before Saddam Hussein finally agreed to implement the Programme) that the average Iraqi's food intake was about 1,275 calories per day, compared with the standard requirement of 2,100 calories.

## C.    *The United Nations' Oil-for-Food Programme*

270.     Following years of refusals to consider a UN-controlled humanitarian program, the Hussein Regime was finally compelled to agree to supply needed food and medicine to the Iraqi people in May of 1996.

### 1.    *The Security Council creates the Programme in Security Council Resolution 986.*

271.     On April 14, 1995, the UN Security Council adopted Resolution 986 establishing the Oil-for-Food Programme as a "temporary measure to provide for the humanitarian needs of the Iraqi people."

272.     According to Security Council Resolution 986, the Programme was created because of the "serious nutritional and health situation of the Iraqi people."

273.     The Programme was created as the sole vehicle for the sale and lifting of Iraqi crude oil and for direct financial transactions with the Hussein Regime.

The Republic of Iraq's First Amended Complaint – page 36

274.    Security Council Resolution 986 permitted the Hussein Regime to sell Iraqi crude oil under strict conditions designed to ensure that all proceeds were used for Programme purposes -- (1) humanitarian aid for the benefit of the Iraqi people, (2) reparations to Kuwaiti victims of the Hussein Regime, (3) costs of Programme administration, and, in later periods of the Programme, (4) the purchase of supplies to support oil production, so that there would be sufficient funds for the needed humanitarian aid and reparations.

275.    There were two chief reasons for the Programme's strict conditions: (1) to maximize the funds available for the Programme's humanitarian purposes and (2) to prevent the Hussein Regime from solidifying its illicit power with the humanitarian funds in the Escrow Account in violation of the Iraq Sanctions Program.

2.    *Following another year of negotiations and suffering, the Husssein Regime finally agrees to a Memorandum of Understanding to implement the Programme.*

276.    The creation of the Programme did not immediately ease the suffering of the Iraqi people, because the Hussein Regime continued its efforts to gain more control over the Programme, using the suffering of the Iraqi people as its main bargaining chip.

277.    Another year of negotiations occurred before the Hussein Regime finally entered into a Memorandum of Understanding with the United Nations concerning implementation and administration of the Programme under Security Council Resolution 986 (the "MOU"). The MOU was executed in May of 1996.

278.    As the Volcker Committee concluded, the Hussein Regime was ultimately induced to agree to the humanitarian program by the defection of a high level Regime official, General Hussein Kamel, Saddam Hussein's son-in-law and former Minister of Industry and Military Industrialization. The General's disclosure of an illicit weapons program ended any hopes within the Hussein Regime that it could induce the end of the Iraq Sanctions Program. The Volcker Committee found: "With

the political situation that resulted from General Kamel's defection, Iraqi officials realized that the sanctions would be extended for some time. This new political climate, coupled with the continued deterioration of the Iraqi economy, created a growing willingness in Baghdad – even by Saddam Hussein – to enter into negotiations on implementing Resolution 986."

279.    The MOU set forth the obligations and agreements of the Hussein Regime as to the Programme.

280.    One of the primary agreements and obligations of the MOU was to "effectively guarantee equitable distribution to the Iraqi population throughout the country of medicine, health supplies, foodstuffs and materials and supplies for essential civilian needs… purchased with the proceeds of the sale of Iraqi petroleum and petroleum products."

281.    To achieve that end, the Hussein Regime was required to provide a Distribution Plan outlining the goods and services needed by the Iraqi people.

282.    The Distribution Plan had to be reviewed and approved by the UN Secretary General.

283.    The MOU required that *all* transactions under the Programme "follow normal commercial practice and be on the basis of the relevant resolutions of the Security Council and procedures of the 661 Committee."

284.    The MOU also required that *all* financial transactions related to the Programme pass through an Iraq account established by the UN and be covered by contractual documents setting forth all payment terms.

3.    *The UN establishes a UN Escrow Account to protect the interests of the Iraqi people.*

285.    The humanitarian aims of the Programme could not be achieved unless all proceeds from the sale of Iraqi oil were deposited into a UN Escrow Account controlled and monitored by the United Nations and the bank operating the account, BNP.

The Republic of Iraq's First Amended Complaint – page 38

286.    The UN Escrow Account was established at BNP in Manhattan (the "UN Escrow Account").

287.    The UN Escrow Account was a requirement of Security Council Resolution 986, the MOU, and all Programme contracts.

288.    Under all Programme rules and contracts, direct financial transactions with the Hussein Regime were not permitted during the Programme. In addition, following the designation of Iraq as a State Sponsor of Terrorism, United States federal law also prohibited transfers of Iraqi assets within the United States absent a license issued by the Department of Treasury's OFAC.

289.    On July 10, 1996, the OFAC amended its Iraq Sanctions Regulations to provide a general license authorizing United States citizens and companies to enter into executory contracts with Iraq for the purchase of Iraqi oil and petroleum products and the sale of humanitarian goods and services with performance conditioned upon approval by the OFAC within the framework of the Programme.

290.    The OFAC also issued a license to BNP so that the UN could operate the Programme. BNP's OFAC License required strict compliance with all Programme rules and voided any transaction outside, or in violation, of those rules.

### D.    Interrelation of the Programme and the Iraq Sanctions Program

291.    In many respects, the Iraq Sanctions Program imposed against the Hussein Regime was unique.

292.    The Iraq Sanctions Program against the Hussein Regime lasted 13 years. Along with the sanctions leveled against South Africa and Rhodesia, this was the longest standing sanctions program in UN history.

293.    The Iraq Sanctions Program is also widely considered the most comprehensive sanctions program ever imposed by the UN against a member nation. As stated by the Security

Council in its Annual Report on the Sanctions Program in 1996: "The scope and intensity of the mandatory measures imposed by the Security Council against Iraq, following its illegal invasion and occupation of Kuwait in August 1990, were, at the time of their adoption, unparalleled in the history of the United Nations."

294.    The scope of the Iraq Sanctions Program required an extensive bureaucracy formed under the auspices of the 661 Committee to coordinate the multiple layers of the economic isolation of the Hussein Regime.

295.    The Programme was an integral part of the Iraq Sanctions Program, because sanctions were targeted not at the Iraqi people but at changing the policies and actions of the Hussein Regime. Therefore, the Programme was required to minimize the unintended harm to the Iraqi people.

296.    According to the UN, the Programme was "[c]onceived as a means for reconciling strong sanctions against a corrupt Iraqi regime with needed supplies of food and medicines to an innocent and vulnerable population." Report on Management of the Oil-for-Food Programme, September 7, 2005 ("Management Report").

297.    When the Programme was adopted, the Netherlands Ambassador to the UN and Chair of the 661 Committee in 1999 and 2000 announced: "Henceforth, the most comprehensive coercive economic measures ever devised by the UN were tempered by the largest humanitarian relief operation in the UN's history."  Management Report V.1 at 7.

298.    The Programme was therefore structured to allow humanitarian aid while otherwise maintaining the economic isolation of the Hussein Regime. Critical to coordinating those goals was the Escrow Account held at BNP and the promises of all Programme participants to adhere to the Programme rules.

*E.    The Goal of the Hussein Regime – Undermine the Programme and the Iraq Sanctions Program*

299.    The institution of the humanitarian program did not change the fundamental goal of the Hussein Regime – to maintain and extend its power.

300.    In fact, the Hussein Regime was openly hostile to the Programme, which, by reducing the suffering of the Iraqi people, reduced the political pressure to remove the Iraq Sanctions Program.

301.    In Saddam Hussein's view, the Iraq Sanctions Program and the Programme were "economic occupation" by the UN and, more specifically, by the United States.

302.    Therefore, the Hussein Regime sought to undermine the Programme and its goals, chiefly in order to undermine the Iraq Sanctions Program. For example, on October 25, 2000, all Iraqi ministries were informed that Saddam Hussein had ordered the imposition of kickbacks of at least 10% in order to subvert the policies of the UN and the United States government. The notice to the Ministries stated:

> The President and leader (may God protect him) has ordered the following
>
> ...
>
> 1.    The final outcome with respect to the 10% of the value of the contracts that are made with external entities is considered the minimum per contract, exclusive of transportation fees. Any percentage above that will be welcomed, as this is the way sanctions are lifted. For this reason, we want to provoke them so that they are faced with two options: either accept reality or lift the sanctions. ....
>
> 2.    The Memorandum of Understanding is in essence economic occupation. .... Therefore, we must work towards the goal of destroying the Memorandum and liberating trade by creating revenues outside of its framework that help achieve this goal, and we don't care whether or not the United States finds out about it.
>
> 3.    Our enemy has implemented a policy to achieve its goals step by step until it has caused us extreme damage .... [W]e should engage the enemy over this matter step by step.

The Republic of Iraq's First Amended Complaint – page 41

303.    The Programme, however, was specifically structured to prevent the Hussein Regime from avoiding its requirements to the detriment of the Iraq Sanctions Program.

304.    Given the interrelation of the Iraq Sanctions Program and the Programme, the Hussein Regime could undermine the Programme only with help from others.  Unfortunately, the Regime found the needed assistance from the Defendants -- it could even buy their participation with humanitarian funds from the Programme.

305.    As found by the Volcker Committee: "The Committee's investigation clearly makes the point that, as the Programme expanded and continued, Saddam Hussein found ways and means of turning it to his own advantage."  Management Report, VI, at 2.

## F.    General Operation of the Programme

306.    In order to protect against the improper aims of the Hussein Regime, the UN created a substantial bureaucracy to review sales and purchases under the Programme.  Over the Programme's course, $64.2 billion was deposited into the UN Escrow Account from the sale of Iraqi crude oil, and approximately $37 billion was spent from the account to purchase humanitarian goods.  In addition, about $18 billion in claims by Kuwaiti victims of the Hussein Regime's aggression were paid from the Escrow Account.  The sums remaining in the Escrow Account following the Programme's end were eventually transferred to the Iraqi Development Fund, owned by the Republic of Iraq.

### 1.    The Programme was conducted in thirteen Phases.

307.    Phase I of the Programme began in December of 1996.

308.    Between December 1996 and December 2002, the UN Security Council adopted a series of resolutions that reauthorized the Programme for thirteen generally 180-day Phases of operation:

- Phase I: December 10, 1996 to June 7, 1997, pursuant to Security Council Resolution ("SCR") 986;

- Phase II: June 8, 1997 to December 4, 1997, pursuant to SCR 1111;

- Phase III: December 5, 1997 to May 29, 1998, pursuant to SCR 1143;

- Phase IV: May 30, 1998 to November 25, 1998, pursuant to SCR 1153;

- Phase V: November 26, 1998 to May 24, 1999, pursuant to SCR 1219;

- Phase VI: May 25, 1999 to December 11, 1999, pursuant to SCR 1242, SCR 1275, and SCR 1280;

- Phase VII: December 12, 1999 to June 8, 2000, pursuant to SCR 1281;

- Phase VIII: June 9, 2000 to December 5, 2000, pursuant to SCR 1302;

- Phase IX: December 6, 2000 to July 3, 2001, pursuant to SCR 1330 and SCR 1352;

- Phase X: July 4, 2001 to November 30, 2001, pursuant to SCR 1360;

- Phase XI: December 1, 2001 to May 29, 2002, pursuant to SCR 1382;

- Phase XII: May 20, 2002 to December 4, 2002, pursuant to SCR 1409 and SCR 1443;

- Phase XIII: December 5, 2002 to June 3, 2003, pursuant to SCR 1447.

*2.    Distribution Plans were approved by the UN for each Phase.*

309.    Each Programme Phase began with a Distribution Plan, initially drafted by the Hussein Regime, but ultimately approved by the UN.

310.    The Distribution Plan set the budget for the needed items of humanitarian aid.

311.    The amount of aid was limited by the amount of oil production from Iraq's fields, which had suffered from years of neglect. Particularly in the early Phases of the Programme, production was severely limited. After amendment of the Programme to allow for investment in oil production, more oil could be produced, but production was never sufficient to fulfill the humanitarian needs of the Iraqi people.

The Republic of Iraq's First Amended Complaint – page 43

312.    As an example, the Executive Summary of the Distribution Plan for Phase VII of the Programme is attached as Exhibit 1.

313.    The budget for the Phase VII Distribution Plan was just over $2.92 billion.  The Phase VII's Distribution Plan included about $1.287 billion for food and food distribution, to provide an estimated 2,330 kilocalories per Iraqi per day.  To put this amount in perspective, the Iraqi population at the time was more than 26 million persons, so the allocation was less than $50 per capita for the 180-day Distribution Plan period.  Other critical parts of the Distribution Plan included $300 million for medical supplies, $198 million to provide potable water and sanitation services, another $292 million to assist farmers damaged by drought and for irrigation, and about $321 million for the electrical infrastructure.

314.    Ultimately, however, less than half the budgeted items arrived in Iraq.

315.    The basic Distribution Plans by Phase were as follows (with amounts in millions):

| 1996-2003 | Programme Phase | | | | | | | | | | | | |
| Sector | I | II | III | IV | V | VI | VII | VIII | IX | X | XI | XII | XIII |
| Agriculture | | 50 | 50 | 250 | 180 | 274 | 292 | 805 | 522 | 703 | 474 | 442 | 444 |
| Education | | 27 | 27 | 100 | 100 | 127 | 119 | 389 | 283 | 287 | 188 | 236 | 192 |
| Electricity | | 55 | 62 | 411 | 409 | 440 | 321 | 752 | 583 | 487 | 294 | 311 | 273 |
| Food and nutrition | | 817 | 815 | 1125 | 1072 | 933 | 1057 | 1282 | 1294 | 1282 | 1291 | 1287 | 1296 |
| Food handling and support | | 99 | 101 | 180 | 120 | 207 | 230 | 518 | 209 | 305 | 195 | 200 | 282 |
| Housing and Settlements | | 6 | 11 | 55 | 40 | 166 | 260 | 959 | 424 | 338 | 293 | 207 | 239 |
| Infrastructure | | 0 | 0 | 0 | 0 | 0 | 0 | 489 | 440 | 407 | 231 | 425 | 343 |
| KAR specific | | 2 | 1 | 11 | 9 | 9 | 12 | 37 | 10 | 17 | 14 | 19 | 25 |
| Medicines and health | | 220 | 210 | 308 | 240 | 250 | 363 | 696 | 401 | 352 | 222 | 198 | 143 |
| Other | | 0 | 0 | 151 | 126 | 130 | 75 | 0 | 387 | 384 | 309 | 701 | 731 |
| Water and sanitation | | 44 | 44 | 210 | 150 | 280 | 198 | 604 | 402 | 343 | 323 | 458 | 360 |
| Sub-total | 1321 | 1320 | 1321 | 2801 | 2446 | 2816 | 2927 | 6531 | 4955 | 4905 | 3834 | 4484 | 4328 |
| Oil | 0 | 0 | 0 | 300 | 300 | 300 | 600 | 600 | 600 | 600 | 600 | 600 | 0 |
| Grand total | 1321 | 1320 | 1321 | 3101 | 2746 | 3116 | 3527 | 7131 | 5555 | 5505 | 4434 | 5084 | 4328 |

### 3.    The 661 Committee was tasked with administering the Programme.

316.    Programme administration was added to the purview of the 661 Committee to achieve and coordinate the twin goals of the Iraq Sanctions Program and the Programme. Later, in October of 1997, the UN Office of Iraq Programme, Oil-for-Food (the "OIP") was created to aid the 661 Committee in its duties.

