GF/09/43) with the Iraqi Gas Filling Company. That side agreement, signed by the same Daimler officer who signed Contract 830815 and the related side agreement, stated in part:

> SUB: SIDE AGREEMENT FOR CONTRACTGF/*09/43*
>
> WE HEREBY CONFIRM AND UNDERTAKE TO PAY YOU THE SUM OF EURO (*39,384.22*) SAY (*thirty nine thousand and three hundred eighty four twenty two cents*)
>
> WHICH REPRESENT [sic] AFTER SALES SERVICES FOR ABOVE CONTRACT. THE AMOUNT WILL BE PAID BY US TO YOUR ACCOUNT AT RAFIDEN BANK IN AMMAN (JORDAN) BEFORE THE ARRIVAL OF THE MATERIALS TO THE IRAQI BORDER.
>
> THE ABOVE AMOUNT WILL BE SUPPORTED BY ISSUING IN YOUR FAVOUR A BANK GUARANTEE WITHIN TWO WEEKS OF CONTRACT APPROVAL BY UN COMMITTEE.

579.    What is particularly telling about this "Side Agreement" is that it is a typed form with the blanks filled out in handwriting (represented by italics above). Daimler knew it was not the only entity agreeing to pay kickbacks.

580.    On July 3, 2001, Daimler also executed a written side agreement with the Ministry of Oil, Oil Products Distribution Company, signed by the same Daimler officer, agreeing to pay the sum of €47,460.66 in relation to Contract SADOP/09/36. This contract was also apparently never issued.

### 4.    *Some Vendor Defendants disguised their payments by using third parties.*

581.    Some Vendor Defendants used agents, consultants, distributors, or front-companies to conceal the payment of the illicit fees.

582.    For example, as part of their individual deferred prosecution agreement with the United States DOJ, the Akzo Nobel, Flowserve, Ingersoll-Rand, Textron, Volvo and York Defendants judicially admitted that they utilized local agents and consultants in the Middle East to make the improper payments. Weir has separately admitted use of an agent.

583.    The Textron Defendants described the general course of dealings in their deferred prosecution agreement. When the Textron Defendants learned in July 2000 that improper ASSF payments had to be made to do business in Iraq, they informed their "consulting firm" in writing that they wanted "to avoid any written agreement [concerning the ASSF] with client side" and "[i]f written document cannot be avoided, this must remain highly confidential." The written memorandum also notes that French management of the Textron Defendants approved the payments and concealment scheme.

584.    Between January and July 2001, the Export Sales Manager for DB France (one of the Textron Defendants) signed ten sales contracts under the Programme. In connection with each, DB France agreed to make ASSF payments, and for each contract, the Export Sales Manager drafted a "Memorandum of Understanding" with DB France's consulting firm. Per that agreement, the consulting firm paid the ASSF to the relevant Iraqi Ministry and then invoiced DB France for "After-Sales-Service-Fees" in the amount of the ASSF payment. DB France recorded the payment of the ASSF as a commission in its books and records.

585.    The efforts to conceal the payment of the fees was necessitated by their illegality.

5.    *Paying the ASSFs defrauded the UN.*

586.    The Vendor Defendants could pay the ASSFs only if they were willing to violate their contractual commitments, UN sanctions, Programme rules, and United States law.

587.    If the Vendor Defendants had informed the UN they were paying ASSFs, the UN would have rejected their contracts.

588.    For example, when Woodhouse informed the UN that its initial contracts contained ASSF payments, the UN rejected the contracts, explaining to Woodhouse that such payments violated Programme and UN regulations.

589.    Rather than lose further business, Woodhouse decided to make ASSF payments on future contracts anyway, simultaneously informing the UN that it would comply with Programme rules. In other words, Woodhouse made ASSF payments and defrauded the UN overseers even after the UN directly advised that Programme rules and Woodhouse's own contractual commitments proscribed the payments.

590.    In another example, in August 2001, the UN declared one of Ingersoll-Rand's contracts (Contract 702647, with ABG, Ingersoll-Rand's German subsdiary) "null and void" when the Swiss Mission to the UN informed Programme officials the contract contained an agreement to pay 10% "working capital" to the Baghdad Mayoralty. The UN's action did not surprise Ingersoll-Rand because on or about May 15, 2001, Ingersoll-Rand's US parent in New Jersey had faxed copies of the relevant UN regulations to another of its subsidiaries in the United Kingdom, highlighting the regulations prohibiting payments to the Hussein Regime.

591.    Like Woodhouse, the only lesson Ingersoll-Rand took from the UN's unequivocal action was that it needed to hide its illegal conduct, not stop it. Ingersoll-Rand continued to pay the Regime kickbacks; it just hid the payments from the UN.

592.    Another example demonstrates the fraud. As part of a deferred prosecution agreement with the DOJ, Flowserve Pompes admitted that its contracts followed this formula: Its Beirut sales office would negotiate a contract with the relevant Iraqi ministry, which would then be approved by Flowserve Pompes' officials in France. Then, the Beirut sales office would generate a pro forma invoice reflecting the actual pricing of the goods to be shipped under the UN contract. To memorialize Flowserve's agreement to pay the ASSF, the Beirut Area Manager signed a side letter with the Iraqi ministry stating that Flowserve Pompes would pay ten percent of the contract price to the ministry to cover "engineering services, installation, and commissioning."

593.    Officials at Flowserve Pompes were fully aware that no engineering, installation, or commissioning services would be performed, but Flowserve's internal documentation maintained the pretense.

594.    Flowserve Pompes did not disclose the side letter to the UN.

595.    In contrast to its internal documents, the documents Flowserve Pompes provided to obtain UN approval of the contract did not pretend that the agent would provide any services. Instead, submitted documents simply inflated the unit prices of the equipment by ten percent. The UN documents also failed to disclose the promise to make a direct payment to the Hussein Regime.

596.    After the UN approved the contract, the Beirut sales office prepared an internal Order Entry Form and an Order Acknowledgement Form for the Iraqi ministry, both of which included false line items for "after sales services," which were valued at ten percent of the contract.

597.    Prior to the shipment of the goods into Iraq, the agent sent a written invoice to Flowserve Pompes in France for the ASSF payments to be made on pending contracts, identifying them as "payments made on your behalf."

598.    Knowing Regime officials had to receive the kickbacks before the goods would be allowed across the border, Flowserve Pompes' President arranged for payment of the agent's ASSF invoices upon receipt, typically within twenty-four hours.

599.    The agent then made the ASSF kickback payments by depositing cash into an Iraqi-controlled account in the Jordanian Housing Bank for Trade and Finance.

600.    The Vendor Defendants' submissions to the UN were fraudulent because they did not disclose any of the following information:

- The contract submitted for approval did not disclose the entire agreement between Vendor Defendant and the Hussein Regime.

- The Vendor Defendant had agreed to make a cash payment to the Hussein Regime in violation of the MOU and UN regulations.

- With the kickback agreement, the contracts were not normal commercial practice.

- The price in the contract was overstated by the amount of the illicit payments.

- The Vendor Defendants would have taken less for the goods.

- The Hussein Regime was demanding kickbacks from vendors of humanitarian goods.

601.    The 661 Committee's approval stated: "Specifically, this application has been examined to establish whether the price and value is credible and whether the items to be exported are in the distribution plan annexes. Additionally, the application has been examined to determine whether all relevant details have been submitted with the application." That examination was necessarily flawed as a result of the Vendor Defendants' omissions. The 661 Committee was not informed that the price was inflated. Nor was the 661 Committee informed that not "all relevant details [had] been submitted with the application."

### 6.    *Some Vendor Defendants made affirmative misrepresentations to the UN.*

602.    At least some of the Vendor Defendants made affirmative misrepresentations to the UN in addition to failing to disclose their improper conduct.

#### (a)    *Woodhouse and Ingersoll-Rand*

603.    As set out above, both Woodhouse and Ingersoll-Rand misrepresented to the UN that they were complying with Programme rules when they knew they were making improper payments.

#### (b)    *The Atlas Copco Defendants*

604.    In April 2000, the Atlas Copco Defendants signed a contract to furnish equipment to the Iraqi Ministry of Oil for a price of €377,434, which disclosed an ASSF of €34,320. The OIP questioned the line-item for the ASSF and inquired of the Atlas Copco Defendants whether any services would be provided.

605.    The Atlas Copco Defendants responded to the UN by mail in the same month, claiming they were providing services justifying the fee, including that an "Atlas Copco engineer will visit the customer" to install the equipment.

606.    The representations to the UN were false and misleading.  When the Atlas Copco Defendants sent the letter to the OIP, they had already entered into a written agreement to pay the entire ASSF to the Hussein Regime.  An ASSF already promised to the Regime could not compensate the Atlas Copco Defendants for after sales services.

607.    The ASSF was a kickback.

608.    Ultimately, the Atlas Copco Defendants entered into about 20 side agreements committing to pay the Regime a 10% kickback on each.  Atlas Copco's representations that it was providing services were simply untrue.

      *(c)*    *AWB*

609.    AWB directly asked the Hussein Regime to assist it in hiding the improper payments from the UN.

610.    In January 2000, the Canadian Wheat Board (CWB), an AWB competitor, lost a chance to contract with the Hussein Regime for refusing to make the improper payments.  When the CWB raised the issue with the UN, the UN asked AWB whether AWB was making any such payments.

611.    AWB emphatically and falsely denied to the UN any irregularities in its Programme contracts, including any direct payments.

612.    After lying to the UN, AWB asked the Hussein Regime to assist it in hiding the improper payments from the UN.  In one fax to the Iraqi Grain Board, AWB stated as follows:

> We wish to advise that the office of AWB Limited in New York has been approached by the Customs office of the United Nations who are questioning the payments by AWB to the Jordanian trucking company.

The Republic of Iraq's First Amended Complaint – page 103

> We are very concerned to learn from the UN that the Canadian Government has taken action within the United Nations to discover the manner of AWB payments.
>
> We ask your assistance in this matter and would ask that no information of a confidential nature is released.

613.   The Australian Report concludes: "It necessarily follows that AWB cannot maintain that payment of the trucking fee was approved by either the UN or the Australian Government because AWB had deliberately hidden or disguised the payment of the fee to Iraq and knew that neither the UN nor the Australian Government was aware of it making payments to Iraq."

614.   The Australian Report further states: "These matters were deliberately and dishonestly concealed from the … United Nations.   Contemporaneously with the Canadian complaint, which made apparent that the United Nations … [was] investigating payments outside the Oil-for-Food Programme, AWB removed from the short-form contract with Iraq reference to payments of that fee, although it had been included in the draft contracts.  Further, AWB disguised the payments to the Iraqi entity by the interposition of [third party intermediaries]."

615.   AWB also tried to influence its own government's policies to gain favor with the Hussein Regime.  In June 2002, the Regime informed AWB it was reducing its purchases of Australian wheat from one million tons to 500,000 tons, because the Australian government supported US policies against it.   To solidify its business dealings with the Hussein Regime, AWB attempted unsuccessfully to alter Australia's policy toward Iraq.

### 7.   The Defendants voluntarily joined the conspiracy to corrupt the Iraq Sanctions Program and the Programme.

616.   The Vendor Defendants had a choice: either join the Hussein Regime's plan to subvert the Programme and the Iraq Sanctions Program or forego the business opportunity to sell under the Programme.  The Defendants chose financial gain over compliance with their legal and moral obligations.

The Republic of Iraq's First Amended Complaint – page 104

617.    The choice was not subtle: the Vendor Defendants knew they were aiding the Hussein Regime in diverting money from humanitarian aid. For example, in a widely-circulated internal report, AWB noted that the "increase in trucking fee and addition of the service charge is a mechanism of extracting more dollars from the escrow account." In a particularly cynical example of the mindset, when AWB had a complaint about demurrage charges in April 2000, it forced a meeting with Regime officials by threatening to cease making direct payments to officials of the Hussein Regime because the UN prohibited such payments: "You will be aware of the restrictions that the UN has placed on such payments and as you are aware this now means that we must halt further payments."

618.    The fact the kickbacks did not impact the Vendor Defendants' profits, because the Iraqi people bore the cost, was a material factor in the analysis. Again, internal AWB documents reveal the thought process. On February 5, 2001, the Hussein Regime asked AWB to *increase* the amount of the price of its wheat, so that more money could be siphoned off the escrow account to the Hussein Regime. AWB agreed because the increase "does not effect AWB costings, as the contract price will be increased ...."

619.    Thus, the Vendor Defendants' actions went well beyond mere breaches of their contractual obligations. The Vendor Defendants assisted a repressive and corrupt dictator. They did so for economic gain.

### 8.    *The Hussein Regime collected more than $1 billion in ASSF kickbacks.*

620.    Representatives of Saddam Hussein had collected about $1.02 billion in ASSF kickbacks by March 2003.

621.    The Hussein Regime kept extensive records to ensure it received all the promised kickbacks.

622.    For example, Exhibit 2 is a translated record from the Ministry of Electricity showing Phase VIII ASSFs. This document confirms ASSFs from the following Defendants:

- ABB AG – 2 contracts,

- ABB Automation – 1 contract,

- ABB Industrie AC Machines – 2 contracts,

- ABB Near East Trading Ltd. – 6 contracts,

- Atlas Copco – 3 contracts,

- Pauwells International – 2 contracts,

- Renault VI – 1 contract,

- Secalt – 1 contract,

- Siemens-Turkey – 5 contracts, and

- Siemens France – 7 contracts.

623.    Exhibit 3 is a translated document from the State Company for Machinery, confirming ASSFs paid by at least the following:

- AGCO SA – 16 contracts, and

- Valtra do Brazil – 1 contract.

624.    Exhibit 4, another translated document, shows paid Phase X ASSFs from at least one medical ministry and confirms kickbacks from the following Defendants:

- The B. Braun Defendants – at least 18 contracts, including 10 from one or more of the Aesculap defendants,

- Boston Scientific – 1 contract,

- The GSK Defendants – 1 contract,

- Cilag (one of the Johnson & Johnson Defendants) – 2 contracts,

- Janssen Pharmaceutical (the other Johnson & Johnson Defendant) – 1 contract,

- Novo Nordisk – 3 contracts,

- The Roche Defendants – 5 contracts, and

- . St. Jude Medical Export – 1 contract.

625.    Exhibit 5 is a translated document from the Hussein Regime that records kickback

payments from the following:

- Air Liquide Engineering – 1 contract,

- Atlas Copco Airpower – 2 contracts,

- Atlas Copco – 4 contracts,

- Daewoo International – 1 contract,

- Daimler – 1 contract,

- Flowserve Pompes – 3 contracts,

- Ingersoll-Rand – 1 contract,

- Sulzer Burkhardt – 1 contract,

- Sulzer Pumpen – 3 contract,

- Sulzer Turbo – 2 contracts,

- Renault Trucks – 2 contracts, and

- Woodhouse – 8 contracts.

626.    A kickback by Dow AgroSciences (on contract CP/129) is recorded on Exhibit 6

(translated).

627.    Exhibit 7 (translated) confirms kickbacks by the following:

- The B. Braun Defendants (Aesculap) – 2 contracts,

- Eastman Kodak – 1 contract,

- Ebewe Pharma – 1 contract,

- The GSK Defendants – 1 contract, and

The Republic of Iraq's First Amended Complaint – page 107

- NV Organon – 2 contracts.

628.    A document from the State Company for Veterinary Supplies, Exhibit 8 (translated), confirms kickbacks being paid by the following:

- Intervet (an Akzo Nobel Defendant) – 1 contract, and

- Merial (a Merck Defendant) – 5 contracts.

629.    For some Defendants, the documents are not so obvious.  For example, Exhibit 9 lists a contract for Liebherr France (Contract 901086) and a payment of $84,764.  This represents roughly 1/11th of the total contract price – €931,853.   The same document shows a payment by Railtech International of $133,582.72 on UN Contract 801236.

630.    In short, the Hussein Regime made sure it was going to be paid its kickbacks.

### 9.    *The Defendants made unconscionable profits.*

631.    The Defendants did not sell their loyalty to the Hussein Regime cheaply.  They made extraordinary profits.

632.    The Defendants that have been required to reveal their profits to date reveal almost unbelievable returns.

633.    For example, Organon, one of the Akzo Nobel Defendants, admits to profits of $1,446,626.92 on its three Programme contracts to sell only about $2,029,000 of medicine to the Programme.  Organon admitted the obvious in its deferred prosecution agreement – the profit was extremely high.

634.    Organon's profit was more than extremely high.  Deduction of Organon's profit and $241,000 in kickbacks from the price of the medicine sold to the Programme leaves just $341,000 that went to buy the actual medicine sold to a UN humanitarian program for more than $2 million. In other words, Organon sold its medicine at nearly six times its actual value.

635.    Organon's conduct was unconscionable, especially in the context of a humanitarian program designed to ease suffering among an entire nation's population.

636.    Organon was not alone.

637.    Siemens also made abnormally high profits. As part of Siemens' guilty plea, Siemens admits to about $38 million in profits on its 42 Programme contracts to sell some $80 million in goods. Many of those contracts were executed before the kickback scheme was instituted, yet Siemens admits it paid about $1.7 million in kickbacks on at least some of its 42 contracts.

638.    Siemens' profits were egregious, even without considering that only part of Siemens' contracts were induced by kickbacks. Siemens had profits of at least 100%.

639.    The Textron Defendants sold about $5,149,000 in goods under the Programme and paid about $650,000 in kickbacks. The Textron Defendants admit profits on those sales of $1,937,000. Like Siemens, the Textron Defendants sold goods at an approximately 100% profit.

## D.    *Supply of Substandard Products*

640.    Notably, the Hussein Regime was initially reluctant to impose high kickbacks on oil production equipment because it feared it would receive substandard equipment, curtailing production.

641.    The Regime had no such concerns about the humanitarian goods purchased for the Iraqi people, so the Regime extracted the majority of the kickbacks from the purchase of humanitarian goods. As a result, many of those critical goods were substandard.

642.    Furthermore, once the process became corrupted, vendors and the Hussein Regime became more focused on profit than on the Programme's humanitarian purposes. This also lead to the delivery of substandard humanitarian goods to the Iraqi people.

643.    Substandard products included wheat, medicine, animal feed, chemicals, and vehicles.

644.   When the Hussein Regime received spoiled and outdated goods destined for the Iraqi people, it approved them in order to receive the kickbacks. The problem was persistent.

645.   Sometimes supplies were so bad that even the Hussein Regime complained, but instead of remedying the situation, such cases were simply another opportunity to divert cash from the Programme to solidify the Regime's power. For example, in late 2002, AWB supplied contaminated wheat under the Programme. Rather than resolve the matter through the UN as required, AWB and the Regime decided to siphon more money from the Programme.

646.   Specifically, AWB and the Hussein Regime agreed to hide a payment of more than $8 million in "damages" from the contaminated wheat provided under AWB's UN contracts. AWB agreed to the illegal plan, because it allowed AWB to compensate for contaminated wheat with Programme funds, instead of supplying uncontaminated wheat at AWB's cost. In other words, AWB twice injured the Iraqi people: first, AWB delivered contaminated wheat; then, it stole Escrow funds to pay the damages for the contaminated wheat.

647.   The plan required further fraud. As part of the arrangement, AWB requested the Hussein Regime to agree that the "payments preferably be made to a company other than the IGB and in a jurisdiction other than Iraq." Under such conditions, "Legal consider [sic] it will be at least arguable that we are not 'making funds or financial resources available' to the Iraqi Government." As concluded by the Australian Report, the "so-called legal opinion was nothing of the sort. It was an attempt to devise a method whereby the payments to Iraq would not be obvious by spreading them thinly over future shipments, to hide the fact of payment to Iraq ... and to falsify the nature of the transaction ..."

648.   Knowing the illegality, AWB nonetheless made the payments because "of the commercial imperative of this situation" -- that is, maintaining the large sales to Iraq.

649.    The Regime and AWB extracted more than $8 million from the UN Escrow Account pursuant to AWB contracts A1670 and A1680, signed on December 12, 2002. The UN approved the contracts, but only because AWB defrauded it as to the true nature of the transaction.

### E.    Overpriced Goods

650.    The UN Report reveals that over the course of the Programme there was a growing and substantial difference between the expected price of the humanitarian goods (based on available market data) and the prices paid through the UN Escrow Account. The price gap widened over the Programme's course.

651.    A United Nations review of 1,600 humanitarian contracts (about one-third of the total value of all contracts under the Programme) concluded that, even "adjusting generously for the vendors' obligation to assume the cost of transporting goods to Iraq," the prices paid under the Programme "markedly exceeded best estimates of adjusted market prices." UN Report, Chapter III, at 298.

652.    The overpricing became egregious after the transportation and ASSF schemes began. According to the Volcker Committee's analysis of three key commodities, by the Programme's end, prices were more than double the expected norms.

653.    The Volcker Committee estimates of overpricing for the final Programme Phases is as follows:

- Phase VI – 127% of expected,
- Phase VII – 143% of expected,
- Phase VIII – 162% of expected,
- Phase IX – 170% of expected,
- Phase X – 174% of expected,
- Phase XI – 166% of expected,

The Republic of Iraq's First Amended Complaint – page 111

- Phase XII – 184% of expected, and

- Phase XIII – 220% of expected.

654.    The United States Defense Contract Audit Agency and Defense Contract Management Agency also reviewed Programme prices.  The agencies' analysis of 759 already approved and funded contracts found approximately $656 million in potential overpricing on contracts with a total value of $3.1 billion, or more than 20%.  The agencies found that food contracts were especially susceptible to overpricing.  Almost 90% of the food contracts examined showed potential overpricing.

655.    Applying the more conservative 20% figure from the Defense Contracting Agency to the $34.5 billion in purchases indicates that the Iraqi people lost more than $7 billion worth of humanitarian goods to overpricing.  Using the Volcker Committee's percentages would increase the damages substantially.

## F.    *Diversion of Goods from Humanitarian Purposes*

656.    Corruption of the Programme included diverting goods from the Iraqi people to other Regime purposes, including items transferred to the Ministry of Defense, the Ministry of Military Industrialization, the General Security Directive, and the Presidential Diwan.

657.    In some cases, these ministries secretly negotiated with the vendors directly, even though they could not legally participate in the OFFP.  In other cases, another Ministry with no humanitarian purpose simply appropriated the goods.

658.    According to the UN Report, commonly diverted items included trucks (particularly trucks that could pull artillery), tires, batteries, and forklifts.  In a telling example, the Regime appropriated date palm excavators from Iraqi farmers to move palm trees to Hussein's Presidential Palaces.

659.    The Regime diverted approximately $1.9 billion in humanitarian goods from the Iraqi people to Iraqi ministries ineligible to participate in the Programme, including $1.4 billion to the Ministry of Defense, $29 million to the Offices of the President and Vice President, and $19 million to the Ministry of Military Industrialization.

## G.    Resale of Humanitarian Goods

660.    The Hussein Regime also appears to have resold some of the humanitarian goods purchased under the Programme. According to data collected by the United Nations Commodity Trade Statistics Database, known as Comtrade, during the period of the Programme, Iraq exported approximately $286 million in goods (excluding oil), some of which were apparently not manufactured in Iraq.

661.    The amount of the resold goods is currently unknown.

## H.    Judicial Admissions of Particular Vendor Defendants

662.    A number of the Vendor Defendants have resolved criminal charges against them for their actions in corrupting the Programme.

663.    As part of the resolution of the criminal charges, these defendants have judicially admitted most of the allegations against them.

