# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **THE REPUBLIC OF IRAQ, including as PARENS PATRIAE on behalf of the CITIZENS of the REPUBLIC OF IRAQ,**<br><br>               **Plaintiff,**<br><br>   **- against -**<br><br>**ABB AG et al.,**<br><br>               **Defendants.** | **08-CV-05951 (SHS)**<br><br><br>**ECF CASE**<br><br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

## DEFENDANTS JOINING IN BRIEF

ABB AG
ABB Electric Sanayi AS
ABB France SAS (successor in interest to ABB
  Automation SAS and to ABB Industrie
  Champagne by way of its merger into ABB
  Automation SAS)
ABB Industrie AC Machines (now ABB
  Industrie AG/ABB Schweitz AG)
ABB Near East Trading Limited
ABB Solyvent-Ventec
ABG Allgemeine Baumaschinen Gesellschaft
  MbH
Aesculap AG and KG
Aesculap Motrics S.A.
Aesculap Surgical Instruments SDN BHD
AGCO Danmark A/S (erroneously named as
  AGCO Denmark A/S)
AGCO S.A.
Air Liquide Engineering
Akzo Nobel N.V.
Astra Zeneca AB
Atlas Copco Airpower N.V.
Atlas Copco CMT Sweden AB
AWB Limited
B. Braun Medical Industries SDN BHD
B. Braun Medical S.A.S.
B. Braun Melsungen A.G.
BNP Paribas Hong Kong
BNP Paribas London Branch
BNP Paribas Paris
BNP Paribas (Suisse) SA
BNP Paribas UK Holdings Limited
BNP Paribas USA
Boston Scientific, S.A.
Buhler Ltd.
CG Holdings Belgium N.V. (f/k/a Pauwels
  International N.V.)
Chevron Corporation
CILAG AG International
Clyde Union, S.A.S. (f/k/a/ Union Pumps,
  S.A.S.)
Daewoo International Corp
Daimler AG (formerly Daimler-Chrysler AG)
David B. Chalmers, Jr.
David Brown Transmissions France, S.A.S
Doosan Benelux SA, as successor to Ingersoll-
  Rand Benelux, N.V.
Dow AgroSciences LLC
Dow AgroSciences S.A.S.

Eastman Kodak S.A.
El Paso Corporation
Eli Lilly Export SA
Evapco Europe S.R.L.
F. Hoffmann-La Roche Ltd
Flowserve B.V.
Flowserve Corporation
Flowserve Pompes S.A.S.
Glaxo Wellcome Export Ltd.
Glaxo Wellcome SA (South Africa) (PRY) Ltd.
GlaxoSmithKline Egypt SAE
GlaxoSmithKline Walls House
Ingersoll-Rand Italiana S.p.A.
Ingersoll-Rand World Trade Ltd.
Intervet International B.V.
Janssen Pharmaceutical
Kia Motors Corporation (erroneously named as
  "Kia Motors")
Liebherr Export AG
Liebherr France, SA
Merial SAS
N.V. Organon
Novo Nordisk A/S
Oscar S. Wyatt, Jr.
Railtech International SA
Renault Agriculture & Sonalika International
Renault Trucks SAS (f/k/a Renault V.I.)
Roche Diagnostics GmbH
Rohm and Haas France, S.A.
Secalt S.A.
Serono Pharma International
Siemens S.A.S. France (erroneously named as
  Siemens S.A.A. of France)
Siemens Sanayi ve Ticaret A.Ş. (erroneously
  named as Siemens Sanayi ve Ticaret A.S. of
  Turkey)
SmithKline Beecham International
Solar Turbines Europe, S.A.
St. Jude Medical Export GmbH
Sulzer Buckhardt Engineering Works Ltd.
Sulzer Pumpen Deutschland,GMBH
Sulzer Turbo Ltd.
Textron, Inc.
The Weir Group PLC
Thermo King Ireland Ltd.
Vitol, S.A.
Volvo Construction Equipment AB (as
  successor to Volvo Construction Equipment
  International)

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................4

    A.    The Republic of Iraq. ......................................................................4

    B.    The Inception of the Oil-for-Food Program.....................................5

    C.    The Operation of the Program. ........................................................7

    D.    The Alleged Corruption of the Program. .........................................7

        1.    The Oil Surcharges .............................................................8

        2.    Kickbacks on Humanitarian Goods ...................................9

    E.    The Defendants. ..............................................................................10

ARGUMENT ........................................................................................................11

I.    THE REPUBLIC OF IRAQ TODAY IS THE SAME SOVEREIGN ENTITY, WITH THE SAME LEGAL RIGHTS AND LIABILITIES, AS IT WAS UNDER THE HUSSEIN REGIME.................................................................................12

    A.    The Rights, Duties, Responsibilities and Liabilities of a Foreign State Survive Changes in the State's Governing Regime. ...............................12

    B.    Iraq Has Operated as a Legal Entity During All Relevant Time Periods and Court Decisions and Iraq's Own Actions Confirm that Iraq Continues to Bear Rights and Liability Accrued During the Hussein Regime.......................16

II.    IRAQ LACKS BOTH ARTICLE III AND *PARENS PATRIAE* STANDING TO ASSERT ANY OF ITS CLAIMS. ..............................................................................19

    A.    Iraq Lacks Article III Standing Because It Fails to Allege Any Particularized Injury Fairly Traceable to Defendants' Conduct. ..........................19

        1.    Iraq Does Not, and Cannot, Allege Injury-in-Fact. ..................................21

        2.    Any Purported Harm Suffered by the Republic of Iraq or Its Citizens Is Not Fairly Traceable to Defendants' Alleged Conduct. ..........22

B.   Iraq Lacks *Parens Patriae* Standing, Which Does Not Extend to Foreign Nations at All, Nor to Claims Brought Even by U.S. States Under RICO, the RPA, or the FCPA..................................................................26

1.   Iraq, a Foreign Nation, Lacks *Parens Patriae* Standing............................26

2.   Neither the RPA, RICO, Nor the FCPA Permits a *Parens Patriae* Action...............................................................................28

III.   IRAQ'S OWN ADMITTED MISCONDUCT BARS ITS CLAIMS...............................30

A.   Iraq's Claims Are Barred by the *In Pari Delicto* Doctrine.....................................31

1.   The Allegations in the FAC Fall Squarely Within the *In Pari Delicto* Doctrine.................................................................31

2.   The *In Pari Delicto* Doctrine Bars Iraq's Federal Causes of Action.........33

3.   The *In Pari Delicto* Doctrine Bars Iraq's Common Law Claims. .............35

B.   This Court Cannot Adjudicate Iraq's Claims Because the Act of State Doctrine Bars Consideration of the Propriety of Iraq's Actions Under the Program.................................................................................36

C.   The Republic of Iraq's Attempt to Distinguish Itself From the Hussein Regime Requires This Court to Decide Non-Justiciable Political Questions.................................................................................39

IV.   BECAUSE IRAQ MASTERMINDED THE ALLEGED CONSPIRACY, IT HAS KNOWN OF THE PURPORTED WRONGFUL CONDUCT FROM THE OUTSET AND THEREFORE ITS CLAIMS ARE TIME-BARRED. .............................42

A.   Iraq's Claims Accrued No Later Than the End of the Program. ..........................42

B.   The Applicable Period of Limitation for Iraq's Claims Expired Well Before It Filed Suit in June 2008. ..................................................................45

C.   Iraq Does Not and Cannot Allege a Basis to Toll the Limitations Periods. ..........48

V.   IRAQ FAILS TO MEET STATUTORY STANDING REQUIREMENTS, FAILS TO ESTABLISH SUBJECT MATTER JURISDICTION, AND FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED FOR ANY OF ITS CAUSES OF ACTION. ...................................................................................50

A.   Iraq's RICO Claims (First and Second Claims) Should be Dismissed for Lack of Standing, Lack of Subject Matter Jurisdiction, and Failure to State a Claim. ...................................................................................50

1.   Iraq Lacks Standing Under RICO.............................................................50

2.     The RICO Claims Must Be Dismissed for Lack of Subject Matter Jurisdiction in Light of the Extraterritorial Nature of the Defendants' Alleged Conduct and Its Effects..........................54

a.     Defendants' Alleged Conduct Is Extraterritorial and Does Not Satisfy the Conduct Test. ......................................55

b.     The Effects of Defendants' Alleged Conduct Are Extraterritorial and Do Not Satisfy the Effects Test. ..................60

3.     Iraq Fails to State a Claim Under RICO Section 1962(c)........................61

a.     Iraq Fails to Allege a RICO Enterprise.........................................61

b.     Iraq Fails to Allege that Defendants Participated in the Conduct of a RICO Enterprise. ......................................64

c.     Iraq Fails to Allege that Defendants Engaged in Racketeering Activity. ................................................65

d.     Iraq has not Alleged that Defendants Engaged in a Pattern of Racketeering Activity. ...............................................71

4.     Iraq Has Failed to State a Conspiracy Claim Under RICO Section 1962(d)..................................................................72

B.     Iraq's Robinson-Patman Act Claim (Ninth Claim) Should Be Dismissed for Lack of Standing, Lack of Subject Matter Jurisdiction, and Failure to State a Claim...........................................................74

1.     Iraq Lacks Standing to Assert RPA Claims Because It Asserts No Cognizable Injury and Is Not an Efficient Enforcer of the Antitrust Laws ..............................................................74

2.     The RPA Claim Must Be Dismissed for Lack of Subject Matter Jurisdiction..............................................................75

3.     Iraq Has Failed to State a Claim under RPA Section 2(c).......................76

C.     Iraq's FCPA Claim (Tenth Claim) Should be Dismissed Because the FCPA Does Not Provide a Private Right of Action................................77

D.     Iraq's Common Law Claims (Third Through Eighth Claims, Inclusive) Must be Dismissed for Lack of Supplemental Jurisdiction and Failure to State a Claim. ..............................................................78

1.     Iraq Fails to State A Claim for Fraud (Third Claim). ...............................78

2.     Iraq Fails to State A Claim for Civil Conspiracy to Commit Fraud
       (Fourth Claim). ............................................................................80

3.     Iraq Fails to State A Claim for Breach of Fiduciary Duty (Fifth
       And Sixth Claims)..........................................................................81

4.     Iraq Fails to State A Claim for Breach of Contract (Seventh
       Claim). ..........................................................................................85

5.     Iraq Fails to State A Claim for Unjust Enrichment (Eighth Claim). .........89

CONCLUSION...............................................................................................90

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
369 F.3d 732 (3d Cir. 2004)........................................................................................ 74, 75

*4 Hour Wireless v. Smith*,
Civ. A. No. 01-9133, 2002 WL 31654963 (S.D.N.Y. Nov. 22, 2002) ............................. 87

*767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugo.*,
218 F.3d 152 (2d Cir. 2000)........................................................................................ 40, 42

*Abercrombie v. Andrews College*,
438 F. Supp. 2d 243 (S.D.N.Y. 2006)......................................................................... 82, 84

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009)............................................................................... 87

*Acree v. Republic of Iraq*,
370 F.3d 41 (D.C. Cir. 2004) ............................................................................................ 16

*Acree v. Republic of Iraq*,
Civ. A. No. 06-723 (RWR), 2009 WL 3112822 (D.D.C. Sept. 30, 2009) ....................... 18

*Adler v. Berg Harmon Assocs.*,
790 F. Supp. 1222 (S.D.N.Y. 1992)................................................................................. 73

*Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*,
483 U.S. 143 (1987)........................................................................................................... 45

*Alfred Dunhill v. Cuba*,
425 U.S. 682 (1976)........................................................................................................... 37

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
458 U.S. 592 (1982)..................................................................................................... 21, 26

*Allen v. New World Coffee, Inc.*,
Civ. A. No. 00-2610, 2001 WL 293683 (S.D.N.Y. Mar. 27, 2001) ................................. 73

*Allen v. Wright*,
468 U.S. 737 (1984)........................................................................................................... 23

*Alperin v. Vatican Bank*,
410 F.3d 532 (9th Cir. 2005) ........................................................................................... 41

**Page(s)**

*Anza v. Ideal Steel Supply Corp.,*
    547 U.S. 451 (2006)........................................................................... 51, 54

*Arbaugh v. Y & H Corp.,*
    546 U.S. 500 (2006)................................................................................. 54

*Ariz. Elec. Power Coop., Inc. v. Fed. Energy Regulatory Comm'n,*
    631 F.2d 802 (D.C. Cir. 1980)................................................................. 22

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)............................................................................. 11

*Associated Gen. Contractors v. Cal. State Council of Carpenters, Inc.,*
    459 U.S. 519 (1983)................................................................................. 74

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007)...................................................................... 80

*Atty. Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,*
    268 F.3d 103 (2d Cir. 2001).................................................................... 38

*Baker v. Carr,*
    369 U.S. 186 (1962).............................................................. 39, 40, 41, 42

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964)................................................................ 3, 20, 36, 40

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
    472 U.S. 299 (1985)..................................................................... 2, 31, 33

*Bauman v. Mount Sinai Hosp.,*
    452 F. Supp. 2d 490 (S.D.N.Y. 2006)..................................................... 66

*Beaty v. Republic of Iraq,*
    480 F. Supp. 2d 60 (D.D.C. 2007),
    *aff'd* No. 07-7057 (D.C. Cir. Nov. 21, 2007),
    *rev'd on other grounds,* 129 S. Ct. 2183 (2009)................................... 17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................... 11, 72

*Bernstein v. Universal Pictures, Inc.,*
    517 F.2d 976 (2d Cir. 1975).................................................................... 34

*Bersch v. Drexel Firestone Inc.,*
    519 F.2d 974 (2d Cir. 1975).................................................................... 60

**Page(s)**

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
 369 F.3d 212 (2d Cir. 2004) .......................................................................... 77

*Bontkowski v. First Nat'l Bank of Cicero*,
 998 F.2d 459 (7th Cir. 1993) ......................................................................... 34

*Boyd v. AWB Ltd.*,
 544 F. Supp. 2d 236 (S.D.N.Y. 2008) ............................ 54, 59, 74, 75, 76

*Boyle v. United States*,
 129 S. Ct. 2237 (2009) .................................................................................. 62

*Braka v. Bancomer, S.N.C.*,
 762 F.2d 222 (2d Cir. 1985) ......................................................................... 38

*Brasseur v. Speranza*,
 21 A.D.3d 297 (N.Y. App. Div. 2005) ........................................................ 84

*Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*,
 Civ. A. No. 99-9623, 2007 WL 1040809 (S.D.N.Y. Apr. 4, 2007),
 *aff'd*, 312 Fed. Appx. 433 (2d Cir. 2009) ........................................ 82, 83, 85

*Brooks v. Bank of Boulder*,
 891 F. Supp. 1469 (D. Colo. 1995) .............................................................. 66

*Broughel v. Battery Conservancy*,
 Civ. A. No. 07- 7755, 2009 WL 928280 (S.D.N.Y. Mar. 30, 2009) .............. 86

*Brownstone Inv. Group, LLC v. Levey*,
 468 F. Supp. 2d 654 (S.D.N.Y. 2007) .......................................................... 81

*Buckley v. Deloitte & Touche USA LLP*,
 Civ. A. No. 06-3291, 2007 WL 1491403 (S.D.N.Y. May 22, 2007) .............. 31

*Bulgartabac Holding AD v. Republic of Iraq*,
 Civ. A. No. 08-06502-RJH, 2009 WL 3113252 (S.D.N.Y. Sept. 30, 2009) ...... 18

*Bullmore v. Ernst & Young Cayman Islands*,
 20 Misc.3d 667 (N.Y. Sup. Ct. 2008) .......................................................... 35

*Butte Mining PLC v. Smith*,
 76 F.3d 287 (9th Cir. 1996) .......................................................................... 60

*Can v. United States*,
 14 F.3d 160 (2d Cir. 1994) ............................................................... 40, 41, 42

*Canyon Cty. v. Syngenta Seeds, Inc.*,
 519 F.3d 969 (9th Cir. 2008) ........................................................................ 30

**Page(s)**

*Castellanos v. Pfizer, Inc.*,
  Civ. A. No. 07-60646, 2008 WL 2323876 (S.D. Fla. May 29, 2008) ............................. 78

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
  547 F.3d 115 (2d Cir. 2008)................................................................... 82, 83, 84

*Cedar Swamp Holdings, Inc. v. Zaman*,
  487 F. Supp. 2d 444 (S.D.N.Y. 2007)........................................................ 63, 64

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)....................................................................... 8

*Citicorp Int'l. Trading Co. v. W. Oil & Ref. Co.*,
  771 F. Supp. 600 (S.D.N.Y. 1991).............................................................. 77

*City of Cohoes v. Kestner Eng'rs*,
  226 A.D.2d 914 (N.Y. App. Div. 1996) ....................................................... 47

*City of New York v. Smokes-Spirits.com, Inc.*,
  541 F.3d 425 (2d Cir. 2008)........................................................... 62, 64, 79

*City of Pittsburgh v. W. Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998).................................................................. 74, 75

*Cohen v. Houseconnect Realty Corp.*,
  289 A.D.2d 277 (N.Y. App. Div. 2001) ....................................................... 78

*Columbia Nitrogen Corp. v. Royster Co.*,
  451 F.2d 3 (4th Cir. 1971) ...................................................................... 35

*Connecticut v. Am. Elec. Power Co.*,
  582 F.3d 309 (2d Cir. 2009)...................................................................... 20

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984)............................................................................... 33

*Cornwell v. Credit Suisse Group*,
  Civ. A. No. 08-3758VM, 2009 WL 3241404 (S.D.N.Y. Oct. 5, 2009)..................... 56, 59

*Cramer v. Devon Group, Inc.*,
  774 F. Supp. 176 (S.D.N.Y. 1991).............................................................. 81

*Crigger v. Fahnestock & Co.*,
  443 F.3d 230 (2d Cir. 2006)...................................................................... 78

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)............................................................................... 70

Page(s)

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006)..................................................................... 20, 23

*Daliberti v. Republic of Iraq,*
146 F. Supp. 2d 19 (D.D.C. 2001) ...................................................... 16

*Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq,*
79 F. Supp. 2d 374 (S.D.N.Y. 2000)................................................... 16

*DeBlasio v. Merrill Lynch & Co., Inc.,*
Civ. A. No. 07-318 (RJS), 2009 WL 2242605 (S.D.N.Y. Jul. 27, 2009) ........ 66

*DeFalco v. Bernas,*
244 F.3d 286 (2d Cir. 2001).................................................. 61, 62, 71

*Demalco Ltd. v. Feltner,*
588 F. Supp. 1277 (S.D.N.Y. 1984)................................................... 80

*Dist. Telecommc'ns Dev. Corp. v. Dist. Cablevision, Inc.,*
638 F. Supp. 418 (D.D.C. 1985) ...................................................... 53

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
822 F.2d 1242 (2d Cir. 1987).......................................................... 80

*Doe I v. State of Israel,*
400 F. Supp. 2d 86 (D.D.C. 2005).................................................... 55

*Dominican Republic v. AES Corp.,*
466 F. Supp. 2d 680 (E.D. Va. 2006) ........................................... 21, 22

*Ely-Cruikshank Co., Inc. v. Bank of Montreal,*
615 N.E.2d 985 (N.Y. 1993)............................................................ 47

*Epstein v. Haas Sec. Corp.,*
731 F. Supp. 1166 (S.D.N.Y. 1990)................................................... 80

*Estados Unidos Mexicanos v. DeCoster,*
229 F.3d 332 (1st Cir. 2000)...................................... 21, 26, 27, 28

*European Cmty. v. RJR Nabisco, Inc.,*
424 F.3d 175 (2d Cir. 2005)........................................................... 38

*Evans v. Lynn,*
537 F.2d 571 (2d Cir. 1976)........................................................... 23

*Faggionato v. Lerner,*
500 F. Supp. 2d 237 (S.D.N.Y. 2007)................................................. 20

Page(s)

*FD Prop. Holding, Inc. v. U.S. Traffic Corp.*,
   206 F. Supp. 2d 362 (E.D.N.Y. 2002) ..................................................... 72, 73

*Fed. Republic of Yugo. v. Park-71st Corp.*,
   913 F. Supp. 191 (S.D.N.Y. 1995)........................................................... 42

*Filler v. Hanvit Bank*,
   339 F. Supp. 2d 553 (S.D.N.Y. 2004)....................................................... 81

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)............................................. 62, 64, 71, 72

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
   281 F.3d 48 (2d Cir. 2002)..................................................................... 16

*First Nat'l Bank of Boston v. Banco Nacional de Cuba*,
   658 F.2d 895 (2d Cir. 1981).................................................................. 38

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994)............................................................. 51, 53

*First Nationwide Bank v. Gelt Funding Corp.*,
   820 F. Supp. 89 (S.D.N.Y. 1993)...................................................... 63, 64

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
   462 U.S. 611 (1983) .............................................................................. 17

*FW/PBS, Inc. v. Dallas*,
   493 U.S. 215 (1990)............................................................................... 21

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
   830 F.2d 716 (7th Cir. 1987) ................................................................ 35

*Genty v. Resolution Trust Corp.*,
   937 F.2d 899 (3d Cir. 1991)................................................................... 34

*Germano v. Friedman*,
   221 A.D.2d 501 (N.Y. App. Div. 1995) .................................................. 79

*GICC Capital Corp. v. Tech Fin. Group, Inc.*,
   67 F.3d 463 (2d Cir. 1995)..................................................................... 71

*Glynwill Invs., N.V. v. Prudential Secs., Inc.*,
   No. 92 Civ. 9267, 1995 WL 362500 (S.D.N.Y. June 16, 1995)................... 46

*Gross v. New Balance Athletic Shoe, Inc.*,
   955 F. Supp. 242 (S.D.N.Y. 1997).......................................................... 75

Page(s)

*Gross v. Waywell*,
    628 F. Supp. 2d 475 (S.D.N.Y. 2009) ........................................................................ 63

*Grynberg v. ENI, S.P.A.*,
    Civ. A. No. 06-6495, 2009 WL 2482181 (S.D.N.Y. Aug. 13, 2009) ............................. 47

*Guar. Trust Co. v. United States*,
    304 U.S. 126 (1938) ........................................................ 1, 13, 40, 41, 42, 48, 49

*Gulf Oil Corp. v. Copp Paving Co.*,
    419 U.S. 186 (1974) ........................................................................................ 76

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ........................................................................................ 65

*Harper v. N.Y. City Hous. Auth.*,
    Civ. A. No. 09-5303, 2009 WL 3861937 (S.D.N.Y. Nov. 6, 2009) ............................. 11

*Hawaii v. Standard Oil Co. of Calif.*,
    405 U.S. 251 (1972) ................................................................ 21, 26, 28, 29

*Higgins v. N.Y. Stock Exch., Inc.*,
    942 F.2d 829 (2d Cir. 1991) .............................................................................. 46

*Hill v. Republic of Iraq*,
    328 F.3d 680 (D.C. Cir. 2003) .......................................................................... 16

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992) ........................................................................................ 51

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005) .............................................................................. 35

*Hyundai Corp. v. Republic of Iraq*,
    Civ. A. No. 02-7199, 2003 WL 22251349 (S.D.N.Y. Sept. 30, 2003) ......................... 16

*IBM Corp. v. T3 Techs., Inc.*,
    Civ. A. No. 06-13565, 2009 WL 3127744 (S.D.N.Y. Sept. 30, 2009) ......................... 74

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    907 N.E.2d 268 (N.Y. 2009) .................................................................... 46, 79, 89

*IIT v. Cornfeld*,
    619 F.2d 909 (2d Cir. 1980) .............................................................................. 56

*Illinois v. Life of Mid-Am. Ins. Co.*,
    805 F.2d 763 (7th Cir. 1986) ............................................................................ 30

**Page(s)**

*In re Am. Express Co. S'holder Litig.*,
    39 F.3d 395 (2d Cir. 1994)..................................................................... 52

*In re Currency Conversion Fee Antitrust Litig.*,
    265 F. Supp. 2d 385 (S.D.N.Y. 2003).......................................................... 80

*In re Edmonds*,
    924 F.2d 176 (10th Cir. 1991) ................................................................. 66

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001).......................................................... 24

*In re Merrill Lynch Ltd. P'ship Litig.*,
    154 F.3d 56 (2d Cir. 1998)................................................................ 44, 45

*In re Novagold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009).......................................................... 59

*In re Oakwood Homes Corp.*,
    Civ. A. No. 08-4445, 2009 WL 4829835 (3d Cir. Dec. 16, 2009) .................................. 35

*In re Parmalat Secs. Litig.*,
    383 F. Supp. 2d 587 (S.D.N.Y. 2005).......................................................... 35

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    263 F. Supp. 2d 172 (D. Mass. 2003)....................................................... 64, 65

*In re Scor Holding (Switzerland) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008)................................................ 56, 58, 59, 61

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005)............................................................... 83, 84

*In re Smith-Kline Beecham Clinical Labs., Inc.*,
    108 F. Supp. 2d 84 (D. Conn. 1999).......................................................... 65

*In re Tobacco/Governmental Health Care Cost Litig.*,
    83 F. Supp. 2d 125 (D.D.C. 1999),
    *aff'd*, 249 F.3d 1068 (D.C. Cir. 2001) ...................................................... 22

*In re Tuli*,
    172 F.3d 707 (9th Cir. 1999) ................................................................ 16

*Int'l Shared Servs., Inc. v. McCoy*,
    259 A.D. 2d 668 (N.Y. App. Div. 1999) ...................................................... 86

*Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*,
    88 F. Supp. 2d 133 (S.D.N.Y. 2000).......................................................... 77

Page(s)

*Itoba Ltd. v. LEP Group PLC*,
    54 F.3d 118 (2d Cir. 1995)...................................................................... 61

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981).............................................................................. 74

*J.S. Serv. Ctr. Corp. v. Gen. Elec. Tech. Servs. Co.*,
    937 F. Supp. 216 (S.D.N.Y. 1996)....................................................... 77

*Jackson v. Broad. Music, Inc.*,
    Civ. A. No. 04-5948, 2006 WL 250524 (S.D.N.Y. Feb. 1, 2006)................... 48

*Jackson v. People's Republic of China*,
    550 F. Supp. 869 (N.D. Ala. 1982)....................................................... 15

*Japanese Gov't v. Commercial Cas. Ins. Co.*,
    101 F. Supp. 243 (S.D.N.Y. 1951)........................................................ 16

*Jugobanka A.D. Belgrade v. Sidex Int'l Furniture Corp.*,
    2 F. Supp. 2d 407 (S.D.N.Y. 1998)...................................................... 42

*June Fabrics v. Teri Sue Fashions*,
    194 Misc. 267 (N.Y. Sup. Ct. 1948)..................................................... 68

*Kalasho v. Republic of Iraq*,
    Civ. A. No. 06-11030, 2007 WL 2683553 (E.D. Mich. Sept. 7, 2007).......... 18

*Karim v. AWB Ltd.*,
    Civ. A. No. 06-15400, 2008 WL 4450265 (S.D.N.Y. Sept. 30, 2008),
    *aff'd*, No. 08-5185, 2009 WL 3161363 (2d Cir. Oct. 2, 2009).............. 20, 24, 25, 53

*Kaufman v. Cohen*,
    307 A.D.2d 113 (N.Y. App. Div. 2003) ........................................... 83, 84, 85

*Kaye v. Grossman*,
    202 F.3d 611 (2d Cir. 2000)................................................................. 89

*Kirschner v. Bennett*,
    648 F. Supp. 2d 525 (S.D.N.Y. 2009).............................................. 83, 85

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991)................................................................... 58

*KMW Int'l v. Chase Manhattan Bank, N.A.*,
    606 F.2d 10 (2d Cir. 1979)................................................................... 40

*Knoll v. Equinox Fitness Clubs*,
    Civ. A. No. 02-9120, 2003 WL 23018807 (S.D.N.Y. Dec. 22, 2003) ........... 79

**Page(s)**

*Knox v. Palestine Liberation Org.*,
    306 F. Supp. 2d 424 (S.D.N.Y. 2004) ............................................................ 40

*Kunica v. St. Jean Fins., Inc.*,
    233 B.R. 46 (S.D.N.Y. 1999) ........................................................................ 87

*L.C. Capital Partners, LP v. Frontier Ins. Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003) .......................................................................... 45

*Lachmund v. ADM Investor Servs., Inc.*,
    191 F.3d 777 (7th Cir. 1999) ........................................................................ 66

*Lamb v. Phillip Morris, Inc.*,
    915 F.2d 1024 (6th Cir. 1990) ...................................................................... 77

*Lefkowitz v. Bank of New York*,
    Civ. A. No. 01-6252, 2009 WL 5033951 (S.D.N.Y. Dec. 22, 2009) .................. 82, 83, 85

*Lehigh Valley R. Co. v. State of Russia*,
    21 F.2d 396 (2d Cir. 1927) .................................................................. 15, 18, 40

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .......................................................................... 43

*Lerner v. Fleet Bank*,
    459 F.3d 273 (2d Cir. 2006) .......................................................................... 51

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003) ........................................................ 50, 51, 52, 53, 54

*Levinsohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc*,
    10 F. Supp. 2d 334 (S.D.N.Y. 1998) ............................................................ 86

*Longi v. Cty. of Suffolk*,
    Civ. A. No. 02-5821, 2008 WL 858997 (E.D.N.Y. Mar. 27, 2008) .................. 48

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................................. 20, 22

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
    Civ. A. No. 7064/08, 2009 WL 921381 (N.Y. Sup. Ct. Apr. 7, 2009) .............. 84, 85

*Madanes v. Madanes*,
    981 F. Supp. 241 (S.D.N.Y. 1997) .............................................................. 57

*Makarova v. United States*,
    201 F.3d 110, 113 (2d Cir. 2000) ................................................................ 11

Page(s)

*Maria Christina, Inc. v. Freis*,
    646 F. Supp. 252 (S.D.N.Y. 1986) ................................................................ 86

*McConnell v. FEC*,
    540 U.S. 93 (2003) ............................................................................... 22, 23

*McKinney v. U.S. Dep't of the Treasury*,
    799 F.2d 1544 (Fed. Cir. 1986) ........................................................................ 23

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) ....................................................................... 43, 71

*McLean v. Int'l Harvester Co.*,
    817 F.2d 1214 (5th Cir. 1987) ......................................................................... 77

*Meridien Int'l Bank Ltd. v. Liberia*,
    23 F. Supp. 2d 439 (S.D.N.Y. 1998) ............................................................ 46, 48

*Merrill Lynch, Pierce, Fenner & Smith v. Young*,
    Civ. A. No. 91-2923, 1994 WL 88129  (S.D.N.Y. Mar. 15, 1994) ................................. 72

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) .......................................................................... 80

*Miltenberg & Samton, Inc. v. Mallor*,
    1 A.D.2d 458 (N.Y. App. Div. 1956) .................................................................. 36

*Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*,
    924 F.2d 1237 (2d Cir. 1991) .......................................................................... 17

*Morrison v. Nat'l Australia Bank Ltd.*,
    547 F.3d 167 (2d Cir. 2008),
    *cert. granted*, No. 08-1191, 2009 WL 4111014 (U.S. Nov. 30, 2009) ..... 54, 56, 58, 59, 61

*Musalli Factory For Gold & Jewelry v. JP Morgan Chase Bank*,
    261 F.R.D. 13 (S.D.N.Y. 2009) .................................................................. 83, 85

*N.S. Fin. Corp. v. Al-Turki*,
    100 F.3d 1046 (2d Cir. 1996) ............................................................ 54, 55, 57, 59, 60

*N.Y. Auto Ins. Plan v. All Purpose Agency & Brokerage, Inc.*,
    Civ. A. No. 97-3164, 1998 WL 695869 (S.D.N.Y. Oct. 6, 1998) ............................. 63, 64

*Nat'l Group for Commc'n & Computers Ltd. v. Lucent Techs. Inc.*,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006) ............................................................ 72, 73

*Nevada v. Burford*,
    918 F.2d 854 (9th Cir. 1990) .......................................................................... 21

Page(s)

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
  102 F.3d 660 (2d Cir. 1996)..................................................................... 11

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
  540 F. Supp. 2d 438 (S.D.N.Y. 2007)................................................ 55, 57, 60

*Nowak v. Ironworkers Local 6 Pension Fund*,
  81 F. 3d 1182 (2d Cir. 1996)..................................................................... 78

*Ocean View Capital, Inc. v. Sumitomo Corp.*,
  Civ. A. No. 98-4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ............................ 75

*Oceanic Exploration Co. v. Phillips Petroleum Co.*,
  Civ. A. No. 08-20338, 2009 WL 3698085 (5th Cir. Nov. 6, 2009)................................. 53

*Oetjen v. Cent. Leather Co.*,
  246 U.S. 297 (1918).............................................................................. 41

*Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*,
  437 F.3d 1145 (11th Cir. 2006) ........................................................... 33, 34

*Orenstein v. Figel*,
  Civ. A. No. 09-7060, 2009 WL 5178472 (S.D.N.Y. Dec. 30, 2009) ................................. 3

*Pacurib v. Villacruz*,
  183 Misc.2d 850 (N.Y. Civ. Ct. 1999)............................................................ 35

*Padavan v. United States*,
  82 F.3d 23 (2d Cir. 1996) ....................................................................... 41

*Paris v. Dep't of Nat'l Store Branch (1) Vietnam*,
  Civ. A. No. 99-8607, 2000 WL 777904 (S.D.N.Y. June 15, 2000) ................................. 57

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
  467 F.3d 283 (2d Cir. 2006)..................................................................... 74