317.    According to Security Council Resolution 986, the 661 Committee was required to approve all transactions under the Programme "in order to ensure the transparency of each transaction and its conformity with the other provisions of this resolution." The 661 Committee therefore reviewed and approved billions of dollars of transactions under the Programme.

318.    As to oil sales, the 661 Committee was charged with reviewing and approving a monthly pricing mechanism for individual oil contracts.

319.    From 1997 to 1999, the 661 Committee was also charged with reviewing all contracts for the purchase of goods under the Programme. Thereafter, 661 Committee approval was streamlined and greater responsibility placed on the OIP to review humanitarian contracts.

### 4.    Iraqi oil was supposed to be sold at the highest available price.

320.    Throughout each of the Programme Phases, Iraqi oil was sold under the Programme at the Official Selling Price ("OSP"), which was set by a committee of Security Council member states in Manhattan upon the recommendation of a rotating group of UN oil overseers.

321.    The UN oil overseers based the OSP on available market data, but also on the price they understood oil purchasers were willing to pay. The oil overseers therefore obtained much needed information from purchasers under the Programme, including from Defendants.

322.    To maximize revenue generated for the OFFP, the UN's goal was to set the OSP at the highest market rate. This, in turn, would increase the amount of humanitarian goods purchased through the OFFP for the Iraqi people.

The Republic of Iraq's First Amended Complaint – page 45

5.    *The Oil Purchasing Defendants had to agree to participate in the Programme subject to all Programme rules.*

323.    The Iraqi State Oil Marketing Organization (SOMO) was the legal entity that entered into the contracts with companies purchasing oil under the Programme. A company interested in purchasing Iraqi oil would negotiate directly with SOMO in Baghdad.

324.    The standard contract form executed by all of the Oil Purchasing Defendants contained the following significant provisions:

- "This Contract is subject to the approval of the Overseers on behalf of the 661 Committee."

- "Assignment of the rights or obligations of the SELLER or BUYER shall be subject to the approval of the 661 Committee."

- "This Contract shall be subject to [listed Security Council Resolutions, including 986, 1111, 1143, 1153, 1210, 1242, 1281, and 1302], the Procedures and the Memorandum of Understanding between the Secretariat of the United Nations and the Government of Iraq on the implementation of [Security Council Resolution] 986."

325.    In other words, to purchase oil under the Programme, the Oil Purchasing Defendants voluntarily agreed to participate in the Programme and abide by the UN regulations, including the obligations (1) to provide the 661 Committee with all information about their purchases and (2) to deposit the "full amount of each purchase" in the UN Escrow Account.

326.    To guarantee payment for the purchases, the Oil Purchasing Defendants provided Letters of Credit (or "LOC") in favor of the UN Escrow Account. According to the sales contract and the incorporated UN regulations, the LOC amount was supposed to represent the entire purchase price for the oil.

327.    Significantly, Security Council Resolution 986, incorporated in all purchase contracts, expressly required that "*the full amount of each purchase* of Iraqi petroleum and petroleum products" be made "directly by the purchaser … into the escrow account to be established by the Secretary-General for the purpose of this resolution." (emphasis supplied).

The Republic of Iraq's First Amended Complaint -- page 46

### 6.    The Vendor Defendants had to agree to participate in the Programme, subject to all Programme rules.

328.    Pursuant to the MOU, the Programme allowed for the purchase of "medicine, health supplies, foodstuffs, and material supplies for essential civilian needs of the Iraqi population throughout the country," but required that such purchases "follow normal commercial practice and be on the basis of the relevant resolutions of the Security Council and procedures of the 661 Committee." MOU at ¶ 19.

329.    According to Programme procedures and the MOU, a company wishing to sell humanitarian goods under the Programme contracted with the appropriate Iraqi Ministry or State-Owned Enterprise or, for goods destined for northern Iraq, with the UN-related agencies.

330.    Like the oil purchase contracts, the standard contracts incorporated the relevant provisions of the MOU and the UN regulations, including that all relevant information was to be provided to the UN for approval and that the contract was to be made in accordance with normal commercial practices.

331.    Thus, like the Oil Purchasing Defendants, to sell goods under the Programme, the Vendor Defendants had to voluntarily agree to participate in the Programme and abide by all Programme rules and regulations, including the rules requiring that dealings with the Hussein Regime follow normal commercial practice and that the Vendor Defendants provide full disclosure of all contract details to the 661 Committee.

332.    Vendors would forward final contracts to the UN in New York through their home country missions to the United Nations.

333.    For a sales contract to be approved, the contracting party was required to "submit all relevant documentation, including contracts, for all goods to be exported under the Resolution to the 661 Committee...." MOU at ¶22.

334.    The 661 Committee adopted procedures that mirrored the MOU requirements: an applicant was to provide "all relevant documentation, including the concluded contractual arrangements." Procedures Section III, at ¶30.

335.    The stated purpose for providing such information was to allow the 661 Committee to examine the contract details, "in particular the details of price and value...." *Id.* at ¶33.

336.    Following creation of the OIP, initial review for price and value was made by the OIP. If the OIP approved the contract and supporting paperwork, the 661 Committee reviewed and approved it under a "no objection" procedure, which meant that the contract was approved if no member of the 661 Committee timely objected.

337.    Upon contract approval, the UN instructed BNP that it could execute a LOC to guarantee payment of the agreed contract price.

338.    The goods could then be transported to Iraq, where UN-hired border inspectors would confirm receipt at one of four border inspection points. The UN inspectors would then inform the escrow bank (BNP) in New York, and BNP would wire payment to the goods supplier from the UN Escrow Account.

### 7.    *Contract approval and payments required extensive use of the mails and wires.*

339.    Completing this process necessarily entailed extensive use of the mails and wires, including telephone, fax, e-mail and wire transfers. Vendors had to negotiate and execute a contract with the Hussein Regime. They then forwarded the contract to the OIP and the 661 Committee at the United Nations in New York for their review and approval. If approved, the UN instructed BNP to issue a LOC. Delivery of the goods had to be arranged, confirmed, and payment requested. UN Inspectors had to inform the UN in New York that delivery of the goods had been completed, and BNP also had to be informed of such receipt. BNPNY then wired payment from the UN Escrow Account in New York.

340.   The OIP provided Programme participants with the following schematic of the approval process:

### CONTRACT APPROVAL AND
### LETTER OF CREDIT ISSUANCE



341.   The Defendants quickly learned that Programme processes required numerous communications by telephone and wire with the UN and with BNP in New York.

342.   An example of the typical process for a contract is Contract 50664 from Phase V of the Programme. This Contract, executed by Daimler (a Defendant), called for the sale of DM 2,176,298.38 (then equivalent to $834,031.21) in spare parts for Mercedes trucks.

The Republic of Iraq's First Amended Complaint – page 49

343.    Approval and payment under the contract required communications by Daimler to the UN (directly or through the German Mission to the UN) on at least the following occasions:

- 22 Feb. 1999: Daimler signs a contract with the General Automotive and Machinery Company in Iraq.

- 6 April 1999: The German Mission forwards the application to approve the contract to the 661 Committee in order to be paid from the UN Escrow Account.

- 12 Nov. 1999: The OIP informs the 661 Committee that the goods fall within the Distribution Plan, but notes that review of the contract had been delayed from April because there were insufficient funds to process under Phase V, which ended in May of 1999.

- 15 Dec. 1999: The 661 Committee sends shipping approval to the German Ambassador to the UN.

- 30 Aug. 2000: Daimler in Germany seeks an extension from the 661 Committee of the shipping date due to difficulties getting parts.

- 27 Sept. 2000: The 661 Committee sends authorization for extending the shipping date to the German Mission.

- 17 Nov. 2000: Daimler in Germany seeks a second extension from the 661 Committee.

344.    Even more communications by telephone or wire were required between the UN and BNP to arrange contract payment.    Daimler was apprised of at least some of these communications, but the need for numerous communications was obvious.    Such communications included at least the following:

- 18 Feb. 2000: Fax from BNPNY to UN requesting approval to open LOC.

- 22 Feb. 2000: UN to BNPNY approving opening of LOC.

- 22 Feb. 2000: BNPNY to UN: stating that it has issued the LOC and asking for authorization to charge the Escrow Account $1,648.71 for its fee.

- 18 April 2000: Fax from BNPNY to UN Treasurer re amending LOC and stating that BNPNY notes no inconsistencies with the Banking Agreement.

- 19 April 2000: UN to BNPNY re amending LOC.

The Republic of Iraq's First Amended Complaint -- page 50

- 20 April 2000: BNPNY to UN: amended LOC and charging the Escrow Account $100.

- 25 July 2000: BNPNY to UN re payment on LOC Y717599 and debiting account $834,031.21 (=1,739,971.48 DM).

- 29 Nov. 2000: Fax from BNPNY to UN Treasurer re LOC; again BNPNY notes no inconsistencies with Banking Agreement.

- 30 Nov. 2000: UN Treasury to BNPNY re another amendment to the LOC.

- 1 Dec. 2000: BNPNY to UN re LOC and charging $100 for the amendment.

- 29 Jan. 2001: UN Treasury to BNPNY re LOC.

- 10 April 2001: Fax from BNPNY to UN Treasurer seeking amendment to LOC Y717599. BNPNY notes no inconsistencies with Banking Agreement.

- 11 April 2001: Teklay Afeworki (UN Treasury) to BNPNY approving amendment to LOC.

- 11 April 2001: BNPNY to UN re amendment to LOC and charging $100.

- 21 June 2000: UN notification to BNPNY re inspections reports of Cotecna in Iraq conducted in June.

- 1 Aug. 2001: UN to BNPNY: Pursuant to MOU and UN procedures: goods have arrived and have been inspected in relation to LOC Y717599.

- 24 Aug. 2001: BNPNY to UN Treasury (acknowledged in writing) that debiting account to make payment on LOC.

345.   BNP advised Daimler's German bank about Daimler's LOC on numerous occasions.

In each case, Daimler's Bank was requested to forward the information to Daimler:

- 22 Nov. 2000: BNPNY to Deutsche Bank in Stuttgart re LOC: "Please advise beneficiaries …"

- 20 Jan. 2001: BNPNY to Deutsche Bank in Stuttgart re LOC: "Please advise beneficiaries …"

- 30 Jan. 2001: BNPNY to Deutsche Bank in Stuttgart re LOC: "Please advise beneficiaries …"

BNP also had to communicate with the Iraqi government; for example, on April 11, 2001, BNPNY sent a communication to the Central Bank of Iraq about the LOC.

346.    Other necessary communications related to the required inspections to ensure purchased goods arrived in Iraq.  Communications related to those activities include at least the following:

- 11 Nov. 1999: "Report Concerning Request to Ship Goods to Iraq in Accordance with Resolution 986."

- Numerous reports from 29 July through 1 August 2001 from inspection company Cotecna re differing parts of shipment. All of these reports were then passed from the UN to BNPNY to authorize payment under the LOC.

347.    Notably, the Cotecna inspection reports note that the contract was delayed because there was "not sufficient funds for food handling contracts submitted under phase V."

348.    Daimler was paid on this contract by two wire transfers from BNPNY to Germany on July 25, 2000 and August 27, 2001 for $843,031.21 and $205,153.93, respectively.

349.    Other Programme contracts, including for oil sales, followed a similar course, except that the LOC for oil sales was in favor of the Escrow Account as opposed to funded by it.

## V.    Illicit Surcharges on Sales of Oil under the OFFP

350.    The Hussein Regime's first method of subverting the Programme to its own purposes was to utilize its control over the sale of Iraqi oil.

### A.    The Hussein Regime's Control Over Choosing Oil Purchasers

351.    The Hussein Regime could choose to whom it sold oil pursuant to the MOU between the Hussein Regime and the UN.

352.    Defendant Wyatt, a self-described personal friend of Hussein, was chosen by Hussein to be the first purchaser under Phase I of the Programme.

353.    During this Phase, while the Hussein Regime welcomed contracts from friends of the Regime, it appears no willing buyers were excluded.

354.    Within a short period, however, the Hussein Regime decided to utilize its control to choose purchasers for its own illicit purposes.

## B.    Oil Vouchers as Bribes

355.    By Phase II, the Hussein Regime realized that, by keeping the price of Iraq's oil artificially low, it could reward political allies using the money the Programme had set aside for humanitarian aid.

356.    Thus, beginning in Phase II of the Programme, the Hussein Regime began directing oil allocations to particular countries and individuals it viewed as supportive of the Regime, and particularly of the Regime's desire to eliminate UN sanctions.

357.    The use of oil allocations to curry political favor increased during succeeding Programme phases.  During Phases IV through the middle of Phase VIII, the primary decision-making criteria for allocating vouchers to purchase oil was to gain favor with political parties, politicians and companies that were allies of the Regime, not to secure the best price to increase the amount of humanitarian aid to the Iraqi people.

358.    For these economic bribes to be effective, however, the purchase price set in the allocations (the OSP) had to be low enough that the holder of the allocation could make a profit with no risk or effort.