### 1.    The Akzo Nobel Defendants admit joining the conspiracy.

#### (a)    Akzo Nobel's Agreement with the United States DOJ

664.    In December 2007, Akzo Nobel, individually and on behalf of its subsidiaries, entered into a non-prosecution agreement with the United States DOJ, in which Akzo Nobel admitted the actions set forth in the attachment to that agreement, some of which are set forth below. Akzo Nobel further agreed not to make any public statement contradicting such statements.

### (b)    *Knowledge of the Scope of the Conspiracy*

665.    The Akzo Nobel Defendants admit they knew the Hussein Regime was demanding a kickback of at least 10% of the contract price, such kickbacks were called "after-sales-service fees."

666.    The Akzo Nobel Defendants admit they knew and were reckless in not knowing such kickbacks were prohibited by the Programme and United States and international trade sanctions on Iraq.

667.    The Akzo Nobel Defendants admit they did not provide services in relation to the ASSFs.

668.    Akzo Nobel's total profits from contracts where it made illegal payments amounted to more than $1.6 million.

### (c)    *Transactions by Intervet*

669.    Prior to August 2001, Intervet's contracts contained no kickback requirement.

670.    Intervet admits that its September 2001 contract (UN Contract 800686), however, included an undisclosed requirement to pay a kickback of $38,741.

671.    Intervet paid the kickback through an agent.

672.    Intervet took no action to notify the UN of the illegal payment or to sanction the agents or the employees involved.

673.    Intervet earned profits of $200,741 on UN Contract 800686.

### (d)    *Transactions by Organon*

674.    Organon admits three contracts involving kickback payments to the Hussein Regime.

675.    Organon retained one of the same agents used by Intervet to pay the kickbacks.

676.    On Organon's first OFFP contract (UN 901408), dated June 18, 2001, Organon and the Hussein Regime agreed on an initial contract price before the Hussein Regime demanded a

kickback of 10% of the contract price. To conceal the kickback, Organon prepared contracts to be submitted to the UN that inflated the originally agreed contract price by 10%.

677.    On two subsequent contracts, both dated July 15, 2002 (UN Contracts 1200322 and 1200325), Organon simply agreed with the Hussein Regime on an initial contract price that was inflated by ten percent and then submitted that inflated contract price in the UN documents.

678.    Organon covered the kickbacks by payments through its agent, who received an extra 10% paid to an account in the agent's name.

679.    Organon funded the kickbacks on November 25, 2002.

680.    Organon paid $240,750 in illegal ASSFs in connection with these three contracts.

681.    Organon's profits on its Programme contracts were $1,446,626.92. Organon admits those profits were extremely high for the amount of goods sold.

### 2.    *AWB admits joining the conspiracy.*

682.    In testimony before the Australian government, AWB officers admitted that AWB knew the transportation payments were illegal and were being required of other sellers.

683.    Mr. Emons, AWB's Regional Manager for the Middle East and Africa, testified: "AWB had two choices: we either complied with the IGB's requirements under their contracts; or we allowed the wheat market to disappear altogether to other companies."

### 3.    *The Flowserve Defendants admit joining the conspiracy.*

#### (a)    *The Flowserve Defendants' Agreement with the United States DOJ*

684.    Flowserve Corp. and Flowserve Pompes entered into a deferred prosecution agreement with the United States DOJ that incorporated a Statement of Facts. Flowserve Corp. and Flowserve Pompes accepted responsibility for all actions described in the Statement of Facts and agreed not to make "any public statements, in litigation or otherwise, contradicting" any of the statements.

685.    Beginning in approximately August 2000, the Hussein Regime demanded that vendors of humanitarian goods pay a kickback, usually 10% of the contract price, which violated OFFP regulations and UN sanctions.

686.    Although termed "after sales service fees," these ASSFs did not represent actual services provided by the vendor.

687.    Flowserve Pompes was awarded 19 OFFP contracts from approximately April 2001 through September 2002. "To obtain the Iraqi contracts, Flowserve Pompes agreed to pay the Iraqi government kickbacks worth 10% of the total contract value."

688.    Flowserve paid kickbacks on 15 contracts and agreed to pay kickbacks on 4 other contracts that were not completed before the US invasion in March 2003.

### (b)    Flowserve Pompes

689.    Flowserve Pompes executed side letters for most payments that falsely reflected Flowserve Pompes would provide actual services.

690.    "In order to generate the funds to pay the kickbacks to the Iraqi government and to conceal those payments from the U.N., Flowserve Pompes inflated the unit price of each piece of equipment by 10% before submitting the contracts to the U.N. for approval."

691.    The contract documents Flowserve Pompes sent the UN for approval were misleading. They omitted any reference to after sales services or related installation fees. Instead, to cover the cost of the illicit ASSF payments, the company inflated the unit price of each piece of equipment without disclosing the fact or rationale for the price increase.

692.    Officials at Flowserve Pompes were fully aware the company would not provide engineering, installation, or commissioning services, but Flowserve's internal documentation maintained the pretense that there would be.

693.    Flowserve Pompes did not disclose the side letters to the UN.

(c)    *Flowserve B.V.*

694.    Flowserve's Dutch subsidiary Flowserve B.V. entered into one contract involving an ASSF kickback payment of $41,836. The contract was for the supply of water pump spare parts to the Iraqi government-owned South Gas Company.

695.    Flowserve B.V.'s Controller concealed the payment by increasing its purchase order by ten percent and passing the difference to Flowserve B.V.'s agent. In September 2001, Flowserve B.V. agreed to pay a supplemental commission – euphemistically labeled a "special project discount" – to the agent to cover the amount of the kickback. The "special project discount" effectively doubled to twenty percent the agent's standard ten percent commission.

696.    The agent submitted an invoice for the combined commission and "special project discount" in February 2002. Flowserve made the payment to the agent in March 2002. The agent then made the ASSF payment to the Iraqi ministry on Flowserve B.V.'s behalf. Flowserve B.V. did not disclose the ASSF payment to the UN.

4.    *The Ingersoll-Rand Defendants admit joining the conspiracy.*

(a)    *The Ingersoll-Rand Defendants' Agreement with the United States DOJ.*

697.    The Ingersoll-Rand Defendants entered into a deferred prosecution agreement with the United States DOJ acknowledging responsibility for their illegal actions. The Ingersoll-Rand Company executed the agreement in its own behalf and on behalf of "all of its affiliates and subordinates, including Ingersoll-Rand Italiana SpA ('I-R Italiana') and Thermo King Ireland Ltd."

698.    "Ingersoll expressly agrees that it shall not, through present or future attorneys, directors, officers, or any other person authorized to speak for Ingersoll, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by Ingersoll set forth above or in the attached Statement of Facts."

699.    Ingersoll-Rand concedes that, although termed "after sales service fees," the ASSFs did not represent any actual services provided by the vendor.

700.    Following UN rejection of an earlier contract, discussed above, and in anticipation of the tender of a contract subsequently referenced by the UN as Contract 1200039, an employee of the Ingersoll-Rand Defendants arranged the sale of six paver finishers and spare parts to a third party company for €968,286.

701.    This price reflected a discount of approximately 10% over the discount the Ingersoll-Rand Defendants usually provided to their distributors.  The increased discount was granted to generate the funds necessary for the distributor to pay approximately €127,540 to the Hussein Regime as a kickback for Contract 1200039.

702.    The Ingersoll-Rand front-company was awarded Contract 1200039 on or around October 30, 2001.  The contract included an extra 10% fee to pay a kickback to the Iraqi government.

703.    The kickback was paid in mid-to-late 2002.

704.    On or around July 24, 2002, the New York branch of BNP-Paribas sent a notice via international wire communication to the Central Bank of Iraq in Baghdad, notifying it of the issuance of a letter of credit to BNP in Beirut, Lebanon, authorizing the eventual payment of the contract price from the UN Escrow Account.

705.    The Ingersoll-Rand Defendants used the same front-company and methodology to pay a kickback of €234,918 on OFFP Contract 901232.  The invasion of Iraq, however, precluded the kickback's payment.

### (b)    I-R Italiana

706.    The Hussein Regime awarded I-R Italiana four Programme contracts valued at approximately €5,262,990 from around November 2000 to about May 2002.

707.    I-R Italiana secured these contracts by paying the Regime approximately €513,861 in kickbacks.

708.    To conceal and generate money to fund the kickbacks, I-R Italiana and SOMO created fictitious line items in I-R Italiana's purchase order calling for I-R Italiana to provide goods and services the parties never intended I-R Italiana to provide.

709.    I-R Italiana's improper dealings were not limited to direct kickbacks.  In or around February 2002, I-R Italiana arranged a visit by eight officials of the Iraqi government to Italy.  While some of the officials spent two days touring I-R Italiana's facility, the remainder of the week-long trip was reserved for sightseeing.  I-R Italiana knew only two of the officials were there for business purposes and the other six were "on holiday."  I-R Italiana spent more than $20,000 on the trip, including "pocket money" of $1,000 for each of the eight government officials.

### (c)    Thermo King Ireland

710.    Thermo King Ireland was awarded a Programme contract valued at approximately €706,148.49 for the sale of spare parts for refrigerated trucks between October 2000 and June 2002.

711.    Thermo King Ireland secured this contract by offering to pay the Regime a kickback of approximately €64,197.46.

712.    The kickback was concealed from the UN by inflating contract prices by 10% before submitting the contract to the 661 Committee for approval.

713.    Thermo King Ireland purchased the parts described in Contract 801228 from Thermo King entities in the United States in November 2000.  The parts were shipped from the United States to Ireland.  Also in November 2000, Thermo King Ireland sent Contract 801228 to

the legal department of Ingersoll, Thermo King's parent company, so that the legal department could obtain a license from the US Treasury Department's Office of Foreign Asset Control ("OFAC"), allowing the shipment of parts originating in the United States from Ireland to Iraq.

714.    OFAC never granted the permission, so, despite its best efforts to defraud the OFAC and the UN, ultimately, Thermo King Ireland failed to obtain UN approval. The Regime cancelled the contract in or around December 2005.

(d)    *ABG*

715.    Ingersoll-Rand's German subsidiary ABG entered into a total of six contracts involving ASSF payments.

716.    As discussed in more detail above, after reviewing an ABG contract with Baghdad Mayoralty that revealed a required transfer to Iraq, the UN directly informed the Ingersoll-Rand Defendants that financial transfers to the Regime were prohibited under UN Security Council resolutions and, by extension, US and international trade sanctions.

717.    The Ingersoll-Rand Defendants nonetheless joined the kickback scheme in violation of Progamme rules. In the year following termination of the Baghdad Mayoralty transaction, ABG's Sales Manager negotiated four more OFFP contracts in ABG's behalf that required ASSF payments.

718.    ABG's distributors made, or agreed to make, ASSF payments on all four contracts. ABG's Jordanian distributor made a total of $107,754 in ASSF payments on two contracts. ABG's Lebanese distributor made an ASSF payment of $120,305 on one contract and entered into a side agreement to make an additional ASSF payment of $198,000 on another contract. The distributor never made the final $198,000 payment because the Coalition Provisional Authority renegotiated the contract after the 2003 invasion.

(e)    *I-R Benelux*

719.    Ingersoll-Rand's Belgian subsidiary I-R Benelux paid a kickback of $260,787.

The Republic of Iraq's First Amended Complaint – page 120

### (f)    Dresser International

720.    Dresser International Group paid at least $117,140 in kickbacks, but the amount is believed to be higher.

### 5.    Novo Nordisk admits joining the conspiracy.

721.    Novo Nordisk entered into an agreement with the United States DOJ in May 2009, admitting and accepting responsibility for the conduct set forth in the agreement and agreeing not to make any public statement contradicting such statements.  In June 2009, Novo Nordisk entered into a similar agreement with Denmark's public prosecutor.

722.    Novo Nordisk knew the Hussein Regime was demanding a kickback of at least 10% of the contract price, which kickbacks were called "after-sales service fees" or ASSFs and that such payments violated Programme regulations and UN sanctions.

723.    Novo Nordisk used a local agent to facilitate sales to Iraq under the Programme and to pay the kickbacks.

724.    To conceal those payments, Novo Nordisk inflated the price of its contracts by approximately 10% before submitting the contracts to the UN for approval.

725.    Novo Nordisk executed three contracts that included 10% kickbacks: Contract 901385, May 26, 2001; Contract 901386, May 26, 2001; Contract 90143, June 3, 2001.

726.    In or about November 2001, Novo Nordisk caused the payment of approximately $128,536 in kickbacks in connection with these three contracts.

727.    Between about January 2001 and April 2002, Novo Nordisk entered into at least eight other contracts on which Novo Nordisk's agent paid kickbacks.

### 6.     The Siemens Defendants admit joining the conspiracy.

#### (a)     The Siemens' Guilty Plea

728.     In December 2008, Siemens pleaded guilty to two counts of violating provisions of the Foreign Corrupt Practices Act and paid one of the largest criminal fines in history.

729.     Siemens' plea agreement made clear its guilty plea was "based on a factual admission of guilt" and that the "Siemens AG is pleading guilty because it is guilty of the charges contained in the accompanying Information and admits and accepts responsibility for the conduct described in the Statement of Offense." The Statement of Offense states "the following facts are true and correct."

#### (b)     Siemens' History of Corrupt Payments

730.     Siemens admits to a long history of corrupt payments to government officials. Until early 1999, Siemens' project cost calculation sheets sometimes reflected "nützliche aufwendungen" ("NAs"), a common tax term literally translated as "useful expenditures" but partly understood by many Siemens employees to mean "bribes." Siemens even developed systems for making such payments. For example, Siemens' offices housed multiple "cash desks" where employees could withdraw large sums of cash, up to and including one million Euros at a time. Throughout the 1990s, Siemens employees withdrew more than one billion Euros for questionable business purposes from off-books accounts in Austria, Switzerland, Liechtenstein, and elsewhere. Siemens also relied heavily on purported "business consultants," in many cases solely to pass along corrupt payments from Siemens to foreign government officials responsible for awarding business.

731.     The scope of Siemens' improper payments is enormous. From about March 2001 to 2007, Siemens made payments totaling approximately $1,360,000,000 through various mechanisms. Siemens paid approximately $554,500,000 for unknown purposes, including approximately

$341,000,000 constituting direct payments to business consultants. Siemens intended the remaining $805,500,000, in whole or in part, as corrupt payments to foreign officials.

### (c)    Siemens' Knowledge of, and Participation in, the Conspiracy

732.    Siemens admits the kickbacks violated Programme regulations and UN sanctions.

733.    Siemens also admits that from "in or about 2000 to in or about 2002, Siemens France, Siemens Turkey, [and] Osram Middle East" executed contracts under the Programme and "caused to be paid" more than a million dollars in kickbacks to the Hussein Regime. "In order to generate the funds to pay the kickbacks to the Iraqi government and to conceal those payments, the Siemens entities inflated the price of some contracts by up to 10% before submitting them to the 661 Committee and the U.N. for approval."

734.    Siemens concedes it made a gross profit of more than $38,000,000 on its Programme contracts.

### (d)    Siemens France

735.    From about January 2000 to about April 2001, Siemens France entered into at least twelve Programme contracts to provide power station renovation, servicing, and spare parts. A kickback was paid to the Regime on each contract.

736.    Siemens France paid some of the kickbacks in cash "so that no names appear on paper."

737.    Siemens France caused a total of at least $321,745 in kickbacks to be paid to the Iraqi government in connection with Siemens France's Programme contracts.

### (e)    Siemens Turkey

738.    Siemens Turkey entered into at least twenty contracts to provide power and electrical equipment from about September 2000 to about June 2002.

The Republic of Iraq's First Amended Complaint – page 123

739.    Siemens Turkey caused kickbacks to be paid on each contract.

740.    Siemens Turkey caused a total of at least $1,243,119 in kickbacks to be paid in connection with its OFFP contracts.

(f)    *Siemens-Osram*

741.    From in or about February 2000 to in or about June 2002, Siemens-Osram entered into at least six contracts to sell lightbulbs and lighting equipment.

742.    Siemens-Osram caused kickbacks to be paid on each contract. In connection with at least three of the contracts, Siemens-Osram delivered side letters to the Ministry of Oil in which it promised to provide the Ministry of Oil with a "letter of credit" or "irrevocable bank guarantee" for a specified sum equivalent to approximately 10% of the contract value.

743.    Siemens-Osram caused a total of at least $89,250 in kickbacks to be paid in connection with its OFFP contracts.

7.    *The Textron Defendants admit joining the conspiracy.*

(a)    *The Textron Defendants' Agreement with the United States DOJ*

744.    As part of a deferred prosecution agreement with the United States DOJ, the Textron Defendants acknowledged their culpability and agreed not to make any public statement contradicting any of the following facts.

745.    The Textron Defendants concede that, starting in the middle of 2000, the Hussein Regime made a concerted effort to subvert the Programme by demanding kickbacks from its humanitarian goods vendors and that such payments were illicit.

746.    The Textron Defendants used Middle East consultants to facilitate sales under the Programme and made ASSF payments through those consultants.

### (b)    DB Guinard Pumps

747.    DB Guinard Pumps used a consultant to negotiate and sign three sales contracts with Iraq's Ministry of Oil for the sale of industrial pumps. It agreed to make ASSF payments of 10% of the contract price on each sale. The sales contracts, containing prices inflated by 10% to cover the cost of the ASSF payments, were submitted to the UN for processing and approval without disclosing the ASSF payment.

748.    With the approval of the DB Guinard Pumps, the consultant then entered into separate written side agreements for each sale with the Ministry of Oil. Pursuant to these side agreements, the consultant agreed to make the ASSF payments on behalf of DB Guinard Pumps prior to receipt of the goods at Iraq's border. DB Guinard Pumps then reimbursed the consultant.

749.    DB Guinard Pumps made more than $48,000 in ASSF payments to Iraq's Ministry of Oil through its consultant in connection with two of the three sales contracts. DB Guinard Pumps authorized, but did not pay, an additional $35,000 in ASSF payments in connection with the third sales contract.

750.    DB Guinard Pumps' internal documentation forms show French management directly approved the ASSF payments on two of the DB Guinard Pumps transactions. Each form, known as a "Bon de Commission," was generated by DB Guinard Pumps' Finance Department and signed by the Sales and Finance Directors in France. The Bon de Commission documents mention the "side agreement" and indicate that the consultant was to receive 50% of the ASSF amount at the time a LOC was opened by BNP and the remainder two weeks before delivery of the goods to Iraq.

### (c)    DB France

751.    During the Programme, DB France conducted business in Iraq with the help of a Jordanian consulting firm. In July 2000, after learning of the new requirement that improper ASSF

payments had to be made to do business in Iraq, the Export Sales Manager drafted a memorandum to the consulting firm and sent copies to his French supervisors.

752. The memorandum explained that DB France wishes "to avoid any written agreement [concerning the ASSF] with client side" and "[i]f written document cannot be avoided, this must remain highly confidential."

753. The Export Sales Manager noted that he received his superior's approval to include the amount of the ASSF in the inflated contract price submitted to the UN.

754. Between January and July 2001, the Export Sales Manager signed ten sales contracts under the Programme. For each contract, the Export Sales Manager drafted a "Memorandum of Understanding" setting forth the obligations of DB France and the consulting firm with respect to the ASSF payment.

755. The consulting firm then invoiced DB France for "After-Sales Service Fees" in the amount of the ASSF payment.

756. Prior to the 2003 invasion of Iraq, DB France made more than $531,000 in ASSF payments through its consultant in connection with nine Programme contracts. DB France authorized, but did not pay, an additional $35,000 in ASSF in connection with a tenth sales contract.

### (d) Textron's History of Corrupt Payments

757. Textron concedes that the payments under the Programme were not unusual. Textron has identified 36 transactions involving improper payments in countries other than Iraq, all made or facilitated by Textron's "David Brown" subsidiaries. These improper payments were similar to the payments Textron made under the Programme, in that Textron provided no bona fide services and the payments were made to secure contracts.

8.   *The Volvo Defendants admit joining the conspiracy.*

    (a)   *The Volvo Defendants' Agreement with the United States DOJ*

758.   On March 20, 2008, AB Volvo, in its own behalf and on behalf of all of its subsidiaries, expressly including Renault Trucks and Volvo Construction, entered into a deferred prosecution agreement with the United States DOJ. Pursuant to the agreement, the Volvo Defendants admitted, accepted, and acknowledged responsibility for, the actions set forth in the Statement of Facts attached to the agreement. The Volvo Defendants also expressly agreed that they would not, through attorneys or otherwise, "make any public statement, in litigation or otherwise, contradicting either the acceptance of responsibility by AB Volvo, Renault Trucks and [Volvo Construction] set forth above or any fact contained in the attached Statement of Facts," which itself declares that the information contained in it is true and accurate.

759.   The Volvo Defendants admit that, from approximately 1999 through 2003, the Volvo Defendants and their agents and distributors made approximately $6,206,331 in kickback payments and authorized additional payments of $2,388,419 in connection with their sales of humanitarian goods to Iraq under the UN OFFP. The Volvo Defendants authorized and paid kickbacks to Iraq in the form of "after-sales service fees" on sales of its products to Iraq. Volvo Construction also made other types of illicit payments to Iraq.

760.   The Volvo Defendants knew such payments were prohibited by the Programme and US and international trade sanctions on Iraq.

761.   Despite incurring losses on several contracts, the Volvo Defendant's total gains from profitable contracts in which ASSF payments and other illicit payments were paid or authorized amounted to $7,299,208.

#### (b)    Volvo Construction

762.    Volvo Construction was one of the first companies to agree to make illicit payments to the Hussein Regime. In fact, Volvo Construction paid kickbacks before the Hussein Regime instituted its broader kickback scheme.

763.    Volvo Construction entered into four Programme contracts from October 1999 to July 2000.

764.    Despite the fact that these contracts predated the formal ASSF conspiracy, Volvo Construction nonetheless made two types of illicit payments to the Hussein Regime related to these contracts.

765.    First, Volvo Construction's internal documents for two of the contracts evidence it made kickback payments to the Regime totaling between 5% and 11.27% of the contract value. Volvo Construction made these payments through its agent to obtain or retain business. An internal Volvo Construction document even discusses the extra trips Volvo Construction staff made to Iraq to make the payments and the possibility of having to give more than just these payments to obtain additional business.

766.    Volvo Construction added the amount of these kickback payments to the commission payments made to an agent, who then gave the money to SOMO.

767.    Illicit payments of $30,506.50 and $37,909, respectively, were made on the first two contracts.

768.    On the fourth contract, Volvo Construction gave its Jordanian Agent a total of $15,950 as "the commitment to the third party whom support us and VOLVO to gain orders in the said ministry."

769.    Volvo Construction also agreed to purchase a car for the Hussein Regime. The "gift" was made through Volvo Construction's Jordanian agent.

770.    After the imposition of the ASSF requirement, Volvo Construction or its distributors entered into five additional contracts with Iraqi ministries that involved the payment or authorization of illicit ASSFs.

771.    Volvo Construction learned of the demands for ASSF payments when a Swedish commercial delegation of VCEI employees visited Iraq in 2000. In a November 1, 2000 internal memorandum discussing the trip, Volvo Construction noted that the ASSF demand "appears to be a clear violation of the UN Embargo Rules that we are expected to participate in."

772.    Volvo Construction sought guidance from the Swedish Embassy in Amman, Jordan about responding to the ASSF demands. On December 3, 2000, the Swedish Embassy in turn sent a letter to the UN, reporting that it had heard that Iraq was demanding ASSF payments. The letter noted that Volvo Construction (which was not identified by name) had informed the embassy it would refuse to sign the contracts. However, records show that Volvo Construction proceeded to enter into transactions that included ASSF payments.