*Pearl v. City of Long Beach*,
  296 F.3d 76 (2d Cir. 2002)...................................................................... 49

*Pennsylvania v. New Jersey*,
  426 U.S. 660 (1976)............................................................................. 23

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
  392 U.S. 134 (1968)....................................................................... 33, 34, 35

*Persaud v. Bode*,
  Civ. A. No. 04-4475, 2006 WL 1419397 (E.D.N.Y. Feb. 6, 2006)................................. 66

**Page(s)**

*Peterson v. Sprock,*
   Civ. A. No. 06-3087, 2008 WL 4787351 (N.D. Ga. Oct. 27, 2008) ................................ 77

*Petro-Chem Processing, Inc v. EPA,*
   866 F.2d 433 (D.C. Cir. 1989) ........................................................................ 23

*Pfizer, Inc. v. Gov't of India,*
   434 U.S. 308 (1978)........................................................................................ 20

*PG 1044 Madison Assocs., L.L.C. v. Sirene One, L.L.C.,*
   369 F. Supp. 2d 512 (S.D.N.Y. 2005)............................................................. 86

*Pinter v. Dahl,*
   486 U.S. 622 (1988)........................................................................................ 33

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,*
   507 F.3d 117 (2d Cir. 2007)........................................................................... 74

*Propst v. Ass'n of Flight Attendants,*
   546 F. Supp. 2d 14 (E.D.N.Y. 2008) ........................................................ 62, 64

*Ramos v. Patrician Equities Corp.,*
   765 F. Supp. 1196 (S.D.N.Y. 1991)............................................................... 81

*Regalado Cuellar v. United States,*
   128 S. Ct. 1994 (2008) ................................................................................... 67

*Rein v. Rein,*
   Civ. A. No. 95-4030, 1996 WL 273993 (S.D.N.Y. May 23, 1996) ................ 38

*Republic of Austria v. Altmann,*
   541 U.S. 677 (2004)..................................................................................... 3, 36

*Republic of Iraq v. Beaty,*
   129 S. Ct. 2183 (2009)................................................................................... 17

*Republic of Liberia v. Bickford,*
   787 F. Supp. 397 (S.D.N.Y. 1992)................................................................. 40

*Reves v. Ernst & Young,*
   507 U.S. 170 (1993)........................................................................................ 64

*Rogers v. McDorman,*
   521 F.3d 381 (5th Cir. 2008) .......................................................................... 34

*Rosewood Apts. Corp. v. Perpignano,*
   200 F. Supp. 2d 269 (S.D.N.Y. 2002)............................................................. 88

**Page(s)**

*Rosner v. Bank of China*,
    528 F. Supp. 2d 419 (S.D.N.Y. 2007)........................................................ 61, 63

*Ross v. Bolton*,
    Civ. A. No. 83-8244, 1991 WL 285619 (S.D.N.Y. Dec. 30, 1991) ................................ 34

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
    348 F.3d 1116 (9th Cir. 2003) ........................................................................ 76

*Rotella v. Wood*,
    528 U.S. 549 (2000)........................................................................ 44, 45

*RSM Prod. Corp. v. Fridman*,
    Civ. A. No. 06-11512, 2009 WL 424540 (S.D.N.Y. Feb. 19, 2009)............................... 77

*Salinas v. United States*,
    522 U.S. 52 (1997)........................................................................ 73

*Santodonato v. Clear Channel Broad., Inc.*,
    26 A.D.3d 543 (N.Y. App. Div. 2006) ............................................................ 79

*Scientific Drilling Int'l, Inc. v. Gyrodata Corp.*,
    Civ. A. No. 99-1077, 1999 WL 674511 (Fed. Cir. Aug. 30, 1999)............................... 77

*Seidl v. Greentree Mortgage Co.*,
    30 F. Supp. 2d 1292 (D. Colo. 1998).............................................................. 66

*Serv. Employees Int'l Union on Health and Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001) .................................................................... 26

*Shoaga v. Maersk, Inc.*,
    Civ. A. No. 08-0786, 2008 WL 4615445 (N.D. Cal. Oct. 17, 2008)............................... 78

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)........................................................................ 23

*Simon v. Republic of Iraq*,
    529 F.3d 1187 (D.C. Cir. 2008),
    *vacated on other grounds*, 330 Fed. Appx. 3 (D.C. Cir. 2009) ....................................... 17

*Small v. United States*,
    544 U.S. 385 (2005)........................................................................ 54

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
    262 F. Supp. 2d 217 (S.D.N.Y. 2003).............................................................. 16

*Socialist Republic of Romania v. Wildenstein & Co.*,
    147 F.R.D. 62 (S.D.N.Y. 1993) .................................................................... 14

Page(s)

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004)....................................................................... 88

*Sperber v. Boesky,*
    849 F.2d 60 (2d Cir. 1988)............................................................ 52

*Spool v. World Child Int'l Adoption Agency,*
    520 F.3d 178 (2d Cir. 2008).......................................................... 65

*Staehr v. Hartford Fin. Servs. Group, Inc.,*
    547 F.3d 406 (2d Cir. 2008).......................................................... 45

*State of Sao Paulo of the Fed. Republic of Brazil v. Am. Tobacco Co.,*
    919 A.2d 1116 (Del. 2007) ........................................................... 27

*State of the Netherlands v. Fed. Reserve Bank,*
    201 F.2d 455 (2d Cir. 1953).......................................................... 15

*Statistical Phone Philly v. NYNEX Corp.,*
    116 F. Supp. 2d 468 (S.D.N.Y. 2000).......................................... 49

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998)........................................................................ 20

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van
    Saybolt Int'l B.V. v. Dwyer & Collora LLP,*
    327 F.3d 173 (2d Cir. 2003).......................................................... 69

*Stutts v. De Dietrich Group,*
    Civ. A. No. 03-4058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006) .............................. 85

*Takeuchi v. Sakhai,*
    227 Fed. Appx. 106 (2d Cir. 2007)............................................... 44

*Thai Airways, Int'l Ltd. v. United Aviation Leasing B.V.,*
    842 F. Supp. 1567 (S.D.N.Y. 1994).............................................. 57

*The Sapphire,*
    78 U.S. (1 Wall.) 164 (1870) ........................................................ 13

*THI-Hawaii, Inc. v. First Comm. Fin. Corp.,*
    627 F.2d 991 (9th Cir. 1980) ........................................................ 35

*Thompson v. Thompson,*
    484 U.S. 174 (1988)...................................................................... 77

*To v. Bank of N.Y.,*
    Civ. A. No. 95-7755, 1996 WL 146517 (2d Cir. Apr. 1, 1996) ...................................... 41

Page(s)

*Town of W. Hartford v. Operation Rescue*,
  915 F.2d 92 (2d Cir. 1990)................................................................. 29

*Trafficante v. Metro. Life Ins. Co.*,
  409 U.S. 205 (1972)......................................................................... 26

*Tran v. Alphonse Hotel Corp.*,
  281 F.3d 23 (2d Cir. 2002)............................................................... 45

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
  731 F. Supp. 619 (S.D.N.Y. 1990)........................................ 2, 14, 15, 18

*Tubby's #14 Ltd. v. Tubby's Sub Shops, Inc.*,
  Civ. A. No. 04-70918, 2005 WL 3556199 (E.D. Mich. Dec. 29, 2005).......... 77

*U.S. Football League v. Nat'l Football League*,
  842 F. 2d 1335 (2d Cir. 1988)............................................................ 35

*United States v. Castle*,
  925 F.2d 831 (5th Cir. 1991) ............................................................. 78

*United States v. Chalmers*,
  474 F. Supp. 2d 555 (S.D.N.Y. 2007)................................................. 70

*United States v. Dhafir*,
  577 F.3d 411 (2d Cir. 2009).............................................................. 67

*United States v. Dinome*,
  86 F.3d 277 (2d Cir. 1996)............................................................... 65

*United States v. Feldman*,
  324 F. Supp. 2d 1112 (C.D. Cal. 2004) .............................................. 40

*United States v. Geibel*,
  369 F.3d 682 (2d Cir. 2004).............................................................. 68

*United States v. Nat'l City Bank of N.Y.*,
  90 F. Supp. 448 (S.D.N.Y. 1950)....................................................... 13

*United States v. Turkette*,
  452 U.S. 576 (1981)................................................................... 61, 62

*United States v. Young & Rubicam, Inc.*,
  741 F. Supp. 334 (D. Conn. 1990)...................................................... 68

*USA Certified Merchants, LLC v. Koebel*,
  262 F. Supp. 2d 319 (S.D.N.Y. 2003).................................................. 66

**Page(s)**

*Vasile v. Dean Witter Reynolds Inc.*,
　20 F. Supp. 2d 465 (E.D.N.Y. 1998),
　*aff'd*, 205 F.3d 1327 (2d Cir. 2000) ................................................ 80

*Veltri v. Bldg. Serv. 32B-J Pension Fund*,
　393 F.3d 318 (2d Cir. 2004) ........................................................... 49

*Vicon Fiber Optics Corp. v. Scrivo*,
　201 F. Supp. 2d 216 (S.D.N.Y. 2002) ...................................... 51, 53

*Vieth v. Jubelirer*,
　541 U.S. 267 (2004) ....................................................................... 41

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*,
　493 U.S. 400 (1990) ................................................................ 36, 37

*Warth v. Seldin*,
　422 U.S. 490 (1975) ........................................................ 20, 21, 23

*Whitmore v. Arkansas*,
　495 U.S. 149 (1990) ....................................................................... 21

*Williams v. WMX Techs., Inc.*,
　112 F.3d 175 (5th Cir. 1997) ......................................................... 66

*Wiwa v. Royal Dutch Petroleum Co.*,
　Civ. A. No. 96-8386, 2009 WL 928297 (S.D.N.Y. Mar. 18, 2009) ........ 55

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
　Civ. A. No. 08-0118, 2009 WL 1391807 (2d Cir. May 19, 2009) ........ 44

*Yucyo, Ltd. v. Republic of Slovenia*,
　984 F. Supp. 209 (S.D.N.Y. 1997) ............................................ 14, 41

**Statutes and Rules**

15 U.S.C. § 1 ...................................................................................... 29

15 U.S.C. § 2 ...................................................................................... 29

15 U.S.C. § 3 ...................................................................................... 29

15 U.S.C. § 4 ...................................................................................... 29

15 U.S.C. § 5 ...................................................................................... 29

15 U.S.C. § 6 ...................................................................................... 29

15 U.S.C. § 7 ...................................................................................... 29

Page(s)

15 U.S.C. § 12 .................................................................................................. 76

15 U.S.C. § 13 .................................................................................................. 28

15 U.S.C. § 13(c). ........................................................................................... 75

15 U.S.C. § 15 ............................................................................................. 28, 29

15 U.S.C. § 15(b) ............................................................................................. 46

15 U.S.C. § 15g ................................................................................................ 29

15 U.S.C. § 78dd-2(a)(1) ................................................................................ 69

15 U.S.C. § 78dd-2(c)(1) ................................................................................ 69

18 U.S.C. § 1341 .............................................................................................. 65

18 U.S.C. § 1343 .............................................................................................. 65

18 U.S.C. § 1952 ......................................................................................... 65, 70

18 U.S.C. § 1956 .............................................................................................. 67

18 U.S.C. § 1956(a)(2)(A) .............................................................................. 67

18 U.S.C. § 1961(1) ........................................................................................ 65

18 U.S.C. § 1961(4) ........................................................................................ 61

18 U.S.C. § 1962(c) ........................................................................................ 61

18 U.S.C. § 1964 .............................................................................................. 29

22 U.S.C. § 287 (Note) .................................................................................... 58

28 U.S.C. § 1607 .............................................................................................. 18

31 C.F.R. § 575.201 ......................................................................................... 69

31 C.F.R. § 575.202 ......................................................................................... 88

31 C.F.R. § 575.321 ......................................................................................... 70

Fed. R. Civ. P. 8 .............................................................................................. 24

Fed. R. Civ. P. 8(a)(2) .................................................................................... 11

Fed. R. Civ. P. 12(b)(1) ............................................................................. 11, 54

Page(s)

Fed. R. Civ. P. 12(b)(6)..................................................................................... 11, 50, 54, 77

Fed. R. Civ. P. 44.1 ................................................................................................. 46

Hart-Scott-Rodino Antitrust Improvement Act of 1976, Pub. L. No. 94-435, Title III,
   § 301, 90 Stat. 1394,
   *codified in relevant part* at 15 U.S.C. § 15c(a)................................................ 29

N.Y. C.P.L.R. § 202 (McKinney 2010)................................................................... 46

N.Y. C.P.L.R. § 213(2) (McKinney 2010) ............................................................. 47

N.Y. C.P.L.R. § 213(8) (McKinney 2010) ............................................................. 48

N.Y. Penal Law § 180.00 (McKinney 2010)..................................................... 65, 68

N.Y. Penal Law § 180.05 (McKinney 2010)..................................................... 65, 68

N.Y. U.C.C. § 2-725(1) (McKinney 2010)............................................................. 47

**Treaties, Agreements & International Authorities**

Agreement Concerning Claims Resulting from the Attack on the U.S.S. Stark,
   State Dep't No. 89-106,
   KAV No. 934, 1989 WL 428529 .................................................................. 22, 48

Commentary to the Fourth Geneva Convention (Aug. 12, 1949)................................ 18

Commercial, Economic and Technical Cooperation Agreement Between the Government
   of the United States of America and the Government of the Republic of Iraq,
   T.I.A.S. No. 12020, 1987 WL 348829....................................................... 22, 48

International Express Mail Agreement Between the United States Postal Service and the
   Postal Administration of Iraq,
   T.I.A.S. No. 11609, 1989 WL 436357........................................................ 22, 48

Memorandum of Understanding Between the Secretariat of the
   United Nations and the Government of Iraq on the Implementation
   of S.C. Resolution 986,
   U.N. Doc. SC/3285 (May 20, 1996) ............................................................. 7, 30

Procedures to be Employed by the Security Council Committee Established by
   Resolution 661 (1990) Concerning the Situation Between Iraq and Kuwait in the
   Discharge of its Responsibilities as Required by Paragraph 12 of Security Council
   Resolution 986 (1995),
   U.N. Doc. SC/1996/636 (Aug. 12, 1996) .......................................................... 8

Page(s)

U.N. Security Council Resolution 661,
U.N. Doc. S/RES/661 (Aug. 6, 1990) ................................................................ 5

U.N. Security Council Resolution 687,
U.N. Doc. S/RES/687 (Apr. 3, 1991) ................................................................ 5

U.N. Security Council Resolution 986,
U.N. Doc. S/RES/986 (Apr. 14, 1995) .............................................................. 6

U.N. Security Council Resolution 1483,
U.N. Doc. S/RES/1483 (May 22, 2003) ...................................................... 8, 20

U.N. Security Council Resolution 1511,
U.N. Doc. S/RES/1511 (Oct. 16, 2003) ........................................................ 20

U.N. Security Council Resolution 1546,
U.N. Doc. S/RES/1546 (June 8, 2004) .......................................................... 20

U.N. Security Council Resolution 1905,
U.N. Doc. S/RES/1905 (Dec. 21, 2009) ........................................................ 22

## Other Authorities

2 NY Pattern Jury Instructions Civil 3:20 (2008) ...................................... 78

Black's Law Dictionary (9th ed. 2009) ................................................... 31, 62

Coalition Provisional Authority Order No. 32 § 1 (2003),
*available at* http://www.cpa-iraq.org/regulations/20030909_CPAORD32.pdf. ............. 17

Dep't of Justice Opinion Procedure Release 97-02 (Nov. 5, 1997)
*available at* http://www.justice.gov/
criminal/fraud/fcpa/opinion/1997/9702.html ............................................. 69

Freeman, Alix and Stecklow, Steve, *How Iraq Reaps Illegal Oil Profits*,
Wall St. J. (May 2, 2002) .................................................................. 44

H.R. Rep. No. 94-499 (1976),
*as reprinted in* 1976 U.S.C.C.A.N. 2572 .................................................. 29

Independent Inquiry Committee, Report on the Manipulation of the Oil-For-Food
Programme by the Iraqi Regime
(Oct. 27, 2005) .......................................................................... 8, 43

*Iraq Moves to Take Back Control of Oil Revenue*,
Wall St. J. (Dec. 4, 2000) ................................................................ 44

**Page(s)**

*Iraq:  Illegal Oil Surcharges earn Baghdad Extra $300 Million*,
    Fin. Times (May 13, 2002) ............................................................................ 44

*Iraq: Oil-For-Food Program, International Sanctions, and Illicit Trade*,
    Cong. Research Serv. Rpt. for Congress (Sept. 26, 2002) ................................ 45

Restatement (Third) of Foreign Relations Law of the United States (1987) ................... 13, 14, 15

*SOMO's Customers In Turmoil Over New Premium*, Middle East Economic Survey
    (Nov. 20, 2000) .......................................................................................... 44

*U.N. Aides Cite Payoff Racket in Iraqi "Oil For Food" Plan*,
    N.Y. Times (Mar. 7, 2001) ......................................................................... 44

U.S. Dep't of State, Background Note: Iraq,
    *available at* http://www.state.gov/r/pa/ei/bgn/6804.htm .................................... 4

*Weapons of Mass Destruction – U.N. Confronts Significant Challenges In
    Implementing Sanctions Against Iraq*,
    US GAO (2002)) ......................................................................................... 45

## INTRODUCTION

This case tests whether a plaintiff foreign state that, by its own account, masterminded and benefited from a scheme to mandate improper payments under an international humanitarian program may later recover damages for payments its own state edicts required. As a matter of law, the answer is "no."

The United Nations ("U.N.") established the Oil-for-Food Program (the "Program") in 1996 to provide relief to the people of the Republic of Iraq from sanctions the U.N. imposed on Iraq after its invasion of Kuwait in 1990. Iraq now alleges that its government under Saddam Hussein corrupted the Program by imposing surcharges on sales of Iraqi oil and demanding kickbacks on purchases of humanitarian goods to obtain hard currency for the Iraqi Treasury in violation of the terms of the Program and the underlying sanctions. Despite the central premise of Iraq's allegations — that Iraq's former government orchestrated the payment of the surcharges and kickbacks to fill the nation's coffers — Iraq now claims to have been injured by such payments and seeks to recover as damages three times the amount of surcharges and kickbacks it claims to have extracted from commercial transactions under the Program. For numerous reasons, Iraq's claims should be dismissed.

***The Republic of Iraq under its current government and the Republic of Iraq under the Hussein regime are legally one and the same, as described in Section I, infra.*** Iraq attempts to distinguish itself from "the former Hussein regime." But this effort fails as a matter of law. The Republic of Iraq has existed continuously as a sovereign state since 1932; and, as the Supreme Court has long recognized, the legal attributes "of a sovereign state are vested in the state rather than in any particular government which may purport to represent it." *Guar. Trust Co. v. United States*, 304 U.S. 126, 137 (1938). Thus, "a change in government, regime or ideology has no effect on that state's international rights and obligations because the state continues to exist

despite the change." *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 731 F. Supp. 619, 621 (S.D.N.Y. 1990).

   ***Iraq lacks standing, as shown in Section II, infra.***  Iraq does not (and cannot) allege that it has suffered an "injury-in-fact" sufficient to confer standing to sue under Article III of the Constitution.  Far from alleging that Iraq suffered any harm to its own sovereign and proprietary interests, the alleged schemes benefited Iraq by, for example, supplying additional streams of revenue to Iraq's Treasury.  Nor does Iraq allege that any purported harm was "fairly traceable" to any party other than itself, having engineered the conduct that caused its supposed injuries.

   Iraq's attempt to avoid these deficiencies in its case by pleading, alternatively, that it is proceeding as *parens patriae* on behalf of its citizens, also fails.  Federal courts uniformly have held that *parens patriae* standing is rooted in principles of federalism and therefore is a basis for standing reserved exclusively for the several States, territories, and possessions of the United States, and even then only in limited circumstances not present here.

   ***Iraq's role as mastermind of the Program's alleged corruption entirely bars its claims for three reasons discussed in Section III, infra.***  First, the principle of *in pari delicto* demands that courts not "lend their good offices" to award damages to a plaintiff who participated in the alleged wrongdoing.  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). The doctrine clearly applies here to preclude any award to Iraq, whose own allegations establish that it was the central character, chief beneficiary, and conspiratorial hub of the alleged schemes to corrupt the Program.

   Second, because Iraq was not simply the chief actor in the alleged conspiracy, but a ***state*** actor, adjudication of this case would require this Court to pass upon the validity of Iraq's official acts within its own territory — a task forbidden under the act of state doctrine, which

precludes judicial examination of the validity of acts "by other sovereigns within their own borders." *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004).

Third, perhaps recognizing that these principles undermine its claims, Iraq seeks to distance itself from its history and asks this Court to declare its former government illegitimate. *See, e.g.*, The Republic of Iraq's First Am. Compl. ("FAC") ¶ 220.[1]  Iraq's invitation to do so raises political questions outside the Judiciary's province, as the Supreme Court has instructed that "[p]olitical recognition [of foreign governments] is exclusively a function of the Executive branch." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964).

**As discussed in Section IV, infra, Iraq's claims are also time-barred**.  Iraq's planning of and participation in the alleged wrongdoing give rise to all of the notice necessary for statutes of limitations to have begun running immediately.  Because Iraq knew of the alleged wrongdoing when it masterminded the conspiracy from 1999 to 2002, Iraq's time for bringing suit has long since passed.

**Finally, as discussed in Section V, infra, Iraq fails to establish subject matter jurisdiction for its federal claims, and otherwise fails to state viable claims with respect to each of its federal and state causes of action.**  Iraq has failed to establish this Court's subject matter jurisdiction over its claims.  For example, absent allegations that the alleged wrongdoing implicates domestic conduct and effects, this Court has no jurisdiction over Iraq's federal claims.  Iraq's complaint also fails to allege the necessary elements of its federal claims.  Once it has dismissed Iraq's federal claims, the Court cannot assert supplemental jurisdiction over Iraq's non-federal claims, each of which is also non-actionable because either Iraq fails to plead the

---

[1]   By referring to Iraq's allegations at the motion to dismiss stage, where well-pleaded factual allegations (but not legal conclusions) must be accepted as true, *Orenstein v. Figel*, Civ. A. No. 09-7060, 2009 WL 5178472, at *2 (S.D.N.Y. Dec. 30, 2009) (Stein, J.), the Defendants are neither admitting nor denying the truth of those allegations.

required elements of its causes of action, or its allegations themselves make clear that Iraq's claims fail as a matter of law.

Accordingly, this Court should dismiss Iraq's lawsuit with prejudice.

## BACKGROUND

### A.    The Republic of Iraq.

Iraq became a sovereign state in 1932, joined the U.N. at its founding in 1945, and has since remained a member without interruption. *See* FAC ¶ 204; U.S. Dep't of State, Background Note: Iraq, *available at* http://www.state.gov/r/pa/ei/bgn/6804.htm ("State Dep't Background Note: Iraq"). Iraq was governed first as a constitutional monarchy, until a military coup overthrew the royal family in 1958 and the state became known as the Republic of Iraq. *See* State Dep't Background Note: Iraq. The Ba'ath Party took control of the government by 1963, and in 1979 Saddam Hussein succeeded to the leadership of the Ba'ath Party and the presidency of Iraq. *See id*.

Following an eight-year war against Iran that left Iraq financially devastated but with the largest military in the Gulf region, Iraq invaded oil-rich Kuwait in August 1990. *Id.*; FAC ¶ 225. Among other responses, the U.N. Security Council adopted Resolution 661, a sanctions regime that severely restricted transactions between U.N. member states and Iraq. FAC ¶¶ 241-42; S.C. Res. 661, U.N. Doc. S/RES/661 (Aug. 6, 1990) (Ex. 1).[2]  In January 1991, the United States severed official diplomatic ties with Iraq and led a multinational coalition of forces acting pursuant to Article 51 of the U.N. Charter and Resolutions of the U.N. Security Council to expel Iraq from Kuwait. FAC ¶ 238; State Dep't Background Note: Iraq. Saddam Hussein remained in power, and the sanctions regime, somewhat modified by Security Council Resolution 687,

---

[2]    Documents cited as Exhibits herein are submitted as exhibits to the accompanying Declaration of Brant W. Bishop.

U.N. Doc. S/RES/687 (Apr. 3, 1991) (Ex. 2), also continued.   In March 2003, a U.S.-led coalition invaded Iraq and removed Saddam Hussein and the Ba'ath Party from power.  *See* State Dep't Background Note: Iraq.  A Coalition Provisional Authority ("CPA") was established for administrative purposes in Iraq until an Interim Iraqi Government took power in June 2004, *see* FAC ¶ 21, followed by an Iraqi Transitional Government in May 2005, which was in turn replaced by a permanent constitutional government in May 2006, *see id.* ¶¶ 21-24.

In sum, for the past 77 years, the state of Iraq has continuously existed under various forms of government.  While deploring many of its provocations, abuses and aggression, the international community has recognized Iraq's sovereignty throughout its existence as an independent state.

### B.  The Inception of the Oil-for-Food Program.

On April 14, 1995, the Security Council passed Resolution 986, which established the Oil-for-Food Program as a limited exception to the sanctions regime imposed by Resolution 661 in the wake of Iraq's invasion of Kuwait.  FAC ¶ 271; *see* S.C. Res. 986, U.N. Doc. S/RES/986 (Apr. 14, 1995) (Ex. 3).   Under the Program, Iraq was permitted to sell oil to purchasers of its choice, subject to approval by a Security Council committee (the "661 Committee") composed of the fifteen members of the Security Council.  FAC ¶¶ 317-18, 324, 351; Ex. 3 ¶ 1.   Proceeds from the sale of Iraqi oil were to be "deposited into a UN Escrow Account controlled and monitored by the United Nations" (the "Program Account").  FAC ¶ 285; *see* Ex. 3 ¶ 8.   Iraq then could use these proceeds to purchase certain goods and services from suppliers it selected, subject to approval of the supply contracts by the 661 Committee.  FAC ¶¶ 274, 319, 328-29, 336, 522; *see* Ex. 3 ¶ 8.   The Program thus allowed the U.N. to continue enforcing sanctions on

Iraq, while permitting the provision of increasingly large quantities of goods and services to the Iraqi people.  FAC ¶ 296; *see* Ex. 3.[3]

Under Resolution 986, goods were imported into Iraq only "at the request of the Government of Iraq."  Ex. 3 ¶ 8a(i); *see also* FAC ¶ 329.  Iraq was required to guarantee "their equitable distribution" through a Distribution Plan proposed by Iraq and approved by the U.N. Secretary General, which described the goods to be purchased.  Ex. 3 ¶ 8a(ii); *see also* FAC ¶¶ 280-82, 309.  Resolution 986 did not require the Iraqi government to sell a minimum amount of oil or buy a minimum amount of approved goods, nor did it require Iraq to expend any proceeds of any oil sales.  *See* Ex. 3.  A memorandum of understanding between the U.N. and the Republic of Iraq, dated May 20, 1996, reflected this arrangement.  FAC ¶¶ 279-84; *see* Memorandum of Understanding Between the Secretariat of the United Nations and the Government of Iraq on the Implementation of S.C. Resolution 986, U.N. Doc. SC/3285 (May 20, 1996) ("MOU") (Ex. 4).

Resolution 986 and the MOU affirmed that nothing in the Program "should be construed as infringing upon the sovereignty or territorial integrity of Iraq."  Ex. 3 ¶ 18; Ex. 4 ¶ 3.  Indeed, oil purchasers and goods suppliers under the Program were selected by, and contracted directly with, ministries of the Republic of Iraq.  FAC ¶¶ 323, 329, 331, 339, 522; *see* Ex. 4 ¶ 21 & Annex II ¶ 1.  While contracts were subject to 661 Committee approval, their terms and conditions were negotiated solely between Iraq and the purchasers and suppliers it chose.  *See* FAC ¶¶ 323, 329-31, 335-37, 339, 382; Ex. 4 Annex II ¶ 1.

---

[3]  Resolution 986 also provided that a percentage of funds deposited in the Program Account was to be used to fund a wide range of U.N.-directed activities pertaining to the Iraq/Kuwait cease fire, established under earlier U.N. Resolutions.  These uses included transfers to the Compensation Fund relating to the invasion and occupation of Kuwait, in the amounts directed by U.N. Security Council Resolutions 687 and 705 (1991), and transfers to meet the operating costs of the Special Commission on weapons inspections, pursuant to Resolution 687.  *See, e.g.*, Ex. 3 ¶¶ 8(c), (e).

Sales of oil and purchases of goods by Iraq were monitored by the 661 Committee.  *See* FAC ¶¶ 317, 321-24, 331-35, 1006-07.   All oil contracts were to be monitored to ensure that the "contract price is fair in view of all relevant circumstances" and to ensure that the contracts "do not contain any attempt at fraud or deception."[4]  Independent, U.N.-appointed inspection agents monitored supply shipments arriving in Iraq.  Shipments were to be compared to the U.N.-approved contracts, and irregularities were to be reported to the U.N. Secretary General and the 661 Committee.  Ex. 4 ¶¶ 16, 24-27 & Annex II ¶ 4; FAC ¶¶ 338-39.

### C.    The Operation of the Program.

Although funds generated by the Program were intended for the purchase of humanitarian aid and other purposes, Iraq spent far less than the funds available for those purposes.  Between 1997 and 2003, as alleged in the FAC, Iraq sold approximately $64 billion in oil and purchased approximately $37 billion in goods.  FAC ¶¶ 306, 1104.  During this time, approximately $18 billion was transferred to the Compensation Fund for Kuwait pursuant to ¶ 8(c) of Resolution 986.  *Id.* ¶ 306; Ex. 3 ¶ 8(c).  In May 2003, the Security Council directed the U.N. Secretary General to terminate the Program and initially transfer $1 billion — and later "all surplus funds" — from the Program Account to the Development Fund for Iraq.  *See* S.C. Res. 1483, U.N. Doc. S/RES/1483 (May 22, 2003) (Ex. 6).  Iraq alleges that approximately $9 billion in funds were remaining in the Program Account at the conclusion of the Program.  *See* FAC ¶ 306.

### D.    The Alleged Corruption of the Program.

Iraq alleges that its own government under the Hussein regime "designed and instigated" corruption of the Program in order to obtain illicit revenues, including through the imposition of

---

4    *See* Procedures to be Employed by the Security Council Committee Established by Resolution 661 (1990) Concerning the Situation Between Iraq and Kuwait in the Discharge of its Responsibilities as Required by Paragraph 12 of Security Council Resolution 986 (1995), ¶ 9, U.N. Doc. SC/1996/636 (Aug. 12, 1996) (Ex. 5) (hereinafter "661 Procedures").   Iraq references and quotes from the 661 Procedures in the FAC.  *See* FAC ¶¶ 324, 334-35, 1007.

"kickbacks" on contracts for the sale of goods to Iraq in 1999 and "surcharges" on oil purchases in 2000. FAC ¶¶ 1, 4, 350-92, 521-630, 640-61. In alleging corruption of the Program, the FAC heavily relies upon the Independent Inquiry Committee, Report on the Manipulation of the Oil-For-Food Programme by the Iraqi Regime, dated Oct. 27, 2005 (the "IIC Report") (Ex. 7). *See, e.g.*, FAC ¶ 5 (alleging that the IIC Report "is a detailed analysis of the scope and means of the conspiracy to manipulate the [Program]").[5]

### 1. The Oil Surcharges

Iraq alleges that it "decided to utilize its control to choose [oil] purchasers for its own illicit purposes" by Fall 2000. *Id.* ¶ 350. Iraq began demanding that "anyone who wanted to purchase oil under the Program make payments (surcharges) to bank accounts owned or controlled by the Hussein Regime." *Id.* ¶¶ 363-64, 379. Oil surcharges were collected by the Iraqi Ministry of Oil and the Iraqi State Oil Marketing Organization. *See id.* ¶¶ 369, 458.[6] According to the FAC, because oil surcharge payments were not made to the Program Account, the "surcharge scheme" diminished the funds available to Iraq to purchase goods and services. FAC ¶¶ 1100-02.

Iraq alleges that oil purchase contracts omitting the "surcharges" were submitted to the U.N. for approval, *id.* ¶ 380, that the U.N. approved these contracts, *id.* ¶ 382, and that U.N. oil overseers approved the proposed oil prices, *id.* ¶¶ 320, 324, 382. Although Iraq alleges that the "661 Committee began hearing rumors of the surcharge scheme" in December 2000, it was not until August 2002 that "the U.N. ultimately imposed retroactive oil pricing to ensure oil was

---

5   The Court may take judicial notice of public governmental statements (such as those referenced or cited in the FAC and those integral to Iraq's claims). *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [in a motion to dismiss] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." (citations omitted)).

6   *See also* IIC Report at 11 ("Iraq ordered its Ministry of Oil to collect surcharges"); *id.* at 19 ("The Iraqi State Oil Marketing Organization ('SOMO') ran a highly organized system to collect oil surcharges").

purchased at market rates."  *Id.* ¶¶ 368, 378.  "The institution of retroactive pricing ended the surcharge scheme in approximately August 2002."  *Id.* ¶ 378.