359.    The Oil Purchasing Defendants and BNP facilitated and profited by this perversion of the Programme's goals by assisting Hussein's allies, who received oil allocations, in completing the sale of the allocated oil for a profit.  The political recipients of oil allocations did not have the financial or business wherewithal to conclude a large sale of crude oil, so they turned to the Oil Purchasing Defendants and, in many cases, to BNP, to finance and coordinate the sales.

The Republic of Iraq's First Amended Complaint – page 53

360.    The assistance the Oil Purchasing Defendants and BNP gave to the allocation holders violated the Programme's rules, because the Oil Purchasing Defendants did not receive authorization from the 661 Committee to receive an assignment of rights from the allocation holders, and neither they nor BNP informed the 661 Committee of all of the details of the oil sales related to these political allocations. In many cases, the Oil Purchasing Defendants actively hid their participation in the transactions, at times with the direct assistance of BNP.

361.    As a result, the Iraqi people, who own Iraq's oil, were effectively funding bribes in the form of allocations for Iraqi oil at heavily discounted prices, designed to keep their oppressor in power.

## C.    The Hussein Regime's Demand for Kickbacks on Oil Sales

362.    Shortly after the Regime determined that it could garner political favor with cheap oil, the Regime seized on a second goal – the generation of illicit income under the Programme, which the Regime could use for non-humanitarian purposes.

### 1.    The Hussein Regime demands surcharge payments on oil sales.

363.    To generate that illicit income, the Hussein Regime simply demanded that anyone who wanted to purchase oil under the Programme make payments (surcharges) to bank accounts owned or controlled by the Hussein Regime.

364.    The Hussein Regime began demanding the surcharges no later than the Fall 2000, in the middle of Phase VIII. Initially, the surcharge was $0.10 per barrel lifted. Thereafter, the amount ranged from a short-lived attempt to impose a $0.50 surcharge, to $0.25 to $0.30, and finally $0.15 towards the end of the scheme.

365.    In addition, the Hussein Regime sometimes required the payment of unauthorized fees before permitting cargo ships to load oil at Iraqi ports. Payment of these so-called "port fees" was not made to the Escrow Account and therefore violated UN regulations.

366.    Participants in the scheme, including the Oil Purchasing Defendants, utilized the mails and wires for the purpose of furthering the conspiracy to corrupt the OFFP.

### 2.    The Oil Purchasing Defendants knew the conspiracy extended to all oil sales under the Programme.

367.    The Hussein Regime told all interested oil purchasers that surcharges were required for any purchases, so all purchasers knew from the start that their conduct was part of a larger conspiracy.

368.    In December 2000, the 661 Committee began hearing rumors of the surcharge scheme.

369.    Although the Hussein Regime denied the rumors, the 661 Committee nonetheless sent a notice to potential oil purchasers that any attempts by SOMO to impose surcharges to be paid to the Hussein Regime violated Programme regulations.

370.    All of the Oil Purchasing Defendants received that notice.

371.    BNP was also aware of the notice.

372.    Shortly after the delivery of this notice, the Hussein Regime began to have difficulty attracting purchasers for its oil, even at the substantial discounts it was offering.

373.    The Oil Purchasing Defendants quickly came to the aid of the Regime, offering advice and a structure to further the Regime's demands for illicit income.

374.    As explained further below, Wyatt, Chalmers and El Paso were particularly helpful in aiding the Hussein Regime's efforts to install the surcharge scheme.

375.    All of the Oil Purchasing Defendants made or caused to be made substantial surcharge payments after the UN notice was received.

376.    The Oil Purchasing Defendants made those payments knowing the scheme was broader than their own participation, knowing the Hussein Regime was under-pricing oil to make political bribes, knowing the Hussein Regime was siphoning humanitarian funds to maintain its

power and defeat the efforts to bring about its fall, knowing the UN considered the surcharges a violation of the Programme rules, and knowing they were providing a State Sponsor of Terrorism with foreign currency reserves in violation of the Iraq Sanctions Program and United States law.

377.    Nonetheless, the Oil Purchasing Defendants decided to join the conspiracy and aid the Hussein Regime, all for monetary gain. In the words of the United States Attorney for this District, the Oil Purchasing Defendants' choice was "breathtakingly immoral."

### 3.    *The Oil Purchasing Defendants defrauded the UN regarding the surcharges.*

378.    If any of the Oil Purchasing Defendants or BNP had disclosed the surcharge scheme, the UN would not have approved the contracts, ending the surcharge scheme. Indeed, the UN ultimately imposed retroactive oil pricing to ensure oil was purchased at market rates. The institution of retroactive pricing ended the surcharge scheme in approximately August 2002.

379.    To purchase oil under the Programme, a purchaser had to agree to join the Hussein Regime's illegal conspiracy by agreeing to pay the surcharge and other improper charges and to file false statements to the UN overseers of the OFFP. The Oil Purchasing Defendants' statements to the UN and the 661 Committee were necessarily false because the Oil Purchasing Defendants' contracts incorporated the Programme's rules, including the requirements (1) that full disclosure of all contract details be made to the 661 Committee and (2) that the full amount of the purchase price be deposited in the UN Escrow Account.

380.    The Oil Purchasing Defendants' representations to the UN failed to disclose at least the following:

- that the contracts submitted by the Oil Purchasing Defendants did not fully describe their agreement with the Hussein Regime;

- that the full purchase price was not being paid to the UN Escrow Account;

- that direct financial transfers were being made to the Hussein Regime outside the UN Escrow Account, the Iraq Sanctions Program, the Programme, and United States law;

- that many of the Oil Purchasing Defendants had received assignments of oil allocations given to others; and

- that the Oil Purchasing Defendants were paying substantial premiums over the OSP for Iraqi oil.

381.    BNP was a willing participant in the scheme through its efforts to hide the participation of the Defendants and others in this process through its willful failure to provide the 661 Committee with the details of all transactions, including the premiums being paid and the assignments of interest.

382.    Entry into the conspiracy necessitated multiple illegal acts, including wire and mail fraud, violations of statutes prohibiting financial transactions with State Sponsors of Terrorism, money laundering, and bribery.  The Oil Purchasing Defendants negotiated and executed contracts with the Hussein Regime, shipped oil from Iraq, and paid surcharges.  In addition, the Oil Purchasing Defendants sought and obtained UN approval, which required fraudulent transmissions to be sent by fax, e-mail or mail to the UN in New York.  Part of the purchase price was made by wiring funds into the Escrow Account at BNPNY; the rest was wired or delivered directly to the Hussein Regime.

### 4.    The Oil Purchasing Defendants defrauded the UN as to the OSP.

383.    Both the oil allocation and surcharge schemes worked only if the oil purchasers could persuade the UN to set the OSP below the actual market value.

384.    The Hussein Regime conspired with the Oil Purchasing Defendants to provide false market data to the UN in order to keep the OSP low enough to allow for the payment of surcharges and for excessive profits to be made by the friends of the Hussein Regime that received the allocations and by the Oil Purchasing Defendants.

The Republic of Iraq's First Amended Complaint – page 57

385.    Wyatt (including on behalf of El Paso) and Chalmers actively lobbied the UN for a lower OSP.

386.    From the information it received, BNP also knew purchasers were paying substantial premiums over the OSP, but BNP, too, failed to inform the 661 Committee of that material fact.

387.    The actual damage from the conspiracy and corruption therefore includes the difference between the OSP and the actual market value of the Iraqi oil sold during this period.

### 5.    The Oil Purchasing Defendants breached their contractual commitments.

388.    At a minimum, the payment of the surcharges violated three of the provisions in the Programme's standard contract for oil sales. Those contract provisions required (1) full disclosure of all contract details to the 661 Committee, (2) payment of the entire purchase price directly into the UN Escrow Account, and (3) 661 Committee approval of any assignment of contract rights.

389.    Failure to make full disclosure made the Oil Purchasing Defendants' representations false and prevented the UN from stopping the illegal conspiracy.

390.    Diversion of payments from the Escrow Account deprived the Programme of needed funds and violated US laws prohibiting financial transactions with designated terrorist groups.

391.    The Oil Purchasing Defendants and BNP never advised the UN that the anti-assignment clause was being systematically violated. Indeed, as set out below, BNP worked directly with Oil Purchasing Defendants and others to hide such violations from the UN.

392.    The breaches of the anti-assignment clause were an integral part of Hussein Regime's scheme to destroy the Programme and Iraq Sanctions Program. Enforcement of these clauses would have prevented these Defendants and the Hussein Regime from extracting the extra value from the oil sales contracts to effectuate their scheme. Enforcement also would have prevented the Hussein Regime from using oil allocations to reward its political allies.

## D.    Actions of the Individual Oil Purchasing Defendants

393.    In addition to the general conduct set forth above, the Oil Purchasing Defendants are culpable of the following:

### 1.    David B. Chalmers, Jr. admits to joining the conspiracy.

394.    Chalmers was the sole shareholder of Bayoil (USA), Inc., an oil company based in Houston, Texas, and Bayoil Supply & Trading Limited, a Bahamian company (together "Bayoil").

395.    Chalmers directly and indirectly paid more than $34.5 million in illegal surcharges to the Hussein Regime.

396.    According to the United States Attorney for the Southern District of New York, "Chalmers and the Bayoil Companies not only failed to sound the alarm on the Hussein regime's exploitation of the OFFP, they stoked the fire. During the crucial month of December 2000 – when all other companies refused to buy Iraqi oil because of the requests for surcharges – Chalmers and the Bayoil Companies leapt right into the market."

#### (a)    Chalmers' Guilty Plea

397.    Chalmers pleaded guilty to, and is currently imprisoned for, at least part of his role in the corruption of the OFFP.

##### (1)    Use of mails and wires

398.    Chalmers admits he directed the purchase of Iraqi oil under the OFFP and that he paid more for the Iraqi oil than the OSP, decreasing the amount of humanitarian aid received by the Iraqi people.

399.    After purchasing Iraqi oil, Chalmers "arranged through facsimile and electronic mail transmissions, as well as telephone calls, for cargo ships to load the oil from Iraq and transport it...."

### (2)    Conspiracy

400.    Chalmers admits that in or about mid-2000, the Hussein Regime began implementing the surcharge scheme, that he was informed that other companies were involved in the conspiracy, and that any company that refused to pay the surcharges would be barred from participation in the OFFP.

401.    Chalmers admits that at times the Hussein Regime would also require the unauthorized payment of port fees in violation of United States law and regulations.

402.    Chalmer's indictment charges: "From in or about mid-2000, up to and including at least in or about 2002, David B. Chalmers, Jr., the defendant, on behalf of the Bayoil Companies, the defendants, and Oscar S. Wyatt, Jr., the defendant, on behalf of the Coastal Corporation [now El Paso] ..., separately, together, and with officials of the Government of Iraq and other co-conspirators not named ..., lobbied the United Nations to select an O.S.P. at a level that would allow recipients of oil allocations from Iraq to pay the required surcharge and still retain a profit for themselves. A below-market O.S.P. would enable the Government of Iraq to achieve its objective of collecting the illegal surcharges on oil allocated pursuant to the Oil-for-Food Program."

403.    "From in or about April 2001, up to and including at least in or about September 2001, David B. Chalmers, Jr. ... agreed to pay, paid, and caused to be paid millions of dollars of secret illegal surcharges to the Government of Iraq. .... To conceal these illegal surcharge payments, Chalmers agreed to pay the Bayoil Foreign Company inflated commission prices on the original oil transactions, with the knowledge and expectation that the Bayoil Foreign Company would then make the surcharge payments to the Government of Iraq. Based on instructions from Iraqi officials, representatives of the Bayoil Companies sent these illegal surcharge payments via wire transfers ...."

404.    Chalmers "knowingly" participated in the "Surcharge Scheme" from about 2001 through about March 2003, and "caused funds to be diverted from the Oil-for-Food Bank Account

that otherwise would have been available to purchase humanitarian goods under the Oil-for-Food Program."

405.    Chalmers and others, including Wyatt, "unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Sections 1343 and 2332d of Title 18, United States Code."

406.    Section 2332d of Title 18 prohibits financial transactions with a terrorist state. Violation of its provisions also constitutes a RICO predicate act.

407.    It "was a part and an object of the conspiracy that David B. Chalmers, Oscar S. Wyatt, Jr. [and others] unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit, and cause to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343."

### (b)    Additional Factual Background

#### (1)    UN Contract M/08/40

408.    Chalmers' companies entered into Contract M/08/40 before the surcharge scheme was implemented, but the Hussein Regime nonetheless required a surcharge payment before the oil could be offloaded. At first, Chalmers objected, stating his willingness to make payments in the future, but not on this shipment. Ultimately, on January 1, 2001, Chalmers relented and paid the requested surcharge.

409.    In exchange for the commitment to make the improper payments, 1.8 million barrels of oil were shipped from Iraq.

The Republic of Iraq's First Amended Complaint -- page 61

### (2)    Chalmers Jump Starts the Scheme

410.    The UN's notification to oil purchasers that surcharges violated Programme rules virtually stopped oil exports due to the unwillingness of established oil companies to pay illicit surcharges.

411.    Chalmers and his companies, however, did not hesitate.   In December 2000, Chalmers, through one of his companies, received a massive allocation of Iraqi oil -- 25 million barrels.

412.    The Hussein Regime's Minister of Oil informed Chalmers that the purpose of the allocation was to "open[] the gates" and to break the "psychological barrier" against participation in the illegal conspiracy, so as to convince other companies to participate.

413.    Before making the first surcharge payment, Chalmers and his front company sought legal advice from the law firm of Hunton & Williams, who opined that payment of the surcharges would constitute entry into a criminal conspiracy.

414.    When the Hunton & Williams' legal opinion caused the initial front-company to balk at paying the surcharge, the Hussein Regime contacted Chalmers directly, since the Regime knew he was the real party in interest.

415.    Chalmers sought personally to remedy the stalemate, committing to finance $9,016,151.40 in surcharges.

416.    Chalmers knew the money was being put into the hands of the Hussein Regime and that he was entering into a criminal conspiracy with the Regime.

417.    The Hussein Regime, however, felt that Chalmers had paid the surcharges late, so the Regime threatened to cancel the contracts.   In response, Chalmers had Wyatt hand-deliver a letter to the Hussein Regime, emphasizing his long-standing commitment to the scheme, even when others refused.