773.    In a December 4, 2000 e-mail, Volvo Construction personnel discussed the need for handling the ASSF payments with "utmost discretion."

774.    Volvo Construction did not notify the UN that it inflated its contracts to cover the ASSF payments.

775.    In some cases, Volvo Construction used distributors acting with Volvo Construction's knowledge and consent to channel the kickbacks.

776.    From about December 2000 through January 2003, Volvo Construction and two distributors paid approximately $1.3 million in kickbacks in order to obtain approximately $13.8 million in Programme contracts.

### (c)    Renault Trucks

777.    From about November 2000 through about April 2003, Renault Trucks obtained about €61 million worth of Programme contracts. To obtain these contracts, Renault Trucks paid and agreed to pay the Hussein Regime $4.8 million in kickbacks.

778.    In order to pay the kickbacks, Renault Trucks inflated the price of the contracts by about 10% before submitting for UN approval.

779.    Renault Trucks paid the kickbacks through front-companies, inflating their payments so the front-companies could pass on the kickbacks.

780.    Renault Trucks first kickback was paid on its November 16, 2000 contract, UN Contract No. 801294.

781.    From about November 2000 through about July 2001, Renault Trucks entered into at least another 16 Programme contracts in which Renault Trucks arranged for a 10% kickback to the Hussein Regime.

782.    The total value of the kickbacks paid by Renault Trucks was approximately $4.19 million.

783.    To mask the payment of ASSFs, Renault Trucks devised a scheme in which these third parties facilitated the payment of the fees to Iraq by adding the ASSF cost to the cost of the subcontracted work and submitting the total cost to Renault Trucks for payment. The third party contractors then passed the ASSF payments to the Hussein Regime.

784.    Renault Trucks' internal documents discuss the fact that Renault Trucks could not make the payments in its own name because "we would have been caught red-handed."

### 9.    The Weir Group admits joining the conspiracy.

785.    In July 2004, the Weir Defendants announced the result of an internal investigation that uncovered "payments made in addition to normal commissions were made" in connection with Weir's contracts.

786.    The Weir Defendants concede they inflated their OFFP contracts by a total of £4.2 million.

787.    The UN Report concludes that the Weir Defendants "knowingly paid kickbacks in connection with sixteen of its contracts under the Programme [calculated to total about] $4.5 million in illicit payments to the Iraqi regime."

788.    The Weir Group made and agreed to make these improper payments through its agents and directly, including several side agreements executed by a Weir officer requiring kickbacks be made.

789.    A Weir Group officer signed one such agreement, which clearly sets out the kickback arrangement, on January 21, 2001. The side letter related to Iraq contract no. NOC/08/8100.

790.    In other instances, the Weir Group acted through an agent, but the Weir Group was made aware of, and approved, the improper payments. For example, on January 17, 2002, a subsidiary advised Weir by email about the "10% AFTER SALES TAX," required to be paid before its goods could be offloaded.

### 10.    York admits joining the conspiracy.

#### (a)    York's Agreement with the United States DOJ

791.    As part of a deferred prosecution agreement, York, on behalf of all of its subsidiaries and affiliates, admitted that the facts described in the Information attached to the agreement were true and accurate.

792.  From about November 2000 through March 2003, York paid approximately $647,000 in kickbacks to the Hussein Regime in return for the award of OFFP contracts with a value of approximately $7 million.

793.  York authorized the kickbacks to be paid through a third party agent.

794.  York concealed the kickbacks from the UN by inflating its contract prices by 10% before submitting the contracts for approval.

795.  York further concedes that, beginning in approximately August 2000, the Hussein Regime demanded that the vendors of humanitarian goods pay a kickback, usually valued at 10% of the contract price.  These kickbacks violated Programme regulations and the Iraq Sanctions Program.

796.  From about September 1999 through December 2005, within the territory of the United States and elsewhere, York and its immediate parents and others unlawfully and knowingly combined, conspired, confederated and agreed together and with each other to "knowingly devise, and intend to devise a scheme and artifice to defraud the United Nations and the Oil-for-Food Program and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, through the use of interstate and foreign wire communications, in violation of 18 U.S.C. § 1343 …."

797.  "The primary purpose of the conspiracy was to pay unlawful kickbacks to the Iraqi government and to make other improper payments to officials of other governments in order to assist in obtaining and retaining business from and with those governments."

798.  In furtherance of the conspiracy and to accomplish its unlawful objects, numerous overt acts were committed within the territory of the United States and elsewhere.

### (b)    York's History of Corrupt Payments

799.    York's practices in Iraq were not anomalies.  Throughout the period late-1999 through 2005, York and its immediate parent conspired to pay hundreds of kickbacks and bribes to employees of government customers and contractors of government customers in order to obtain approximately $42 million in contracts on governmental projects in Bahrain, Egypt, India, Turkey, and UAE.  These kickbacks and bribes were primarily facilitated through contractors, who generated and submitted false invoices to York and its immediate parent for consulting services that they had not performed.  The contractors then gave cash to the York salespersons to fund the kickbacks and bribes.

## I.    Kickbacks and Contracts of the Individual Vendor Defendants

### 1.    The ABB Defendants paid at least $717,000 in illicit kickbacks.

800.    The ABB Defendants paid at least $717,000 in illicit kickbacks to sell more than $4,839,000 in goods under the OFFP.

### (a)    ABB AG

801.    ABB AG paid at least $3,865 in illicit kickbacks to sell about $31,000 in goods.

802.    ABB AG caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 702893 | 7 | Electronic logic print | 29,941 | | 2,722 | 1,000 |
| 802496 | 8 | Switch yard equipment and accessories | 17,004 | 16,062 | 1,546 | 1,560 |
| 802497 | 8 | Switch yard equipment and accessories | 15,295 | 15,230 | 1,390 | 1,305 |

### (b)    ABB Automation

803.    ABB Automation paid at least $10,000 in illicit kickbacks to sell about $113,000 in goods.

The Republic of Iraq's First Amended Complaint – page 133

804. ABB Automation caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801834 | 8 | Pumps, compressors, rotary machines and spares | 117,904 | 113,246 | 10,719 | 10,000 |

### (c)  ABB Elektric Sanayi

805. ABB Elektric Sanayi paid at least $159,797 in illicit kickbacks to sell about $1,832,874 in goods.

806. ABB Elektric Sanayi caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 830312 | 8 | Substation equipment and materials | 986,750 | 1,081,038 | 89,699 | 89,699 |
| 930450 | 9 | Electrical material and equipment | 682,464 | 751,836 | 63,630 | 70,098 |

### (d)  ABB Industrie AC Machines

807. ABB Industrie AC Machines paid at least $43,234 in illicit kickbacks to sell about $489,000 in goods.

808. ABB Industrie AC Machines caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801163 | 8 | Motor | 252,293 | 260,223 | 22,934 | 22,934 |
| 801234 | 8 | Pumps, compressors and rotary machines | 234,116 | 228,956 | 21,281 | 20,300 |

(e)    *ABB Industrie Champagne*

809.    ABB Industrie Champagne paid about $112,000 in illicit kickbacks to sell about $1,230,000 in goods.

810.    ABB Industrie Champagne caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801906 | 8 | Electrical accessories | 1,197,473 | 1,230,543 | 108,859 | 111,865 |

(f)    *ABB Near East Trading Ltd.*

811.    ABB Near East Trading Ltd. paid at least $309,365 in illicit kickbacks to sell more than $3.3 million in goods.

812.    ABB Near East Trading Ltd. caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 800584 | 8 | Control protection and measuring system | 58,325 | 64,586 | 5,302 | 5,318 |
| 800846 | 8 | Switch yard equipment and accessories, spare parts | 136,669 | 137,376 | 12,423 | 12,421 |
| 801160 | 8 | Switch yard equipment and accessories | 159,055 | 160,394 | 14,459 | 14,030 |
| 801200 | 8 | Boiler auxiliary system | 360,001 | 377,178 | 32,724 | 32,724 |
| 801562 | 8 | Transmission line spares | 663,496 | 692,184 | 60,312 | 60,313 |
| 801820 | 8 | Transmission line spares | 625,424 | 660,475 | 56,851 | 56,851 |
| 901008 | 9 | Circuit breakers | 319,713 | 333,257 | 29,065 | 30,296 |
| 901362 | 9 | Transformers | 825,235 | 889,538 | 75,021 | 80,867 |
| 1101993 | 11 | Control protection and measuring system | 67,574 | | 6,139 | 2,000 |
| 1102001 | 11 | Substation equipment and materials | 1,489,618 | - | 135,407 | 10,000 |
| 1102008 | 11 | Transducers and metering equipment | 498,134 | - | 45,280 | 4,545 |

(g)    *ABB Solyvent-Ventec*

813.    ABB Solyvent-Ventec paid about $80,000 in illicit kickbacks to sell about $835,000 in goods.

814.    ABB Solyvent-Ventec caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801896 | 8 | Air fan | 114,437 | 123,603 | 11,029 | 11,913 |
| 901219 | 9 | Fan | 673,390 | 711,983 | 64,155 | 67,832 |

### 2.    *The AGCO Defendants paid more than $5 million in kickbacks.*

815.    Together, the AGCO Defendants paid more than $5 million in illicit kickbacks in order to sell more than $75 million in goods under the OFFP.

### (a)    *AGCO Danmark*

816.    AGCO Danmark paid at least $1,279,854 in illicit kickbacks to sell more than $15 million in tractors and spare parts.

817.    AGCO Danmark caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 1100172 | 11 | Tractor/spare parts | 9,686,376 | 10,347,963 | 880,509 | 880,546 |
| 1100173 | 11 | Tractor/spare parts | 4,392,696 | 4,709,168 | 388,876 | 399,308 |

### (b)    *AGCO S.A.*

818.    AGCO S.A. paid at least $4,648,184 in illicit kickbacks to sell more than $57 million in agricultural machinery.

819.    AGCO S.A. caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
| | | | Face Value | Disbursements | Amount | Amount |
|---|---|---|---|---|---|---|
| 601943 | 6 | Tractors | 4,403,544 | 4,667,680 | 260,332 | 260,332 |
| 702667 | 7 | Tractors | 2,093,823 | 2,086,610 | 205,943 | 190,404 |
| 800948 | 8 | Tractors | 2,070,080 | 2,061,105 | 101,891 | 101,891 |
| 801211 | 8 | Tractors | 8,293,943 | 7,772,253 | 724,446 | 724,609 |
| 801388 | 8 | Tractors; spare parts | 571,772 | 549,391 | 49,945 | 51,974 |
| 801475 | 8 | Harvester combines | 957,611 | 942,857 | 43,816 | 45,596 |
| 801689 | 8 | Tractor spare parts | 172,100 | 168,633 | 15,219 | 15,645 |
| 901525 | 9 | Tractors | 9,082,184 | 9,069,436 | 836,427 | 825,612 |
| 901526 | 9 | Tractors | 3,443,151 | 3,377,136 | 317,209 | 313,108 |
| 901808 | 9 | Generating sets and parts | 2,084,756 | 2,240,057 | 191,995 | 169,538 |
| 1100049 | 11 | Combines harvesters | 2,998,370 | 3,355,396 | 272,554 | 272,554 |
| 1100175 | 11 | Tractors | 5,151,734 | 5,719,443 | 468,296 | 468,297 |
| 1100176 | 11 | Tractors | 2,823,917 | 3,142,046 | 256,695 | 256,696 |
| 1100241 | 11 | Harvester | 2,941,406 | 3,411,938 | 267,383 | 267,383 |
| 1100249 | 11 | Tractor; spare parts | 7,530,397 | 8,569,452 | 684,536 | 684,545 |

(c)    *Valtra do Brazil*

820.    Valtra do Brazil paid at least $181,316 in illicit kickbacks to sell more than $3 million in sales of tractors and spare parts.

821.    Valtra do Brazil caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
| | | | Face Value | Disbursements | Amount | Amount |
|---|---|---|---|---|---|---|
| 602086 | 6 | Tractor spare parts | 199,606 | 2,443,242 | 181,316 | 181,316 |
| 701434 | 7 | Tractor spare parts | 709,500 | 709,500 | – | – |

3.    *Air Liquide paid at least $34,272 in kickbacks.*

822.    Air Liquide paid at least $34,272 in illicit kickbacks to sell about $370,000 in goods under the OFFP.

The Republic of Iraq's First Amended Complaint – page 137

823.    Air Liquide caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 830377 | 8 | Electrical equipment with spares | 370,768 | 403,783 | 34,272 | 34,272 |

### 4.    *The Akzo Nobel Defendants paid about $279,000 in kickbacks.*

824.    From approximately 2000 through 2003, the Akzo Nobel Defendants authorized and made approximately $279,491 in kickback payments in connection with their sales of humanitarian goods to Iraq under the OFFP.

### (a)    *Intervet*

825.    Intervet paid a kickback of $38,741.

826.    Intervet caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 800686 | 8 | Agricultural Supplies | | | 38,741 | 38,741 |

### (b)    *Organon*

827.    Organon paid $240,750 in kickbacks.

828.    Organon caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 901408 | 9 | Medicine | 725,953 | 795,176 | 35,808 | 70,034 |
| 1200322 | 12 | Medicine | 1,574,360 | 907,022 | 143,116 | 143,116 |
| 1200325 | 12 | Medicine | 303,607 | 326,823 | 27,600 | 27,600 |

### 5.    *Astra Zeneca paid about $162,571 in kickbacks.*

829.    Astra Zeneca AB paid about $162,571 in illicit kickbacks to sell about $1,788,000 of medicine under the OFFP.

830.    The Astra Zeneca kickbacks were not anomalies. Astra Zeneca has agreed to pay fines in the hundreds of millions of dollars for paying kickbacks in the United States to sell its products.

831.    Astra Zeneca caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 1100807 | 11 | Xylocaine | 961,832 | 1,097,160 | 87,439 | 99,742 |
| 1100809 | 11 | Xylocaine; marcaine | 148,371 | 179,634 | 13,488 | 16,330 |
| 1200015 | 12 | Supply of drugs | 1,792,460 | 511,489 | 162,951 | 46,499 |

### 6.    The Atlas Copco Defendants paid more than $1.3 million in kickbacks.

832.    From 1997 to 2003, the Atlas Copco Defendants paid more than $1.3 million in ASSF kickbacks to sell more than $15.6 million in goods.

833.    The Atlas Copco Defendants also paid improper inland transportation fees.

834.    The agent for the Atlas Copco Defendants has admitted that he discussed the kickbacks with Atlas Copco and that Atlas Copco was aware of the payments.

835.    The Atlas Copco Defendants caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 730554 | 7 | Rotating equipment with spares | 156,410 | 138,724 | 14,219 | 4,234 |
| 730864 | 7 | Spare parts | 18,213 | 16,038 | 1,584 | 1,658 |
| 730870 | 7 | Spare parts for air compressor | 128,818 | 112,251 | 11,710 | 11,711 |
| 731020 | 7 | Maintenance tools | 18,369 | - | 1,670 | 3,340 |
| 800890 | 8 | Pumps, compressors and rotary machines; spare parts | 49,153 | 50,274 | 4,468 | 4,468 |
| 800996 | 8 | Air compressors/spare parts | 682,789 | 723,933 | 62,072 | 65,812 |
| 801449 | 8 | Pumps, compressors and rotary machines | 15,704 | 14,319 | 1,427 | 1,427 |
| 801755 | 8 | Compressor/parts | 242,827 | 234,870 | 22,075 | 21,352 |
| 801855 | 8 | Air compressors | 1,267,468 | 1,310,071 | 115,224 | 119,097 |
| 801965 | 8 | Pumps, compressors and rotary machines | 1,525,823 | 1,447,933 | 138,698 | 138,698 |
| 802004 | 8 | Compressor w/ accessories and parts | 1,055,756 | 1,002,704 | 95,968 | 91,146 |
| 802034 | 8 | Air compressors | 441,030 | 403,448 | 40,094 | 36,677 |
| 802248 | 8 | Compressor w/ accessories and parts | 146,163 | 156,817 | 13,288 | 14,256 |

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802391 | 8 | Spare parts | 205,204 | 204,954 | 18,654 | 18,654 |
| 802678 | 8 | Air compressors | 50,031 | 52,806 | 4,548 | 4,800 |
| 830053 | 8 | Air compressors/spare parts | 469,945 | 507,995 | 37,237 | 37,253 |
| 830061 | 8 | Air compressors with air dryers and spares | 213,653 | 212,612 | 22,978 | 22,978 |
| 830072 | 8 | Air compressors w/air dryers and spares | 237,114 | 237,504 | 21,555 | 21,556 |
| 830079 | 8 | Machines and equipment for workshops w/ spares | 346,906 | 333,258 | 31,544 | 31,544 |
| 830095 | 8 | Maintenance and operation of existing facilities in storage and cooling plant consist of spares for comp | 262,841 | 244,569 | 23,893 | 23,893 |
| 830098 | 8 | Replacement of damaged compressors with spares | 609,730 | 651,966 | 56,823 | 56,823 |
| 830101 | 8 | Replacement of damaged pumps, compressors, turbines, gear, boxes, fans...etc..w/spares | 79,702 | 76,827 | 9,623 | 9,623 |
| 830504 | 8 | Lightning generators with spares | 113,490 | 131,516 | 10,317 | 10,317 |
| 830505 | 8 | Air compressors/spare parts | 173,950 | 180,711 | 20,302 | 20,302 |
| 830556 | 8 | Spare parts | 1,669,898 | 1,946,007 | 151,809 | 151,844 |
| 830731 | 8 | Air compressors/spare parts | 185,143 | 193,740 | 16,830 | 16,830 |
| 830807 | 8 | Portable air compressor | 159,468 | 171,663 | 14,496 | 14,496 |
| 901158 | 9 | Air compressors | 358,008 | 388,392 | 32,543 | 35,304 |
| 901262 | 9 | Air compressors | 225,391 | 233,238 | 20,490 | 21,203 |
| 930064 | 9 | Mechanical spares lpg filling plant | 255,455 | 279,142 | 23,221 | 23,221 |
| 930066 | 9 | Lightning equipment and accessories | 123,393 | 135,979 | 13,220 | 13,220 |
| 930496 | 9 | Emergency diesel power generators | 1,236,385 | 1,342,086 | 112,387 | 112,387 |
| 1000230 | 10 | Spare parts for air compressor | 37,246 | 35,747 | 3,405 | 3,268 |
| 1130056 | 11 | Spare parts for air and gas comp | 172,018 | 199,449 | 15,637 | 15,637 |
| 1200082 | 12 | Air compressors/spare parts | 1,247,475 | 1,333,245 | 113,398 | 121,194 |
| 1230241 | 12 | Jack hammers with pins and hoses | 58,209 | - | 5,291 | 5,292 |

### 7.    *AWB paid more than $221.7 million in kickbacks.*

836.    AWB was the largest provider of humanitarian goods under the OFFP. From 1997 to 2003, AWB sold a total of 6.8 million tons of wheat for more than $2.3 billion in payments from the UN Escrow Account.

837.    In total, AWB assisted the Hussein Regime in diverting at least $232,128,189.98 from the UN escrow account: $146,101,906.59 in "transportation fees," $78,026,283.39 in "after-sales-service fees," and more than $8 million for the contaminated wheat dispute.

838.    AWB caused kickbacks to be paid on at least the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF | Inland Transportation Fee |
|---|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount | Amount |
| 600078 | 6 | WHEAT | 40,687,500 | 40,611,818 | | | 3,144,120 |
| 600079 | 6 | WHEAT | 40,687,500 | 40,640,217 | | | 2,871,416 |
| 600080 | 6 | WHEAT | 32,550,000 | 32,550,000 | | | 2,267,994 |
| 600744 | 6 | WHEAT | 32,550,000 | 32,407,540 | | | 3,134,804 |
| 700032 | 7 | WHEAT | 51,345,000 | 48,946,758 | | | 4,504,303 |
| 700033 | 7 | WHEAT | 51,345,000 | 51,222,397 | | | 4,399,467 |
| 700034 | 7 | WHEAT | 51,345,000 | 51,268,607 | | | 4,458,116 |
| 800030 | 8 | WHEAT | 36,750,000 | 36,718,591 | | | 2,939,954 |
| 800031 | 8 | WHEAT | 73,500,000 | 73,268,551 | | | 5,871,539 |
| 800032 | 8 | WHEAT | 73,500,000 | 71,598,248 | | | 5,726,379 |
| 800667 | 8 | WHEAT | 66,469,586 | 66,602,032 | 6,042,690 | 6,054,730 | 4,502,064 |
| 900011 | 9 | WHEAT | 113,372,207 | 108,639,936 | 10,306,564 | 10,064,547 | 13,387,635 |
| 900012 | 9 | WHEAT | 114,513,827 | 106,939,353 | 10,410,348 | 9,907,003 | 12,238,838 |
| 1000002 | 10 | WHEAT | 118,048,718 | 121,224,420 | 10,731,702 | 11,230,390 | 14,850,137 |
| 1000117 | 10 | WHEAT | 119,215,385 | 122,170,231 | 10,837,762 | 11,318,012 | 14,279,988 |
| 1100013 | 11 | WHEAT | 122,783,451 | 132,922,680 | 11,162,132 | 12,223,531 | 15,556,222 |
| 1100014 | 11 | WHEAT | 121,581,866 | 135,417,070 | 11,052,897 | 12,545,216 | 15,472,892 |
| 1200083 | 12 | AUSTRALIAN WHEAT | 122,388,371 | 90,565,561 | 11,126,216 | 7,801,661 | 9,668,626 |

8.    *The B. Braun Defendants paid at least $3.25 million in kickbacks.*

839.    Together, the B. Braun Defendants paid at least $3.25 million in illicit kickbacks to sell more than $40 million in goods under the OFFP.

(a)    *Aesculap AG and KG*

840.    Aesculap AG and KG paid about $265,000 in illicit kickbacks to sell about $2.9 million in goods under the OFFP.

841.    Aesculap AG and KG caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801851 | 8 | Medical equipment and appliances | 1,997,983 | 1,901,468 | 181,635 | 172,861 |
| 802469 | 8 | Medical equipment and appliances | 221,198 | 217,577 | 20,109 | 19,780 |
| 802470 | 8 | Medical equipment and appliances | 384,373 | 386,349 | 34,943 | 35,123 |
| 802537 | 8 | Medical equipment | 384,040 | 410,570 | 34,913 | 37,325 |

### (b)    Aesculap Motric S.A.

842.    Aesculap Motric S.A. paid about $288,250 in illicit kickbacks to sell about $3.17 million in goods under the OFFP.

843.    Aesculap Motric caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801532 | 8 | Medical equipment and appliances | 3,277,478 | 3,170,863 | 297,953 | 288,260 |

### (c)    Aesculap Surgical Instruments SDN

844.    Aesculap Surgical Instruments SDN paid at least $733,504 in illicit kickbacks to sell more than $11 million in goods under the OFFP.