2.  <u>Kickbacks on Humanitarian Goods</u>

Beginning in May 1999, Iraq alleges that it implemented "a variety of schemes to systematically divert funds" in connection with contracts for the supply of goods to Iraq.  *Id.* ¶¶ 521, 524.  Initially, Iraqi officials "demanded that additional 'transportation fees' be paid directly to the Hussein Regime on all shipments of humanitarian goods to Iraq."  *Id.* ¶ 526.  A June 1999 official Iraqi government directive required "all Ministries to impose non-negotiable 'transportation fees' on goods requiring inland delivery."  *Id.* ¶ 527.  "The Regime's Economic and Affairs Committee assigned the fees, and the Ministry of Transportation oversaw their collection."  *Id.*  Iraq allegedly required vendors to pay the transportation fee before allowing goods to enter Iraq.  *Id.* ¶ 535.  In August 2000, the FAC claims Iraq "decided to impose what it called an 'after-sales-service fee' or ASSF on all Program[] contracts," which "significantly increased kickbacks on [Program] purchases."  *Id.* ¶¶ 558, 560.  The FAC further alleges that Iraqi "Vice President Taha Yassin Ramadan directed, in an August 3, 2000 memo, that all funds generated from increased fees were 'to be transferred to general treasury,'" and that Iraqi ministries "kept extensive records" of ASSFs received.  *Id.* ¶¶ 568, 621-28; FAC Exs. 2-9; *see also* FAC ¶¶ 302, 569.

Iraq alleges that the various fees were added to the contract price by the Iraqi government and its suppliers after a mutually acceptable price for the goods was reached.  FAC ¶¶ 531, 533, 573-74.  It further alleges that contracts reflecting the inflated prices were submitted to the U.N. for payment from the Program Account, *id.* ¶¶ 534, 573; that the U.N. approved these contracts, *id.* ¶¶ 534, 601; and that a U.N. inspection agent authenticated the arrival of the goods at the Iraqi border, *id.* ¶¶ 337-38.  Because the contract price was paid from the Program Account, Iraq

alleges, the various fees diminished the funds available to Iraq for purchasing goods and services. *See id.* ¶ 1111.

Finally, the FAC alleges that the Iraqi government "divert[ed] goods from the Iraqi people to other Regime purposes." *Id.* ¶¶ 656, 659.

### E.    The Defendants.

Iraq has named approximately 90 individuals and entities as Defendants, which it categorizes as:  (i) the "Vendor Defendants," 80 purported corporate entities and affiliates, which the FAC alleges to have sold goods to Iraq through the Program, *see id.* ¶¶ 26-70, 81-82, 88-99, 103-85, 188-97, 200-01; (ii) the "Oil Purchasing Defendants," two individuals and three corporate entities the FAC alleges to have been involved in the purchase of Iraqi oil through the Program, *see id.* ¶¶ 83-87, 100-02, 186-87, 198-99; and (iii) the "BNP Defendants," six purported subsidiaries, branches, or affiliates of BNP Paribas, an international bank providing non-discretionary banking services to the U.N. for the Program, *id.* ¶¶ 71-80, 976.[7]

Notwithstanding that Iraq itself claims to have "designed and instigated" the corruption of the Program, *id.* ¶ 4, and notwithstanding that Iraq itself claims to have mandated and received the proceeds of the surcharges and kickbacks under the Program, Iraq now seeks to recover three times the value of these alleged surcharges and kickbacks, asserting claims for (i) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (ii) conspiracy to violate RICO, (iii) fraud, (iv) conspiracy to commit fraud, (v) breach of fiduciary duty, (vi) participation in or

---

[7]    As discussed in greater detail in the Supplemental Memorandum of Law in Support of the Motion of the BNP Paribas Defendants to Dismiss Plaintiff's First Amended Complaint, the BNP Defendants are not alleged (i) to have entered into any contractual arrangements with Iraq to purchase any oil or sell any goods or services under the Program; (ii) to have paid any surcharges or kickbacks to Iraq or (iii) to have had any knowledge of the alleged surcharge and kickback schemes.  References in this brief to "Defendants" allegedly entering into contractual arrangements with Iraq or allegedly making surcharge, transportation fee, or after-sales-service fee payments therefore do not include the BNP Defendants.  Pursuant to the December 18, 2009 Stipulation and Order, the BNP Defendants filed their Supplemental Memorandum of Law to identify additional grounds for dismissal as to them.

inducement of breach of fiduciary duties, (vii) breach of contract, (viii) unjust enrichment, (ix) violation of the commercial bribery prohibitions of the Robinson-Patman Act ("RPA"), and (x) violation of the Foreign Corrupt Practices Act ("FCPA").

## ARGUMENT

Dismissal for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) is required where, as here, "the district court lacks the statutory or constitutional power to adjudicate [the case]." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Dismissal is also required when a complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6). *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff may not satisfy this standard with conclusory allegations; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Likewise, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In deciding a Rule 12(b)(6) motion, courts consider only the facts alleged in the complaint, documents attached thereto as exhibits or incorporated by reference, and matters of which judicial notice may be taken. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996); *Harper v. N.Y. City Hous. Auth.*, Civ. A. No. 09-5303, 2009 WL 3861937, at *2 (S.D.N.Y. Nov. 6, 2009) (Stein, J.).

Under these standards, the FAC should be dismissed.

I.  **THE REPUBLIC OF IRAQ TODAY IS THE SAME SOVEREIGN ENTITY, WITH THE SAME LEGAL RIGHTS AND LIABILITIES, AS IT WAS UNDER THE HUSSEIN REGIME.**

Implicitly recognizing that a party cannot legitimately pursue claims arising from an alleged conspiracy of which it was the mastermind, the Republic of Iraq asks this Court to accept the notion that it is distinct from Iraq under Saddam Hussein's regime.  But this legal characterization, upon which many of Iraq's legal theories are premised, is contrary to well-established law.  Moreover, Iraq's own recent conduct, as well as the "rights" it asserts *in this case*, contradict its effort to present itself as an entity that is legally distinct from Iraq under the former regime.  Just as Iraq has asserted ownership over the funds relating to the Program, *see, e.g.*, FAC ¶¶ 254, 464, and has retained positions in various international treaties and bodies that existed or were established during the Hussein regime, so too must Iraq bear the liabilities and other consequences flowing from the actions of Iraq under prior governments, including the Hussein regime.  As a matter of law, the continuity of the Iraqi state dooms the Republic of Iraq's claims.

A.  **The Rights, Duties, Responsibilities and Liabilities of a Foreign State Survive Changes in the State's Governing Regime.**

In the FAC, Iraq attempts to separate itself today from the Iraq that existed under the Hussein regime.  But Iraq cannot simply reinvent its identity as a state by a shift in governance. The FAC's attempt to distinguish between the "Republic of Iraq," on one hand, *id.* ¶¶ 18-24, and the "Hussein Regime," on the other, *id.* ¶¶ 2, 215-38, fails because the distinction is founded on the legally erroneous notion that a government has different rights and liabilities than the state itself, such that one regime can separate itself from the legal consequences arising from a prior government's actions.

The Supreme Court and courts in this Circuit have long held that "the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it."  *Guar. Trust Co. v. United States*, 304 U.S. 126, 137 (1938); *see also* Restatement (Third) of Foreign Relations Law of the United States ("Restatement") § 208 cmt. a (1987) ("Under international law, the capacities, rights, and duties [of a state] appertain to the state, not to the government which represents it [and] are not affected by a mere change in the regime or in the form of government or its ideology.").  Accordingly, a change in governing regimes — which is all that the FAC alleges — works no corresponding change in the rights and duties appertaining to the state.  *See The Sapphire*, 78 U.S. (1 Wall.) 164, 168 (1870) ("The reigning Emperor, or National Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty.  A change in such representative works no change in the national sovereignty or its rights.").   Just as the rights of a state continue despite regime change, so too do the state's liabilities.  *See, e.g.*, *United States v. Nat'l City Bank of N.Y.*, 90 F. Supp. 448, 452 (S.D.N.Y. 1950) (post-revolutionary Communist-controlled Russia liable on treasury notes issued by a provisional government of pre-revolutionary Russia).

Indeed, it is a bedrock principle of law that a state's rights and liabilities survive even dramatic regime changes.  The Republic of France, for example, was liable for the acts of Emperor Napoleon's government even though he was removed from power by Prussia during an invasion and occupation.  *See The Sapphire*, 78 U.S. (11 Wall) at 167.  Similarly, the Soviet government was treated as an "uninterrupted extension of the empire of the Czars" despite "the cataclysmic character of the Bolshevik revolution."  *Nat'l City Bank of N.Y.*, 90 F. Supp. at 454.  And Sudan "has been only one state" despite having undergone several fundamental regime changes:

13

> a civilian parliamentary government, which lasted until November
> 1958; a military regime, which . . . continued in office until it was
> overthrown by a civilian coup in October 1964, a second civilian
> regime, which was then installed and lasted until May 1969 . . ., a
> 12-month transitional military regime, ushered in by the coup of
> April 1985 . . .; a civilian coalition government which followed the
> general election of April 1986; and the present military regime
> which overthrew the civilian administration on 30 June 1989.

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 731 F. Supp. 619, 622-23 (S.D.N.Y. 1990) (quotations and emphasis omitted).[8]

Only when an entirely new state is created — *i.e.*, "state succession" as opposed to mere transfers of power between "governments" — do existing rights and liabilities sometimes disappear. *Trans-Orient Marine*, 731 F. Supp. at 621. But state succession occurs only in the limited circumstances where the territory or population of a nation undergoes fundamental change. *See* Restatement § 208 cmt. b ("successor state" is "a state that wholly absorbs another state, that takes over part of the territory of another state, that becomes independent of another state of which it had formed a part, or that arises because of the dismemberment of the state of which it had been a part").[9] The FAC never alleges any change remotely that fundamental, and any effort to do so would be patently frivolous. Accordingly, the rights, duties, and responsibilities flowing to Iraq because of the Ba'athist Hussein regime's control of the Iraqi state remain attributable to Iraq despite Hussein's removal from power.

---

[8] *See also Socialist Republic of Romania v. Wildenstein & Co.*, 147 F.R.D. 62, 65 (S.D.N.Y. 1993) (holding successor government in Romania legally responsible for predecessor's litigation strategy notwithstanding the violent overthrow of the Ceausescu dictatorship).

[9] *Compare Yucyo, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209 (S.D.N.Y. 1997) (Slovenia not liable on contracts of the former Yugoslavia because the "Yugoslav government did not merely see its power taken over by a new government[,] [but] [r]ather, Yugoslavia has been dismembered, its boundaries have been dramatically redrawn, and multiple sovereigns exist where once there stood a single nation"), *with Trans-Orient Marine*, 731 F. Supp. at 621 (applying the Restatement's definition to hold that no state succession had occurred in Sudan).

This is so notwithstanding the Hussein regime's despotic practices and its 2003 overthrow by military force.  The Second Circuit long ago held that a change in governments from absolute to constitutional forms does not affect the state's legal status:

> A monarchy may be transformed into a republic, or a republic into a monarchy; absolute principles may be substituted for constitutional, or the reverse; but, though the government changes, the nation remains, with rights and obligations unimpaired.

*Lehigh Valley R. Co. v. State of Russia*, 21 F.2d 396, 401 (2d Cir. 1927).  Courts have repeatedly found continuity of a state's rights and liabilities despite regime changes achieved through force and installation of a new government predicated on entirely different principles or ideologies. *See Trans-Orient Marine*, 731 F. Supp. at 622 ("[T]hat the transitions resulted by way of military coups as opposed to routine, constitutional processes, the re-naming of the nation, the suspension of the constitution, the closing of the borders and the declaration of a state of emergency . . . do[es] not effect a succession of state."); *Jackson v. People's Republic of China*, 550 F. Supp. 869, 872 (N.D. Ala. 1982) (Communist-controlled People's Republic of China obligated on bonds issued by the prior Imperial Chinese government despite a revolution and civil war that brought the Communists to power).

Nor are Iraq's legal rights and duties affected by the institution of a transitional authority from the coalition that ousted the Hussein government.  "Military occupation, whether during war or after an armistice, does not terminate statehood."  Restatement § 201, Reps.' Note 3.  "[I]t is generally agreed that the occupant does not succeed to sovereignty over the occupied territory, but has only limited administrative authority."  *State of the Netherlands v. Fed. Reserve Bank*, 201 F.2d 455, 461 (2d Cir. 1953) (internal citations omitted); *see also* Commentary to the Fourth Geneva Convention (Aug. 12, 1949), at 275 ("[T]he occupation of territory in wartime is essentially a temporary, de facto situation, which deprives the occupied Power of neither its

statehood nor its sovereignty.").  Thus, this Court has held that the temporary U.S. occupation of

Japan following World War II did not disrupt that country's statehood.  *See Japanese Gov't v.*

*Commercial Cas. Ins. Co.*, 101 F. Supp. 243, 245 (S.D.N.Y. 1951) (denying motion to dismiss a

breach of contract claim brought by the Japanese government and taking judicial notice of the

fact that "[t]he occupation has been, essentially, provisional and temporary; Japan has continued

as a sovereign with its rights and powers of sovereignty limited only by the directives of the

[American] Supreme Commander").

> **B.**     **Iraq Has Operated as a Legal Entity During All Relevant Time Periods and Court Decisions and Iraq's Own Actions Confirm that Iraq Continues to Bear Rights and Liability Accrued During the Hussein Regime.**

Iraq could and did operate as a legal entity throughout all relevant time periods.  Prior to

the U.S.-led coalition invasion in 2003, the Republic of Iraq was a recognized international

sovereign able to sue and be sued in United States courts and, in fact, was party to multiple

lawsuits in that period.[10]  Iraq voluntarily elected to participate in some (but not all) of those

suits, demonstrating that it was capable of asserting its rights in U.S. courts.

Iraq remained empowered to act during the Coalition Provisional Authority period.  From

July 13, 2003 to June 1, 2004, the CPA authorized a governing body — the Iraqi Interim

Governing Council — to govern Iraq.  On September 4, 2003, the CPA entered Order Number

32 ("Order 32") which, among other things, "transfer[red] the entity responsible for management

of international litigation, claims and arbitrations involving the Government of Iraq and its

---

[10]   Iraq was involved in at least eight U.S. cases from 1999 to 2003, all as a defendant.  Iraq defaulted in five of those cases.  *See Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004); *Hill v. Republic of Iraq*, 328 F.3d 680 (D.C. Cir. 2003); *In re Tuli*, 172 F.3d 707 (9th Cir. 1999); *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217 (S.D.N.Y. 2003); *Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*, 79 F. Supp. 2d 374 (S.D.N.Y. 2000).  Iraq took some sort of action, however, in the remaining three cases.  In *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19 (D.D.C. 2001), Iraq filed a motion to dismiss.  When the motion was denied, Iraq defaulted.  In the final two cases, Iraq defaulted, and then sought to vacate default and to dismiss the case.  *See First City, Texas-Houston, N.A. v. Rafidain Bank*, 281 F.3d 48 (2d Cir. 2002); *Hyundai Corp. v. Republic of Iraq*, Civ. A. No. 02-7199, 2003 WL 22251349, at *2 (S.D.N.Y. Sept. 30,  2003).  As discussed *infra* at 20, in 2009, Iraq moved to vacate the default judgment entered in *Acree*.

governmental agencies, instrumentalities and companies from the previous regime's Office of

the Council of Ministers to the Ministry of Justice."  Coalition Provisional Authority Order No.

32 § 1 (2003), *available at* http://www.cpa-iraq.org/regulations/20030909_CPAORD32.pdf.

("Order 32") (Ex. 8).   Order 32 transferred authority over litigation from one entity, the

"previous regime's Office of the Council of Ministers," to another entity, "the Ministry of

Justice," thus acknowledging a previously-existing entity capable of litigating on Iraq's behalf

after the invasion and an unbroken transfer of authority to a new entity.  *Id.*[11]

Since then, the D.C. Circuit has held in two separate cases that lawsuits raising claims

based on actions taken by Iraq during the Hussein regime could proceed against Iraq under its

current government.  *See Simon v. Republic of Iraq*, 529 F.3d 1187 (D.C. Cir. 2008), *vacated on

other grounds*, 330 Fed. Appx. 3 (D.C. Cir. 2009); *Beaty v. Republic of Iraq*, 480 F. Supp. 2d 60

(D.D.C. 2007), *aff'd* No. 07-7057 (D.C. Cir. Nov. 21, 2007), *rev'd on other grounds,* 129 S. Ct.

2183 (2009).[12]  Likewise, since the Supreme Court's decision in *Republic of Iraq v. Beaty*, 128

---

11  The continuity of Iraq's sovereignty and statehood throughout the 2003 military invasion and subsequent period
of transitional governance is further demonstrated by resolutions of the U.N. Security Council.  *See, e.g.*, S.C.
Res. 1483 (May 22, 2003) (Ex. 6) ("[r]eaffirming the sovereignty and territorial integrity of Iraq" while at the
same time "recognizing the specific authorities, responsibilities, and obligations … of [the U.S.-led Coalition]
as occupying powers under unified command."); S.C. Res. 1511, U.N. Doc. S/RES/1511 (Oct. 16, 2003) (Ex. 9)
("Underscoring that the sovereignty of Iraq resides in the State of Iraq, …. [r]eaffirm[ing] the sovereignty and
territorial integrity of Iraq, and underscore[ing], in that context, the temporary nature of the exercise [of
governmental power] by the Coalition Provisional Authority"); S.C. Res. 1546, U.N. Doc. S/RES/1546 (June 8,
2004) (Ex. 10) ("[r]eaffirming the independence, sovereignty, unity, and territorial integrity of Iraq" while at the
same time providing that "in connection with the dissolution of the Coalition Provisional Authority, the Interim
Government of Iraq and its successors shall assume the rights, responsibilit[y] and obligations … undertaken by
the Authority" with respect to the Program). This Court may take judicial notice of the Security Council's
actions.  *See Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 924 F.2d 1237, 1244 (2d Cir. 1991).

12  The Supreme Court's subsequent review of these decisions raised no question regarding Iraq's potential liability
for the Hussein regime's actions, much less hold that the current Republic of Iraq is a distinct legal entity from
the Republic of Iraq under the Hussein regime.  Instead the Court dismissed the suits only because new
legislation passed by Congress gave Iraq a sovereign immunity defense against suits in U.S. courts.  *See
Republic of Iraq v. Beaty*, 129 S. Ct. 2183 (2009).  Obviously, any immunity defense Iraq might have does not
cure *defects* in or *defenses to* claims Iraq voluntary files in the United States.  *See First Nat'l City Bank v. Banco
Para El Comercio Exterior de Cuba*, 462 U.S. 611, 620 (1983)  (holding that a foreign nation's statutorily-
provided sovereign immunity is "not intended to affect the substantive law determining the liability of a foreign
state or instrumentality").  Nor did *Beaty* or the legislation it interpreted abrogate the law that in suits a foreign
nation files in U.S. courts, it has no sovereign immunity against any related counterclaims or any unrelated

S. Ct. 2183 (2009) — recognizing that a new legislative enactment gave Iraq the defense of sovereign immunity from suit in U.S. courts — Iraq has sought to open default judgments, asserting that it has "meritorious defenses" to the claims asserted, including sovereign immunity from U.S. court jurisdiction and statute of limitations.  *See Acree v. Republic of Iraq*, Civ. A. No. 06-723 (RWR), 2009 WL 3112822, at *3 (D.D.C. Sept. 30, 2009) (granting motion to set aside default).  It has not, however, claimed that it cannot be held liable because it is somehow a distinct entity from the Hussein regime.  *See id.*  Only in this case has Iraq put forth that legal invention.[13]

Iraq's attempt in the FAC to distance itself from the unwanted liabilities of the Hussein regime — in a way that is contrary to the law — is all the more incredible given its repeated assertion of rights held by Iraq under Saddam Hussein.  For example, Iraq occupies the same seat in the U.N. and its specialized agencies as Hussein-controlled Iraq, and it otherwise holds itself out as a party to treaties entered into by the Hussein regime.[14]  Even more illustrative is this very

counterclaims that do not exceed the amount of the sovereign's claim.  *See* 28 U.S.C. § 1607 (foreign state has no immunity with respect to counterclaim arising out of the same transaction or occurrence that is the subject of the foreign state's suit, or to the extent the counterclaim does not seek relief exceeding or differing in kind from that sought by the foreign state).

13  *See also Bulgartabac Holding AD v. Republic of Iraq*, Civ. A. No. 08-06502-RJH, 2009 WL 3113252, at *6-7 (S.D.N.Y. Sept. 30, 2009) (holding that contract of pre-war government constituted "commercial activity" of Republic of Iraq but dismissing on other grounds).  Moreover, at least one federal magistrate judge has applied these principles to conclude that Iraq today is the same state that existed under Saddam Hussein and thus may be held responsible for actions of the former regime.  *See Kalasho v. Republic of Iraq*, Civ. A. No. 06-11030, 2007 WL 2683553, at *5-6 (E.D. Mich. Sept. 7, 2007).  Although this decision was ultimately rejected on other grounds by the district judge, the Magistrate stated that "the current Republic of Iraq … is the same 'foreign state' against whom Plaintiffs bring their claims, notwithstanding the regime change" and that "throughout the[] incremental changes in power from Saddam's Ba'athist regime to the current government, Iraq has maintained its status as a state, or nation."  *Id.* (citing *Trans-Orient Marine*, 731 F. Supp. at 622; *Lehigh Valley*, 21 F.2d at 401).

14  *See, e.g.*, Agreement Concerning Claims Resulting from the Attack on the U.S.S. Stark, State Dep't No. 89-106, KAV No. 934, 1989 WL 428529 (entered into force Mar. 28, 1989); Commercial, Economic and Technical Cooperation Agreement Between the Government of the United States of America and the Government of the Republic of Iraq, T.I.A.S. No. 12020, 1987 WL 348829 (entered into force Oct. 27, 1987); International Express Mail Agreement Between the United States Postal Service and the Postal Administration of Iraq, T.I.A.S. No. 11609, 1989 WL 436357 (entered into force June 15, 1989); *cf.* Letter dated 13 Dec. 2009 from Prime Minister of Iraq addressed to the President of the Security Council, *attached to* S.C. Res. 1905, U.N. Doc.

case, where Iraq bases its claims on an assertion of legal entitlement to Program funds generated by the prior regime's oil sales. Iraq may not invoke the historical rights and privileges of the Iraqi state while simultaneously denying obligations and liabilities springing from the same source.

Because the rights and liabilities of a nation belong to the state, not its government, and because the overthrow of the Hussein regime did not effect a succession of state, the current Iraqi regime stands on the same legal ground that Saddam Hussein's regime would have stood upon had it brought these claims. The result is that this litigation, at its core, asks whether the mastermind of an alleged conspiracy can pursue claims against and recover damages from the alleged secondary participants in that conspiracy — *i.e.*, whether the admitted conspiratorial "hub" can sue the alleged "spokes." For the manifold reasons outlined below, the law's answer is emphatically "no."

## II.   IRAQ LACKS BOTH ARTICLE III AND *PARENS PATRIAE* STANDING TO ASSERT ANY OF ITS CLAIMS.

Iraq purports to bring this action both in its sovereign capacity and as *parens patriae* on behalf of the people of Iraq. *See* FAC ¶ 17. But Iraq lacks Article III standing to bring these claims in its sovereign capacity, and a foreign government cannot assert standing as *parens patriae* in U.S. courts. All of Iraq's claims therefore should be dismissed.

### A.   Iraq Lacks Article III Standing Because It Fails to Allege Any Particularized Injury Fairly Traceable to Defendants' Conduct.

Iraq fails to satisfy the requirements for constitutional standing to raise its allegations in federal court. At its "irreducible constitutional minimum," Article III standing requires that (1) a

---

S/RES/1905 (Dec. 21, 2009) (Ex. 11) ("Iraq is committed to finding a satisfactory solution to the problem of the debts and claims that it inherited from the previous regime."); S.C. Res 1483, U.N. Doc. S/RES/1483 (May 22, 2003) (Ex. 6) (agreeing "to fulfil[l] all remaining obligations related to the termination of the Program[]" and assuming the responsibility to contribute five percent of its oil revenues to Kuwait as reparations for Gulf War misconduct).

plaintiff "suffered an 'injury in fact'"; (2) the plaintiff's injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is "likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted); *see also Karim v. AWB Ltd.*, Civ. A. No. 06-15400, 2008 WL 4450265 (S.D.N.Y. Sept. 30, 2008) (holding that Iraqi citizens lacked Article III standing to assert RICO claims based on alleged corruption of the Program), *aff'd*, No. 08-5185, 2009 WL 3161363 (2d Cir. Oct. 2, 2009).   To sue on its own behalf, a foreign nation must satisfy the same Article III standing requirements as any other plaintiff.  *See Pfizer, Inc. v. Gov't of India,* 434 U.S. 308, 318-319 (1978); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 408-09 (1964).  And Iraq, both in its sovereign capacity and as *parens patriae*, must satisfy these constitutional standing requirements of Article III — injury in fact, fair traceability and likely redressability — even if it were otherwise eligible to assert the injuries of and sue as *parens patriae* on behalf of the Iraqi people.  *See Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 338 (2d Cir. 2009) (analyzing claim under both *Lujan*'s Article III standard and *parens patriae* doctrine; reserving the question whether state entitled to assert *parens patriae* standing must satisfy both).[15]

Article III standing is a "'threshold question that must be resolved . . . before proceeding to the merits.'"  *Karim*, 2008 WL 4450265, at *2 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998)).   Iraq bears the burden of establishing standing, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006); *Warth v. Seldin,* 422 U.S. 490, 508, 518 (1975), which "cannot be inferred argumentatively from the averments in the pleadings," *Faggionato v. Lerner*, 500 F. Supp. 2d 237, 243 (S.D.N.Y. 2007) (citing *FW/PBS, Inc. v. Dallas*,

---

15  For the reasons discussed in section II.B., Iraq may not sue as *parens patriae* on behalf of the Iraqi people. Even assuming it were permitted to assert the injuries of its citizens as *parens patriae*, Iraq would, among other things, fail to establish the Article III requirements of fair traceability, as set forth in section II.A.2.

493 U.S. 215, 231 (1990)).  Consequently, where, as here, standing is not properly alleged, the

complaint must be dismissed without further inquiry.  *See Warth*, 422 U.S. at 517-18; *Whitmore*

*v. Arkansas*, 495 U.S. 149, 155 (1990).

### 1.   Iraq Does Not, and Cannot, Allege Injury-in-Fact.

Iraq lacks Article III standing because it has failed to allege that it was injured by

Defendants' alleged conduct.  To comply with the "injury-in-fact" requirement, a foreign nation

must assert that it has incurred a discernable injury to its interests *as a state* (*e.g.*, its interests in

maintaining its boundaries, owning land or conducting a business venture) that is *separate* from

any damages caused to its citizens.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.

592, 601-02 (1982); *Estados Unidos Mexicanos v. DeCoster,* 229 F.3d 332, 336 n.3 (1st Cir.

2000); *Nevada v. Burford*, 918 F.2d 854 (9th Cir. 1990).  Thus, just as with a U.S. state, a foreign

nation cannot assert claims in its sovereign capacity based on damages suffered by its citizens.

*See Hawaii v. Standard Oil Co. of Calif.*, 405 U.S. 251, 259 n.12 (1972) (in order to invoke

Article III standing, a "State must bring an action on its own behalf and not on behalf of

particular citizens").  For example, in *Dominican Republic v. AES Corp.,* the U.S. District Court

for the Eastern District of Virginia held that the Dominican Republic alleged "concrete and

actual injury" when coal ash dumped by defendants contaminated its land and waters, but

nonetheless lacked standing to assert a claim based on a decline in tourism resulting from the

pollution.  466 F. Supp. 2d 680, 687-88 (E.D. Va. 2006).  Concluding that the "injury" to tourism

was "not concrete enough," the court stated, *inter alia*, that "the tourist industry suffered the

injury, not the Government of the Dominican Republic directly."  *Id.* at 688.  The court further

held that the Dominican Republic lacked standing to assert claims for costs incurred by its

state-run health system in caring for persons injured by the pollution because those alleged

injuries were suffered by specific persons, who, even if they did not pay for their treatment, must sue individually. *Id.*[16]

Similarly here, although Iraq asserts in conclusory fashion that it is pursuing claims in its sovereign capacity, *see* FAC, Preamble & ¶ 17, the FAC is devoid of allegations that articulate how Iraq itself has been harmed. Far from being injured, Iraq was the *recipient* of the funds and goods allegedly diverted from the humanitarian program established to help its citizens. The FAC repeatedly alleges that the Iraqi government mandated the acts complained of and directed the funds at issue into the Iraqi Treasury. *See id.* ¶¶ 4, 302, 363-65, 367, 395, 400, 412, 426, 446, 453, 468, 469, 473-74, 493, 526-27, 536, 547-48, 550, 562, 565, 568-69, 599, 620, 656, 658--60, 733, 749, 1074, 1079-80. Iraq thus seeks a windfall in this case: damages for "fees" and "surcharges" it has already collected and for goods it allegedly "diverted for its own uses." As a matter of law, however, a party that is "whole" is barred from maintaining a lawsuit because it "lack[s] a legally cognizable interest in the outcome." *Ariz. Elec. Power Coop., Inc. v. Fed. Energy Regulatory Comm'n*, 631 F.2d 802, 808 (D.C. Cir. 1980).

### 2. Any Purported Harm Suffered by the Republic of Iraq or Its Citizens Is Not Fairly Traceable to Defendants' Alleged Conduct.

Iraq also lacks standing because it does not allege the necessary "causal connection between the injury and the conduct complained of," as required by *Lujan*. 504 U.S. at 560.

The causal chain is broken here because any purported injury to Iraq was self-inflicted, stemming from its own self-described volitional conduct. *See McConnell v. FEC*, 540 U.S. 93, 153 (2003) (plaintiffs lacked standing to challenge election statute because alleged injury arose from plaintiffs' personal decisions not to solicit or accept permissible large campaign

---

[16] *Cf. In re Tobacco/Governmental Health Care Cost Litig.*, 83 F. Supp. 2d 125, 126 (D.D.C. 1999), *aff'd*, 249 F.3d 1068 (D.C. Cir. 2001) (dismissing Guatemala's suit to recover costs incurred in treating its citizens' smoking related illnesses because the alleged injury was (i) "completely derivative of the injuries suffered by individual Guatemalan smokers" and (ii) "too remote").

contributions rather than from statute itself).[17]  Iraq unequivocally alleges that it "designed and instigated" the alleged "corruption" of which it now complains.  FAC ¶ 4.  Indeed, the FAC expressly asserts that each facet of the alleged "corruption" was instituted by the Iraqi government, including: its (i) imposition of oil surcharges and fees on goods, *id*. ¶¶ 363, 527, 558; (ii) diversion of goods to Iraqi government ministries, *id*. ¶ 656; (iii) resale of goods to third parties, *id*. ¶ 660; (iv) underpricing of oil allocations to gain political favors, *id*. ¶ 357; and (v) acceptance of substandard and overpriced products in order to receive kickbacks, *id*. ¶ 644. Accordingly, any "injury" suffered by Iraq resulted from its own volitional conduct, thereby severing the chain of causation required to establish standing.  *See McConnell*, 540 U.S. at 153.

Iraq also lacks standing because its allegations of harm attributable to Defendants are inherently speculative.  Standing does not exist where "[s]peculative inferences are necessary to connect [plaintiff's alleged] injury to the challenged actions of [defendants]," or where the alleged injury "results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42, 45-46 (1976).[18]  Here, any asserted causal connection between Defendants' alleged conduct and the injuries alleged hinges on the intervening discretionary actions of the U.N. and multiple arms of the Iraqi government.  It is

---

[17]  *See also Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (states lacked standing to challenge other states' income tax on non-resident employees because their injury — decreased tax income — was "self-inflicted" by their own decision to credit taxpayers for taxes paid to other states); *Petro-Chem Processing, Inc v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (trade organization lacked standing to challenge agency decisions allowing members' competitors to use less expensive methods of hazardous waste disposal because claimed injury was "completely due to the [plaintiff's] own fault as to break the causal chain"); *McKinney v. U.S. Dep't of the Treasury*, 799 F.2d 1544, 1555-56 (Fed. Cir. 1986) (longshoremen's association lacked standing to challenge U.S. Treasury determination that certain Soviet goods not subject to bar on import of goods produced by forced labor because asserted injury would result from "a volitional action . . . carried out with full awareness of the potential of adverse consequences").

[18]  *See also Cuno*, 547 U.S. at 339-44 (state taxpayers lacked standing to challenge a tax exemption that allegedly depleted public funds because economic effects of exemption depended upon government policy decisions); *Allen v. Wright*, 468 U.S. 737, 757-58 (1984); *Warth*, 422 U.S. at 507; *Evans v. Lynn*, 537 F.2d 571, 598 (2d Cir. 1976) .

impossible to know how much Program revenue might have been generated or how many goods and services might have been purchased in the absence of the surcharge and kickback schemes Iraq alleges. In fact, this Court, in an opinion by Judge Lynch, has held that Iraqi citizens lacked standing to challenge alleged vendor kickbacks under the Program because, among other reasons, "whether or not the payment of kickbacks actually caused the plaintiffs to receive fewer benefits is a matter of speculation and conjecture." *Karim,* 2008 WL 4450265, at *4 ("[T]he allegation that the Hussein regime would have distributed more benefits to the Iraqi population in general, including plaintiffs, but for the alleged kickback scheme is 'conjectural or hypothetical,' not 'actual or imminent,' as required to show injury-in-fact.").