*(3)    Other Purchases through Allocation Holders*

418.    When Chalmers was unsatisfied with his own oil allocation, he turned to other allocation holders.

419.    Between April 2001 and March 2003, Chalmers, through his companies, purchased 144.9 million barrels of OFFP oil under 38 distinct contracts.

*(4)    Chalmers' Surcharges*

420.    Chalmers caused surcharges to be paid on at least the following contracts:

| Contract | Surcharge Levied | Surcharge Amount Paid |
|---|---|---|
| M/08/05 Total | $1,163,203.00 | $1,163,207.00 |
| M/08/111 Total | $157,500.00 | $39,978.50 |
| M/08/27 Total | $100,240.00 | $100,193.20 |
| M/08/58 Total | $144,474.00 | $140,000.00 |
| M/08/95 Total | $354,234.00 | $350,000.00 |
| M/09/106 Total | $288,347.40 | $288,348.00 |
| M/09/116 Total | $1,054,566.50 | $1,075,775.00 |
| M/09/18 Total | $9,731,651.59 | $9,803,960.14 |
| M/09/54 Total | $498,973.00 | $498,518.00 |
| M/09/66 Total | $292,500.00 | $292,470.00 |
| M/09/78 Total | $612,089.70 | $612,090.00 |
| M/09/80 Total | $550,588.50 | $299,968.00 |
| M/09/89 Total | $606,642.90 | $606,642.90 |
| M/09/97 Total | $545,800.95 | $545,800.95 |
| M/10/02 Total | $501,393.75 | $497,370.00 |
| M/10/07 Total | $1,101,606.05 | $1,101,610.80 |

| Contract | Surcharge Levied | Surcharge Amount Paid |
|---|---|---|
| M/10/20 Total | $600,300.90 | $1,183,769.00 |
| M/10/21 Total | $601,159.20 | $601,160.00 |
| M/10/34 Total | $485,782.25 | $485,762.00 |
| M/10/35 Total | $237,500.00 | $237,500.00 |
| M/10/42 Total | $300,000.00 | $349,985.00 |
| M/10/50 Total | $262,086.25 | $249,973.00 |
| M/10/52 Total | $500,208.25 | $500,000.00 |
| M/10/54 Total | $250,000.00 | $250,000.00 |
| M/10/55 Total | $562,357.30 | $562,357.30 |
| M/10/57 Total | $250,224.00 | $250,022.00 |
| M/10/61 Total | $5,511,246.35 | $5,432,265.35 |
| M/10/62 Total | $512,151.50 | $59,434.08 |
| M/10/76 Total | $573,315.95 | $551,955.95 |
| M/10/78 Total | $241,610.00 | $240,988.00 |
| M/10/85 Total | $267,485.10 | $267,458.00 |
| M/10/93 Total | $535,575.30 | $534,765.30 |
| M/11/05 Total | $3,781,855.50 | $2,502,000.00 |
| M/11/100 Total | $225,000.00 | $225,000.00 |
| M/11/15 Total | $3,526,610.50 | $3,744,095.35 |
| M/11/17 Total | $912,801.30 | $912,771.30 |
| M/11/21 Total | $930,000.00 | $930,000.00 |
| M/11/28 Total | $472,422.50 | $323,425.00 |
| M/11/33 Total | $520,947.75 | $520,948.00 |

| Contract | Surcharge Levied | Surcharge Amount Paid |
|---|---|---|
| M/11/36 Total | $140,834.70 | $140,834.70 |
| M/11/51 Total | $315,462.75 | $315,500.00 |
| M/11/84 Total | $109,810.20 | $30,000.00 |
| M/12/18 Total | $297,986.55 | $297,979.50 |
| M/12/53 Total | $219,387.15 | $384,765.00 |
| Grand Total | $40,847,932.59 | $39,500,646.32 |

### 2. *Chevron admits to joining the conspiracy.*

421.    From approximately April 2001 through May 2002, Chevron contracted through third parties to purchase approximately 78 million barrels of crude oil under the Programme.

422.    Chevron paid the third parties a substantial premium over the OSP, so that, in turn, the third parties could make the surcharge payments to the Hussein Regime.

423.    In all, Chevron indirectly paid about $20 million in illegal surcharge payments in connection with its purchases. Chevron knew, should have known, or consciously disregarded the obvious fact that the third parties paid a portion of the premiums they received from Chevron to Iraq as illegal surcharges.

#### (a) *Chevron's Admissions*

424.    On November 8, 2007, Chevron entered into a non-prosecution agreement with the United States Department of Justice ("DOJ") in which it accepted, and acknowledged responsibility for, a number of facts, including that the Hussein Regime was demanding surcharges from oil purchasers, that Chevron knew of such demands, and that Chevron indirectly made such payments.

### (b)  Chevron's Knowledge

425.    Chevron knew the OFFP and US and international trade sanctions against the Hussein Regime prohibited financial transfers to the Hussein Regime and thus the surcharge payments.

426.    The surcharges paid in connection with Chevron's purchases of oil bypassed the Escrow Account and were instead paid to Regime-controlled accounts at banks in Jordan and Lebanon.

427.    Chevron paid a premium above the OSP for the Programme oil it purchased.

428.    In the Fall 2000, Chevron received the notice by the 661 Committee advising potential oil purchasers that it was illegal to make such payments.

### (c)  Chevron's Purchases

429.    From April 17, 2001 through May 6, 2002, Chevron purchased approximately 78 million barrels of crude oil from Iraq pursuant to 36 contracts with third parties that included the payment of illegal surcharges to Iraq.

430.    Chevron management knew, should have known, or was consciously indifferent to the fact that Chevron was funding illegal surcharge payments as part of the inflated premiums it paid to third parties for the purchase of Iraqi oil.

431.    At least one trader responsible for a large portion of Chevron's purchases from Iraq factored the cost of the surcharge payments into the price negotiations with third parties.

432.    In January 2001, after learning of Iraq's surcharge demands, Chevron implemented a company-wide policy that facially prohibited the payment of surcharges in connection with the purchase of Iraqi oil from third parties. Among other things, the policy required traders to obtain prior written approval for all proposed Iraqi oil purchases from Chevron's Director of Global Crude

Trading and charged management with reviewing each proposed Iraqi oil deal to ensure that there was no reason to believe that a surcharge had been or would be paid.

433.    Chevron's traders did not follow the company-wide policy against surcharge payments to Iraq.

434.    Chevron had strong indications that its purported policies were ignored. In one instance, a Chevron credit check of a proposed third party seller revealed it was a "brass plate company," meaning that the company had no experience in the oil business, no real business operations, and had no known assets.

435.    Despite such knowledge and concern on the part of Chevron's management, Chevron entered into two transactions to purchase three million barrels of oil from that third party in January 2002, paying a premium of $0.415 cents per barrel. Illegal surcharges were paid on both of these transactions and funded by Chevron through the inflated premiums Chevron paid to the middlemen.

436.    Thus, during the relevant period, Chevron knew or consciously disregarded that it was paying inflated premiums to third parties that included the costs of surcharge payments to Iraq. Chevron's premium payments to third parties increased after Iraq's surcharge demands began in approximately August 2000 and remained inflated until the surcharge policy ended.

437.    Shortly before the surcharge policy began, Chevron's premiums to third parties typically ranged from $0.25 to $0.28 cents per barrel. After the surcharge policy was implemented, Chevron's premiums rose as high as $0.53 per barrel and ranged from $0.36 to $0.495 cents per barrel.

### (d)    Chevron's Payment of Illegal Surcharges

438.    Third parties paid $20 million in illegal surcharges on Chevron's thirty-six transactions for the purchase of 78 million barrels of Iraqi crude under the Programme.

439.    Chevron caused surcharges to be paid on at least the following dates in relation to the referenced contracts:

| CONTRACT | Contract Value | Barrels Lifted | Surcharge Levied | Payment Date |
|---|---|---|---|---|
| M/08/102 | $75,590,321.23 | 3,539,238.00 | $746,179.30 | 3/18/2001 |
| M/08/102 Total | | | $746,179.30 | |
| M/08/73 | $41,067,590.97 | 1,499,532.00 | $8,000.00 | 3/22/2001 |
| M/08/73 Total | | | $8,000.00 | |
| M/08/84 | $40,900,500.00 | 1,500,000.00 | $150,000.00 | 2/5/2001 |
| M/08/84 Total | | | $150,000.00 | |
| M/08/87 | $49,194,759.61 | 1,960,627.00 | $196,062.00 | 2/28/2001 |
| M/08/87 | | | | 3/11/2001 |
| M/08/87 | | | | 3/18/2001 |
| M/08/87 | | | | 8/27/2001 |
| M/08/87 | | | | 12/31/2001 |
| M/08/87 | | | | 1/6/2002 |
| M/08/87 | | | | 3/21/2002 |
| M/08/87 Total | | | $196,062.00 | |
| M/09/02 | $78,333,407.32 | 4,002,725.00 | $1,200,817.50 | 6/25/2001 |
| M/09/02 | | | | 7/30/2001 |
| M/09/02 Total | | | $1,200,817.50 | |
| M/09/08 | $93,908,581.73 | 4,851,657.00 | $1,455,497.10 | 4/5/2001 |
| M/09/08 | | | | 4/6/2001 |
| M/09/08 | | | | 8/11/2001 |
| M/09/08 | | | | 12/13/2001 |
| M/09/08 | | | | |
| M/09/08 Total | | | $1,455,497.10 | |
| M/09/51 | $79,062,833.09 | 4,043,821.00 | $1,213,146.30 | 3/27/2001 |
| M/09/51 | | | | 5/31/2001 |
| M/09/51 | | | | 6/5/2001 |
| M/09/51 | | | | |
| M/09/51 Total | | | $1,213,146.30 | |
| M/09/72 | $75,851,886.42 | 4,069,646.00 | $1,220,893.80 | 4/23/2001 |
| M/09/72 | | | | 5/27/2001 |
| M/09/72 | | | | |
| M/09/72 Total | | | $1,220,893.80 | |
| M/09/86 | $38,855,204.98 | 2,026,458.00 | $607,937.40 | 3/18/2001 |
| M/09/86 | | | | 6/25/2001 |
| M/09/86 | | | | 6/28/2001 |
| M/09/86 | | | | 7/2/2001 |
| M/09/86 | | | | 7/9/2001 |
| M/09/86 | | | | 7/11/2001 |
| M/09/86 | | | | 7/16/2001 |
| M/09/86 | | | | |
| M/09/86 Total | | | $607,937.40 | |
| M/10/05 | $78,774,008.29 | 4,893,534.00 | $1,468,060.20 | 3/29/2001 |

The Republic of Iraq's First Amended Complaint – page 68

| CONTRACT | Contract Value | Barrels Lifted | Surcharges Levied | Payment Date |
|---|---|---|---|---|
| M/10/05 | | | | 10/11/2001 |
| M/10/05 | | | | 11/18/2001 |
| M/10/05 | | | | 12/20/2001 |
| M/10/05 | | | | |
| M/10/05 Total | | | $1,468,060.20 | |
| M/10/11&M/10/19 | $34,401,443.95 | 2,235,673.00 | $670,701.90 | 9/6/2001 |
| M/10/11&M/10/19 | | | | 10/4/2001 |
| M/10/11&M/10/19 | | | | 10/8/2001 |
| M/10/11&M/10/19 | | | | 10/28/2001 |
| M/10/11&M/10/19 | | | | 11/12/2001 |
| M/10/11&M/10/19 | | | | |
| M/10/11&M/10/19 Total | | | $670,701.90 | |
| M/10/19 | $60,618,137.68 | 2,948,421.00 | $884,526.30 | 4/25/2001 |
| M/10/19 | | | | 8/20/2001 |
| M/10/19 | | | | 10/16/2001 |
| M/10/19 | | | | 11/21/2001 |
| M/10/19 | | | | |
| M/10/19 Total | | | $884,526.30 | |
| M/10/41 | $32,330,652.01 | 2,004,217.00 | $601,265.10 | 8/2/2001 |
| M/10/41 | | | | 10/9/2001 |
| M/10/41 | | | | 11/15/2001 |
| M/10/41 | | | | |
| M/10/41 Total | | | $601,265.10 | |
| M/10/65 | $49,125,108.28 | 3,129,339.00 | $886,467.95 | 11/10/2001 |
| M/10/65 | | | | 1/3/2002 |
| M/10/65 | | | | |
| M/10/65 Total | | | $886,467.95 | |
| M/10/75 | $56,907,442.10 | 2,956,979.00 | $887,093.70 | 3/18/2002 |
| M/10/75 | | | | 3/19/2002 |
| M/10/75 | | | | 3/21/2002 |
| M/10/75 Total | | | $887,093.70 | |
| M/11/03&M/11/49 | $44,672,498.81 | 2,067,652.00 | $620,295.60 | 1/15/2002 |
| M/11/03&M/11/49 | | | | 1/21/2002 |
| M/11/03&M/11/49 | | | | 5/16/2002 |
| M/11/03&M/11/49 Total | | | $620,295.60 | |
| M/11/11 | $31,466,676.32 | 2,001,688.00 | $600,506.40 | 3/26/2002 |
| M/11/11 | | | | 3/26/2002 |
| M/11/11 | | | | 5/5/2002 |
| M/11/11 Total | | | $600,506.40 | |
| M/11/17 | $48,230,126.90 | 3,042,671.00 | $912,801.30 | 1/17/2002 |
| M/11/17 | | | | 2/28/2002 |
| M/11/17 | | | | |
| M/11/17 Total | | | $912,801.30 | |
| M/11/32 | $46,247,662.76 | 2,049,989.00 | $308,998.35 | 10/11/2001 |
| M/11/32 | | | | 12/31/2001 |

The Republic of Iraq's First Amended Complaint – page 69

| CONTRACT | Contract Value | Barrels Lifted | Surcharge Levied | Payment Date |
|---|---|---|---|---|
| M/11/32 Total | | | $308,998.35 | |
| M/11/79 | $114,505,649.84 | 5,281,331.00 | $1,203,840.95 | 5/1/2002 |
| M/11/79 | | | | 6/24/2002 |
| M/11/79 | | | | 6/24/2002 |
| M/11/79 | | | | 6/30/2002 |
| M/11/79 Total | | | $1,203,840.95 | |
| M/12/01 | $208,958,501.03 | 8,799,923.00 | $288,293.30 | 8/13/2002 |
| M/12/01 Total | | | $288,293.30 | |
| M/12/38 | $476,542,859.42 | 19,569,126.00 | $1,251,822.15 | 9/30/2002 |
| M/12/38 | | | | 12/11/2002 |
| M/12/38 | | | | 3/1/2003 |
| M/12/38 Total | | | $1,251,822.15 | |
| Grand Total | | | $17,383,206.60 | |

### 3.    *El Paso admits to joining the conspiracy.*

440.    From approximately June 2001 through June 2002, El Paso and its predecessor-in-interest Coastal indirectly made approximately $5.5 million in illegal surcharge payments to purchase crude oil from third parties under the OFFP.