845.    Aesculap Surgical Instruments caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 1000876 | 10 | Medical equipment and appliances | 4,282,065 | 4,471,186 | 389,279 | 406,471 |
| 1000877 | 10 | Medical equipment and appliances | 774,214 | 830,435 | 70,378 | 70,378 |
| 1000883 | 10 | Medical equipment and appliances | 14,740 | 16,083 | 1,340 | 1,340 |
| 1000884 | 10 | Medical equipment and appliances | 11,243 | 13,401 | 1,022 | 1,218 |
| 1000885 | 10 | Medical equipment and appliances | 902,881 | 995,652 | 82,074 | 82,074 |
| 1000886 | 10 | Medical equipment and appliances | 131,954 | 141,710 | 11,995 | 11,995 |
| 1000887 | 10 | Medical equipment and appliances | 134,396 | 153,984 | 12,218 | 13,999 |
| 1000888 | 10 | Medical equipment and appliances | 4,280,477 | 4,425,839 | 389,096 | 139,479 |
| 1200076 | 12 | Medical equipment and appliances | 7,579 | - | 690 | 690 |
| 1200169 | 12 | Medical equipment and appliances | 64,443 | - | 5,859 | 5,859 |
| 1200323 | 12 | Medical equipment and appliances | 7,380,279 | - | 670,901 | 1 |

The Republic of Iraq's First Amended Complaint – page 142

### (d)    *B. Braun Medical France*

846.    B. Braun Medical France paid $1.3 million in illicit kickbacks to sell more than $14 million in goods under the OFFP.

847.    B. Braun Medical France caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801665 | 8 | Medical equipment and appliances | 5,593,361 | 5,599,809 | 508,487 | 509,074 |
| 801667 | 8 | Medical equipment and appliances | 4,251,070 | 4,150,444 | 386,461 | 377,313 |
| 801668 | 8 | Medical equipment and appliances | 26,604 | 25,289 | 2,419 | 2,299 |
| 802317 | 8 | Medical equipment and appliances | 376,200 | 422,503 | 34,200 | 38,409 |
| 802318 | 8 | Medical equipment and appliances | 24,155 | 24,008 | 2,196 | 2,183 |
| 802359 | 8 | Medical equipment | 1,868,091 | 1,958,272 | 169,826 | 178,025 |
| 802360 | 8 | Medical equipment and appliances | 2,085,538 | 2,154,995 | 189,594 | 195,909 |

### (e)    *B. Braun Medical Industries SDN BHD*

848.    B. Braun Medical Industries SDN BHD paid at least $99,254 in illicit kickbacks to sell about $2.4 million in goods under the OFFP.

849.    B. Braun Medical Industries caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 702846 | 7 | Medical equipment and appliances | 320,031 | 341,168 | 29,092 | 29,092 |
| 1001714 | 10 | Syringes | 15,543 | - | 1,414 | 1,414 |
| 1100114 | 11 | Medical equipment and appliances | 1,624,707 | 1,999,258 | 147,691 | 64,497 |
| 1100758 | 11 | Medical equipment and appliances | 46,758 | 56,527 | 4,251 | 4,251 |

(f)    *B. Braun Melsungen A.G.*

850.    B. Braun Melsungen A.G. paid at least $569,750 in illicit kickbacks to sell about $6.5 million in goods under the OFFP.

851.    B. Braun Melsungen caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801850 | 8 | Medicine | 2,087,813 | 2,032,493 | 189,801 | 184,772 |
| 802126 | 8 | Metronidazole | 1,480,086 | 1,392,903 | 134,553 | 126,628 |
| 802475 | 8 | Medicine | 55,008 | 54,673 | 5,001 | 4,970 |
| 901652 | 9 | Medical equipment and appliances | 2,055,392 | 2,284,795 | 186,895 | 186,895 |
| 901658 | 9 | Medical equipment and appliances | 203,500 | 42,934 | 18,500 | 3,807 |
| 1000936 | 10 | Medical equipment and appliances | 577,828 | 639,171 | 52,553 | 52,553 |
| 1002069 | 10 | Medicine | 111,372 | 136,951 | 10,125 | 10,125 |

**9.    *Boston Scientific S.A. paid at least $28,717 in kickbacks.***

852.    Boston Scientific S.A. paid at least $28,717 in illicit kickbacks to sell about $315,911 in goods under the OFFP.

853.    Boston Scientific caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 1001847 | 10 | Medical equipment and appliances | 315,911 | - | 28,717 | 28,717 |

**10.    *Buhler Ltd. paid at least $3,375,000 in kickbacks.***

854.    Buhler Ltd. paid $3,375,917 in illicit kickbacks to sell more than $38 million in goods under the OFFP.

855.    Buhler caused kickbacks to be paid on the following Programme contracts:

The Republic of Iraq's First Amended Complaint – page 144

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 800548 | 8 | Rapid Moisture Tester | 660,545 | 660,545 | 60,050 | 60,050 |
| 800549 | 8 | In line magnet for floury materials | 243,100 | 243,100 | 22,100 | 22,100 |
| 800759 | 8 | On line measuring and control unit | 3,232,167 | 3,938,773 | 293,833 | 358,070 |
| 801048 | 8 | Spare parts | 450,568 | 476,448 | 40,961 | 43,313 |
| 801134 | 8 | Grain pumps w/ accessories | 2,644,318 | 2,742,810 | 240,393 | 249,346 |
| 801135 | 8 | Equipment | 9,012,881 | 9,559,207 | 819,353 | 869,019 |
| 802117 | 8 | Equipment | 13,688,359 | 14,089,054 | 1,244,396 | 1,280,823 |
| 900675 | 9 | Grinding wheels; fluting tools | 24,667 | 26,142 | 2,242 | 2,377 |
| 900786 | 9 | Laboratory equipment | 66,088 | 66,027 | 6,008 | 6,002 |
| 901192 | 9 | Laboratory equipment | 716,910 | 859,551 | 65,174 | 78,141 |
| 901435 | 9 | Bulk scale | 3,185,393 | 3,854,140 | 289,581 | 350,376 |
| 1100461 | 11 | Truck intake Basrah silo | 479,042 | 601,633 | 43,549 | 54,694 |
| 1200056 | 12 | Lab. Plan sifter | 836,331 | 1,117,670 | 76,030 | 101,606 |

**11.    Daewoo International Corp. paid at least $230,000 in kickbacks.**

856.    Daewoo International Corp. paid at least $230,533 in illicit kickbacks to sell about $2,353,000 in goods under the OFFP.

857.    Daewoo International caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 830237 | 8 | Drum squeezer with spare part | 721,245 | 707,424 | 65,564 | 65,564 |
| 830521 | 8 | Calibration devices | 341,141 | 346,158 | 31,009 | 31,009 |
| 830533 | 8 | Spare parts for vehicle | 365,171 | 371,238 | 33,197 | 33,197 |
| 830706 | 8 | Spare parts for vehicle | 20,482 | 21,061 | 1,862 | 1,863 |
| 830717 | 8 | Spare for fuel dispensers and pumps | 421,375 | 423,372 | 38,303 | 38,303 |
| 930602 | 9 | Spare parts for fuel dispenser and pumps | 467,093 | 484,248 | 42,460 | 42,459 |
| 1030635 | 10 | Spare parts for fork lift | 199,539 | – | 18,138 | 17,164 |

### 12.    *Daimler paid at least $7,000 in kickbacks.*

858.    DaimlerChrysler, now Daimler, executed four contracts under the OFFP, totaling $5.2 million.  Daimler paid at least DM13,589 in illicit kickbacks pursuant to these contracts.

859.    On December 12, 2002, Daimler paid the kickback (€6,950.00) by wire transfer from Daimler's German bank to an account at the Housing Bank for Trade and Finance in Jordan, which was controlled by the Hussein Regime.

860.    Daimler caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|----------|-------|----------------|----------|--|-------------|-----------|
| | | | Face Value | Disbursements | Amount | Amount |
| 830815 | 8 | Mobile box truck | 70,184 | 75,246 | 6,380 | 7,134 |

### 13.    *Dow AgroSciences paid at least $127,999 in kickbacks.*

861.    Dow AgroSciences paid at least $127,999 in illicit kickbacks to sell about $1 million in pesticides, herbicides and insecticides.

862.    Dow AgroSciences caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|----------|-------|----------------|----------|--|-------------|-----------|
| | | | Face Value | Disbursements | Amount | Amount |
| 901070 | 9 | Pesticide | 426,050 | 440,420 | 40,975 | 40,976 |
| 1001911 | 10 | Pesticide | 133,627 | 148,931 | 12,684 | 12,147 |
| 1001912 | 10 | Pesticide | 348,592 | 389,704 | 33,088 | 31,687 |
| 1300310 | 13 | Pesticide | 475,117 | – | 43,189 | 43,189 |

### 14.    *Eastman Kodak paid about $17,000 in kickbacks.*

863.    Eastman Kodak, S.A. paid at least $16,713 in illicit kickbacks to sell about $183,854 in medical supplies under the OFFP.

864.    Eastman Kodak caused kickbacks to be paid on the following Programme contract:

The Republic of Iraq's First Amended Complaint – page 146

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|----------|-------|----------------|----------|--|-------------|-----------|
| | | | Face Value | Disbursements | Amount | Amount |
| 1200707 | 12 | Medical equipment and appliances | 183,854 | | 16,713 | 16,713 |

*15.*     *Ebewe Pharma paid at least $145,897 in kickbacks.*

865.     Ebewe Pharma paid at least $145,897 in illicit kickbacks to obtain sales of about $1.2 million of medicine under the OFFP.

866.     Ebewe Pharma caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|----------|-------|----------------|----------|--|-------------|-----------|
| | | | Face Value | Disbursements | Amount | Amount |
| 1101219 | 11 | Medicine | 289,738 | 328,658 | 26,338 | 26,338 |
| 1101220 | 11 | Medicine | 313,217 | 218,650 | 28,473 | 28,473 |
| 1101221 | 11 | Medicine | 786,670 | 436,667 | 71,510 | 71,510 |
| 1101222 | 11 | Medicine | 116,982 | 130,604 | 10,634 | 10,634 |
| 1200022 | 12 | Supply of drugs | 98,355 | 108,432 | 8,942 | 8,942 |

*16.*     *Eli-Lilly Export paid at least $343,191 in kickbacks.*

867.     Eli-Lilly Export paid at least $343,191 in illicit kickbacks to sell more than $3 million in medical supplies.

868.     Eli-Lilly Export's kickbacks in this matter were not anomalies. Eli-Lilly Export's US parent recently agreed to pay a fine of more than $1 billion for paying kickbacks to sell drugs within the United States.

869.     Eli-Lilly Export caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|----------|-------|----------------|----------|--|-------------|-----------|
| | | | Face Value | Disbursements | Amount | Amount |
| 1100823 | 11 | Medicine | 3,238,130 | 3,775,096 | 294,375 | 343,191 |

*17.*     *The Evapco Defendants paid more than $800,000 in kickbacks.*

870.     Together, the Evapco Defendants paid more than $800,000 in illicit kickbacks.

### (a)    Evapco (Austria)

871.    Evapco (Austria) paid about $827,478 in illicit kickbacks to sell more than $9 million in oil production equipment.  Evapco also paid an unknown amount of kickbacks disguised as inland transportation costs.

872.    Evapco (Austria) caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801130 | 8 | Chillers with recommended spare parts | 8,551,021 | 8,691,483 | 777,366 | 790,135 |
| 801569 | 8 | Cooling towers/parts | 420,754 | 410,990 | 38,250 | 37,363 |

### (b)    Evapco Europe

873.    Evapco Europe paid about $8,000 in illicit kickbacks to sell about $92,000 in goods under the OFFP.

874.    Evapco Europe caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802188 | 8 | Cooling tower | 91,932 | 92,264 | 8,357 | 8,388 |

### 18.    FiatAvio paid at least $80,000 in kickbacks.

875.    FiatAvio paid at least $79,962 in illicit kickbacks, but the amount is believed to be higher.  FiatAvio made those payments to obtain contracts of more than $11.5 million in sales.

876.    FiatAvio caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|
| | | | Face Value | Amount | Amount |
| 1101353 | 11 | Turbine and Compressor Blades | 2,770,115 | 251,820 | 53,157 |
| 1200850 | 12 | Turbine and Compressor Blades | 6,977,812 | 634,306 | 63,178 |
| 1200852 | 12 | Turbine and Compressor Blades | 1,796,057 | 163,265 | 175,880 |

The Republic of Iraq's First Amended Complaint – page 148

*19.    The Flowserve Defendants paid more than $645,000 in kickbacks.*

877.    Together, the Flowserve Defendants paid more than $645,000 in kickbacks in connection with sixteen OFFP contracts.

878.    Flowserve Pompes and Flowserve Corp. admit to paying the following kickbacks:

| UN Contract No. | Kickback Paid | Amount of Kickback |
|---|---|---|
| DR/08/30 | 04/26/01 | $28,756.59 |
| DR/08/31 | 04/26/01 | $77,704.70 |
| DR/08/32 | 04/26/01 | $19,883.72 |
| DR/09/02 | 05/12/01 | $166,169.35 |
| SOC/08/177 | 07/15/01 | $25,899.25 |
| SOC/08/179 | 07/15/01 | $3,552.52 |
| SOC/09/131 | 07/15/01 | $1,781.63 |
| SOC/09/185 | 07/15/01 | $26,552.68 |
| SOC/08/178 | 07/16/01 | $33,842.08 |
| NGI/08/06 | 07/25/01 | $74,364.00 |
| NGI/08/33 | 07/25/01 | $16,011.48 |
| SRC/08/21 | 08/29/01 | $71,104.01 |
| SRC/09/23 | 08/29/01 | $15,119.52 |
| DR/08/66 | 08/30/01 | $31,595.48 |
| GF 11/27 | 09/23/02 | $45,397.88 |

    (a)    *Flowserve Pompes*

879.    Flowserve Pompes paid about $500,000 in kickbacks.

880.    Flowserve Pompes caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 830660 | 8 | Spare parts for existing rotating equipment | 634,018 | 708,623 | 57,635 | 57,617 |
| 830661 | 8 | Pumps and spare parts | 141,298 | 157,618 | 12,845 | 12,845 |
| 830663 | 8 | Centrifugal pump sets w/accessories and spares | 645,429 | 725,960 | 65,006 | 65,006 |
| 830664 | 8 | Centrifugal pumps w/motors | 96,322 | 108,251 | 9,544 | 9,544 |
| 830665 | 8 | Centrifugal pumps | 244,215 | 273,762 | 24,200 | 24,200 |
| 830666 | 8 | Pumps and spare parts | 154,058 | 171,536 | 15,265 | 15,411 |
| 830667 | 8 | Spare parts for pumps | 298,663 | 333,080 | 27,149 | 27,149 |
| 830830 | 8 | Pumps complete drive by motors | 286,527 | 346,793 | 28,397 | 28,397 |
| 830835 | 8 | Spares for existing equipment | 656,099 | 720,858 | 60,279 | 59,621 |

The Republic of Iraq's First Amended Complaint – page 149

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 930404 | 9 | Pumps and spare parts | 15,194 | 17,304 | 1,381 | 1,381 |
| 930406 | 9 | Spare parts | 226,388 | 261,384 | 20,579 | 20,562 |
| 930407 | 9 | Pumps and spare parts | 1,450,155 | 1,755,352 | 143,800 | 143,800 |
| 930534 | 9 | Replacement of damaged pumps with spares | 147,238 | 177,689 | 13,635 | 13,635 |
| 120017 | 12 | Vertical condensate water pumps | 300,629 | | 27,328 | 2,740 |

     *(b)*    *Flowserve B.V.*

881.    Flowserve B.V. paid about $34,000 in kickbacks.

882.    Flowserve B.V. caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 830464 | 8 | Seals and spares for pumps | 521,290 | 371,133 | 47,385 | 34,416 |

    *20.*    ***The GSK Defendants paid about $2 million in kickbacks.***

883.    The GlaxoSmithKline Defendants paid about $2 million in illicit kickbacks to sell almost $22 million of medicine under the OFFP.

    *(a)*    *GlaxoSmithKline Walls House*

884.    GlaxoSmithKline Walls House paid at least $834,390 in illicit surcharges to sell more than $9 million of medicine under the OFFP.

885.    GlaxoSmithKline Walls House caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 901566 | 9 | Medicine | 9,075,118 | 9,152,293 | 825,011 | 832,027 |
| 1200432 | 12 | Medicine | 25,986 | | 2,363 | 2,363 |

### (b)    GlaxoSmithKline Egypt SAE

886.    GlaxoSmithKline Egypt SAE paid about $54,000 in illicit surcharges to sell about $600,000 of medicine under the OFFP.

887.    GlaxoSmithKline Egypt caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802377 | 8 | Medicine | 604,810 | 595,730 | 54,983 | 54,157 |

### (c)    Glaxo Wellcome Export Ltd.

888.    Glaxo Wellcome Export Ltd. paid at least $257,596 in illicit surcharges to sell more than $2.8 million of medicine under the OFFP.

889.    Glaxo Wellcome Export caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802216 | 8 | Medicine | 1,137,059 | 1,109,484 | 103,369 | 100,862 |
| 802233 | 8 | Ventolin | 653,885 | 616,439 | 59,444 | 56,040 |
| 802234 | 8 | Medicine | 198,499 | 188,604 | 18,045 | 17,146 |
| 802366 | 8 | Medicine | 126,187 | 125,143 | 11,472 | 11,377 |
| 802337 | 8 | Medicine | 535,944 | 539,161 | 48,722 | 49,015 |
| 901615 | 9 | Medicine | 174,937 | 190,568 | 17,493 | 17,493 |
| 1000984 | 10 | Medicine | 62,298 | 71,228 | 5,663 | 5,663 |

### (d)    Glaxo Wellcome SA (South Africa) (PRY) Ltd.

890.    Glaxo Wellcome SA (South Africa) (PRY) Ltd. paid about $20,000 in illicit surcharges to sell about $220,000 in medical supplies.

891.    Glaxo Wellcome (South Africa) caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802557 | 8 | Medicine | 243,241 | 218,194 | 22,113 | 19,836 |

### (e)    Smithkline Beecham International

892.    Smithkline Beecham International paid at least $834,390 in illicit surcharges to sell more than $9.1 million of medicine under the OFFP.

893.    Smithkline Beecham International caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802557 | 8 | Medicine | 243,241 | 218,194 | 22,113 | 19,836 |

### 21.    *The Ingersoll-Rand Defendants paid about $1.5 million in kickbacks.*

894.    From approximately 2000 through 2003, the Ingersoll-Rand Defendants entered into OFFP contracts involving approximately $1,507,845 in kickback payments in connection with sales of industrial equipment to the Hussein Regime. In total, the Ingersoll-Rand Defendants directly and indirectly made kickbacks of approximately $963,148 and authorized additional payments of $544,697.

### (a)    ABG

895.    ABG caused kickbacks of about $228,000 to be paid on four Programme contracts, all of which were in the name of front companies. In addition, ABG agreed to pay kickbacks on the contract with the Baghdad Mayorality, discussed above, and another contract executed just prior to the invasion of Iraq.

### (b)   Dresser International

896.   Dresser International paid kickbacks of at least $71,000 to sell about $797,000 in goods under the Programme.

897.   Dresser International caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF | Inland Transportation Fee |
|---|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount | Amount |
| 801366 | 8 | Cement | 54,530 | 54,884 | 4,957 | 4,989 | 1,200 |
| 801367 | 8 | Ammonium sulphate | 77,771 | 76,091 | 7,070 | 6,917 | |
| 802200 | 8 | Girth gears w/pinions and shafts | 476,783 | 514,916 | 43,344 | 46,811 | |
| 802679 | 8 | Steam Turbines | 679,475 | | 61,769 | 11,880 | |

### (c)   I-R Italiana

898.   I-R Italiana paid at least $292,215 in kickbacks to sell about $3 million in goods.

899.   I-R Italiana caused kickbacks to be paid of the following Prorgamme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 830139 | 8 | Spare parts | 584,785 | 595,190 | 53,157 | 53,157 |
| 830173 | 8 | Spare parts for existing compressor/centac | 589,700 | 601,190 | 63,178 | 63,178 |
| 930047 | 9 | Equipment and spare parts | 1,705,463 | 1,958,033 | 175,880 | 175,880 |

### (d)   Thermo King Ireland

900.   Thermo King Ireland agreed to pay a kickback on UN Contract 801228, which was ultimately not completed because Thermo King Ireland could not obtain an OFAC license to export US-originating goods to Iraq.

### (e)   Ingersoll-Rand Benelux

901.   Ingersoll-Rand Benelux paid a kickback of about $260,000 on one Programme contract. The kickback was paid through a third party.

     *(f)    Ingersoll-Rand World Trade*

902.    Ingersoll-Rand World Trade worked in conjunction with the other Ingersoll-Rand Defendants on their contracts.

    ***22.    The Johnson & Johnson Defendants paid about $857,000 in kickbacks.***

903.    The Johnson & Johnson Defendants paid at least $857,000 in illicit kickbacks to sell almost $10 million of medicine under the OFFP.

    *(a)    Cilag*

904.    Cilag paid at least $509,092 in illicit surcharges to sell more than $6 million of medicine under the OFFP.

905.    Cilag caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801406 | 8 | Medicine | 500,614 | 488,389 | 45,510 | 43,944 |
| 801407 | 8 | Medicine | 37,057 | 36,897 | 3,369 | 3,354 |
| 801863 | 8 | Medicine | 212,331 | 206,316 | 19,303 | 18,756 |
| 900868 | 9 | Sultrin | 1,179,112 | 1,289,196 | 107,180 | 107,180 |
| 900869 | 9 | Eprex | 3,657,514 | 4,050,061 | 332,463 | 332,463 |
| 1001190 | 10 | Pevisone Cream | 37,344 | 41,339 | 3,395 | 3,395 |

    *(b)    Janssen Pharmaceuticals*

906.    Janssen Pharmaceuticals paid at least $348,295 in illicit surcharges to sell about $3.75 million of medicine.

907.    Janssen Pharmaceuticals caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802120 | 8 | Medicine | 78,497 | 75,868 | 7,136 | 6,897 |
| 802121 | 8 | Medicine | 125,694 | 125,695 | 11,427 | 11,427 |
| 802195 | 8 | Haloperidol | 67,092 | 63,670 | 6,099 | 5,788 |

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802209 | 8 | Medicine | 376,282 | 371,606 | 34,207 | 33,782 |
| 802458 | 8 | Medicine | 583,987 | 572,927 | 53,090 | 52,084 |
| 901725 | 9 | Medicine | 97,907 | 98,471 | 8,900 | 8,900 |
| 901726 | 9 | Medicine | 43,289 | 51,480 | 3,935 | 3,935 |
| 1001745 | 10 | Medicine | 920,061 | 1,099,016 | 83,642 | 99,911 |
| 1001746 | 10 | Medicine | 13,611 | 15,500 | 1,238 | 1,238 |
| 1001747 | 10 | Medicine | 386,110 | 314,093 | 35,101 | 28,554 |
| 1001851 | 10 | Medicine | 239,574 | 285,631 | 21,779 | 25,966 |
| 1100821 | 11 | Supply of drugs | 32,523 | | 2,957 | 6,187 |
| 1200376 | 12 | Supply of drugs | 1,269,149 | 692,953 | 115,377 | 62,996 |

### 23. *Kia Motors paid about $695,000 in kickbacks.*

908.    Kia Motors paid at least $695,424 in illicit kickbacks to sell about $8 million in buses under the OFFP.

909.    Kia Motors caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 631056 | 6 | Mini bus | 282,000 | 282,000 | | |
| 830698 | 8 | Buses with spare parts | 7,650,421 | 7,653,021 | 695,423 | 695,424 |

### 24. *The Liebherr Defendants paid more than $2.8 million in kickbacks.*

910.    The Liebherr Defendants paid more than $2.8 million in kickbacks to sell more than $30 million in goods under the Programme.