For example, the FAC not only fails to establish, but actually contradicts the notion that Defendants' conduct resulted in a net diminution of Program Account funds. Even if Oil Purchasing and Vendor Defendants had not contracted with Iraq on the terms Iraq claims it imposed, there is no basis in the FAC for supposing that Iraq would have contracted with others on different terms. To the contrary, the FAC alleges that the kickbacks and surcharges were *mandatory* for *any* corporation participating in the Program. FAC ¶¶ 363, 526, 558. And it asserts that absent the financial incentive provided by kickbacks and surcharges, Iraq would not have sold or purchased anything at all. *See id.* ¶ 1140; *accord* ¶¶ 265-68, 276, 300, 302. The notion that the Program would ever have operated in an ideal fashion is pure speculation and contradicted by its own pleading. Accordingly, the Court may not credit that suggestion in determining a motion to dismiss. *See, e.g., In re Livent, Inc. Noteholders Sec. Litig.,* 151 F. Supp. 2d 371, 405-07 (S.D.N.Y. 2001) (Fed. R. Civ. P. 8 does not grant plaintiff "license to plead inconsistent *assertions of facts* within the allegations" serving as predicates for a claim; "[t]hus, a court need not feel constrained to accept as truth conflicting pleadings that make no

sense, . . . or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely.").

Likewise, it is manifestly speculative to assume that Defendants' alleged conduct caused any diminution in the amount or quality of goods and services purchased and delivered to the Iraqi people.  Iraq was under no obligation to purchase or deliver any set amount or any particular quality of goods or services.  *See* MOU ¶ 22) (Ex. 4) ("Each export of goods to Iraq shall be at the request of the Government of Iraq."); *see also* U.N. S.C. Res. 986 ¶ 8(a)(i) (Ex. 3), MOU ¶¶ 6, 21 (Ex. 4).  Moreover, not all proceeds deposited in the Program Account went to purchasing goods and services — significant portions were set aside for other purposes.  *See* U.N. S.C. Res. 986 ¶ 8(c)-(g) (Ex. 3).

Further, various independent intervening factors, including market dynamics, the decisions of the Iraqi government, and the U.N. approval processes, dictated how much oil was sold or how many goods and services were ultimately provided to Iraq.  As the Court in *Karim* recognized, "it is also possible that the Hussein regime sold more oil than it otherwise would have in order to pay for the kickbacks, or that the amount of goods distributed was dictated by the U.N.-approved distribution plan, rather than by the amount of funds available in the [Program Account]."  2008 WL 4450265, at *4.  Indeed, Iraq's own allegations indicate that while some $43 billion was available to Iraq over the course of the Program, only $28 billion in goods was actually delivered.  FAC ¶ 1125.  These unexpended funds "suggest[ ] that something other than the [Program Account] balance was the constraint on the amount of humanitarian aid distributed by the Hussein regime." *Karim*, 2008 WL 4450265, at *4.[19]

---

[19]   This $15 billion difference far exceeds the $1.5 billion in alleged vendor kickbacks and the $358 million to $2 billion allegedly "diverted" by the oil surcharges.  *See* FAC ¶ 1110.  The substantial difference between the proceeds deposited into the Program Account and the amount of money spent on humanitarian goods indicates that kickbacks and surcharges were not the constraint on the amount of aid available.

**B.    Iraq Lacks *Parens Patriae* Standing, Which Extends Neither to Foreign Nations at All, Nor to Claims Brought Even by U.S. States Under RICO, the RPA, or the FCPA.**

Iraq's standing deficiencies are not cured by its attempt to invoke the doctrine of *parens patriae* on behalf of Iraqi citizens.  The doctrine of *parens patriae* is a narrow, judicially-created doctrine based entirely upon principles of federalism that, in limited circumstances, permits U.S. States to seek redress for injuries to their "quasi-sovereign" interests.  *DeCoster*, 229 F.3d at 335 (citing *Snapp*, 458 U.S. at 600); *see also Standard Oil Co.*, 405 U.S. at 257-59.[20]   As shown below, *parens patriae* standing is not available to foreign nations under any circumstances, much less to pursue the claims alleged here.  Moreover, not even U.S. States may assert *parens patriae* standing for claims arising under RICO, the RPA, or the FCPA.

1.    Iraq, a Foreign Nation, Lacks *Parens Patriae* Standing.

As a foreign nation, Iraq may not invoke *parens patriae* standing.  Observing that the Supreme Court has never recognized *parens patriae* standing in a foreign nation, the First Circuit in *DeCoster* held that "*parens patriae* standing should not be recognized in a foreign nation unless there is a clear … intent to grant such standing expressed by the Supreme Court or by the two coordinate branches of government."  229 F.3d at 336 (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)).  Defendants have found no case in which a foreign nation has gained access to U.S. courts (on either federal or state law claims) by invoking the *parens patriae* doctrine.  *See Serv. Employees Int'l Union on Health and Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1073 (D.C. Cir. 2001) (existence of *parens patriae* standing by a foreign nation is a "dubious assertion at best"); *accord State of Sao Paulo of the Fed. Republic of Brazil*

---

[20]   Quasi-sovereign interests "are not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party," but "consist of a set of interests that the State has in" (1) "the health and well-being — both physical and economic — of its residents in general," and (2) "not being discriminatorily denied its rightful status within the federal system."  *Snapp*, 458 U.S. at 602, 607.

*v. Am. Tobacco Co.*, 919 A.2d 1116, 1121-22 (Del. 2007) (denying *parens patriae* standing for Sao Paulo because "*parens patriae* standing is reserved for U.S. States which, in certain limited circumstances are permitted by the federal courts to assert claims on behalf of their citizens"). Nor has any intent to grant foreign states *parens patriae* standing been announced by any branch of the U.S. government.

There are at least three reasons Iraq does not have *parens patriae* standing.  First, the *parens patriae* standing doctrine "derives from important principles underlying [the] federal system" that are inapplicable to foreign nations.  *DeCoster*, 229 F.3d at 337.  In certain respects, "the States have surrendered . . . their sovereignty to the federal government and, in return, are given recourse to solve their problems with other States."  *Id.*  Moreover, "States require a sufficiently independent forum to resolve their disputes with one another," which is expressly grounded in the Constitution's grant of original jurisdiction to the Supreme Court over suits between States or between a State and a citizen of another State.  *Id.*  Of course, "neither of these two federalism justifications applies" to a foreign nation.  *Id.* at 338; *see also State of Sao Paulo*, 919 A.2d at 1122 (following the reasoning of *DeCoster* and holding that foreign governments lacked *parens patriae* standing to recover medical expenses incurred in treating citizens who smoked defendants' tobacco products).

Second, extending *parens patriae* to foreign nations would raise serious separation-of-powers concerns.  The "conduct of the foreign affairs . . . is committed to the Executive and to the Congress."  *DeCoster*, 229 F.3d at 340.  In *DeCoster*, the court cautioned against "imping[ing] on the Executive's treaty-making prerogatives or . . . assum[ing] that courts have the institutional competence to perform functions assigned elsewhere by the Constitution."  *Id.* The court stressed that the Executive, unlike the Judiciary, can require reciprocal protection of

American interests before extending certain rights to foreign nations. "The ability of the other branches to secure such reciprocity could be undermined if the Judiciary did not adhere to the principle of non-interference." *Id.*

Finally, *parens patriae* standing is unsupported by "any principle of customary international law." *Id.* at 339. "*Parens patriae* is not mentioned as an established principle of international law in either the Restatement . . . or any major treatise in the field." *Id.* at 340 n.10. While "[c]omity permits foreign nations to sue in our courts if they meet the normal standing requirements imposed on individuals . . . *parens patriae* standing goes beyond normal standing requirements." *Id.* at 339-40 (internal citations omitted). The law simply does not afford foreign states such preferential standing in federal court.

### 2.   Neither the RPA, RICO, Nor the FCPA Permits a *Parens Patriae* Action.

Iraq's claims also fail because none of the statutes under which it asserts a claim — the RPA, RICO, or the FCPA — allows even U.S. states to seek damages as *parens patriae*. Courts are not permitted to expand *parens patriae* absent "a clear expression of a congressional purpose to make it so." *Standard Oil*, 405 U.S. at 264.

*Parens patriae* standing plainly is not available under the RPA, an amendment to Section 2 of the Clayton Act.[21]   Defendants are aware of no case in which any U.S. State, much less a foreign nation, has been granted standing to bring a RPA action for damages as *parens patriae*. To the contrary, in *Standard Oil*, the Supreme Court held that Section 4 of the Clayton Act, 15 U.S.C. § 15 — which, like RICO and the RPA, provides a remedy for any person "injured in its business or property" by reason of a violation — does not confer *parens patriae* standing even on U.S. states to seek damages for injuries to their quasi-sovereign interests. *Standard Oil*, 405

---

[21]   Principally codified at 15 U.S.C. § 13.

U.S. at 265.  Congress responded by amending Section 4 of the Clayton Act to authorize state attorneys general to invoke *parens patriae* standing for *certain antitrust* actions.[22]   But this limited grant of *parens patriae* standing does not extend to claims arising under the RPA.  Indeed, the legislative history confirms that Congress expressly considered and rejected *parens patriae* standing for RPA actions.  *See* H.R. Rep. No. 94-499, at 10 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 2572, 2579 ("The Assistant Attorney General recommended that [RPA actions] not be included, and the committee agreed that they are not appropriate for *parens patriae* actions.").[23]

Nor is *parens patriae* standing available for Iraq's RICO claims.  In enacting the civil RICO statute, Congress adopted the Clayton Act's civil remedies language, which provides recourse to "[a]ny person injured in his business or property by reason of a violation."  18 U.S.C. § 1964.  That provision allows both foreign nations and domestic states to bring actions for specific injuries to their own "business or property," but does not authorize *parens patriae* actions seeking damages for injuries to their general economy or the well-being of their people.  *Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 103 (2d Cir. 1990) (citing *Standard Oil*).  Although, as noted above, Congress amended the Clayton Act to allow *parens patriae* actions in certain antitrust actions by U.S. states, it made no similar change in RICO "[d]espite the existence of identical language in the RICO statute and despite [the RICO statute's] reliance on

---

[22]   *See* Hart-Scott-Rodino Antitrust Improvement Act of 1976, Pub. L. No. 94-435, Title III, § 301, 90 Stat. 1394, *codified in relevant part* at 15 U.S.C. § 15c(a).

[23]   Even with respect to those provisions which, unlike the RPA, may be the subject of a *parens patriae* claim (namely 15 U.S.C. §§ 1-7, the enabling legislation contemplates use of *parens patriae* standing by only U.S. States and territories or possessions.  15 U.S.C. § 15g ("The term 'State' means a State, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.").  Had Congress intended to allow *parens patriae* standing for foreign nations, it could have expanded its definition accordingly.  *See, e.g.*, 15 U.S.C. § 15 (providing the definition for the term "foreign state").  Indeed, that Congress focused only on U.S. entities is to be expected in light of, and further confirms, the general bar on foreign states' *parens patriae* standing.  See supra Part II.B.1.

the Clayton Act model in enacting RICO." *Illinois v. Life of Mid-Am. Ins. Co.*, 805 F.2d 763, 767 (7th Cir. 1986) (internal quotations omitted).  In "the face of [this] congressional inaction," it is plain that "the maintenance of such an action was not intended by Congress." *Id.* (holding that state could not bring *parens patriae* suit for RICO damages).[24]

Finally, the FCPA does not support *parens patriae* standing for a civil damages remedy because it does not even create a private right of action.  *See* § V.C, *infra*.  No U.S. State or foreign nation has standing to bring an FCPA civil damages suit in any capacity, much less as *parens patriae*.

*   *   *

For all these reasons, Iraq lacks standing to pursue its claims, either directly or as *parens patriae*, and the FAC should be dismissed.

## III.    IRAQ'S OWN ADMITTED MISCONDUCT BARS ITS CLAIMS.

Not only does Iraq's role as the mastermind of the conspiracy it alleges vitiate its attempt to establish standing, it also gives rise to other fatal deficiencies.  In particular, as described in subsection A, *infra*, the *in pari delicto* doctrine completely bars Iraq's claims as a matter of law — a primary wrongdoer may not recover from secondary participants in the alleged scheme. Iraq attempts to evade this bar by distinguishing itself from, and challenging the legitimacy of its prior government.  But that ploy runs head-long into two other obstacles.  First, as discussed in subsection B, *infra*, the act of state doctrine precludes the Court from passing on the lawfulness or validity of the acts (particularly revenue raising measures) of a sovereign nation.  Second, as discussed in subsection C, *infra*, the FAC's allegation that the Hussein regime was not a

---

24  *See also Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 979 (9th Cir. 2008) (political subdivision injured only "in its sovereign and/or quasi-sovereign capacities" is not statutorily entitled to bring RICO claim).

legitimate government would require the Court to decide a political question that is committed to the sole authority of the Executive Branch.

**A.    Iraq's Claims Are Barred by the *In Pari Delicto* Doctrine.**

Because Iraq participated in (and masterminded) the alleged misconduct, Iraq's claims are barred by the *in pari delicto* doctrine.  Courts long have refused to "lend their good offices" to claims brought by parties who themselves are wrongdoers in the alleged injurious conduct. *Bateman Eichler, Hill Richards, Inc. v. Berne*, 472 U.S. 299, 306 (1985).  Here, Iraq concedes that the alleged conspiracy at the heart of its claims "was designed and instigated by the Hussein Regime."  FAC ¶ 4.  Because the Republic of Iraq today is, as a matter of law, the same legal entity that it was when governed by the Hussein regime, *see supra* § I, such that the acts of the Hussein regime are attributable to Iraq, the *in pari delicto* doctrine precludes Iraq from pursuing claims based on Defendants' alleged participation in a conspiracy that Iraq planned and executed.

1.    The Allegations in the FAC Fall Squarely Within the *In Pari Delicto* Doctrine.

*In pari delicto* embodies the common sense principle that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing."  Black's Law Dictionary 862 (9th ed. 2009).  A plaintiff may not recover damages where he bears "at least substantially equal responsibility for his injury."  *Bateman Eichler*, 472 U.S. at 307.  "[C]ourts may appropriately apply the doctrine of *in pari delicto* on a motion to dismiss on those occasions when . . . issues of relative fault between the parties to the litigation[] are clearly established by the allegations on the face of the complaint."  *Buckley v. Deloitte & Touche USA LLP*, Civ. A. No. 06-3291, 2007 WL 1491403, at *15 (S.D.N.Y. May 22, 2007) (Stein, J.).

Setting aside the unavoidable fact that Iraq was the beneficiary of the payments on which its claims rest, the FAC describes in abundant detail Iraq's own responsibility for any injuries it alleges. Iraq admits that the "corruption" and "conspiracy" it challenges were "designed and instigated by the Hussein Regime," FAC ¶¶ 1-2, 4, and the FAC amply details how the Iraqi government planned and executed the various components of the alleged conspiracy. For example, the FAC alleges that the "Hussein Regime decided to *utilize its control* to choose [oil] purchasers for *its own illicit purposes*" and thereafter allegedly used "oil vouchers as bribes" and also "*demanded* that anyone who wanted to purchase oil under the Program[] make payments (surcharges) to bank accounts owned or *controlled by the Hussein Regime*." *Id.* ¶¶ 350, 354, 363.[25] The FAC also alleges that the "Hussein Regime retained the right to choose the parties from which it would purchase goods . . . [and] used this power to *induce participation in a corrupt scheme* to divert funds from their humanitarian purposes." *Id.* ¶¶ 522-23. The Iraqi government allegedly carried out this scheme by "*demand[ing]* that . . . 'transportation fees' be paid directly to the Hussein Regime on all shipments of humanitarian goods to Iraq," *id.* ¶ 526, and by "*allow[ing]* vendors to include the fees in their contract prices," *id.* ¶ 531. Similarly, it was the Iraqi government that "*decided to impose* . . . an 'after-sales-service fee' . . . on all Program[] contracts," *id.* ¶ 558, and that "*approved*" the receipt of allegedly substandard products, *id.* ¶ 644. Finally, the FAC alleges that the Iraqi government "commonly *diverted*," "*appropriated*," or even "*resold*" goods meant to benefit the Iraqi people, *id.* ¶¶ 658, 660.

In all these alleged schemes, Iraq is the central character, primary beneficiary, and conspiratorial hub. Moreover, the FAC cites various official Iraqi government directives and orders establishing and operating the alleged conspiracy. *See id.* ¶¶ 302, 527. Given all this,

---

[25] Unless otherwise noted, all emphases in quotations from the FAC are added.

there can be no doubt Iraq acted not only *in pari delicto*, but "*in majore delicto*." *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1155 (11th Cir. 2006).

2.   The *In Pari Delicto* Doctrine Bars Iraq's Federal Causes of Action.

The *in pari delicto* doctrine applies to preclude Iraq's federal RICO and RPA claims.[26] Under the Supreme Court's framework for determining the applicability of *in pari delicto* to private actions created by federal statutes, the doctrine applies when "(1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement" of the federal statutes at issue.  *See Pinter v. Dahl*, 486 U.S. 622, 633 (1988) (federal securities claims); *Bateman Eichler*, 472 U.S. at 310-11 (same); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134 (1968) *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) (federal antitrust claims).

As to the first factor, there is no doubt that Iraq was an active participant bearing not only "substantially equal," but greater responsibility than Defendants for the conspiratorial actions alleged.  As detailed above, the FAC itself asserts that Iraq planned and executed every element of the purported schemes.  *See, e.g.*, FAC ¶¶ 4; 350, 354, 363; 522-23.  Unlike the situation in *Perma Life Mufflers*, for example, where the participation of the plaintiff franchisees in the alleged conspiracy "was not voluntary in any meaningful sense," 392 U.S. at 139, here Iraq's participation was not only voluntary but the driving force behind all of the alleged unlawful conduct.   Iraq's conduct thus constitutes "active participation" sufficient to trigger *in pari delicto*.  *See, e.g.*, *Edwards*, 437 F.3d at 1155 (*in pari delicto* bars RICO claim brought by a

---

26   As discussed below, *see infra* § V.C, the other federal statute Iraq invokes — the FCPA — provides no private cause of action.  Even if it did, the FCPA claims would be barred by *in pari delicto* principles for the same reasons those principles bar the RICO and RPA claims.

bankruptcy trustee where the debtor-corporation "devised" and operated a Ponzi scheme in which defendant entities knowingly participated).

Under the second factor, applying *in pari delicto* to RICO and RPA claims is consistent with the policy goals of those statutes and does not undermine their effective enforcement. Indeed, this Court, as well as every Circuit to have addressed the issue, has held that the *in pari delicto* doctrine may bar RICO claims. *See Ross v. Bolton*, Civ. A. No. 83-8244, 1991 WL 285619, at *3 (S.D.N.Y. Dec. 30, 1991).[27]  Barring Iraq, the mastermind of the alleged conspiracy, from collecting damages for alleged injuries resulting from the very conspiracy it led is entirely consistent with RICO's civil-enforcement purposes.

Courts likewise have recognized that applying *in pari delicto* principles is consistent with the purposes of the RPA and other antitrust laws.  In *Perma Life Mufflers*, five justices expressed approval of the *in pari delicto* doctrine in the antitrust context where a plaintiff's culpability was equal to that of the defendants.  *See* 392 U.S. at 146 (White, J. concurring), 147 (Fortas, J. concurring), 149 (Marshall, J. concurring), and 153 (Harlan, J. and Stewart, J. concurring in part and dissenting in part); *see also Bernstein v. Universal Pictures, Inc.*, 517 F.2d 976, 982 (2d Cir. 1975) ("[A] majority of the court recognized in *Perma Life* [that] a plaintiff may properly be denied antitrust relief when his culpability is equal to that of the defendant.").  The Court ultimately held the doctrine inapplicable to the facts of that case because, unlike Iraq in the present case, the plaintiffs' "participation" in the alleged anti-competitive scheme "was not

---

[27]  *See also Rogers v. McDorman*, 521 F.3d 381, 389 (5th Cir. 2008) (holding that *in pari delicto* is cognizable in civil RICO claim); *Edwards*, 437 F.3d at 1155 (concluding that it would be "anomalous, to say the least, for the RICO statute to make racketeering unlawful in one provision, yet award the violator with treble damages in another provision of the same statute"); *Bontkowski v. First Nat'l Bank of Cicero*, 998 F.2d 459, 462 (7th Cir. 1993) (recognizing the *in pari delicto* doctrine in the context of aRICO claim, but holding it did not apply on the facts of the case); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 910 (3d Cir. 1991) ("Congress intended RICO's civil remedies to help eradicate organized crime from the social fabric by divesting the association of the fruits of ill-gotten gains." (citations omitted)).

voluntary in any meaningful sense." 392 U.S. at 139.  Following *Perma Life Mufflers*, "every Court of Appeals that has decided the issue has held that antitrust plaintiffs who were involved in a conspiracy at a requisite level are barred from suing." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 382 (3d Cir. 2005) (collecting cases).[28]  Under even the most stringent standard of involvement, Iraq's RPA claims are barred because its participation in the alleged scheme was not only voluntary, complete, and continuing, but was the very impetus for the scheme itself.

Because Iraq masterminded and coordinated the schemes alleged in the FAC, its federal causes of action are barred under a straightforward application of the *in pari delicto* doctrine.

3.       The *In Pari Delicto* Doctrine Bars Iraq's Common Law Claims.

Iraq's common law claims also are barred.  Because the FAC alleges that Iraq was not just an active participant in the alleged conspiracy but, rather its mastermind, no recovery on any of the common law claims is permissible.  *See In re Oakwood Homes Corp.*, Civ. A. No. 08-4445, 2009 WL 4829835, at *3 (3d Cir. Dec. 16, 2009) (*in pari delicto* doctrine is recognized under New York common law); *Pacurib v. Villacruz*, 183 Misc.2d 850, 865 (N.Y. Civ. Ct. 1999) (recognizing "the general rule which bars any cause of action against those with whom said plaintiffs were *in pari delicto*"); *Bullmore v. Ernst & Young Cayman Islands*, 20 Misc.3d 667, 670 (N.Y. Sup. Ct. 2008) (same).[29]

---

[28] *See also Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 724 (7th Cir. 1987) (doctrine applies if plaintiff "bore substantially equal responsibility for the anti-competitive restrictions"); *THI-Hawaii, Inc. v. First Comm. Fin. Corp.*, 627 F.2d 991, 995 (9th Cir. 1980) ("complete involvement" of plaintiff in anticompetitive scheme barred recovery); *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 16 (4th Cir. 1971); *cf. U.S. Football League v. Nat'l Football League*, 842 F. 2d 1335, 1369 (2d Cir. 1988) (*In pari delicto* "may be available . . . when the plaintiff was present at the creation and had a complete and continuing involvement in the monopolization scheme.").

[29] *See also In re Parmalat Secs. Litig.*, 383 F. Supp. 2d 587, 599 (S.D.N.Y. 2005) ( "[R]ecovery [for fraud claim] is barred by *in pari delicto* because the Company was an active participant in all of the transactions that allegedly operated as a fraud upon it."); *Miltenberg & Samton, Inc. v. Mallor*, 1 A.D.2d 458, 461 (N.Y. App.

**B.      This Court Cannot Adjudicate Iraq's Claims Because the Act of State Doctrine Bars Consideration of the Propriety of Iraq's Actions Under the Program.**

Iraq's role as both plaintiff and perpetrator of the alleged wrongful acts at the center of the FAC raises yet another bar to adjudicating its claims:  because the claims necessarily require this Court to pass upon the validity of Iraq's official acts undertaken within its borders, they must be dismissed.  Iraq's claims rest directly on the assertion that the prior government's direction and control of the Program, and its official acts in collecting and distributing revenue, were invalid and cannot be given effect.  The act of state doctrine requires dismissal of such claims.  Under that doctrine, "the courts of one state will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts." *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004).  Dismissal is required "when a court *must decide* — that is, when the outcome of the case turns upon — the effect of official action by a foreign sovereign." *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (citation omitted); *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964) (act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory").

Iraq alleges that the imposition of kickbacks and surcharges were official, public acts of the Iraqi government under the Hussein regime, performed in Iraq pursuant to official governmental orders or public decrees.  Such allegations on their face assert classic acts of state. For example, Iraq alleges that "all Iraqi ministries were informed that Saddam Hussein had ordered the imposition of kickbacks of at least 10%," FAC ¶ 302; that "the Hussein Regime

---

Div. 1956) ("It is well settled law that parties to a fraudulent or illegal transaction who are *in pari delicto* may not invoke judicial aid to undo the consequences of their illegal acts.").

simply demanded that anyone who wanted to purchase oil under the Program[] make payments (surcharges) to bank accounts owned or controlled by the Hussein Regime," *id.* ¶ 363; and that "[t]he Hussein Regime issued a directive in June 1999 requiring all Ministries to impose non-negotiable 'transportation fees' on goods requiring inland delivery," *id.* ¶ 527; *see also id.* ¶¶ 562, 568-69 (alleging various official Iraqi government public acts). Iraq also alleges that the Iraqi government's distributions of Program funds and goods were official, public acts of state. *See, e.g., id.* ¶¶ 362, 555, 620, 641-42, 656-59, 1101, 1111-13. These actions are public acts reflected in "statute, decree, order or resolution of the [government]," not *ultra vires* actions, or discretionary actions undertaken by low-level officials and reflecting no assertion of sovereign powers. *Alfred Dunhill v. Cuba*, 425 U.S. 682, 695 (1976); *cf. Kirkpatrick*, 493 U.S. at 402, 406. Indeed, the FAC alleges that Hussein himself "ordered" the imposition of the challenged payments. FAC ¶ 302. Resolving Iraq's claims thus would require the Court to address the validity of Iraq's imposition of surcharges and kickbacks, as well as the validity of Iraq's distribution of Program revenues and goods.

Each of Iraq's claims asserts, and would require the Court to determine, that particular official acts of Iraq in administering the Program were unlawful or invalid.[30] Moreover, Iraq's

---

[30] Iraq's RICO claims are based on alleged improper direct payments to the Hussein regime, *see* FAC ¶ 1141; its fraud claim is based on alleged payments to the Hussein regime in violation of Program regulations, *see id.* ¶ 1159; its civil conspiracy claim is based on alleged payments to the Hussein regime in violation of Program regulations, *see id.* ¶ 1162; its breach of fiduciary duty claim is based on the allegation that that the BNP Defendants earned fees that violated Program regulations, *see id.* ¶ 1175; its inducement of breach of fiduciary duty claim is based on the allegation that the Hussein regime's acts violated Program regulations and constituted a breach of fiduciary duty, *see id.* ¶ 1178; its breach of contract claim is based on the allegation that any surcharge or kickback payments breached contractual commitments to the U.N., *see id.* ¶¶ 1182, 1187-88, as well as the allegation that "any transfer of Iraqi funds that fell outside the specific rules and regulations of the Iraq Sanctions Program and BNP OFAC License were null and void," *id.* ¶ 1192; its unjust enrichment claim is based on the allegation that payments to the Hussein regime manipulated and corrupted the Program, *see id.* ¶ 1196; its RPA claim is based on the allegation that the payments to the Hussein regime were "illicit payments outside of the [Program]," *see id.* ¶ 1198; and its FCPA claim is based on the allegation that the payments made to the Hussein regime were not payments to a legitimate government for government purposes, but payments to government officials for illegitimate purposes outside of the Program regulations, *see id.* ¶ 1200.

allegations that Saddam Hussein was not a legitimate governmental ruler and that his regime acted as a group of corrupt government officials rather than a legitimate government, *see* FAC ¶¶ 216-23, likewise call into question the validity of the Iraqi government's authority and actions under Hussein.   Accordingly, the broad issue Iraq presents as to the validity of any of the Hussein government's actions is non-justiciable not only because it presents a political question of state legitimacy that is beyond the judiciary's purview, *see infra* § III.C, but also because it calls upon the Court to assess the propriety of the public acts of Iraq's government.  *See Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985) (affirming dismissal of contract and federal securities claims against nationalized bank based on act of state doctrine because claims required inquiry into the Mexican government's issuance of regulations preventing bank from performing contractual obligations).[31]

Iraq's claims also trigger the act of state doctrine because the requirement that courts not inquire into the validity of a foreign sovereign's public acts is particularly stringent where, as here, the sovereign acts at issue concern revenue collection.  The Second Circuit has directed courts not to pass on the validity of a sovereign's tax or revenue collection mechanisms.  *See, e.g., European Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175, 182 (2d Cir. 2005) ("'When a foreign nation appears as a plaintiff in our courts seeking enforcement of its revenue laws, the judiciary risks being drawn into issues and disputes of foreign relations policy that are assigned to — and better handled by — the political branches of government.'" (quoting *Atty. Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 114 (2d Cir. 2001))).  Certain of the acts

---

[31] *See also First Nat'l Bank of Boston v. Banco Nacional de Cuba*, 658 F.2d 895, 901-03 (2d Cir. 1981) (concluding that quasi-contract and unjust enrichment claims should have been dismissed under the act of state doctrine because claims were based on the Cuban government bank's succession to assets through an act of nationalization by forced expropriation); *Rein v. Rein,* Civ. A. No. 95-4030, 1996 WL 273993, at *5 (S.D.N.Y. May 23, 1996) (Stein, J.) ("the relief that plaintiff seeks . . . would require this Court 'to declare invalid the official act of a foreign sovereign performed within its own territory'" (citations omitted)).

placed at issue in the FAC, including enforcement of the ASSFs and the oil surcharges, however unpalatable or unorthodox they might be, implicate foreign state revenue collection measures beyond the purview of this Court.

Because Iraq's allegations require this Court to determine the validity of official Iraqi government acts administering the Program, the FAC must be dismissed for failure to state a justiciable claim.

<blockquote>
C.    **The Republic of Iraq's Attempt to Distinguish Itself From the Hussein Regime Requires This Court to Decide Non-Justiciable Political Questions.**
</blockquote>

Iraq's overarching effort to distance itself from the Hussein regime also presents a non-justiciable political question and therefore constitutes a separate and independent basis for dismissal.   Iraq alleges that the Hussein government was not a "*de jure* or legitimate government," or did not act as such, and that its actions should therefore not be imputed to the Iraqi state.  FAC ¶ 220; *see also id.* ¶¶ 216-23.  Assessing such arguments unavoidably leads to questions such as: (1) whether the Hussein government was the *de jure* government of Iraq because it assumed and maintained power unlawfully; (2) whether Saddam Hussein was the rightful ruler of Iraq; (3) whether officials of the Hussein regime were legitimate functionaries; (4) whether the United States somehow "unrecognized" the Hussein regime as the sovereign of Iraq; and (5) whether the challenged payments were made pursuant to legitimate Iraqi government purposes.  *See id.* ¶¶ 19-24, 215-38, 1200.  These are not questions of law that the Judiciary is equipped or permitted to answer.  Instead, determining the U.S. position on such inherently political questions, and their consequences, is constitutionally committed exclusively to the Executive.  *See Baker v. Carr*, 369 U.S. 186, 217 (1962).  Consistent with the uniform holdings of the Second Circuit, "it is firmly established that official recognition of a foreign sovereign is solely for the President to determine, and 'is outside the competence' of courts."

*Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994).  For complaints, such as Iraq's, that present issues of state succession and legitimacy, "adjudication would force the court to resolve 'political questions,' [and] the proper course for the courts is to dismiss."  *767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugo.*, 218 F.3d 152, 164 (2d Cir. 2000).[32]

The judicial intervention Iraq seeks on these questions would be especially unwarranted here, where the Executive Branch has already recognized the *de jure* and *de facto* rule of Hussein's regime, as evidenced by, among other things, agreements that the United States entered into with Hussein-controlled Iraq.[33]  The United States maintained official ties with the Hussein government until 1991 — long after Hussein became president of Iraq.  FAC ¶¶ 215-16, 238.  And, even after severing diplomatic ties, the United States recognized that the Hussein regime exercised sovereignty in Iraq, which was the very premise of the U.S. objective of effecting "regime change," even before the 2003 invasion of Iraq.  *See, e.g., id.* ¶¶ 232-34 (reciting Clinton administration policy of "regime change").  Such actions on the part of the

---

[32]  *See also Sabbatino*, 376 U.S. at 410 ("Political recognition is exclusively a function of the Executive."); *Baker*, 369 U.S. at 212 ("[R]ecognition of foreign governments . . . strongly defies judicial treatment."); *Guar. Trust Co. v. United States*, 304 U.S. 126, 137-38 (1938) ("[O]bjections to [the political branches' state recognition] determination as well as to the underlying policy are to be addressed to [the political branch of government] and not to the courts."); *Can*, 14 F. 3d at 162 (holding "the question of whether to recognize such former citizens, or the current Hanoi regime, or indeed any other possible claimant, as the rightful owner of South Vietnamese assets to be clearly political"); *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 17 n.5 (2d Cir. 1979) ("Recognition [of de jure control] is a matter to which the courts are bound by the Executive Branch's determination, and of which the court may take judicial notice." (internal citations omitted)); *Lehigh Valley R. Co. v. State of Russia*, 21 F.2d 396, 400 (2d Cir. 1927) ("Who may be the sovereign de jure or de facto of a territory is a political question; not judicial."); *Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 440 (S.D.N.Y. 2004) ("[T]he manner, means and timing that define the terms of . . . conditions of recognition of a purported sovereign or its representatives are matters clearly beyond the realm of judicial competence."); *Republic of Liberia v. Bickford*, 787 F. Supp. 397, 401 (S.D.N.Y. 1992) (similar).