441.    El Paso knew, was reckless in not knowing, or was consciously indifferent to the fact that illegal surcharges were paid in connection with those purchases and that the third parties passed those surcharges back to El Paso in premiums.

### (a)    *El Paso's Admissions*

442.    On February 5, 2007, El Paso entered into a non-prosecution agreement with the United States DOJ, acknowledging and accepting responsibility for a number of facts, including that it knew surcharges were being paid and that El Paso's steps to prevent the payment of surcharges were inadequate.

443.    El Paso knew the OFFP and US and international trade sanctions on Iraq prohibited the surcharge payments.

444.    El Paso received the notice sent by the 661 Committee advising that it was illegal to make surcharge payments.

The Republic of Iraq's First Amended Complaint -- page 70

### (b)    Coastal

445.    When the OFFP began, Coastal, through its former Chief Executive Officer Wyatt, had longstanding ties to Iraq and to Saddam Hussein personally.

446.    Coastal first received a surcharge demand from an Iraqi government official in September 2000. In that month, two Coastal senior executives met in Baghdad with the SOMO Director General, who demanded that Coastal pay a surcharge of $0.10 per barrel on all future Iraqi crude oil liftings. The Coastal officials conveyed the demand to Coastal's corporate headquarters.

447.    After that notice, Coastal did not enter into further direct contracts with SOMO, but Coastal did not cease purchasing Iraqi crude oil. Instead, it purchased through third parties, and knew, was reckless in not knowing, or was consciously indifferent to the fact that illegal surcharges were paid in connection with those purchases and ultimately funded by Coastal in the form of excess premiums paid on the oil.

448.    In making their commercial decisions on oil trades, Coastal's and El Paso's traders factored the surcharge payments into the price of their oil.

449.    In purchasing Iraqi crude oil from third parties, El Paso paid a premium above the OSP established by the United Nations and SOMO.

450.    Before the merger, Coastal knew from first-hand experience that SOMO was demanding illegal surcharges on all purchases of Iraqi oil, including oil it was purchasing. For example, on December 3, 2000, a tanker chartered by Coastal arrived in port to load millions of barrels of oil under Coastal's contracts with two third parties. In the following days, Coastal was advised that SOMO demanded a surcharge of $0.40 per barrel and would not allow the tanker to be loaded until the surcharge was paid. The third party informed Coastal that it refused to make the surcharge payment. A standoff ensued, and Coastal incurred demurrage charges of $60,000 per day

while the ship was stuck in port. Ultimately, the third party paid a surcharge on the lifting, and on December 20 the tanker was loaded.

### (c)    El Paso's Contracts and Knowledge

451.    Shortly after the December 2000 demurrage dispute, the El Paso merger took place.

452.    Subsequently, another lifting under the contract was made through a third party. Records show that the third party paid a total surcharge of $1,031,436 in connection with the transaction. El Paso then paid the third party a substantial premium on the oil to cover the cost of the surcharge payment.

453.    El Paso's knowledge of surcharge demands is evident in recorded telephone conversations of the company's oil traders, which include references to discussions between El Paso's traders and SOMO officials in which SOMO reiterated its across-the-board surcharge demands.

454.    El Paso knew of the full scope of the conspiracy – that surcharge payments were a part of all Iraqi transactions. In one call, an El Paso oil trader described the surcharge scheme as "very blatant."

455.    Starting in or around 2001, El Paso inserted a provision in some of its third party Iraqi oil purchase contracts requiring its contract partners to represent that they had "made no surcharge or other payment to SOMO" outside the Oil for Food Escrow Account in obtaining the crude oil sold to El Paso. The representations were false. Records show that surcharges were paid on the oil transactions. El Paso officials intentionally did not conduct sufficient due diligence to ensure that surcharges were not paid for the Iraqi crude oil it purchased from third parties. To the contrary, El Paso officials knew SOMO continued to demand surcharges as a precondition for receiving Iraqi oil.

456.    El Paso had direct knowledge that its contract provisions were false and ineffective.

457.    In one recorded El Paso conversation, a third party brazenly indicated that, if he was willing to violate international trade sanctions by paying illegal surcharges to Iraq, he would be equally willing to sign a false certification denying the payment.

458.    Beginning in June 2001, El Paso entered into fourteen additional third party transactions involving fifteen contracts between third parties and SOMO to purchase crude oil, despite its knowledge of the SOMO kickback scheme. El Paso paid a total of approximately $420 million for approximately 21.4 million barrels of oil under these transactions. Between June 2001 and June 2002, surcharge payments of approximately $5.5 million were paid in connection with these transactions.

### (d)    El Paso's Profits

459.    El Paso made about $5.5 million in profits on these transactions.

460.    El Paso paid surcharges on one contract (M/08/72) in the name of Coastal Corporation N.V. and admits to causing surcharge payments on 15 additional contracts made through third parties.

### 4.    Vitol admits to joining the conspiracy.

461.    Vitol, a Swiss company, purchased or financed the purchase of nearly $4 billion in oil purchases under the Programme.

### (a)    Vitol's Guilty Plea

462.    In November 2007, Vitol entered a guilty plea in New York state court to the count of grand larceny in the first degree.

463.    Vitol pleaded guilty to having "during the period from on or about June 1, 2001 to on or about September 30, 2002, stole property from the United Nations and the value of the property exceeded one million dollars."

The Republic of Iraq's First Amended Complaint – page 73

464.    The stolen property was actually property of the Republic of Iraq, held in trust by the UN in the Escrow Account for the benefit of the Iraqi people.

465.    During the pendency of the Programme, Vitol purchased Iraqi crude oil directly with SOMO and through intermediaries.

466.    Vitol received the 661 Committee's December 2000 notice that surcharges violated the regulations of the OFFP.

467.    After an OPEC meeting in around March 2001, Iraqi officials told a Vitol consultant that Vitol would need to pay surcharges to buy Iraqi crude oil.

468.    Thereafter, Vitol paid or caused to be paid to the Hussein Regime approximately $780,000 in surcharges on Vitol's direct purchases and approximately $12,000,000 on indirect purchases of crude oil.

469.    As stated in Vitol's indictment: "Under the doctrine of collective knowledge, Vitol S.A. is responsible for approximately $13,000,000 in surcharges that were paid to the Iraqi government in connection with crude oil purchased directly or indirectly by Vitol S.A."

      *(b)    Additional Allegations*

470.    Vitol purchased crude oil from SOMO both directly and through an intermediary. Vitol entered into eight direct purchase contracts under the Programme. Vitol financed oil purchases at least 70 times under the Programme. When using an intermediary, Vitol paid the intermediary company a premium above SOMO's selling price. The intermediary used at least part of the premium to pay the surcharge to the Hussein Regime.

471.    The layers of individuals and companies between the allocation and the end-user of Iraq's crude oil resulted in transactions that hid from the UN the entity actually benefiting from or controlling the purchase of Iraq's oil.

472.    Vitol financed the purchase of oil by, inter alia, the following companies: (1) Unifuel LLC, (2) International Petroleum and Industrial Services, (3) Machinoimport, (4) Mastek SDN BHD, (5) Masefield AG, (6) Seta Insaat Petrol VE Petrol Urunleri Nakliyecilik Ilac Sanayi VE Ticaret A.S., (7) Al-Rasheed International Cooperation, (8) Oil & Gas Services Group Ltd., (9) Jaloul Investment and Trade, (10) Russian Engineering Company, (11) Devon Petroleum Ltd. S.A., (12) Hyson (Nigeria) Limited, (13) Emercom Agency (Russia), (14) Rosneftegazexport, (15) Federalny Torgoviy Dom Oil, (16) Ghassan Shallah Co., and (17) The Oil Services of Vung Tau Vietnam.

473.    Vitol paid some of the surcharges to Regime-controlled bank accounts through other entities and agents and also paid certain surcharges directly. With a few exceptions, the Hussein Regime used Fransabank in Lebanon and Jordan National Bank (Ahli Bank) in Jordan to collect the surcharges. The Hussein Regime opened the accounts at Fransabank and at Jordan National Bank under the names of two SOMO employees, the Executive Director of SOMO and the Director of the Financial Department, both of whom were loyal to Saddam Hussein.

474.    After the surcharges were deposited or transferred to these accounts (also referred to as bridge accounts), the surcharge funds were then transferred to accounts of the Central Bank of Iraq ("CBI"), held at the same bank. From there, CBI employees withdrew the funds in cash and transported it to Baghdad.

475.    Vitol caused surcharges to be paid on at least the following dates in relation to the referenced contracts:

| CONTRACT | Contract Value | Barrels Lifted | Surcharge Levied | Payment Date | Surcharge Amount Paid |
|---|---|---|---|---|---|
| M/08/05 | $385,841,452.11 | 15,547,900.00 | $1,163,203.00 | | |
| M/08/05 | | | | 10/23/2000 | $100,000.00 |
| M/08/05 | | | | 10/26/2000 | $100,000.00 |
| M/08/05 | | | | 11/3/2000 | $100,000.00 |
| M/08/05 | | | | 11/7/2000 | $100,000.00 |
| M/08/05 | | | | 12/20/2001 | $98,025.00 |
| M/08/05 | | | | 12/20/2001 | $99,596.00 |

The Republic of Iraq's First Amended Complaint – page 75

| CONTRACT | Contract Value | Barrels Lifted | Surcharge Levied | Payment Date | Surcharge Amount Paid |
|---|---|---|---|---|---|
| M/08/05 | | | | 12/20/2001 | $565,586.00 |
| M/08/05 Total | | | $1,163,203.00 | | $1,163,207.00 |
| M/08/111 | $39,074,604.27 | 1,575,000.00 | $157,500.00 | | |
| M/08/111 | | | | 2/7/2002 | $39,978.50 |
| M/08/111 Total | | | $157,500.00 | | $39,978.50 |
| M/08/27 | $75,253,115.80 | 3,022,410.00 | $100,240.00 | | |
| M/08/27 | | | | 11/10/2000 | $100,193.20 |
| M/08/27 Total | | | $100,240.00 | | $100,193.20 |
| M/08/58 | $38,013,680.44 | 1,444,744.00 | $144,474.00 | | |
| M/08/58 | | | | 3/30/2002 | $140,000.00 |
| M/08/58 Total | | | $144,474.00 | | $140,000.00 |
| M/08/95 | $143,092,130.30 | 5,550,846.00 | $354,234.00 | | |
| M/08/95 | | | | 5/30/2001 | $150,000.00 |
| M/08/95 | | | | 6/3/2001 | $200,000.00 |
| M/08/95 Total | | | $354,234.00 | | $350,000.00 |
| M/09/106 | $19,530,360.24 | 961,158.00 | $288,347.40 | | |
| M/09/106 | | | | 4/8/2001 | $120,000.00 |
| M/09/106 | | | | 11/21/2001 | $100,000.00 |
| M/09/106 | | | | 8/7/2002 | $68,348.00 |
| M/09/106 Total | | | $288,347.40 | | $288,348.00 |
| M/09/116 | $66,220,075.22 | 3,842,370.00 | $1,054,566.50 | | |
| M/09/116 | | | | 5/13/2001 | $120,000.00 |
| M/09/116 | | | | 10/29/2001 | $563,829.00 |
| M/09/116 | | | | 11/6/2001 | $10,096.00 |
| M/09/116 | | | | 12/19/2001 | $141,600.00 |
| M/09/116 | | | | 12/19/2001 | $240,250.00 |
| M/09/116 Total | | | $1,054,566.50 | | $1,075,775.00 |
| M/09/18 | $674,111,767.17 | 34,307,522.00 | $9,731,651.59 | | |
| M/09/18 | | | | 1/10/2001 | $340,000.00 |
| M/09/18 | | | | 1/14/2001 | $370,000.00 |
| M/09/18 | | | | 2/6/2001 | $300,000.00 |
| M/09/18 | | | | 2/7/2001 | $390,000.00 |
| M/09/18 | | | | 2/13/2001 | $194,290.42 |
| M/09/18 | | | | 3/27/2001 | $500,000.00 |
| M/09/18 | | | | 3/28/2001 | $300,000.00 |
| M/09/18 | | | | 3/29/2001 | $200,000.00 |
| M/09/18 | | | | 4/15/2001 | $450,000.00 |
| M/09/18 | | | | 4/17/2001 | $350,000.00 |
| M/09/18 | | | | 4/23/2001 | $80,000.00 |
| M/09/18 | | | | 4/23/2001 | $120,000.00 |
| M/09/18 | | | | 4/23/2001 | $100,000.00 |
| M/09/18 | | | | 4/30/2001 | $443,764.69 |
| M/09/18 | | | | 5/1/2001 | $30,000.00 |
| M/09/18 | | | | 5/2/2001 | $20,000.00 |
| M/09/18 | | | | 5/8/2001 | $50,000.00 |
| M/09/18 | | | | 5/8/2001 | $40,000.00 |