#### (a)    *Liebherr Export AG*

911.    Liebherr Export AG paid $918,258 in illicit kickbacks to sell more than $10 million in goods under the OFFP.

912.    Liebherr Export caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 800908 | 8 | Wheel loader/parts | 2,858,764 | 2,975,858 | 259,888 | 270,533 |

The Republic of Iraq's First Amended Complaint – page 155

| Contract | Phase | Goods Category | Contract Face Value | Disbursements | Levied ASSF Amount | Paid ASSF Amount |
|---|---|---|---|---|---|---|
| 802256 | 8 | Crane | 1,532,298 | 1,477,314 | 139,300 | 134,301 |
| 900876 | 9 | Truck mixers/spares | 5,452,795 | 5,613,166 | 495,709 | 510,288 |
| 1000245 | 10 | Spare parts | 33,100 | 34,500 | 3,009 | 3,136 |

    *(b)*    *Liebherr France*

913.    Liebherr France paid $1,950,503 in illicit kickbacks to sell more than $20 million in goods under the OFFP.

914.    Liebherr France caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract Face Value | Disbursements | Levied ASSF Amount | Paid ASSF Amount |
|---|---|---|---|---|---|---|
| 800949 | 8 | Hydraulic excavators w/spare parts | 11,798,097 | 12,124,571 | 1,072,459 | 110,134 |
| 801113 | 8 | Truck mixers/spares | 5,094,665 | 5,293,880 | 463,110 | 481,218 |
| 801114 | 8 | Concrete truck mixer/parts | 942,825 | 861,510 | 85,704 | 78,312 |
| 802428 | 8 | Crawler excavator | 2,236,958 | 2,245,024 | 203,343 | 204,075 |
| 901086 | 9 | Truck mixers/spares | 798,503 | 854,882 | 92,400 | 84,764 |

**25.**    **The Merck Defendants paid about $1 million in kickbacks.**

915.    The Merck Defendants paid at least $983,000 in illicit kickbacks to sell about $11.5 million in goods.

    *(a)*    *Serono Pharma International*

916.    Serono Pharma International paid at least $859,001 in illicit kickbacks to sell about $10 million in medical supplies under the OFFP.

917.    Serono Pharma International caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract Face Value | Disbursements | Levied ASSF Amount | Paid ASSF Amount |
|---|---|---|---|---|---|---|
| 801633 | 8 | Medicine | 730,253 | 712,860 | 66,387 | 64,805 |
| 801735 | 8 | Medicine | 1,363,280 | 1,309,919 | 123,935 | 119,084 |
| 801885 | 8 | Medicine | 533,631 | 519,846 | 48,512 | 47,259 |

The Republic of Iraq's First Amended Complaint – page 156

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802384 | 8 | Medicine | 610,615 | 653,546 | 55,510 | 59,413 |
| 901512 | 9 | Medicine | 568,054 | 625,061 | 51,639 | 51,639 |
| 901763 | 9 | Personal | 584,200 | 623,920 | 53,104 | 53,104 |
| 1001011 | 10 | Medicine | 1,637,732 | 1,887,677 | 148,885 | 171,607 |
| 1001012 | 10 | Medicine | 1,472,000 | 574,024 | 133,818 | 52,184 |
| 1001013 | 10 | Medicine | 3,500,000 | 2,638,970 | 318,182 | 239,906 |

(b)     *Merial*

918.    Merial paid at least $124,561 in illicit kickbacks to sell about $1.5 million in veterinary medical supplies under the Programme.

919.    Merial caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 800719 | 8 | Vety-pharmaceuticals | 1,265,568 | 1,306,891 | 121,896 | 115,043 |
| 901871 | 9 | Vety-drugs | 55,515 | 54,049 | 5,046 | 5,047 |
| 1001542 | 10 | Vety-pharmaceuticals | 49,190 | 55,000 | 4,471 | 4,471 |

*26.    Novo Nordisk paid about $1.4 million in kickbacks.*

920.    From about January 2001 through April 2003, Novo Nordisk obtained approximately €22 million in contracts to supply insulin and other medicines under the Programme. To obtain these contracts, Novo Nordisk paid $1,437,946 in illicit kickbacks to the Hussein Regime.

921.    Novo Nordisk admits entering into the following Programme Contracts and paying the following kickbacks:

| Contract No. | Date | Contract Value | Kickback Paid |
|---|---|---|---|
| 802046 | 30 Jan. 2001 | €2.052,736 | $166,318 |
| 802047 | 30 Jan. 2001 | €317,407 | $26,194 |
| 1000720 | 15 Sept. 2001 | €1,384,548 | $115,572 |
| 1000803 | 24 Sept. 2001 | €881,375 | $77,834 |
| 1001491 | 4 Oct. 2001 | €805,200 | $64,431 |
| 1100115 | 4 Feb. 2002 | €17,878 | $1,403 |
| 1100882 | 15 Apr. 2002 | €2,138,118 | $223,108 |
| 1101024 | 27 Apr. 2002 | €12,942,438 | $639,550 |

The Republic of Iraq's First Amended Complaint – page 157

922.    Novo Nordisk caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 802046 | 8 | Medicine | 1,881,518 | 1,829,494 | 171,047 | 166,318 |
| 802047 | 8 | Medicine | 290,932 | 288,131 | 26,448 | 26,194 |
| 901385 | 9 | Medicine | 1,042,789 | 1,184,445 | 94,799 | 94,799 |
| 901386 | 9 | Medicine | 359,615 | 368,998 | 32,692 | 33,545 |
| 901403 | 9 | Medicine | 2,107 | 2,132 | 192 | 192 |
| 1000720 | 10 | Insulin | 1,271,394 | 1,361,293 | 115,572 | 115,572 |
| 1000803 | 10 | Medicine | 801,250 | 873,834 | 72,834 | 72,834 |
| 100149 | 10 | Medicine | 708,803 | 798,620 | 64,431 | 64,431 |
| 1100115 | 11 | Medicine | 15,438 | 17,555 | 1,403 | 1,403 |
| 1100882 | 11 | Medicine | 2,092,164 | 2,454,187 | 190,197 | 223,108 |
| 1101024 | 11 | Supply of drugs | 11,680,901 | 7,035,053 | 1,061,900 | 639,550 |

27.    *Pauwels International N.V. paid more than $1 million in kickbacks.*

923.    Pauwels International N.V. paid more than $1 million to obtain more than $11 million in sales under the Programme.

924.    Pauwels International admitted to the UN that its contracts included ASSFs, although it denied that the payments were improper.

925.    Pauwels International caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801441 | 8 | Transmission and distribution network materials | 5,010,088 | 5,064,972 | 455,418 | 457,624 |
| 802167 | 8 | Transformer and spare parts | 639,381 | 711,455 | 58,120 | 58,120 |
| 830081 | 8 | Mobil outdoor substations with spares | 5,438,164 | 5,233,679 | 494,369 | 529,369 |
| 1001325 | 10 | Transformers; spare parts | 830,370 | - | 75,482 | 5,000 |

28.    *Railtech International paid at least $135,000 in kickbacks.*

926.    Railtech International paid at least $135,583 in illicit kickbacks to obtain about $1,387,000 in sales under the Programme.

927.    Railtech International caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801236 | 8 | Welding set | 1,478,385 | 1,387,800 | 133,582 | 133,583 |

### 29.    *The Roche Defendants paid at least $780,000 in kickbacks.*

928.    The Roche Defendants paid at least $780,000 in illicit kickbacks to sell about $5.1 million in goods under the Programme.

### (a)    *F. Hoffman La Roche*

929.    F. Hoffman la Roche paid at least $296,225 in illicit kickbacks to sell about $3.4 million worth of medicine under the Programme.

930.    F. Hoffman la Roche caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 900994 | 9 | Medicine | 159,454 | 184,641 | 14,494 | 15,915 |
| 900995 | 9 | Medicine | 258,621 | 259,980 | 23,509 | 23,509 |
| 900996 | 9 | Medicine | 257,646 | 264,370 | 23,420 | 23,420 |
| 900997 | 9 | Medicine | 481,026 | 532,447 | 43,725 | 43,725 |
| 901742 | 9 | Medicine | 126,664 | 141,873 | 11,514 | 11,514 |
| 1000602 | 10 | Medicine | 42,778 | 44,605 | 3,889 | 3,889 |
| 1000603 | 10 | Medicine | 96,511 | 102,993 | 8,773 | 8,773 |
| 1000604 | 10 | Rivotril | 115,183 | 128,746 | 10,471 | 10,471 |
| 1000605 | 10 | Riforen | 286,494 | 319,095 | 26,045 | 29,009 |
| 1000606 | 10 | Riforen | 437,929 | 469,036 | 39,809 | 39,809 |
| 1000704 | 10 | Medicine | 45,349 | 48,576 | 4,123 | 4,123 |
| 1000705 | 10 | Rivotril | 126,641 | 134,313 | 11,512 | 11,512 |
| 1000706 | 10 | Medicine | 232,323 | 268,753 | 21,120 | 24,432 |
| 100153 | 10 | Medicine | 41,079 | 46,736 | 3,735 | 3,735 |
| 1200079 | 12 | Medicine | 12,513 | 13,781 | 1,138 | 1,253 |
| 1200081 | 12 | Medicine | 834,784 | 452,501 | 75,890 | 41,136 |

### (b)    Roche Diagnostics GmbH

931.    Roche Diagnostics GmbH paid at least $184,618 to sell about $1.7 million in medical equipment under the Programme.

932.    Roche Diagnostics caused kickbacks on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 901916 | 9 | Batteries | 2,031,000 | 1,720,878 | 184,618 | 184,618 |

### 30.    Rohm and Haas France S.A. paid about $64,000 in kickbacks.

933.    Rohm and Haas France, S.A. paid about $64,000 in illicit kickbacks to sell about $700,000 in chemicals under the Programme.

934.    Rohm and Haas France caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 100780 | 10 | Resins | 497,781 | 571,325 | 45,253 | 51,939 |
| 100781 | 10 | Resins | 109,683 | 134,991 | 9,971 | 12,272 |

### 31.    Secalt S.A. paid at least $351,522 in kickbacks.

935.    Secalt, S.A. paid at least $351,522 in illicit kickbacks to sell more than $4 million in goods under the Programme.

936.    Secalt caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801310 | 8 | Tirfor | 274,536 | 271,677 | 24,955 | 23,000 |
| 901189 | 9 | Mechanical and electrical machinery and tools | 4,700,855 | 3,833,740 | 427,350 | 348,522 |

### 32.    The Siemens Defendants paid at least $1.5 million in kickbacks.

937.    The Siemens Defendants paid at least $1.5 million in illegal kickbacks.

The Republic of Iraq's First Amended Complaint -- page 160

### (a)    Siemens-France

938.    Siemens-France paid at least $321,256 in kickbacks.

939.    Siemens-France caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract Face Value | Disbursements | Levied ASSF Amount | Paid ASSF Amount |
|---|---|---|---|---|---|---|
| 702664 | 7 | Control protection and measuring system | 96,611 | 109,177 | 8,782 | 8,782 |
| 801337 | 8 | Spare parts | 1,994,424 | 2,042,563 | 181,293 | 176,776 |
| 801930 | 8 | Turbine system equipment; spare parts | 493,286 | 510,459 | 44,840 | 44,840 |
| 802005 | 8 | Pumps, compressors and rotary machines | 44,455 | 43,117 | 4,124 | 4,124 |
| 802006 | 8 | Telecommunications equipment | 15,335 | 14,874 | 1,394 | 1,396 |
| 802007 | 8 | Telecommunications equipment | 423,536 | | 38,493 | 1,833 |
| 802009 | 8 | Control protection and measuring system | 43,124 | 44,112 | 3,962 | 3,962 |
| 802268 | 8 | Circuit breakers w/spares | 703,669 | 738,517 | 63,965 | 63,965 |
| 802393 | 8 | Spare parts | 89,808 | 96,271 | 8,164 | 8,164 |
| 901462 | 9 | Control, measurement and protection system with spares | 31,138 | 33,807 | 2,831 | 2,831 |
| 1200846 | 12 | Control protection and measuring system | 671,537 | - | 61,043 | 4,583 |

### (b)    Siemens-Turkey

940.    Siemens-Turkey obtained 20 contracts under the OFFP and agreed to pay more than $6.1 million in kickbacks to obtain them. At least $1.2 million of that amount was actually paid, and if the kickback process worked according to plan, all $6.1 million was paid.

941.    Siemens-Turkey caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract Face Value | Disbursements | Levied ASSF Amount | Paid ASSF Amount |
|---|---|---|---|---|---|---|
| 702892 | 7 | Transformers | 115,321 | - | 10,484 | 2,000 |
| 801541 | 8 | Switch yard equipment and accessories | 468,232 | 444,837 | 42,562 | 42,559 |
| 1000844 | 10 | Communications equipment/supplies | 660,195 | 760,564 | 60,015 | 60,859 |
| 1101329 | 11 | Control, measurement and protection systems w/spares | 211,347 | 212,256 | 19,212 | 469 |
| 1102002 | 11 | Switch gear and spare parts | 1,490,084 | - | 135,450 | 10,000 |
| 1102013 | 11 | Power supply equipment | 89,283 | | 8,116 | 1,000 |
| 1200420 | 12 | Circuit breakers w/spares | 277,089 | | 25,190 | 2,956 |
| 1200519 | 12 | Switch gear and spare parts | 147,183 | | 13,380 | 1,281 |
| 1200571 | 12 | Digital three phase energy meters | 22,950 | | 2,086 | 196 |
| 1200572 | 12 | Circuit breakers | 819,282 | | 74,474 | 6,849 |
| 1200574 | 12 | Relays | 162,204 | | 14,745 | 4,892 |
| 1200855 | 12 | Circuit breakers w/spares | 570,742 | - | 51,882 | 3,000 |

The Republic of Iraq's First Amended Complaint -- page 161

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 1300342 | 13 | Substation equipment and materials | 47,775,384 | – | 4,342,865 | 49,179 |
| 1300428 | 13 | Circuit breakers w/spares | 1,909,013 | | 173,534 | 16,900 |

### (c)    Siemens-Osram

942.    Siemens-Osram paid at least $85,673 in kickbacks in connection with six contracts under the OFFP. More may have been paid in the form of inland transportation fees.

943.    Siemens-Osram caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 730527 | 7 | Spare parts for street lighting | 79,162 | 79,162 | 7,197 | 3,250 |
| 730528 | 7 | Electrical lamp, lamp fitting and access | 59,609 | 59,609 | | |
| 730985 | 7 | Electrical equipment, materials | 84,642 | – | 7,752 | 7,752 |
| 830186 | 8 | Lamps and lighting fixtures w/lamps, replacement of damaged electrical parts in substations | 107,342 | 106,629 | 9,758 | 9,758 |
| 901649 | 9 | Metal halid lamp | 413,222 | 413,998 | 37,563 | 37,563 |
| 930139 | 9 | Electrical material and equipment for general maintenance | 297,392 | 326,968 | 27,350 | 27,350 |

### 33.    Solar Turbines Europe S.A. paid about $510,000 in kickbacks.

944.    Solar Turbines Europe, S.A. paid at least $510,056 in illicit kickbacks to sell more than $4 million in goods under the OFFP.

945.    Solar Turbines Europe caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 730926 | 7 | Rehab. of compressor station | 422,322 | 443,357 | 38,393 | 38,393 |
| 830510 | 8 | Spares for solar gas compressor | 371,829 | 384,544 | 35,240 | 35,240 |
| 830527 | 8 | Spares for solar gas compressor | 296,376 | 281,754 | 27,966 | 27,966 |
| 830832 | 8 | Spare parts for solar turbines | 35,298 | 38,579 | 3,209 | 3,209 |
| 930073 | 9 | Solar gas turbine | 776,083 | 576,655 | 42,429 | 42,429 |
| 930613 | 9 | Service contract for overhaul of solar gas turbines | 1,572,000 | – | 142,895 | 142,895 |
| 930636 | 9 | Gas turbine | 608,623 | 707,487 | 64,312 | 64,312 |

The Republic of Iraq's First Amended Complaint – page 162

| Contract | Phase | Goods Category | Contract | | Paid ASSF Amount | Levied ASSF Amount |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | | |
| 1030337 | 10 | Repair of complete assy., solar gas turbine | 535,415 | 591,891 | 53,804 | 53,804 |
| 1030338 | 10 | Spares for solar turbine | 317,776 | 341,563 | 31,049 | 31,049 |
| 1030339 | 10 | Spares for solar turbine | 248,915 | 273,941 | 24,902 | 24,902 |
| 1030683 | 10 | Spares for solar turbine | 399,807 | 504,459 | 45,857 | 45,857 |

**34.    St. Jude paid at least $642,983 in kickbacks.**

946.    St. Jude paid at least $642,983 in illicit kickbacks denominated as ASSFs to sell more than $7.6 million in medical supplies, including heart valves, under the OFFP.

947.    St. Jude caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF Amount | Paid ASSF Amount |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | | |
| 801424 | 8 | Medical appliances; medical equipment | 756,489 | 722,349 | 68,772 | 65,668 |
| 801425 | 8 | Medical appliances; medical equipment | 2,447,639 | 2,357,326 | 222,513 | 214,302 |
| 801854 | 8 | Medical equipment and appliances | 157,324 | 154,565 | 14,302 | 14,051 |
| 1000701 | 10 | Medical equipment and appliances | 3,838,887 | 4,372,802 | 348,962 | 348,962 |

**35.    The Sulzer Defendants paid about $505,000 in kickbacks.**

948.    The Sulzer Defendants paid at least $505,000 in illicit kickbacks to sell about $6 million in goods under the Programme.

**(a)    Sulzer Burckhardt**

949.    Sulzer Burckhardt paid at least $13,130 in illicit kickbacks to sell $155,358 in goods under the OFFP.

950.    Sulzer Burckhardt caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF Amount | Paid ASSF Amount |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | | |
| 900605 | 8 | Spares for compressors | 144,444 | 155,358 | 13,130 | 13,130 |

(b)    *Sulzer Pumpen*

951.    Sulzer Pumpen paid at least $236,354 in illicit kickbacks to sell more than $3 million in goods under the OFFP.

952.    Sulzer Pumpen caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
| | | | Face Value | Disbursements | Amount | Amount |
|---|---|---|---|---|---|---|
| 830842 | 8 | Replacement pumps with spares | 196,442 | 197,068 | 16,457 | 18,063 |
| 830562 | 8 | Replacement of damaged pumps with spares | 338,781 | 390,110 | 30,864 | 32,457 |
| 830843 | 8 | Replacement of damaged pumps with spares | 1,390,274 | 1,660,054 | 126,385 | 124,300 |
| 930457 | 9 | Replacement of damaged pumps with spares | 679,252 | 806,353 | 61,744 | 61,744 |

(c)    *Sulzer Turbo Ltd.*

953.    Sulzer Turbo Ltd. paid at least $256,760 in illicit kickbacks to sell about $3 million in goods under the OFFP.

954.    Sulzer Turbo caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
| | | | Face Value | Disbursements | Amount | Amount |
|---|---|---|---|---|---|---|
| 730800 | 7 | Rotor repaired of gas turbine and its import back | 452,222 | 492,140 | 41,107 | 41,107 |
| 830113 | 8 | Compressor spare parts | 1,944,860 | 2,093,793 | 178,560 | 182,293 |
| 830850 | 8 | Spares for existing equipment | 359,465 | 399,450 | 36,360 | 36,360 |

*36.    The Textron Defendants paid about $650,539 in kickbacks.*

955.    The Textron Defendants paid at least $650,539 in kickbacks in connection with the sale of humanitarian goods under the OFFP.

956.    The profits on these contracts were $1,936,926.

(a)    *DB Guinard Pumps*

957.    DB Guinard Pumps paid about $6,000 in kickbacks.

958.    DB Guinard Pumps caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 830855 | 8 | Pumps and spare parts | 65,298 | 70,607 | 5,936 | 5,936 |

### (b)    DB France

959.    DB France made more than $531,000 in illicit ASSF payments through a consultant in connection with nine of its ten Programme contracts.

960.    DB France authorized, but did not pay, an additional $35,000 in connection with a tenth sales contract.

961.    DB France caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF | Inland Transportation Fee |
|---|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount | Amount |
| 801812 | 8 | Gear boxes | 95,023 | 91,237 | 8,638 | 8,294 | |
| 801815 | 8 | Gear boxes | 578,731 | 602,723 | 52,622 | 54,803 | |
| 802547 | 8 | Spare parts | 40,528 | 40,023 | 4,476 | 4,476 | |
| 830513 | 8 | Pumps | 438,897 | 484,944 | 39,895 | 39,896 | |
| 900555 | 9 | Couplings | 227,356 | 222,503 | 20,669 | 11,922 | |
| 900608 | 9 | Spare parts | 17,905 | 17,512 | 2,695 | 2,695 | |
| 901213 | 9 | Mechanical equipment | 1,900,248 | 2,227,444 | 172,750 | 202,495 | 2,400 |
| 1000164 | 10 | Couplings | 260,322 | 284,964 | 27,890 | 30,530 | |
| 1000248 | 10 | Gear boxes | 61,466 | 68,875 | 5,604 | 5,604 | |
| 1000322 | 10 | Gear boxes | 897,192 | 1,037,223 | 85,470 | 98,809 | |

### 37.    The Volvo Defendants

962.    The Volvo Defendants paid approximately $6,206,331 in kickback payments to the Hussein Regime.

### (a)    Renault Trucks

963.    Renault Trucks paid about $150,000 in kickbacks.

964.    Renault Trucks caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801188 | 8 | Recovery truck | 2,087,304 | 2,013,730 | 189,755 | 183,066 |
| 801190 | 8 | Truck tractors | 20,599,139 | 20,190,575 | 1,872,649 | 1,835,507 |
| 801191 | 8 | Truck | 4,887,525 | 4,682,714 | | |
| 801192 | 8 | Tipper truck | 9,090,708 | 8,750,905 | 826,428 | 795,537 |
| 801283 | 8 | Lorry/parts | 496,835 | 423,464 | 45,167 | 38,497 |
| 801294 | 8 | Fuel tanker truck/parts | 6,904,288 | 6,510,436 | 627,663 | 591,858 |
| 801295 | 8 | Lorry/parts | 6,538,844 | 6,256,763 | 594,440 | 568,797 |
| 801501 | 8 | Truck cranes w/spares | 3,298,394 | 3,464,362 | 299,854 | 314,942 |
| 801502 | 8 | Truck cranes w/spares | 815,919 | 857,214 | 74,174 | 77,929 |
| 801905 | 8 | Tanker/parts | 622,755 | 670,257 | 56,617 | 60,935 |
| 801910 | 8 | Garbage trucks/spare parts | 793,658 | 776,425 | 72,149 | 70,582 |
| 802342 | 8 | Tanker and spare parts | 1,309,496 | 1,478,244 | 119,035 | 119,859 |
| 830591 | 8 | Spare parts for tractors | 476,603 | 547,755 | 43,327 | 43,328 |
| 900947 | 9 | Projector | 180,857 | 207,704 | 19,210 | 22,062 |
| 900948 | 9 | Garbage truck/spare parts | 303,686 | 362,356 | 30,962 | 36,943 |
| 900949 | 9 | Cherry picker vehicles | 496,149 | 651,457 | 51,436 | 67,537 |
| 930319 | 9 | Spare parts for tractors | 270,820 | 306,153 | 24,618 | 24,619 |
| 930506 | 9 | Spare parts for vehicle; equipment | 300,235 | 322,563 | 27,291 | 27,292 |
| 1000200 | 10 | Truck tractors | 15,897,523 | 15,934,097 | 1,445,229 | 1,448,554 |
| 1000465 | 10 | Truck | 2,849,098 | 3,247,559 | 259,009 | 295,233 |

###### (b)    *Renault A&S*

965.    Renault A&S paid about $150,000 in kickbacks.

966.    Renault A&S caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 900879 | 9 | Tractor/spare parts | 1,646,626 | 1,968,505 | 158,434 | 149,679 |

###### (c)    *Volvo Construction*

967.    Volvo Construction paid about $317,000 in kickbacks.

968.    Volvo Construction caused kickbacks to be paid on the following Programme contract:

| Contract | Phase | Goods Category | Contract Face Value | Disbursements | Levied ASSF Amount | Paid ASSF Amount |
|---|---|---|---|---|---|---|
| 901216 | 9 | Wheel loader/parts | 6,109,363 | 6,438,504 | 555,397 | 317,336 |

*38.    The Weir Group paid about $4.5 million in kickbacks.*

969.    The Weir Group paid about $4.5 million in illicit payments to the Hussein Regime.

970.    The Weir Group caused kickbacks to be paid on at least the following Programme contracts:

| Contract | Phase | Goods Category | Contract Face Value | Disbursements | Levied ASSF Amount | Paid ASSF Amount |
|---|---|---|---|---|---|---|
| 730541 | 7 | Mather and platt centrifugal pump/accessories | 1,171,007 | 1,171,007 | | |
| 800972 | 8 | Spare parts for pump sets | 10,866,210 | 11,053,747 | 987,788 | 987,788 |
| 930195 | 9 | Control and monitoring instruments for cluster manifolds | 655,905 | 743,011 | 59,628 | 64,697 |
| 930196 | 9 | S/p for main crude oil pump | 389,936 | 436,793 | 35,449 | 36,040 |
| 930197 | 9 | Spare parts | 101,535 | 118,225 | 9,230 | 9,385 |
| 930219 | 9 | Spare parts | 3,224,782 | 3,709,264 | 319,594 | 322,229 |
| 1230248 | 12 | Spare parts for pumps | 2,295,116 | - | 208,637 | 208,637 |

*39.    Woodhouse paid at least $593,000 in kickbacks.*

971.    Woodhouse paid at least $593,000 in illicit kickbacks to sell more than $15 million in oil equipment under the OFFP.