[33]  *See, e.g.*, Agreement Concerning Claims Resulting from the Attack on the U.S.S. Stark, State Dept. No. 89-106, KAV No. 934, 1989 WL 428529 (entered into force Mar. 28, 1989); Commercial, Economic and Technical Cooperation Agreement Between the Government of the United States of America and the Government of the Republic of Iraq, T.I.A.S. No. 12020, 1987 WL 348829 (entered into force Oct. 27, 1987); International Express Mail Agreement Between the United States Postal Service and the Postal Administration of Iraq, T.I.A.S. No. 11609, 1989 WL 436357 (entered into force June 15, 1989).  This Court may take judicial notice of treaties and international agreements.  *See, e.g., United States v. Feldman*, 324 F. Supp. 2d 1112, 1118 (C.D. Cal. 2004) (taking judicial notice of various treaties and agreements between the United States and Spain).

Executive Branch "conclusively bind[]" this Court, *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918), and it therefore cannot decide claims that call into question the power of Saddam Hussein or his government to bind the Republic of Iraq.  *See id.*; *see also To v. Bank of N.Y.*, Civ. A. No. 95-7755, 1996 WL 146517, at *2 (2d Cir. Apr. 1, 1996) (court "cannot review and overturn the decision of the President to recognize the current government of Vietnam").  By the same token, Iraq's attempt to have the Court ignore clear legal principles of state continuity, *see* § I.A, *supra*, in favor of the notion that it should be treated as distinct from the Republic of Iraq under the Hussein regime requires resolution of political questions not to be decided by the courts.  *See, e.g.*, *Guar. Trust Co.*, 304 U.S. at 137-38; *Can*, 14 F. 3d at 162; *Yucyo, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 219 (S.D.N.Y. 1997).

Moreover, as noted above, there are no "discoverable and manageable standards" to guide judicial evaluation of whether the Hussein government was a legitimate government. *Baker*, 369 U.S. at 217, 223; *see also Vieth v. Jubelirer,* 541 U.S. 267, 278 (2004) (courts must ask whether they have the legal tools to reach a ruling that is "principled, rational, and based upon reasoned distinctions") (citing *Alperin v. Vatican Bank*, 410 F.3d 532, 552 (9th Cir. 2005)). Here, there are no judicial criteria to evaluate many of the questions central to the FAC, such as whether the Hussein regime acted as a real government or as a "group of corrupted government officials."  FAC ¶ 223.  In the same vein, to question how a foreign government decided to allocate revenues — how Iraq distributed revenues among government ministries, for example, *see id.* ¶ 656 — goes to the heart of the political question doctrine.  *Cf. Padavan v. United States*, 82 F.3d 23, 27 (2d Cir. 1996) (whether federal government should allocate revenues to reimburse expenses New York state incurred for illegal immigration presented a non-justiciable political question).  Where similar questions involving governmental legitimacy or succession have

41

arisen, courts routinely have held the claims non-justiciable due to the lack of judicially discoverable and manageable criteria. *See, e.g., Can,* 14 F.3d at 162-63 ("The courts have no standards for judging a claim of succession to a former sovereign, even where that succession is only to property rather than to government's power"); *see also Baker*, 369 U.S. at 225 (collecting cases concerning non-justiciable claims regarding "the republican" nature of state governments).[34]

## IV. BECAUSE IRAQ MASTERMINDED THE ALLEGED CONSPIRACY, IT HAS KNOWN OF THE PURPORTED WRONGFUL CONDUCT FROM THE OUTSET AND THEREFORE ITS CLAIMS ARE TIME-BARRED.

Iraq's claims are barred by the statute of limitations, which operate against foreign nations seeking redress in U.S. courts. *See Guar. Trust Co.*, 304 U.S. at 134 ("We can find . . . no intimation that the policy underlying exemption of the domestic sovereign (from the statute of limitations) supports its extension to a foreign sovereign suing in our courts."). The statutes of limitations on Iraq's claims expired well before its suit was filed in June 2008, and no tolling doctrine or other equitable principle saves its claims.

### A. Iraq's Claims Accrued No Later Than the End of the Program.

As the FAC makes plain, Iraq's claims began to accrue as early as 1999 and certainly no later than June 3, 2003. The Program operated between May 1996 and June 3, 2003 through thirteen 180-day periods reauthorized by successive Security Council Resolutions. *See* FAC ¶¶ 277, 308. According to the FAC, the alleged corruption in the Program — which "was designed and instigated by the Hussein Regime" — began in May 1999. *Id.* ¶ 4. With respect to Iraq's claim that Program Funds for humanitarian goods were depleted by kickbacks, such "injury" would have occurred simultaneously with the purported kickback payments. And the FAC

---

[34] *See also 767 Third Ave. Assocs.*, 218 F.3d at 159-63; *Jugobanka A.D. Belgrade v. Sidex Int'l Furniture Corp.*, 2 F. Supp. 2d 407, 416-17 (S.D.N.Y. 1998); *Fed. Republic of Yugo. v. Park-71st Corp.*, 913 F. Supp. 191, 194 (S.D.N.Y. 1995).

establishes that the payment of oil surcharges ended by August 2002 when the conduct and, necessarily, the injury were claimed to have been uncovered.  *Id.* ¶ 378.  Accordingly, the limitations period for each of Iraq's claims began to accrue no later than the time of each allegedly wrongful act and simultaneous injury — none later than June 3, 2003, when Program operations ended.

Moreover, the FAC concedes that Iraq planned and participated in all aspects of the alleged wrongdoing concerning the Program from the outset, and therefore had actual knowledge of its purported claims well before 2003.  Iraq, after all, was the contractual counterparty to the agreements that it claims depleted funds and misallocated goods, which agreements were executed in the name of the "Republic of Iraq" or one of its controlled entities.[35]  The Iraqi government in fact claims that it mandated the imposition of kickbacks and oil surcharges, belying any notion that individual officials were acting on their own.  *See, e.g., id.* ¶¶ 302, 364, 368.  Iraq therefore cannot deny that it had knowledge of the alleged wrongful acts and their consequences when they occurred, and thus had notice of its claims.  *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 233 (2d Cir. 2008).

Even if Iraq somehow could deny actual knowledge of its own prior misconduct, it still had inquiry notice of its claims more than six years before suing.  Inquiry notice is "notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 169 (2d Cir. 2005); *see also McLaughlin*, 522 F.3d at 233 (knowledge is imputed when a plaintiff "should reasonably have discovered" the injury).  For instance, in the RICO context, "storm warnings" are sufficient to put a party on "inquiry"

---

[35]  *See* FAC ¶¶ 323, 329-31, 335-37, 339, 382, 522; Ex. 4 ¶ 21 & Annex II ¶ 1; IIC Report at 253 (Ex. 7) ("A company selling humanitarian or other civilian goods under the Program[] contracted with a ministry of the Government of Iraq or, for goods intended to be distributed in northern Iraq (other than bulk purchases and oil spare parts) with one of the UN-related Agencies."); *id.* at 257 ("As many as sixteen Iraqi ministries procured goods through the Program[], totaling $34.5 billion in purchases.").

notice and a party is charged with all knowledge that a reasonable investigation would have yielded.  *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, Civ. A. No. 08-0118, 2009 WL 1391807, at *1 (2d Cir. May 19, 2009); *In re Merrill Lynch Ltd. P'ship Litig.*, 154 F.3d 56, 58-59 (2d Cir. 1998).  Discovery of the conduct may, without more, suffice to place a litigant on notice of the resulting injury.  *See Takeuchi v. Sakhai*, 227 Fed. Appx. 106, 107 (2d Cir. 2007). Moreover, there is no need to discover the entire pattern of conduct giving rise to the injury. *Rotella v. Wood*, 528 U.S. 549, 558 (2000).

Here, there can be no doubt that Iraq was on inquiry notice of any claims it had from the very inception of any alleged corruption that is the basis of its claims.  The FAC alleges that the Iraqi government not only masterminded the conduct in question, but also made little or no effort to hide its imposition of fees, alleging that Iraq issued governmental decrees requiring the imposition of kickbacks on humanitarian goods.  *See* FAC ¶ 302 (detailing decrees issued on October 25, 2000 to all Iraqi ministries, requiring "the imposition of kickbacks of at least 10%" on contracts under the Program); *see also id.* ¶¶ 364, 368 (alleging that the Iraqi regime openly demanded oil surcharges, leading to "rumors" of surcharges at the U.N. in 2000).  And, if Iraq's own conduct was not enough to put it on notice, allegations of vendor "kickback" and oil "surcharge" schemes both became the subject of public discussion beginning in 2000, well outside the applicable statutes of limitations.  Numerous media and official reports identified the very conduct upon which the FAC is founded as early as the fall of 2000.[36]  *Cf. L.C. Capital*

---

[36]  In November 2000, the Iraqi government reportedly called publicly for a surcharge on oil to be paid directly into government accounts not controlled by the U.N.  *SOMO's Customers In Turmoil Over New Premium*, Middle East Economic Survey (Nov. 20, 2000); *Iraq Moves to Take Back Control of Oil Revenue*, Wall St. J. (Dec. 4, 2000).  News coverage continued into 2002.  *See, e.g.*, *U.N. Aides Cite Payoff Racket in Iraqi "Oil For Food" Plan*,  N.Y. Times (Mar. 7, 2001); Alix Freeman and Steve Stecklow, *How Iraq Reaps Illegal Oil Profits*, Wall St. J. (May 2, 2002); *Iraq:  Illegal Oil Surcharges earn Baghdad Extra $300 Million*, Fin. Times (May 13, 2002).  In addition, governmental agencies published numerous reports during 2002 chronicling the Iraqi government's demands for kickbacks and surcharges as part of the Program.  *See, e.g.*, *Weapons of Mass Destruction − U.N. Confronts Significant Challenges In Implementing Sanctions Against Iraq* at 7, US GAO

*Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) (holding that even a single newspaper notice can provide inquiry notice). Thus, Iraq cannot plausibly claim that the facts necessary to investigate and prosecute its claims were somehow concealed from its view. Iraq's alleged schemes were notorious well before the end of the Program, such that any reasonably diligent investigation would have given sufficient information to Iraq.

### B. The Applicable Period of Limitation for Iraq's Claims Expired Well Before It Filed Suit in June 2008.

The alleged wrongful conduct, as well as the harm Iraq is alleged to have suffered, all occurred prior to the end of the Program, and it cannot be disputed that Iraq had either actual or inquiry notice of these claimed wrongs and injuries as they arose. Based on the FAC's allegations and the limitations periods for Iraq's causes of action, all or nearly all of Iraq's claims were therefore time-barred when suit was filed in 2008.

RICO: Civil RICO claims are subject to a four-year limitations period, *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156 (1987), which begins to run "when the plaintiff discovers or should have discovered the RICO injury," *Merrill Lynch*, 154 F.3d at 58; *see also Rotella*, 528 U.S. at 558 (clarifying that the limitations period commences at "the point of injury or its reasonable discovery"); *see also Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 35 (2d Cir. 2002). As discussed above, Iraq had either actual or inquiry notice of Defendants' alleged conduct at the latest by June 3, 2003, if not earlier. Accordingly, since Iraq's RICO claims are predicated on alleged conduct and injury through the oil surcharge and kickback

---

(2002) ) ("[T]he Iraqi government has been levying a surcharge against oil purchasers and commissions against commodity suppliers participating in the oil for food program."); *Iraq: Oil-For-Food Program, International Sanctions, and Illicit Trade*, Cong. Research Serv. Rpt. for Congress (Sept. 26, 2002) ("[Iraq] has generated additional funds by imposing surcharges on oil buyers."). The Court may take judicial notice of documents such as *media reports* in deciding motions to dismiss, where it is "not . . . for the truth of the matters asserted in them, but rather to establish that the matters [had] been publicly asserted." *Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 424 (2d Cir. 2008) (internal quotation marks omitted).

schemes that occurred more than four years before Iraq brought suit in June 2008, such claims are untimely.

Robinson-Patman Act:  A similar analysis applies to Iraq's commercial bribery claims under RPA Section 2(c), which also has a four-year statute of limitations.  *See* 15 U.S.C. § 15(b). The statute begins to run when a defendant commits an act injuring a plaintiff's business.  *See Higgins v. N.Y. Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991); *see also Meridien Int'l Bank Ltd. v. Liberia*, 23 F. Supp. 2d 439, 453 (S.D.N.Y. 1998).  Because Iraq's purported injuries occurred no later than June 3, 2003, if not significantly earlier, Iraq's RPA claims are time-barred.

Breach of Fiduciary Duty:  For claims of a breach of fiduciary duty seeking monetary damages, the statute of limitations is three years.  *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (N.Y. 2009).[37]  The statute of limitations begins to run when the alleged breach occurred.  *Glynwill Invs., N.V. v. Prudential Secs., Inc.*, No. 92 Civ. 9267, 1995 WL 362500, at *4 (S.D.N.Y. June 16, 1995).  Iraq alleges that it owed fiduciary duties to the people of Iraq and that all Defendants aided and abetted the breach of these duties by violating the terms of the Program.  FAC ¶¶ 1177-81.  These claims are time-barred because the operation

---

[37]  Defendants do not concede that New York law could properly be applied to all claims against all Defendants, regardless of the conduct in question and where it took place.  But Iraq provides no notice of any intent to rely for its non-federal claims on any foreign country's law, *see* Fed. R. Civ. P. 44.1 (requiring notice of intent to raise foreign law), and invokes only federal and New York law, *see* FAC ¶ 1147.  This memorandum therefore demonstrates grounds for dismissal of non-federal claims, including on the basis of statutes of limitations and other failures to state viable claims, under the only non-federal law Iraq has invoked (New York's).  In all events, because of New York's "borrowing statute," the fact that Iraq's claims are untimely under New York law bars those claims even if they would be timely under some other state's or foreign country's law.  *See* N.Y. C.P.L.R. § 202 (McKinney 2010) (With respect to claims by non-resident of New York, "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued.").  If the claims were not dismissed, choice of law analysis might require the application of other states' or nations' laws to particular claims or issues.

of the Program (and any fiduciary duties associated with it) ended far more than three years before the original complaint was filed in June 2008.

Unjust Enrichment:  Unjust enrichment claims under New York law also have a three-year statute of limitations, which begins to run upon the occurrence of the wrongful act. *Grynberg v. ENI, S.P.A.*, Civ. A. No. 06-6495, 2009 WL 2482181, at *3 (S.D.N.Y. Aug. 13, 2009).  As with the breach of fiduciary duty claim, the applicable three-year statute of limitations period bars this claim.

Breach of Contract:  Under New York law, if the contract is for sale of goods, the statute of limitations is four years.  N.Y. U.C.C. § 2-725(1) (McKinney 2010) ; *City of Cohoes v. Kestner Eng'rs*, 226 A.D.2d 914, 918 (N.Y. App. Div. 1996).  The statute of limitations is six years for breach of contracts involving services.  N.Y. C.P.L.R. § 213(2) (McKinney 2010); *Ely-Cruikshank Co., Inc. v. Bank of Montreal*, 615 N.E.2d 985, 986 (N.Y. 1993).  The cause of action accrues at the time of breach, at which point the statute of limitations starts running, even if no damage occurs until later.  *See Ely-Cruikshank Co.,* 615 N.E.2d at 986.  The FAC alleges that Oil Purchasing and Vendor Defendants breached contractual commitments to the U.N. by participating in the various kickback schemes Iraq alleges.  FAC ¶¶ 1182, 1187-88.  The breach of express or implied terms, and therefore accrual, occurred when any such payments were made or earlier when Iraq claims it agreed with Defendants to make them.  As a result, Iraq's breach of contract claims for all humanitarian goods and oil sales, as well as all services agreements, for which purported kickbacks or oil surcharges were set in motion by Iraq and its contractual counterparties prior to June 27, 2004 (for goods), or June 27, 2002 (for services), are time-barred.

Fraud:  The limitations period for New York common law fraud claims is the greater of six years from accrual, or two years from the time the plaintiff actually discovered or with reasonable diligence could have discovered the fraud.  N.Y. C.P.L.R. § 213(8) (McKinney 2010).  Since Iraq knew of, or reasonably could have discovered, the alleged fraudulent payments as they were made, only the six year limitations period matters for the timeliness of Iraq's fraud claims.  *See* § IV.A, *supra*.  Iraq's fraud claims accrued when the alleged injury (fewer funds to purchase humanitarian goods) occurred.  This alleged loss occurred no later than when any surcharges and kickbacks were paid, because it is that payment that supposedly depleted humanitarian funds — and Iraq itself knew of any depletion that would result when it set those payments in motion much earlier.  *See Longi v. Cty. of Suffolk*, Civ. A. No. 02-5821, 2008 WL 858997, at *10-11 (E.D.N.Y. Mar. 27, 2008); *Jackson v. Broad. Music, Inc.,* Civ. A. No. 04-5948, 2006 WL 250524, at *7-*9 (S.D.N.Y. Feb. 1, 2006).  Thus, all fraud claims predicated on surcharges and kickbacks allegedly paid or set in motion by Iraq prior to June 27, 2002 are time-barred.

### C.    Iraq Does Not and Cannot Allege a Basis to Toll the Limitations Periods.

Iraq has not pled, and cannot argue, that the limitations periods on its claims should have been suspended under any tolling doctrines.  *First*, Iraq cannot toll statutes of limitations by arguing that it somehow lacked the capacity to bring these claims earlier than it did.  Incapacity tolls the statute only if the litigant is precluded, in a meaningful sense, from acting.  *See Meridien Int'l Bank Ltd. v. Liberia*, 23 F. Supp. 2d 439, 445 (S.D.N.Y. 1998).  It is not enough for Iraq simply to point to the change in governance brought about by the U.S. invasion of Iraq and the overthrow of the Hussein regime to invoke incapacity tolling.  The Supreme Court rejected this exact argument in *Guaranty Trust Co.*, holding that statutes of limitations are not tolled when U.S. courts are open to the foreign sovereign and the political branches have recognized the

foreign government.  304 U.S. at 139.  As shown in § I.B, *supra*, U.S. courts have been open to Iraq during all relevant time periods, and as discussed in § III.C, *supra*, the Executive Branch has recognized the Iraqi government during all relevant time periods as well.

To the extent Iraq argues that tolling based on incapacity is warranted merely because the officials of the prior Iraqi government did not wish to press the claims or rights favored by this government, that argument was also rejected by the Supreme Court in *Guaranty Trust Co.*, 304 U.S. at 139.  Iraq could have pursued these claims long ago but chose not to, and the current government's decision to wait until June 2008 does not save them.

*Second*, any attempt by Iraq to invoke equitable tolling would be similarly unavailing. The doctrine of equitable tolling is available only if a plaintiff can plead it has been "prevented in some extraordinary way from exercising his rights" and "that it would have been impossible for a reasonably prudent person to learn about his or her cause of action."  *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002) (quotation omitted).  In cases of alleged concealment or deception, "[p]laintiffs' tolling argument only works if the fraudulent concealment succeeds in depriving plaintiffs of notice; otherwise every fraudulent concealment claim would result in tolling.  The question is whether plaintiff knew enough to sue."  *Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 482 (S.D.N.Y. 2000); *see also Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004) ("The relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action.").  Here, the various schemes alleged in the FAC were widely known long before Iraq filed suit, thus defeating any attempt to argue that Defendants fraudulently concealed Iraq's claims.

*       *       *

In sum, Iraq's claims all accrued no later than June 3, 2003, if not earlier when it set the alleged schemes in motion.  But Iraq did not file suit until June 2008, well after the statutes of limitations for all or nearly all of its claims expired, and no tolling doctrine saves them.

**V.    IRAQ FAILS TO MEET STATUTORY STANDING REQUIREMENTS, FAILS TO ESTABLISH SUBJECT MATTER JURISDICTION, AND FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED FOR ANY OF ITS CAUSES OF ACTION.**

In addition to the foregoing infirmities, which affect Iraq's complaint as a whole, each cause of action Iraq purports to assert also suffers individually from fatal deficiencies.

**A.    Iraq's RICO Claims (First and Second Claims) Should be Dismissed for Lack of Standing, Lack of Subject Matter Jurisdiction, and Failure to State a Claim.**

**1.    Iraq Lacks Standing Under RICO.**

Just as Iraq has not met the pleading requirements for Article III standing, as discussed in § II, *supra*, it likewise fails to meet RICO's heightened pleading requirements for standing.  To demonstrate civil RICO standing, "a plaintiff must plead, at a minimum, (1) the defendant's violation of [RICO] § 1962, (2) an injury to plaintiff's business or property, and (3) causation of the injury by the defendant's violation."  *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 120 (2d Cir. 2003) (internal quotations omitted).[38]

Iraq does not, and cannot, allege that it or the Iraqi people suffered an injury to their "business or property."  As discussed in § II.A, *supra*, the FAC fails to identify any injury whatsoever to Iraq or the Iraqi people fairly traceable to Defendants' conduct, and as discussed in § II.B.2, *supra*, Iraq may not pursue a RICO claim on behalf of the Iraqi people.  To the contrary, the FAC admits that Iraq itself mandated and received all the proceeds of the alleged

---

[38]  "RICO standing, unlike other standing doctrines, is sufficiently intertwined with the merits of the RICO claim that" dismissal of civil RICO claims based on standing should be addressed under Federal Rule of Civil Procedure 12(b)(6).  *Lerner,* 318 F.3d at 116-17.

conspiracy.  Hence, any alleged misconduct actually benefited Iraq's proprietary interests by supplying the Iraqi government with revenues that it could not otherwise have obtained.

Iraq also lacks RICO standing because Defendants' alleged conduct was not the direct and proximate cause of the alleged injuries.  The proximate causation requirement for RICO standing is significantly more demanding than the "fairly traceable" analysis required by Article III.  *See Lerner v. Fleet Bank (Lerner II)*, 459 F.3d 273, 283-86 & n.5 (2d Cir. 2006); *Lerner*, 318 F.3d at 122 n.8.  To satisfy the causation requirement for RICO standing, a plaintiff must allege that "the defendant's injurious conduct [was] both the factual and the proximate cause of the injury alleged."  *Lerner*, 318 F.3d at 120 (emphasis added) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)); *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994).

More specifically, "[t]he RICO statute requires that the [alleged] pattern of racketeering activity or the individual predicate acts [alleged] impose a direct injury on plaintiffs."  *Lerner*, 318 F.3d at 123.  Thus, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).  "[W]hen factors other than the defendant's [conduct] are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of defendant's action."  *Gelt Funding Corp.*, 27 F.3d at 769.  "A predicate act does not proximately cause an injury if it merely furthers, facilitates, permits or conceals an injury that happened or could have happened independently of the act."  *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002).  RICO proximate causation also requires that plaintiffs be among the "reasonably foreseeable victims" of the underlying RICO violation, *i.e.*, "the targets, competitors and intended victims of the

51

racketeering enterprise," *Lerner*, 318 F.3d at 123-24, such that injury to them is the "preconceived purpose" and "specifically intended consequence" of the RICO enterprise, *see In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994); *see also Sperber v. Boesky*, 849 F.2d 60, 65 (2d Cir. 1988).[39]

Here, Iraq's causation allegations fail for at least two reasons.  First, neither Iraq nor the Iraqi people are alleged to be the "targets, competitors [or] intended victims of the [alleged] racketeering enterprise."  *Lerner*, 318 F.3d at 124.  Nor was injury to them alleged to have been its intended purpose or consequence.  The Iraqi government certainly was not the intended target of the alleged scheme; it was the alleged instigator.  If anything, the alleged enterprise facilitated delivery of humanitarian assistance to the Iraqi people that their government had refused to provide without the surcharges and kickbacks Iraq alleges.  Indeed, the FAC alleges that "[w]ithout [Defendants'] participation in the Program[]'s operations, the Program[] would not have had any operations at all."  FAC ¶ 1140.

Second, as shown at § II.A.2, *supra*, Iraq's posited chain of causation is inherently speculative and hinges on, among other things, the intervening discretionary acts of the Iraqi government itself.  To demonstrate any link between Defendants' alleged conduct and Iraq's asserted injuries, Iraq must show that Defendants' conduct was the direct cause of Iraq's harm. But the chain of causation required to connect the Defendants' alleged conduct to Iraq's supposed injury would involve many speculative leaps, including the notions that:  (1) Iraq would have decided not to award any contracts to the Oil Purchasing and Vendor Defendants but instead to enter into transactions with others; (2) those others would have refused to cooperate

---

[39]  Indeed, the Second Circuit has encouraged courts to resolve RICO claims raising complicated issues of standing under predicate act statutes on proximate cause grounds where possible.  *Lerner*, 318 F.3d at 122 n.7.  Because Iraq has failed to satisfy the less stringent causation requirements of Article III, *see* § II.A.2, *supra*, it cannot possibly satisfy RICO's proximate causation requirement.

with Iraq's illicit payment schemes; (3) despite Iraq's official policy and strong desire to obtain surcharges and kickbacks, it would have agreed to deal with these other businesses in at least the same quantity that it did with the Oil Purchasing and Vendor Defendants; (4) the purchased goods and services actually would have been provided to the Iraqi people (and not diverted by the government); and (5) those goods and services would not have been of substandard quality. "The mere recitation of the chain of causation alleged by the plaintiff[] is perhaps the best explanation of why [it] do[es] not have standing in this case." *Lerner*, 318 F.3d at 123 (citation omitted).

Like the claims dismissed for lack of RICO standing in *Lerner* and *Gelt Funding Corp.*, "[e]ach of the assumptions upon which this theory rests is inherently speculative," such that "there is no rational way to allocate the damages that flow from the" Defendants' alleged conduct. *Lerner*, 318 F.3d at 124; *see also Oceanic Exploration Co. v. Phillips Petroleum Co.*, Civ. A. No. 08-20338, 2009 WL 3698085, at *4-5 (5th Cir. Nov. 6, 2009) (per curiam). Especially because the Iraqi government was not required to sell any oil or purchase any particular amount of goods under the Program, the injuries alleged in the FAC "happened or could have happened independently of" the Defendants' alleged predicate acts. *Scrivo*, 201 F. Supp. 2d at 219; *see also Dist. Telecommc'ns Dev. Corp. v. Dist. Cablevision, Inc.*, 638 F. Supp. 418, 422 (D.D.C. 1985). Finally, as discussed above in Section II.A.2, the presence of unspent funds in the Program Account "suggests that something other than the [Program Account] balance was the constraint on the amount of humanitarian aid distributed by the Hussein regime." *Karim v. AWB Ltd.*, Civ. A. No. 06-15400, 2008 WL 4450265, at *4 (S.D.N.Y. Sept. 30, 2008).

Iraq simply has not alleged, as it must, that Defendants' conduct "led directly to the [P]laintiff's injuries." *See Anza*, 547 U.S. at 461. Because "the connection between the RICO violation and the injury alleged is too attenuated to satisfy the proximate cause requirement," Iraq lacks statutory standing under RICO. *See Lerner*, 318 F.3d at 123.

       2.      The RICO Claims Must Be Dismissed for Lack of Subject Matter Jurisdiction in Light of the Extraterritorial Nature of the Defendants' Alleged Conduct and Its Effects.

Under Second Circuit precedent, federal courts lack subject matter jurisdiction over RICO claims premised on alleged conduct that is predominantly extraterritorial and has no domestic effects. *See, e.g.*, *N.S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996). In light of the overwhelmingly foreign nature of the alleged conduct, Iraq cannot satisfy its burden of showing that this Court has subject matter jurisdiction, and the Court should dismiss Iraq's RICO claims for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *See Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *cert. granted*, No. 08-1191, 2009 WL 4111014 (U.S. Nov. 30, 2009) (No. 08-1911).[40]

Although RICO is silent on the issue of extraterritorial application, the Second Circuit has held that RICO's extraterritorial reach is limited. *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 251-52 (S.D.N.Y. 2008) (citing *Al-Turki*, 100 F.3d at 1051-52); *see also Small v. United States*, 544 U.S. 385, 388-89 (2005) (adopting a "legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial application"). The "ultimate inquiry" in assessing whether RICO should be applied extraterritorially is whether "Congress would have wished the

---

[40]    To the extent that extraterritorial activity might constitute not a subject matter jurisdiction defect, but the absence of an essential ingredient to a federal claim, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 503 (2006) (noting that courts have "sometimes confused or conflated [two distinct] concepts: federal court 'subject-matter' jurisdiction over a controversy; and the essential ingredients of a federal claim for relief"), Iraq's failure to allege domestic conduct or effects would still prevent it from stating a RICO or Robinson Patman Act claim under Rule 12(b)(6).

precious resources of United States courts and law enforcement agencies to be devoted" to the particular foreign conduct. *Al-Turki*, 100 F.3d at 1052 (internal quotation marks omitted). The Second Circuit has recognized two tests for determining whether RICO should apply to extraterritorial conduct: the "conduct" test and the "effects" test. *Id.*; *see Norex Petroleum Ltd. v. Access Indus., Inc.*, 540 F. Supp. 2d 438, 443 (S.D.N.Y. 2007). Because these tests are "premised upon congressional intent in enacting the Securities Exchange Act and the antitrust statutes, not the intention of Congress concerning RICO," *Al-Turki*, 100 F.3d at 1052, they should apply "only insofar as they serve the RICO statute's purpose, which is to *protect . . . domestic markets* from corrupt foreign influences." *Wiwa v. Royal Dutch Petroleum Co.*, Civ. A. No. 96-8386, 2009 WL 928297, at *4 (S.D.N.Y. Mar. 18, 2009) (internal quotation marks omitted and emphasis added).[41] Iraq's claims fail to satisfy either test.

a.   *Defendants' Alleged Conduct Is Extraterritorial and Does Not Satisfy the Conduct Test.*

Iraq fails to establish, as it must, that Defendants' conduct took place within the United States. To satisfy the conduct test, a plaintiff must demonstrate that (1) the defendant's U.S. conduct was material — rather than "peripheral" or "preparatory" — to the completion of the scheme, and (2) the U.S. conduct directly caused the plaintiff's injury. *See Al-Turki*, 100 F.3d at 1050-51; *Norex*, 540 F. Supp. 2d at 442. The test is not satisfied and there is no jurisdiction if, as here, the conduct that was at the "heart of the alleged fraud," — *i.e.*, the conduct central to the completion of the alleged scheme and that caused the alleged injury — took place outside of the

---

[41]   Furthermore, it is imperative that RICO's extraterritorial reach is limited so that RICO is not used as "an avenue through which to litigate the political crises of the global community." *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 115 (D.D.C. 2005). The Second Circuit has suggested, without deciding, that satisfaction of the conduct test alone might not give rise to subject matter jurisdiction for RICO cases, as distinguished from securities cases, and that "the effects-oriented approach borrowed from antitrust cases is an equally or even more appropriate test." *Al-Turki*, 100 F.3d at 1052. The Second Circuit had no need to decide that issue in *Al-Turki* because plaintiff failed to satisfy the conduct test. The same is true here.

United States.  *Morrison*, 547 F.3d at 175; *see also Cornwell v. Credit Suisse Group*, Civ. A. No. 08-3758VM, 2009 WL 3241404, at *4-5 (S.D.N.Y. Oct. 5, 2009).  Thus, "[t]he '[d]etermination whether American activities directly caused losses to foreigners depends not only on how much was done in the United States but also on how much . . . was done abroad.'"  *In re Scor Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 569 (S.D.N.Y. 2008) (quoting *IIT v. Cornfeld*, 619 F.2d 909, 920-21 (2d Cir. 1980)) (alterations in original).

Here, as shown above, the FAC repeatedly alleges that the scheme was initiated and directed by the Republic of Iraq within Iraq's borders and that the points of contact between Defendants and Iraq — by which Iraq claims it exacted payments from them — were outside of the United States.[42]  The only even arguable U.S. conduct alleged by Iraq — *i.e.*, (1) money transfers into and out of the Program Account; (2) submission of contracts to the U.N.; and (3) general use of the U.S. mail and wires — does not satisfy the conduct test because this conduct was merely peripheral to the scheme alleged and was not the direct cause of the alleged harm. As shown below, courts in this Circuit have rejected the notion that such conduct supports the exercise of RICO jurisdiction.

Transfers to/from the Program Account.  As a matter of law, the transfer of money into and out of the Program Account cannot establish subject matter jurisdiction for three independent reasons.  First, the Program Account should not be regarded as a domestic U.S. account because it was established pursuant to agreements and resolutions explicitly providing that it was an instrumentality of the United Nations subject to the "privileges and immunities of

---

[42] *See, e.g.*, FAC ¶ 302 ("[O]n October 25, 2000, all Iraqi ministries were informed that Saddam Hussein had ordered the imposition of kickbacks of at least 10% . . . ."); *id.* ¶ 367 ("The Hussein Regime told all interested oil purchasers that surcharges were required for any purchases . . . ."); *id.* ¶ 527 ("The Hussein Regime issued a directive in June 1999 requiring all Ministries to impose non-negotiable 'transportation fees' on goods requiring inland delivery."); *id.* ¶ 323 ("A company interested in purchasing Iraqi oil would negotiate directly with [the Iraqi State Oil Marketing Organization] in Baghdad."); *id.* ¶ 565 ("Generally, accumulated payments were transferred to Iraq in cash, usually by diplomatic pouch."); *see also, e.g., id.* ¶¶ 535-536, 599.

the United Nations." *Paris v. Dep't of Nat'l Store Branch (1) Vietnam*, Civ. A. No. 99-8607, 2000 WL 777904, at *4-5 & n.8 (S.D.N.Y. June 15, 2000) (holding that the Program Account was immune from a restraining notice because the account "enjoy[ed] the privileges and immunities of the United Nations").

Second, even if the Program Account were a U.S. account, no improper payments to Iraq are alleged to have been made from the Program Account; and the transfer of money into and out of the Program Account therefore was, at most, merely incidental, preparatory, or peripheral to the Iraqi government's extraction of illicit fees which occurred overseas. *See Norex*, 540 F. Supp. 2d at 444 (holding that where the "principal fraud" was the defendants' alleged bribery of Russian government officials using money transferred through U.S. banks, the transfer itself was only incidental to the fraud in Russia (citing *Al-Turki*, 100 F.3d at 1053)).