The Republic of Iraq's First Amended Complaint -- page 76

| CONTRACT | Contract Value | Barrels Lifted | Surcharge Levied | Payment Date | Surcharge Amount Paid |
|---|---|---|---|---|---|
| M/09/18 | | | | 5/8/2001 | $50,000.00 |
| M/09/18 | | | | 5/14/2001 | $20,000.00 |
| M/09/18 | | | | 5/14/2001 | $174,856.47 |
| M/09/18 | | | | 5/17/2001 | $264,414.93 |
| M/09/18 | | | | 5/17/2001 | $40,000.00 |
| M/09/18 | | | | 7/9/2001 | $194,513.44 |
| M/09/18 | | | | 7/9/2001 | $228,349.44 |
| M/09/18 | | | | 7/16/2001 | $429,104.08 |
| M/09/18 | | | | 7/18/2001 | $241,593.83 |
| M/09/18 | | | | 8/2/2001 | $175,712.98 |
| M/09/18 | | | | 8/6/2001 | $1,760,875.85 |
| M/09/18 | | | | 8/29/2001 | $456,051.20 |
| M/09/18 | | | | 4/1/2002 | $1,490,432.81 |
| M/09/18 Total | | | $9,731,651.59 | | $9,803,960.14 |
| M/09/54 | $46,224,516.90 | 1,935,892.00 | $498,973.00 | | |
| M/09/54 | | | | 3/13/2001 | $60,000.00 |
| M/09/54 | | | | 5/27/2001 | $438,518.00 |
| M/09/54 Total | | | $498,973.00 | | $498,518.00 |
| M/09/66 | $19,811,624.34 | 975,000.00 | $292,500.00 | | |
| M/09/66 | | | | 9/9/2001 | $99,985.00 |
| M/09/66 | | | | 9/10/2001 | $192,485.00 |
| M/09/66 Total | | | $292,500.00 | | $292,470.00 |
| M/09/78 | $42,369,590.96 | 2,040,299.00 | $612,089.70 | | |
| M/09/78 | | | | 10/24/2001 | $200,000.00 |
| M/09/78 | | | | 10/28/2001 | $391,452.50 |
| M/09/78 | | | | 10/28/2001 | $20,637.50 |
| M/09/78 Total | | | $612,089.70 | | $612,090.00 |
| M/09/80 | $45,295,929.41 | 2,002,354.00 | $550,588.50 | | |
| M/09/80 | | | | 2/15/2001 | $59,983.00 |
| M/09/80 | | | | 8/13/2001 | $239,985.00 |
| M/09/80 Total | | | $550,588.50 | | $299,968.00 |
| M/09/89 | $40,550,345.91 | 2,022,143.00 | $606,642.90 | | |
| M/09/89 | | | | | |
| M/09/89 | | | | 3/14/2001 | $50,000.00 |
| M/09/89 | | | | 10/28/2001 | $279,341.00 |
| M/09/89 | | | | 11/7/2001 | $157,301.90 |
| M/09/89 | | | | 11/22/2001 | $119,978.50 |
| M/09/89 | | | | 1/20/2002 | $21.50 |
| M/09/89 Total | | | $606,642.90 | | $606,642.90 |
| M/09/97 | $45,446,092.99 | 1,986,148.00 | $545,800.95 | | |
| M/09/97 | | | | 6/25/2001 | $250,217.25 |
| M/09/97 | | | | 9/1/2001 | $108,000.00 |
| M/09/97 | | | | 9/1/2001 | $187,583.70 |
| M/09/97 Total | | | $545,800.95 | | $545,800.95 |
| M/10/02 | $41,566,416.67 | 2,005,575.00 | $501,393.75 | | |
| M/10/02 | | | | 11/11/2001 | $497,370.00 |

The Republic of Iraq's First Amended Complaint – page 77

| CONTRACT | Contract Value | Barrels Lifted | Surcharge Levied | Payment Date | Surcharge Amounts Paid |
|---|---|---|---|---|---|
| M/10/02 Total | | | $501,393.75 | | $497,370.00 |
| M/10/07 | $86,144,814.95 | 4,006,395.00 | $1,101,606.05 | | |
| M/10/07 | | | | 4/10/2001 | $60,000.00 |
| M/10/07 | | | | 8/8/2001 | $556,828.80 |
| M/10/07 | | | | 9/14/2001 | $190,693.00 |
| M/10/07 | | | | 10/11/2001 | $250,889.00 |
| M/10/07 | | | | 10/26/2001 | $43,200.00 |
| M/10/07 Total | | | $1,101,606.05 | | $1,101,610.80 |
| M/10/20 | $31,620,080.53 | 2,001,003.00 | $600,300.90 | | |
| M/10/20 | | | | 5/17/2001 | $49,968.00 |
| M/10/20 | | | | 9/12/2001 | $300,000.00 |
| M/10/20 | | | | 9/12/2001 | $233,500.00 |
| M/10/20 | | | | 11/12/2001 | $180,000.00 |
| M/10/20 | | | | 11/12/2001 | $120,357.00 |
| M/10/20 | | | | 11/21/2001 | $299,944.00 |
| M/10/20 Total | | | $600,300.90 | | $1,183,769.00 |
| M/10/21 | $320,010,301.32 | 2,003,864.00 | $601,159.20 | | |
| M/10/21 | | | | 9/20/2001 | $601,160.00 |
| M/10/21 Total | | | $601,159.20 | | $601,160.00 |
| M/10/34 | $34,186,555.87 | 1,943,129.00 | $485,782.25 | | |
| M/10/34 | | | | 8/12/2001 | $59,985.00 |
| M/10/34 | | | | 12/2/2001 | $425,777.00 |
| M/10/34 Total | | | $485,782.25 | | $485,762.00 |
| M/10/35 | $16,369,100.62 | 950,000.00 | $237,500.00 | | |
| M/10/35 | | | | 8/19/2001 | $30,000.00 |
| M/10/35 | | | | 12/10/2001 | $207,500.00 |
| M/10/35 Total | | | $237,500.00 | | $237,500.00 |
| M/10/42 | $14,635,454.55 | 1,000,000.00 | $300,000.00 | | |
| M/10/42 | | | | 12/31/2001 | $349,985.00 |
| M/10/42 Total | | | $300,000.00 | | $349,985.00 |
| M/10/50 | $26,860,504.98 | 1,048,345.00 | $262,086.25 | | |
| M/10/50 | | | | 12/19/2001 | $249,973.00 |
| M/10/50 Total | | | $262,086.25 | | $249,973.00 |
| M/10/52 | $34,826,235.75 | 2,000,833.00 | $500,208.25 | | |
| M/10/52 | | | | 8/14/2001 | $60,000.00 |
| M/10/52 | | | | 12/27/2001 | $440,000.00 |
| M/10/52 Total | | | $500,208.25 | | $500,000.00 |
| M/10/54 | $19,361,795.77 | 1,000,000.00 | $250,000.00 | | |
| M/10/54 | | | | 3/26/2002 | $250,000.00 |
| M/10/54 Total | | | $250,000.00 | | $250,000.00 |
| M/10/55 | $35,615,116.29 | 2,049,137.00 | $562,357.30 | | |
| M/10/55 | | | | 8/19/2001 | $50,000.00 |
| M/10/55 | | | | 10/21/2001 | $24,978.50 |
| M/10/55 | | | | 10/23/2001 | $160,000.00 |
| M/10/55 | | | | 10/24/2001 | $24,978.50 |
| M/10/55 | | | | 11/7/2001 | $82,676.60 |

The Republic of Iraq's First Amended Complaint – page 78

| CONTRACT | Contract Value | Barrels Lifted | Surcharge Levied | Payment Date | Surcharge Amount Paid |
|---|---|---|---|---|---|
| M/10/55 | | | | 11/11/2001 | $7,978.50 |
| M/10/55 | | | | 1/20/2002 | $211,745.20 |
| M/10/55 Total | | | $562,357.30 | | $562,357.30 |
| M/10/57 | $16,808,457.40 | 1,000,896.00 | $250,224.00 | | |
| M/10/57 | | | | 6/11/2001 | $59,808.00 |
| M/10/57 | | | | 12/19/2001 | $190,214.00 |
| M/10/57 Total | | | $250,224.00 | | $250,022.00 |
| M/10/61 | $285,434,059.22 | 19,042,866.00 | $5,511,246.35 | | |
| M/10/61 | | | | 9/5/2001 | $600,000.00 |
| M/10/61 | | | | 10/16/2001 | $220,000.00 |
| M/10/61 | | | | 10/26/2001 | $560,000.00 |
| M/10/61 | | | | 11/22/2001 | $352,000.00 |
| M/10/61 | | | | 11/26/2001 | $800,000.00 |
| M/10/61 | | | | 11/29/2001 | $568,400.00 |
| M/10/61 | | | | 12/5/2001 | $250,875.00 |
| M/10/61 | | | | 12/19/2001 | $185,000.00 |
| M/10/61 | | | | 12/26/2001 | $550,000.00 |
| M/10/61 | | | | 1/15/2002 | $600,000.00 |
| M/10/61 | | | | 2/1/2002 | $430,000.00 |
| M/10/61 | | | | 2/6/2002 | $315,990.35 |
| M/10/61 Total | | | $5,511,246.35 | | $5,432,265.35 |
| M/10/62 | $40,168,855.76 | 2,048,606.00 | $512,151.50 | | |
| M/10/62 | | | | 9/9/2001 | $59,434.08 |
| M/10/62 Total | | | $512,151.50 | | $59,434.08 |
| M/10/76 | $33,332,607.44 | 2,085,497.00 | $573,315.95 | | |
| M/10/76 | | | | 11/6/2001 | $551,955.95 |
| M/10/76 Total | | | $573,315.95 | | $551,955.95 |
| M/10/78 | $17,194,294.75 | 966,440.00 | $241,610.00 | | |
| M/10/78 | | | | 1/16/2003 | $240,988.00 |
| M/10/78 Total | | | $241,610.00 | | $240,988.00 |
| M/10/85 | $10,925,682.58 | 891,617.00 | $267,485.10 | | |
| M/10/85 | | | | 10/7/2001 | $29,970.00 |
| M/10/85 | | | | 2/6/2002 | $237,488.00 |
| M/10/85 Total | | | $267,485.10 | | $267,458.00 |
| M/10/93 | $22,451,558.21 | 1,785,251.00 | $535,575.30 | | |
| M/10/93 | | | | 12/27/2001 | $499,978.50 |
| M/10/93 | | | | 1/20/2002 | $34,786.80 |
| M/10/93 Total | | | $535,575.30 | | $534,765.30 |
| M/11/05 | $313,993,593.77 | 15,234,298.00 | $3,781,855.50 | | |
| M/11/05 | | | | 2/26/2002 | $775,000.00 |
| M/11/05 | | | | 3/18/2002 | $600,000.00 |
| M/11/05 | | | | 4/26/2002 | $300,000.00 |
| M/11/05 | | | | 6/21/2002 | $310,000.00 |
| M/11/05 | | | | 8/7/2002 | $517,000.00 |
| M/11/05 Total | | | $3,781,855.50 | | $2,502,000.00 |
| M/11/100 | $31,495,774.65 | 1,500,000.00 | $225,000.00 | | |

The Republic of Iraq's First Amended Complaint -- page 79

| CONTRACT | Contract Value | Barrels Lifted | Surcharge Levied | Payment Date | Surcharge Amount Paid |
|---|---|---|---|---|---|
| M/11/100 | | | | 10/29/2002 | $225,000.00 |
| M/11/100 Total | | | $225,000.00 | | $225,000.00 |
| M/11/15 | $270,877,282.41 | 13,575,751.00 | $3,526,610.50 | | |
| M/11/15 | | | | 11/28/2001 | $600,000.00 |
| M/11/15 | | | | 1/13/2002 | $30,605.70 |
| M/11/15 | | | | 1/16/2002 | $550,000.00 |
| M/11/15 | | | | 2/6/2002 | $393,209.65 |
| M/11/15 | | | | 6/17/2002 | $153,980.00 |
| M/11/15 | | | | 7/9/2002 | $1,430,969.10 |
| M/11/15 | | | | 7/9/2002 | $186,930.90 |
| M/11/15 | | | | 7/31/2002 | $311,000.00 |
| M/11/15 | | | | 8/7/2002 | $87,400.00 |
| M/11/15 Total | | | $3,526,610.50 | | $3,744,095.35 |
| M/11/17 | $48,230,126.90 | 3,042,671.00 | $912,801.30 | | |
| M/11/17 | | | | 1/17/2002 | $312,786.30 |
| M/11/17 | | | | 2/28/2002 | $599,985.00 |
| M/11/17 Total | | | $912,801.30 | | $912,771.30 |
| M/11/21 | $53,468,136.64 | 3,100,000.00 | $930,000.00 | | |
| M/11/21 | | | | 2/5/2002 | $262,500.00 |
| M/11/21 | | | | 3/22/2002 | $52,500.00 |
| M/11/21 | | | | 3/29/2002 | $165,000.00 |
| M/11/21 | | | | 4/23/2002 | $150,000.00 |
| M/11/21 | | | | 5/24/2002 | $200,000.00 |
| M/11/21 | | | | 5/29/2002 | $100,000.00 |
| M/11/21 Total | | | $930,000.00 | | $930,000.00 |
| M/11/28 | $67,778,813.13 | 3,016,150.00 | $472,422.50 | | |
| M/11/28 | | | | 6/2/2002 | $50,000.00 |
| M/11/28 | | | | 7/7/2002 | $193,950.00 |
| M/11/28 | | | | 9/23/2002 | $79,475.00 |
| M/11/28 Total | | | $472,422.50 | | $323,425.00 |
| M/11/33 | $49,216,117.10 | 2,083,791.00 | $520,947.75 | | |
| M/11/33 | | | | 3/25/2002 | $520,948.00 |
| M/11/33 Total | | | $520,947.75 | | $520,948.00 |
| M/11/36 | $21,294,280.35 | 938,898.00 | $140,834.70 | | |
| M/11/36 | | | | 10/31/2002 | $140,834.70 |
| M/11/36 Total | | | $140,834.70 | | $140,834.70 |
| M/11/51 | $24,139,746.51 | 1,261,851.00 | $315,462.75 | | |
| M/11/51 | | | | 6/5/2002 | $315,500.00 |
| M/11/51 Total | | | $315,462.75 | | $315,500.00 |
| M/11/84 | $17,676,376.89 | 732,068.00 | $109,810.20 | | |
| M/11/84 | | | | 3/26/2002 | $30,000.00 |
| M/11/84 Total | | | $109,810.20 | | $30,000.00 |
| M/12/18 | $206,514,433.92 | 8,054,075.00 | $297,986.55 | | |
| M/12/18 | | | | 9/9/2002 | $155,777.00 |
| M/12/18 | | | | 9/22/2002 | $142,202.50 |
| M/12/18 Total | | | $297,986.55 | | $297,979.50 |

The Republic of Iraq's First Amended Complaint -- page 80

| CONTRACT | Contract Value | Barrels lifted | Surcharge Levied | Payment Date | Surcharge Amount Paid |
|---|---|---|---|---|---|
| M/12/53 | $279,224,871.85 | 11,625,301.00 | $219,387.15 | | |
| M/12/53 | | | | 11/6/2002 | $120,000.00 |
| M/12/53 | | | | 12/19/2002 | $122,555.00 |
| M/12/53 | | | | 12/20/2002 | $142,210.00 |
| M/12/53 Total | | | $219,387.15 | | $384,765.00 |
| Grand Total | | | $40,847,932.59 | | $39,500,646.32 |

### 5. *Wyatt admits to joining the conspiracy.*

476.   Wyatt created Coastal, now El Paso, a Houston-based oil company.   Until January 2001, he was its Chairman of the Board.