972.    Woodhouse caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract Face Value | Disbursements | Levied ASSF Amount | Paid ASSF Amount | Inland Transp. Fee Amount |
|---|---|---|---|---|---|---|---|
| 830122 | 8 | spares for drilling and workover rigs | 1,817,324 | 1,872,122 | 165,195 | 165,195 | |
| 830123 | 8 | equipment for drilling and workover rigs | 1,572,018 | 1,632,098 | 147,897 | 134,331 | 39000 |
| 830339 | 8 | cement additives | 727,644 | - | 66,145 | 50,672 | |
| 830340 | 8 | equipment and accessories for oil well cementing laboratories | 13,852 | 13,554 | 1,259 | 1,260 | |
| 830341 | 8 | acid additives | 185,056 | 212,769 | 16,822 | 16,823 | 2700 |
| 830342 | 8 | drilling fluid materials and cement additive | 87,311 | 100,386 | 7,937 | 7,937 | 900 |
| 830482 | 8 | lighting fittings | 89,825 | 97,268 | 8,164 | 8,165 | |

The Republic of Iraq's First Amended Complaint – page 167

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF | Inland Transp. Fee |
|---|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount | Amount |
| 930259 | 9 | spare parts and equipment | 1,053,775 | 1,194,630 | 95,798 | 94,015 | 600 |
| 930385 | 9 | cement and additives | 382,881 | 409,946 | 34,805 | 34,805 | |
| 930583 | 9 | drilling bits and nozzles | 710,095 | 755,044 | 64,549 | 64,549 | |
| 1030280 | 10 | Tubing | 76,652 | 86,821 | 6,968 | 6,967 | 600 |
| 1230052 | 12 | spare parts and accessories | 55,248 | - | 5,022 | 1,371 | |

**40.    York paid about $650,000 in kickbacks.**

973.    York paid approximately $647,110 in illicit kickbacks in return for the award of OFFP contracts worth approximately $7 million.

974.    York caused kickbacks to be paid on the following Programme contracts:

| Contract | Phase | Goods Category | Contract | | Levied ASSF | Paid ASSF |
|---|---|---|---|---|---|---|
| | | | Face Value | Disbursements | Amount | Amount |
| 801559 | 8 | Compressor | 1,236,379 | 1,209,017 | 112,398 | 109,911 |
| 801608 | 8 | Spare parts | 1,669,457 | 1,608,940 | 151,769 | 146,267 |
| 900834 | 9 | Air conditioner | 464,488 | 447,749 | 42,221 | 32,482 |
| 900835 | 9 | Spare parts | 231,522 | 248,922 | 22,989 | 22,277 |
| 901296 | 9 | Air cooled package units with spares | 40,279 | 46,731 | 4,040 | 3,923 |
| 1100131 | 11 | Air conditioners/spare parts | 3,232,323 | 3,655,054 | 293,824 | 332,250 |

## VII.    Wrongful Actions of the Escrow Bank and its Affiliates

975.    In 1996, the United Nations selected BNP, a French bank, to serve as the Escrow Bank under the OFFP.

## A.    The Banking Agreement

976.    On September 12, 1996, the UN and BNP executed an Agreement for Banking Services, setting forth BNP's role in the Programme (the "Banking Agreement").

The Republic of Iraq's First Amended Complaint – page 168

.

### 1.    *The Banking Agreement sets forth BNP's agreement to participate in the Programme.*

977.    The creation and function of the Escrow Account was an integral part of the Programme.

978.    BNP agreed to fulfill that integral role: "The Bank shall open the account provided for in SCR 986 on behalf of the United Nations for the receipt of funds and for the making of payments pursuant to SCR 986."

979.    The Banking Agreement obligated BNP to do, among other things, the following:

(1)    establish and manage the Escrow Account;

(2)    issue letters of credit for the purchase of humanitarian goods under the Programme;

(3)    confirm letters of credit issued by banks retained by buyers of oil under the Programme, and

(4)    conform its conduct to Resolution 986, the MOU, and the rules and procedures for review and approval of transactions under the Programme.

BNP's Chief Executive Officer signed the Banking Agreement.

980.    The Banking Agreement was a binding agreement and part of a humanitarian relief program intended to benefit the Republic of Iraq and the Iraqi people.  Indeed, the Agreement's core purpose was to protect the interests of the Republic of Iraq and the Iraqi people from the corrupt and wrongful intentions of the Hussein Regime.

981.    Over the course of the Programme, BNPNY confirmed all of the letters of credit for the $64.2 billion in oil purchases under the Programme, the proceeds of which were deposited into the Escrow Account, and issued all of the letters of credit for the purchase of $34.5 billion in humanitarian goods from the Escrow Account.

### 2.    *The Banking Agreement obligated BNP to enforce all Programme rules.*

982.    The Banking Agreement called for far more than the provision of standard banking services.  Due to BNP's central role in the Programme and the protection of the Iraq Sanctions Program, the Banking Agreement placed specific and direct duties on BNP to enforce and monitor compliance of all Programme rules.

983.    The Banking Agreement begins by noting that "it is essential to the United Nations that the account and the funds and assets therein, and all connections, data and information relating thereto, be secure from misuse and from unauthorized access, use, tampering or intrusion and that the Services rendered in connection with such accounts, funds, assets and transactions be reliable and secure."

984.    BNP expressly promised to work toward that end: "The Bank shall refrain from any action which is inconsistent with the terms and conditions of this Agreement, whether express or implied, or which it knows or has reason to know may adversely affect the United Nations, and shall fulfill its commitments with the fullest regard for its undertakings in this Agreement."

985.    Also:  "The Bank shall administer the United Nations Iraq Account and perform the Services in full conformity with the terms and conditions of this Agreement."

986.    The Banking Agreement also stated: "The procedures and requirements set forth in SCR 986, the Memorandum of Understanding and the 661 Committee Procedures constitute essential and fundamental terms and conditions of this Agreement."

### 3.    *BNP agreed to ensure that the Escrow Account would be managed according to all Programme rules.*

987.    The Bank had specific and direct duties not to allow actions in contravention of the Programme's goals.

988.    In fact, BNP expressly guaranteed: "The proceeds of the sale of Iraq's petroleum and petroleum products shall not be diverted from the purposes laid down in SCR 986."

989.    Any transfers by BNP of funds in the Escrow Account made in violation of Programme rules was expressly *ultra vires*: "The Bank shall have no power or authority to pay, transfer, assign, hypothecate, negotiate, pledge or otherwise dispose of or deliver any funds or other assets from time to time held by the Bank pursuant to this Agreement, in the United Nations Iraq Account or otherwise, to any person or entity, whether Governmental or otherwise, except in strict accordance with the express terms and conditions of this Agreement."

990.    BNP promised particularly not to take any instructions from any person "in or acting on behalf of the Government of Iraq, or representing persons or entities in Iraq."

991.    BNP assured the compliance of its employees as well: "The Bank shall be responsible for the professional and technical competence of its employees and will select, for work under this Agreement, reliable individuals who will perform effectively in the implementation of this Agreement, and conform to a high standard of moral and ethical conduct."

992.    Finally, BNP agreed to hold the Escrow Account harmless from any wrongful acts, including its negligence or any transfers made in violation of the Programme rules: "In addition to and without limiting the foregoing, the Bank shall be liable for loss of or damages to funds or other property or assets held by it in connection with the performance of this Agreement, howsoever caused by any breach of or failure to perform this Agreement or any negligence or willful misconduct of the Bank, its employees, agents, servants or subcontractors, including but not limited to theft, misappropriation, fraud or misfeasance."

### 4.    BNP's US license to deal with assets of a State Sponsor of Terrorism also restricted its ability to act outside Programme guidelines.

993.    BNP's conduct was further restricted by the provisions of its license to operate issued by the United States Department of Treasury's OFAC.

994.    BNP needed an OFAC license, because Iraq had been officially listed as a State Sponsor of Terrorism. As a result, during the period of the Programme, United States law required

The Republic of Iraq's First Amended Complaint -- page 171

any person or entity seeking to transfer Iraqi assets to obtain authorization to do so from OFAC, 31 C.F.R. § 575.201(a); 31 C.F.R. § 575.801 (licensing procedure).

995.    Since the funds in the Escrow Account were Iraqi assets held in the United States, any transfer of them required an OFAC license.

996.    OFAC issued a license to BNP (the "OFAC License"), permitting BNP to, among other things, open, maintain, and administer the Escrow Account.  The OFAC License required BNP to comply with the Iraq Sanctions Program, the Banking Agreement, Resolution 986, the MOU, and other relevant United Nations Security Council Resolutions or guidance.

997.    The OFAC License limited BNP's authority to make payments from the Escrow Account to payments made in conformity with the Programme.  In addition, the OFAC License required all parties to the OFAC License to comply with all regulations, rulings, orders and instructions issued by the Secretary of the Treasury pursuant to section 203 of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, and section 5 of the United Nations Participation Act, 22 U.S.C. § 287c (the "UNPA").

998.    The OFAC License was subject to the terms of Executive Order Nos. 12722 and 12724, and the Sanctions Regulations.

999.    Unauthorized transfers of Iraqi assets were null and void.  31 C.F.R. § 575.202.

1000.    Therefore, transfers made in violation of Programme rules were void.

1001.    Since the Banking Agreement required BNP to indemnify against losses to the Escrow Account from violations of the Agreement, which included Programme rules, BNP is obliged to return improperly transferred funds to the Escrow Account.

### 5.    *The Banking Agreement required BNP to maintain transparency on all Programme transactions.*

1002.    The Banking Agreement required BNP to comply with Resolution 986 and the other UN policies and regulations governing the OFFP.

The Republic of Iraq's First Amended Complaint – page 172

1003.  In particular, BNP was required to maintain transparency of the transactions in which it participated and to provide the UN overseers with "full transaction details."

1004.  BNP agreed that it would issue LOCs only "on behalf of its customers who are approved purchasers of Iraqi petroleum and petroleum products" and that it would not "sell, assign or transfer any LOC to any person or entity."

1005.  Resolution 986, incorporated into the Banking Agreement, required in part: "Approval by the Committee established by resolution 661 (1990), in order to ensure the transparency of each transaction and its conformity with the other provisions of this resolution ..., including details of the purchase price at fair market value ...."

1006.  Pursuant to the MOU, also incorporated into the Banking Agreement, the OFFP allowed for the purchase of "medicine, health supplies, foodstuffs, and material supplies for essential civilian needs of the Iraqi population throughout the country," but required that such purchases "follow normal commercial practice and be on the basis of the relevant resolutions of the Security Council and procedures of the 661 Committee." MOU at ¶19. For a sales contract to be approved, the contracting party was required to "submit all relevant documentation, including contracts, for all goods to be exported under the Resolution to the 661 Committee...." MOU at ¶22.

1007.  The 661 Committee procedures mirrored the MOU requirements: an applicant was to provide "all relevant documentation, including the concluded contractual arrangements." Procedures Section III, at ¶30.

1008.  Thus, BNP had the express contractual duty to disclose all information in its possession to the UN.

1009.  BNP intentionally failed in that duty.

**B.    Issuing of Letters of Credit for Oil Purchasers – the Conflict of Interest**

1010.    In addition to confirming letters of credit for humanitarian purchases, the Banking Agreement also allowed BNP to issue letters of credit on behalf of the purchasers of oil who had to secure payment for the purchase.

1011.    BNP availed itself of this opportunity and ultimately issued approximately 70% of all letters of credit for oil transactions during the course of the OFFP, which equated to the issuance of $45.7 billion in letters of credit to oil purchasers.

1012.    BNP issued the following LOCs:

BNP's Letter of Credit Issuance by Branch, Subsidiary, or Affiliate

| BNP by City | Number of L/Cs | Value of L/Cs |
|---|---|---|
| Geneva | 1,224 | $25,897,061,250 |
| Paris | 495 | $9,716,040,610 |
| London | 172 | $3,507,013,659 |
| Milan | 60 | $856,101,638 |
| Hong Kong | 52 | $1,157,795,138 |
| Basel | 36 | $727,568,066 |
| Other (13 branches) | 195 | $3,905,122,639 |
| Total BNP | 2,234 | $45,766,703,001 |
| | | |
| Total Programme | 3,120 | $64,181,293,181 |
| % of BNP to Total Programme | 71.6% | 71.3% |

1013.    BNP earned an estimated $30 million for issuing these letters of credit to oil purchasers.

1014.    More important than the $30 million, however, was the opportunity for BNP to create and to solidify business relationships with the oil purchasers, who were generally large companies.  Those business relationships were far more valuable than the fees BNP could earn by doing its job under the Banking Agreement.

The Republic of Iraq's First Amended Complaint – page 174

1015. BNP's financial opportunities from issuing letters of credit to oil purchasers created the real and substantial possibility of a conflict of interest between BNP's duties as holder and manager of the Escrow Account and its duties to its other customers, the oil purchasers.

1016. Unfortunately for the Iraqi people, the conflicts arose, and, like the other Defendants, BNP chose money over its duties.

## C.    *BNP's Entry into the Conspiracy to Withhold Information from the UN*

1017. In many cases, oil purchases under the Programme were made through intermediaries and financed by larger, more established companies. This was done for a variety of reasons, including (a) that the holder of the right to buy oil did not have the credit to finance the transaction and (b) to hide the payment of the illegal surcharges, or, in some cases, both.

1018. Intermediaries were also an integral part of the scheme to use oil allocations as a means of rewarding allies of the Hussein Regime for their support.

1019. The mere fact that an intermediary was involved in the oil transactions was a material fact, because the presence of an intermediary necessarily means that the Programme was not getting full market value (the intermediary is getting a part of the gain). For this reason, most large sellers of oil deal exclusively with end users.

1020. The use of intermediaries in many cases also violated the standard terms of the oil purchasing contracts, which prohibited assignments without approval of the 661 Committee.

1021. BNP's contract also prohibited the issuance of LOCs to entities that were not approved purchasers under the Programme.

1022. To further the interests of its commercial customers and therefore its own commercial interests, BNP agreed with many of its customers to hide the fact that they were financing the purchase of oil under the Programme by others.

1023. BNP's cooperation with the Oil Purchasing Defendants to hide material information from the UN was a direct breach of UN regulations governing the Programme and the Banking Agreement.

1024. BNP knew from the information it received that oil purchasers were paying a substantial premium over the OSP. BNP did not forward that material information to the 661 Committee.

1025. For example, in May 2001, BNP Geneva agreed with Vitol to conceal Vitol's participation in a purchase nominally made by Al-Rasheed International Cooperation. So, BNP Geneva failed to disclose Vitol's involvement to the UN and to BNP.

1026. In 2001, BNP agreed with Glencore International AG ("Glencore") to hide Glencore's participation in a transaction nominally involving the Council for Trade and Economic Cooperation with Middle East and North Africa Countries ("ACTEC"), which had received an oil allocation jointly with "Russia – Communist Party." Glencore wrote to BNP: "We repeat that Glencore International AG's name must not appear on any correspondence sent to third parties …. We remind you that there must be absolutely no mention of the name Glencore International AG."

1027. BNP also agreed with Glencore to include a term in the LOC issued in the name of ACTEC that the Letter of Credit was not assignable and not transferrable. This condition was required by the UN regulations. BNP, however, knew Glencore's concealed participation was essentially a transfer of the letter of credit, and therefore, that the regulations and their purposes were being violated.

1028. The ACTEC/Glencore transaction, alone, accounted for more than $1.1 million in illicit surcharges paid to the Hussein Regime and diverted from humanitarian aid.

1029. In February 2001, the Hussein Regime granted a concession to lift two million barrels of Iraqi oil to Bulf Drilling and Oil Services ("Bulf").

The Republic of Iraq's First Amended Complaint – page 176

1030.  Bulf, through an agent, turned to Texaco Inc. (now Chevron, so hereinafter referred to as Chevron) to finance the purchase.

1031.  In March 2001, Chevron requested that BNP open a line of credit for the purchase of one million barrels of oil. The letter of credit, however, was to be in the name of Bulf, despite the fact that Chevron had been granted the full authority to move and dispose of the oil.

1032.  This transfer of authority to Chevron violated the provisions of Programme's regulations, which prohibited transfers of oil allocations absent UN approval.

1033.  Despite its direct duties to prevent such violations, BNP opened two letters of credit for Chevron, in March and April 2001. In both cases, Chevron requested that BNP issue the letters of credit in Bulf's name alone, further violating UN regulations and the Banking Agreement.

1034.  BNP and Chevron knew those letters of credit were being forwarded to the United Nations for approval and knew those letters of credit were materially misleading, were not commercially reasonable, and violated UN regulations.

1035.  Neither BNP nor Chevron informed the United Nations of Chevron's role.

1036.  From February 8, 2001 to November 25, 2001, these transactions involved the payment of $490,790 in illicit surcharges, reducing the humanitarian assistance to the Iraqi people.

1037.  During these and similar transactions, BNP knew misleading disclosures were being made to the UN to obtain approvals for the transaction, but agreed to participate in the violation.

1038.  BNP's failures to disclose material information to the UN were not limited to oil sales under the Programme. A Congressional Hearing reports that BNP admits that in at least 403 instances BNP made payments from the UN Escrow Account to entities other than the named beneficiaries of the LOCs. In other words, BNP made payments of Escrow funds without proper authorization from the United Nations.

1039.  Moreover, BNP's own disclosures to the United Nations were knowingly false and misleading; they failed to disclose the real parties in interest.  BNP made those disclosures by fax, telephone, and email.

## D.    Breach of the Banking Agreement

1040.  BNP breached the Banking Agreement by, among other things, concealing material information from its disclosures to the UN, including the actual purchasers of oil and that intermediaries were profiting from the humanitarian Programme.

1041.  BNP's agreement to keep material information from the UN violated its contractual duties.

1042.  As concluded in the UN Report, "the failure to disclose the name of the third-party purchasers of oil resulted in a lack of transparency between BNP offices, as well as between BNP and the United Nations.  This was contrary to the obligations the United Nations imposed on the Bank by the Banking Agreement."

1043.  BNP also failed to fulfill the procedural requirements of its contracts.  For example, according to a Congressional Hearing Report, in 2000 and 2001, "BNP auditors reported that the bank's operating procedures were out of date as of January 1997, soon after the program began and that the flow of paperwork, according to these audits, was even at times irrational."

1044.  BNP's operating procedures were thus insufficient well before the kickback scheme began.

1045.  The Republic of Iraq and the Iraqi people were third party beneficiaries of the Banking Agreement.  The Banking Agreement and the incorporated Programme rules were directly intended to benefit and to protect the Republic of Iraq and the Iraqi people from the corrupt and illegal intentions of the Hussein Regime and to ensure that all humanitarian funds went to their intended beneficiaries (the Iraqi people).

1046.  The entire purpose of the Escrow Account and the role of BNP was to protect the plaintiffs here.  When BNP failed in that role, it became liable for the damage to the Iraqi people and nation.

1047.  Indeed, BNP agreed to hold the Escrow Account harmless from any of its violations, and the Escrow Account is property of the nation.

1048.  As part of the agreement to indemnify the Escrow Account, BNP is liable to return all funds transferred from the Escrow Account in violation of the Programme or BNP's OFAC License.  Transfers made in violation of Programme rules were *ultra vires* under the Banking Agreement and void under United States law.  BNP should be required to refund all payments made outside the Programme rules to the Escrow Account.

1049.  At least the following surcharge payments were made through BNP:

### Examples of Surcharges that Flowed through BNP

| Company Name | BNP Branch or Affiliate | Date of Surcharge Payment | Recipient | USD Amount | Euro Amount |
|---|---|---|---|---|---|
| Ben Hur (affiliate of African Middle East Petroleum) | UEB Geneva | October 17, 2001 | SOMO controlled account, Jordan National Bank, Amman | | €177,978.00 |
| Glasford Shipping Limited | BNP Hong Kong | February 21, 2001 | SOMO controlled account, Fransabank, Beirut | $227,358.00 | |
| Glasford Shipping Limited | BNP Hong Kong | November 30, 2001 | SOMO controlled account, Fransabank, Beirut | $1,777,970.40 | |
| Glasford Shipping Limited | BNP Hong Kong | June 6, 2002 | SOMO controlled account, Fransabank, Beirut | | €1,235,370.61 |
| Italtech | UEB Geneva | April 19, 2001 | Al-Wasel and Babel, Abu Dhabi Commercial Bank | | €1,531,943.00 |
| Italtech | UEB Geneva | April 23, 2001 | Al-Wasel and Babel, Abu Dhabi Commercial Bank | | €2,258,341.00 |
| Italtech | UEB Geneva | April 30, 2001 | Al-Wasel and Babel, Abu Dhabi Commercial Bank | | €1,717,518.00 |
| Italtech | UEB Geneva | May 3, 2000 | Mohammed Ibrahim, Arab Bank, Geneva | $200,000.00 | |
| Taurus (Identity masked by UEB Geneva) | UEB Geneva | September 20, 2000 | SOMO controlled account, Fransabank, Beirut | $230,220.90 | |
| Taurus (Identity masked by UEB Geneva) | UEB Geneva | October 16, 2000 | SOMO controlled account, Fransabank, Beirut | $130,000.00 | |

| | | | | | |
|---|---|---|---|---|---|
| Taurus (Identity masked by UEB Geneva) | UEB Geneva | October 25, 2000 | SOMO controlled account, Fransabank, Beirut | $160,000.00 | |
| Taurus | UEB Geneva | October 26, 2000 | SOMO controlled account, Fransabank, Beirut | $200,000.00 | |
| Scandinavian T. Ltd. | UEB Geneva | October 20, 2000 | SOMO controlled account, Fransabank, Beirut | $100,000.00 | |
| Scandinavian T. Ltd. | UEB Geneva | October 24, 2000 | SOMO controlled account, Fransabank, Beirut | $100,000.00 | |
| Scandinavian T. Ltd. | UEB Geneva | November 6, 2000 | SOMO controlled account, Fransabank, Beirut | $100,000.00 | |
| | | | Total | $3,225,549.30 | €6,921,150.61 |

## E.   BNP's Participation in the Illicit Surcharges

1050.   BNP was involved in the transfer of approximately $10 million in illicit surcharges paid to the Hussein Regime.

1051.   BNP failed to review those transactions adequately and either knew or should have known the transfers were wrongful.