Third, Iraq has not alleged facts showing that any transfers to or from the Program Account directly caused Iraq's alleged injury, nor could it. Any movement of money through a U.S. bank satisfies the direct causation requirement of the conduct test only when the movement itself is integral to the scheme, such as when the transfer itself either constitutes conversion,[43] or when the transfer injured the plaintiff by preventing it from recovering transferred property to which it was entitled.[44] Here, the transfers did not cause any injury to Iraq, directly or otherwise. Indeed, according to the FAC, the funds that were deposited into the Program Account *benefited* Iraq, *see* § II.A, *supra*, and the FAC fails to allege that any of the illicit payments, which are claimed to have caused injury, actually were made from the Program Account or any U.S.

---

[43] *See Madanes v. Madanes*, 981 F. Supp. 241, 251 (S.D.N.Y. 1997) ("In contrast [to *Al-Turki*], the explicit allegation here is that . . . transfer *itself* is the fraud.").

[44] *See Thai Airways, Int'l Ltd. v. United Aviation Leasing B.V.*, 842 F. Supp. 1567, 1571 (S.D.N.Y. 1994).

account.  Thus, the alleged money transfers, if not entirely unrelated to the alleged injury, were too remote from it to confer subject matter jurisdiction.[45]

Submission of Contracts to the U.N.   Similarly, the submission of contracts containing alleged misrepresentations to the U.N. in New York also fails the conduct test.  First, as a matter of law, submission of contracts to the U.N. is not U.S. conduct.  As the Second Circuit explained in *Klinghoffer v. S.N.C. Achille Lauro*, pursuant to the terms of the 1947 "Headquarters Agreement" between the U.S. and the U.N. (*reprinted at* 22 U.S.C. § 287 (Note)), the U.S. ceded the territory of the U.N.'s headquarters to the U.N., and that territory ceased to be subject to the jurisdiction of the U.S.  937 F.2d 44, 51 (2d Cir. 1991).  Thus, the U.N.'s headquarters "is not really United States territory at all," *id.*, and the submission of contracts to the U.N. does not constitute U.S. conduct for purposes of determining subject matter jurisdiction.

Second, even if the submission of the contracts to the U.N. were found to constitute "U.S." conduct, according to the FAC, the alleged scheme was orchestrated and occurred predominantly, if not entirely, abroad.  Specifically, Iraq acknowledges that the contracts were negotiated and signed outside of the United States and were forwarded to the U.N. only after the terms were decided.  FAC ¶¶ 329, 332, 343.  The alleged deal-making, which occurred overseas, was "significantly more central to the fraud" than any alleged "U.S." conduct.  *See Morrison*, 547 F.3d at 176.  Thus, the mere submission of the contracts to the U.N. is insufficient to confer RICO subject matter jurisdiction here.  *See, e.g., In re Scor Holding*, 537 F. Supp. 2d at 568 (holding, in analogous foreign securities fraud cases, that "the act of filing documents with the SEC is insufficient standing alone to confer jurisdiction in an action for damages" when the

---

[45]   In addition, Iraq's allegations regarding the issuance of letters of credit draw no connection to U.S. conduct. Iraq has not alleged that any letters of credit for the purchase of oil were issued in the U.S., or that the issuance of any allegedly misleading letters of credit was orchestrated, controlled, or masterminded in the U.S.  *See Morrison*, 547 F.3d at 174.

fraud occurred predominantly overseas); *see also Cornwell*, 2009 WL 3241404, at *12-13; *In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 305-06 (S.D.N.Y. 2009).

Third, the submission of contracts to the U.N. was not the direct cause of the alleged injury; rather, the alleged execution and performance of those contracts abroad and the alleged extra-contractual payments abroad have a far more direct causal nexus with the alleged injury. *See Morrison*, 547 F.3d at 176 (declining jurisdiction because action taken abroad was "more directly responsible for the harm"); *In re Scor Holding*, 537 F. Supp. 2d at 568-69 & n.18 (finding misleading SEC filings "too attenuated" to be a direct cause of the plaintiffs' loss because "each of the decisions underlying those statements was . . . made abroad").  Any suggestion to the contrary would conflate the stringent *direct* causation requirement with the less rigorous notion of *factual* or *but for* causation.  If the conduct test could be satisfied whenever a defendant engaged in any U.S. conduct necessary to complete the scheme, then the direct causation requirement would lack independent force.  *See Boyd*, 544 F. Supp. 2d at 244.

Use of U.S. Mails and Wires.  Finally, the allegation that "the scheme could not have functioned without phones, faxes, emails, and wire transfers" in the United States, *see* FAC ¶ 1143; *see also id.* ¶¶ 339, 344, 382, is insufficient under the case law to satisfy the conduct test. The incidental use of U.S. mail and wires in the general course of business operations does not establish subject matter jurisdiction over an alleged RICO scheme that is predominantly overseas.  *See Al-Turki*, 100 F.3d at 1053 ("There is no reason to extend the jurisdictional scope of RICO to make criminal the use of the mail and wire in the United States as part of an alleged fraud outside the United States.  We do not suppose that Congress in enacting RICO had the

purpose of punishing frauds by aliens abroad even if peripheral preparations were undertaken by them here." (quoting *Butte Mining PLC v. Smith*, 76 F.3d 287, 291 (9th Cir. 1996))).[46]

In sum, the U.S. conduct alleged in the FAC was neither central to the alleged scheme nor did it directly cause the alleged harm. To the contrary, the conduct at the heart of the alleged scheme occurred outside of the United States.

b.    *The Effects of Defendants' Alleged Conduct Are Extraterritorial and Do Not Satisfy the Effects Test.*

Iraq is also unable to establish that any of the alleged effects were felt in the United States. Courts apply two versions of the effects test to extraterritorial RICO cases, "one borrowed from securities law and one from antitrust law." *Norex*, 540 F. Supp. 2d at 442. Under the securities test, courts may exercise their jurisdiction only when "a predominantly foreign transaction has *substantial effects* within the United States." *Al-Turki*, 100 F.3d at 1051 (emphasis added). "Transactions with only remote and indirect effects in the United States do not qualify as substantial." *Id.* Under the antitrust test, "liability may attach to anticompetitive conduct occurring outside the United States, but having consequences here, if the conduct *is intended to and actually does* have an effect on United States imports or exports." *Id.* at 1052 (emphasis added).

Iraq alleges three effects: that Defendants' conduct (1) damaged the Iraqi citizens because, but for the alleged RICO scheme, they would have received higher value for Iraq's oil, FAC ¶¶ 1100, 1164; (2) deprived the Iraqi citizens of humanitarian goods, *id.* ¶¶ 1114-15, 1121-25, 1128; and (3) impaired the effectiveness of the U.N. sanctions program, perpetuating the

---

[46]    *See also Bersch v. Drexel Firestone Inc.*, 519 F.2d 974, 985-87 (2d Cir. 1975) (rejecting extensive preparatory communication in the U.S. as a sufficient basis for subject matter jurisdiction); *Norex*, 540 F. Supp. 2d at 444 (same). In addition, the mail and wires to and from the U.N. do not constitute "U.S." conduct for jurisdictional purposes, and the operations of the Program, including contract approval and payments through mail and wire, are not reviewable. (*See supra* at 72.)

Hussein regime and allowing it access to foreign currency, *id.* ¶¶ 1116, 1132.  None of these effects had any impact in or on the U.S., nor has Iraq alleged any such impact, and therefore neither of the effects tests is satisfied here.[47]

3.    <u>Iraq Fails to State a Claim Under RICO Section 1962(c).</u>

In addition to the lack of standing and subject matter jurisdiction, Iraq fails to state a claim under RICO § 1962(c).  To state a claim under 18 U.S.C. § 1962(c), a plaintiff must allege that each defendant, "through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the activities of which affected interstate or foreign commerce."  *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001). Iraq has failed to allege several essential elements of a Section 1962(c) claim.

a.    *Iraq Fails to Allege a RICO Enterprise.*

Under RICO, it is "unlawful for any person *employed by or associated with any enterprise* . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c) (emphasis added).  An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  It must exist "separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583 (1981).  Iraq may not satisfy these requirements simply by uttering the word "enterprise," *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 428-29 (S.D.N.Y. 2007), but must allege facts sufficient to establish either (1) a legal entity or (2) an

---

[47] This total lack of "effects" within the U.S. further supports the conclusion that any peripheral conduct in the U.S. does not provide a basis for subject matter jurisdiction.  *See Morrison*, 547 F.3d at 176 ("[T]he striking absence of any allegation that the alleged fraud affected American investors or America's capital markets . . . weighs against our exercise of subject matter jurisdiction."); *see also In re Scor Holding*, 537 F. Supp. 2d at 562 ("[A]n admixture or combination of the two [tests] often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." (quoting *Itoba Ltd. v. LEP Group PLC*, 54 F.3d 118, 122 (2d Cir. 1995))).

61

"association in fact" that is "separate and apart" from the alleged criminal activity.  *See Propst v. Ass'n of Flight Attendants*, 546 F. Supp. 2d 14, 25 (E.D.N.Y. 2008).

Iraq asserts that "[t]he Enterprise was the Program[]."  FAC ¶ 1136.  In the alternative, Iraq alleges "the Enterprise was an association-in-fact enterprise of the Iraq Sanctions Program in general, including the Program[] (as an integral part of the Sanctions Program), the 661 Committee, the OIP, and the Program[] participants, including the Defendants."  *See* FAC ¶ 1137.  Neither alleged enterprise is a legal entity.  *See Black's Law Dictionary* 913 (9th ed. 2009) (defining a "legal entity" as a "body, other than a natural person, that can function legally, sue or be sued, and make decisions through agents"); *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 448 (2d Cir. 2008) (private corporation); *DeFalco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001) (city government).  And neither satisfies the requirements of pleading an association-in-fact enterprise.

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," *Turkette*, 452 U.S. at 583, and "must have at least three structural features:  [1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009); *see also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004).  Iraq's "conclusory naming of a string of entities does not adequately allege an enterprise."  *Satinwood*, 385 F.3d at 175 (quotations omitted).  Iraq fails to allege a RICO enterprise because it cannot establish either a common purpose or the requisite working relationships among the enterprise's supposed parts.

Far from alleging a *common* purpose, Iraq alleges that the participants in the "Iraq Sanctions Program" had *distinct and disparate* purposes.  Iraq's participation in Program

transactions had one alleged purpose:  "to undermine U.N. sanctions and the U.S. laws prohibiting transactions with State Sponsors of Terrorism."  FAC ¶ 7.  But that purpose is entirely contrary to the enterprise's supposed purpose of "providing humanitarian aid to the Iraqi people while maintaining the effectiveness of the Iraq Sanctions Program."  *Id.* ¶ 1138.  And Defendants' alleged purpose was different than both:  "The Defendants' goal was more straightforward.  They wanted money."  *Id.* ¶ 8.

As a result of the avowed differences in purpose, unsurprisingly Iraq cannot establish that "the defendants operated symbiotically and played necessary roles in the achievement of a common purpose," *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007), or "work[ed] together" to achieve any particular purpose.  *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993) (quotations omitted).  Iraq alleges only that "[w]ithout [Defendants'] participation in the Program[]'s operations, the Program[] would not have had any operations at all."  FAC ¶ 1140.  This does not show the functioning of a "unit" with Iraq or any U.N. committee administering the sanctions regime.  *See Rosner*, 528 F. Supp. 2d at 428-29.  Instead, the FAC alleges at worst that the Oil Purchasing and Vendor Defendants acted in parallel, not together as a unit, in agreeing with Iraq to engage in separate transactions to benefit themselves.  Such parallel action, rather than unity, constitutes neither a single conspiracy nor a RICO enterprise.  *See, e.g., Gross v. Waywell*, 628 F. Supp. 2d 475, 498 (S.D.N.Y. 2009); *N.Y. Auto Ins. Plan v. All Purpose Agency & Brokerage, Inc.*, Civ. A. No. 97-3164, 1998 WL 695869, at *5-6 (S.D.N.Y. Oct. 6, 1998); *Gelt Funding Corp.*, 820 F. Supp. at 98.

Nor does Iraq's allegation that Defendants knew there were "probably" other participants in the Hussein regime's scheme, *see* FAC ¶ 1085, suffice to make them all part of an enterprise.  "The allegation that each provider was aware that there were likely other providers engaged in

parallel schemes is insufficient to establish an association-in-fact RICO enterprise." *In re Pharm. Indus. Average Wholesale Price Litig.* ("*AWP*"), 263 F. Supp. 2d 172, 184 (D. Mass. 2003).[48]  As alleged in the FAC, "[t]his is a classic 'hub and spoke' conspiracy, in which [Iraq was] the 'hub' and the various [Defendants] were the 'spokes.'  Such a scheme is not one true common law conspiracy nor is it a RICO enterprise." *N.Y. Auto. Ins. Plan*, 1998 WL 695869, at *5.[49]

> b.  *Iraq Fails to Allege that Defendants Participated in the Conduct of a RICO Enterprise.*

Even if Iraq had alleged the requisite enterprise, "simply establishing the presence of an enterprise is not enough.  Plaintiffs must also allege that the defendants conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs . . . ." *Satinwood*, 385 F.3d at 175-76 (quotations and alteration omitted).  Iraq must allege that Defendants had "some part in directing [the enterprise's] affairs" or played a role in the "operation or management" of the enterprise.  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993); *Smokes-Spirits.com*, 541 F.3d at 449.

Here, Iraq does not allege that Defendants played any role in directing, operating, or managing the sanctions regime or the Program.  Rather, it is clear from the FAC that the

---

[48]  *See also Gelt Funding*, 820 F. Supp. at 98 ("[I]t appears at worst that several borrowers each committed a similar but independent fraud with the aid of a particular lender, and that each such borrower acted on a particular occasion to benefit himself or herself and not to assist any other borrower. That series of discontinuous independent frauds is no more an 'enterprise' than it is a single conspiracy."); *Zaman*, 487 F. Supp. 2d at 450 ("[C]ourts have held that allegations of a 'hub-and-spokes' structure — that is, allegations that a common defendant perpetrated various independent frauds, each with the aid of a different co-defendant — do not satisfy the enterprise element of a RICO claim.").

[49]  *See also, e.g.*, *Propst v. Assoc. of Flight Attendants*, 546 F. Supp. 2d 14, 25 (E.D.N.Y. 2008) ("At most, plaintiffs have alleged independent, albeit similar, activities by each member of the enterprise in defrauding plaintiffs about MidAtlantic's true corporate status, but such allegations do not show that the constituent members functioned as a unit or that they were associated together for a common purpose of engaging in a course of conduct." (quotations omitted)); *AWP*, 263 F. Supp. 2d at 184 (no enterprise where "there was no rim to connect the spokes"); *N.Y. Auto Ins.*, 1998 WL 695869, at *6 (broker worked individually with numerous insureds to submit fraudulent applications: "Such a series of discontinuous independent frauds is not an 'enterprise.'  Each is a single two-party conspiracy.").

sanctions regime was administered by the U.N.   FAC ¶ 271.   Nor does Iraq allege that

Defendants either infiltrated the sanctions regime or that they conspired with its insiders.   *See*

*AWP*, 263 F. Supp. 2d at 186.   Although Defendants are alleged to have conspired to damage the

effectiveness of the Program and the sanctions regime, FAC ¶¶ 1099-1132, an allegation that

Defendants "have *victimized* the [alleged enterprise] . . . does not suffice to establish that

[Defendants] '*operated or managed*' the affairs of each of the[] alleged enterprises."   *In re*

*Smith-Kline Beecham Clinical Labs., Inc.*, 108 F. Supp. 2d 84, 100 (D. Conn. 1999) (emphasis in

original).

c.      *Iraq Fails to Allege that Defendants Engaged in Racketeering*
        *Activity.*

Iraq's claim also fails because it does not allege that Defendants engaged in "racketeering

activity," which is defined to include "any act which is indictable under any" one of a number of

specified criminal statutes.   18 U.S.C. § 1961(1).   A plaintiff must allege a pattern of

racketeering activity consisting of at least two "predicate acts."   *H.J. Inc. v. Nw. Bell Tel. Co.*,

492 U.S. 229, 239 (1989).   Here, Iraq purports to allege violations of: (1) mail/wire fraud

statutes, 18 U.S.C. §§ 1341, 1343; (2) money laundering statutes; (3) the Travel Act, 18 U.S.C.

§ 1952; and (4) New York's anti-bribery statutes, N.Y. Penal Law §§ 180.00, 180.05.   FAC ¶¶

1142-50.   Iraq fails, however, to sufficiently allege any of these predicate acts.

Mail & Wire Fraud.   Iraq's mail and wire fraud allegations lack the particularity required

by Federal Rule of Civil Procedure 9(b).   *Spool v. World Child Int'l Adoption Agency*, 520 F.3d

178, 184-85 (2d Cir. 2008).   The essential elements of a mail or wire fraud violation are: (1) a

scheme to defraud, (2) with money or property as the object, and (3) using the mails or wires to

further the scheme.   *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996).   To state a claim

for mail or wire fraud, a plaintiff must allege specifics about the mail or wire fraud violations in

question, not generalities about the use of mail or the wires.  Thus, for example, one court has required "the specific number of wires [or mailings], the precise dates, and how they further the scheme."  *Seidl v. Greentree Mortgage Co.*, 30 F. Supp. 2d 1292, 1304 (D. Colo. 1998).[50] Furthermore, "where more than one defendant is charged with fraud, it is necessary for a plaintiff to particularize and prove each defendant's participation in the fraud and each defendant's enactment of the two necessary predicate acts."  *USA Certified Merchants, LLC v. Koebel*, 262 F. Supp. 2d 319, 332 (S.D.N.Y. 2003); *see also DeBlasio v. Merrill Lynch & Co., Inc.*, Civ. A. No. 07-318 (RJS), 2009 WL 2242605, at *10 (S.D.N.Y. July 27, 2009).  In other words, a plaintiff must "specify which defendant told which lie and under what circumstances."  *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1477 (D. Colo. 1995); *see also, e.g.*, *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997); *In re Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991).

Here, Iraq relies on grossly generalized allegations about the use of the mails and wires. The sum of its allegations concerning such use by Defendants consists of just two non-specific paragraphs.  FAC ¶¶ 339, 1143.  Although the FAC purports to provide an "example" of the "typical process for a contract," that example at most reflects the details of a *single* contract involving a *single* defendant.  *Id.* ¶¶ 342-48.  The FAC says nothing of the "who, what, when, where and how" of the mail and wire transactions conducted by the remaining Defendants.[51] Instead, Iraq inadequately asserts that "[o]ther Program[] contracts, including for oil sales,

---

50  *See also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); *Persaud v. Bode*, Civ. A. No. 04-4475, 2006 WL 1419397, at *4-*5 (E.D.N.Y. Feb. 6, 2006) (concluding that plaintiff "fail[ed] to state with particularity the fraudulent content of the mailings, when the mailings were made, or which defendants were responsible for the mailings"); *Bauman v. Mount Sinai Hosp.*, 452 F. Supp. 2d 490, 503 (S.D.N.Y. 2006) (dismissing RICO claim where complaint "omit[ted] the who, what, when, where and how of the alleged fraud") (internal quotation omitted).

51  Even for the handful of defendants for whom Iraq identifies instances of use of the mails or wires, the allegations still fall short of the detail the law requires.  *See* FAC ¶¶ 399, 403, 407, 704, 796, 859.

followed a similar course." *Id.* ¶ 349.  These allegations plainly lack the necessary particularity to set forth a predicate act of mail or wire fraud.

      <u>Money Laundering.</u>  Iraq's money laundering allegations are insufficient because the alleged payments routed through the Program Account are not alleged to have entered the United States and because there is no allegation of cognizable "unlawful activity."  "The federal money laundering statute, 18 U.S.C. § 1956, prohibits specified transfers of money derived from unlawful activities.   Subsection (a)(1) makes it unlawful to engage in certain financial transactions, while subsection (a)(2) criminalizes certain kinds of transportation." *Regalado Cuellar v. United States*, 128 S. Ct. 1994, 1999 (2008).  18 U.S.C. § 1956(a)(2)(A) makes it a crime to "transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A); *see also United States v. Dhafir*, 577 F.3d 411, 413 (2d Cir. 2009).  Here, there are no allegations that the money at issue ever entered the United States.

      Iraq's RICO claim predicated on violations of the money laundering statute also fails because the money laundering statute requires its own underlying predicate acts, *i.e.*, "specified unlawful activity."  Iraq must, in other words, plead predicates-of-a-predicate.  Iraq attempts to do so by alleging that Defendants' "unlawful activity" "includes, among other matters, (1) bribery, (2) violations of the [FCPA] and, following adoption of the Patriot Act, (3) violations of the IEEPA [International Emergency Economic Powers Act]."  FAC ¶ 1145.  As explained below, however, Iraq has not adequately alleged violations of any of these statutes.

First, to allege a violation of New York's anti-bribery statute,[52] N.Y. Penal Law §§ 180.00, 180.05 (McKinney 2010), a plaintiff must show a bribe was made to "confer[] a[] benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs," *id.* § 180.00, or that the bribe was received by an "employee, agent or fiduciary . . . without the consent of his employer or principal . . . upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs," *id.* § 180.05. A plaintiff must allege "the defendant used a facility of interstate or foreign commerce to make easier or facilitate the intended unlawful activity, and thereafter did one additional act in furtherance of the unlawful activity[,]" such as a violation of a state anti-bribery statute. *United States v. Geibel*, 369 F.3d 682, 698 (2d Cir. 2004) (citations & internal quotation omitted).

Iraq fails to meet these requirements because it does not allege that payments were made to rogue Iraqi officials to influence decisions of the Iraqi government; it claims they were made to the Iraqi government pursuant to official directives from that very government. *See, e.g.,* FAC ¶¶ 363, 381, 526-27, 528, 536, 546, 555, 568, 571, 620-21. Because sections 180.00 and 180.05 redress only bribes paid to employees, agents or fiduciaries who act "without the consent of his employer or principal," payments accepted at the direction of the Iraqi government are not actionable. *See June Fabrics v. Teri Sue Fashions*, 194 Misc. 267, 270-71 (N.Y. Sup. Ct. 1948) (anti-bribery statute could not be violated if the principal or employer had knowledge and either approved or condoned the act of his employee or agent).

---

[52] The use of New York's anti-bribery statute to establish a predicate act is also flawed because the law is only intended to encompass bribery of non-New York public servants when the bribery is performed within the borders of New York by local New York private businesses. *See United States v. Young & Rubicam, Inc.*, 741 F. Supp. 334, 339 (D. Conn. 1990).

Second, Iraq cannot use the FCPA to establish a predicate act, either. The FCPA prohibits using any instrumentality of interstate commerce "corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to — [ ] any foreign official[.]" 15 U.S.C. § 78dd-2(a)(1). To violate the FCPA, payments to a foreign official must be made to influence any act or decision of such foreign official in his official capacity. *Id.*; *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Dwyer & Collora LLP*, 327 F.3d 173, 180 (2d Cir. 2003). The FCPA, however, has no application to payments made to a foreign government itself. *See* Dep't of Justice Opinion Procedure Release 97-02 (Nov. 5, 1997) *available at* http://www.justice.gov/ criminal/fraud/fcpa/opinion/1997/9702.html ("As the requestor's donation will be made directly to a government entity — and not to any foreign government official — the provisions of the FCPA do not appear to apply to this prospective transaction."). Here, the FAC alleges that payments went to a foreign *government*, not to any foreign officials. *See* FAC ¶¶ 273, 363, 536, 571. The payments therefore do not implicate the FCPA.

Moreover, even where payments are made to foreign officials, the FCPA imposes no liability for payments that were "lawful under the written laws and regulations of the foreign official's . . . country[.]" 15 U.S.C. § 78dd-2(c)(1). Here, Iraq concedes that the payments it alleges as the basis for its claims were mandated by Iraqi law. *See* FAC ¶¶ 527, 562. Accordingly, these payments cannot constitute violations of the FCPA.

Third, Iraq has not adequately alleged a violation of IEEPA. To begin with, IEEPA and its implementing regulations in force during the relevant time frame, apply only to "U.S. persons." *See* 31 C.F.R. § 575.201 *et seq.* Iraq has not alleged that Defendants, who are largely

foreign corporations, are "U.S. persons," nor could it.  *See* 31 C.F.R. § 575.321 (defining U.S. persons as "any United States citizen; permanent resident alien; juridical person organized under the laws of the United States or any jurisdiction within the United States, including foreign branches; or any person in the United States").[53]  Iraq's attempt to base IEEPA violations on Executive Order Nos. 12,722 and 12,724 fails for the same reason — both orders only concern transactions involving U.S. persons.  *See* FAC ¶¶ 993-1001.  Moreover, Iraq does not allege that Defendants violated any import or export restrictions contained in the Orders.

Unable to establish any of the predicates for money laundering, Iraq in turn cannot rely on money laundering as a RICO predicate.

The Travel Act.  Iraq's Travel Act allegations fail for want of "unlawful activity."  The Travel Act prohibits interstate and foreign travel in aid of any racketeering enterprise and necessitates participation in at least one of the enumerated "unlawful activit[ies]."  18 U.S.C. § 1952.  Iraq premises its Travel Act allegations on transgressions of the Money Laundering Control Act and those alleged wrongs underlying them (bribery, and violations of the FCPA and the IEEPA).  *See* FAC ¶ 1147.  Because Iraq fails to allege any of these purported violations adequately, it has not alleged the necessary "unlawful activity" to sustain a violation of the Travel Act.

New York Anti-Bribery Statute.  Iraq's New York anti-bribery violations are insufficient for the reasons set forth above.  For all these reasons, Iraq has not sufficiently alleged *any* predicate acts constituting "racketeering activity."

---

[53]  *See also United States v. Chalmers*, 474 F. Supp. 2d 555, 565 (S.D.N.Y. 2007) ("[W]hile other federal regulations and statutes prohibiting transactions with hostile countries have been crafted so as to make clear that they reach foreign entities, such is not the case here."); *cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000) (C.F.R. definition of "United States persons" in federal statute imposing sanctions on Burma excluded foreign corporations).

> d.   *Iraq has not Alleged that Defendants Engaged in <u>a Pattern</u> of Racketeering Activity.*

Finally, Iraq fails to allege that each individual Defendant engaged in predicate acts over a "substantial period of time," and thus fails to establish a "closed-ended pattern" of racketeering activity.   Because there is no threat of continuing criminal activity that might otherwise constitute an "open-ended" pattern of racketeering activity, Iraq must allege facts sufficient to establish a "closed-ended pattern" of such activity.   *GICC Capital Corp. v. Tech Fin. Group, Inc.*, 67 F.3d 463, 466 (2d Cir. 1995).   Indeed, the Second Circuit has concluded that it has never found a closed-ended pattern where an individual defendant's predicate acts "spanned fewer than two years."   *Satinwood,* 385 F.3d at 181.

Although Iraq alleges corruption of the Program lasting approximately six years, the FAC's specific allegations against most individual Defendants encompass activity spanning four or fewer six-month Phases of the Program — *i.e.*, less than two years.   *See, e.g.*, FAC ¶¶ 800-974 (setting forth the time periods in which individual Vendor Defendants allegedly participated in unlawful contracts under the Program).   This is inadequate.   *See DeFalco v. Bernas*, 244 F.3d 286, 322 n.22 (2d Cir. 2001) (holding that the closed-ended pattern requirement "must be established as to *each defendant* . . . regardless of the point in time at which the plaintiffs allege the overall [scheme] began" (emphasis added)).   Indeed, the FAC's allegations that most Defendants' purported participation in the pattern of racketeering activity was only episodic and of limited duration further underscore that Iraq has failed to plead a plausible RICO claim, given the "hub and spoke" nature of the alleged RICO enterprise.

Further, RICO's "pattern" element requires at a "bare minimum . . . that a defendant personally committed or aided and abetted the commission of two predicate acts."   *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992); *see also Merrill Lynch, Pierce, Fenner & Smith*

*v. Young*, Civ. A. No. 91-2923, 1994 WL 88129, at *6 (S.D.N.Y. Mar. 15, 1994) ("The bare minimum of RICO is that the defendant personally commit or aid and abet the commission of two predicate acts.  Mere membership in a group is not sufficient to ground RICO liability. The plaintiff must establish individual actions by defendants that form violations of RICO." (internal quotations omitted)).  But here, the FAC alleges that several defendants entered into a single agreement to pay kickbacks under the Program.  *See* FAC ¶¶ 622-628, 804, 810, 823, 826, 843, 853, 860, 864, 869, 874, 882, 887, 891, 893, 927, 932, 950, 958, 966, 968 (listing only one contract for several defendants).

         4.     Iraq Has Failed to State a Conspiracy Claim Under RICO Section 1962(d).

Iraq's RICO conspiracy claim also fails.  "[A] 1962(d) conspiracy claim must be dismissed where the substantive RICO claim is deficient."  *Nat'l Group for Commc'n & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006); *see also Satinwood*, 385 F.3d at 182.  Because Iraq's substantive RICO claim must be dismissed, *see* § V.A.1-3, *supra*, its RICO conspiracy claim also must be dismissed.

Moreover, Iraq's speculative and conclusory allegations are insufficient to state a RICO conspiracy claim.  The mere allegation of a conspiracy is nothing more than a legal conclusion, and, as such, is not entitled to the assumption of truth.  *Twombly*, 550 U.S. at 555.  A "RICO conspiracy allegation should be more than a conclusory add-on at the end of a complaint.  It should state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it."  *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002) (citation omitted).  A "Section 1962(d) claim must be dismissed [if] plaintiff['s] pleadings fail to provide specific allegations supporting an inference that each defendant knowingly agreed to participate in a

conspiracy." *Allen v. New World Coffee, Inc.*, Civ. A. No. 00-2610, 2001 WL 293683, at *9 (S.D.N.Y. Mar. 27, 2001).

The FAC "fails to set forth sufficient facts to suggest how each of the defendants, through words or actions, reached an agreement." *Nat'l Group for Commc'ns & Computers*, 420 F. Supp. 2d at 272.  It simply alleges, in conclusory fashion, that Defendants conspired with each other to engage in substantive RICO violations, FAC ¶ 1156, agreed to the alleged conspiracy's unlawful purpose, *id.* ¶ 1157, and joined and participated in the alleged master conspiracy and other smaller conspiracies, *id.* ¶¶ 1074-80, 1085, 1090-95, 1158.  Iraq fails to allege plausibly, as it must, that any particular RICO conspirator understood the nature and scope of the racketeering enterprise and consciously agreed to further the affairs of the enterprise.  *See Salinas v. United States*, 522 U.S. 52, 64-65 (1997)   Indeed, Iraq concedes that many of the Defendants did not know the scope of the conspiracy.  *See* FAC ¶ 1085 ("Vendor Defendants might not have known the entire scope of the conspiracy . . . .").  Instead, Iraq lumps almost all of the Defendants together, alleging generally that they entered into this conspiracy.  *Id.* ¶¶ 1095, 1158.  These speculative and vague allegations, lacking any facts to support an inference that various Defendants agreed to become part of a RICO conspiracy, are insufficient as a matter of law.  *See, e.g., Nat'l Group for Commc'n & Computers*, 420 F. Supp. 2d at 272; *FD Prop. Holding*, 206 F. Supp. 2d at 374; *Adler v. Berg Harmon Assocs.*, 790 F. Supp. 1222, 1234 (S.D.N.Y. 1992).  As a result, Iraq's claims for RICO conspiracy should be dismissed.

**B.      Iraq's Robinson-Patman Act Claim (Ninth Claim) Should Be Dismissed for Lack of Standing, Lack of Subject Matter Jurisdiction, and Failure to State a Claim.**

1.  Iraq Lacks Standing to Assert RPA Claims Because It Asserts No Cognizable Injury and Is Not an Efficient Enforcer of the Antitrust Laws

To establish "antitrust standing" to bring an action under the RPA, a plaintiff must allege "antitrust injury," which requires a plaintiff to show, *inter alia*, an injury in fact, and establish that it is an "efficient enforcer" of the antitrust laws.  *See Associated Gen. Contractors v. Cal. State Council of Carpenters, Inc.*, 459 U.S. 519, 540-45 (1983); *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121-22 (2d Cir. 2007); *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 739-41 (3d Cir. 2004); *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 249 (S.D.N.Y. 2008). Iraq satisfies neither requirement.

Iraq has failed to allege any injury in fact of its own, and does not have *parens patriae* standing to sue for alleged injuries to the Iraqi people.  *See* §§ II.A and II.B, *supra*.  These failures alone preclude antitrust standing.  *See City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 268-69 (3d Cir. 1998) (stating that an antitrust plaintiff "must establish that he actually sustained [an] injury-in-fact" and finding no antitrust injury where the "damages alleged by the City are not simply difficult to measure, but their occurrence would, in fact, be impossible to prove" (quotation omitted)).