477.   Following El Paso's acquisition of Coastal in January 2001, Wyatt utilized other entities to transact business under the OFFP.

#### (a) *Wyatt's Guilty Plea*

478.   Wyatt pleaded guilty to a small part of his role in the corruption of the OFFP.

479.   Pursuant to the plea agreement, signed by Wyatt on October 1, 2007, Wyatt acknowledged that he pleaded guilty "because he is in fact guilty." Wyatt pleaded guilty to Count One of the Indictment against him, charging conspiracy to commit wire fraud.

#### (b) *Wyatt's Actions*

480.   In or about mid-2000, Wyatt was informed that the Hussein Regime began implementing the surcharge scheme and that other companies were involved in the conspiracy.

481.   Wyatt also knew the Hussein Regime at times would require the unauthorized payment of port fees in violation of United States law and regulations.

482.   As stated in the indictment against Wyatt: "From in or about mid-2000, up to an including at least in or about 2002, David B. Chalmers, Jr., the defendant, on behalf of the Bayoil Companies, the defendants, and Oscar S. Wyatt, Jr., the defendant, on behalf of the Coastal Corporation [now El Paso] ..., separately, together, and with officials of the Government of Iraq and other co-conspirators not named ..., lobbied the United Nations to select an O.S.P. at a level

that would allow recipients of oil allocations from Iraq to pay the required surcharge and still retain a profit for themselves. A below-market O.S.P. would enable the Government of Iraq to achieve its objective of collecting the illegal surcharges on oil allocated pursuant to the Oil-for-Food Program."

483.    "From in or about December 2001, up to an including at least in or about March 2003, Oscar S. Wyatt, Jr. [including on behalf of Coastal] agreed to pay, paid, and caused to be paid millions of dollars of secret illegal surcharges to the Government of Iraq. .... By participating in this Surcharge Scheme and bypassing the Oil-for-Food Program, Wyatt [and others] caused funds to be diverted from the Oil-for-Food Bank Account that otherwise would have been available to purchase humanitarian goods under the Oil-for-Food Program."

484.    Wyatt and others, including Chalmers, "unlawfully, willfully, and knowingly did combine conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Sections 1343 and 2332d of Title 18, United States Code."

485.    Section 2332d of Title 18 prohibits financial transactions with a terrorist state. Violation of its provisions also constitutes a RICO predicate act.

486.    It "was a part and an object of the conspiracy that David B. Chalmers, Oscar S. Wyatt, Jr. [and others] unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit, and cause to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343."

### (c)    *Wyatt's Close Relationship with Saddam Hussein*

487.    Through Coastal, Wyatt bought crude oil from Iraq throughout the decades leading up to Iraq's 1990 invasion of Kuwait.

488.     Following the invasion and the imposition of comprehensive economic sanctions on Iraq, Wyatt worked to maintain his close relationship with Saddam Hussein, in large part to ensure his continued access to Iraqi oil.  For example, during much of the 1990s, Wyatt used front-companies and foreign associates to funnel illegally more than $50 million directly to the Hussein Regime – rather than to "frozen" Iraqi escrow accounts, to which the Hussein Regime would not have had access.

489.     Wyatt's illegal efforts to convey much-needed foreign cash to Saddam Hussein's Regime began within weeks of the invasion of Kuwait, just as United States armed forces were beginning to deploy to the Middle East to prepare for war with Iraq.

490.     Given his status with the Hussein Regime and the Iraqi oil ministry, Wyatt was in a singular position to dissuade the Hussein Regime from adopting the surcharge scheme – either through arguments demonstrating the oil market's likely negative response, or simply by refusing to accept the terms himself, thus showing the Government of Iraq that its most loyal United States customer was not willing to engage in systematic sanctions-busting.

491.     At the very least, given his direct conversations about the scheme with senior Hussein Regime officials, Wyatt could have provided UN monitors with firsthand information that market rumors about the surcharge scheme were true – thereby giving them the necessary proof to challenge those country representatives who denied the scheme's very existence.

492.     Rather than dissuade the Regime, refuse to participate, or inform the UN (or United States law-enforcement) about his first-hand knowledge, Wyatt embraced the scheme at its inception and offered the Iraqis ways to improve and conceal the scheme from the scrutiny of the international community.

### (d) Wyatt Agrees to Pay Surcharges in a "Bent" Manner

493.    In January 2001, Wyatt participated in a series of Baghdad meetings with SOMO officials and the Minister of Oil in which he agreed to make the illegal surcharge payments.

494.    But first, Wyatt proposed an alternative scheme: Under Wyatt's proposal, the Hussein Regime would divide the global Iraqi crude market into four geographical zones, and Wyatt would create a front-company for each zone to sell Iraqi oil. Wyatt would then pass the bulk of his profits from the sale of this oil directly to the Hussein Regime, outside the Programme and in violation of United States laws prohibiting financial dealings with State Sponsors of Terrorism. The Hussein Regime rejected Wyatt's proposal, preferring a per-barrel surcharge in a fixed amount to shared profits.

495.    At the same meeting, Wyatt suggested that he would pay a 25-cent per barrel surcharge in a "bent" manner to make it difficult to detect the payments.

496.    Wyatt also informed the Hussein Regime at the January 2001 meetings that SOMO's bank account in Lebanon was "exposed," and that he would accordingly make payments through Jordan where, Wyatt indicated, he had his "men," and "it is safe."

497.    Finally, Wyatt suggested that, in the future, SOMO should provide his oil allocations to him through a Cyprus front company.

### (e) The Surcharge Payments on Wyatt's Contract M/08/72

498.    Wyatt's surcharge debts began accumulating even before he explicitly agreed during the January 2001 Baghdad meetings to make illegal surcharge payments.

499.    Without advising Wyatt, the Hussein Regime imposed a 10-cent per barrel surcharge on all Iraqi crude oil lifted after September 1, 2000 – Phase VIII oil contracts. Wyatt's Coastal lifted approximately 2 million barrels of Phase VIII oil after September 1 – and consequently, according to the Hussein Regime, owed a surcharge payment of about $200,000.

The Republic of Iraq's First Amended Complaint – page 84

500.    Wyatt initially resisted making this $200,000 payment. At a Baghdad meeting, Wyatt told SOMO officials they should not require the surcharge payment since Coastal had already lifted the oil.

501.    In a November 2001 letter to the Minister of Oil, Wyatt argued his non-payment of the surcharge should not imperil his relationship with Iraq. Wyatt's letter specifically sought to trade on his long and illegal relationship with the Hussein Regime, including his (illegally) supplying and funding a satellite communications system for the Hussein Regime, which had cost Wyatt $3-4 million.

502.    Regime officials were unmoved by Wyatt's requests for special treatment. As contemporaneous Regime records put it: "No company shall be exempted for any reason."

503.    Ultimately, to insure he would continue to receive oil allocations, Wyatt caused a surcharge payment of 220,000 Euros (then about $200,000) to be made during December 2001.

504.    Around the same time, Wyatt sought reimbursement for the payment from El Paso, which, in Wyatt's view, had succeeded to Coastal's obligations – including the illegal obligation, discharged by Wyatt, to make the approximately $200,000 surcharge payment.

505.    Seeking reimbursement, Wyatt caused Sarenco S.A., a Swiss company, to send a $200,000 invoice to an El Paso affiliate. Wyatt believed that a $200,000 payment from El Paso to Sarenco (as opposed to a $200,000 payment directly to Wyatt) would not raise red flags because the Sarenco $200,000 payment would appear to be in the "normal course ... an invoice just like they normally do for ser[vices rendered]."

506.    By late December 2001, Wyatt became agitated at not being reimbursed for his $200,000 surcharge payment. In a December 21, 2001 recorded telephone call to an El Paso oil trader, Wyatt said: "[D]id you check to see whether they've approved the two hundred thousand that

I've already paid to the bastards over there?" As Wyatt explained in that same phone call: "the money came out of my hip pocket." "I already paid it."

507.    El Paso refused the reimbursement.

### (f)    *Programme Phases IX to XII*

508.    In the period following Coastal's January 2001 merger with El Paso, Wyatt stopped receiving his oil allocations under the OFFP through Coastal and started receiving them through two Cypriot front companies, Mednafta and Nafta.

509.    SOMO's surcharge database indicates Coastal received allocations worth about $700 million during Phases I through VIII, while Mednafta and Nafta received no allocations. After Phase VIII, these companies' positions switched: Coastal received no allocations, and Mednafta and Nafta received nearly $400 million worth of oil allocations.

510.    Wyatt made no secret of his control over Mednafta and Nafta to SOMO. Wyatt told Iraqi officials that those entities were his companies and agreed in a face-to-face meeting in Baghdad to make a surcharge payment to Iraq on Nafta's behalf.

511.    SOMO officials created an Oscar Wyatt file and placed in it materials related to three companies: Coastal, Mednafta, and Nafta.

512.    In Programme Phases IX to XII, Wyatt received his oil allocations through his Cypriot-based companies. Wyatt paid millions of dollars in total surcharge payments on these allocations. Wyatt made the surcharge payments, in small amounts, to a SOMO-controlled account in Jordan, Wyatt's stated preference during the January 2001 meetings in Baghdad.

513.    Wyatt caused surcharges to be paid on the following dates in support of at least the following referenced contracts:

| CONTRACT | Contract Value | Barrels Lifted | Payment Date | Surcharge Amount Paid |
|---|---|---|---|---|
| M/08/72 | $60,150,610.89 | 248,771.00 | | |
| M/08/72 | | | 12/9/2001 | $197,824.20 |
| M/08/72 | | | 3/25/2002 | $4,052.80 |
| M/08/72 Total | | | | $201,877.00 |
| M/09/28 | $152,708,212.39 | 8,023,472.00 | | |
| M/09/28 | | | 5/7/2001 | $120,000.00 |
| M/09/28 | | | 5/8/2001 | $90,000.00 |
| M/09/28 | | | 5/9/2001 | $130,000.00 |
| M/09/28 | | | 5/10/2001 | $140,000.00 |
| M/09/28 | | | 5/13/2001 | $110,000.00 |
| M/09/28 | | | 5/30/2001 | $85,600.00 |
| M/09/28 | | | 5/31/2001 | $90,000.00 |
| M/09/28 | | | 6/3/2001 | $115,000.00 |
| M/09/28 | | | 6/5/2001 | $100,000.00 |
| M/09/28 | | | 6/17/2001 | $210,000.00 |
| M/09/28 | | | 6/19/2001 | $213,000.00 |
| M/09/28 | | | 6/20/2001 | $205,000.00 |
| M/09/28 | | | 6/24/2001 | $204,000.00 |
| M/09/28 | | | 7/11/2001 | $110,000.00 |
| M/09/28 | | | 7/11/2001 | $135,000.00 |
| M/09/28 | | | 7/11/2001 | $123,000.00 |
| M/09/28 | | | 7/11/2001 | $125,000.00 |
| M/09/28 | | | 7/11/2001 | $95,000.00 |
| M/09/28 | | | 8/26/2001 | $6,441.60 |
| M/09/28 Total | | | | $2,407,041.60 |
| M/10/13 | $140,090,671.90 | 8,085,396.00 | | |
| M/10/13 | | | 8/26/2001 | $118,858.40 |
| M/10/13 | | | 8/27/2001 | $137,000.00 |
| M/10/13 | | | 8/28/2001 | $129,000.00 |
| M/10/13 | | | 8/29/2001 | $110,050.00 |
| M/10/13 | | | 8/30/2001 | $111,500.00 |
| M/10/13 | | | 11/12/2001 | $98,109.20 |
| M/10/13 | | | 11/13/2001 | $119,367.00 |
| M/10/13 | | | 11/15/2001 | $112,960.00 |

The Republic of Iraq's First Amended Complaint – page 87

| CONTRACT | Contract Value | Barrels Lifted | Payment Date | Surcharge Amount Paid |
|---|---|---|---|---|
| M/10/13 | | | 11/18/2001 | $106,140.00 |
| M/10/13 | | | 11/19/2001 | $101,119.50 |
| M/10/13 | | | 11/20/2001 | $125,300.80 |
| M/10/13 | | | 11/21/2001 | $116,920.30 |
| M/10/13 | | | 11/22/2001 | $109,725.00 |
| M/10/13 | | | 11/25/2001 | $128,407.00 |
| M/10/13 | | | 11/26/2001 | $98,761.60 |
| M/10/13 | | | 12/4/2001 | $178,040.00 |
| M/10/13 | | | 12/5/2001 | $187,299.00 |
| M/10/13 | | | 12/6/2001 | $191,113.50 |
| M/10/13 Total | | | | $2,279,671.30 |
| M/11/55 | $163,956,185.70 | 8,094,595.00 | | |
| M/11/55 | | | 3/25/2002 | $156,564.51 |
| M/11/55 | | | 3/27/2002 | $327,975.00 |
| M/11/55 | | | 3/31/2002 | $370,770.00 |
| M/11/55 | | | 4/1/2002 | $305,340.00 |
| M/11/55 | | | 6/13/2002 | $94,170.00 |
| M/11/55 | | | 6/16/2002 | $113,736.00 |
| M/11/55 | | | 6/18/2002 | $128,034.00 |
| M/11/55 | | | 6/19/2002 | $119,512.50 |
| M/11/55 | | | 6/20/2002 | $110,308.00 |
| M/11/55 | | | 6/23/2002 | $105,996.00 |
| M/11/55 | | | 6/25/2002 | $116,544.00 |
| M/11/55 | | | 6/26/2002 | $104,128.50 |
| M/11/55 | | | 6/27/2002 | $127,712.00 |
| M/11/55 | | | 6/30/2002 | $99,700.00 |
| M/11/55 | | | 7/2/2002 | $108,218.00 |
| M/11/55 Total | | | | $2,388,708.51 |

The Republic of Iraq's First Amended Complaint – page 88

| CONTRACT | Contract Value | Barrels Lifted | Payment Date | Surcharge Amount Paid |
|---|---|---|---|---|
| Grand Total | | | | $7,277,298.41 |

514.    Wyatt is also responsible for the payments of El Paso prior to his leaving that company.

### (g)    "Wyatt's Conduct was Shameless"

515.    Wyatt's criminal conduct was sophisticated and calculated.

516.    As described by the US Attorney: "Wyatt threw himself into illegal dealings with the Hussein regime, closely monitoring whether surcharge 'packages' had cleared; personally negotiating surcharge payment terms; suggesting more effective ways for the Hussein regime to collect money outside of the OFFP; and having foreign co-conspirators call SOMO to confirm that particular surcharge payments had indeed been made."