## F.   BNP's Breach of its Fiduciary Duties

1052.   As holder and manager of the Escrow Account and pursuant to the terms of the Banking Agreement, BNP owed fiduciary duties to the Republic of Iraq and the Iraqi people.

1053.   BNP was not merely holding funds; it had agreed to protect those funds from unauthorized transactions in violation of Programme rules, all of which focused on ensuring that Programme funds were not diverted from their humanitarian purposes.

1054.   BNP also owed fiduciary duties to the United Nations. The Republic of Iraq and the Iraqi people were third party beneficiaries of the duties owed the United Nations, because the duties were created by a binding contract expressly intended to benefit directly and principally the Republic of Iraq and the Iraqi people.

1055.   As described above, BNP breached those duties when it allowed its conflicts of interest to subvert its duties to the Republic of Iraq and the Iraqi people and when it placed the aims, including the illicit aims, of its commercial customers over those of the Republic of Iraq and to the Iraqi people.

1056.   As manager of the UN Escrow Account, BNP had the fiduciary duty to disclose all material information in its possession to the United Nations.   This duty included the obligation to disclose information about any known fraud or other illicit conduct being committed in relation to the Programme.

1057.   In brief, BNP had the duty to communicate to the UN all knowledge acquired in the course of its agency with respect to material facts that might have affected the UN's decision as to any transaction under the Programme.

1058.   BNP knew the UN and, to an even greater extent, the Iraqi people were relying on BNP's protection from illicit conduct of the Hussein Regime.

1059.   BNP wholly failed to fulfill its duty to disclose.   In particular, BNP's agreements with its commercial customers to keep information from the UN violated BNP's disclosure duties.   The other BNP Defendants aided and participated in those breaches.

1060.   BNP has denied that it owed any fiduciary duties to the Republic of Iraq or the Iraqi people.

1061.   Until the publishing of the UN Report in October 2005, the Republic of Iraq and the Iraqi people had no way of knowing that BNP rejected its fiduciary duties under the Banking Agreement and that it had breached its fiduciary duties.

## G.    BNP's Participation in the Conspiracy to Corrupt the Programme

1062.   BNP's actions were not mere breaches of contract or negligence in its oversight responsibilities.

The Republic of Iraq's First Amended Complaint – page 181

1063.  BNP actively joined and supported the conspiracy by agreeing to hide the participation of oil financiers, by agreeing to hide the violations of the end-user requirements, and by failing to inform the UN of all of the Programme violations known to BNP.  If BNP had done so, the conspiracy would have been curtailed, if not stopped. But BNP, like the other Defendants, chose financial gain over the dictates of its corporate conscience, its contractual obligations, its fiduciary duties, and the law.

## H.    BNP's Earnings – More than $200 million

1064.  BNP earned an estimated $173 million in fees for its services pursuant to the Banking Agreement.

1065.  BNP earned an additional estimated $30 million for providing LOCs to oil purchasers.

1066.  BNP's earnings from the relationships it forged by allowing oil purchasers to corrupt the Programme rules are unknown at this time.

# VIII.    Conspiracy and Interrelation Among the Defendants

## A.    The Defendants' Participation in the Programme

1067.  All of the Defendants voluntarily agreed to participate in the Programme.

1068.  All of the Defendants voluntarily agreed to abide by all Programme rules, including the requirements of Security Council Resolution 986, the MOU, and the procedures established by the 661 Committee and the OIP.

1069.  The Defendants' roles in the Programme were integral to the Programme's operations.  Without oil sales, humanitarian purchases, and an Escrow Account, the Programme would have collapsed.

1070.  The Defendants' roles were also integral to the corruption of the Programme.

1071.  If the Oil Purchasing Defendants had not agreed to subvert the Programme by paying surcharges and hiding the extensive use of unproductive middlemen, the corruption of the oil side of the Programme would have been impossible.

1072.  If BNP had not agreed with the Oil Purchasing Defendants to hide the use of middlemen from the UN, the same would have been true.

1073.  If the Vendor Defendants had not agreed to pay kickbacks, the corruption of the purchasing side of the Programme would have been impossible.

## B.    The Conspiracy Among the Defendants and the Hussein Regime

1074.  The Defendants were informed by the Hussein Regime that the illicit payments were a requirement of doing business with the Regime under the Programme.

1075.  The Defendants were therefore put to a stark choice: agree to enter into an illegal and fraudulent conspiracy to divert humanitarian funds from the UN Escrow Account (and thus the Iraqi people) or forego the opportunity to profit from sales under the Programme.

1076.  All of the Defendants chose to join the conspiracy.

1077.  The conspiracy ended only when forces outside the Defendants' control caused it to stop, chiefly the invasion of Iraq and the ouster of the Hussein Regime.

### 1.    The Oil Purchasing and Vendor Defendants agreed to join the conspiracy.

1078.  The Oil Purchasing and Vendor Defendants entered into express agreements with the Hussein Regime to corrupt the Programme and undermine the Iraq Sanctions Program.

1079.  The Oil Purchasing Defendants agreed to make and made millions of dollars in direct financial transfers to the Hussein Regime in the form of surcharge payments.  Those payments were in direct violation of Programme rules.

1080. The Vendor Defendants agreed to make and made millions of dollars in direct financial transfers to the Hussein Regime in the form of transportation and ASSF payments. Those payments too were in direct violation of Programme rules.

### 2.    BNP agreed to join the conspiracy.

1081. BNP also agreed to join the conspiracy, although, based on current information, not directly with the Hussein Regime.

1082. BNP expressly agreed to hide the participation of middlemen in oil transactions from the UN and the 661 Committee.

1083. BNP agreed to those direct violations of Programme rules knowing from official 661 Committee notices that there were existing concerns that the Hussein Regime was siphoning off proceeds from oil sales through surcharges.

1084. Knowing that the 661 Committee was concerned with corruption of the Programme, BNP nonetheless chose to agree to facilitate that corruption by aiding the Oil Purchasing Defendants and other Programme purchasers in keeping relevant and material information from the Programme overseers – the 661 Committee and the OIP.

### 3.    The Defendants understood the scope of the conspiracy.

1085. Since the Oil Purchasing and Vendor Defendants knew the surcharges and kickback fees were a necessary part of gaining the Hussein Regime's permission to participate in the Programme, they also had to understand that the scope of the conspiracy went beyond their individual circumstance and probably encompassed all aspects of the Programme. In other words, although the Oil Purchasing and Vendor Defendants might not have known the entire scope of the conspiracy, they knew they were assisting (for profit) in the corruption of a humanitarian program that was intended to benefit the Iraqi people and that the conspiracy was larger than their individual participation.

The Republic of Iraq's First Amended Complaint – page 184

1086.   BNP also had strong indications that the scope of the corruption of the Programme was larger than its participation.  BNP had been informed and expressly acknowledged that "it is essential to the United Nations that the account and the funds and assets therein … be secure from misuse and from unauthorized access, use, tampering or intrusion and that the Services rendered in connection with such accounts, funds, assets and transactions be reliable and secure."

1087.   BNP had also been informed that there were rumors that funds were being transferred directly to the Hussein Regime.

1088.   BNP nonetheless agreed to hide material information from the UN.

1089.   BNP knew or was consciously indifferent to the fact that the only reason to hide such information from the UN was to also hide some illicit purpose.

1090.   The Defendants' knowledge is also demonstrated by the efforts made to disguise the payments, including the use of accounts in the names of individuals (usually an official of the Hussein Regime appointed by Saddam Hussein) and front companies and the misleading descriptions of the payments in the contracts presented for UN approval.  If the payments had not been illicit, these subterfuges would not have been necessary.

1091.   The Defendants knew or were reckless in not knowing that the conspiracy encompassed all aspects of the Programme.

1092.   At a minimum, the Defendants who paid kickbacks knew of the conspiracy to extract those payments, and the Defendants who paid surcharges and BNP knew of that conspiracy.

### 4.   The Defendants also entered into separate conspiracies.

1093.   BNP and Chevron conspired to conceal Chevron's participation in the surcharge scheme.

1094.   BNP and Vitol conspired to conceal Vitol's participation in the scheme.

1095.   The individual defendant groups (e.g., the Volvo Defendants) conspired together and with other affiliated companies within their respective organizations.

### 5.     The Defendants are responsible for their alter egos.

1096.   A number of Defendants utilized the purported corporate separateness of their affiliates and subsidiaries to justify and perpetuate a fraud on the UN, to evade United States laws and to violate Programme rules.  The BNP Defendants also used their subsidiaries and affiliates to breach their fiduciary duties.

1097.   The use of technical distinctions to avoid fiduciary duties violates equity, and therefore, such Defendants should be considered as one entity with their affiliates and subsidiaries that participated in their wrongful conduct and their corporate separateness ignored.

1098.   The Defendants that utilized the purported corporate separateness of their subsidiaries and affiliates to evade United States laws and Programme rules and to commit fraud include: (1) the ABB Defendants, (2) the AGCO Defendants, (3) the Akzo Nobel Defendants, (4) the B. Braun Defendants, (5) Boston Scientific S.A. (with its US parent); (6) the BNP Defendants, (7) Chalmers (with Bayoil), (8) Dow AgroSciences (with its US parent), (9) Eastman Kodak S.A., (10) Eli-Lilly Export S.A. (with its US parent), (11) the Evapco Defendants, (12) FiatAvio (with its parents), (13) the Flowserve Defendants, (14) the GSK Defendants, (15) the Ingersoll-Rand Defendants, (16) the Johnson & Johnson Defendants, (17) the Liebherr Defendants, (18) the Merck Defendants, (19) Pauwels International N.V., (20) the Roche Defendants, (21) the Siemens Defendants, (22) Solar Turbines Europe (with its US parent), (23) St. Jude Medical Export GmbH (with its US parent), (24) the Sulzer Defendants, (25) the Textron Defendants, (26) the Volvo Defendants, (27) the Weir Group, (28) Woodhouse, (29) Wyatt (with at least Coastal, Mednafta, and Nafta), and (30) York (with its US parent).

## IX.    Effect of the Defendants' Conduct

1099.   The conspiracy to corrupt the Programme had serious consequences for the Republic of Iraq and the Iraqi people.

### A.    Financial Losses to the Escrow Account – at least $10 billion

1100.   The UN Escrow Account was funded by the sale of Iraqi oil, owned by the Iraqi people according to the Iraqi Constitution. The Defendants' conduct deprived the Iraqi people of the value of that oil and the food and medicine the sale of the oil should have provided.

#### 1.    Proceeds from the sale of Iraq's oil were diverted from the Programme.

1101.   Over the course of the OFFP, the Hussein Regime directly diverted approximately $228.8 million through the oil surcharges. At least that entire sum was diverted from the Escrow Account and the Iraqi people.

1102.   The actual damages caused by the corruption of the oil side of the OFFP was much higher than the amount of the surcharges themselves. The Surcharge Scheme required that the OSP be kept artificially low so that (a) the surcharges could be paid and (b) the Defendants and the necessary middlemen could reap undue profits.

1103.   As found by the Volcker Committee, under-pricing of Iraqi oil ranged from $4 per barrel in April 2001 to as little as $1-2 per barrel. Since oil prices were never as much as $35 per barrel during the period, the under-pricing was frequently more than 10%.

1104.   Total oil sales were about $64 billion dollars, so even at the lowest rate of $1 per $35, the premiums would have cost the Escrow Account more than $1.8 billion. The number must be substantially higher.

1105.   In contrast: "Adjusting prices to permit payment of a surcharge would have required relatively little underpricing – the $229 million paid in surcharges is less than one percent of the total oil sales during the period when surcharges were being imposed."

The Republic of Iraq's First Amended Complaint – page 187

1106.  Additional loss was caused by "the Iraqi regime's efforts to gain influence and support from governmental figures, journalists, and others through its oil allocation scheme. The prices imposed by SOMO allowed recipients of oil allocations to obtain a profit when their allocations were sold on the market. The additional underpricing required by Iraq to implement its oil-for-influence scheme was approximately $130.3 million."

1107.  The greatest part of the disparity in pricing, however, is attributable to the involvement of the Oil Purchasing Defendants -- the necessary middlemen to both the surcharge and influence schemes. The undue profits they charged to facilitate those schemes placed the greatest damage on the Iraqi people.

1108.  To pay all of the unnecessary participants and illegal payments, the Hussein Regime had to sell its oil at below market rates. This is demonstrated by the fact that following the UN's adoption, in October 2001, of "retroactive pricing" of Iraqi crude -- which set the price for oil at the time it was lifted -- the surcharge scheme quickly diminished and eventually disappeared, because a fair market price made it impossible to reap the excessive profits needed to keep the conspiracy alive.

1109.  At a minimum, the Republic of Iraq is entitled to the difference between the OSP and the fair market value of the oil sold under the Programme, which is preliminarily estimated to be in the billions of dollars.

1110.  Thus, the minimum diversion from the oil sales side of the Programme was $358 million, but is believed to be greater than $2 billion.

### 2.    *The amount paid for humanitarian purchases was inflated to fund kickbacks.*

1111.  By Spring 2003, the Hussein Regime, with the assistance of the Defendants and others like them, had siphoned more than $1 billion from the UN Escrow Account through the use of ASSFs. Another $530 million was diverted under the transportation fee scheme, bringing the

total to more than $1.5 billion directly diverted from its intended use to purchase humanitarian goods.

1112.    The delivery of substandard and overpriced goods cost at least an estimated $7 billion.

1113.    About $1.9 billion in goods were diverted to other purposes.

### 3.    *The diversions from the Escrow Account total at least $10 billion.*

1114.    The corruption of the Programme by the Defendants and others directly deprived the Iraqi people of about $10 billion in essential food, medicine, and other humanitarian goods that should have been paid from the UN Escrow Account.

## B.    *Non-Financial Damage*

1115.    The greatest damage to the Iraqi people, however, was not the wholesale theft of their oil revenues, but the effect caused by the diversion of those revenues from humanitarian goods to the illicit purposes of the Hussein Regime.

### 1.    *The money diverted to the Hussein Regime damaged the Iraqi people and nation.*

1116.    The Defendants conspired to help the Hussein Regime gain access to foreign currency in direct violation of Programme rules and US law.

1117.    They did so knowing that the Hussein Regime was a State Sponsor of Terrorism, a known violator of human rights and international law, and an oppressor of its own people.

1118.    Undeterred by the consequences of supporting such a Regime, the Defendants placed financial gain over morality and law.

1119.    By aiding the Hussein Regime in using oil allocations and humanitarian purchases as a means of rewarding its allies, the Defendants forced the Iraqi people to fund the payments of bribes designed to extend the reign of the tyrannical Regime that subjected them.

1120.   By providing or hiding direct financial transactions with the Hussein Regime, the Defendants were actively assisting a declared State Sponsor of Terrorism and were violating all US laws related to transfers to such entities. The Defendants thus helped enable the Hussein Regime to subject the Iraqi people to the same terrorist practices the Hussein Regime inflicted abroad.

2.    *The loss of humanitarian supplies damaged the Iraqi people and nation.*

1121.   Given the humanitarian crisis in Iraq during the Programme, the loss of the benefits of the humanitarian goods themselves dwarfed the financial loss.

1122.   The Programme was designed to provide critically needed food, medicine, and other goods to Iraqi people. In those trying times, the loss of those goods was far more costly than merely financial loss.

1123.   The loss of revenue to the Programme translated directly into reduced aid.

1124.   All Programme Phases but the last were underfunded. As a result, the amount of humanitarian aid that arrived in Iraq was always less than the Distribution Plans approved by the UN, and even those Distribution Plans were based on estimates of available oil revenues, which would have been substantially higher for much of the Programme had the OSP not been artificially deflated.

1125.   According to the UN Secretary-General's 180-day reports on the Programme, for the thirteen Phases of the Programme, the shortfalls were as follows (in millions of dollars):

| Phase | Distribution Plan Budget | Actual Humanitarian Revenue Available | Shortfall | Value of Humanitarian Goods Delivered | Shortfall |
|-------|--------------------------|----------------------------------------|-----------|----------------------------------------|-----------|
| I*    | 1,321 | 1,094 | 227    | 672   | 649   |
| II*   | 1,321 | 919   | 402    | 672   | 649   |
| III*  | 1,321 | 1,439 | -118   | 672   | 649   |
| IV    | 3,100 | 1,771 | 1,329  | 1,516 | 1,584 |
| V     | 2,746 | 1,636 | 1,110  | 1,213 | 1,533 |
| VI    | 3,116 | 4,632 | -1,516 | 1,884 | 1,232 |
| VII   | 3,527 | 4,650 | -1,123 | 1,443 | 2,084 |
| VIII  | 7,131 | 6,456 | 675    | 763   | 6,368 |

The Republic of Iraq's First Amended Complaint -- page 190

| Phase | Distribution Plan Budget | Actual Humanitarian Revenue Available | Shortfall | Value of Humanitarian Goods Delivered | Shortfall |
|---|---|---|---|---|---|
| IX | 5,556 | 4,452 | 1,104 | 2,266 | 3,290 |
| X | 5,505 | 4,537 | 968 | 4,790 | 715 |
| XI | 4,432 | 4,072 | 360 | 6,110 | -1,678 |
| XII | 5,083 | 2,793 | 2,290 | 3,000 | 2,083 |
| XIII | 4,327 | 4,694 | -367 | 3,120 | 1,207 |
| Totals | 48,486 | 43,145 | 5,341 | 28,121 | 20,365 |

*These figures are estimated based on the average of the first three Phases, because a breakdown is not available.

    1126.   As is evident, particularly during the later Phases of the Programme, the value of approved contracts materially exceeded the available revenues.

    1127.   The last Phase is an anomaly because the Coalition Provisional Authority induced **all** Programme participants to reduce their contract prices by at least 10% during this Phase.

    1128.   As a result, the Iraqi people suffered greatly from shortages of food and medicine.

    1129.   While there were funds in the Escrow Account at the end of the Programme, those amounts resulted from reductions in contract amounts following the invasion of Iraq (when Programme participants uniformly agreed to reduce their contracts by at least 10%), oil payments received but not yet allocated, amounts related to goods placed on hold by the Security Council, and a gain on currency exchange (due to Hussein's demand that no funds be held in dollars and a rise in the Euro).

    1130.   Unfortunately, those sums were unavailable earlier, so every dollar siphoned off with the help of the Defendants directly cost the Iraqi people.

    1131.   Even if the Programme had enjoyed a surplus throughout its existence, the funds remaining in the Escrow Account are owned by the Republic and people of Iraq, as a result of their constitutional ownership of Iraq's oil reserves. At a minimum, they would have had the use of the siphoned funds after the Regime's fall.

### 3.    *The Defendants' corruption damaged the UN Sanctions.*

1132.    The Defendants' facilitation of the corruption of the OFFP also severely damaged the UN's ability to use economic sanctions as a nonviolent means of inducing change in tyrannical and terrorist regimes.  The Defendants' willingness to mislead the United Nations and violate OFFP rules eviscerated the effectiveness of the Iraq Sanctions Program and allowed the Hussein Regime to stay in power until Hussein was ousted by military action.

1133.    The weakening of the UN sanctions should at least be considered in the imposition of punitive damages.

## *X.    Claims for Relief*

1134.    Based on the foregoing facts, incorporated by reference, the Republic of Iraq raises the following claims for relief:

## A.    *First Claim for Relief – RICO Section 1962(c)*

1135.    The conduct described above violates the provisions of 18 U.S.C. § 1962(c).

### 1.    *The Enterprise was the Programme.*

1136.    The Enterprise was the Programme.

1137.    In the alternative, the Enterprise was an association-in-fact enterprise of the Iraq Sanctions Program in general, including the Programme (as an integral part of the Sanctions Program), the 661 Committee, the OIP, and the Programme participants, including the Defendants.

1138.    The Enterprise had a distinct purpose – to provide humanitarian aid to the Iraqi people while maintaining the effectiveness of the Iraq Sanctions Program.

1139.    The Enterprise had a distinct structure.  As set forth in the relevant Security Council Resolutions, the Programme, OIP, and 661 Committee had distinct operational rules and

bureaucracy that existed for years. Billions of dollars of transactions were organized over the length of the Programme.

### 2. The Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through racketeering activity.

1140. The Defendants played integral roles in the Programme and its operations. Without their participation in the Programme's operations, the Programme would not have had any operations at all.

1141. All of the improper direct transfers to the Hussein Regime came from a Programme participant. Every one of those transactions was in direct violation of the Banking Agreement.

#### (a) Mail and Wire Fraud (all Defendants)

1142. The racketeering activities include at least mail and wire fraud (18 U.S.C. §§ 1341 and 1343), violations of the Travel Act (18 U.S.C. § 1952), and money laundering (18 U.S.C. §§ 1956 and 1957).

1143. The Defendants' scheme necessarily involved multiple violations of the mail and wire fraud statutes, because, as explained above, the scheme could not have functioned without phones, faxes, e-mails, and wire transfers.

#### (b) Money Laundering (all Defendants)

1144. The Defendants committed money laundering each time they received payment from the UN Escrow Account that included sums covering an illegal kickback. The Money Laundering Control Act, 18 U.S.C. §§ 1956, 1957, prohibits the use or movement through the United States of proceeds of certain unlawful activity with the intent to promote the unlawful activity.

1145. The Defendants' "unlawful activity" includes, among other matters, (1) bribery, (2) violations of the Foreign Corrupt Practices Act, and, following adoption of the Patriot Act, (3) violations of the IEEPA.

1146. The following Defendants had transactions that post-date the adoption of the Patriot Act: the ABB Defendants, the AGCO Defendants, Akzo Nobel, Astra Zeneca, the Atlas Copco Defendants, AWB, the B. Braun Defendants, Buhler, Chalmers, Chevron, Dow AgroSciences, El Paso, Eastman Kodak, Ebewe, Eli Lilly, the Flowserve Defendants, the GSK Defendants, the Johnson & Johnson Defendants, Novo Nordisk, the Roche Defendants, the Siemens Defendants, Vitol, Woodhouse, Wyatt, and York.