Iraq lacks antitrust standing for the further reason that it is not an efficient enforcer of the antitrust laws.  First, as set forth in § II.A.1, *supra*, Iraq's allegation of injury is hopelessly speculative.  *See Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 293 (2d Cir. 2006); *IBM Corp. v. T3 Techs., Inc.*, Civ. A. No. 06-13565, 2009 WL 3127744, at *7 (S.D.N.Y. Sept. 30, 2009); *Boyd*, 544 F. Supp. 2d at 251 n.16.  Second, as explained in §§ II.A.2 and V.A.1,

74

*supra*, Iraq does not and cannot allege that any of its asserted injuries were directly and proximately caused by Defendants.   Ultimately, any alleged harm to Iraq or its people was caused by the Iraqi government's manipulation of the Program to its own ends.  *See Penn Power Co.*, 147 F.3d at 268-69.[54]   Third, there is an identifiable class of other persons whose self-interest normally would lead them to sue for the violation:  competitors for contracts to sell goods or purchase Iraqi oil, who, as Judge Lynch held in *Boyd*, would have been foreclosed from participation in the Program by the payments of alleged surcharges and kickbacks.  *See Boyd*, 544 F. Supp. 2d at 250; *2660 Woodley Rd. Joint Venture*, 369 F.3d at 741-42.   Fourth, as described in § II.A.2 and V.A.1, *supra*, Iraq's claim falls "in the category of the type of indirect injury that is incapable of being quantified with any degree of economic certainty" due to "significant intervening causative factors."  *Gross*, 955 F. Supp. at 246-47; *see also Boyd*, 544 F. Supp. 2d at 250-51; *Ocean View Capital, Inc.*, 1999 WL 1201701, at *6-7.   Iraq's failure to demonstrate that it is an "efficient enforcer" of the antitrust laws, requires dismissal of its Section 2(c) claim for lack of antitrust standing.

### 2.  The RPA Claim Must Be Dismissed for Lack of Subject Matter Jurisdiction.

Iraq further fails to satisfy its burden of alleging that the asserted improper payments fall within the RPA's limited extraterritorial reach, and claims that fall outside that reach are beyond the Court's subject matter jurisdiction.  *See, e.g.*, *Boyd*, 544 F. Supp. 2d at 248.   The statute applies to such payments only if (1) the "person [is] engaged in commerce" and (2) the transaction occurred "in the course of such commerce."   15 U.S.C. § 13(c).   "Commerce" is

---

[54]   *See also Boyd*, 544 F. Supp. 2d at 250 (holding that plaintiff wheat farmers lacked antitrust standing to challenge alleged kickbacks under the Program because plaintiffs failed to allege facts showing that defendants' conduct was the proximate cause of their asserted injury); *Ocean View Capital, Inc. v. Sumitomo Corp.*, Civ. A. No. 98-4067, 1999 WL 1201701, at *4 (S.D.N.Y. Dec. 15, 1999) (dismissal on antitrust standing grounds appropriate where plaintiff did not suffer harm directly flowing from defendant's alleged anticompetitive activity); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246-47 (S.D.N.Y. 1997) (same).

defined as "trade or commerce among the several States and with foreign nations," 15 U.S.C. § 12, and excludes transactions "between" or "among" foreigners, *Boyd*, 544 F. Supp. 2d at 247-48.  Moreover, activities that merely "affect commerce" are not sufficient.  *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974).  Instead, the persons or activities themselves must actually be "within the flow of interstate commerce."  *Id.*

*Rotec Indus., Inc. v. Mitsubishi Corp.*, 348 F.3d 1116 (9th Cir. 2003), exemplifies the RPA's extraterritorial limits.  There, the court found nothing "in commerce" when an alleged unlawful payment was made between two foreign corporations and the defendant transferred the money to a foreign bank.  *Id.* at 1122.  Similarly, here Iraq does not allege that Defendants made improper payments from U.S. bank accounts or otherwise engaged in any U.S.-based transactions "integral" to the alleged schemes.  *See* § __, *supra*.  Rather, Iraq alleges that Vendor Defendants — predominantly foreign entities that cannot be simply assumed to have acted in the United States — paid kickbacks directly to the Iraqi government or a foreign entity controlled by the government, with no indication of the origin of the alleged payments.  *See, e.g.*, FAC ¶ 536 ("[V]endors paid the fees in cash directly to the Regime through Iraqi embassies or to Regime accounts in Baghdad [or] . . . through front companies . . . .").  The only locations identified are "Regime accounts in Baghdad" and "Alia for Transportation and General Trade ('Alia'), a Jordanian company that was 49% owned by the Iraqi Ministry of Transportation."  *Id.* Therefore, the Court should dismiss the RPA claim for lack of subject matter jurisdiction.

3.       Iraq Has Failed to State a Claim under RPA Section 2(c).

Iraq has not stated a claim under RPA Section 2(c) because it has failed to allege facts showing that the alleged payments were made with the intent "to influence improperly the conduct of another."  *See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts*

*Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004).[55]   Far from alleging that the payments at issue "influenced" the Iraqi government to act in any way, the FAC alleges that the Iraqi government *itself* devised the alleged kickback scheme, *see, e.g.*, FAC ¶¶ 4, 363, 365, 524, 526-27, 535, 558, 562, and imposed it on a "take it or leave it" basis, *see id.* ¶ 616; *see also id.* ¶¶ 566, 1074, 1085.   Iraq imposed the alleged scheme as a condition of doing business and no alleged payment by any defendant "influenced" the way that the Iraqi government behaved.   The FAC admits as much:  "The Hussein Regime used this power [to choose the parties from which it would purchase goods] *to induce participation* [*by Defendants*] in a corrupt scheme to divert funds from their humanitarian purposes."  *Id.* ¶ 523 (emphasis added).   The RPA claim accordingly should be dismissed.  *See Blue Tree Hotels*, 369 F.3d at 222-23.[56]

### C.   Iraq's FCPA Claim (Tenth Claim) Should be Dismissed Because the FCPA Does Not Provide a Private Right of Action.

It is well-established that the FCPA does not provide a private right of action.  *See J.S. Serv. Ctr. Corp. v. Gen. Elec. Tech. Servs. Co.*, 937 F. Supp. 216, 226 (S.D.N.Y. 1996) ("[W]e also decline to infer a private right of action under the FCPA."); *Citicorp Int'l. Trading Co. v. W. Oil & Ref. Co.*, 771 F. Supp. 600, 607 (S.D.N.Y. 1991) ("[N]o private right of action exists under the FCPA.").[57]   Hence, the FCPA claims should be dismissed pursuant to Rule 12(b)(6).

---

[55] Some courts within this circuit have held that Section 2(c) does not reach commercial bribery claims, *see Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*, 88 F. Supp. 2d 133, 139-41 (S.D.N.Y. 2000) (Section 2(c) limited narrowly to claims for "dummy" brokerage payments), and the Second Circuit has expressly left open the question, *see Blue Tree Hotels*, 369 F.3d at 221.  This Court need not decide this issue to dispose of Iraq's claim.

[56] *See also Peterson v. Sprock*, Civ. A. No. 06-3087, 2008 WL 4787351, at *7 (N.D. Ga. Oct. 27, 2008); *Tubby's #14 Ltd. v. Tubby's Sub Shops, Inc.*, Civ. A. No. 04-70918, 2005 WL 3556199, at *6 (E.D. Mich. Dec. 29, 2005).

[57] *See also Thompson v. Thompson*, 484 U.S. 174, 179 (1988); *Scientific Drilling Int'l, Inc. v. Gyrodata Corp.*, Civ. A. No. 99-1077, 1999 WL 674511, at *3 (Fed. Cir. Aug. 30, 1999) (holding that there is no private right of action under the FCPA); *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1028-30 (6th Cir. 1990) (same); *McLean v. Int'l Harvester Co.*, 817 F.2d 1214, 1219 (5th Cir. 1987) (same); *RSM Prod. Corp. v. Fridman*, Civ. A. No. 06-11512, 2009 WL 424540, at *19 (S.D.N.Y. Feb. 19, 2009) (same); *Shoaga v. Maersk, Inc.*, Civ. A. No. 08-

**D.     Iraq's Common Law Claims (Third Through Eighth Claims, Inclusive) Must be Dismissed for Lack of Supplemental Jurisdiction and Failure to State a Claim.**

As discussed in §§ V.A-C, *supra*, the Court must dismiss Iraq's federal claims, and therefore lacks supplemental jurisdiction over Iraq's common law claims. *See, e.g.*, *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F. 3d 1182, 1187 (2d Cir. 1996) (court may not exercise supplemental jurisdiction over claims unless there is first a proper basis for original federal jurisdiction).  In addition, Iraq has failed to state a claim under any of the common law causes of action it invokes.

1.     <u>Iraq Fails to State A Claim for Fraud (Third Claim).</u>

Iraq is unable to state a claim for fraud under New York law.  To do so, a plaintiff must allege: (1) misrepresentations were made to the plaintiff (or that the plaintiff was intended to rely upon them), (2) the misrepresentations induced the plaintiff to take some action, (3) the plaintiff justifiably relied on the misrepresentations, and (4) the plaintiff sustained damage proximately caused by justifiably relying upon the misrepresentations.  *See Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006); *Cohen v. Houseconnect Realty Corp.*, 289 A.D.2d 277, 278 (N.Y. App. Div. 2001); 2 NY Pattern Jury Instructions Civil 3:20 (2008).

Iraq, both in its sovereign capacity and as *parens patriae*, fails to establish a fraud claim for three reasons.  First, Iraq has failed to allege numerous essential elements of a fraud claim. In particular, Iraq does not allege that Defendants made misrepresentations to Iraq or to another on which they intended Iraq to rely; or that any misrepresentations induced Iraq to take some action; or that Iraq actually relied on any misrepresentations; or anything else that would support

---

0786, 2008 WL 4615445, at *4 (N.D. Cal. Oct. 17, 2008) (same); *Castellanos v. Pfizer, Inc.*, Civ. A. No. 07-60646, 2008 WL 2323876, at *2 (S.D. Fla. May 29, 2008) (same); *see also United States v. Castle*, 925 F.2d 831, 833 (5th Cir. 1991)  (per curiam) (scope of FCPA liability may not be expanded beyond the bounds intended by Congress through resort to other general liability theories).

a claim for fraud.  And because no reliance by Iraq is alleged, Iraq could not have sustained

damage proximately caused by its reliance.  Although Iraq alleges misrepresentations were made

to the U.N., "[s]uch allegations of third-party reliance . . . are insufficient to make out a common

law fraud claim under New York Law," *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d

425, 454 (2d Cir. 2008), where, as here, Iraq does not claim that it was intended to rely upon

them, much less that "it was actually duped," *IDT Corp. v. Morgan Stanley Dean Witter & Co.*,

907 N.E.2d 268, 272 (N.Y. 2009).[58]

Second, Iraq fails to allege that any Defendant's conduct was the proximate cause of any

injury it incurred.  *See* § II.A.2, *supra*.  Instead, Iraq asserts that it was the Iraqi government itself

that decided whether and to what extent to purchase goods for the Iraqi people, *see* FAC ¶¶ 279-

81, and that the government — not Defendants — diverted humanitarian goods from the Iraqi

people for its own purposes, *id.* ¶ 656.  "Since [Iraq] has not demonstrated that [D]efendant[s']

misrepresentations … were 'a substantial cause of the events which produced [the] injury,' [it]

has not met [its] burden of proving a prima facie case of proximate cause."  *See Santodonato v.*

*Clear Channel Broad., Inc.*, 26 A.D.3d 543, 545 (N.Y. App. Div. 2006).  Moreover, as discussed

earlier, the FAC itself asserts that Iraq benefited from the alleged misconduct because it received

payments.

Third, Iraq fails to allege fraud with particularity, as required by Rule 9(b).  The FAC

fails to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements

---

[58] Nor has Iraq alleged that Defendants were obligated to make any disclosures to it, and therefore Iraq cannot state a fraud claim based on nondisclosure.  *Knoll v. Equinox Fitness Clubs*, Civ. A. No. 02-9120, 2003 WL 23018807, at *7 (S.D.N.Y. Dec. 22, 2003); *see also, e.g.*, *Germano v. Friedman*, 221 A.D.2d 501, 502 (N.Y. App. Div. 1995).  While Iraq alleges that Defendants had a duty to disclose certain facts to the U.N., *see* FAC ¶ 1159, there is no allegation of a duty to disclose to Iraq which, as the mastermind of the alleged fraud, necessarily knew all of the relevant facts.

were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).  Where, as

here, "multiple defendants are asked to respond to allegations of fraud, the complaint should

inform *each defendant* of the nature of his alleged participation in the fraud."  *DiVittorio v.*

*Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (emphasis added); *see also*

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Because Iraq has

failed to do so, its fraud claims should be dismissed.[59]

> 2.   Iraq Fails to State A Claim for Civil Conspiracy to Commit Fraud (Fourth
>      Claim).

Because Iraq has not adequately alleged fraud, it has not stated a claim for conspiracy to

commit fraud.  *Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166, 1187 (S.D.N.Y. 1990) ("[C]ivil

conspiracy to commit fraud, standing alone, is not actionable . . . if the underlying independent

tort has not been adequately pleaded . . . ." ) (citing *Demalco Ltd. v. Feltner*, 588 F. Supp. 1277,

1278 (S.D.N.Y. 1984)); *see also Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 481

(E.D.N.Y. 1998), *aff'd*, 205 F.3d 1327 (2d Cir. 2000).

Moreover, under New York law, in addition to the existence of an underlying

independent tort, a claim of civil conspiracy requires that (1) the conspirator and wrongdoer

entered into an agreement, (2) the conspirator shared a common purpose, (3) the conspirator

---

[59]  Referencing claims for fraud and breach of fiduciary duties, *see* FAC ¶ 1096, Iraq asserts the legal conclusion
that "Defendants should be considered as one entity with their affiliates and subsidiaries that participated in
their wrongful conduct and their corporate separateness ignored."  *Id.* ¶ 1097.  But Iraq makes no factual
allegations to support that conclusion.  It alleges simply that "[a] number of Defendants utilized the purported
corporate separateness of their affiliates and subsidiaries to justify and perpetuate a fraud on the UN, to evade
United States laws and to violate Programme rules," FAC ¶ 1096, and, in the case of the BNP Defendants, "to
breach their fiduciary duties," *id.* ¶ 1097.   The FAC does not allege, for example, how the corporate
separateness of any defendant was supposedly abused, whether any entity is alleged to have dominated another
(and, if so, which ones dominated which), or whether any company was undercapitalized.  Indeed, no *facts* are
alleged at all.  Such "purely conclusory allegations cannot suffice to state a claim based on veil-piercing or
alter-ego liability, even under the liberal notice pleading standard" of Rule 8.  *In re Currency Conversion Fee*
*Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003) (*see also* cases collected therein).  Iraq cannot avoid
dismissal of its claims for fraud or breach of fiduciary duty — or, for that matter, its other claims for relief —
based on its conclusory assertions that "Defendants are responsible for their alter egos."  FAC, at p.186,
subheading 5.  Moreover, any defendant included in the complaint solely on the basis of the deficient alter ego
theory of liability should be dismissed from the action.

committed a wrongful act in furtherance of the conspiracy, and (4) the conspirator knew of the wrongful conduct of the wrongdoer.  *Brownstone Inv. Group, LLC v. Levey*, 468 F. Supp. 2d 654, 660 (S.D.N.Y. 2007); *Filler v. Hanvit Bank*, 339 F. Supp. 2d 553, 560 (S.D.N.Y. 2004).  A plaintiff must allege facts showing particularly:  (1) what a defendant did to carry the conspiracy into effect; (2) whether such acts fit within the framework of the conspiracy alleged; and (3) whether such acts, in the ordinary course of events, would proximately cause plaintiff's injury. *Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991).  To survive a motion to dismiss, a complaint must contain more than general allegations in support of the conspiracy; it must allege specific times, facts and circumstances.  *Brownstone Inv. Group*, 468 F. Supp. 2d at 661.

As with its allegations of RICO conspiracy, Iraq has failed to allege with the required specificity any agreement among Defendants to conspire to commit fraud against it.  Iraq alleges that Defendants "combined and agreed with each other and others, including the Hussein Regime, to defraud the UN (and thus Iraq and its people) . . . ."  FAC ¶ 1162.  Yet this boilerplate allegation is purely conclusory, contrary to the factual assertions in the FAC that each Defendant acted separately from the others in agreeing with Iraq to kickbacks and surcharges, and does not satisfy the pleading requirements for a conspiracy to defraud under New York law. *See* § V.D.1, *supra*.  As a result, the conspiracy claim should be dismissed.

### 3.    Iraq Fails to State A Claim for Breach of Fiduciary Duty (Fifth And Sixth Claims).

Iraq fails to allege either the existence or breach by Defendants of any fiduciary duty to the Iraqi people.  A claim for breach of fiduciary duty must allege, at a minimum: (1) the existence of a fiduciary relationship between the parties and (2) breach of the fiduciary duty. *Cramer v. Devon Group, Inc.*, 774 F. Supp. 176, 184 (S.D.N.Y. 1991).  The plaintiff must "set

forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." *Abercrombie v. Andrews College*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) (internal citation omitted).

To plead "participation in" or "inducement of" a breach of fiduciary duty ("aiding and abetting"), a plaintiff must allege:  "(1) the existence of a violation committed by the primary . . . party" (*i.e.* the one owing a fiduciary duty); "(2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in achievement of the violation."  *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, Civ. A. No. 99-9623, 2007 WL 1040809, at *21-22 (S.D.N.Y. Apr. 4, 2007), *aff'd*, 312 Fed. Appx. 433 (2d Cir. 2009) (citations omitted).  An underlying breach of a fiduciary duty is a prerequisite to any claim for aiding and abetting, inducement, or participation in such a breach.  *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 134 (2d Cir. 2008); *Lefkowitz v. Bank of New York*, Civ. A. No. 01-6252, 2009 WL 5033951, at *27-28 (S.D.N.Y. Dec. 22, 2009).

Iraq's breach of fiduciary duty claims should be dismissed because the FAC fails to plead facts sufficient to establish:  (1) with respect to its Fifth Claim, that BNP Paribas owed or breached any fiduciary duty to the Iraqi people; (2) with respect to its Sixth Claim, that Iraq owed or breached any fiduciary duty to the Iraqi people; or (3) with respect to either fiduciary duty claim, that any Defendant induced or participated in any purported breach of fiduciary duty by anyone.

Iraq's Fifth Claim.  Because Iraq fails to state a claim for a primary violation for breach of fiduciary duty by BNP Paribas, *see* Suppl. Mem. of Law of BNP Paribas Defs. in Supp. of Mot. to Dismiss at § III.B, there can be no secondary violation for aiding and abetting by any of

the BNP Defendants, Chevron or Vitol.  *See Catskill*, 547 F.3d at 134.  Moreover, Iraq fails to

allege that any of these entities had "actual knowledge" or provided "substantial assistance" to

BNP Paribas.  To state a claim for participation in, or inducement of, breach of a fiduciary duty,

a plaintiff must "'allege some facts, in non-conclusory terms' to show knowing participation by

defendants in the alleged breach."  *Musalli Factory For Gold & Jewelry v. JP Morgan Chase

Bank*, 261 F.R.D. 13, 24 (S.D.N.Y. 2009); *see also Lefkowitz*, 2009 WL 5033951, at *27 ("in

pleading th[e defendant's] role, the plaintiff may not 'rely on conclusory and sparse allegations

that the aider or abettor knew of should have known about the primary breach of fiduciary

duty'"); *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (N.Y. App. Div. 2003) ("Constructive

knowledge of the breach of fiduciary duty by another is legally insufficient to impose aiding and

abetting liability.").  Further, "knowing acceptance of benefits alone is insufficient to sustain a

claim for participating in the breach of a fiduciary duty."  *Catskill*, 547 F.3d at 136.

Here, Iraq fails to allege that Chevron or Vitol had "actual knowledge" of any fiduciary

relationship between BNP Paribas and Iraq or its citizens, let alone that BNP Paribas had or

breached any such duty.  It alleges only that Chevron or Vitol possessed general knowledge of

alleged wrongdoing associated with the Program, *see* FAC ¶¶ 1085, 1091, which is insufficient

to state a claim for aiding and abetting breach of fiduciary duty.  *See Lefkowitz*, 2009 WL

5033951, at *27; *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 545 (S.D.N.Y. 2009); *Briarpatch

Ltd.*, 2007 WL 1040809, at *23.

Iraq also has failed to allege that these defendants "substantially assisted" in the

purported breach of fiduciary duty.  *In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005)

(citing *Kaufman*, 307 A.D.2d at 126-27).  "Substantial assistance may only be found where the

alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do

so,'" and "'[t]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.'"  *Id.*  Here, although Iraq alleges in conclusory fashion that the "other BNP Defendants aided and participated" in BNP Paribas's alleged breach of its purported "duty to disclose," FAC ¶ 1059, Iraq does not allege that the BNP Defendants themselves — let alone Chevron and Vitol — owed fiduciary duties directly to Iraq or its citizens.  This deficiency is fatal to the aiding and abetting claim.  *See Kaufman*, 307 A.D.2d at 126-27.

Iraq's allegations that the BNP Defendants, Chevron and Vitol accepted benefits as a result of the alleged wrongdoing or that such wrongdoing generally could not have occurred without them, *see, e.g.*, FAC ¶ 4, also do not meet the requirements for alleging substantial assistance.  *See Catskill*, 547 F.3d at 136; *Brasseur v. Speranza*, 21 A.D.3d 297, 299 (N.Y. App. Div. 2005).  Iraq must allege more than that these defendants engaged in business transactions with BNP Paribas under the Program.  *M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, Civ. A. No. 7064/08, 2009 WL 921381, at *15 (N.Y. Sup. Ct. Apr. 7, 2009).  It has failed to satisfy these pleading requirements.

Iraq's Sixth Claim.  Iraq's aiding and abetting claim against all Defendants — its "Sixth Claim," FAC ¶¶ 1177-80 — likewise should be dismissed.  In this claim, Iraq seeks to hold Defendants liable for aiding and abetting purported breaches of fiduciary duty owed by Iraq to its citizens.  *See* FAC ¶ 1177.  Iraq, however, fails to "set forth specific facts" that would allow the court "to determine whether, if true, such facts could give rise to a fiduciary relationship" between Iraq and its people.  *Abercrombie*, 438 F. Supp. 2d at 274.  Iraq's single conclusory

allegation that such a duty was owed, FAC ¶ 1177, is insufficient. *See Musalli*, 2261 F.R.D. at 24.[60]

Even if Iraq had pleaded facts sufficient to show that it breached fiduciary duties owed to its people, it still would be unable to maintain a cause of action against any Defendant for participation in, or inducement of, such breach. First, allegations that Defendants simply knew generally of alleged wrongdoing by Iraq associated with the Program, *see, e.g.*, FAC ¶¶ 4, 11, 13, 1076, 1085, 1091, are insufficient to state a claim for aiding and abetting breach of fiduciary duty. *See Lefkowitz*, WL 5033951, at *27; *Kirschner*, 648 F. Supp. 2d at 545; *Briarpatch*, 2007 WL 1040809, at *23.

Second, Iraq fails to allege that any Defendant "substantially assisted" Iraq's purported breach of a fiduciary duty to its citizens. At most, Iraq alleges arms-length transactions between itself and Defendants, which do not, as a matter of law, constitute "substantial assistance." *M&T Bank Corp.*, 2009 WL 921381, at *15. Nor does Iraq's allegation that Defendants failed to disclose the alleged scheme rise to the level of "substantial assistance." FAC ¶ 378. "Inaction can only constitute substantial assistance for purposes of aiding and abetting liability where the defendant owes the plaintiff a fiduciary duty." *Stutts v. De Dietrich Group*, Civ. A. No. 03-4058, 2006 WL 1867060, at *14 (E.D.N.Y. June 30, 2006). Defendants are not alleged to have owed, and did not owe, Iraq or its people any fiduciary duties that could have been breached, and the aiding and abetting claim therefore fails. *See Kaufman*, 307 A.D.2d at 126-27.

### 4. Iraq Fails to State A Claim for Breach of Contract (Seventh Claim).

Iraq cannot state a claim for breach of contract. To sustain a breach of contract claim, a plaintiff must show, in addition to the existence of an enforceable agreement, that (1) it

---

[60] Any effort by Iraq to have the Court define the nature and extent of a foreign government's duties to its own citizenry is squarely foreclosed by the political question doctrine. *See* § III.C.

adequately performed its contractual obligations to the defendant; (2) the defendant breached the agreement; and (3) it was damaged thereby. *Broughel v. Battery Conservancy*, Civ. A. No. 07-7755, 2009 WL 928280, at *5 (S.D.N.Y. Mar. 30, 2009); *Levinsohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc*, 10 F. Supp. 2d 334, 344 (S.D.N.Y. 1998).   Here, Iraq's breach of contract claim fails because (1) Iraq waived any breach by the Defendants and (2) Iraq failed to perform obligations owed to the Defendants.   Further, as addressed in § II.A.1, *supra*, Iraq has failed to allege it was damaged by the alleged conduct.

Under New York law, a party waives a breach of an agreement by continuing to perform under and accept the benefit of the agreement despite having actual knowledge of the other party's breach. *PG 1044 Madison Assocs., L.L.C. v. Sirene One, L.L.C.,* 369 F. Supp. 2d 512, 519 (S.D.N.Y. 2005).   Also, a party who encourages or aids in the breach of a provision of an agreement waives its right to enforce the breached provision.   *See Int'l Shared Servs., Inc. v. McCoy,* 259 A.D. 2d 668, 669 (N.Y. App. Div. 1999).   Here, the FAC's allegations establish that Iraq expressly demanded the conduct it now claims violated U.N. regulations incorporated into contracts.   For example, Iraq alleges that it demanded payment of oil surcharges on all oil contracts and the payment of fees on all contracts for the purchase of humanitarian goods.   *See* FAC ¶¶ 363, 525.   Accordingly, any breaches resulting from payment of such surcharges and fees were waived by Iraq.

Moreover, a plaintiff cannot "insist upon the enforcement of a contract when he himself has brought about its breach."   *Maria Christina, Inc. v. Freis*, 646 F. Supp. 252, 254 (S.D.N.Y. 1986).   According to the FAC, Iraq demanded payment of surcharges and fees, in violation of Program rules.   To the extent payments breached applicable contracts, they were at Iraq's insistence, and therefore preclude Iraq's claim.

Additionally, the FAC also lacks factual allegations supporting Iraq's conclusory declaration that it was a third-party beneficiary of any contract between any Defendant and any other party. "[F]or a contract to give rise to a third-party beneficiary, the contracting parties must intend at the time of the contract to create third-party benefits, and there must be a clear statement of such intent to benefit third parties." *4 Hour Wireless v. Smith,* Civ. A. No. 01-9133, 2002 WL 31654963, at *14 (S.D.N.Y. Nov. 22, 2002). Unless a plaintiff identifies contractual language from which a third-party's right to enforce the contract can be inferred, the mere allegation that contracts were entered into for the benefit of a third-party cannot sustain a third-party beneficiary claim. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,* 651 F. Supp. 2d 155, 173 (S.D.N.Y. 2009); *Kunica v. St. Jean Fins., Inc.*, 233 B.R. 46, 60 (S.D.N.Y. 1999). But the FAC does not identify any language in any contract from which any intent to convey third-party benefits to Iraq can be inferred. Instead, the FAC contains the conclusory allegation that the Program and the contracts were intended to benefit the Iraqi people. *See id.* ¶¶ 272, 1183. Such an allegation, without any reference to a contractual provision, is insufficient to state a claim as a third-party beneficiary of a contract.

Indeed, Iraq's assertion of a third-party beneficiary claim is a matter of pure sophistry. Iraq asserts that "Defendants breached their contractual commitments to the UN," FAC ¶ 1182, but it does not contend that Defendants (other than BNP) entered into contracts with the U.N. Instead, Iraq contends that the Defendants entered into contracts with Iraq. Iraq then conclusorily and illogically asserts that it is a third party beneficiary of its own agreements. *See id.* ¶ 1189 ("The Republic of Iraq, as a third party beneficiary of the contracts . . . ."). This is, of course, a legal impossibility and fatal to Iraq's claim.

Iraq also is not entitled to rescission of its contracts.  Under New York law, a court may rescind a transaction for only one of the following reasons: "[i] failure of consideration; [ii] fraud in making the contract; [iii] inability to perform the contract; [iv] repudiation of the contract or an essential part of it; and [v] a breach that substantially defeats the purpose of the contract." *Rosewood Apts. Corp. v. Perpignano*, 200 F. Supp. 2d 269, 272 (S.D.N.Y. 2002).  The FAC is devoid of facts supporting a rescission claim under any of these bases.

Nor does Iraq derive a right to rescission from the IEEPA, the United Nations Participation Act ("UNPA"), or 31 C.F.R. § 575.202, *see* FAC ¶ 1192, because these provisions do not provide a private right of action.  "[A] decision to create a private right of action is one better left to legislative judgment in the great majority of cases."  *Sosa v. Alvarez-Machain,* 542 U.S. 692, 727 (2004).   While the IEEPA delineates the Executive's authority to take extraordinary measures to deal with certain threats to national security, and Section 1705 of the IEEPA makes it unlawful to violate any such measures, it does not provide for a private cause of action.  The UNPA authorizes the President to take measures — including the regulation or prohibition of economic relations between a foreign country or a foreign national and the United States — to give effect to decisions of the U.N. Security Council.  It provides that violations of any executive act promulgated under the UNPA can be sanctioned with fines and/or imprisonment and that property involved in the violation may be forfeited to the United States, but it does not contain a private right of action.  In addition, 31 C.F.R. § 575.202 invalidates transfers in violation of the Iraqi sanctions regulations and provides that such transfers "shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property."  This language makes clear that the regulation provides only a defense against claims based on transactions subject to the sanctions regime; it does not provide

an affirmative remedy for rescission or damages.   Thus, Iraq has no claim under either the identified statutes or the regulation.

5.   Iraq Fails to State A Claim for Unjust Enrichment (Eighth Claim).

Finally, Iraq fails to state a claim for unjust enrichment.   An unjust enrichment claim "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 360 (N.Y. 2009) (citation omitted).   An unjust enrichment claim under New York law must allege "[1] that the defendant benefited; [2] at the plaintiff's expense; and [3] that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).   Iraq not only fails to allege that each Defendant benefited at Iraq's expense, it expressly alleges that Iraq itself directly benefited from the challenged transactions.   In effect, Iraq would have the Court order the Defendants to pay Iraq twice, once in the form of the payments Iraq by its own account already received, and again in the form of a "remedy" in this suit.   Equity and good conscience do not require restitution in such circumstances, but rather are a basis for dismissal.

**CONCLUSION**

For the foregoing reasons, the FAC should be dismissed.