517.    "An irreducible part of Wyatt's criminal conduct was his working to curry favor with the Hussein regime, so that he could keep receiving lucrative oil allocations – even after all other Americans (except for Wyatt's employee, Samir Vincent) had been cut off. In pursuit of ever more oil – and ever more money for himself – Wyatt's conduct was shameless."

518.    In late January 2003, about two months before the onset of war between the United States and Iraq, Wyatt went to Baghdad to visit his "friends" in the Hussein Regime and told them when and from where he believed United States troops would be invading Iraq.

519.    In a similar vein, while Iraq was under a tight global embargo during the 1990s – and U.S. planes were repeatedly encountering Iraqi forces in the air over the no-fly zone – Wyatt illegally provided the Hussein Regime with global positioning devices useable on Iraqi Army helicopters.

520.    Finally, while the United States geared up for its first war with Iraq in 1990, Wyatt personally told Saddam Hussein that the President of the United States was not to be trusted and that America's last-ditch efforts to avoid war through diplomacy were insincere.

The Republic of Iraq's First Amended Complaint – page 89

## VI.    Corruption of the Humanitarian Side of the Programme

521.    As its reluctance to agree to any humanitarian program demonstrated, the Hussein Regime was more interested in entrenching its power than in the humanitarian needs of the Iraqi people.  Therefore, the Hussein Regime quickly moved to subvert the humanitarian purchases as well.

### A.    The Hussein Regime's Control Over Humanitarian Purchases

522.    According to the MOU, the Hussein Regime retained the right to choose the parties from which it would purchase goods.

523.    The Hussein Regime used this power to induce participation in a corrupt scheme to divert funds from their humanitarian purposes.

524.    Beginning at least by the start of Phase VI in May of 1999, the Hussein Regime implemented a variety of schemes to systematically divert funds from the UN Escrow Account and their humanitarian purposes into solidifying the Regime's power.

### B.    The Inland Transportation Fees

525.    The Hussein Regime's first guise for diverting funds was to charge what the Hussein Regime characterized as "inland transportation fees."

#### 1.    The Hussein Regime imposed improper transportation fees to siphon money from the Programme.

526.    Although the transportation costs within Iraq were covered by a delineated line item in the Distribution Plans, beginning at least in Phase VI, the Hussein Regime demanded that additional "transportation fees" be paid directly to the Hussein Regime on all shipments of humanitarian goods to Iraq.

527.    The Hussein Regime issued a directive in June 1999 requiring all Ministries to impose non-negotiable "transportation fees" on goods requiring inland delivery. The Regime's Economic and Affairs Committee assigned the fees, and the Ministry of Transportation oversaw their collection.

528.    The Regime required the vendor to pay the "inland transportation fee" directly to the Hussein Regime, not the UN Escrow Account. Such payments directly contravened UN regulations and the standard provisions of the humanitarian contracts.

529.    Direct payments to the Hussein Regime also violated US laws prohibiting financial transactions with terrorist organizations.

530.    The inland transportation fees were actually kickbacks made through front companies that provided no legitimate transportation services, but illegally funneled escrow funds to the Hussein Regime.

2.    *The transportation fees were funded through the UN Escrow Account.*

531.    The Hussein Regime did not require vendors to pay these fees from their own funds. Instead, the Regime allowed vendors to include the fees in their contract prices, so they were ultimately paid with Programme funds.

532.    Vendors had to hide the fees from the UN, because making direct payments to the Hussein Regime violated the central requirements of the Iraq Sanctions Program and the Programme.

533.    The process for paying the transportation fees was as follows. First, the Hussein Regime and the vendor agreed on a unit price for the humanitarian goods. Then, the Regime informed the vendor of the transportation fee it would be required to pay to the Hussein Regime, either directly or through a nominee. If the vendor agreed, the vendor would revise the previously negotiated unit price upward to include the agreed payments.

534.    The contract submitted to the UN for approval would include the higher, revised price.

535.    The Hussein Regime required vendors to pay the "transportation fee" kickback to the Hussein Regime before allowing the goods to enter Iraq, which triggered payment from the UN Escrow Account. Thus, the vendors generally had to pay the kickback to the Hussein Regime before they received reimbursement from the UN Escrow Account.

536.    Vendors paid the fees in a variety of manners. Sometimes, vendors paid the fees in cash directly to the Regime through Iraqi embassies or to Regime accounts in Baghdad. When cash payments were not practicable, vendors made payments through front companies that received the funds for remittance to the Hussein Regime. For example, vendors in many cases paid the transportation fees through a Regime nominee called Alia for Transportation and General Trade ("Alia"), a Jordanian company that was 49% owned by the Iraqi Ministry of Transportation. Alia would then transfer the transportation fees to the Hussein Regime.

### 3.    *Payment of the transportation fees defrauded the UN.*

537.    Contracts containing transportation fees rarely disclosed the fee or that the contract unit price was higher than the vendor was willing to accept. The failure to disclose this information violated Programme rules and breached the supply contracts, which required disclosure of all relevant information to the UN and the 661 Committee.

538.    All of the contracts failed to disclose the agreement to make direct financial transfers to the Hussein Regime. The UN would not have approved the contract in the face of such disclosure, since both the Iraq Sanctions Program and the Programme forbade direct financial transactions with the Hussein Regime.

539.    The payment of the transportation fees thus violated Programme requirements and rendered fraudulent the suppliers' representations to the UN (necessary to obtain contract approvals and payment).

540.    In the rare cases where the contracts submitted to the UN identified transportation services, the representations were still misleading. As found in the Australian Report: "Suggestions in the tender or contracts [to the effect that vendors were required to transport items in exchange for the fee] were a sham designed to deceive the United Nations and extract hard currency from the UN escrow account for payment to Iraq."

541.    In fact, the documents submitted for UN approval in such cases had to be affirmatively misleading. The documents professed a requirement to perform transportation services that the vendors did not agree to provide and did not in fact provide.

542.    "Thus AWB submitted to ... the United Nations documents that AWB knew did not reflect the true contractual arrangements between it and the IGB in respect of the 3 July 1999 contracts."

### 4.    *The transportation fees were kickbacks.*

543.    The UN Report concludes that the payments were a "de facto kickback."

544.    The Vendor Defendants knew the payments were illicit.

545.    As an initial matter, the fact the payments violated UN sanctions and Programme rules was obvious.

546.    It was also apparent that the fees were being paid to the Hussein Regime, not actual transportation companies.

547.    As found by the Australian Report: "the so-called trucking fee was known by AWB to be an impost imposed by the Iraq regime and to be paid to Iraq." Internal AWB emails reveal that AWB confirmed payments had been transferred by the "trucking company" to the Regime.

548.    At least one AWB officer concedes he "never had a doubt … the money was always going into Iraq …."

549.    In fact, documents from AWB establish that the Vendor Defendants were directly informed that the transportation fees were required to be paid to maintain Programme business and were being paid to the Hussein Regime. AWB, in particular, was informed of the transportation fee at a June 1999 meeting in Iraq between two AWB officers and the IGB Director General.

550.    As found in the Australian Report, "AWB understood from the June meeting that the US$12 fee [per ton] was a payment going back to the Iraq Government."

551.    "AWB also understood that payment of hard currency to Iraq was prohibited by UN sanctions."

552.    The reason AWB and the other Vendor Defendants agreed to pay the illicit charges is obvious: "AWB knew that if it declined to make the payment it would lose its Iraqi trade. Senior management decided to do what was necessary to retain that trade."

553.    This illicit kickback scheme allowed the Hussein Regime to obtain foreign currency from the UN Escrow Account that could be used to perpetuate the Regime's control over Iraq, directly contravening the core purpose of the Iraq Sanctions Program and the Programme.

554.    Because the kickbacks were incorporated into the vendor's unit price and were paid from the Escrow Account, the vendors had no incentive to reduce the amount of the kickback.

5.    *The Hussein Regime collected about $530 million in "transportation fees."*

555.    The Hussein Regime collected about $530 million in so-called "transportation fees."

556.    AWB alone paid more than $146,101,906.59 in illicit "transportation fees" to the Hussein Regime.

### C.    The After-Sales-Service Fees (or "ASSFs")

557.    After collecting improper transportation fees for about a year, the Hussein Regime realized that, with some additional help from participants in the Programme, it could divert even more money from humanitarian aid to its own aims.

558.    Therefore, beginning no later than August 2000, the Hussein Regime decided to impose what it called an "after-sales-service fee" or ASSF on all Programme contracts.

559.    Some defendants had other names for the kickback.    For example, Woodhouse called the fee a "post award discount," while the Weir Group called it an "after sales tax."

560.    The ASSF significantly increased kickbacks on OFFP purchases.

#### 1.    The ASSF kickbacks were as high as 30%.

561.    Initially, the Hussein Regime planned to limit the ASSF to 2-5% of food and medicine (but not medical equipment) and 5-10% for everything else, but within a few months, the Regime raised the minimum ASSF to 10% on all humanitarian purchases under the Programme.

562.    The Regime advised all Iraqi ministries and agencies that Saddam Hussein had personally implemented the requirement and that imposition of ASSFs above 10% would be viewed as "commendable."

563.    From October 2000 to the end of the OFFP in 2003, most contracts carried a 10% surcharge, but the surcharge could be as high as 30%.

564.    After the early success of the ASSFs, the Hussein Regime substantially increased the inland transportation fee by as much as 250%.

565.    Suppliers paid these fees in one of three ways: cash, transfers to Regime-controlled accounts, or payments to front companies controlled by individuals or companies loyal to the Hussein Regime.    Generally, accumulated payments were transferred to Iraq in cash, usually by diplomatic pouch.

The Republic of Iraq's First Amended Complaint – page 95

### 2.    *The ASSFs were kickbacks.*

566.    The UN Report concludes that the ASSFs were illicit and a "mandatory kickback."

567.    The ASSFs did not even pretend to represent the actual cost of some service; they were a set percentage notwithstanding the nature of the goods supplied.

568.    Internal memoranda from the Hussein Regime confirm the ASSFs diverted funds from the humanitarian purposes of the Programme. Regime Vice President Taha Yassin Ramadan directed, in an August 3, 2000 memo, that all funds generated from increased fees were "to be transferred to general treasury." And: "Income generated from after sales services are to be handed over in cash inside Iraq, or to a banking entity determined by the Iraqi side according to pre-determined banking arrangements, in the case that handling over the money in cash inside Iraq fails."

569.    Another memo from May 11, 2000 stated that on "the second week of the intended month, the Ministry of Finance will transfer … the Ministry of Defense's shares of revenues earned from after sales services."

570.    The ASSFs had nothing to do with the provision of humanitarian services provided under the Programme and were improper under Programme rules.

571.    First, the ASSFs were paid directly to the Hussein Regime. Such direct payments to the Regime were prohibited, regardless of their purpose.

572.    Second, Programme regulations authorized service agreements only in particular circumstances, not applicable to the ASSFs. According to Programme rules, provision of services was permissible only if the "services are ancillary to the supply of material goods." To qualify for payment, services "must, like the supply of goods, be authenticated by the United Nations Independent Inspection Agent in Iraq before payment may be made from the Iraq account." There

was no authentication for services related to the ASSFs, because the Vendor Defendants provided no services.

### 3. The ASSFs required side agreements with the Hussein Regime, which were not disclosed to the UN and which required direct financial transactions with the Regime.

573.     The process for setting and paying the ASSFs was similar to the process for the transportation fees: a supplier would negotiate a unit price for its goods with the Regime, and then agree to pay an ASSF to the Regime. To cover the ASSF, the vendor would submit a contract for UN approval with an inflated price that covered the ASSF. The vendor would pay the ASSF as the Regime directed.

574.     At the conspiracy's start, vendors and Regime representatives generally executed written side agreements memorializing the vendors' agreement to pay the ASSF directly to the Regime. After the scheme became institutionalized with a vendor, side agreements were no longer needed; the vendor simply increased its sales price by 10% to cover the kickback.

575.     For example, on July 8, 2001, Daimler contracted to sell the Ministry of Oil a "Mercedes box truck," an armored van for moving cash. This Contract was referenced by the 661 Committee as Contract 830815 and by the Hussein Regime as SADOP/08/66.

576.     In addition to the main contract, Daimler executed a side agreement on June 8, 2001 that stated: "DaimlerChrysler AG undertakes to pay to the Oil Products Distribution Company a sum of DM 13.589,50 equivalent to 10% of the total amount of DM 135.895…."

577.     The contract submitted to the UN through the German Mission, however, showed the price for the box truck to be DM 149.484,50, and thus included the undisclosed kickback.

578.     Although Daimler apparently paid only one kickback to the Hussein Regime, it purposefully sought a far greater participation in the overall scheme, but was frustrated by forces outside its control. For example, Daimler signed a side agreement for a proposed contract (no.

The Republic of Iraq's First Amended Complaint – page 97