        (c)    *The Travel Act (all Defendants)*

1147. The Defendants violated the Travel Act by traveling in interstate or foreign commerce and by using facilities of interstate and foreign commerce (including, without limitation, mail, wire, e-mail, and courier services) with the intent to promote, manage, establish, carry on, and facilitate the promotion of (1) bribery in violation of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd and the New York commercial bribery statute, N.Y. Penal Law §§ 180.00 and 180.05, (2) money laundering, and, following adoption of the Patriot Act, (3) violations of the IEEPA

1148. The Defendants violated the Travel Act by traveling in interstate or foreign commerce and by using facilities of interstate and foreign commerce (including, without limitation, mail, wire, e-mail, and courier services) to distribute the proceeds of their illegal conduct.

        (d)    *Bribery (all Defendants but BNP)*

1149. The systematic bribery by the Defendants is a "racketeering activity." 18 U.S.C. § 1961(1) ("racketeering activity" means (A) any act or threat involving … bribery [under state law]…."). The Defendants' conduct violated New York's anti-bribery statutes.

1150. The kickbacks and surcharges were a form of bribery, as was the use of oil allocations to reward Hussein allies.

### 3.     The Defendants' racketeering activity formed a pattern.

1151.   The Defendants' racketeering activity constituted a pattern in that the conduct had a central purpose of diverting funds from their intended humanitarian purposes to the Hussein Regime and to the Defendants.

1152.   The racketeering acts were also focused and organized by the processes of the OFFP: the Defendants all had to agree to participate in the Programme, to conceal the involvement of necessary third parties, to mislead the UN into approving payments from the UN Escrow Account, and then to make and conceal the improper payments.

1153.   At the insistence of the Hussein Regime and the affirmative assistance of the Defendants, this pattern became the regular means of conducting the OFFP.

1154.   The pattern of racketeering activity began shortly after the creation of the OFFP and continued uninterrupted until the Programme's end, following the United States' invasion of Iraq.

1155.   As set forth above, the Defendants intentionally became associated with the OFFP, the Enterprise, which was engaged in interstate and foreign commerce, to participate, directly and indirectly, in the operation of the Programme through a pattern of racketeering activity.

## B.     Second Claim for Relief – RICO 1962(d)

1156.   The Defendants conspired among themselves and others, including the Hussein Regime, to make the violations described immediately above.

1157.   The Defendants agreed to the unlawful purpose of the conspiracy – to divert funds from the humanitarian purposes of the Programme.

1158.   Each of the Defendants voluntarily joined in the operation of the Programme, which acted in interstate commerce. Each Defendant knowingly joined the conspiracy to participate in the operation of the Programme in an illegal and illicit manner. Each Defendant did so through a pattern of racketeering by agreeing to commit and in fact committing the predicate acts listed above.

## C.    Third Claim for Relief – Fraud

1159.    The Defendants' materially false statements to the United Nations were fraudulent, including, by failing to disclose, among other material matters set forth above, that kickbacks and surcharges were being paid, that Programme regulations were being violated, that contracts were not being made on normal commercial terms, and that full disclosures were not being made to the UN.

1160.    The Republic of Iraq and the Iraqi people were direct victims of that fraud.

1161.    The Republic of Iraq and the people of Iraq are entitled to their actual damages and punitive or exemplary damages.

## D.    Fourth Claim for Relief – Civil Conspiracy to Commit Fraud

1162.    The Defendants combined and agreed with each other and others, including the Hussein Regime, to defraud the UN (and thus Iraq and its people) by failing to disclose, among other material matters set forth above, that kickbacks and surcharges were being paid, that Programme regulations were being violated, that contracts were not being made on normal commercial terms, and that full disclosures were not being made to the UN.

1163.    The conspiracy commenced during Phase II, no later than December 1997, and continued through the end of the Programme.  Indeed, the Defendants' efforts to hide their wrongs have continued through the UN investigation and to date.

1164.    Pursuant to their agreement(s), the Defendants acted in concert to support their common purpose of diverting money from the humanitarian ends of the Programme for their own purposes – including excess profits – causing Iraq and the Iraqi people to receive less than fair value for their oil and to overpay for the humanitarian goods they received.

1165.    Each Defendant committed at least one overt act in furtherance of the conspiracy, including misleading the UN as to the true nature of their arrangements with the Hussein Regime.

1166.   Each Defendant acted with the common intent to defraud the UN (and thus Iraq and the Iraqi people) and understood that all Defendants and the Hussein Regime shared in that common purpose.

1167.   The Defendants' conduct was willful, wanton, malicious, and oppressive.

1168.   Having knowingly joined and participated in a conspiracy, the Defendants are jointly and severally liable with other members of the conspiracy.

1169.   The Defendants' unlawful conspiracy has directly, legally, and proximately caused substantial injury to Iraq and the Iraqi people, as set forth below.

1170.   The Republic of Iraq is entitled to its actual damages and punitive damages.

## E.      Fifth Claim for Relief – Breach of Fiduciary Duty and Participation in, or Inducement of, Breach of Fiduciary Duty

1171.   This claim is raised against the BNP Defendants, Chevron, and Vitol.

1172.   BNP breached its fiduciary duties to the Republic of Iraq and the Iraqi people.

1173.   The various BNP entities participated in and induced the breaches of BNP's fiduciary duties.

1174.   Chevron and Vitol separately participated in and induced BNP's breach of its fiduciary duties.

1175.   The Republic of Iraq is entitled to forfeiture of the fees made by the BNP Defendants under the Banking Agreement and otherwise related to the Programme (approximately $200 million), its actual damages, punitive damages, and any other relief to which it may be entitled.

1176.   The other BNP Defendants, Chevron, and Vitol are jointly and severally liable for BNP's breaches of fiduciary duty.

F.    *Sixth Claim for Relief – Participation in, or Inducement of, Breach of Fiduciary Duty*

1177.   The Hussein Regime, as the self-proclaimed ruler of Iraq, owed fiduciary duties to the people of Iraq.

1178.   The Hussein Regime breached its fiduciary duties to the Iraqi people by diverting funds designed for humanitarian aid to the Iraqi people to the Hussein Regime to be used for other purposes, particularly to maintain their corrupt and illegal control over Iraq and the Iraqi people.

1179.   The Defendants participated in, and induced the breaches of, those fiduciary duties.

1180.   The Republic of Iraq is entitled to forfeiture of the profits made by the Defendants under the OFFP, its actual damages, punitive damages, and any other relief to which it may be entitled.

1181.   The Defendants are jointly and severally liable for the damages resulting from the breaches of fiduciary duty by the Hussein Regime.

G.    *Seventh Claim for Relief – Breach of Contract*

1182.   The Defendants breached their contractual commitments to the UN.

1183.   The Republic of Iraq is a third party beneficiary to those contracts, as they were intended to benefit the Iraqi people and protect them from the corrupt intentions of the Hussein Regime.

1.    *BNP breached the Banking Agreement.*

1184.   BNP breached the Banking Agreement, including without limitation, the incorporated provisions of Resolution 986.

1185.   BNP breached the Banking Agreement through negligence and intentional conduct.

1186.   BNP has also breached its agreement to refund to the Escrow Account transfers that were made in violation of Programme rules and BNP's OFAC License.

### 2.    *The Vendor Defendants breached their contracts.*

1187.    The Vendor Defendants breached the standard provisions in each of their contracts that incorporated the regulations of the Programme, including the provisions requiring full disclosure of all contract terms to the UN, prohibiting direct transfers to the Hussein Regime, and stating that all contracts had to be made on normal commercial terms.

### 3.    *The Oil Purchasing Defendants breached their contracts.*

1188.    The Oil Purchasing Defendants breached the standard provisions in each of their contracts, including the provisions that incorporated the regulations of the Programme, that prohibited assignments of contract rights without prior UN approval, that required full disclosure of contract provisions to the UN, and that required that the full purchase price be deposited into the Escrow Account.

1189.    The Republic of Iraq, as a third party beneficiary of the contracts, is entitled to recover its actual damages and all other relief to which it is entitled to under the law and the contracts.

1190.    The Republic of Iraq is also entitled to forfeiture of all transfers made from the Escrow Account to the BNP Defendants that were made in violation of its OFAC License.

### 4.    *The Republic of Iraq is entitled to rescission.*

1191.    All of the Vendor Defendants and the BNP Defendants received funds from the Escrow Account, which held funds of the Republic of Iraq.

1192.    Pursuant to United States law at the time, any transfer of Iraqi funds that fell outside the specific rules and regulations of the Iraq Sanctions Program and BNP OFAC License were null and void. *See* International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706; the United Nations Participation Act, 22 U.S.C. § 287c (the "UNPA"); 31 C.F.R. § 575.202.

1193.  The transfers the Vendor Defendants received from the Escrow Account in relation to their contracts during the period of the Kickback Schemes were in violation of UN regulations, and therefore, are void.

1194.  The transfers the BNP Defendants received following their breach of the Banking Agreement are also void.

1195.  The Republic of Iraq is entitled to rescission of all transfers from the Escrow Account to the Vendor Defendants and the BNP Defendants under the relevant United States statutes and general equitable principles.

### H.    *Eighth Claim for Relief – Unjust Enrichment*

1196.  The Defendants unjustly enriched themselves at the expense of the Republic of Iraq and the Iraqi people through their manipulation and corruption of the Programme.   The circumstances of their enrichment, including their conscious efforts to undermine the Programme's humanitarian goals and their knowing provision of financial resources to a State Sponsor of Terror, are such that, in equity and good conscience, the Defendants should be required to make restitution to the Republic of Iraq.

### I.    *Ninth Claim for Relief – Section 2(c) of the Robinson Patman Act*

1197.  The Defendants' conduct described above violates the prohibitions against commercial bribery of section 2(c) of the Robinson Patman Act. 15 U.S.C. § 13(c).

1198.  The Defendants induced, and participated in, breaches of fiduciary duties owed by the officials of the Hussein Regime to the Republic of Iraq and to the Iraqi people. The Defendants induced, and participated in, those breaches of duties by making, and agreeing to make, or actively concealing, illicit payments outside of the OFFP.

1199.  The Republic of Iraq is entitled to treble its actual damages, attorney's fees, and all other relief provided for under federal law, including relief pursuant to 15 U.S.C. §§ 13(c) and 15(a).

J.    **Tenth Claim for Relief – Violations of the FCPA**
      **(against the Vendor and Oil Purchasing Defendants)**

1200.    When the Vendor and Oil Purchasing Defendants paid surcharges and kickbacks to the Hussein Regime, they were not making payments to a legitimate government for government purposes. Instead, those payments were being made to government officials for purposes unrelated to official government purposes. As set out in the Programme regulations and the MOU, the sole legitimate government use for the humanitarian funds in the Escrow Account had already been established by agreement. The surcharges and kickbacks were diverted from those legitimate governmental purposes to the personal aims of Saddam Hussein, who used them to solidify his power and to maintain the trappings of his dictatorship.

1201.    The conduct of the Vendor and Oil Purchasing Defendants therefore violated the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, *et seq.*

1202.    The Republic of Iraq is entitled to its actual damages.

# XI.    Jury Demand

1203.    The Republic of Iraq demands a trial by jury.

## XII.    *Prayer for Relief*

The Republic of Iraq prays for itself, its agencies and instrumentalities, and, in parens patriae,

for the people of Iraq that this Court award it all the relief to which it is entitled under law or equity.

July 31, 2009                                          Respectfully submitted,
New York, New York

BURFORD & MANEY PC

Mark Maney (*mmaney@burfordmaney.com*)
(not yet admitted in District)
Roliff Purrington (*rpurrington@maneypurrington.com*)
(not yet admitted in District)

700 Louisiana, Suite 4600
Houston, Texas 77002
(713) 237-1111 Telephone
(713) 222-1475 Facsimile

BERNSTEIN LIEBHARD LLP

Stanley D. Bernstein (*bernstein@bernlieb.com*)
Rebecca M. Katz (*katz@bernlieb.com*)
Christian Siebott (*siebott@bernlieb.com*)
Brian E. Lehman (*lehman@bernlieb.com*)

10 East 40th Street
New York, New York 10016
(212) 779-1414 Telephone
(212) 779-3218 Facsimile

COUNSEL FOR THE REPUBLIC OF IRAQ

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE REPUBLIC OF IRAQ, including as PARENS PATRIAE in behalf of the CITIZENS of the REPUBLIC OF IRAQ, | ECF CASE<br><br>08 Civ. 5951 (GEL) |
| Plaintiff, | |
| -against- | |
| ABB AG, et al., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Christian Siebott, hereby certify that on the 31st day of July, 2009, I caused true and accurate copies of the foregoing the Republic of Iraq's First Amended Complaint to be served via ECF and/or first class mail upon counsel listed in the attached service list.

CHRISTIAN SIEBOTT

## SERVICE LIST

ALSTON BIRD, LLP
Nelson Boxer
Christina Spiller
90 Park Avenue
New York, NY 10016

*Attorneys for Aesculap AG and KG,*
*Aesculap Motric S.A., Aesculap Surgical*
*Instruments SDN, B. Braun Medical*
*France, B. Braun Medical Industries*
*SDN BHD (Malaysia), B. Braun*
*Melsungen A.G.*

AXINN, VELTROP & HARKRIDER,
LLP
John Harkrider
Evan Storm
114 West 47th Street
New York, NY 10036

*Attorneys for Secalt S.A.*

BAKER & MCKENZIE
Lawrence Newman
1114 Avenue of the Americas
New York, NY 10036

*Attorney for Sulzer Buckhardt*
*Engineering Works Ltd.*

BARNES & THORNBURG
Andrew Helfrich
121 W. Franklin St., Suite 200
Elkhart, IN 46516

*Attorney for ABB Solyvent-Ventec*

CADWALADER, WICKERSHAM &
TAFT LLP
James K. Robinson
Michael Evan Horowitz
700 6th Street N.W.
Washington, DC 20001

CADWALADER, WICKERSHAM &
TAFT LLP
Jason Jurgens
Nathan Marshall Bull
One World Financial Center
New York, NY 10281

*Attorneys for Dow Agrosciences*

COVINGTON & BURLING LLP
Nancy Lynn Kestenbaum
620 Eighth Avenue
New York, NY 10018

COVINGTON & BURLING LLP
O. Thomas Johnson, Jr.
Mark H. Lynch
1201 Pennsylvania Avenue, NW
Washington, DC 20004

*Attorneys for Akzo Nobel N.V., Astra*
*Zeneca AB, Cilag AG International,*
*Intervet International B.V. ("Intervet"),*
*Janssen Pharmaceutical, Merial, N.V.*
*Organon ("Organon")*

CRAVATH, SWAINE & MOORE, LLP
Robert H. Baron
Timothy Cameron
825 Eighth Avenue
New York, NY 10019

*Attorneys for AWB Ltd.*

## SERVICE LIST

DAVIS POLK & WARDWELL
Brian Stryker Weinstein
Jason Bradley McCullough
450 Lexington Avenue
New York, NY 10017

*Attorneys for F. Hoffman La Roche,
Roche Diagnostics GMBH*

DRINKER BIDDLE & REATH, LLP
Gregory Miller
One Logan Square Ste. 2000
Philadelphia, PA 19103-6996

DRINKER BIDDLE & REATH, LLP
Michael Miner
1500 K Street, N.W.
Washington, DC 20005

*Attorneys for Renault Agriculture &
Sonalika International*

EDWARDS, ANGELL, PALMER &
DODGE, LLP
Ira G. Greenberg
750 Lexington Avenue
New York, NY 10022

EDWARDS, ANGELL, PALMER &
DODGE, LLP
Florence Crisp
2800 Financial Plaza
Providence, RI 02903

*Attorneys for Dresser International*

EPSTEIN, BECKER & GREEN, P.C.
Peter Louis Altieri
David John Clark
250 Park Avenue
New York, NY 10177

*Attorneys for Railtech International*

HARKINS CUNNINGHAM, LLP
John G. Harkins, Jr.
Colleen Healy Simpson
Marianne Consentino
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103-7042

*Attorneys for Rohm and Haas France
S.A.*

HOWREY LLP
Greg Baker
1299 Pennsylvania Ave., N.W.
Washington, DC 20004

*Attorney for Solar Turbines Europe*

JONES DAY
Meir Feder
Phineas E. Leahey
Thomas E. Lynch
222 East 41st Street
New York, NY 10017

*Attorneys for Chevron Corp. including
as successor to Texaco Corp.*

JONES DAY
Chris J. Lopata
222 East 41st Street
New York, NY 10017

JONES DAY
Thomas Jones
Michael H. Ginsberg
Amy K. Pohl
500 Grant Street - Suite 4500
Pittsburgh, PA 15219

*Attorneys for The Weir Group*

## SERVICE LIST

KELLEY DRYE & WARREN, LLP
Thomas Benjamin Kinzler
David I. Zalman
Melissa Errine Byroade
101 Park Avenue
New York, NY 10178

KELLEY DRYE & WARREN LLP
Eric McClafferty
Washington Harbour, Suite 400 -- 3050
K Street, N.W.
Washington, DC 20007

*Attorneys for Flowserve B.V., Flowserve
Corp., Flowserve Pompes (formerly
Ingersoll-Dresser Pompes)*

KIRKLAND & ELLIS LLP
Brant Warren Bishop
John R. Bolton
Thomas D. Yannucci
655 Fifteenth Street, NW Suite 1200
Washington, DC 20005

*Attorneys for Siemens Sanayi ve Ticaret
A.Ş., Osram Middle East FZE, Siemens
S.A.S. France*

KIRKLAND & ELLIS LLP
James P. Gillespie, PC
Andreanna M. Truelove
Karen McCartan DeSantis
655 Fifteenth Street, N.W., Suite 1200
Washington, DC 20005

*Attorneys for ABB AG, ABB Automation,
ABB Elektric Sanayi A.Ş., ABB Industrie
AC Machines, ABB Industrie
Champagne, ABB Near East Trading
Ltd.*

EL PASO CORPORATION
LEGAL DEPARTMENT
Thomas M. Malone
John L. Shoemaker
1001 Louisiana St., Suite 1925
Houston, TX 77002

*Attorneys for El Paso Corp. (successor
to Coastal Corp.)*

ST. JUDE MEDICAL, INC.
LEGAL DEPARTMENT
Jim Ladner
1 Lillehei Plaza
St. Paul, MN 55117

*Attorney for St. Jude Medical Export
GMBH*

PARK & JENSEN LLP
Tai H. Park
369 Lexington Avenue, 16th Floor
New York, NY 10017

*Attorney for Boston Scientific S.A.*

## SERVICE LIST

PEPPER HAMILTON LLP
Kenneth J. King
620 Eighth Avenue, 37th Floor
New York, NY 10018

PEPPER HAMILTON LLP
Gregory A. Paw
Robert L. Hickok
3000 Two Logan Square -- Eighteenth
and Arch Streets
Philadelphia, PA  19103

*Attorneys for Glaxo Smithkline Egypt
SAE, Glaxo Wellcome Export Ltd.,
Glaxo Wellcome SA (South Africa)
(PRY) Ltd., GlaxoSmithKline Walls
House, SmithKline Beecham
International*

PILLSBURY WINTHROP SHAW
PITTMAN, LLP
John F. Pritchard
Ranah Leila Esmaili
1540 Broadway
New York, NY 10036

*Attorneys for Atlas Copco Airpower n.v.,
Atlas Copco CMT Sweden AB*

REED SMITH
Casey Devin Laffey
599 Lexington Avenue
New York, NY 10022

REED SMITH
Casey L. Westover
Richard Wray
10 South Wacker Drive
Chicago, IL 60606

*Attorneys for York Air Conditioning and
Refrigeration FZE*

SHEARMAN & STERLING LLP
Tammy Bieber
Dan Newcomb
H. Miriam Farber
599 Lexington Avenue
New York, NY 10022

*Attorneys for ABG Allgemeine
Baumaschinen-GesellschaftmbH,
Renault V.I., Renault Trucks SAS, Volvo
Construction Equiptment AB (a
successor company to Volvo
Construction Equiptment International)*

SHEARMAN & STERLING LLP
Ken Kramer
H. Miriam Farber
599 Lexington Avenue
New York, NY 10022

*Attorneys for Buhler Ltd.*

SHEARMAN & STERLING LLP
Ken Kramer
599 Lexington Avenue
New York, NY 10022

*Attorney for Sulzer Pumpen Deutschland
GMBH, Sulzer Turbo Ltd.*

## SERVICE LIST

SIDLEY AUSTIN LLP
Dorothy Jane Spenner
Andrew Douglas Hart
787 Seventh Avenue
New York, NY 10019

SIDLEY AUSTIN LLP
Bradford A. Berenson
Richard D. Klingler
1501 K Street, N.W.
Washington, DC 20005

*Attorneys for Eli Lilly Export S.A., Novo Nordisk*

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
William John O'Brien, III
Four Times Square
New York, NY 10036

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Robert S. Bennett
Jennifer L. Spaziano
1440 New York Avenue N.W.
Washington, DC 20005

*Attorneys for BNP Paribas (Suisse) SA ,
BNP Paribas Hong Kong , BNP Paribas
London Branch, BNP Paribas Paris,
BNP Paribas UK Holdings Limited,
BNP Paribas USA*

SPAGNOLETTI & CO.
Francis I. Spagnoletti
401 Louisiana Street, 8th Floor
Houston, TX 77002

*Attorney for David B. Chalmers, Jr.*

SULLIVAN & CROMWELL, LLP
Penny Shane
Andrew Hunter Reynard
David Harold Braff
Steven Robert Peikin
125 Broad Street
New York, NY 10004

*Attorneys for Vitol S.A.*

TROUTMAN SANDERS, L.L.P.
Elliot Cohen
Robert M. Carmen
405 Lexington Avenue
New York, NY 10174-0700

*Attorneys for AGCO Denmark A/S,
AGCO S.A., Valtra do Brazil*

WILLIAMS & CONNOLLY LLP
Robert A. Van Kirk
Katherine M. Turner
Matthew W.H. Wessler
Philip A. Sechler
725 Twelfth Street, N.W.
Washington, DC 20005

*Attorneys for Clyde Union S.A.S.
(formerly known as Union Pumps S.A.S.
formerly known as David Brown
Guinard Pumps S.A.S.), David Brown
Transmissions France S.A., Textron Inc.*

## SERVICE LIST

GIBBONS P.C.
Philip Warren Crawford
Jennifer Marino Thibodaux
Thomas R. Valen
One Gateway Center
Newark, NJ 07102

LEE, HONG, DEGERMAN, KANG &
WAIMEY
Larry R. Schmadeka
660 South Figueroa Street, Suite 2300
Los Angeles, CA 90017

*Attorneys for Daewoo International
Corp., Kia Motors Corp.*

LANDMAN CORSI BALLAINE &
FORD PC
Mark S. Landman
120 Broadway, 27th Floor
New York, NY 10271

WILLCOX & SAVAGE P.C.
Conrad M. Shumadine
Brett A. Spain
One Commercial Place Suite 1800
Norfolk, VA 23510

*Attorneys for Liebherr Export, Liebherr
France SA*

CANALES & SIMONSON, P.C.
J. A. Canales
Hector Canales
2601 Morgan Avenue
Corpus Christi, TX 78405

LAW OFFICE OF STEVEN
ORLIKOFF
Steven Orlikoff
P.O. Box 6225
New York, NY 10150

THE PARKER LAW FIRM
Carl A. Parker
1 Plaza Square
Port Arthur, TX 77642

*Attorneys for Oscar S. Wyatt, Jr.*

K&L GATES
Walter P. Loughlin
599 Lexington Avenue
New York, NY 10022-6030

SHACKELFORD MELTON &
MCKINLEY
Leland DeLaGarza
Andy Seigel
Tim Zieger
3333 Lee Parkway, 10th Floor
Dallas, TX 75219

*Attorneys for Woodhouse International*