Respectfully submitted,

January 15, 2010                                     ___/s/ Brant W. Bishop, P.C.____

Thomas D. Yannucci, P.C.*
Brant W. Bishop, P.C.
John R. Bolton*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Suite 1200
Washington, DC 20005
(202) 879-5000
thomas.yannucci@kirkland.com
brant.bishop@kirkland.com
john.bolton@kirkland.com

*Counsel for Siemens S.A.S. France and
Siemens Sanayi ve Ticaret A.Ş*

*   Admitted pro hac vice

(Full signature pages of all joining defendants follow)

James P. Gillespie, P.C.
Karen M. DeSantis (not yet admitted)
KIRKLAND & ELLIS, LLP
655 Fifteenth Street, NW- Suite 1200
Washington, DC 20005
(202) 879-5000
james.gillespie@kirkland.com
karen.desantis@kirkland.com

*Counsel for ABB AG, ABB Electric Sanayi AS,
ABB Industrie AC Machines (now ABB Industrie
AG/ABB Schweitz AG), ABB Near East Trading
Limited and ABB France SAS (successor in
interest to ABB Automation SAS and to ABB
Industrie Champagne by way of its merger into
ABB Automation SAS)*

Nelson A. Boxer
Christina Spiller
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
nelson.boxer@alston.com
christina.spiller@alston.com

*Counsel for Aesculap AG, Aesculap Motric S.A.,
Aesculap Surgical Instruments SDN BHD, B.
Braun Medical Industries SDN BHD, B. Braun
Medical S.A.S. and B. Braun Melsungen AG*

S. Alyssa Young
LEADER & BERKON, LLP
630 Third Avenue , 17th Floor
New York, NY 10017
(212) 486-2400

Christopher S. Riley, Esq.
BARNES & THORNBURG, LLP
121 W. Franklin Street - Suite 200
Elkhart, IN 46516
(574) 293-0681 (office)
(574) 296-2535 (facsimile)
www.btlaw.com
Christopher.Riley@btlaw.com

*Counsel for ABB Solvyent-Ventec*

Elliot Cohen
Aaron Mendelsohn
TROUTMAN SANDERS LLP
405 Lexington Avenue
New York, NY 10174-0700
(212) 704-6000
elliot.cohen@troutmansanders.com
aaron.mendelsohn@troutmansanders.com

*Counsel for AGCO Danmark A/S (erroneously
named as AGCO Denmark A/S) and AGCO S.A.*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

James P. Gillespie, P.C.
Karen M. DeSantis (not yet admitted)
KIRKLAND & ELLIS, LLP
655 Fifteenth Street, NW- Suite 1200
Washington, DC 20005
(202) 879-5000
james.gillespie@kirkland.com
karen.desantis@kirkland.com

*Counsel for ABB AG, ABB Electric Sanayi AS,
ABB Industrie AC Machines (now ABB Industrie
AG/ABB Schweitz AG), ABB Near East Trading
Limited and ABB France SAS (successor in
interest to ABB Automation SAS and to ABB
Industrie Champagne by way of its merger into
ABB Automation SAS)*

Nelson A. Boxer
Christina Spiller
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
nelson.boxer@alston.com
christina.spiller@alston.com

*Counsel for Aesculap AG, Aesculap Motric S.A.,
Aesculap Surgical Instruments SDN BHD, B.
Braun Medical Industries SDN BHD, B. Braun
Medical S.A.S. and B. Braun Melsungen AG*

S. Alyssa Young
LEADER & BERKON, LLP
630 Third Avenue , 17th Floor
New York, NY 10017
(212) 486-2400

Christopher S. Riley, Esq.
BARNES & THORNBURG, LLP
121 W. Franklin Street - Suite 200
Elkhart, IN 46516
(574) 293-0681 (office)
(574) 296-2535 (facsimile)
www.btlaw.com
Christopher.Riley@btlaw.com

*Counsel for ABB Solyvent-Ventec*

Elliot Cohen
Aaron Mendelsohn
TROUTMAN SANDERS LLP
405 Lexington Avenue
New York, NY 10174-0700
(212) 704-6000
elliot.cohen@troutmansanders.com
aaron.mendelsohn@troutmansanders.com

*Counsel for AGCO Danmark A/S (erroneously
named as AGCO Denmark A/S) and AGCO S.A.*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

James P. Gillespie, P.C.
Karen M. DeSantis (not yet admitted)
KIRKLAND & ELLIS, LLP
655 Fifteenth Street, NW- Suite 1200
Washington, DC 20005
(202) 879-5000
james.gillespie@kirkland.com
karen.desantis@kirkland.com

*Counsel for ABB AG, ABB Electric Sanayi AS,
ABB Industrie AC Machines (now ABB Industrie
AG/ABB Schweitz AG), ABB Near East Trading
Limited and ABB France SAS (successor in
interest to ABB Automation SAS and to ABB
Industrie Champagne by way of its merger into
ABB Automation SAS)*

Nelson A. Boxer
Christina Spiller
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
nelson.boxer@alston.com
christina.spiller@alston.com

*Counsel for Aesculap AG, Aesculap Motric S.A.,
Aesculap Surgical Instruments SDN BHD, B.
Braun Medical Industries SDN BHD, B. Braun
Medical S.A.S. and B. Braun Melsungen AG*

S. Alyssa Young
LEADER & BERKON, LLP
630 Third Avenue , 17th Floor
New York, NY 10017
(212) 486-2400

Christopher S. Riley, Esq.
BARNES & THORNBURG, LLP
121 W. Franklin Street - Suite 200
Elkhart, IN 46516
(574) 293-0681 (office)
(574) 296-2535 (facsimile)
www.btlaw.com
Christopher.Riley@btlaw.com

*Counsel for ABB Solyvent-Ventec*

ELLIOT COHEN /AMM

Elliot Cohen
Aaron Mendelsohn
TROUTMAN SANDERS LLP
405 Lexington Avenue
New York, NY 10174-0700
(212) 704-6000
elliot.cohen@troutmansanders.com
aaron.mendelsohn@troutmansanders.com

*Counsel for AGCO Danmark A/S (erroneously
named as AGCO Denmark A/S) and AGCO S.A.*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

Darrell Prescott
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 626-4476
darrell.prescott@bakernet.com

*Counsel for Air Liquide Engineering*

John F. Pritchard
Ranah L. Esmaili
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, New York 10036
(212) 858-1000
john.pritchard@pillsburylaw.com
ranah.esmaili@pillsburylaw.com

*Counsel for Atlas Copco Airpower N.V. and Atlas Copco CMT Sweden AB*

Nancy Kestenbaum
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
nkestenbaum@cov.com

O. Thomas Johnson, Jr.*
Mark H. Lynch*
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000
tjohnson@cov.com
mlynch@cov.com

*Counsel for Akzo Nobel N.V., Astra Zeneca AB, CILAG AG International, Intervet International B.V., Janssen Pharmaceutical, Merial SAS and N.V. Organon*

Robert H. Baron
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rbaron@cravath.com
tcameron@cravath.com

*Counsel for AWB Limited*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

Darrell Prescott
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 626-4476
darrell.prescott@bakernet.com

*Counsel for Air Liquide Engineering*

John F. Pritchard
Ranah L. Esmaili
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, New York 10036
(212) 858-1000
john.pritchard@pillsburylaw.com
ranah.esmaili@pillsburylaw.com

*Counsel for Atlas Copco Airpower N.V. and Atlas Copco CMT Sweden AB*

Nancy Kestenbaum
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
nkestenbaum@cov.com

O. Thomas Johnson, Jr.*
Mark H. Lynch*
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000
tjohnson@cov.com
mlynch@cov.com

*Counsel for Akzo Nobel N.V., Astra Zeneca AB, CILAG AG International, Intervet International B.V., Janssen Pharmaceutical, Merial SAS and N.V. Organon*

Robert H. Baron
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rbaron@cravath.com
tcameron@cravath.com

*Counsel for AWB Limited*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

Darrell Prescott
BAKER & MCKENZIE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 626-4476
darrell.prescott@bakernet.com

*Counsel for Air Liquide Engineering*

John F. Pritchard
Ranah L. Esmaili
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, New York 10036
(212) 858-1000
john.pritchard@pillsburylaw.com
ranah.esmaili@pillsburylaw.com

*Counsel for Atlas Copco Airpower N.V. and Atlas Copco CMT Sweden AB*

Nancy Kestenbaum
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
nkestenbaum@cov.com

O. Thomas Johnson, Jr.*
Mark H. Lynch*
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000
tjohnson@cov.com
mlynch@cov.com

*Counsel for Akzo Nobel N.V., Astra Zeneca AB, CILAG AG International, Intervet International B.V., Janssen Pharmaceutical, Merial SAS and N.V. Organon*

Robert H. Baron
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rbaron@cravath.com
tcameron@cravath.com

*Counsel for AWB Limited*

*   Admitted *pro hac vice*
**  *pro hac vice* application pending

_Robert S. Bennett_
HOGAN & HARTSON LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
rsbennett@hhlaw.com

William J. O'Brien, III
SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
wobrien@skadden.com

Jennifer L. Spaziano*
SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
(202) 371-7000
jen.spaziano@skadden.com

_Counsel for Defendants named as BNP Paribas_
_USA, BNP Paribas Hong Kong, BNP Paribas_
_Paris, BNP Paribas UK Holdings Limited, BNP_
_Paribas London Branch and BNP Paribas (Suisse)_
_SA_

John P. Doherty
Jennifer S. Kozar
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
john.doherty@alston.com
jennifer.kozar@alston.com

_Counsel for CG Holdings Belgium N.V. (f/k/a_
_Pauwels International N.V.)_

Tai H. Park
PARK & JENSEN LLP
630 Third Avenue
New York, NY 10017
(646) 200-6310
tpark@parkjensen.com

_Counsel for Boston Scientific, S.A._

Meir Feder
Thomas E. Lynch
Phineas E. Leahey
JONES DAY
222 East 41st Street
New York, NY 10017-6702
(212) 326-3939/Telephone
(212) 755-7306/Facsimile
mfeder@jonesday.com
telynch@jonesday.com
peleahey@jonesday.com

_Counsel for Chevron Corporation_

\*   Admitted _pro hac vice_
\*\* _pro hac vice_ application pending

Robert S. Bennett
HOGAN & HARTSON LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
rsbennett@hhlaw.com

William J. O'Brien, III
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
wobrien@skadden.com

Jennifer L. Spaziano*
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
(202) 371-7000
jen.spaziano@skadden.com

*Counsel for Defendants named as BNP Paribas
USA, BNP Paribas Hong Kong, BNP Paribas
Paris, BNP Paribas UK Holdings Limited, BNP
Paribas London Branch and BNP Paribas (Suisse)
SA*

_Tai Park /BWB_
Tai H. Park
PARK & JENSEN LLP
630 Third Avenue
New York, NY 10017
(646) 200-6310
tpark@parkjensen.com

*Counsel for Boston Scientific, S.A.*

John P. Doherty
Jennifer S. Kozar
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
john.doherty@alston.com
jennifer.kozar@alston.com

*Counsel for CG Holdings Belgium N.V. (f/k/a
Pauwels International N.V.)*

Meir Feder
Thomas E. Lynch
Phineas E. Leahey
JONES DAY
222 East 41st Street
New York, NY 10017-6702
(212) 326-3939/Telephone
(212) 755-7306/Facsimile
mfeder@jonesday.com
telynch@jonesday.com
peleahey@jonesday.com

*Counsel for Chevron Corporation*

\*    Admitted *pro hac vice*
\*\*  *pro hac vice* application pending

Robert S. Bennett
HOGAN & HARTSON LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
rsbennett@hhlaw.com

William J. O'Brien, III
SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
wobrien@skadden.com

Jennifer L. Spaziano*
SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
(202) 371-7000
jen.spaziano@skadden.com

*Counsel for Defendants named as BNP Paribas
USA, BNP Paribas Hong Kong, BNP Paribas
Paris, BNP Paribas UK Holdings Limited, BNP
Paribas London Branch and BNP Paribas (Suisse)
SA*

John P. Doherty
Jennifer S. Kozar
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
john.doherty@alston.com
jennifer.kozar@alston.com

*Counsel for CG Holdings Belgium N.V. (f/k/a
Pauwels International N.V.)*

Tai H. Park
PARK & JENSEN LLP
630 Third Avenue
New York, NY 10017
(646) 200-6310
tpark@parkjensen.com

*Counsel for Boston Scientific, S.A.*

Meir Feder
Thomas E. Lynch
Phineas E. Leahey
JONES DAY
222 East 41st Street
New York, NY 10017-6702
(212) 326-3939/Telephone
(212) 755-7306/Facsimile
mfeder@jonesday.com
telynch@jonesday.com
peleahey@jonesday.com

*Counsel for Chevron Corporation*

\*   Admitted *pro hac vice*
\*\*  *pro hac vice* application pending

Robert S. Bennett
HOGAN & HARTSON LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
rsbennett@hhlaw.com

William J. O'Brien, III
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
wobrien@skadden.com

Jennifer L. Spaziano*
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
(202) 371-7000
jen.spaziano@skadden.com

*Counsel for Defendants named as BNP Paribas
USA, BNP Paribas Hong Kong, BNP Paribas
Paris, BNP Paribas UK Holdings Limited, BNP
Paribas London Branch and BNP Paribas (Suisse)
SA*

John P. Doherty
Jennifer S. Kozar
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
john.doherty@alston.com
jennifer.kozar@alston.com

*Counsel for CG Holdings Belgium N.V. (f/k/a
Pauwels International N.V.)*

Tai H. Park
PARK & JENSEN LLP
630 Third Avenue
New York, NY 10017
(646) 200-6310
tpark@parkjensen.com

*Counsel for Boston Scientific, S.A.*

Meir Feder
Thomas E. Lynch
Phineas E. Leahey
JONES DAY
222 East 41st Street
New York, NY 10017-6702
(212) 326-3939/Telephone
(212) 755-7306/Facsimile
mfeder@jonesday.com
telynch@jonesday.com
peleahey@jonesday.com

*Counsel for Chevron Corporation*

* Admitted *pro hac vice*
** *pro hac vice* application pending

_Katherine M. Turner_

Philip A. Sechler*
Robert A. Van Kirk*
Katherine M. Turner*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
psechler@wc.com
rvankirk@wc.com
kturner@wc.com

*Counsel for Clyde Union, S.A.S. (f/k/a Union
Pumps, S.A.S.), David Brown Transmissions
France, S.A.S. and Textron, Inc.*

_Philip Urofsky_                    /BwB

Philip Urofsky*
SHEARMAN & STERLING LLP
801 Pennsylvania Ave. NW
Washington, D.C. 20004
(202) 508-8060
philip.urofsky@shearman.com

*Counsel for Daimler AG (formerly Daimler-
Chrysler AG)*

Philip W. Crawford, Esq.
Thomas R. Valen, Esq.*
GIBBONS, P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500
pcrawford@gibbonslaw.com
tvalen@gibbonslaw.com

Larry R. Schmadeka, Esq.*
LEE, HONG, DEGERMAN, KANG & WAIMEY
660 South Figueroa Street
Suite 2300
Los Angeles, CA 90017
(213) 244-7061

*Co-counsel for Daewoo International Corp. and
Kia Motors Corporation (erroneously named as
"Kia Motors")*

Francis I. Spagnoletti*
David S. Toy
SPAGNOLETTI & CO.
401 Louisiana Street, 8th Floor
Houston, TX 77002
(713) 653-5600
(713) 653-5656 (fax)
fspagnoletti@spaglaw.com
dtoy@spaglaw.com

*Counsel for David B. Chalmers, Jr.*

\*    Admitted *pro hac vice*
\*\*  *pro hac vice* application pending

Philip A. Sechler*
Robert A. Van Kirk*
Katherine M. Turner*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000
psechler@wc.com
rvankirk@wc.com
kturner@wc.com

*Counsel for Clyde Union, S.A.S. (f/k/a Union Pumps, S.A.S.), David Brown Transmissions France, S.A.S. and Textron, Inc.*

Philip Urofsky**
SHEARMAN & STERLING LLP
801 Pennsylvania Ave. NW
Washington, D.C. 20004
(202) 508-8060
philip.urofsky@shearman.com

*Counsel for Daimler AG (formerly Daimler-Chrysler AG)*

Philip W. Crawford, Esq.
Thomas R. Valen, Esq.*
GIBBONS, P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500
pcrawford@gibbonslaw.com
tvalen@gibbonslaw.com

Larry R. Schmadeka, Esq.*
LEE, HONG, DEGERMAN, KANG & WAIMEY
660 South Figueroa Street
Suite 2300
Los Angeles, CA 90017
(213) 244-7061

*Co-counsel for Daewoo International Corp. and Kia Motors Corporation (erroneously named as "Kia Motors")*

Francis I. Spagnoletti*
David S. Toy
SPAGNOLETTI & CO.
401 Louisiana Street, 8th Floor
Houston, TX 77002
(713) 653-5600
(713) 653-5656 (fax)
fspagnoletti@spaglaw.com
dtoy@spaglaw.com

*Counsel for David B. Chalmers, Jr.*

\*    Admitted *pro hac vice*
\*\*  *pro hac vice* application pending

Philip A. Sechler*
Robert A. Van Kirk*
Katherine M. Turner*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000
psechler@wc.com
rvankirk@wc.com
kturner@wc.com

*Counsel for Clyde Union, S.A.S. (f/k/a Union Pumps, S.A.S.), David Brown Transmissions France, S.A.S. and Textron, Inc.*

Philip Urofsky**
SHEARMAN & STERLING LLP
801 Pennsylvania Ave. NW
Washington, D.C. 20004
(202) 508-8060
philip.urofsky@shearman.com

*Counsel for Daimler AG (formerly Daimler-Chrysler AG)*

Philip W. Crawford, Esq.
Thomas R. Valen, Esq.*
GIBBONS, P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500
pcrawford@gibbonslaw.com
tvalen@gibbonslaw.com

Larry R. Schmadeka, Esq.*
LEE, HONG, DEGERMAN, KANG & WAIMEY
660 South Figueroa Street
Suite 2300
Los Angeles, CA 90017
(213) 244-7061

*Co-counsel for Daewoo International Corp. and Kia Motors Corporation (erroneously named as "Kia Motors")*

Francis I. Spagnoletti*
David S. Toy
SPAGNOLETTI & CO.
401 Louisiana Street, 8th Floor
Houston, TX 77002
(713) 653-5600
(713) 653-5656 (fax)
fspagnoletti@spaglaw.com
dtoy@spaglaw.com

*Counsel for David B. Chalmers, Jr.*

*     Admitted *pro hac vice*
**   *pro hac vice* application pending

Steven C. Herzog
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
sherzog@paulweiss.com

Robert P. Parker (not yet admitted)
Anna O. Crowell (not yet admitted)
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
2001 K Street, NW
Washington, District of Columbia 20006-1047
(202) 223-7300
rparker@paulweiss.com
acrowell@paulweiss.com

*Counsel for Doosan Benelux SA, as successor to
Ingersoll-Rand Benelux, N.V.*

Robert B. Calihan
NIXON PEABODY LLP
437 Madison Avenue
New York, NY 10022
(212) 224-7341
rcalihan@nixonpeabody.com

*Counsel for Eastman Kodak S.A.*

Michael E. Horowitz
James Robinson*
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street NW
Washington, DC  20001
(202) 862-2200
mhorowitz@cwt.com
jrobinson@cwt.com

Jason Jurgens
Nathan Bull
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000
jjurgens@cwt.com
nbull@cwt.com

*Counsel for Dow AgroSciences LLC and Dow
AgroSciences S.A.S.*

*  Admitted *pro hac vice*
** *pro hac vice* application pending

Thomas M. Malone**
Vice President and Associate General Counsel,
Legal Department
EL PASO CORPORATION
Suite 1952
1001 Louisiana Street
Houston, Texas, 77002
(713) 420 5651

John L. Shoemaker**
Senior Counsel, Legal Department
EL PASO CORPORATION
Suite 1925
1001 Louisiana Street
Houston, Texas 77002
john.shoemaker@elpaso.com

*Counsel for El Paso Corporation*

Steven C. Herzog
PAUL, WEISS, RIFKIND, WHARTON &
 GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
sherzog@paulweiss.com

Robert P. Parker (not yet admitted)
Anna O. Crowell (not yet admitted)
PAUL, WEISS, RIFKIND, WHARTON &
 GARRISON LLP
2001 K Street, NW
Washington, District of Columbia 20006-1047
(202) 223-7300
rparker@paulweiss.com
acrowell@paulweiss.com

*Counsel for Doosan Benelux SA, as successor to
Ingersoll-Rand Benelux, N.V.*

Michael E. Horowitz
James Robinson*
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street NW
Washington, DC  20001
(202) 862-2200
mhorowitz@cwt.com
jrobinson@cwt.com

Jason Jurgens
Nathan Bull
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000
jjurgens@cwt.com
nbull@cwt.com

*Counsel for Dow AgroSciences LLC and Dow
AgroSciences S.A.S.*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

Robert B. Calihan
NIXON PEABODY LLP
437 Madison Avenue
New York, NY 10022
(212) 224-7341
rcalihan@nixonpeabody.com

*Counsel for Eastman Kodak S.A.*

Thomas M. Malone\*\*
Vice President and Associate General Counsel,
Legal Department
EL PASO CORPORATION
Suite 1952
1001 Louisiana Street
Houston, Texas, 77002
(713) 420 5651

John L. Shoemaker\*\*
Senior Counsel, Legal Department
EL PASO CORPORATION
Suite 1925
1001 Louisiana Street
Houston, Texas 77002
john.shoemaker@elpaso.com

*Counsel for El Paso Corporation*

Steven C. Herzog
PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
sherzog@paulweiss.com

Robert P. Parker (not yet admitted)
Anna O. Crowell (not yet admitted)
PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
2001 K Street, NW
Washington, District of Columbia 20006-1047
(202) 223-7300
rparker@paulweiss.com
acrowell@paulweiss.com

*Counsel for Doosan Benelux SA, as successor to
Ingersoll-Rand Benelux, N.V.*

Robert B. Calihan
NIXON PEABODY LLP
437 Madison Avenue
New York, NY 10022
(212) 224-7341
rcalihan@nixonpeabody.com

*Counsel for Eastman Kodak S.A.*

Michael E. Horowitz
James Robinson*
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street NW
Washington, DC  20001
(202) 862-2200
mhorowitz@cwt.com
jrobinson@cwt.com

Jason Jurgens
Nathan Bull
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000
jjurgens@cwt.com
nbull@cwt.com

*Counsel for Dow AgroSciences LLC and Dow
AgroSciences S.A.S.*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

Thomas M. Malone
Vice President and Associate General Counsel,
Legal Department
EL PASO CORPORATION
Suite 1952
1001 Louisiana Street
Houston, Texas, 77002
(713) 420 5651

John L. Shoemaker**
Senior Counsel, Legal Department
EL PASO CORPORATION
Suite 1925
1001 Louisiana Street
Houston, Texas 77002
john.shoemaker@elpaso.com

*Counsel for El Paso Corporation*

_Dorothy J. Spenner_

Dorothy J. Spenner
Andrew D. Hart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
dspenner@sidley.com
ahart@sidley.com

Richard D. Klingler*
Bradford A. Berenson*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
rklingler@sidley.com
bberenson@sidley.com

*Counsel for Eli Lilly Export SA*

_Brian S. Weinstein  /bsb_

Brian S. Weinstein
Jason McCullough
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
brian.weinstein@davispolk.com
jason.mccullough@davispolk.com

*Counsel for F. Hoffmann-La Roche Ltd and Roche Diagnostics GmbH*

_Robert A. Salerno  /bsb_

Robert A. Salerno**
Tim A. O'Brien
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006-1888
telephone: (202) 887-6930
facsimile: (202) 887-0763
RSalerno@mofo.com
TOBrien@mofo.com

*Counsel for Evapco Europe S.R.L.*

Thomas B. Kinzler
David Zalman
Melissa E. Byroade
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
(212) 808-7800
(212) 808-7897 (fax)
tkinzler@kelleydrye.com
dzalman@kelleydrye.com
mbyroade@kelleydrye.com

*Counsel for Flowserve B.V., Flowserve Corporation and Flowserve Pompes S.A.S.*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

Dorothy J. Spenner
Andrew D. Hart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
dspenner@sidley.com
ahart@sidley.com

Richard D. Klingler*
Bradford A. Berenson*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
rklingler@sidley.com
bberenson@sidley.com

*Counsel for Eli Lilly Export SA*

Brian S. Weinstein
Jason McCullough
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
brian.weinstein@davispolk.com
jason.mccullough@davispolk.com

*Counsel for F. Hoffmann-La Roche Ltd and Roche Diagnostics GmbH*

Robert A. Salerno**
Tim A. O'Brien
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006-1888
telephone: (202) 887-6930
facsimile: (202) 887-0763
RSalerno@mofo.com
TOBrien@mofo.com

*Counsel for Evapco Europe S.R.L.*

Thomas B. Kinzler
David Zalman
Melissa E. Byroade
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
(212) 808-7800
(212) 808-7897 (fax)
tkinzler@kelleydrye.com
dzalman@kelleydrye.com
mbyroade@kelleydrye.com

*Counsel for Flowserve B.V., Flowserve Corporation and Flowserve Pompes S.A.S.*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

_Kenneth J. King_ /bub

Kenneth J. King
PEPPER HAMILTON LLP
620 Eighth Avenue, 37th Floor
New York, New York 10018
(212) 808-2700
kingk@pepperlaw.com

Robert L. Hickok (not yet admitted)
Gregory A. Paw (not yet admitted)
Barak A. Bassman (not yet admitted)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103
(215) 981-4000

_Counsel for GlaxoSmithKline Walls House,
GlaxoSmithKline Egypt SAE, Glaxo
Wellcome Export Ltd., Glaxo Wellcome SA
(South Africa) (PRY) Ltd. and SmithKline
Beecham International_

_Dorothy J. Spenner_

Dorothy J. Spenner
Andrew D. Hart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
dspenner@sidley.com
ahart@sidley.com

Richard D. Klingler*
Bradford A. Berenson*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
rklingler@sidley.com
bberenson@sidley.com

_Counsel for Ingersoll-Rand Italiana S.p.A.,
Ingersoll-Rand World Trade Ltd. and Thermo
King Ireland Ltd._

\*   Admitted _pro hac vice_
\*\*  _pro hac vice_ application pending

_Brett A. Spain_ /bub

Mark S. Landman
LANDMAN CORSI BALLAINE & FORD P.C.
120 Broadway, 27th Floor
New York, New York 10271-0079
(212) 238-4800
mlandman@lcbf.com

Conrad M. Shumadine (not yet admitted)
Brett A. Spain*
WILLCOX & SAVAGE P.C.
1800 Bank of America Center
One Commercial Place
Norfolk, Virginia 23510
(757) 628-5500
cshumadine@wilsav.com
bspain@wilsav.com

_Counsel for Liebherr Export AG
and Liebherr France, SA_

_Dorothy J. Spenner_

Dorothy J. Spenner
Andrew D. Hart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
dspenner@sidley.com
ahart@sidley.com

Richard D. Klingler*
Bradford A. Berenson*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
rklingler@sidley.com
bberenson@sidley.com

_Counsel for Novo Nordisk A/S_

_Tony Canales_ / BuB
J.A. Canales
Hector A. Canales
CANALES & SIMONSON, P.C.
2601 Morgan Avenue – P.O. Box 5624
Corpus Christi, Texas 78465-5624
(361) 883-0601
tonycanales@canalessimonson.com

Carl A. Parker, P.C.
THE PARKER LAW FIRM
1 Plaza Square
Port Arthur, Texas 77642
(409) 985-8814
cparker714@aol.com

_Counsel for Oscar S. Wyatt, Jr._


_Michael R. Miner_ / BuB
Gregory P. Miller*
DRINKER BIDDLE & REATH LLP
One Logan Square – 18th & Cherry Streets
Philadelphia, PA 19103
(215) 988-2700
gregory.miller@dbr.com

Michael R. Miner*
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W., Suite 1100
Washington, DC 20005
(202) 842-8800
michael.miner@dbr.com

Marsha J. Indych
DRINKER BIDDLE & REATH LLP
140 Broadway, 39th Floor
New York, NY 10005
(212) 248-3160
marsha.indych@dbr.com

_Counsel for Renault Agriculture & Sonalika International_


_Peter L. Altieri_ / BuB
Peter L. Altieri
David J. Clark
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500
paltieri@ebglaw.com
dclark@ebglaw.com

_Counsel for Railtech International SA_


_Tammy Bieber_ / BuB
Danforth Newcomb
Tammy Bieber
H. Miriam Farber
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
dnewcomb@shearman.com
tbieber@shearman.com
mfarber@shearman.com

_Counsel for Renault Trucks SAS (formerly known as Renault V.I.), Volvo Construction Equipment, AB (as successor to Volvo Construction Equipment International), and ABG Allgemeine Baumaschinen Gesellschaft mbH, Sulzer Pumpen Deutschland GMBH, Sulzer Turbo Ltd., and Buhler Ltd._


\*   Admitted _pro hac vice_
\*\*  _pro hac vice_ application pending

John G. Harkins, Jr.*
Colleen Healy Simpson (not yet admitted)
HARKINS CUNNINGHAM LLP
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103-7042
(215) 851-6700
jharkins@harkinscunningham.com
csimpson@harkinscunningham.com

*Counsel for Rohm and Haas France, S.A.*

David M. Ryan
Fred A. Kelly, Jr.*
Joshua H. Orr*
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
(617) 345-1000
dryan@nixonpeabody.com
fkelly@ nixonpeabody.com
jorr@ nixonpeabody.com

*Counsel for Serono Pharma International*

John D. Harkrider
Evan S. Storm (not yet admitted)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, New York 10036
(212) 728-2200
jdh@avhlaw.com
ess@avhlaw.com

*Counsel for Secalt S.A.*

Thomas D. Yannucci, P.C.*
Brant W. Bishop, P.C.
John R. Bolton*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Suite 1200
Washington, DC 20005
(202) 879-5000
thomas.yannucci@kirkland.com
brant.bishop@kirkland.com
john.bolton@kirkland.com

*Counsel for Siemens S.A.S. France and Siemens Sanayi ve Ticaret A.Ş.*

\*   Admitted *pro hac vice*
\*\*  *pro hac vice* application pending

John G. Harkins, Jr.*
Colleen Healy Simpson (not yet admitted)
HARKINS CUNNINGHAM LLP
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103-7042
(215) 851-6700
jharkins@harkinscunningham.com
csimpson@harkinscunningham.com

*Counsel for Rohm and Haas France, S.A.*

John D. Harkrider
Evan S. Storm (not yet admitted)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, New York 10036
(212) 728-2200
jdh@avhlaw.com
ess@avhlaw.com

*Counsel for Secalt S.A.*

David M. Ryan
Fred A. Kelly, Jr.*
Joshua H. Orr*
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
(617) 345-1000
dryan@nixonpeabody.com
fkelly@ nixonpeabody.com
jorr@ nixonpeabody.com

*Counsel for Serono Pharma International*

Thomas D. Yannucci, P.C.*
Brant W. Bishop, P.C.
John R. Bolton*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Suite 1200
Washington, DC 20005
(202) 879-5000
thomas.yannucci@kirkland.com
brant.bishop@kirkland.com
john.bolton@kirkland.com

*Counsel for Siemens S.A.S. France and Siemens Sanayi ve Ticaret A.Ş.*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

_Gregory L. Baker_ **

Gregory L. Baker**
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-6615
BakerG@howrey.com

*Counsel for Solar Turbines Europe, S.A.*

Chris J. Lopata
JONES DAY
222 E. 41st Street
New York, NY 10017
(212) 326-3939
cjlopata@jonesday.com

Michael H. Ginsberg*
Thomas S. Jones*
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
(412) 391-3939
mhginsberg@jonesday.com
tsjones@jonesday.com

*Counsel for The Weir Group PLC*

James W.A. Ladner (not yet admitted)
Associate General Counsel, Legal Department
ST. JUDE MEDICAL, INC.
One St. Jude Medical Drive
St. Paul, MN 55117
(651) 756-2048
jladner@sjm.com

*Counsel for St. Jude Medical Export GmbH*

David H. Braff
Penny Shane
Andrew H. Reynard
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
braffd@sullcrom.com
shanep@sullcrom.com
reynarda@sullcrom.com

*Counsel for Vitol, S.A.*

Lawrence W. Newman
BAKER & MCKENZIE LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 891-3970
(212) 310 1600 fax
lwn@bakernet.com

*Counsel for Sulzer Buckhardt Engineering Works
Ltd.*

\*    Admitted *pro hac vice*
\*\*  *pro hac vice* application pending

Gregory L. Baker**
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-6615
BakerG@howrey.com

*Counsel for Solar Turbines Europe, S.A.*

James W.A. Ladner (not yet admitted)
Associate General Counsel, Legal Department
ST. JUDE MEDICAL, INC.
One St. Jude Medical Drive
St. Paul, MN 55117
(651) 756-2048
jladner@sjm.com

*Counsel for St. Jude Medical Export GmbH*

Lawrence W. Newman
BAKER & MCKENZIE LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 891-3970
(212) 310 1600 fax
lwn@bakernet.com

*Counsel for Sulzer Buckhardt Engineering Works
Ltd.*

Chris J. Lopata
JONES DAY
222 E. 41st Street
New York, NY 10017
(212) 326-3939
cjlopata@jonesday.com

Michael H. Ginsberg*
Thomas S. Jones*
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
(412) 391-3939
mhginsberg@jonesday.com
tsjones@jonesday.com

*Counsel for The Weir Group PLC*

David H. Braff
Penny Shane
Andrew H. Reynard
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
braffd@sullcrom.com
shanep@sullcrom.com
reynarda@sullcrom.com

*Counsel for Vitol, S.A.*

* Admitted *pro hac vice*
** *pro hac vice* application pending

Gregory L. Baker**
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-6615
BakerG@howrey.com

*Counsel for Solar Turbines Europe, S.A.*

Chris J. Lopata
JONES DAY
222 E. 41st Street
New York, NY 10017
(212) 326-3939
cjlopata@jonesday.com

Michael H. Ginsberg*
Thomas S. Jones*
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
(412) 391-3939
mhginsberg@jonesday.com
tsjones@jonesday.com

*Counsel for The Weir Group PLC*

James W.A. Ladner (not yet admitted)
Associate General Counsel, Legal Department
ST. JUDE MEDICAL, INC.
One St. Jude Medical Drive
St. Paul, MN 55117
(651) 756-2048
jladner@sjm.com

*Counsel for St. Jude Medical Export GmbH*

David H. Braff
Penny Shane
Andrew H. Reynard
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
braffd@sullcrom.com
shanep@sullcrom.com
reynarda@sullcrom.com

*Counsel for Vitol, S.A.*

Lawrence W. Newman
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 891-3970
(212) 310 1600 fax
lwn@bakernet.com

*Counsel for Sulzer Buckhardt Engineering Works
Ltd.*

\*   Admitted *pro hac vice*
\*\* *pro hac vice* application pending

Gregory L. Baker**
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-6615
BakerG@howrey.com

*Counsel for Solar Turbines Europe, S.A.*

Chris J. Lopata
Jones Day
222 E. 41st Street
New York, NY 10017
(212) 326-3939
cjlopata@jonesday.com

Michael H. Ginsberg*
Thomas S. Jones*
Jones Day
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
(412) 391-3939
mhginsberg@jonesday.com
tsjones@jonesday.com

*Counsel for The Weir Group PLC*

James W.A. Ladner (not yet admitted)
Associate General Counsel, Legal Department
St. Jude Medical, Inc.
One St. Jude Medical Drive
St. Paul, MN 55117
(651) 756-2048
jladner@sjm.com

*Counsel for St. Jude Medical Export GmbH*

David H. Braff
Penny Shane
Andrew H. Reynard
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
braffd@sullcrom.com
shanep@sullcrom.com
reynarda@sullcrom.com

*Counsel for Vitol, S.A.*

Lawrence W. Newman
Baker & McKenzie LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 891-3970
(212) 310 1600 fax
lwn@bakernet.com

*Counsel for Sulzer Buckhardt Engineering Works
Ltd.*

\*   Admitted *pro hac vice*
\*\*  *pro hac vice* application pending

## CERTIFICATE OF SERVICE

I, Brant W. Bishop, hereby certify that I caused a true and correct copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT to be served via ECF upon all counsel of record registered through the Court's ECF system.

On this 15th day of January, 2010.

   __/s/ Brant W. Bishop_____
   Brant W. Bishop
   Counsel for Siemens S.A.S. France and
   Siemens Sanayi ve Ticaret A.Ş.