**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE REPUBLIC OF IRAQ, including as
PARENS PATRIAE in behalf of the
CITIZENS of the REPUBLIC OF IRAQ,

                 Plaintiff,

         -against-

ABB AG, et al.,

              Defendants.

ECF CASE

08 Civ. 5951 (SHS)

**PLAINTIFF'S OPPOSITION TO THE DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

*Table of Contents*

**_Page_**

Table of Authorities.................................................................................................vii

Table of Contents ....................................................................................................... i

Preliminary Statement ................................................................................................1

Factual Background ....................................................................................................2

     A.     The Complaint ...............................................................................2

     B.     The Defendantsø Version of the Complaint ..................................6

Pleading Standards .....................................................................................................8

Argument ....................................................................................................................8

I.     The Hussein Regime was not the equivalent of the Iraqi nation.........................8

     A.     A government is the agent of the sovereign, not the sovereign itself. ...................9

     B.     A sovereign state is not intrinsically bound by the actions of its former rulers..................................................................................................10

          1.     Ferdinand Marcos..................................................................10

          2.     Jean-Claude ōBaby Docö Duvalier.........................................12

          3.     Marcos Perez Jimenez ............................................................12

          4.     Manuel Noriega......................................................................13

II.     The Republic of Iraq has standing to sue for the damage the Defendants caused. ...........14

     A.     The Complaint sets forth a definite case and controversy. ................................14

     B.     The Defendants injured the Republic of Iraq and the Iraqi people......................15

          1.     The Complaint alleges injury caused by the Defendantsøscheme............15

               b.     The Republic of Iraq and the Iraqi people suffered distinct injuries.......................................................................16

          2.     Opinions in related cases establish the Republic of Iraqøs standing. ........16

          3.     The opinions in <u>Karim</u>, <u>Boyd</u> and <u>Mastafa</u> support standing. .................18

4.      Numerous opinions establish the standing of sovereigns to sue those who bribe their officials. ...............................................20

C.      A judgment in the Republic's favor would benefit the victims of the Defendants' crimes. ......................................................................23

D.      The Republic of Iraq's parens patriae standing does not conflict with US foreign policy interests. ................................................................23

1.      In appropriate cases, foreign nations can assert parens patriae standing. ..............................................................................24

2.      The Republic of Iraq has inquired of the State Department, which has responded that it is premature for it to make a formal statement. .......................................................................24

3.      In this case, there is no need for the State Department to issue a formal statement, because the United States' foreign policy interests are clear. ..................................................................25

4.      The Defendants do not challenge the general propriety of parens patriae standing in this case. ..................................................26

5.      The parens patriae damages are not speculative. .....................26

III.    The Hussein Regime's illicit conduct does not bar the Republic of Iraq's claims. ..........27

A.      The in pari delicto defense does not bar the Republic of Iraq's claims. ...............27

1.      Comparison of fault is a fact question. ....................................28

2.      "Fraud for" v. "fraud against" jurisprudence helps explain the flaws in the Defendants' in pari delicto defense. ......................29

3.      As a matter of law, the in pari delicto defense does not apply to the Republic of Iraq's claims in support of Iraq's public interests. ...............30

B.      The act of state doctrine does not bar adjudication of the Republic's claims. ...................................................................................31

1.      The act of state doctrine raises fact questions that cannot be addressed on the face of the Complaint. ..................................31

2.      The Hussein Regime's corrupt actions were not acts of state. ..................32

3.      The act of state doctrine does not apply as a matter of law. ....................34

4.      The Republic's action does not seek collection of taxes. .........................36

C.      This action does not implicate the political question doctrine. ............................36

     1.     The political question doctrine raises the same fact questions as the act of state doctrine...................................................................................36

     2.     This action does not interfere with the conduct of foreign relations........37

     3.     As a matter of law, this Court is competent to determine whether the kickbacks were made pursuant to a legitimate governmental purpose.............................................................................................38

     4.     This Court need not decide the Hussein Regime's illegitimacy, which has already been determined by the Executive Branch.................40

IV.    The Republic of Iraq's claims are not barred by limitations. ...........................................41

   A.     The Republic of Iraq's claims against BNP began to accrue October 27, 2005...................................................................................................41

   B.     General tolling rules apply to actions brought by foreign sovereigns. .................42

   C.     Limitations was tolled as a matter of law from 1991 through July 2004 because the Republic of Iraq was incapable of bringing suit in the United States. ................................................................................................43

     1.     As an enemy of the United States law, the Hussein Regime could not prosecute a lawsuit in the United States from 1991 through July 2004. .................................................................................................43

     2.     Tolling is unaffected by the CPA's control of Iraqi sovereignty. .............45

   D.     Extraordinary circumstances delayed the Republic's filing................................46

     1.     Hussein's tyrannical rule justifies tolling. .................................................47

     2.     The conflict in Iraq and its nascent governmental institutions justify equitable tolling. .........................................................................48

V.    The Republic of Iraq's specific claims support relief.......................................................49

   A.     The Republic of Iraq has stated viable RICO claims...........................................49

     1.     The Complaint alleges the requirements for RICO standing....................49

     2.     This Court has subject matter jurisdiction under RICO. ..........................52

        a.     The relevant conduct is not extraterritorial. .................................53

b. The UN Escrow Account and Programme administration falls under this Court's jurisdiction.................................54

c. Standing is appropriate under the ultimate inquiry......................56

d. Standing is appropriate under the conducts test. .........................56

e. Standing is appropriate under the effects test..............................57

3. The Complaint pleads the elements of a RICO Section 1962(c) claim. ...................................................................................57

a. There are two viable RICO Enterprises. ......................................57

(1) The Defendants alter RICO's statutory definition. ...........58

(2) The Programme is a "legal entity" enterprise. .................58

(3) Both Complaint enterprises are also association-in-fact enterprises. ...........................................................60

b. The Defendants "operated or managed" the enterprises through their pattern of racketeering............................................61

(1) The Defendants are enterprise insiders............................62

(2) The Defendants participated in the Programme's operations and management through bribery and kickbacks. .....................................................................63

c. The Defendants engaged in racketeering activity.........................65

d. The Defendants engaged in a pattern of racketeering activity. ...................................................................................70

4. The Complaint alleges a RICO conspiracy under 1962(d).....................73

B. The Complaint alleges a claim under the Robinson-Patman Act or ("RPA")...................................................................................78

1. The Republic of Iraq has standing to sue under the RPA.......................78

2. There is subject matter jurisdiction under the RPA. ..............................80

3. The Republic of Iraq states a viable claim under the RPA......................81

C. This Court should infer a private right of action under the FCPA. ......................81

D. The Republic of Iraq's common law claims are more than plausible..................83

1. The Complaint states a claim for common law fraud.............................83

 a. The Defendants fraud was directed at the UN.............................83

 b. The Republic of Iraq can base its fraud claim on misrepresentations directed at the UN. ........................................84

  (1) The Republic's fraud claims are governed by general common law rules, not New York law.................84

  (2) Even if New York law applies, this Court is bound by decisions of the New York Court of Appeals. .............85

 c. In the alternative, the Republic of Iraq seeks leave to amend to restate its common law fraud claim as claims for money had and received and conversion.....................................88

2. The Defendants conspired to defraud the UN..........................................89

3. The Republic of Iraq adequately pleaded its fiduciary duty claims. .........89

4. The Defendants breached their contracts.................................................91

5. The Complaint alleges an unjust enrichment claim. ...............................94

Leave to Amend.................................................................................................94

Conclusion ........................................................................................................95

*Table of Authorities*

## CASES

*131 Main Street Assos. v. Manko,*
  897 F. Supp. 1507 (S.D.N.Y. 1995) ....................................................................63

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,*
731 F.2d 112 (2d Cir. 1984) ........................................................................88-89

*Abbas v. Dixon,*
  480 F.3d 636 (2d Cir. 2007) ........................................................................47

*Abecassis v. Wyatt,*
  2010 WL 1286871 (S.D. Tex. 2010) ..............................................................20

*A.C. Monk & Co. v. Ubaf Arab Am. Bank,*
  875 F. Supp. 311 (E.D.N.C. 1995) ................................................................45

*In re Adelphia Commun. Corp.,*
  365 B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd in part sub. nom*
  *Adelphia Recovery Trust v. Bank of Am., N.A.,*
  390 B.R. 64 (S.D.N.Y. 2008) .........................................................................47

*Aetna Cas. Sur. Co. v. P & B Autobody,*
  43 F.3d 1546 (1st Cir. 1994) ........................................................................65

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
  425 U.S. 682 (1976) ..............................................................................32, 33

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ..............................................................................23, 26

*Arce v. Garcia,*
  434 F.3d 1254 (11th Cir. 2006) ...............................................................47, 48

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009) ..................................................................................8

*Associated Gen. Contractors v. Cal.*
*State Council of Carpenters Inc.,*
  459 U.S. 519 (1983) ....................................................................................79

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,*
  268 F.3d 103 (2d Cir. 2001) .........................................................................36

*In re Automated Teller Mach. Advantage LC v. Moore,*
 2009 WL 2431513 (S.D.N.Y. 2009) ........................................................... 65, 70, 72

*Baker v. Carr,*
 369 U.S. 186 (1962) ................................................................................... 36, 37

*Banco Nacional de Cuba v. Sabbatino,*
 376 U.S. 398 (1964) ................................................................................... 31, 34

*Bancoult v. McNamara,*
 445 F.3d 427 (D.C. Cir. 2006) ............................................................................ 37

*Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano,*
 2007 WL 1687044 (S.D.N.Y. 2007) ..................................................................... 89

Baroor v. New York City Dep't of Educ.,
 2010 WL 227681 (2d Cir. 2010) ........................................................................ 46

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
 472 U.S. 299 (1985) ........................................................................................... 28

*BCCI Holdings (Luxembourg), SA v. Pharaon,*
 43 F. Supp. 2d 359 (S.D.N.Y. 1999) ................................................................... 50

*Beaty v. Republic of Iraq,*
 480 F. Supp. 2d 60 (D.D.C. 2007), *rev'd on other grounds,*
 129 S. Ct. 2183 (2009) ...................................................................................... 37

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007) ............................................................................................. 8

*Bernhardt v. Tradition N. Am.,*
 676 F. Supp. 2d 301 (S.D.N.Y. 2009) ................................................................... 8

*Bigio v. Coca-Cola Co.,*
 239 F.3d 440 (2d Cir. 2000) ............................................................................... 34

*Blue Shield of Virginia v. McCready,*
 457 U.S. 465 (1982) ................................................................................ 78, 79, 80

*Blue Tree Hotels Inv. (Canada), Ltd. v.*
*Starwood Hotels & Resorts Worldwide, Inc.,*
 369 F.3d 212 (2d Cir. 2004) .......................................................................... 52, 81

*Boyd v. AWB, Ltd,*
 544 F. Supp. 2d 236 (S.D.N.Y. 2008) ....................................................... 18, 19, 20

*Boyle v. United States,*
129 S. Ct. 2237 (2009) .......................................................................................... 60

*Braka v. Bancomer, S.N.C.,*
762 F.2d 222 (2d Cir. 1985) ................................................................................. 33

*Bridge v. Phoenix Bond & Indem. Co.,*
128 S. Ct. 2131 (2008) .................................................................................... *passim*

*Buckley v. Deloitte & Touche USA LLP,*
2007 WL 1491403 (S.D.N.Y. 2007) .............................................................. 28, 29

*Burke v. Dowling,*
944 F. Supp. 1036 (E.D.N.Y. 1995) .................................................................... 62

*Buxton Mfg. Co. v. Valient Moving & Storage, Inc.,*
239 A.D.2d 452 (2d Dept 1997) ..................................................................... 86, 87

*In re Cardiac Devices Qui Tam Litig.,*
221 F.R.D. 318 (D. Conn. 2004) ......................................................................... 66

*Cannon v. Univ. of Chicago,*
441 U.S. 677 (1979) ............................................................................................ 82

*Carl Marks & Co. v. USSR,*
665 F. Supp. 323 (S.D.N.Y. 1987), *aff'd,*
841 F.2d 26 (2d Cir. 1988) ................................................................................. 42

*Carter v. Berger,*
777 F.2d 1173 (7th Cir. 1985) ............................................................................ 21

*Cement & Concrete Workers Dist. Council Welfare Fund v. Lallo,*
148 F.3d 194 (2d Cir. 1998) ........................................................................... 84, 88

*Cenco Inc. v. Seidman & Seidman,*
686 F.2d 449 (7th Cir. 1982) .............................................................................. 29

*Chavez v. Carranza,*
407 F. Supp. 2d 925 (W.D. Tenn. 2004) ............................................................. 48

*Chavez v. Carranza,*
559 F.3d 486 (6th Cir. 2009) .............................................................................. 47

*City of New York v. Citisource, Inc.,*
679 F. Supp. 393 (S.D.N.Y. 1998) ..................................................................... 32

*City of New York v. Corwen,*
164 A.D.2d 212 (1st Dept 1990) .................................................................... 22, 30

*City of New York v. Joseph L. Balkan, Inc.,*
    656 F. Supp. 536 (E.D.N.Y. 1987)...........................................................................22, 52, 67

*City of New York v. Smokes-Spirits.com, Inc.,*
    541 F.3d 425(2d. Cir. 2008), *rev'd on other grounds,*
    130 S. Ct. 983 (2010) .........................................................................................84, 88

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*
    187 F.3d 229 (2d Cir. 1999) .........................................................................................70

*Connecticut v. Am. Elec. Power Co.,*
    582 F.3d 309 (2d Cir. 2009) ...................................................................................26, 27

*Consolidated Gold Fields PLC v. Minorco, S.A.,*
    871 F.2d 252 (2d Cir. 1989) .........................................................................................57

*Cont'l Mgmt., Inc. v. United States,*
    527 F.2d 613 (Ct. Cl. 1975) ..........................................................................................22

*Cooper v. Weisblatt,*
    154 Misc. 522 (Sup. Ct. N.Y. Co. 1935) .......................................................................86

*Coordination Council for N. Am. Affairs v. Nw. Airlines Inc.,*
    891 F. Supp. 4 (D.D.C. 1995) .......................................................................................25

*Cosmos Forms Ltd. v. Guardian Life Ins. Co.,*
    113 F.3d 308 (2d Cir. 1997) .........................................................................................71

*Crimpers Promotions Inc. v. Home Box Office, Inc.,*
    724 F.2d 290 (2d Cir. 1983) .........................................................................................80

*Daventree Ltd. v. Republic of Azerbaijan,*
    349 F. Supp. 2d 736 (S.D.N.Y. 2004)......................................................................31, 32

*DeFalco v. Bernas,*
    244 F.3d 286 (2d Cir. 2001) ...................................................................................59, 72

*Desser v. Schatz,*
    182 A.D.2d 478 (1st Dept 1992) ...................................................................................86

*Doe I v. Unocal Corp.,*
    963 F. Supp. 880 (C.D. Ca. 1997), *related opinion vacated,*
    403 F.3d 708 (9th Cir. 2005) ..................................................................................35, 48

*Doe v. Exxon Mobil Corp.,*
    473 F.3d 345 (D.C. Cir. 2007), *cert. denied,*
    128 S. Ct. 2931 (2009).................................................................................................38

*Doe v. Saravia,*
  348 F. Supp. 2d 1112 (E.D. Cal. 2004) .................................................................48

*Dominicus Americana Bohio v. Gulf & W. Indus., Inc.,*
  473 F. Supp. 680 (S.D.N.Y. 1979) ........................................................................66

*Dornberger v. Metro. Life Ins. Co.,*
  961 F. Supp. 506 (S.D.N.Y. 1997) .................................................................. 93, 94

*DP Aviation v. Smith Indus. Aerospace & Defense Sys. Ltd.,*
  268 F.3d 829 (9th Cir. 2001) ...............................................................................47

*Enzo Biochem, Inc. v. Johnson & Johnson,*
  1990 WL 136038 (S.D.N.Y. 1990) ................................................................. 60-61

*Estate of Cabello v. Fernandez-Lonos,*
  157 F. Supp. 2d 1345 (S.D. Fla. 2001) ................................................................48

*In re Estate of Ferdinand Marcos, Human Rights Litig.,*
  25 F.3d 1467 (9th Cir. 1994) ...............................................................................32

*Estados Unidos Mexicanos v. DeCoster,*
  229 F.3d 332 (1st Cir. 2000) ......................................................................... 24, 25

*Ex Parte Colonna,*
  314 U.S. 510 (1942) .............................................................................................43

*Farbenfabriken Bayer A. G. v. Sterling Drug, Inc.,*
  251 F.2d 300 (3d Cir. 1958) ................................................................................45

*Fed. Ins. Co. v. Argitakos,*
  637 F. Supp. 814 (S.D.N.Y. 1986) .......................................................................89

*Field v. Fid. Union Trust Co.,*
  311 U.S. 169 (1940) .............................................................................................87

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,*
  385 F.3d 159 (2d Cir. 2004) ................................................................................61

*First Fid. Bank, N. Am. v.*
*Gov't of Antigua & Barbuda-Permanent Mission,*
  877 F.2d 189 (2d Cir. 1989) .......................................................................... 10, 31

*Foman v. Davis,*
  371 U.S. 178 (1962) .............................................................................................94

*Forti v. Suarez-Mason,*
   672 F. Supp. 1531 (N.D. Cal. 1987). ........................................................ 48, 49

*Fuji Photo Film U.S.A., Inc. v. McNulty,*
   2009 WL 3334867 (S.D.N.Y. 2009) ......................................................... 66

*Fuji Photo Film U.S.A., Inc. v. McNulty,*
   640 F. Supp. 2d 300 (S.D.N.Y. 2009) ...................................................... 73

*George C. Frey Ready-Mixed Concrete, Inc. v.*
*Pine Hill Concrete Mix Corp.,*
   554 F.2d 551 (2d Cir. 1977) ................................................................... 81

*Gladstone, Realtors v. Vill. of Bellwood,*
   441 U.S. 91 (1979) ................................................................................ 14

*Gordon v. State of Texas,*
   153 F.3d 190 (5th Cir. 1998) ................................................................. 38

*Gov't of Rwanda v. Johnson,*
   409 F.3d 368 (D.C. Cir. 2005) ............................................................... 90

*Gov't of Union of Burma v. Unocal, Inc.,*
   176 F.R.D. 329 (C.D. Ca. 1997) ............................................................. 33

*Guar. Trust Co. v. United States,*
   304 U.S. 126 (1938) .........................................................................*passim*

*Gulf Oil Corp. v. Copp Paving Co.,*
   419 U.S. 186 (1974) .......................................................................... 80- 81

*Haekal v. Refco, Inc.,*
   198 F.3d 37 (2d Cir. 1999) ................................................................... 46

*Hamdi v. Rumsfeld,*
   542 U.S. 507 (2004) ............................................................................. 44

*Hecht v. Commerce Clearing House, Inc.,*
   897 F.2d 21 (2d Cir. 1990) ................................................................... 89

*Herman & MacLean v. Huddleston,*
   459 U.S. 375 (1983) ............................................................................. 82

*Hilao v. Estate of Ferdinand Marcos,*
   103 F.3d 767 (9th Cir. 1996) ................................................................. 47

*Hilaturas Miel, S.L. v. Republic of Iraq,*
   573 F. Supp. 2d 781 (S.D.N.Y. 2008) .................................................. 54, 81

*H.J. Inc. v. Nw. Bell Tel. Co.,*
   492 U.S. 229 (1989) ................................................................................ 64, 72

*Hyosung Am., Inc. v. Sumagh Textile Co.,*
   25 F. Supp. 2d 376 (S.D.N.Y. 1998), *aff'd,*
   189 F.3d 461 (2d Cir. 1999) ........................................................................ 87

*IDT Corp. v. Morgan Stanley Dean Witter & Co.,*
   12 N.Y.3d 132 (2009) ................................................................................. 94

*In re Initial Pub. Offering Sec. Litig.,*
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................................................ 65

*Jacobson v. Cooper,*
   882 F.2d 717 (2d Cir. 1989) ....................................................................... 61

*Jean v. Dorelien,*
   431 F.3d 776 (11th Cir. 2005) .................................................................... 47

*Jefferson County Pharms. Ass'n, Inc. v. Abbott Labs.,*
   460 U.S. 150 (1983) .............................................................................. 21, 80

*Jimenez v. Aristeguieta,*
   311 F.2d 547 (5th Cir. 1962) ..................................................... 12-13, 32-33

*Johnson v. Yellow Cab Transit Co.,*
   321 U.S. 383 (1944) .................................................................................. 28

*Johnson Elec. N. Am. v. Mabuchi Motor Am. Cop.,*
   98 F. Supp. 2d 480 (S.D.N.Y. 2000) ..................................................... 53, 54

*Johnston v. Eisentrager,*
   339 U.S. 763 (1950) .................................................................................. 43

*Jungquist v. Nahyan,*
   940 F. Supp. 312 (D.D.C. 1996) ............................................................... 32

*Kadic v. Karadzic,*
   70 F.3d 232 (2d Cir. 1995) ..................................................................... 14, 38

*Karim v. AWB, Ltd.,*
   2008 WL 4450265 (S.D.N.Y. 2008), *aff'd,*
   347 Fed. Appx. 714 (2d Cir. 2009) ................................................. 18, 20, 50

*Kashani v. Tsann Kuen China Enter. Co.,*
   13 Cal. Rptr. 3d 174 (Ct. App. 2004) ..................................................... 93-94

*Kemler v. United States,*
   133 F.2d 235 (1st Cir. 1942) .................................................................................23

*Klinghoffer v. S.N.C. Achille Lauro,*
   937 F.2d 44 (2d Cir. 1991) ............................................................................ 38, 43

*Kunstsammlungen zu Weimar v. Elicofon,*
   536 F. Supp. 829 (E.D.N.Y. 1981), *aff'd,*
   678 F.2d 1150 (2d Cir. 1982) ...............................................................................46

*Lamb v. Phillip Morris, Inc.,*
   915 F.2d 1024 (6th Cir. 1990) ........................................................................ 81, 83

*Late Corp. of the Church of Jesus Christ of
Latter-Day Saints v. United States,*
   136 U.S. 1 (1890) ....................................................................................................25

*Laudes Corp. v. United States,*
   84 Fed. Cl. 298 (Fed. Cl. 2008) ............................................................................46

*Lehigh Valley R.R. Co. v. State of Russia,*
   21 F.2d 396 (2d Cir. 1927) ......................................................................................9

*Leighton Techs. LLC v. Orberthur Card Sys., S.A.,*
   531 F. Supp. 2d 591 (S.D.N.Y. 2008) ...................................................................27

*Lerner v. Fleet Bank, N.A.,*
   318 F.3d 113 (2d Cir. 2003) ........................................................................ 49, 51, 52

*Letelier v. Republic of Chile,*
   488 F. Supp. 665 (D.D.C. 1980) ...........................................................................35

*Levine v. Michael Ashton, Inc.,*
   2010 WL 128077 (Sup. Ct. N.Y. Co. 2010) .........................................................85

*Liu v. Republic of China,*
   892 F.2d 1419 (9th Cir. 1989) ...............................................................................33

*Lou v. Belzberg,*
   728 F. Supp. 1010 (S.D.N.Y. 1990) ......................................................................47

*Luce v. Edelstein,*
   802 F.2d 49 (2d Cir. 1986) .....................................................................................95

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................................................................23

*Lyondell-Citgo Ref., LP v. Petroleos de Venezuela, S.A.,*
   2003 WL 21878798 (S.D.N.Y. 2003) ............................................................ 31, 33

*Madanes v. Madanes,*
   981 F. Supp. 241 (S.D.N.Y. 1997) ....................................................................... 8

*Malewicz v. City of Amsterdam,*
   517 F. Supp. 2d 322 (D.D.C. 2007) .................................................................... 33

*Mannington Mills, Inc. v. Congoleum Corp.,*
   595 F.2d 1287 (3d Cir. 1979), *rev'd on other grounds,*
   115 F.3d 1020 (D.C. Cir. 1997) .......................................................................... 32

*Man Radio & Elec. Ltd. v. Von Cseh,*
   12 Misc. 435 (Sup. Ct. N.Y. Co. 1958) ............................................................. 89

*Masafa v. Australian Wheat Bd. Ltd.,*
   2008 WL 4378443 (S.D.N.Y. 2008) ......................................................18, 19, 20 52

*MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.,*
   216 F. Supp. 2d 251 (S.D.N.Y. 2002) ............................................................... 27

*In re MTBE Prods. Liab. Litig.,*
   438 F. Supp. 2d 291 (S.D.N.Y. 2006) ............................................................... 36

*Morrison v. Nat'l Australia Bank Ltd.,*
   547 F.3d 167(2d Cir. 2008), *cert. denied,*
   130 S. Ct. 783 (2009) ......................................................................................... 53

*Municipality of Anchorage v. Hitachi Cable, Ltd.,*
   547 F. Supp. 633 (D. Alaska 1982) .............................................................. 21, 80

*N. Am. v. Mabuchi Motor Am. Corp.,*
   98 F. Supp. 2d 480 (S.D.N.Y. 2000) ................................................................ 53

*Nat'l Oil Corp. v. Libyan Sun Oil Co.,*
   733 F. Supp. 800 (D. Del. 1990) ....................................................................... 45

*Nat'l Coal. Gov't of Union of Bermuda v. Unocal, Inc.,*
   176 F.R.D. 329 (C.D. Ca. 1997) ............................................................ 33, 34, 48

*N.B. Garments (PVT.) Ltd. v. Kids Int'l Corp.,*
   2004 WL 444555 (S.D.N.Y. 2004) ...................................................... 66, 85-86, 87

*N. S. Fin. Corp. v. Al-Turki,*
   100 F.3d 1046 (2d Cir. 1996) ................................................................ 53, 56, 57

*Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards,*
  437 F.3d 1145 (11th Cir. 2006) ................................................................28

*Oerlikon Mach. Tool Works Buehrle & Co. v. United States,*
  102 F. Supp. 417(Ct. Cl. 1952), *vacated on other grounds,*
  151 F. Supp. 332 (Ct. Cl. 1957) ..........................................................43-44

*Osbourne v. United States,*
  164 F.2d 767 (2d Cir. 1947) ....................................................................44

*Paris v. Dep't Nat'l Store Branch 1 (Vietnam),*
  2000 WL 777904 (S.D.N.Y. 2000) ...................................................... 16, 69

*People v. Coumatos,*
  32 Misc. 2d 1085 (Gen. Sess. N.Y. Co. 1962), *aff'd mem.,*
  247 N.Y.S.2d 1000 (1964) ......................................................................55

*People v. Weiner,*
  85 Misc. 2d 161 (Crim. Ct. N.Y. Co. 1976) ........................................ 55, 56

*Pfizer, Inc. v. Gov't of India,*
  434 U.S. 308 (1978) ................................................................................43

*Pfizer, Inc. v. Lord,*
  522 F.2d 612 (8th Cir. 1975) ..................................................................25

*Philip Morris, Inc. v. Grinnell Lithographic Co.,*
  67 F. Supp. 2d 126 (E.D.N.Y. 1999) ...................................................21-22

*Pinter v. Dahl,*
  486 U.S. 622 (1988) ................................................................................28

*Polycast Tech. Corp. v. Uniroyal, Inc.,*
  728 F. Supp. 926 (S.D.N.Y. 1989) ..................................................... 72, 73

*Pons v. People's Republic of China,*
  666 F. Supp. 2d 406 (S.D.N.Y. 2009) ........................................................8

*Psimenos v. E.F. Hutton & Co.,*
  722 F.2d 1041 (2d Cir. 1983) ..................................................................56

*Qualls v. Rumsfeld,*
  357 F. Supp. 2d 274 (D.D.C. 2005) .........................................................44

*Republic of Haiti v. Duvalier,*
  211 A.D.2d 379 (1st Dept 1995) ..............................................................12

*Republic of Iraq v. First Nat'l City Bank,*
  353 F.2d 47 (2d Cir. 1965) ...................................................................................84

*Republic of the Philippines v. Marcos,*
  806 F.2d 344 (2d Cir. 1986) ........................................................................ 12, 32, 84

*Republic of the Philippines v. Marcos,*
  818 F.2d 1473 (9th Cir. 1987), *rev'd,*
  862 F.2d 1355 (9th Cir. 1988) ...............................................................11, 12, 39, 40

*Republic of the Philippines v. Marcos,*
  862 F.2d 862 F.2d 1355 (9th Cir. 1988) ....................................................*passim*

*Republic of the Philippines v. Westinghouse Elec. Corp.,*
  774 F. Supp. 1438 (D.N.J. 1991) ..............................................................*passim*

*Reves v. Ernst & Young,*
  507 U.S. 170 (1993) ........................................................................... 61, 63, 64

*Rice v. Manley,*
  66 N.Y. 82 (1876) .............................................................................. 85, 86

*Ruffing v. Union Carbide Corp.,*
  308 A.D.2d 526 (2d Dept 2003).....................................................................87

*In re S. African Apartheid Litig.,*
  617 F. Supp. 2d 228 (S.D.N.Y. 2009) ..........................................................41, 47

*Salinas v. United States,*
  522 U.S. 52 (1997) ............................................................................ 73, 74

*Schacht v. Brown,*
  711 F.2d 1343 (7th Cir. 1983) ..................................................................29, 30

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) ................................................................................57

*Segal v. Gordon,*
  467 F.2d 602 (2d Cir. 1972) ......................................................................66

*Serv. Employees Int'l Union Health &*
*Welfare Fund v. Philip Morris Inc.,*
  249 F.3d 1068 (D.D. Cir. 2001)....................................................................25

*Siegelman v. Cunard White Star, Ltd.,*
  221 F.2d 189 (2d Cir. 1955) .......................................................................47

*Smith v. Bromley,*
  2 Douglas 696 (1760) ..................................................................................................28

*Spool v. World Child Int'l Adoption Agency,*
  520 F.3d 178 (2d Cir. 2008) ................................................................................. 72, 73

*Staehr v. Hartford Fin. Servs. Group, Inc.,*
  547 F.3d 406 (2d Cir. 2008) ....................................................................................... 8

*Stauffer v. Brooks Bros., Inc.,*
  615 F. Supp. 2d 248 (S.D.N.Y. 2009) ....................................................................14

*Sterling Nelson & Sons, Inc. v. Rangen, Inc.,*
  235 F. Supp. 393 (D. Idaho 1964), *aff'd,*
  351 F.2d 851 (9th Cir. 1965) ............................................................................. 21, 80

*In re Sumitomo Copper Litig.,*
  995 F. Supp. 451 (S.D.N.Y. 1998) ..........................................................................67

*Superintendent of Ins. v. Bankers Life & Cas. Co.,*
  404 U.S. 6 (1971) ........................................................................................................82

*The Sapphire,*
  78 U.S. 164 (1870) ................................................................................................ 9, 41

*Thomas v. City of Richmond,*
  79 U.S. 349 (1870) .....................................................................................................28

*Touche Ross & Co. v. Remington,*
  442 U.S. 560 (1979) ...................................................................................................82

*Trajano v. Marcos,*
  878 F.2d 1439, 1989 WL 76894 (9th Cir. 1989) ..................................................36

*Underhill v. Hernandez,*
  168 U.S. 250 (1897) ...................................................................................................35

*In re Union Carbide Corp. Gas Plant Disaster,*
  634 F. Supp. 842 (S.D.N.Y. 1986), *aff'd as modified,*
  809 F.2d 195 (2d Cir. 1987) .....................................................................................25

*United States v. Allen,*
  155 F.3d 35 (2d Cir. 1998) ................................................................................. 62, 64

*United States v. Angelilli,*
  660 F.2d 23 (2d Cir. 1981).................................................................................. 58, 59

*United States v. Barber,*
    476 F. Supp. 182 (S.D. W.Va. 1979) ...................................................................59

*United States v. Busacca,*
    936 F.2d 232 (6th Cir. 1991) ............................................................................71

*United States v. Castro,*
    89 F.3d 1443 (11th Cir. 1996) ..........................................................................63

*United States v. Chalmers (Chalmers I),*
    410 F. Supp. 2d 278 (S.D.N.Y. 2006) .......................................................*passim*

*United States v. Chalmers (Chalmers II),*
    474 F. Supp. 2d 555 (S.D.N.Y. 2007) .......................................................*passim*

*United States v. Ciccone,*
    312 F.3d 535 (2d Cir. 2002) .............................................................................74

*United States v. Clark,*
    646 F.2d 1259 (8th Cir. 1981) ..........................................................................59

*United States v. Collins,*
    927 F.2d 605, 1991 WL 23558 (6th Cir. 1991) ...............................................58

*United States v. Custer Battles, LLC,*
    562 F.3d 295 (4th Cir. 2009) ............................................................................46

*United States v. Evans,*
    667 F. Supp. 974 (S.D.N.Y. 1987) ...........................................................35, 38

*United States v. Fiel,*
    35 F.3d 997 (4th Cir. 1994) ..............................................................................60

*United States v. Frumento,*
    405 F. Supp. 23 (E.D. Pa. 1975), *aff'd,*
    563 F.3d 1083 (3d Cir. 1977) ...........................................................................59

*United States v. Hernandez,*
    168 U.S. 250 (1897) ..........................................................................................36

*United States v. Marzook,*
    426 F. Supp. 2d 820 (N.D. Ill. 2006) ...............................................................40

*United States v. Noriega,*
    746 F. Supp. 1506 (S.D. Fla. 1990), *aff'd,*
    117 F.3d 1206 (11th Cir. 1997) ............................................. 13-14,  32, 35

*United States v. Perholz*,
842 F.2d 343 (D.C. Cir. 1988) ....................................................................58

*United States v. Philip Morris, Inc.*,
300 F. Supp. 2d 61 (D.D.C. 2004) ..............................................................30

*United States v. Rastelli*,
870 F.2d 822 (2d Cir. 1989) ........................................................................77

*United States v. Trafigura AG*,
2008 WL 4057907 (S.D. Tex. 2008) ......................................................16-17

*United States v. Turkette*,
452 U.S. 476 (1981) ....................................................................................60

*United States v. Vignola*,
464 F. Supp. 1091 (E.D. Pa. 1979), *aff'd*,
605 F.2d 1199 (3d Cir. 1979), *cert. denied*,
444 U.S. 1072 (1980) ..................................................................................59

*United States v. Viola*,
35 F.3d 37 (2d Cir. 1994), *cert. denied*,
513 U.S. 1198 (1995) ..................................................................................63

*United States v. Yannotti*,
541 F.3d 112 (2d Cir. 2008), *cert. denied*,
129 S. Ct. 1648 (2009) ................................................................................77

*United States v. Zichettello*,
208 F.3d 72 (2d Cir. 2000) ....................................................................61, 76

*United States ex rel. DRC, Inc. v. Custer Battles Inc.*,
376 F. Supp. 2d 617 (E.D. Va. 2005), *rev'd on other grounds*,
562 F.3d 295 (4th Cir. 2009) ......................................................................16

*United States ex rel. Taylor v. Gabelli*,
345 F. Supp. 2d 313 (S.D.N.Y. 2004) ........................................................66

*United States ex rel. Tiesinga v. Dianon Sys, Inc.*,
231 F.R.D. 122 (D. Conn. 2005) ................................................................66

*Vine v. Republic of Iraq*,
459 F. Supp. 2d 10 (D.D.C. 2006), *rev'd on other grounds*,
129 S. Ct. 2183 (2009) ............................................................................38-39

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
493 U.S. 400 (1990) ..............................................................................31, 32

*WWE, Inc. v. Jakks Pac., Inc.*,
   530 F. Supp. 2d 486 (S.D.N.Y. 2007), *aff'd*,
   328 Fed. Appx. 695 (2009) .................................................................................. 70

*Youkhana v. Gonzales*,
   460 F.3d 927 (7th Cir. 2006) .............................................................................. 46

*Zito v. Leasecomm Corp.*,
   2004 WL 2211650 (S.D.N.Y. 2004) ............................................................. 76, 77

## STATUTES

15 U.S.C. § 13 ................................................................................................ 21

15 U.S.C. § 15 ................................................................................................ 78

15 U.S.C. § 78dd-2 ......................................................................................... 70

18 U.S.C. § 542 .............................................................................................. 17

18 U.S.C. § 1343 .............................................................................................. 7

18 U.S.C. § 1961 ....................................................................................... *passim*

18 U.S.C. § 1962 ....................................................................................... *passim*

18 U.S.C. § 1956 ............................................................................................. 68

C.P.L.R. § 209 ............................................................................................... 44

## RULES & REGULATIONS

Fed. R.Civ. P. 9 ............................................................................................. 65

31 C.F.R. § 575.201 ....................................................................................... 69

31 C.F.R. § 575.321 ....................................................................................... 69

31 C.F.R. § 575.404 ....................................................................................... 69

31 C.F.R. § 575.701 ....................................................................................... 69

## OTHER AUTHORITIES

13C Alan Wright & Arthur R. Miller,
FEDERAL PRACTICE AND PROCEDURE
 § 3534.21 (3d ed. 2010) ........................................................................................................ 33

Alan Wright & Arthur R. Miller,
FEDERAL PRACTICE AND PROCEDURE
 § 3534 (3d ed. 2010) ............................................................................................................. 36

Alan Wright & Arthur R. Miller,
FEDERAL PRACTICE AND PROCEDURE
 § 1487 (3d ed. 2010) ............................................................................................................. 95

H.R. Rep. No. 640, 95th Cong., 1st Sess. (1977) ...................................................................... 83

S. Rep. No. 1031, 94th Cong., 2d Sess. (1976) ........................................................................ 82

*The Role of BNP-Paribas SA in the United Nations*
*Oil-for-Food Program: Hearing Before the Subcommittee on*
*Oversight and Investigations, House Committee on Int'l Relations,*
 109th Cong. (2005) ............................................................................................................... 69

Restatement (Second) of Contract § 302 (1981) ...................................................................... 92

Note, Lamb v. Philip Morris, Inc. 915 F.2d 1024:
*The Sixth Circuit Gets Sheepish on Foreign Corrupt*
*Practices Act Enforcement,*
 5 Transnat'l Law. 533 (1992) ......................................................................................... 82, 83

## Preliminary Statement

The Defendants conspired with the Hussein Regime to steal humanitarian funds on deposit in New York as part of the United Nations Oil for Food Programme. These Programme funds were designated by UN Security Council Resolution to feed and succor the Iraqi people. The funds were generated by the sale of Iraqi oil and therefore were owned by the Republic of Iraq. The Defendants received their share of the stolen funds through exorbitant contract profits. Saddam Hussein received his share in cash bribes and diverted goods, which he used to circumvent the sanctions and remain in power.

The Republic of Iraq sues for the injuries the Defendants' conspiracy with the Hussein Regime inflicted on the Republic and its citizens. The Republic's damages are in the billions of dollars. The Defendants' conduct constituted RICO violations, fraud, and participation in the breaches of fiduciary duty by the Republic's former ruler, among other claims for relief.

There is no doubt about the Defendants' liability. About a third of the Defendants have already entered into plea agreements with US authorities in which they admit their wrongdoing. An independent United Nations investigation, headed by Paul Volcker, confirms the wrongful actions of all Defendants.

Attempting to avoid their liability, the Defendants base their motion to dismiss on a single false legal premise – the Hussein Regime and the sovereign Republic of Iraq are identical. On this basis, the Defendants invite the Court to hold that their theft of humanitarian funds from the Republic and its citizens is not wrongful as a matter of law because the Hussein Regime was involved in the thievery. On the same basis, the Defendants even claim that as a matter of law their theft of humanitarian funds *benefited* the Republic of Iraq and the Iraqi people. The Defendants, however, cannot transform "injury" into "benefit" by unilaterally defining "Iraq" and "Hussein Regime" as co-extensive terms.

The Hussein Regime is not the plaintiff in this lawsuit.  The plaintiff is the Republic of Iraq, which, along with the Iraqi people, was victimized by the Defendants' conspiracy with the Hussein Regime.  The Hussein Regime was not the nation, but the nation's self-proclaimed ruler (that is, its self-appointed agent).  Because the Defendants ignore this elemental distinction, they misstate in the first sentence of their memorandum the central question raised by this case.  Contrary to the Defendants' formulation of the question, the Defendants' scheme was not masterminded by a "foreign state," but by the foreign state's corrupt dictator and his carefully controlled cadre.  Properly stated, this action tests whether private companies and individuals who assist an oppressive dictator in stealing from his own country are liable for their wrongs or whether their clear violations of law are excused by the dictator's complicity.  This question is neither unprecedented nor unclear.  Opinions involving a litany of dictators reject the purportedly absolute power of a despot as a legal defense.

## Factual Background

### A.    The Complaint

Following the Hussein Regime's invasion of Kuwait, the United Nations imposed sanctions to isolate the Regime.  First Amended Complaint ("Complaint" or "FAC") ¶¶ 239-40.  The sanctions had unintended yet dire consequences for the health and welfare of the Iraqi people.  To alleviate their suffering, in 1996 the UN created a single exception to the Iraqi sanctions – the Oil for Food Programme (the "Programme").  The Programme allowed the sale of Iraqi oil to purchase needed humanitarian aid.  According to the UN, the Programme was "[c]onceived as a means for reconciling strong sanctions against a corrupt Iraqi regime with needed supplies of food and medicines to an innocent and vulnerable population."  FAC ¶ 296 (quoting United Nations Report on Management of the Oil-for-Food Programme, September 7, 2005 ("UN Management Report")).

The UN carefully structured the Programme to furnish assistance to the Iraqi people while maintaining the sanctions' effectiveness and avoiding the Hussein Regime's enrichment. For this reason, the Programme did not allow the Hussein Regime to receive the proceeds from oil sales. Instead, the Programme required the deposit of all oil proceeds in the escrow account managed by Defendant BNP. The Programme allocated about two-thirds of oil proceeds to medicine, food, and other humanitarian aid. The remaining third was assigned to Kuwaiti war relief, administrative costs, and weapons inspection. *E.g.*, FAC ¶¶ 306-49.

While the UN did not trust the Hussein Regime, it did trust the Programme participants, the private parties who bought oil and sold humanitarian goods. Indeed, the Programme's main protection against Regime misconduct was the requirement that Programme participants agree to follow Programme procedures and obtain UN approval of the terms of their contracts to purchase oil or sell humanitarian aid. FAC ¶¶ 298, 325-35.

To circumvent Programme protections, the Hussein Regime needed the Defendants' help. The Defendants gave it. In exchange for the Regime's approval of windfall profits on their Programme contracts, the Defendants agreed to pay the Regime hundreds of millions in kickbacks and bribes. FAC ¶¶ 420, 439, 458, 475, 513. Specifically, the oil purchasing Defendants agreed to pay the Hussein Regime a surcharge over the UN-approved price for Iraqi oil. As a result, the escrow account did not receive the full price for oil sales as required by Programme rules. In addition, these Defendants worked to keep the approved oil price artificially low to cover the cost of the surcharges and their excessive profits. FAC ¶¶ 350-520. Likewise, the Defendants selling humanitarian goods agreed to pay kickbacks to the Hussein Regime on their sales. In exchange, the Hussein Regime accepted contract prices high enough to cover the kickbacks and exorbitant profits for the Defendants. FAC ¶¶ 521-974. To further its economic interests, BNP facilitated the overall scheme by agreeing to hide information from the UN. FAC ¶¶ 975-1066.

The Defendants played a central role in the conspiracy. They were the chief actors in the linchpin fraud on the UN. The conspiracy's goal was to steal Programme funds under the UN's and BNP's guard in New York. Therefore, the Defendants and their conspirators by necessity directed their fraud at the UN Programme in New York, but the fraud victimized the Republic, which owned the diverted Programme funds, and the Iraqi people, who did not receive the humanitarian aid they should have.[1]

Under Programme procedures, only the Defendants could submit Programme contracts for UN approval, and without UN approval, no oil could be sold, and no goods purchased. *E.g.*, FAC ¶¶ 325, 332, 339-40. The UN would not approve a contract knowing it contained unwritten terms, much less promises to pay kickbacks or bribes to the Hussein Regime. Indeed, a few Defendants told the UN about side payments on some of their early contracts. The UN rejected them. In response, these Defendants simply omitted any mention of the kickbacks on future contracts. FAC ¶¶ 588-91. The UN would likewise have rejected Defendants' contracts if the Defendants had revealed the overcharges needed to fund the kickbacks and excessive profits. Programme contracts were required to "follow normal commercial practice." FAC ¶ 328.

The Defendants' fraud was not limited to the UN. The Defendants also misled the United States Department of the Treasury and its Office of Foreign Assets Control ("OFAC"). Because the Republic of Iraq owned the Programme funds, which were proceeds from the sale of Iraqi oil, the

---

[1] Contrary to the Defendants' contention, the Programme's ending surplus does not indicate that humanitarian aid was uncurtailed. As the Complaint explains, the surplus was caused by (1) the Coalition Provisional Authority's (the "CPA") imposition of a 10% price reduction on existing Programme contracts to reduce clear overcharges, (2) currency gains, and (3) amounts for goods placed on hold by the UN Security Council. FAC ¶ 1129. Thus, absent the kickbacks and excessive profits, more humanitarian aid would have been available to the Iraqi people. FAC ¶¶ 1123-30.

Moreover, the Republic of Iraq owned the surplus. So, if the conspiracy had not diverted billions from the Programme, the Republic of Iraq would have benefited from at least one of the following: (1) more humanitarian aid to fulfill a legitimate governmental purpose of aiding its citizens, (2) more funds remaining in the Escrow Account, or (3) oil remaining in the control of the nation. FAC ¶ 1131.

Programme funds came under OFAC's control as property of a Terrorist State.  The OFAC license that authorized Programme transfers independently required compliance with Programme rules. When the Defendants misled the UN into authorizing Programme transfers in violation of the OFAC license, they violated US laws proscribing financial transactions in violation of sanctions. Following September 11 and adoption of the PATRIOT Act, those violations were RICO predicates.  *E.g.,* FAC ¶¶ 288-90.

Ultimately, the Hussein Regime and the Defendants absconded with billions from the UN humanitarian Programme.  They diverted nearly $2 billion in cash and far more in goods to Saddam Hussein and his Regime.  FAC ¶¶ 1100-14.  Although much of this money may have ostensibly been placed in "government" coffers, not Swiss bank accounts in Hussein's name, the Regime still used the proceeds for Hussein's purposes, not the nation's, particularly Hussein's vain attempt to retain his power and the trappings that went with it.  Hussein's control of the nation was so entrenched that the distinction between public and private held no meaning to him.  *See, e.g.,* FAC ¶¶ 223-26, 1115-20.  Much as the Defendants confuse Hussein with the nation, Hussein respected no difference between public and private funds or property.  Hussein's excesses were such that General Tommy Franks commented that the Programme should have been called the "oil-for-palace program." NY Times, April 18, 2003.[2]  Deputy Assistant Treasury Secretary for Terrorist Financing and Financial Crimes Juan Zarate stated, "Hussein and his cronies used a global network of agents and businesses to pilfer from the Iraqi people and to underwrite their tyranny." Ex. 1.[3]

---

[2] The conspiracy diverted about $2 billion in cash to the Hussein Regime, coincidently the sum the Clinton administration estimated Hussein spent on his palaces during this period.  CRS Report for Congress: Iraq: Oil-For-Food Program, Illicit Trade, and Investigations (Apr. 6, 2005), at 13 n.14.  In another coincidence, when the Second Gulf War began, Hussein reportedly had his son withdraw about $1 billion from the Central Bank of Iraq.  http://news.bbc.co.uk/2/hi/middle_east/3004079.stm.  Hussein was captured with $750,000 in cash on him.  CRS Report: Foreign Regimes' Assets: The United States Faces Challenges in Recovering Assets, but Has Mechanisms That Could Guide Future Efforts (Sept. 2004) at 44.

[3] Referenced exhibits are attached to the Declaration of Mark Maney.

Based on independent estimates from the United Nations and the US Defense Contracting Agency, the Complaint alleges that the Defendants' scheme diverted more than $10 billion in cash and goods from the legitimate needs of the Republic of Iraq and the Iraqi people. The suffering caused by those diversions is incalculable.

### B. The Defendants' Version of the Complaint

The Complaint, the UN Report, and the Defendants' many plea agreements present a factually consistent description of the Defendants' wrongful actions. In contrast, the Defendants use their Hussein-was-Iraq theme and other devices to create a self-serving fiction in the background section of their memorandum of law.

In framing their version of the facts, the Defendants' chief technique is to paraphrase the Complaint, substituting "Iraq" for the "Hussein Regime." For example, the Defendants state, "Iraq alleges that it 'decided to utilize its control to choose [oil] purchasers for its own illicit purposes' by Fall 2000." Defendants' Memorandum of Law ("DML") at 8. But the allegation actually states that the "Hussein Regime" utilized its control to divert Programme funds (owned by the Republic of Iraq) to the Hussein Regime's illicit purposes. FAC ¶ 350.

In many respects, the Defendants' background contradicts the facts affirmed by the Defendants who have already resolved related criminal proceedings. For example, while the Defendants describe the kickbacks as "revenue collection," at 38-39, Chevron Corp. and El Paso Corp. individually agreed never to contest that the surcharges were "secret" and "illegal." Ex. 2 (Chevron's agreement) at 1, 6, and Ex. 3 (El Paso's agreement) at 1, 6. Vitol pleaded guilty before a New York court to stealing from the Programme, but now claims that the owner of the Programme funds, the Republic of Iraq, was not injured and that Programme is outside the jurisdiction of US courts. Ex. 4 (Vitol's plea documents); DML at 56-57. The remaining Purchasing Defendants, Wyatt and Chalmers, pleaded guilty to conspiring to use the US mails and wires to defraud the

Programme, yet they claim here that their actions have no US connection sufficient to support jurisdiction.   DML at 56-57; Ex. 5 (Wyatt's plea documents) and Ex. 6 (Chalmers' plea documents). On the selling side, at least twenty-eight Vendor Defendants have entered into agreements with the US government that prohibit these Defendants from denying their payments were illegal "kickbacks."  Those agreements are attached as exhibits 7-16.

While the Republic of Iraq cannot repeat all of the Defendants' admissions within the confines of this memorandum, the contrast between their admissions in related criminal and civil (SEC) proceedings and their denials to this Court must be noted.  For example, in contrast to the Defendants' contention that there was no US fraud or conspiracy, Defendant York executed a plea agreement admitting that it "and others, known and unknown, did unlawfully and knowingly combine, conspire, confederate and agree together and with each other … to devise a scheme and artifice to defraud the United Nations and the Oil-for-Food Program and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, through the use of interstate and foreign wire communications, in violation of 18 U.S.C. § 1343 . . . ."  Ex. 7 at 21.  "The primary purpose of the conspiracy was to pay unlawful kickbacks to the Iraqi government . . . ."  *Id.* at 22.

The Defendants' criminal agreements also generally acknowledge more extensive bribes to the Hussein Regime than those set forth in the UN Report and the Complaint.  For example, Daimler entered into its deferred prosecution agreement after the Complaint was filed.  While the Complaint alleges that Daimler paid kickbacks on a single contract and agreed to pay kickbacks on two others, Daimler has now admitted that it used third-parties to obtain 12 additional contracts on which it paid $5 million in kickbacks to the Hussein Regime.  Ex. 8.

## Pleading Standards

"In deciding a motion to dismiss a complaint pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor." *Bernhardt v. Tradition N. Am.*, 676 F. Supp. 2d 301, 304 (S.D.N.Y. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to be plausible, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level;" that is, the claims must lie "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. This Court may grant a Rule 12(b)(6) motion on the basis of an affirmative defense only if the affirmative defense appears on the face of the complaint, *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425-26 (2d Cir. 2008), and it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Pons v. People's Republic of China*, 666 F. Supp. 2d 406, 411 (S.D.N.Y. 2009) (citation omitted).

When subject matter jurisdiction is challenged under Rule 12(b)(1), "uncontroverted factual allegations in the Complaint are taken as true, and the Court 'may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits.'" *Madanes v. Madanes*, 981 F. Supp. 241, 249 (S.D.N.Y. 1997) (citations omitted). Because the Defendants do not present evidence on the jurisdictional issues, those issues are also assessed on the face of the Complaint.

## Argument

### I.      The Hussein Regime was not the equivalent of the Iraqi nation.

The Defendants' motion turns on whether the Defendants' wrongful conduct is excused by the participation of the Republic of Iraq's former corrupt ruler. In brief, the Defendants argue the Republic of Iraq is invariably bound by Saddam Hussein's actions and agreements even when he

acted for himself and against the interests of the nation.   The Defendants' legal premise is insupportable: sovereign entities (including the Republic of Iraq) are not bound by corrupt officials acting against the public interest.   When corrupt officials conspire with others to damage the nation, the nation can seek redress from all those that aided the corruption.   As set forth in section III, the actions of Saddam Hussein, his Regime, and the Defendants in diverting humanitarian aid to their own pockets were not acts of the sovereign state of Iraq.   They were personal acts that do not excuse the Defendants' crimes.

### A.    A government is the agent of the sovereign, not the sovereign itself.

The Defendants' Hussein-was-Iraq theme is premised on a fundamental misunderstanding of the relevant law.   Yes: the Republic of Iraq today is the same nation as the nation oppressed by the Hussein Regime.   The continuity of identity bases the Republic's damages; if the state itself had changed, it could not claim damages incurred before the change.   Where the Defendants go astray is assuming that continuity of the *nation* equates to continuity of national *government*.

A government is not the nation, but the nation's agent.   The Supreme Court highlighted the distinction in 1870: "The reigning Emperor, or National Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty."   *The Sapphire*, 78 U.S. 164, 168 (1870) (cited in DML at 13).   "[T]he rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it."   *Guar. Trust Co. v. United States*, 304 U.S. 126, 137 (1938) (cited in DML at 13).   "The state is a community or assemblage of men, and the government the political agency through which it acts in international relations . . . .   The foreign state is the true or real owner of its property, and the agency the representative of the national sovereignty."   *Lehigh Valley R.R. Co. v. State of Russia*, 21 F.2d 396, 400 (2d Cir. 1927).

The Republic does not allege it is a different nation "from Iraq under Saddam Hussein's regime," but that the nation and the Hussein Regime are different.   DML at 12.   Indeed, Saddam

Hussein's reign exemplifies the difference between a nation and its officials. His oppression of the Iraqi people and the Republic itself is recognized in the new Iraqi Constitution, which begins with litany of the wrongs inflicted on the nation and its citizens by his "autocratic clique." Ex. 17.

**B.    A sovereign state is not intrinsically bound by the actions of its former rulers.**

The Defendants raise an argument that has been characterized as "deceptively simple": because a dictator is endowed with extraordinary powers, the nation he ruled can never seek justice for the wrongs inflicted by the dictator and those who aid him, even after the dictator is deposed. *See Republic of the Philippines v. Westinghouse Elec. Corp.*, 774 F. Supp. 1438, 1452 (D.N.J. 1991). The argument has been rejected in a series of opinions, all ignored by the Defendants.

A basic example is set out in *First Fidelity Bank, North America v. Government of Antigua & Barbuda-Permanent Mission,* 877 F.2d 189 (2d Cir. 1989). In *First Fidelity*, the plaintiff claimed a note signed by Antigua's UN ambassador necessarily bound Antigua simply because it was signed by the sitting ambassador. The Second Circuit found the issue more complicated:

> The implication of First Fidelity's argument is that Antigua is bound by Jacobs' actions solely because he was Antigua's ambassador to the U.N. In effect, First Fidelity is telling us: "L'état, c'est lui." If it were true, as a matter of law, that an ambassador's actions under color of authority automatically bind the state that he represents, then we must affirm the decision below . . . . We do not believe, however, that a person's position as ambassador, and nothing more, should be dispositive in this case, let alone all cases . . . .

*Id.* at 192.

"Put another way, the possession of authority does not, *ipso facto*, validate every exercise of it." *Id.* The issue is not whether Hussein wielded great authority, but how he abused his authority. In short, dealing with a Hussein or others of his ilk does not immunize wrongful conduct.

**1.    Ferdinand Marcos**

The Republic of the Philippines brought a series of lawsuits against Ferdinand Marcos, two of which are of particular interest.

*The Republic of the Philippines v. Westinghouse.*  The *Westinghouse* allegations mirror the allegations

here: the Philippines sued corporations for giving kickbacks to Marcos on contracts he controlled.

774 F. Supp. at 1442-43.  The *Westinghouse* defendants' "deceptively simple" defense also has a

familiar ring:

> Defendants contend that under then-existing Philippine law President Marcos owed
> the people of the Philippines *no* fiduciary duty.  Their argument for this proposition
> is a deceptively simple one.  As the absolute dictator of the Philippines, defendants
> argue, every action President Marcos took was lawful, because his acts were the law.
> Or, put differently, defendants argue that President Marcos was legally bound to
> respect no authority other than his own.  Therefore, they reason, if President Marcos
> did take any bribes, such conduct was entirely lawful, and was not in breach of any
> fiduciary duty President Marcos could owe to the people of the Philippines.  Thus,
> they conclude that they may not be held liable for the tortious interference with a
> fiduciary duty which did not exist.

*Id.* at 1452.

The "deceptively simple" argument was rejected as "manifestly not true," "cynical," and as

having "no place in a court of law."  *Id.* at 1452, 1459, 1465.  As a purported public official, Marcos

was not above the law, no matter how much power he seized:

> Of course, it is true, as defendants point out, that President Marcos instituted
> martial law, that he arrogated expansive powers to himself, that he ruled
> undemocratically for many years, and that he often violated the civil liberties and
> rights of his fellow citizens.  Nor, presumably, would the Republic deny that the
> Marcos regime was corrupt – indeed, this forms the basis of the Republic's claim.
> None of this means, however, that the Philippine legal system was completely swept
> away during the Marcos regime, that – as a matter of law – President Marcos
> operated completely outside any legal norms, or that, as a result, everything President
> Marcos did was "absolutely lawful."

*Id.* at 1454.

*The Republic of the Philippines v. Marcos.*[4]  In this seminal case, the Philippines alleged that

Ferdinand Marcos had turned the entire Philippine government into a RICO "enterprise."[5]  Marcos

---

[4] 862 F.2d 1355 (9th Cir. 1988) (en banc).

[5] *Republic of the Philippines v. Marcos,* 818 F.2d 1473, 1477 (9th Cir. 1987) ("The first RICO claim charges the
Marcoses and the minor defendants with conducting a RICO enterprise, consisting either of the Philippine

and his wife Imelda defended on the basis that Marcos' actions could not be questioned.  The original panel agreed, but the *en banc* Ninth Court of Appeals rejected the argument:

> Although sometimes criticized as a ruler and at times invested with extraordinary powers, Ferdinand Marcos does not appear to have had the authority of an absolute autocrat.  He was not the state, but the head of the state, bound by the laws that applied to him.  *Our courts have had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law.*  As in the case of the deposed Venezuelan ruler, Marcos Perez Jimenez, the latter acts are as adjudicable and redressable as would be a dictator's act of rape.

*Id.* at 1361 (emphasis added).

### 2.      Jean-Claude "Baby Doc" Duvalier

Some six months after "Baby Doc" Duvalier fled his home, Haiti filed suit in New York state court against the deposed dictator's wife.  *Republic of Haiti v. Duvalier*, 211 A.D.2d 379 (1st Dept 1995).  When Duvalier's wife challenged the court's ability to question Duvalier's dictatorial acts, the defense was again rejected on multiple grounds, including that "the foreign sovereign itself is seeking adjudication in our courts and the regime which committed the act of state in question is no longer in existence .... "  *Id.* at 382.  The court also relied on *Republic of the Philippines v. Marcos*, 806 F.2d 344 357 (2d Cir. 1986), in holding there was no bar to judging the illegal acts of Haiti's former ruler. *Republic of Haiti*, 211 A.D.2d at 382.

### 3.      Marcos Perez Jimenez

Marcos Perez Jimenez ruled Venezuela as part of a military junta until 1958, when he was ousted from power and fled to the United States.  *Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir. 1962).  Jimenez too claimed that, as dictator, he was the sovereign and could not wrong the nation:

> Seizing upon Venezuela's characterization of appellant as a 'dictator' he argues that as a 'dictator' he himself would be the sovereign – the government of Venezuela – and that all his acts constituting the financial crimes with which he is charged and as to which probable cause of guilt has been found are acts of state or sovereign acts,

---

government itself or, alternatively, of an association-in-fact made up of the defendants with an existence apart from the racketeering activity in which they allegedly engaged."), *rev'd*, 862 F.2d 1355 (9th Cir. 1988).

the legality of which the Act of State Doctrine precludes an extradition judge or magistrate from adjudicating.

*Id.* at 557.  The Fifth Circuit had little difficulty rejecting the argument:

> Even though characterized as a dictator, appellant was not himself the sovereign – government – of Venezuela within the Act of State Doctrine.  He was chief executive, a public officer, of the sovereign nation of Venezuela . . . .
>
> Appellant's acts constituting the financial crimes of embezzlement or malversation, fraud or breach of trust, and receiving money or valuable securities knowing them to have been unlawfully obtained as to which probable cause of guilt had been shown were not acts of Venezuela sovereignty . . . .  They constituted common crimes committed by the Chief of State done in violation of his position and not in pursuance of it.  They are as far from being an act of state as rape which appellant concedes would not be an 'Act of State.'

*Id.* at 557-58.

### 4.     *Manuel Noriega*

Manuel Noriega also sought to use his self-proclaimed sovereign status as a legal excuse for his crimes.   *United States v. Noriega*, 746 F. Supp. 1506, 1519 & n.11 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997).

The *Noriega* court described the appropriate standard: "The inquiry is not whether Noriega used his official position to engage in the challenged acts, but whether those acts were taken on behalf of Noriega instead of Panama."  *Id.* at 1522.  In particular, the court found illogical Noriega's claim that his actions were inherently public acts of state:

> Defendant does little more than state that, as the de facto ruler of Panama, his actions constitute acts of state.  This sweeping position completely ignores the public/private distinction and suggests that government leaders are, as such, incapable of engaging in private, unofficial conduct.  Aside from its lack of logic, suffice it to say that this argument has been implicitly rejected in several cases distinguishing the private from public conduct of heads of state and foreign dictators.  The notion that Noriega, qua dictator, was essentially the sovereign and that all of his acts are therefore acts of state is most thoroughly undermined by the *Jimenez* case*, supra,* an authoritative precedent directly contrary to Noriega's position.

*Id.*  The court questioned whether certain actions could ever be acts of state: "The Court fails to see how Noriega's alleged drug trafficking and protection of money launderers could conceivably

constitute public action taken on behalf of the Panamanian state." *Id.*[6]  Diverting money designated for humanitarian aid is likewise inherently against the public interest.

## II.   The Republic of Iraq has standing to sue for the damage the Defendants caused.

Constitutional standing is not an onerous requirement.  The Supreme Court explains that the "constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between himself and the defendant." *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979).  Determining whether there is an Article III case or controversy depends on whether the plaintiff suffered injury in fact, which is fairly traceable to challenged actions of the defendant, and which "is likely to be redressed by a favorable decision." *Id.* at 120 (citation omitted).

The Complaint alleges the Defendants diverted billions of dollars in Programme funds, owned by the Republic of Iraq, into their own pockets and into the hands of the nation's corrupt agents.  FAC ¶¶ 1100-14.  The Defendants present no evidence disputing these allegations, but argue that the Republic of Iraq could not have been injured because the Hussein Regime was involved in the Defendants' scheme.  In determining Article III standing pursuant to Rule 12(b)(1), however, in the absence of controverting evidence, "the Court must accept as true all material facts alleged in the complaint …." *Stauffer v. Brooks Bros., Inc.*, 615 F. Supp. 2d 248, 252 (S.D.N.Y.  2009).

### A.   The Complaint sets forth a definite case and controversy.

Even without addressing the specific factors, there is manifestly a justiciable controversy here.  When the Defendants' fraudulent scheme became public, the UN Secretary General called on all member states to act against the participants in the corruption.  Ex. 18 (UN Press Release).  In response, the United States has thus far prosecuted about a third of the Defendants for their roles.

---

[6] The Second Circuit reached the same conclusion in reviewing claims against alleged war criminal, Radovan Karadzic: "we doubt that the acts of even a state official, taken in violation of a nation's fundamental law and wholly unratified by that nation's government, could properly be characterized as an act of state." *Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995).

*See* Exs. 2-16.  The United States House and Senate also publicly called for action to hold the culpable responsible.[7]

The Defendants would have this Court believe all that attention is unwarranted because no one was injured sufficiently to create even a justiciable controversy for a judge and jury.  In fact, according to the Defendants, Iraq benefited from the corruption.  *E.g.*, DML at 51.  And, the UN could not have been harmed; it was not their money.  If the Defendants are right, a massive fraud perpetrated against a UN humanitarian program causing substantial damage to a nation and its citizens and in violation of a slew of legal protections is a victimless crime.

### B.    The Defendants injured the Republic of Iraq and the Iraqi people.

#### 1.    The Complaint alleges injury caused by the Defendants' scheme.

##### a.    The Complaint alleges injuries from two causes – diversions (1) to the Hussein Regime and (2) to the Defendants.

The conspiracy diverted Programme funds to two parties – the Defendants and the Hussein Regime.  FAC ¶¶ 1100-14.  The Defendants received excessive profits.  The Hussein Regime received illicit kickbacks and bribes.

The Defendants' argument that the Republic's injuries are speculative ignores the diversions to the Defendants' own pockets.  Even if the Republic of Iraq were somehow unable to prove injury from transfers to the Hussein Regime, it was still damaged by the Defendants' windfall profits and

---

[7] On April 7, 2004, then Senator Joseph Biden's Opening Statement to start the Hearing to Review the UN Oil for Food Program before the Senate Foreign Relations Committee, observed: "[T]here also are serious allegations about mismanagement and corruption [of the Programme] that we must address not simply to hold people accountable, but to make sure we get it right in the future."  Senator Carl Levin noted in an October 31, 2005, Hearing before the Senate Committee on Homeland Security and Governmental Affairs (at 6): "The United Nations is not a law enforcement agency.  It can't prosecute anybody.  It is completely dependent on its member countries to police their nationals . . . .  We have to look not just at Saddam's conduct and the conduct of the private sector which paid him kickbacks."  *See also* Hearing before Senate Committee on Homeland Security and Governmental Affairs, "Oil for Influence: How Saddam Used Oil to Reward Politicians Under the United Nations Oil-for-Food Program," May 17, 2005, at 8; Statement of Thomas A. Schweich, then Chief of Staff of the United States Mission to the United Nations in Hearing before the House Committee on Energy and Commerce on June 21, 2005, (at 41) (US is to "push for judicial and prosecutorial action against the perpetrators.").

abusive pricing, established by independent studies and the Defendants' admissions.  Exs. 2-16;
FAC ¶¶ 631-39, 650-55.

> **b.      The Republic of Iraq and the Iraqi people suffered distinct injuries.**

The diversion of funds affected the Republic of Iraq and the people of Iraq differently.

The Republic of Iraq owned the Programme funds.  Its damages are the property damages
resulting from the diversion of its property to the Defendants and to the Hussein Regime's illicit
purposes.  *E.g.*, FAC ¶¶ 1100-14.

The Iraqi people were damaged by the reduction in the food, medicine and other
humanitarian aid they were to have received under the Programme.  FAC ¶¶ 1115-31.  The Republic
of Iraq's *parens patriae* standing to present those damages is discussed below in section II.D.

> **2.      Opinions in related cases establish the Republic of Iraq's standing.**

In related matters, courts have recognized the injuries to the Republic of Iraq and the Iraqi
people caused by the diversion of Programme funds.

The Republic of Iraq's Injury.  A court in this District recognized that the Programme funds
were owned by Iraq and therefore "blocked property" under the Iraqi sanctions regulations.  *Paris v.
Dep't Nat'l Store Branch 1 (Vietnam)*, 2000 WL 777904, at *2 (S.D.N.Y. 2000).  The State Department
issued an official Statement of Interest in *Paris*, also clarifying that "the position of the United States
is grounded on Iraq's property interests in the Account . . . ."  2007 WL 777904, at *4.  Another
court recognized that the Republic of Iraq owned the funds in the Development Fund for Iraq (the
"DFI"), the successor fund to the Escrow Account, because the DFI was "a depository for Iraqi
proceeds from the sale of Iraqi national resources . . . ."  *United States ex rel. DRC, Inc. v. Custer Battles,
Inc.*, 376 F. Supp. 2d 617, 645 (E.D. Va. 2005), *rev'd on other grounds*, 562 F.3d 295 (4th Cir. 2009).

The Republic of Iraq's standing to recover diversions from the Programme was confirmed in
*United States v. Trafigura AG,* 2008 WL 4057907 (S.D. Tex. 2008).  Trafigura "was indicted for entry

of goods into the United States by means of false statements under 18 U.S.C. § 542." *Id.* at *1. The fraudulent statements were that the oil it was selling "'was obtained pursuant to all necessary approvals and in accordance with all applicable procedures of U.N. resolution 986 and the U.N. Security Council Committee' established by SCR 661." *Id.* at *1. When the United States sought forfeiture of Trafigura's profits, the Republic of Iraq intervened and claimed the funds were owned by the Republic. *Id.* The United States opposed the intervention, claiming "that the Republic of Iraq lacks standing because it cannot demonstrate it had a vested interest in the oil at the time the crime was committed." *Id.* at *2. The court, however, held that, since the Republic of Iraq "alleges essentially that this oil was stolen" from the Republic, it had alleged a sufficient property interest to support standing. *Id.* at *3 (footnoted omitted).

Two opinions dealing with the prosecutions of Defendants Chalmers and Wyatt also recognize the Republic of Iraq's injury. *See United States v. Chalmers (Chalmers I)*, 410 F. Supp. 2d 278 (S.D.N.Y. 2006); and *United States v. Chalmers (Chalmers II)*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007). The Defendants mention one of these opinions on another issue (DML at 70), but otherwise ignore this relevant standing authority.

Wyatt and Chalmers were charged with (and ultimately pleaded guilty to) having "engaged in a scheme to defraud the United Nations Oil-for-Food Program and the people of Iraq." *Chalmers I*, 410 F. Supp. 2d at 281. When Wyatt and Chalmers claimed there were no victims of their fraud, Judge Chin held that diversions from the UN Escrow Account injured the Programme. *Id.* at 287; *Chalmers II*, 474 F. Supp. 2d at 561. Since the funds in the Programme were owned by the Republic of Iraq, the recognized damage to the Programme is also damage to the Republic.

<u>The Iraqi people's injuries</u>. The *Chalmers* opinions also recognize the property interests of the Iraqi people: "U.N. Resolution 986 ('Resolution 986'), which created the Oil-for-Food Program, and the Memorandum of Understanding between the Government of Iraq and the U.N.

implementing the Program clearly establish the property interest held by the Iraqi People." *Chalmers II*, 474 F. Supp. 2d at 563.

### 3. The opinions in <u>Karim</u>, <u>Boyd</u> and <u>Mastafa</u> support standing.

The Defendants extensively discuss two of the related civil cases filed in this Court – *Karim v. AWB, Ltd.*[8] and *Boyd v. AWB, Limited*.[9]  A third – *Mastafa v. Australian Wheat Board Ltd.*[10] – is ignored. Read in conjunction, the opinions support standing.

*Karim*.  A class of Kurdish Iraqi citizens alleged that Programme corruption reduced the benefits they would have received.  This Court denied standing because the *Karim* plaintiffs were at least once removed from the actual damage – "even if the kickbacks diminished the amount of goods distributed to Iraqis overall, there is no allegation that the benefits plaintiffs themselves received was affected."  2008 WL 4450265,  at *4.

In contrast to the *Karim* plaintiffs, the Republic of Iraq, as owner of the Programme funds, was damaged whether more oil was sold to purchase overpriced humanitarian goods or less humanitarian goods were supplied because of the scheme.

As to the Republic's *parens patriae* damages, *Karim* recognized *Chalmers'* conclusion that the Iraqi people *as a whole* suffered a cognizable injury, but distinguished the claims of *individual* beneficiaries:

> *Chalmers* held that "the Iraqi People as a whole" had a property interest in the escrow account funds, not that any individual Iraqis had such a property interest. . . . .  By contrast, an individual has a property interest in a public benefit only where the relevant statute or regulation "dictates [a] particular result as to any given benefits applicant."

*Karim*,  2008 WL 4450265, at  *5 (citation omitted).

---

[8] 2008 WL 4450265 (S.D.N.Y.  2008) (Lynch, J.), *aff'd*, 347 Fed. Appx. 714 (2d Cir.. 2009).

[9] 544 F. Supp. 2d 236 (S.D.N.Y. 2008) (Lynch, J.).

[10] 2008 WL 4378443 (S.D.N.Y. 2008) (Lynch, J.).

Boyd.  A class of American wheat farmers sued for damages caused by AWB's kickbacks. The *Boyd* plaintiffs, however, were "domestic wheat farmers, not exporters, and even if the alleged bribery conspiracy may have had a 'direct' effect of 'lost exports,' plaintiffs' asserted injury is a drop in domestic wheat *prices*, not lost exports."  544 F. Supp. 2d at 246.  The *Boyd* plaintiffs lacked standing only because there were more directly injured parties who were better plaintiffs.  *Id.* at 250.

Mastafa.  In contrast to the tangential damage claims in *Karim* and *Boyd*, the plaintiffs in the unmentioned *Mastafa* opinion alleged injuries suffered directly at the hands of the Hussein Regime – they "'were victims of torture, extrajudicial killings, disappearances, rape and/or murder' at the hands of the Hussein regime, between 1996 and March 2003."  2008 WL 4378443, at *2.  The *Mastafa* plaintiffs sought to hold AWB and BNP "liable for these acts because they 'conspired [with] and aided and abetted the Saddam Hussein regime' in their commission by giving the regime 'substantial assistance . . . through the form of kickbacks and/or financial assistance in violation of Security Council Resolution 986.'"  *Id.*

In a virtually verbatim version of the argument presented in this case, BNP and AWB contested standing.  Ex. 19 (BNP's Memorandum of Law) at 8-15; Ex. 20 (AWB's Memorandum of Law) at 6-9.  The argument was rejected.  Judge Lynch, who also decided *Karim* and *Boyd*, found Article III standing:  "Plaintiffs have alleged that the Hussein regime caused them injuries and that defendants are vicariously liable for those injuries.  They therefore have alleged sufficient facts to support Article III standing."  *Mastafa*, 2008 WL 4378443, at *2.  Judge Lynch expressly found causation, rejecting the defendants' argument that the Hussein Regime's conduct was an intervening cause cutting off causation.

> If plaintiffs aided and abetted the Hussein regime in the commission of human rights abuses that injured plaintiffs, then defendants are responsible for those acts, not because they caused them, but because the law "hold[s] the person who aids and abets liable for the tort itself."  The injuries resulting from the Hussein regime's acts are thus "fairly traceable" to any who aided and abetted their commission.  Similarly, the injuries are not "the result of the independent action of some third party not

before the court" because the acts of the Hussein regime are not "independent" of steps taken to aid and abet those acts. Plaintiffs have alleged that the Hussein regime caused them injuries and that defendants are vicariously liable for those injuries. They therefore have alleged sufficient facts to support Article III standing.

*Id.* at *2 (citation omitted).[11]

Thus, the *Karim* and *Boyd* opinions do not deny standing because, as the Defendants assert, it is speculative to claim Programme corruption caused any damage, but instead because standing is limited to those directly injured. The Republic of Iraq alleges direct injury on the indisputable basis that it owned the oil and oil proceeds illicitly diverted. The Iraqi people's injury is also direct, since, as recognized in *Chalmers* and *Karim*, the Iraqi people, as a whole, were necessarily damaged by the reduction in humanitarian aid. *Chalmers II*, 474 F. Supp. 2d at 563; *Karim*, 2008 WL 4450265, at *5.

The causal connection alleged in the Complaint is far more direct than that found sufficient to support standing in *Mastafa*. The Defendants did not merely aid and abet the Hussein Regime's wrongful actions. Their actions independently caused damage.

### 4. Numerous opinions establish the standing of sovereigns to sue those who bribe their officials.

The Defendants' chief standing argument is that the Republic of Iraq cannot claim injury because its agent, the Hussein Regime, received part of the diverted funds and was involved in the Defendants' conspiracy. The Defendants, however, cite no authority denying standing to a sovereign or governmental entity when its officials are bribed. To the contrary, standing is uniformly recognized in such cases.

---

[11] Ultimately, the Court held the *Mastafa* plaintiffs did not allege a direct connection between BNP's support of the Hussein Regime and the torture because "aiding the Hussein regime is not the same thing as aiding and abetting its alleged human rights abuses." *Id.* at *4. In this case, the Republic of Iraq is suing for wrongs directly caused by the Programme's corruption, although the Hussein Regime's other wrongs, aided by the Defendants, are relevant to punitive damages. AWB was sent to Australia to defend itself on the ground of *forum non conveniens. Id.* at *6.

Mastafa's analysis was recently applied in another related case – this one claiming that Programme corruption fueled the Hussein Regime's support of terrorist bombings in Israel. *Abecassis v. Wyatt*, 2010 WL 1286871 (S.D. Tex. 2010).

A good example is *Carter v. Berger*, which highlights the same distinctions drawn in the *Karim* and *Mastafa* opinions.   777 F.2d 1173 (7th Cir. 1985) (Easterbrook, J.).   A group of taxpayers brought a RICO action claiming the defendant bribed County tax employees to obtain lower tax assessments for his client's property.   The plaintiffs alleged "they had to pay more tax because Berger's clients paid less." *Id.* at 1174.   "A little later Cook County filed an independent suit under RICO," seeking to recover the lost taxes. *Id.*   The Seventh Circuit ruled the County had standing, but the taxpayers did not, because "[o]nce the County brought its own suit, it became the real party in interest." *Id.* at 1174.

Anchorage's standing to sue for damages from the bribery of its government officials was recognized in *Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F. Supp. 633 (D. Alaska 1982).   The Supreme Court cited *Hitachi* for the proposition "that the Robinson-Patman Act may apply where the State, as in *Sterling*, or the municipality, as in *Hitachi*, is the victim of commercial bribery under § 2(c), 15 U.S.C. § 13(c), rather than the favored customer." *Jefferson County Pharms. Ass'n, Inc. v. Abbott Labs.,* 460 U.S. 150, 183 n.16 (1983) (*also referring to Sterling Nelson & Sons, Inc. v. Rangen, Inc.*, 235 F. Supp. 393 (D. Idaho 1964), *aff'd*, 351 F.2d, 851, 858-59 (9th Cir. 1965)).   The *Hitachi* court recognized that sovereigns suffer different damages than competitors: "There is no overlap between the Municipality's damages, which are measured by the difference between Hitachi's bid price and that of the next lowest bidder, and the damages suffered by Hitachi's competitors, which would be measured by the profits on their lost bids." 547 F. Supp. at 641.

Substantial precedent also refutes the Defendants' assertion that damages from a bribery scheme are "inherently speculative," because, as the Defendants' words, "there is no basis in the FAC for supposing that Iraq would have contracted with others on different terms." DML at 23, 24.   The argument was directly rejected in *Philip Morris, Inc. v. Grinnell Lithographic Co.*, 67 F. Supp. 2d 126 (E.D.N.Y. 1999).   Grinnell was the victim of bribery.   The *Grinnell* defendants' "initial argument

[was] that *all* of plaintiff's claims should be dismissed because it has not suffered any injury as a result of defendants' conduct," *id.* at 129, particularly because, *after discovery*, the plaintiff was unable "to identify a specific transaction in which a product supplied by Grinnell could have been furnished to plaintiff by another vendor at a lower price." *Id.* at 130.  The court held that the failure to prove specific harm was "not fatal to plaintiff's case.  To the contrary . . .  there is a legal presumption that, at a minimum, the prices paid by plaintiff to Grinnell were inflated by the amount of the bribes and, accordingly, the bribe amounts are recoverable as damages." *Id.*  "In sum, there is a material issue of fact whether plaintiff sustained an injury as a result of the bribes." *Id.*

In *Continental Management, Inc. v. United States*, the Court of Claims held that the alleged bribers "cannot seriously contend that, because the Government has not offered to prove damages more specific than these, we must assume that the plaintiffs gained nothing and the Government lost nothing." 527 F.2d 613, 618 (Ct. Cl. 1975).

A surprising number of opinions address bribery of City of New York officials.  In *City of New York v. Citisource, Inc.*, the court rejected as "inconsistent with governing law" the defendants' claim "that the City's claims for damages are spurious and speculative" because, "[a]ccording to defendants, the only funds the City paid under the fraudulently induced contracts were for services that were fully performed at a competitive price." 679 F. Supp. 393, 398 (S.D.N.Y. 1988).  Another court in this District held the defendant "may urge at trial the claim it did not inflict damages on the City" by its bribery, but the defendant could not defeat standing on the mere allegation there was no injury. *City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 542 (E.D.N.Y. 1987); *see also City of New York v. Corwen*, 164 A.D.2d 212 (1st Dept 1990) (rejecting contention "that the relief sought by the City would amount to a windfall . . .  on the theory that the City suffered no real monetary injury because the market terms of the leases were commercially reasonable").

The Defendants suggest their contracts would have been on the same terms even if the Hussein Regime had not demanded they pay illegal bribes and kickbacks, but, "[o]bviously no one would give or offer a bribe unless he expected to gain some advantage thereby." *Kemler v. United States*, 133 F.2d 235, 238 (1st Cir. 1942).

### C.      A judgment in the Republic's favor would benefit the victims of the Defendants' crimes.

The final standing factor is that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted).  The Defendants do not address this factor, but it is nonetheless telling, because a judgment in this matter is the only means to provide justice to the victims of the Defendants' scheme.  For, who were the victims of the conspiracy if not the Republic of Iraq and the Iraqi people?  The Republic's oil was sold to pay for food and medicine, but the oil proceeds were diverted by excessive profits, kickbacks, and shoddy goods to the Defendants' pockets and the hands of the Republic's oppressor.  If the Programme had just been shut down, the Republic would, at a minimum, have billions of dollars of more oil available for the nation's reconstruction – a substantial and unquestionable damage that can be redressed only by a judgment in this matter.

### D.      The Republic of Iraq's <u>parens patriae</u> standing does not conflict with US foreign policy interests.

"*Parens patriae* means literally 'parent of the country.'"  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982).  The doctrine creates an exception to the standing rules in recognition of the special role a State plays in pursuing its quasi-sovereign interests in the "health and well-being – both physical and economic – of its residents in general."  *Id.* at 607.[12]

---

[12]In accordance with this authority, the Republic of Iraq's *parens patriae* claims assert damage to the general health and welfare of the Iraqi people.  The Republic of Iraq is, therefore, not bringing its RICO, Robinson Patman, FCPA claims as *parens patriae*, because recovery under those statutes is limited to property damages, and the oil proceeds held by the Programme were owned by the nation.  Therefore, the statutory claims are presented by the Republic of Iraq solely in its direct capacity.

The Republic of Iraq can sue in *parens patriae* if its suit in that capacity does not conflict with United States foreign policy interests.  The Defendants have demonstrated no such conflict.

### 1. In appropriate cases, foreign nations can assert parens patriae standing.

The Defendants overstate their authority when they assert that as "a foreign nation, Iraq may not invoke *parens patriae* standing."   DML at 26.   The Defendants base that conclusion on a quotation from the First Circuit's opinion in *Estados Unidos Mexicanos v. DeCoster*: "[*parens patriae* standing] should not be recognized in a foreign nation **unless** there is a clear indication of intent to grant such standing expressed by the Supreme Court or by the two coordinate branches of government."  229 F.3d 332, 336 (1st Cir. 2000) (citations omitted; emphasis added).

To make their broad statement of the law, the Defendants ignore that "unless."  According to *DeCoster, parens patriae* standing in a foreign nation **might** conflict with US foreign policy interests, and therefore a court should not recognize such standing **unless** the Executive or the Legislative Branch has indicated there is no conflict.  *Id.* at 341.  The exception, of course, means that *parens patriae* standing is appropriate in particular circumstances.

The Republic of Iraq believes that Executive Branch's policy towards the Hussein Regime and the Programme corruption needs no further explanation, but in any event, the *DeCoster* court noted the proper course for resolving any lack of clarity – ask the State Department.  *Id.* at 342 ("Finally, the district court commendably invited comment from the U.S. Department of State.").

### 2. The Republic of Iraq has inquired of the State Department, which has responded that it is premature for it to make a formal statement.

Attempting to moot this issue and following *DeCoster*'s direction, the Minister of Justice of the Republic of Iraq requested that the State Department formally declare its position on the specific issue of *parens patriae* standing.  Ex. 21 (Letter from Minister of Justice of the Republic of Iraq to the Secretary of State of the United States).  While the Republic has received no formal response, the

State Department has informally replied that, as a matter of State Department policy, it is too early

in this litigation for the State Department to present a formal Statement of Interest.  *See* Declaration

of Mark Maney.  It is, therefore, also too early for this Court to decide there is a conflict under the

*DeCoster* rule.

> **3.    In this case, there is no need for the State Department to issue a formal statement, because the United States' foreign policy interests are clear.**

The Republic of Iraq does not concede that *DeCoster* requires the Executive Branch to

formally state its position in order for a foreign nation to have *parens patriae* standing.  The Republic's

only point is that a State Department response could moot the Defendants' sole challenge to *parens*

*patriae* standing.[13]   In this case, the Executive Branch's foreign policy towards the former Hussein

Regime and the Defendants' actions is sufficiently clear for this Court to determine if the Republic

of Iraq's *parens patriae* claims create a conflict.   Even absent a formal Statement of Interest, the

Executive and Legislative Branches' multiple public expressions, indeed insistence, that the

Defendants be held responsible for their corrupt acts, establishes there is no conflict.  *See* Exs. 2-16;

*supra* note 7.

---

[13]In addition to *DeCoster*, precedent supports *parens patriae* standing by foreign governments in appropriate circumstances.  The Supreme Court traces *parens patriae* to the King's "prerogative" and holds that is "is inherent in the supreme power of every state . . . [and] often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves."  *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 57 (1890); *see also Coordination Council for N. Am. Affairs v. Nw. Airlines Inc.*, 891 F. Supp. 4, 7 n.3 (D.D.C. 1995) ("Foreign sovereigns are equally entitled to protect their citizens and may claim *parens patriae* standing to the same extent as a state.") (*Cf. Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1073 (D.C. Cir. 2001)).  A court in this District implicitly recognized that foreign sovereigns can assert *parens patriae* standing when it analyzed India's suit as *parens patriae* to recover for personal injuries caused by the Bhopal tragedy.  *In re Union Carbide Corp. Gas Plant Disaster*, 634 F. Supp. 842, 844 (S.D.N.Y. 1986), *aff'd as modified*, 809 F.2d 195 (2d Cir. 1987).  Although the court rejected *parens patriae* standing, it did so because India did not prove the necessary prerequisites, not on the basis that it was a foreign sovereign.  The same implicit recognition occurred in *Pfizer, Inc. v. Lord*, 522 F.2d 612 (8th Cir. 1975).

### 4.    The Defendants do not challenge the general propriety of parens patriae standing in this case.

According to the Defendants' own authority, there are clearly times (included in that "unless") when *parens patriae* standing is warranted.  This is one of those times.

Other than their broad claim that foreign nations are foreclosed from ever asserting *parens patriae* standing, the Defendants do not challenge the appropriateness of such standing in this case.[14]  The omission is understandable.  Protecting the health and well-being of its citizens is one of the established quasi-governmental interests protected through *parens patriae* standing, particularly for the Republic of Iraq, which has a constitutional duty to care for the health of its citizens.[15]

This Circuit places an additional requirement on *parens patriae* standing – "the Court must also make 'a finding that individuals [upon whose behalf the state is suing] could not obtain complete relief through a private suit.'"  *Connecticut*, 582 F.3d at 336 (citation omitted).  As explained above, the *Karim* court determined that individual Iraqis cannot base a claim for Programme losses.  Therefore, if *parens patriae* standing is denied, no party can seek redress for the injuries caused to the health and welfare of the Iraqi people.

### 5.    The parens patriae damages are not speculative.

Diversions of Programme funds necessarily reduced the humanitarian aid that reached the Iraqi people: (1) the Programme's humanitarian side was constantly underfunded, and (2) the

---

[14] The Defendants' recitation of *DeCoster*'s reasons why *parens patriae* standing should depend on a lack of conflict with the political branches does not address the situation if there is clearly no conflict.  DML at 27-28.

[15] *E.g., Alfred L. Snapp & Son*, 458 U.S. at 593 ("The State must express a 'quasi-sovereign' interest, such as its interest in the health and well-being – both physical and economic – of its residents in general."); *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 335 n.11 (2d Cir. 2009) ("The Court identified two types of quasi-sovereign interests:  (1) protecting 'the health and well-being … of its residents ….'").  The Iraqi Constitution (attached as exhibit 17) states: "The State shall guarantee to the individual and the family – especially children and women – social and health security, the basic requirements for living a free and decent life, and shall secure for them suitable income and appropriate housing."  Ex. 17 at Art. 30; *see also id*. at Art. 31 ("Every citizen has the right to health care.").

Defendants diverted funds from that aid by charging excessive amounts (or paying too little for oil) and by making side payments to the Hussein Regime.  FAC ¶¶ 1100-31.  If those allegations are accepted as true, as they must, then there is injury to support standing.  The Defendants' factual contest of those *allegations* cannot support a motion to dismiss: "Even if [the Defendants'] argument has merit, it cannot be considered on a motion to dismiss because it contests the facts alleged by MDCM in its Amended Complaint."  *MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.*, 216 F. Supp. 2d 251, 259 (S.D.N.Y. 2002); *see also Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 531 F. Supp. 2d 591, 595 (S.D.N.Y. 2008) ("If the plaintiff presents sufficient evidence to create a genuine dispute of material (jurisdictional) facts, then the case proceeds to trial, so that the factfinder can determine the facts, and the jurisdictional dispute will be reevaluated at that point.") (citations omitted).

## III.   The Hussein Regime's illicit conduct does not bar the Republic of Iraq's claims.

The Defendants concede that their *in pari delicto*, act of state and political question doctrines are rehashes of the Hussein-was-Iraq theme in various forms.  DML at 30 ("Not only does Iraq's role as the mastermind of the conspiracy it alleges vitiate its attempt to establish standing, it also gives rise to other fatal deficiencies.").

### A.   The <u>in pari delicto</u> defense does not bar the Republic of Iraq's claims.

The Defendants posit their co-conspirator's actions as a legal defense.  But the *in pari delicto* defense applies only on the basis of *plaintiff*'s culpability, an obvious point the Defendants obscure by characterizing the Republic of Iraq and the Iraqi people as synonymous with, as opposed to victims of, the Hussein Regime.  According to the Defendants, "Iraq [read Hussein] is the central character, primary beneficiary, and conspiratorial hub" of the Defendants' crimes.  DML at 32.

### 1.   Comparison of fault is a fact question.

"Unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated." *Pinter v. Dahl*, 486 U.S. 622, 636 (1988).

Comparison of responsibility under the *in pari delicto* defense is a question of fact, which cannot be determined on the basis of a defendant's bare assertions. *Pinter*, 486 U.S. at 639 ("Given the record in this case, we cannot ascertain whether Pinter may successfully assert an *in pari delicto* defense . . . ."). *In pari delicto* is not a rigid legal defense, applicable anytime it can be asserted. It is an equitable defense, and its application requires "the free and just exercise of discretion" based on the particular facts of the case. *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387-88 (1944).[16]

A motion to dismiss raising the *in pari delicto* defense can be granted only if the defense is clear from the face of the complaint. *Buckley v. Deloitte & Touche USA LLP*, 2007 WL 1491403, at *1 (S.D.N.Y. 2007). In *Buckley*, this Court analyzed allegations similar to the Complaint's and held, "because this Court must draw all reasonable inferences in favor of plaintiff for purposes of this

---

[16] Even without discovery, there are clear policy reasons not to apply the defense. For example, it is unclear whether the *in pari delicto* defense applies to RICO claims at all, but if it does, it applies only in furtherance of RICO's statutory purposes. *E.g, Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards,* 437 F.3d 1145, 1152-53 (11th Cir. 2006) ("There is a paucity of federal caselaw regarding whether the doctrine of *in pari delicto* bars a complaint under RICO, and none of our sister circuits have squarely decided the issue."). At a very minimum, "the concept of 'equal fault' should be narrowly defined in litigation arising under federal regulatory statutes." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 308 (1985).

RICO's policy interests are clear. Following September 11, the PATRIOT Act added prohibitions on financial transactions with State Sponsors of Terrorism, including the Hussein Regime, to RICO's prohibitions. Defendants with Programme contracts completed post September 11 violated those provisions. More generally, RICO addresses the support of criminal and terrorist organizations. There is no basis to let participation by a terrorist or oppressor prevent redress to the terrorized and oppressed: "where the law violated is calculated for the protection of the subject against oppression, extortion, and deceit, and the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover." *Thomas v. City of Richmond*, 79 U.S. 349, 355 (1870) (quoting Lord Mansfield in *Smith v. Bromley*, 2 Douglas 696 (1760)). The United States' strong policy interests in supporting UN humanitarian programs are likewise thwarted if parties can avoid liability by conspiring with local officials. Examples abound, but it should suffice to say that US policy interests are not served by allowing corporations to violate US laws with impunity simply because they are assisting a Somalian or Bosnian Warlord or a Saddam Hussein steal food and medicine from their involuntary subjects.

motion to dismiss, it cannot ignore the allegations within Buckley's complaint that suggest that the DVI insiders acted entirely for their own benefit." *Id.*

### 2. *"Fraud for" v. "fraud against" jurisprudence helps explain the flaws in the Defendants' in pari delicto defense.*

The Hussein Regime's actions were against the interests of the Republic and do not give rise to an *in pari delicto* defense against the Republic. An analogy can be made to corporations. When management commits a fraud, that fraud can either be for or against the corporation's interests. As Judge Posner explained in his seminal opinion on the issue, "Fraud on behalf of a corporation is not the same as fraud against it." *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 456 (7th Cir. 1982). "Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims." *Id.* In the analogy, the Hussein Regime is management; the nation is the corporation, and the Iraqi citizens, the stockholders.

When corporate managers commit fraud for the corporation, their wrongdoing is imputed to the corporation potentially supporting a defense; when managers commit fraud against the corporation, there is no imputation and no defense. *Cenco*, 686 F.3d 435-54. In *Cenco*, the fraud was for the interests of the corporation: the "managers . . . [turned] the company into an engine of theft against outsiders." *Cenco*, 686 F.2d at 454. In contrast, the Defendants and the Hussein Regime did not victimize outsiders; their victims were the Republic, which owned the oil, and the Iraqi people. A closer factual parallel to this case is *Schacht v. Brown*, where:

> as a consequence of the illegal activities of Reserve's directors and the outside defendants, Reserve was, *inter alia*, fraudulently continued in business past its point of insolvency and systematically looted of its most profitable and least risky business and more than $3,000,000 in income − all actions which aggravated Reserve's insolvency. In no way can these results be described as beneficial to Reserve.

711 F.2d 1343, 1347-48 (7th Cir. 1983). In like manner, the Complaint alleges the Defendants and the Hussein Regime stole funds owned by Iraq (the corporation) so that the Hussein Regime (management) could maintain its power and extract more from the nation and its citizens (the

shareholders).  *E.g.*, FAC ¶¶ 7, 1178, 1200.  As in *Schacht*: "In no way can these results be described as beneficial to" the Republic of Iraq or the Iraqi people.  711 F.2d at 1348.

In the corporate context, a two-part test determines if fraud is for or against the corporation: "In *Cenco*, we undertook a two-pronged analysis to determine whether such imputation should occur: whether a judgment in favor of the plaintiff corporation would properly compensate the victims of the wrongdoing, and whether such recovery would deter future wrongdoing."  *Schacht*, 711 F.2d at 1348.  In *Schacht*, the court found "that, if warranted by the proof at trial, recovery by the Director on behalf of Reserve would do both."  *Id.* at 1348.  The same is true here: a judgment would compensate the principal victims of the Defendants' wrongs – the people and nation of Iraq – and would deter others who think they can help oppressive dictators loot humanitarian aid with impunity.

> ### 3.     As a matter of law, the <u>in pari</u> <u>delicto</u> defense does not apply to the Republic of Iraq's claims in support of Iraq's public interests.

"The case law overwhelmingly supports" the proposition that the *in pari delicto* defense is inapplicable when the government "is acting in its sovereign capacity to exercise public rights to protect the public interest."  *United States v. Philip Morris, Inc.,* 300 F. Supp. 2d 61, 65-66 (D.D.C. 2004).  In this case, there is no basis to apply a different rule.

The *in pari delicto* defense does not protect those that conspire with corrupt government officials.  *E.g., Corwen*, 164 A.D.2d 212.  In *Corwen*, the City of New York sued to recover payments made to a City director.  When the bribers raised the *in pari delicto* defense, the court ruled: "The affirmative defenses grounded on 'the unclean hands' doctrine and *in pari delicto* also were properly dismissed since the Corwen defendants fail to allege any immoral or unconscionable conduct by plaintiff City, nor any fault on the City's part equal to the alleged fault of defendants."  *Id.* at 218.

**B.    The act of state doctrine does not bar adjudication of the Republic's claims.**

The defendants raise the act of state doctrine in an unusual context.  Typically, if not always, the doctrine is raised defensively by a sovereign, not by private parties against a sovereign.  The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).  The Supreme Court has "more recently described [the doctrine] . . . as a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs."  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (citation omitted).

**1.    The act of state doctrine raises fact questions that cannot be addressed on the face of the Complaint.**

When the act of state defense is raised in connection with a motion to dismiss, "the court must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state."  *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 755 (S.D.N.Y. 2004) (citation omitted).[17]  The act of state doctrine, therefore, cannot be applied in the face of the Complaint's allegations that the Hussein Regime acted against the national interest and for Hussein's personal reasons.  *See First Fidelity Bank,* 877 F.2d at 192 ("the possession of authority does not, *ipso facto*, validate every exercise of it").

The reasons against applying the *in pari delicto* defense also preclude application of the act of state doctrine.  As the numerous qualifications in *Sabbatino*'s holding indicate, "the act of state doctrine is 'supple, flexible, *ad hoc*.'"  *Republic of the Philippines*, 862 F.2d at 1361.  "Sometimes, even

---

[17]*See also Lyondell-Citgo Ref., LP v. Petroleos de Venezuela, S.A.*, 2003 WL 21878798, at *4 (S.D.N.Y. 2003) ("before granting a motion to dismiss based on the act of state doctrine, 'the court must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state'") (citation omitted).

though the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application." *W.S. Kirkpatrick*, 493 U.S. at 409.

> As this Court has noted, the act of state doctrine will rarely support a motion to dismiss:

> As a substantive rather than a jurisdictional defense, the Act of State doctrine is more appropriately raised in a motion for summary judgment than in a motion to dismiss. Accordingly, this court cannot determine whether or not defendants' acts are protected by the Act of State doctrine in the absence of a fuller record.

*Daventree Ltd.*, 349 F. Supp. 2d at 755 (citation omitted).

### 2.      The Hussein Regime's corrupt actions were not acts of state.

For the act of state doctrine to apply, the Defendants must establish that the Hussein Regime's activities were "acts of state;" that is, that the Regime's actions were taken on behalf of the Republic and not merely to preserve the power and prerogatives of the Hussein Regime itself. *See generally Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694 (1976). "That the acts must be public acts of the sovereign has been repeatedly affirmed." *Republic of the Philippines v. Marcos*, 806 F.2d at 358.

"The Act of State doctrine applies to acts that are the result of 'a considered policy determination by a government to give effect to its political and public interest.'" *Jungquist v. Nahyan*, 940 F. Supp. 312, 318 (D.D.C. 1996) (quoting *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1294 (3d Cir. 1979)), *rev'd on other grounds*, 115 F.3d 1020 (D.C. Cir. 1997).

In another Marcos case, the court stated: "[T]he illegal acts of a dictator are not 'official acts' unreviewable by federal courts." *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1471 (9th Cir. 1994). The Hussein Regime's actions in diverting humanitarian aid were not public acts in the public interest. "The inquiry is not whether [Hussein] used his official position to engage in the challenged acts, but whether those acts were taken on behalf of [Hussein] instead of [Iraq]." *Noriega*, 746 F. Supp. at 1522 (discussing Noriega and Panama). As in the *Jimenez* matter: "Even

32

though characterized as a dictator, appellant was not himself the sovereign – government – of Venezuela within the Act of State Doctrine.  He was chief executive, a public officer, of the sovereign nation of Venezuela." 311 F.2d at 557.

When actions are uniformly condemned by the international community, there is an additional basis for denying them status as acts of state.  "In determining whether the doctrine bars judicial review, one factor to be considered is 'the degree of international consensus regarding an activity.'"  *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.,* 176 F.R.D. 329, 353 (C.D. Ca. 1997) (quoting *Liu v. Republic of China*, 892 F.2d 1419, 1433 (9th Cir. 1989)).  Stealing from a UN humanitarian program meets this standard.  In particular: "The Supreme Court has ruled that bribery of foreign officials is not the sort of 'official act' required to establish an act of state." 13C Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 3534.2.1 (3d ed. 2010) ("FEDERAL PRACTICE:") (footnote omitted).

Contracting is also not an act of state.  *See, e.g., Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 338 (D.D.C. 2007) ("A review of the cases reveals that the City's attempt to cast its acquisition of the Malewicz artwork as an 'official act' stretches the meaning of that phrase – and hence the act of state doctrine – too far.  The cases reveal that the key question is whether the act in question is truly a *sovereign* act – that is, an act '*jure imperii*,' an act that is taken 'by right of sovereignty.'"). Extensive authority states commercial acts, such as contracting under the Programme, are never acts of state. *E.g., Dunhill*, 425 U.S. at 695-706 (plurality);[18] *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985); *Lyondell-Citgo Ref.*, 2003 WL 21878798, at *9 (provisionally applying the commercial activities exception in response to a motion to dismiss "in part on the fact that defendants seek to use the act of state doctrine as a shield at such an early stage of the proceedings").

---

[18] Four Justices in *Dunhill* stated:  "The concept of an act of state should not be extended to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities." *Id.* at 695.  The remaining Justices found it unnecessary to reach the issue. *Id.* at 724-25.

### 3.     The act of state doctrine does not apply as a matter of law.

Even if Hussein's actions could be classed as acts of state, there are a number of independent legal reasons the act of state doctrine does not apply.

<u>Hussein was deposed</u>.  The act of state doctrine does not apply to acts of governments no longer in power.  As the Supreme Court stated in *Sabbatino*: "The Judicial Branch will not examine the validity of a taking of property within its own territory by a sovereign foreign government, extant and recognized by this country *at the time of suit* . . . ."  *Sabbatino*, 376 U.S. at 428 (emphasis added). "The final factor set out in *Sabbatino* [is] whether the government allegedly responsible for the challenged acts is still in existence."  *Nat'l Coal. Gov't,* 176 F.R.D. at 355; *see also Bigio v. Coca-Cola Co.*, 239 F.3d 440, 452-53 (2d Cir. 2000).

<u>The Plaintiff is the Republic of Iraq</u>.  "Moreover, the act of state doctrine reflects respect for foreign states, so that when a state comes into our courts and asks that our courts scrutinize its actions, the justification for application of the doctrine may well be significantly weaker."  *Philippines v. Marcos*, 862 F.2d at 1369 (dissent).

> [T]he classification of "act of state" is not a promise to the ruler of any foreign country that his conduct, if challenged by his own country after his fall, may not become the subject of scrutiny in our courts . . . .  Once deposed, the dictator will find it difficult to deploy the defense successfully.  The "balance of considerations" is shifted.  *A fortiori*, when a ruler's former domain has turned against him and seeks the recovery of what it claims he has stolen, the classification has little or no applicability.  The act of state doctrine is supple, flexible, *ad hoc*.  The doctrine is meant to facilitate the foreign relations of the United States, not to furnish the equivalent of sovereign immunity to a deposed leader.

*Id.* at 1360-61 (citation omitted).

<u>Executive Branch's Position</u>.  The act of state doctrine applies only if there is a risk of conflict with the Executive's foreign policy:

> Extrapolating from [the Marcos] decision, it appears that invocation of the act of state doctrine is not appropriate unless it is "apparent" that adjudication of the matter will bring the nation into hostile confrontation with the foreign state.  Where, as here, the coordinate branches of government have already denounced the foreign

state's human rights abuses, it is hard to imagine how judicial consideration of the matter will so substantially exacerbate relations as to cause "hostile confrontation."

*Doe I v. Unocal Corp.*, 963 F. Supp. 880, 893 (C.D. Ca. 1997), *related opinion vacated*, 403 F.3d 708 (9th Cir. 2005); *see also Noriega*, 746 F. Supp. at 1523 ("No such danger is present here and in fact the opposite is true since the Executive's position is amply demonstrated by its decision to indict and prosecute the defendant.") (citing *United States v. Evans*, 667 F. Supp. 974, 987 (S.D.N.Y. 1987)).

In this case, the Executive Branch has already expressed its position on Programme corruption, the Defendants' actions, and the related actions of the Hussein Regime. The Executive Branch's prosecutions of many Defendants for their role in corrupting the Programme demonstrate that the Executive is unconcerned about analyzing the acts of the Hussein Regime, a regime that it targeted for removal. If holding the Defendants responsible for corrupting the Programme impinged on the act of state doctrine, those prosecutions would have been impossible. In fact, the US Attorney for this district argued against application of the act of state doctrine in this context when the defense was raised by Defendant Wyatt. Ex. 22 (US Attorney's Opposition to Wyatt's Motion to Dismiss) at 18-19.

Effects in the United States. The Republic of Iraq challenges the conspiracy to defraud the UN in New York to obtain funds on deposit in New York, not acts confined within Iraq's territorial limits. From its inception, the act of state doctrine has been limited to "the acts of the government of another, done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). When acts are directed at, or have tortuous effects in, the United States, the act of state doctrine does not apply. *Letelier v. Republic of Chile*, 488 F. Supp. 665, 674 (D.D.C. 1980) ("Although the acts allegedly undertaken directly by the Republic of Chile to obtain the death of Orlando Letelier may well have been carried out entirely within that country, that circumstance alone will not allow it to absolve itself under the act of state doctrine if the actions of its alleged agents resulted in tortious injury in this country.").

35

### 4. The Republic's action does not seek collection of taxes.

The Defendants go too far when they try to apply the revenue rule, which states "that the courts of one sovereign will not enforce the tax judgments or claims of another sovereign." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 106 (2d Cir. 2001); DML at 38-39. Application of the revenue rule requires (a) a tax and (b) an attempt to collect that tax.

Nothing in this case seeks collection of a tax or enforcement of an Iraqi tax judgment. First, of course, kickbacks are not taxes. Second, even if the Complaint is rewritten to the Defendants' liking, and the surcharges and kickbacks were "taxes," this matter does not involve the collection of those "taxes." The Republic is not suing to collect unpaid amounts promised the Hussein Regime.

### C. This action does not implicate the political question doctrine.

The Defendants' next variation of their Hussein-was-Iraq theme is to concoct five political questions related to US foreign policy they claim this Court is incompetent to resolve. This case, however, turns on whether the Defendants' actions were legal, not on an issue of US foreign policy.

"A motion to dismiss pursuant to the political question doctrine is a 'motion to dismiss for failure to state a justiciable cause of action.'" *In re MTBE Prods. Liab. Litig.*, 438 F. Supp. 2d 291, 294 (S.D.N.Y. 2006) (quoting, *Baker v. Carr*, 369 U.S. 186, 276 (1962)).

### 1. The political question doctrine raises the same fact questions as the act of state doctrine.

The political question doctrine is related to, and as flexible as, the act of state doctrine, and therefore, the same fact-intensive considerations are involved in applying it. "The act of state doctrine is the foreign relations equivalent of the political question doctrine." *Trajano v. Marcos*, 878 F.2d 1439, 1989 WL 76894, at *2(9th Cir. 1989); *see also* FEDERAL PRACTICE § 3534 ("The act of state doctrine bears a close affinity to the political question doctrine in the field of foreign affairs."). Thus, the same considerations counseling against application of the act of state doctrine apply to this doctrine.

## 2. *This action does not interfere with the conduct of foreign relations.*

The doctrine is "primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. at 210. The touchstone for determining whether a case presents a non-justiciable political question remains the non-exhaustive list of factors set forth in *Baker v. Carr*:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. at 217; *see also Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006).

"[T]he potential for a clash between a federal court and other branches of the federal government is fundamental to the existence of a political question." *Gordon v. State of Texas,* 153 F.3d 190, 194 (5th Cir. 1998). While matters involving foreign relations can raise political questions, the doctrine "is one of 'political questions,' not 'political cases.'" *Id.*; *see also Beaty v. Republic of Iraq*, 480 F. Supp. 2d 60, 70-71 (D.D.C. 2007), *rev'd on other grounds*, 129 S. Ct. 2183 (2009). "Hence, [the Defendants] cannot secure dismissal on political-question grounds simply by invoking the foreign-affairs label; a closer examination of both the 'specific claims' brought by plaintiffs and the issues alleged to constitute 'political questions' is required." *Id.* at 72. In particular, this Court should determine if the Republic of Iraq's claims "bring into question the *propriety* of United States policy toward Iraq." *Id.* (emphasis added). "The next task is to identify with precision the ways in which adjudicating [the Republic's claims] might infringe on the constitutional prerogatives of the political branches." *Id.*

The Executive's view of whether this case conflicts with US foreign policy is clear – the Executive is prosecuting a substantial number of the Defendants.[19]  As stated by one court: "Here, of course, the Executive's view of whether this case presents an affront to its ability to conduct foreign policy is asserted in the most forceful manner; it is prosecuting the defendants with respect to the [transaction in issue]."  *United States v. Evans,* 667 F. Supp. at 987; *see also Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50 (2d Cir. 1991) ("resolution of this matter will not exhibit 'a lack of respect due coordinate branches in government'") (citation omitted).

If this Court is nonetheless concerned about interfering with the Executive Branch, it should ask the Executive Branch, not dismiss on a possibility, particularly given the Executive's consistent statements condemning the Defendants' actions.  *See Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 355 (D.C. Cir. 2007), *cert. denied*, 128 S. Ct. 2931 (2009); *Kadic*, 70 F.3d at 250.

### 3.  As a matter of law, this Court is competent to determine whether the kickbacks were made pursuant to a legitimate governmental purpose.

Only the last of the Defendants' five purported political questions – "whether the challenged payments were made pursuant to legitimate Iraqi government purposes" – needs to be decided by this Court, but there is nothing political about this question.  DML at 39.

Judging the Hussein Regime's conduct does not implicate the political question doctrine, because the doctrine guards against interference with the political decisions of the US government, not those of the Hussein Regime.  *See Vine v. Republic of Iraq*, 459 F. Supp. 2d 10, 20 (D.D.C. 2006) ("This case [challenging the Hussein Regime's use of human shields] does not require an evaluation of any executive or congressional policy decision or value judgment.  Rather, it involves the liability

---

[19] The Executive Branch's position was clarified by the United States Attorney in Wyatt's Sentencing Report: "At the same time as it sought to aid the vulnerable, the OFFP was structured to keep Iraq's oil wealth from being used by the Hussein regime.  Saddam Hussein's actions as the Iraqi head of state were as appalling as they were widely known."  Ex. 23 (Sentencing Report) at 26.

of a foreign sovereign under a well-defined statutory scheme….”), *rev'd on other grounds*, 129 S. Ct. 2183 (2009).

Even when the Philippines alleged that Marcos had turned the entire Philippines' government into a RICO enterprise, the court rejected Marcos' political question argument for the same reasons it rejected the related act of state argument – dictatorial acts against the public interests “are as adjudicable and redressable as would be a dictator's act of rape.” *Republic of the Philippines*, 862 F.2d at 1361 (citations omitted).

> *Political Questions.* Bribetaking, theft, embezzlement, extortion, fraud, and conspiracy to do these things are all acts susceptible of concrete proofs that need not involve political questions. The court, it is true, may have to determine questions of Philippine law in determining whether a given act was legal or illegal. But questions of foreign law are not beyond the capacity of our courts.

*Id.* “[I]n *Republic of the Philippines*, we held that Marcos' alleged illegal acts were not official acts pursuant to his authority as President of the Philippines[, and we] rejected the contention that the Republic's RICO suit against Marcos involved a nonjusticiable political question….” *Id.*

In *Philippines v. Westinghouse*, the court forcefully rejected the defendants' argument:

> First, defendants argue that the political question doctrine should require dismissal here because I lack “judicially discoverable and manageable standards” for deciding the issues presented. As the Republic points out, applying the doctrine in this case would do nothing “to keep the judiciary in equilibrium relative to other branches of government” or “prevent unnecessary conflict” with Congress and the Executive. Defendants' argument, rather, is that deciding this case will necessarily involve this Court in “metaphysical” issues of whether President Marcos owed the Philippines a fiduciary duty under Philippine law.

> This case involves no such “metaphysical” issues. Rather, the question is whether the Republic has a cause of action here and, if so, what the elements of that claim might be. ….

> It is true that defendants have argued that I should ignore the plain prohibitions of Philippine law because they believe President Marcos' *de facto* power negated the very existence of these laws. But as I have already explained, I reject defendants' arguments precisely because they depart from the law and enter the realm of political theory. Obviously, the fact that defendants merely raise an argument which has no place in a court of law does not mean that the Republic's claims must be dismissed with defendants' argument.

774 F. Supp. at 1464-65 (citations omitted); *see also United States v. Marzook*, 426 F. Supp. 2d 820, 824 (N.D. Ill. 2006) ("determination of whether or not Hamas is a racketeering enterprise" is not a political question).

### 4. This Court need not decide the Hussein Regime's illegitimacy, which has already been determined by the Executive Branch.

The Defendants' remaining "political questions" relate to the illegitimacy of the Hussein government,[20] but none of the Republic's claims depend upon this Court's holding the Hussein Regime illegitimate. Even a legitimate government or government official can act wrongfully. For example, the Philippines' action against Marcos did not depend on proving the Marcos government was illegitimate in the eyes of the State Department, only that it acted criminally. *Republic of the Philippines*, 862 F.2d at 1360-61. This case calls for this Court to determine if the Hussein Regime acted for or against the national interests, not whether the Executive Branch thought the Regime was Iraq's rightful ruler.

In addition, the political question doctrine instructs this Court to follow the Executive's foreign policy determinations, not to avoid or ignore them. As in the cases discussed immediately below, if the Executive Branch declares a government illegitimate, or unrecognized, or an enemy of the United States, then this Court must accept those determinations and apply them to the legal issues before it. So, if the Hussein Regime's illegitimacy becomes relevant, the political question doctrine would simply remove any question about the Executive's formal pronouncements about the Hussein Regime, including that it was a State Sponsor of Terrorism and a perpetrator of war

---

[20] "(1) whether the Hussein government was the *de jure* government of Iraq …; (2) whether Saddam Hussein was the rightful ruler of Iraq; (3) whether officials of the Hussein regime were legitimate functionaries; (4) whether the United States somehow 'unrecognized' the Hussein regime as the sovereign of Iraq …." DML at 39. The last question demonstrates, once again, that the Defendants misunderstand the nature of government: the Hussein Regime could never be "the sovereign of Iraq." "The reigning Emperor, or Nation Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty." *Sapphire*, 78 U.S. at 168.

crimes and that it was the formal policy of the United States to depose Saddam Hussein.  *See* FAC ¶¶ 227-29, 232-35.  In other words, this Court would be in conflict with the political branches only if it adopted the Defendants' view that the Hussein Regime could do no wrong, a view directly contrary to Executive Branch's statements.

Certainly, in this context, holding that the Hussein Regime was corrupt and oppressive would not conflict with United States foreign policy interests so as to raise a political question.

## IV.    The Republic of Iraq's claims are not barred by limitations.

The Defendants break no new ground with their limitations argument – "[b]ecause Iraq masterminded the alleged conspiracy, … its claims are time-barred" (DML at 42) – but the issue is not "When did Iraq know?," but, "When could Iraq reasonably bring suit?"

In other words, limitations was tolled.

Standard.  "[W]hen plaintiffs raise an equitable tolling argument, a court must deny a motion to dismiss based on the statute of limitations unless all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that this statute was tolled."  *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 287 (S.D.N.Y. 2009) (citation and internal quotation marks omitted).

### A.    The Republic of Iraq's claims against BNP began to accrue October 27, 2005.

Although tolling rather than accrual determines limitations for most of the Republic's claims, there is one exception – the claims against BNP.  As the Complaint states: "Until the publishing of the UN Report in October 2005, the Republic of Iraq and the Iraqi people had no way of knowing that BNP rejected its fiduciary duties under the Banking Agreement and that it had breached its fiduciary duties."  FAC ¶ 1061.  At this time, there is no allegation that any Iraqi official knew of

BNP's wrongful conduct, so limitations on the BNP claims did not begin to run until October 27, 2005.[21]

**B.      General tolling rules apply to actions brought by foreign sovereigns.**

Although tolling is the crux of the limitations issue, the Defendants brush over tolling in three paragraphs about an irrelevant opinion.  In brief, the Defendants claim that the Supreme Court's *Guaranty Trust* opinion forecloses tolling in suits by foreign sovereigns.  DML at 48-49; *Guar. Trust*, 304 U.S. at 129.

The Defendants misread *Guaranty Trust*, which affirms that sovereigns may raise equitable tolling on the same basis as any party.  In the Supreme Court's words, the "principal question for decision" in *Guaranty Trust* was whether a foreign government "is subject to the local statute of limitations as are private litigants" or whether, like domestic governments, it is not bound by such rules.  *Id.* at 129.  Although the Court denied foreign governments a complete exemption from limitations, it held that limitations were to be applied just "as they run against a private litigant."  *Id.* at 136.

The remainder of *Guaranty Trust* is irrelevant.  It deals with the United States' refusal from 1917 through 1933 to recognize the new Soviet government, while instead recognizing the Russian Government in Exile.  "*Guaranty Trust Co. v. United States* … held only that recognition of the Soviet Government did not, in and of itself, nullify the legal effects of acts of the Provisional Government while it was recognized." *Carl Marks & Co. v. USSR*, 665 F. Supp. 323, 345 (S.D.N.Y. 1987), *aff'd*, 841 F.2d 26 (2d Cir. 1988).  The tolling requested in *Guaranty Trust* was rejected because the Government in Exile had both (1) been recognized by the US government and (2) had brought its

---

[21] The Interim UN Reports issued earlier in 2005 questioned the process by which BNP was chosen over superior bids from other banks, but the Interim Reports did not mention that BNP had joined the Defendants' conspiracy or had failed to protect the Escrow Funds.

own lawsuits in the period between 1917 and 1933, so the nation had never been unrepresented.  *Id.* at 137-39.

### C. Limitations was tolled as a matter of law from 1991 through July 2004 because the Republic of Iraq was incapable of bringing suit in the United States.

The Defendants concede that limitations are tolled if a plaintiff is unable to sue, but they assume that the Hussein Regime or the CPA could have brought this suit.   Even humoring the assumption that the Hussein Regime was required to sue over its own illegal kickbacks, the argument depends on a second, false assumption – "U.S. courts have been open to Iraq during all relevant time periods."  DML at 49.

#### 1. As an enemy of the United States law, the Hussein Regime could not prosecute a lawsuit in the United States from 1991 through July 2004.

"It has long been established that only governments **recognized** by the United States and **at peace with us** are entitled to access to our courts ...."  *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 319-20 (1978) (emphasis added).  The Hussein Regime, Iraq's only government, was neither.

"[W]ar suspends the right of enemy plaintiffs to **prosecute** actions in our courts."[22]  *Ex Parte Colonna*, 314 U.S. 510, 511 (1942) (emphasis added); *see also Johnston v. Eisentrager*, 339 U.S. 763, 776 (1950) (suspension through "period of hostilities").

The common law bar against enemies suing in our courts is a temporary one and anticipates a return to peace, with limitations tolled in the interim.  "The decisions of the Supreme Court and of lower courts are uniform in holding that the statute [of limitations] is tolled throughout the period during which a litigant is denied the right to come into court to assert his claim."  *Oerlikon Mach. Tool Works Buehrle & Co. v. United States*, 102 F. Supp. 417, 420 (Ct. Cl. 1952) (multiple citations omitted),

---

[22] The Defendants note that eight default judgments were entered during the sanctions period, but default judgments hardly show that the Hussein Regime could have filed suit.  DML at 16 n.10; *see, e.g, Klinghoffer,* 937 F.2d at 48 ("While unrecognized regimes are generally precluded from appearing as plaintiffs in an official capacity without the Executive Branch's consent, there is no bar to suit where an unrecognized regime is brought into court as a defendant.") (citations omitted).

*vacated on other grounds*, 151 F. Supp. 332 (Ct. Cl. 1957); *Osbourne v. United States*, 164 F.2d 767, 769-70 (2d Cir. 1947).[23]

Peace between the US and Iraq ended in 1991 when Congress officially authorized the use of military force against the Hussein Regime.  Public Law 102-1.[24]  This first authorization to utilize military force was not suspended until after the Second Gulf War; for example, the authorization was referenced in a November 6, 1998 letter from the President to Congress updating them as required in the authorization.  Ex. 24 (Presidential letter).  On October 16, 2002, Congress again authorized the use of military force against the Hussein Regime.  Public Law 107-243.

The state of war existed until July 30, 2004, when the President declared that the political situation supporting the authorizations in both 1991 and in 2002 "has been significantly altered by the removal of the regime of Saddam Hussein and other developments."  Executive Order No. 13,350.  Even then, the Executive Order noted there remained "obstacles to the orderly reconstruction of Iraq, the restoration and maintenance of peace and security in that country, and the development of political, administrative and economic institutions in Iraq."  *Id.*

In addition, the unusually extensive sanctions against the Hussein Regime during this period raise serious questions about the Hussein Regime's ability to seek relief from United States courts, suspending the statute of limitations.  The sanctions aimed at economically isolating the Hussein Regime blocked all property of the Iraqi nation, including claims for relief.  *E.g.,* Executive Order

---

[23] By statute, New York follows the same rule: "Where a person is unable to commence an action in the courts of the state because any party is an alien subject or citizen of a foreign country at war with the United States or any of its allies, whether the cause of action accrued during or prior to the war, the time which elapsed between the commencement of the war and the termination of hostilities with such country is not a part of the time within which the action must be commenced."  C.P.L.R. § 209(b).

[24] Lest the Defendants argue the Gulf Wars were not actual wars, since there was no "declaration of war," but two authorizations to utilize military force, it has already been determined that the "United States Congress, by its authorization statutes, has initiated war in the same way it has initiated war since World War II."  *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 284 (D.D.C. 2005); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004) (Iraqi citizens held in Guantanamo are "enemy combatants.").

12,724; *see also Farbenfabriken Bayer A. G. v. Sterling Drug, Inc.*, 251 F.2d 300, 301 (3d Cir. 1958) (Claims

for relief of "a former enemy alien" are property subject to seizure.).  The Iraqi sanctions have been

held to require US Treasury permission to bring suit in US courts, a permission never granted to the

Hussein Regime.  *See A.C. Monk & Co. v. Ubaf Arab Am. Bank*, 875 F. Supp. 311, 312-13 (E.D.N.C.

1995).  The same authority states that a lack of permission to sue tolls limitations.  *Id.* at 313.[25]

      The Defendants' failure to discuss the state of war and the sanctions policy speaks volumes.

The US and UN were committed to preventing the Hussein Regime from receiving economic

assistance because of the threat it presented to the United States, the Iraqi people, and the world, yet

even after institution of this suit, the Defendants still blithely claim that the Regime could have filed

a multi-billion dollar lawsuit in US court if it had just wanted to.

      **2.**    ***Tolling is unaffected by the CPA's control of Iraqi sovereignty.***

      The CPA's temporary control over the Republic is irrelevant to tolling.  According to UN

Security Council Resolution 1546, from the Hussein Regime's fall in 2003 until June 28, 2004,

sovereignty over the Republic of Iraq vested with the CPA, not with any government created or

maintained by the Iraqi people.  Ex. 25 (SCR 1546).  The CPA's sovereign control included

Programme activities: "[I]n connection with the dissolution of the Coalition Provisional Authority,

the Interim Government of Iraq and its successors shall assume the rights, responsibilities and

---

[25] "The Court finds that the transaction which took place between these parties involved Iraqi-related property.  Therefore, the transaction was affected by the Iraqi Sanctions Regulations, such that the plaintiff was unable to gain the right to bring this action involving blocked property until 1994.  The statute of limitations on this action was effectively tolled by the Executive Orders and the Iraqi Sanctions Regulations, and did not begin to run until the plaintiff obtained a litigation license to bring suit against the defendant."  *Id.*  Other courts have held that different sanctions regimes did not bar lawsuits, just judgments.  *See, e.g, Nat'l Oil Corp. v. Libyan Sun Oil Co.*, 733 F. Supp. 800, 810 (D. Del. 1990).

obligations relating to the Oil-for-Food Programme that were transferred to the Authority…." *Id.* at ¶ 26.  The CPA's sovereign control over the Republic has been recognized by US courts.[26]

The CPA initially transferred sovereignty to an interim Iraqi government with restricted powers.  Interim governments controlled the Republic of Iraq until May 20, 2006, when the first post-CPA constitutional government of the Republic of Iraq was seated.  FAC ¶¶ 21, 24.

The Defendants' contention that "Iraq remained empowered to act during the Coalition Provisional Authority period" is unsupported and directly contrary to existing authority.  DML at 16; *Kunstsammlungen zu Weimar v. Elicofon*, 536 F. Supp. 829 (E.D.N.Y. 1981), *aff'd*, 678 F.2d 1150 (2d Cir. 1982).  In *Elicofon*, East Germany (the "GDR") sought the return of art taken during WWII.  Relying on *Guaranty Trust,* the court ruled that limitations was tolled during the period the GDR could not access US courts as an enemy of the nation.  536 F. Supp. at 847-48.  The defendants countered that for four years the Allied Powers could have sued in GDR's behalf.  The court rejected the argument, because, even if the Allied Powers could have filed suit (a proposition the court viewed with "serious doubt"), "at most they would have been acting as trustees for the GDR's interests," and "the commencement of a prior action by a trustee or guardian does not thereby lift the disability toll accorded the beneficiary."  678 F.2d at 1165; *see also* 536 F. Supp. at 847 ("No authority supports Elicofon's claim that the four Allied Powers could have brought suit in the United States on behalf of Germany.").

### D.   *Extraordinary circumstances delayed the Republic's filing.*

Equity tolls limitations to prevent unfairness.  *Haekal v. Refco, Inc.*, 198 F.3d 37, 43 (2d Cir. 1999).  The relevant equitable considerations are (1) whether the plaintiff acted with reasonable diligence and (2) whether the circumstances are so extraordinary that the tolling doctrine should apply.  *Baroor v. New York City Dep't of Educ.*, 2010 WL 227681, at *2 (2d Cir. 2010).

---

[26] *E.g., Laudes Corp. v. United States,* 84 Fed. Cl. 298, 300 (Fed. Cl. 2008); *Youkhana v. Gonzales*, 460 F.3d 927, 933 (7th Cir. 2006); *United States v. Custer Battles, LLC,* 562 F.3d 295, 297 (4th Cir. 2009).

In addition to the war, the Complaint alleges ample bases for tolling, although the "pleading requirements in the Federal Rules of Civil Procedure … do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007).[27]  For example, the Complaint pleads that the Hussein Regime harshly suppressed opposition and that creating a functioning government has been arduous due to violent conflict.  FAC ¶ 20; ¶¶ 216-23.

### 1.    Hussein's tyrannical rule justifies tolling.

In *Republic of the Philippines v. Westinghouse*, the court found "the Republic has a reasonable excuse for delay in light of the difficulty it would have faced in bringing suit during the Marcos regime."  774 F. Supp. at 1451.  In a different Marcos case, the Ninth Circuit concurred: "Any action against Marcos for torture, 'disappearance,' or summary execution was tolled during the time Marcos was president."  *Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767 (9th Cir. 1996).

"[E]very court that has considered [whether] a civil war and a repressive authoritarian regime constitute 'extraordinary circumstances' which toll the statute of limitations…has answered in the affirmative."  *Jean v. Dorelien*, 431 F.3d 776, 780 (11th Cir. 2005) (Haiti; citations omitted).[28]

---

[27] The Republic of Iraq notes that the Defendants' assumption that New York law governs the Republic's "common law claims" is unwarranted.  For example, the Republic's Sixth Claim – aiding and abetting breaches of fiduciary duty by the Hussein Regime – could be governed by Iraqi law under the internal affairs doctrine.  *E.g.*, *Lou v. Belzberg*, 728 F. Supp. 1010 (S.D.N.Y. 1990); *cf. In re Adelphia Commun. Corp.*, 365 B.R. 24, 40 (Bankr. S.D.N.Y. 2007), *aff'd in part sub. nom, Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008).  The Republic of Iraq also notes that the Defendants read the Complaint and Rule 44.1 too narrowly.  First, the Defendants incorrectly claim the Complaint "invokes only federal and New York law, *see* FAC ¶ 1174," DML at 46 n.37, but the referenced paragraph merely lists Travel Act predicates and does not refer to or restrict the Republic's claims in general.  Second, the Republic was not required to plead foreign law in the Complaint. "Pleading the foreign law [is] clearly unnecessary."  *Siegelman v. Cunard White Star, Ltd.*, 221 F.2d 189, 196 (2d Cir. 1955); *see also* Notes of Advisory Committee on Rule 44.1 (notice "need not be incorporated in the pleadings"); *DP Aviation v. Smith Indus. Aerospace & Defense Sys. Ltd.*, 268 F.3d 829, 847 (9th Cir. 2001) (Rule 44.1 notice reasonable if "given before or during the pretrial conference").

[28] *See Arce v. Garcia*, 434 F.3d 1254 (11th Cir. 2006) (fear of reprisals and Salvadoran Civil War); *Chavez v. Carranza*, 559 F.3d 486, 494 (6th Cir. 2009) ("extraordinary circumstances outside of plaintiffs' control … the circumstances in El Salvador were not sufficiently safe for plaintiffs to seek redress in court"); *S. African Apartheid Litig.*, 617 F. Supp. 2d at 288

Tolling is appropriate even if the Iraqi government had not been barred from US courts. *See Arce*, 434 F.3d at 1262 ("situation in the home state nonetheless remains such that the fair administration of justice would be impossible, even in United States courts").

> **2.      *The conflict in Iraq and its nascent governmental institutions justify equitable tolling.***

"Even after the transfer of sovereignty, the process of building a functioning, constitutional, and democratic government has been arduous due to the unstable political and social conditions, including the ongoing violent conflict in Iraq." FAC ¶ 20. Such conditions also justify tolling, but go unmentioned by the Defendants. *See Saravia*, 348 F. Supp. 2d at 1146-48 (civil war); *Unocal Corp.*, 963 F. Supp. at 897 (lack of a "functioning judiciary"). In general, limitations begins to run when peace and a democratic and functioning government are restored. *Forti*, 672 F. Supp. at 1549 (question of fact whether limitations began to run before democratically elected government took power); *Chavez v. Carranza*, 407 F. Supp. 2d 925, 929 (W.D. Tenn. 2004) (limitations tolled until "the first national elections occurred after the end of the civil war"); *Estate of Cabello*, 157 F. Supp. at 1368 ("The Court further finds that once the civilian government under the leadership of President Patricio Aylwin replaced General Pinochet's military regime in 1990, the tolling ceased, and the limitations period commenced.").

At a minimum: "Plaintiffs' allegations are sufficient to raise an issue of fact as to whether the limitations period was tolled." *Nat'l Coal. Gov't*, 176 F.R.D. at 335.

---

("[C]ourts have been especially willing to toll the statute of limitations during the time the abusive *government* remains in power."); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1146-48 (E.D. Col. 2004) (El Salvadoran Civil War and fear of retaliation); *Estate of Cabello v. Fernandez-Lonos*, 157 F. Supp. 2d 1345, 1368 (S.D. Fla. 2001) (General Pinochet's regime); *Unocal Corp.*, 963 F. Supp. at 897 (RICO Claims; "threat of reprisal" by Burmese dictator); *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1550 (N.D. Cal. 1987) (fact issue – "the pervasiveness of military's reign of terror").

**V.     The Republic of Iraq's specific claims support relief.**

> **A.     The Republic of Iraq has stated viable RICO claims.**

>> **1.     The Complaint alleges the requirements for RICO standing.**

"To demonstrate [RICO] standing, a plaintiff must plead, at a minimum, '(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation.'" *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 120 (2d Cir. 2003) (citation omitted).  To meet those elements, the Complaint alleges the Defendants conspired with the Hussein Regime (the Republic of Iraq's agent) to defraud the UN with the express purpose of stealing property owned by the Republic of Iraq, which was designated by international agreement to pay for the humanitarian needs of the Iraqi people.  The Defendants challenge injury and causation.

Injury.  The Defendants' RICO standing argument focuses on the *parens patriae* damages – the damages caused by the loss of humanitarian aid – but, as explained above, the Republic of Iraq is not bringing its RICO claims as *parens patriae*.  The relevant RICO damages are diversions of the proceeds from the sale of the Republic of Iraq's oil.  With that clarification, there is no question of injury.

The goal of the Defendants' scheme was to obtain the Republic of Iraq's property held by the UN in New York.  They extracted that property through their excessive profits and by diversions to the Republic of Iraq's corrupt agent.

Apart from focusing on *parens patriae* damages, the Defendants' only argument against injury mirrors its Article III argument; in fact, it goes even further: "[A]ny alleged misconduct actually benefitted Iraq's proprietary interests by supplying the Iraqi government with revenues that it could not otherwise have obtained."  DML at 51.  Even apart from the improper equation of the Hussein Regime and the nation, the argument makes no sense.  The "revenues" cited by the Defendants came from the sale of the nation's property.  Humoring the Defendants' argument, at best, the

Defendants helped the Hussein Regime divert national resources from their agreed purpose (humanitarian aid) to other Regime purposes, but the diversion came at a cost (the Defendants' excessive profits).  As a result, even if the diversion to the Hussein Regime caused no injury, there was a substantial decrease in national property caused by the Defendants' fraudulent conduct.  The diversion to the Republic's corrupt agent was also injurious.

Causation.  The Defendants' causation argument makes the same errors.

First, the Defendants focus exclusively on *parens patriae* damages – which are based on the reductions in aid received by the Iraqi people – as opposed to diversion of the Republic's oil wealth. DML at 52-53.   In this regard, the Defendants gain some consolation from Judge Lynch's speculations in *Karim* that the Programme's ending surplus indicates that humanitarian aid might not have been constrained by their scheme.  As explained above, the surplus has other explanations, and humanitarian aid was curtailed, but, in any event, the provision of humanitarian aid is irrelevant to RICO standing.   The Republic's RICO claims are based on diversions of its oil wealth, not reductions in the humanitarian aid received by its citizens.  DML at 53. [29]

"In the RICO context, the Second Circuit has repeatedly announced that to have standing, a plaintiff must demonstrate that they were 'the intended targets of the RICO violations,' and that any alleged RICO injury must have been the 'preconceived purpose' of the RICO activities."  *BCCI Holdings (Luxembourg), SA v. Pharaon*, 43 F. Supp. 2d 359, 365 (S.D.N.Y. 1999) (citation omitted).

The conspiracy's target was the billions generated by sales of the Republic's (not Hussein's) oil sitting in the Programme's escrow account.  Since the "preconceived purpose" of the scheme was

---

[29] The Defendants go further than Judge Lynch's speculation about affects on particular citizens.  In keeping with the rest of their argument, the Defendants posture themselves as supporting the Iraqi people through their corruption:  "If anything, the alleged enterprise facilitated delivery of humanitarian assistance to the Iraqi people that their government had refused to provide without the surcharges and kickbacks Iraq alleges."  DML at 52.

to obtain the Republic of Iraq's money, the Republic of Iraq was necessarily "the intended target" of the scheme.

The Defendants' fraudulent conduct was directed in the first instance at the UN (the gatekeeper to the Republic of Iraq's money), but the fraud targeted the Republic's property. The fraudulent misrepresentations do not have to be directed at the plaintiff to be actionable. *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131 (2008). The *Bridge* plaintiffs' RICO action alleged their competitors defrauded Cook County, Illinois to win contracts. In response, the defendants argued "that because the alleged pattern of racketeering activity consisted of acts of mail fraud, [plaintiffs] must show that they relied on petitioners' fraudulent misrepresentations[, which] they cannot do, because the alleged misrepresentations … were made to the county, not respondents." *Id.* at 2138. The argument was rejected because the defendants' misrepresentations to Cook County directly damaged the plaintiffs:

> Moreover, a person can be injured "by reason of" a pattern of mail fraud even if he has not relied on any misrepresentations. This is a case in point. Accepting their allegations as true, respondents clearly were injured by petitioners' scheme: As a result of petitioners' fraud, respondents lost valuable liens they otherwise would have been awarded.

*Id.* at 2139. In the same manner, the Republic of Iraq was damaged by the Defendants' fraud directed at the UN, which gave them access to the Republic's property.

The Defendants' Role in the Conspiracy. The Defendants try to diminish their role in the conspiracy, but as explained above, they were integral to achieving the conspiracy's goal of obtaining Programme funds. This case is, therefore, far different from the Defendants' principal authority on speculation, *Lerner*, 318 F.3d 113; *see* DML at 50-54. *Lerner* held: "The fundamental flaw in plaintiffs' theory is plaintiffs' allegation that defendants proceeded independently of Schick, without the purpose or design of aiding in his fraud against plaintiffs." *Id.* at 124. In contrast, the Defendants in this case were the prime actors in this conspiracy. The Hussein Regime had no ability to defraud the

UN into giving it Programme funds; only the Defendants could do that.  Also unlike *Lerner*, in this

case there are not two fraudulent schemes – the Hussein Regime's and the Defendants'.  There was

one scheme with one common goal – to obtain excessive amounts of Programme funds.

Intervening Cause.  The Defendants also claim the Hussein Regime's "strong desire to

obtain surcharges and kickbacks" is an "intervening discretionary act[]."  DML at 53, 52.  But, the

fact that the corrupt government official eagerly wants his bribe does not erase the crime of bribery.

*E.g., Joseph L. Balkan, Inc.*, 656 F. Supp. at 542 ("Mirabile argues that plaintiff cannot be permitted 'to

use its own agency for extortion and then claim its victims to be connected with it in an enterprise.'

However, the complaint does not allege that plaintiff used 'its own agency' for extortion, but rather

alleges that its own agency was one of the victims."); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood

Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004) ("But commercial bribery cannot be

committed unilaterally by an alleged bribe receiver: one cannot be guilty of receiving a commercial

bribe unless someone else is guilty of paying it.").  RICO aims directly at those that assist

racketeering enterprises; it does not countenance a defense that some of the conspirators were

aggressively criminal and might have acted even without assistance.

Judge Lynch in *Mastafa* expressly rejected the Defendants' argument that the Hussein

Regime's actions were an intervening act cutting off the defendants' liability: "[T]he injuries are not

'the result of the independent action of some third party not before the court' because the acts of

the Hussein regime are not 'independent' of steps taken to aid and abet those acts."  2008 WL

4378443, at *2.

### 2.     *This Court has subject matter jurisdiction under RICO.*

The Defendants premise their subject matter attack on the claim that their conspiracy

centered on Iraq, not New York.  According to the Defendants, the Complaint alleges "conduct that

is predominantly extraterritorial and has no domestic effects" and that is of "overwhelmingly foreign nature." DML at 54.

General Standard.   Since RICO is silent about its extraterritorial application, courts are guided by the conduct and effects tests developed in securities and antitrust cases.  *E.g., N.S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051-52 (2d Cir. 1996).  The ultimate inquiry is whether "Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries."  *Id.* at 1052 (citations omitted).

The Defendants, however, assume the first step – that the illegal conduct was extraterritorial.

### a.   *The relevant conduct is not extraterritorial.*

"However, where racketeering activities, including mail or wire fraud, occur within the United States, it is unnecessary to apply any test for determining the extraterritorial reach of the statute.  As a threshold matter, then, this Court must first determine whether the alleged acts are extraterritorial in nature."  *Johnson Elect. N. Am. v. Mabuchi Motor Am. Corp.*, 98 F. Supp. 2d 480, 485 (S.D.N.Y. 2000) (citations omitted).

"Heart of the alleged fraud."[30]  To paraphrase Willie Sutton, the Defendants came to New York to perpetrate their scheme, because that is where the money was.  The proceeds from the sale of Iraq's oil rested at BNP in New York, and the Defendants and their co-conspirators decided to rob the bank, aided by the fact that the bank was part of the scheme.  The Republic of Iraq's loss was not caused by the negotiation of the illegal side deals in Baghdad, but by the misrepresentations to the UN in New York where the money was.

In such a scenario, the conduct is not extraterritorial.  In *Johnson Electric*, the court found no need to conduct an extraterritorial analysis, because "all of the allegedly fraudulent mailings took

---

[30] "The issue for us to resolve here boils down to what conduct comprises the heart of the alleged fraud." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 175 (2d Cir. 2008), *cert. denied*, 130 S. Ct. 783 (2009).

place either exclusively or partially within the United States through the use of the United States Postal Service." 98 F. Supp. 2d at 486. The same is true here.

Mail and Wire Fraud. Likewise, the mail and wire fraud allegations are premised in New York activities and the necessary communications to the UN in order to obtain contract approval and to release Programme funds. FAC ¶¶ 339-49. There was nothing incidental about the use of mails and wires in the United States. As the Complaint explains, given the nature of the Programme's procedures, the Defendants could not defraud the UN without the use of the mails and wires, and without that fraud, the scheme would not have worked. FAC ¶¶ 339-49.

Money Laundering. As explained more fully below, when the Defendants fraudulently induced the UN to transfer them Programme funds, they violated US laws related to blocked property. FAC ¶¶ 230, 250, 253-54, 288-90, 993-1000, 1192. Those violations made the transfers from the UN money laundering, a RICO predicate act alleged in the Complaint, which occurred entirely in the United States.

Other US Commercial Activities. Programme contracts were determined to constitute commercial activities affecting the United States in *Hilaturas Miel, S.L. v. Republic of Iraq*, 573 F. Supp. 2d 781, 794 (S.D.N.Y. 2008).

### b. The UN Escrow Account and Programme administration falls under this Court's jurisdiction.

The Defendants try to avoid the scheme's New York focus by claiming that "the Program Account should not be regarded as a domestic U.S. account because it was established pursuant to agreements and resolutions explicitly providing that it was an instrumentality of the United Nations subject to the 'privileges and immunities of the United Nations.'" DML at 56-57 (citations omitted). The Defendants, however, cite no authority for the proposition that claims related to the theft of, or damage to, property endowed with sovereign immunity are outside this Court's jurisdiction, and such a rule would lead to absurd results. Sovereign immunity is not a sword to be used by private

parties to avoid liability for damaging sovereign property.  The UN building is immune, as are the sovereign vessels in the Port of New York, but surely this Court would have jurisdiction if the Defendants robbed the UN at gunpoint or sank a sovereign vessel docked in the Port.

Not surprisingly, the Defendants' basic contention has been squarely rejected.  "The [UN Headquarters] treaty in no way deprives the United Nations or its representatives of a forum for legal redress, whether it be civil or criminal in nature."  *People v. Weiner*, 85 Misc. 2d 161, 166 (Crim. Ct. N.Y. Co. 1976).  To the contrary, the UN Headquarters Treaty states:

- "Except as otherwise provided in this agreement or in the General Convention, the federal, state and local law of the United States shall apply within the headquarters district."

- "Except as otherwise provided in this agreement or in the General Convention, the federal, state and local courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district as provided in applicable federal, state and local laws."

Quoted at FAC ¶¶ 207-08.

Stealing funds held by the UN is stealing and subject to this Court's jurisdiction.  *People v. Coumatos*, 32 Misc. 2d 1085, 1086 (Gen. Sess. N.Y. Co. 1962), *aff'd mem.*, 247 N.Y.S.2d 1000 (1964). Coumatos was a UN inventory clerk tried for theft by fraud.  He "objected to the entire proceeding on the stated ground that this Court is entirely without jurisdiction … in view of the fact that all of the alleged acts constituting a violation of our Penal Law took place on the United Nations premises, which the United States ceded to this International Organization by agreement in 1947." *Id.*  The court rejected the jurisdictional challenge, holding, based on the same treaty provisions cited in the Complaint, that "federal, state and local law shall apply within the headquarters district" and that "the courts of the appropriate American authorities shall have jurisdiction to try and determine issues between the parties."  *Id.* at 1088-89 (citation omitted); FAC ¶¶ 207-09.  In *Weiner,* the defendant "sprayed red paint on the outside wall of the United Nations

headquarters." 378 N.Y.S.2d at 972. Based on the same treaty provisions, the court rejected the defendant's argument that the New York Criminal Courts had no jurisdiction over conduct on UN soil. *Id.*

The Defendants' Judicial Admissions. The Defendants did not just overlook this authority. Vitol, for example, pleaded guilty before a New York state court to having "stole property from the United Nations" exceeding $1 million, namely Programme funds from the Escrow Account. Ex. 4 at 1. Wyatt and Chalmers also pleaded guilty to defrauding the Programme. Exs. 5, 6. A number of Vendor Defendants also admitted they defrauded the Programme. Exs. 7-16.

### c.      *Standing is appropriate under the ultimate inquiry.*

The Defendants concede the "ultimate inquiry" in determining whether RICO applies to a given factual scenario is whether "Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries." *Al-Turki*, 100 F.3d at 1052 (citations omitted); DML at 54-55.

For obvious reasons, the Defendants do not proffer an answer to that ultimate question. The Congressional condemnations of the Defendants' actions (*e.g., supra* note 7) and the Executive's prosecutions (Exs. 2-16) are clear indications of Congressional intent on this matter. Substantial governmental resources have already been devoted to addressing the issues raised by this case and to bringing the Defendants to justice.

### d.      *Standing is appropriate under the conducts test.*

The jurisdictional framework is broader than the Defendants imply. The wrongful conduct does not have to occur entirely or even mostly in the United States. All that is required is that "conduct material to the completion of the fraud occurred in the United States." *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1046 (2d Cir. 1983). As explained above when discussing whether the

conduct was extraterritorial, defrauding the UN, which controlled the funds, was essential to the Defendants' scheme.

### e.    Standing is appropriate under the effects test.

Standing is appropriate under the effects test "whenever a predominantly foreign transaction has substantial effects within the United States." *Al-Turki*, 100 F.3d at 1051-52 (quoting *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261-62 (2d Cir. 1989)).  The heart of the Defendants' scheme was to obtain Programme funds.  The kickbacks and bribes were just how Saddam Hussein received his share.  Gathering in Baghdad to plan the robbery and to split the take does not remove jurisdiction when the bank they robbed was here.  Thus, this is not the situation discussed in the Defendants' authority where there are "only remote and indirect effects in the United States."  DML at 60 (citing *Al-Turki*, 540 F.3d at 1051).  Vitol's guilty plea to stealing Programme funds, alone, makes an ultimate finding of substantial effects in the United States clearly plausible.  Ex. 4.

### 3.    The Complaint pleads the elements of a RICO Section 1962(c) claim.

"RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985) (citations omitted).

Section 1962(c) states in relevant part:  "It shall be unlawful for any person . . . associated with [1] any enterprise . . . [2] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through [3] a pattern of [4] racketeering activity . . . ."  18 U.S.C. § 1962(c).  The Defendants change the standard order, but challenge each element.

### a.    There are two viable RICO Enterprises.

A RICO "'enterprise' includes [1] any individual, partnership, corporation, association, or other legal entity, and [2] any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The two types of enterprises are generally called "legal entity" enterprises and "aassociation-in-fact" enterprises.  The Republic of Iraq alleges two alternative

enterprises: (1) the Programme, FAC ¶ 1136, which is both a legal entity and an association-in-fact enterprise, and (2) an association-in-fact encompassing "the Iraq Sanctions Program, in general, including the Programme (as an integral part of the Sanctions Program), the 661 Committee, the OIP, and the Programme participants, including the Defendants." FAC ¶ 1137.

### (1)     The Defendants alter RICO's statutory definition.

To make RICO's enterprise definition appear more restrictive, the Defendants edit the statutory definition, replacing the statute's "includes" with an "is." Compare:

- Defendants' version – "An 'enterprise' *is* 'any individual, partnership …" (DML at 61) *with*

- the statutory definition – "'enterprise' *includes* any individual, partnership…."

The alteration is not insignificant. As the Second Circuit noted in determining that a New York City court was a "legal entity" enterprise under RICO, the "use of the word 'includes,' rather than a more restrictive term such as 'means,' 'indicates that the list is not exhaustive but merely illustrative.'" *United States v. Angelilli*, 660 F.2d 23, 31 (2d Cir. 1981) (citations omitted); *see also United States v. Perholz*, 842 F.2d 343, 357 (D.C. Cir. 1998) ("The statute defines 'enterprise' as *including* the various entities specified; the list of entities is not meant to be exhaustive."); *United States v. Collins*, 927 F.2d 605, 1991 WL 23558, at *12 (6th Cir. 1991) ("the word 'includes,' … indicates the list is not exhaustive or exclusive") (unpublished; citations omitted).

### (2)     The Programme is a "legal entity" enterprise.

Using the Black's Law Dictionary definition of "legal entity" as their chief legal source, the Defendants argue that the Programme is not a "legal entity." DML at 62. Although the argument is basically unexplained, coupling the Black's Law definition with the rewrite of the statutory definition, the Defendants seem to claim that an enterprise has to embody one of the legal entities listed in the RICO definition. There is no basis for the assumption.

Indeed, there is no reason to turn to Black's Law at all, since the Second Circuit has set forth the proper definition of "legal entity:"

> Finally, the word "entity" itself is hardly restrictive. It denotes anything that exists. As modified by the word "legal," it suggests that any being whose existence is recognized by law is within the term "enterprise."

*DeFalco v. Bernas*, 244 F.3d 286, 311 (2d Cir. 2001).

Thus, when an enterprise "includes" the listed entities, "enterprise" also "includes" parts of the listed entities. Since the Programme was part of a recognized legal entity (the United Nations), under Second Circuit precedent, the Programme can constitute a legal entity enterprise. Examples abound: *DeFalco*, 244 F.3d at 308 (New York City Civil Court proper enterprise) (citing *Angelilli*, 660 F.2d at 30-35); *United States v. Clark*, 646 F.2d 1259, 1261 (8th Cir. 1981) ("government agencies or offices"); *United States v. Frumento*, 405 F. Supp. 23, 29-30 (E.D. Pa. 1975) (bureau of cigarette and beverage taxes), *aff'd*, 563 F.2d 1083, 1089-92 (3d Cir. 1977); *United States v. Barber*, 476 F. Supp. 182, 184 (S.D. W.Va. 1979) (state alcohol beverage control); *United States v. Vignola*, 464 F. Supp. 1091, 1095-97 (E.D. Pa. 1979) (city traffic court), *aff'd*, 605 F.2d 1199 (3d Cir. 1979), *cert. denied*, 444 U.S. 1072 (1980).

The Programme has been recognized sufficiently to meet the broad Second Circuit definition. In fact, the Programme possessed most if not all of the attributes set out in Black's Law. "First, the Program is a part of the U.N. Both the Program and the U.N. had the ability to – and did – hold property." *Chalmers II*, 474 F. Supp. 2d at 564. "The Program had a direct, economic interest in the monies in the OFFP Bank Account, and indeed, those interests are reflected in the U.N. documents establishing and implementing the Program." *Id*. "Thus, the Program had a financial interest in the funds held in the OFFP Bank Account." *Id*. When Wyatt and Chalmers argued that the Programme was not a cognizable victim of mail and wire fraud, the US Attorney for this District

argued that the Programme, as part of the UN, had the capacity to sue and be sued and to hold property.  Ex. 22 at 7-8, 11-12.

In the alternative, if part of the UN is not a proper legal entity enterprise, the Republic of Iraq seeks leave to amend to change the designated enterprise to the United Nations itself.

### (3)     Both Complaint enterprises are also association-in-fact enterprises.

Both the Programme and the Iraq Sanctions Program qualify as association-in-fact enterprises.  The Defendants' sole argument is that "[f]ar from alleging a *common* purpose, Iraq alleges that the participants in the 'Iraq Sanctions Program' had *distinct* and *disparate* purposes." DML at 62 (emphasis in original).  "As a result of the avowed differences in purpose," according to the Defendants, "Iraq cannot establish that 'the defendants operated symbiotically and played necessary roles in the achievement of a common purpose.'"  *Id.* at 63 (citation omitted).

RICO jurisprudence, however, does not require the enterprise to have a "common purpose" *with* defendants corrupting the enterprise to their own purposes.  A legitimate enterprise will always have different purposes from those individuals using it for their own corrupt means.  As the Supreme Court has repeatedly emphasized, an enterprise "'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'"  *Boyle v. United States,* 129 S. Ct. 2237, 2243 (2009) (quoting *United States v. Turkette*, 452 U.S. 476, 583 (1981)).  For example, a motorcycle club constitutes an enterprise when it is organized "for the purpose of riding motorcycles and drinking beer."  *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994) (quoting indictment).  The club remains an enterprise even if its members use this association-in-fact enterprise for other purposes such as dealing drugs.  *See id.*

The Defendants' basic argument[31] was rejected by a court in this District, which held:

---

[31]The *Enzo Biochem* defendants argued:

> [T]here have been several cases in which the RICO association-in-fact enterprise included the plaintiff and the defendant. In none of these cases was defendant's alleged hidden motive to victimize plaintiff held to prevent plaintiffs' and defendants' association-in-fact from constituting a proper RICO enterprise.
>
> Defendants argue that these cases are inapposite because they fail to address the "logical conundrum" of a claimed association-in-fact enterprise between a victim and a victimizer. One of the objectives of the RICO statute, however, is to protect enterprises from the racketeering activities of its members. The Court thus declines to create a new requirement that members of RICO association-in-fact enterprises share the same purposes.

*Enzo Biochem, Inc.*, 1990 WL 136038, at *6 (citing, *inter alia, Jacobson v. Cooper*, 882 F.2d 717 (2d Cir. 1989)).

The Programme and the association of entities that were organized for purposes of enforcing sanctions while protecting the Iraqi people constituted "enterprises" under RICO's plain language. They remained enterprises even when the Defendants corrupted their purposes.

### b.   The Defendants "operated or managed" the enterprises through their pattern of racketeering.

In the Second Circuit, the "'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear . . . especially at the pleading stage." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (citations omitted). The Supreme Court set forth the test in *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).[32] The Court in *Reves* explained: "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.*

---

Defendants assert that the joint venture formed between plaintiff and Ortho (the Enzo/Ortho Enterprise) cannot constitute a RICO association-in-fact enterprise because, according to plaintiff's factual allegations, Enzo and Ortho did not have a common goal or purpose. That is, although the stated purpose of the Enzo/Ortho Enterprise was to develop and market health care products, plaintiff alleges that Ortho's real purpose was to destroy or victimize Enzo.

*Enzo Biochem v. Johnson & Johnson*, 1990 WL 136038, at *5 (S.D.N.Y. 1990).

[32] The operation or management test is irrelevant to the Republic's claim under section 1962(d) for conspiracy. *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000).

Fact Question.  The Second Circuit explains that whether conduct "constitutes participation in the operation or management of the enterprise's affairs" is a fact question:

> Unless a civil RICO defendant is indisputably directing the affairs of the enterprise, his commission of crimes that advance its objectives **must be assessed by a fact-finder** to determine whether or not his criminal activity, assessed in the context of all the relevant circumstances, constitutes participation in the operation or management of the enterprise's affairs.

*United States v. Allen*, 155 F.3d 35, 42 (2d Cir. 1998) (emphasis added).

To avoid dismissal, the Complaint need only allege facts sufficient to show a plausible claim that the Defendants violated section 1962(c).  *Burke v. Dowling,* 944 F. Supp. 1036, 1054 (E.D.N.Y. 1995) ("plaintiffs are entitled to discovery on their claims so long as they have pleaded some minimal factual basis which would entitle them to relief").

### (1)    *The Defendants are enterprise insiders.*

Although the Defendants contend the Complaint "does not allege that Defendants played any role in directing, operating, or managing the sanctions regime," DML at 64, the Complaint alleges, "[t]he Defendants' roles in the Programme were integral to the Programme's operations." FAC ¶ 1069.  The "Defendants voluntarily agreed to participate in the Programme[, and] voluntarily agreed to abide by all Programme rules, including the requirements of Security Council Resolution 986, the MOU, and the procedures established by the 661 Committee and the OIP."  FAC ¶ 1067.

To obtain their Programme contracts, the Defendants, unlike normal sellers or vendors, had to agree to abide by the regulations and policies of an outside agency, the Programme.  Thus, the Defendants were not mere suppliers or buyers; the Defendants (and their co-conspirators) were active participants in a complicated UN bureaucracy.  The Defendants' actions affected essentially every Programme transaction throughout the Programme's history.

As integral parts of the Programme's operations, the Defendants meet *Reves'* "operation-or-management rule[, which] is intended to spare from RICO liability true enterprise outsiders (such as

outside accounting firms),” not insiders, even “key, if passive, insiders.” *131 Main Street Assos. v. Manko*, 897 F. Supp. 1507, 1527 (S.D.N.Y. 1995).   In *131 Main Street*, the “defendants did not operate or manage the enterprise in the sense of involving themselves in the day-to-day processing of fraudulent trades and communications,” but “neither were they the sort of unwitting foot soldiers whose liability was at issue in *United States v. Viola*, 35 F.3d 37 (2d Cir. 1994), *cert. denied*, 513 U.S. 1198 (1995).” *Id.* at 1527.   Instead: “They allegedly enabled the partnerships to function effectively ….” *Id.*

### (2)   The Defendants participated in the Programme’s operations and management through bribery and kickbacks.

Even if the Defendants are viewed as Programme outsiders, “the word ‘participate’ makes clear that RICO liability is not limited to those with primary responsibility for the enterprise’s affairs, just as the phrase ‘directly or indirectly’ makes clear that RICO liability is not limited to those with a formal position in the enterprise.” *Reves*, 507 U.S. at 179.

The Defendants directed the Programme through their conspiracy with the Hussein Regime. As the Defendants concede, even overemphasize, the Hussein Regime had a direct and integral role in Programme management – for example, the Hussein Regime determined its contractual counterparties.   The Defendants influenced the Hussein Regime’s decision-making through kickbacks, bribes, and side agreements to supply goods other than humanitarian supplies.

As the *Reves*’ Court stated: “An enterprise also might be ‘operated’ or ‘managed’ by others ‘associated with’ the enterprise who exert control over it as, for example, by bribery.” *Id.* at 1824.

“Outsiders may exert control over an enterprise’s affairs through illegal means sufficient to satisfy *Reves’* requirements.” *United States v. Castro*, 89 F.3d 1443, 1452 n.5 (11th Cir. 1996) (citation omitted).   The *Castro* defendants were convicted of giving kickbacks to influence judicial decisions. On appeal, they argued that “as outsiders they could not have exerted the requisite degree of control

over the 'operation or management' of the Circuit Court of the Eleventh Judicial Circuit to meet the requirements of *Reves*." *Id.* at 1452.  The Court disagreed: "Our view of the evidence in the light most favorable to the government indicates that more than sufficient evidence existed to demonstrate that appellants 'agreed' to affect the operation or management of the Circuit Court of the Eleventh Judicial Circuit through paying kickbacks." *Id.*

In a similar fashion, the Supreme Court reversed dismissal of a RICO claim that "asserted that respondents participated in the conduct and affairs of MPUC [a public utility district] through this pattern of racketeering activity, contrary to § 1962(c)," when they allegedly "sought to influence members of the MPUC in the performance of their duties – and in fact caused them to approve rates for the company in excess of a fair and reasonable amount." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 234 (1989).  The *H.J. Inc.* defendants directed official conduct by "making cash payments to commissioners, negotiating with them regarding future employment, and paying for parties and meals, for tickets to sporting events and the like, and for airline tickets." *Id.* at 233.  In contrast, the hundreds of millions of dollars the Defendants funneled to Saddam Hussein and their series of fraudulent communications to the UN were far more extensive involvement in Programme management.

The Defendants' conduct was also far more involved than the bribery found sufficient in *United States v. Allen*, 155 F.3d at 42.  In *Allen*, the United States brought a civil action against trash hauling companies and others for bribery.  *Id.* at 38.  The *Allen* defendants argued:

> … that the evidence suggests only that they accidentally discovered the bribery scheme, and that their participation was limited to insisting that the dump workers give them corrupt benefits on the same terms as those given to the members of the enterprise.  Accordingly, they argue that they cannot be understood to have "operated" the enterprise whose scheme they envied and then imitated.

*Id.* at 40-41.  The Second Circuit held: "A reasonable fact-finder could find that payment of the bribes either did or did not render the defendants liable under section 1962(c)." *Id.* at 42-43.

The Defendants also participated in the Programme's management through fraud directed at the UN.  In *Automated Teller Machine Advantage LC v. Moore*, the plaintiff alleged the defendants "engaged in a complex scheme to defraud Plaintiff of $16,475 million by inducing Plaintiff to purchase large numbers of automated teller machines ['ATMs'] that did not exist."  2009 WL 2431513, at *1 (S.D.N.Y. 2009).  The court held that the allegations supported a finding of management or control.  *Id.; see also Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1559 (1st Cir. 1994) ("By acting with purpose to cause Aetna to make payments on false claims, appellants were participating in the 'operation' of Aetna.").  While some courts have cautioned against overdue extension of allowing fraudulent influence (as opposed to influence purchased through bribes or kickbacks) to constitute direction under RICO, the Defendants' fraudulent activities so pervaded the Programme's management that it is certainly plausible that they participated in the management through fraud, especially when coupled with the related bribes.

### c.     The Defendants engaged in racketeering activity.

The Defendants assert that the Republic of Iraq has failed to "sufficiently allege any of these predicate acts," under either Rule 9 (for wire fraud) or generally for the other claims.  DML at 65.

The Basic Requirements.  Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  "The additional requirements of Rule 9(b) were well described by Judge Frank Easterbrook when he wrote that '[particularity] means the who, what, when, where, and how: the *first paragraph* of any newspaper story.'"  *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (citation omitted); F.R.C.P. Form 13 (model fraud complaint which, according to rule 84, "indicate[s] the simplicity and brevity of statement which the rules contemplate").

"When a plaintiff asserts that 'the mail or wire transmissions were themselves fraudulent . . . the complaint should specify the fraud involved, identify the parties responsible for the fraud, and

where and when the fraud occurred."' *Fuji Photo Film U.S.A., Inc. v. McNulty*, 2009 WL 3334867, at *2 (S.D.N.Y. 2009).  However, when a plaintiff alleges that "the mail or wire fraud was only used in furtherance of a scheme to defraud, then the complaint does not have to be as specific with respect to each allegation of mail or wire fraud, so long as the RICO scheme is sufficiently pled to give notice to the defendants." *Id.* (citations omitted).

Rule 8's standard, which governs the pleading of the other predicate acts, is even less stringent, requiring only a "short plain statement of the claim showing that the pleader is entitled to relief." F.R.C.P. 8(a).

<u>Mail and Wire Fraud</u>.  "It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) (citation omitted).  This is particularly true "in cases involving complex fraudulent schemes or those occurring over a lengthy period of time and involving thousands of billing documents." *United States ex rel. Tiesinga v. Dianon Sys, Inc.*, 231 F.R.D. 122, 123 (D. Conn. 2005); *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 326 (S.D.N.Y. 2004) ("where a case involves complex or extensive fraudulent schemes, courts have 'relaxed' Rule 9(b)'s pleading requirements").  The requirements are also "relaxed under certain circumstances, including situations when (a) '[t]he pleader is asserting that third persons have been defrauded,' and (b) 'when facts are peculiarly within the opposing party's knowledge.'" *N.B. Garments (PVT.) Ltd. v. Kids Int'l Corp.*, 2004 WL 444555, at *2 (S.D.N.Y. 2004) (citing, *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir. 1972); *Dominicus Americana Bohio v. Gulf & W. Indus., Inc.*, 473 F. Supp. 680, 693 (S.D.N.Y. 1979)).

"In complex civil RICO actions involving multiple defendants, therefore, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity.  In such cases, Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme."  *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

In this case, the Complaint alleges the "Defendants quickly learned that Programme processes required numerous communications by telephone and wire with the UN and with BNP in New York," and provides an extensive example of why that is true.  FAC ¶¶ 341-49.  "The Defendants' scheme necessarily involved multiple violations of the mail and wire fraud statutes, because, as explained above, the scheme could not have functioned without phones, faxes, e-mails and wire transfers."  FAC ¶ 1143.  The Complaint specifies the contracts induced by the Defendants' bribes.  *See, e.g.*, FAC ¶ 475 (5½ pages of Vitol contracts).  The Complaint also explains how paying for oil purchases under the Programme involved "extensive use of the mails and wires, including telephone, fax, e-mail and wire transfers."  FAC ¶ 339; *see also* FAC ¶ 340.

The Defendants protest that the Complaint uses one UN contract to explain how mail and wire fraud were integral to the Defendants' scheme and does not set out contractual details for each Defendant contract, but the demanded detail is unreasonable.  "As can be readily inferred from the alleged *modus operandi* of the schemes, there were numerous mailings of standardized documents containing identical false representations…. To burden the complaint with specific allegations of hundreds of such instances would serve little purpose, particularly since defendants seem to be in the best position to provide the details they demand."  *Joseph L. Balkan, Inc.*, 656 F. Supp. at 545.

The Complaint's single example required about two-and-a-half pages to detail the communications regarding one small contract.  FAC ¶¶ 342-48.  The Complaint raises kickbacks

regarding more than 400 contracts, some quite involved, so the same measure of detail would add at least a thousand pages to the Complaint.  In discovery, the Republic of Iraq will produce the UN contract files for all contracts described in the Complaint.  Thus, there is no need for tedious detail, but if it is desired, the Republic seeks leave to amend pursuant to Rule 15 to add a thousand pages that no one will ever read.

Money Laundering.  The Defendants' money laundering argument misreads the Complaint. According to the Defendants, "Iraq's money laundering allegations are insufficient because the alleged payments routed through the Program Account are not alleged to have entered the United States and because there is no allegation of cognizable 'unlawful activity.'"  DML at 67.

The Complaint's money laundering allegations, however, are not based on transfers to Saddam Hussein, but rather the transfers from the UN Escrow Account in New York to the Defendants:

> The Defendants committed money laundering each time they received payment from the UN Escrow Account that included sums covering an illegal kickback.  The Money Laundering Control Act, 18 U.S.C. §§ 1956, 1957, prohibits the use or movement through the United States of proceeds of certain unlawful activity with the intent to promote the unlawful activity.

FAC ¶ 1144.

When the Defendants defrauded the UN into transferring Programme funds to them, they received "proceeds of certain unlawful activity," because the fraudulently induced transfers violated the US blocking statutes and the mail and wire fraud statutes.  The transfers were also integral to the scheme; they were the source of the illgotten gains.  Therefore, the transfers constituted money laundering as both movement through the US of criminal proceeds and as transfers in furtherance of the larger conspiracy.  "It was through overpricing of goods that kickbacks were made to Iraq – by inflating the price of goods and kicking back the difference to Saddam's henchmen." *The Role of*

*BNP-Paribas SA in the United Nations Oil-for-Food Program: Hearing Before the Subcommittee on Oversight and Investigations, House Committee on Int'l Relations*, 109th Cong. 2 (2005) (Rohrabacher).

Since the transfers originated in the United States, the Defendants' contention that "there are no allegations that the money at issue ever entered the United States" is baseless.  DML at 67.

International Emergency Economic Powers Act (the IEEPA).  The Defendants misinterpret the IEEPA, claiming it does not apply to them because they are not "U.S. persons" under the regulations.  DML at 69-70 (relying on 31 C.F.R. § 575.321).

The definition of "U.S. persons," however, limits solely the scope of what property can be blocked by US authorities; the blocking provisions reach only property held or controlled by U.S. persons or within the United States.  31 C.F.R. § 575.201(a).  Those limits are irrelevant here, because the Escrow Account at BNP in New York clearly held blocked property, and all transfers from the account required an OFAC license.  *Paris*, 2000 WL 777904, at *2.

On the other hand, IEEPA's prohibitions and penalties for avoiding restrictions on transfers of blocked property (including BNP's license to transfer Programme funds) are not limited to U.S. persons: "*Whoever* after the date of enactment of this Act willfully violates or evades or attempts to violate or evade Executive Order Number 12722, 12723, 12724, or 12725 or any license, order, or regulation issued under any such Executive Order – (i) shall, upon conviction, be fined not more than …."  31 C.F.R. § 575.701(2) (emphasis added).  Likewise: "No debits may be made to a blocked account to pay obligations to U.S. persons *or other persons*, including payment for goods, technology or services exported prior to the effective date, except as authorized pursuant to this part." 31 C.F.R. § 575.404 (emphasis added).

When the Defendants misrepresented their dealings with the Hussein Regime to receive Programme funds, they violated the IEEPA in relation to BNP's license to hold and to transfer funds held in New York, not outside the United States.

Travel Act and Bribery.  In response to the bribery predicates, including the Travel Act, the Defendants merely rehash the unsupported claim that if the government official wants the bribe, there is no bribery.  This argument is discussed above at 52.  The Defendants apply the same argument to the FCPA, arguing that the payments were "lawful under the written laws and regulations of" Iraq.  DML at 69 (quoting 15 U.S.C. § 78dd-2(c)(1)).  Notably, the Defendants do not substantiate this statement of Iraqi law; nor does the statement comply with the Defendants' own (albeit incorrect) reading of Rule 44.1.  *See* DML at 46 n.37.  Pervasive governmental corruption does not convert an officials' corrupt motives into legal ones.

### d.   The Defendants engaged in a pattern of racketeering activity.

The Defendants go off track from the start of their "pattern" argument, when they fail to discuss both types of RICO patterns – open-ended and closed-ended.  The Complaint alleges both.

In any event, "[a]t the pleading stage, [this] hurdle is relatively low." *Automated Teller Mach. Advantage*, 2009 WL 2431513, at *5 (quoting *WWE, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 496 (S.D.N.Y. 2007), *aff'd*, 328 Fed. Appx. 695 (2009)).

Open-Ended.  To establish open-ended continuity, the Complaint "need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).

With no analysis, the Defendants declare: "Because there is no threat of continuing criminal activity that might otherwise constitute an 'open-ended' pattern of racketeering activity, Iraq must allege facts sufficient to establish a 'close-ended pattern' of such activity."  DML at 71 (citation

omitted).  Presumably, the claim is that, because Saddam Hussein was ousted by military force and the Programme dissolved, there can be no threat of continuing illegal activity, but the (unexplained) argument misunderstands the nature of the continuing threat requirement.

The threat of continuing criminal activity is judged from the defendant's perspective at the time of the criminal acts, so the issue is not whether circumstances outside the Defendants' control stopped their scheme, but whether the conspirators would have stopped if circumstances had remained the same.  *See DeFalco*, 244 F.3d at 323.  In other words: "The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict."  *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991); *see also Cosmos Forms Ltd. v. Guardian Life Ins. Co.*, 113 F.3d 308, 310 (2d Cir. 1997).

Nothing in the Defendants' or the Hussein Regime's conduct gives any indication that they would ever have stopped their scheme of their own accord or that the scheme was "inherently finite and therefore did not pose a threat of repetition."  *DeFalco*, 244 F.3d at 323.  The Programme was part of "the longest standing sanctions program in UN history," FAC ¶ 292, largely because the weakened sanctions could not cause Hussein's downfall.  The Complaint alleges: "The Defendants' willingness to mislead the United Nations and violate OFFP rules eviscerated the effectiveness of the Iraq Sanctions Program and allowed the Hussein Regime to stay in power until Hussein was ousted by military action."  FAC ¶ 1132.

An open-ended conspiracy is not cut off because tanks rolled into Baghdad to do what sanctions weakened by the Defendants' scheme could not.  Rather, that it took a war to stop the scheme evidences the threat of continued illegal activity.  "In short, there was sufficient evidence from which a reasonable jury could conclude that [the Defendants] … had no intention of stopping once they met some immediate goal.  Based on this evidence, the jury could reasonably have

concluded that the [Defendants] would have continued extorting the plaintiffs into the future." *DeFalco*, 244 F.3d at 324 (discussing rampant corruption in a New York town).

<u>Closed-Ended</u>. To satisfy closed-ended continuity, the plaintiff must prove "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 241. The Defendants contend that, as to the individual Defendants that executed only one Programme contract, the Complaint's allegations fail to meet that standard. DML at 72. The argument suffers from two errors: (1) it took more than two years of racketeering to obtain payment on a single contract, and, in any event, (2) there is no two-year minimum.

Even Defendants who entered into a single Programme contract committed racketeering acts over more than two years. As set out in the Complaint, Programme contracting was a complicated and tedious affair. In the Complaint's example, payment on a contract signed in February 1999 was not received until August 2001, and that time-frame did not include the negotiation of the main contract *and* the illicit side deal before submission to the UN. FAC ¶¶ 341-348. As explained in the Complaint, there would have been RICO predicate acts throughout that lengthy period. *E.g.*, FAC ¶¶ 339-49.

In addition, the Second Circuit has "not viewed two years as a bright-line requirement," but has instead indicated solely that patterns of a shorter duration would be rare "particularly where … '[t]he activities alleged involved only a handful of participants' and do not involve a 'complex, multi-faceted conspiracy.'" *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) (citation omitted); *see also Automated Teller Mach.*, 2009 WL 2431513, at *5 ("a scheme's duration alone is not dispositive" "the court must examine the overall context in which the acts took place").

The rule is different for "a complex, multifaceted conspiracy." *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 948 (S.D.N.Y. 1989). In *Polycast*, given the complexity of the conspiracy, this Court found twenty-six predicate acts over eight-and-a-half months sufficient to establish a

racketeering pattern, even when the scheme involved a single victim and injury. *Id.* at 947; *see also Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 320 (S.D.N.Y. 2009).

The Defendants' conspiracy was exceedingly complex and multi-faceted and involved far more than a "handful of participants." *See Spool*, 520 F.3d at 184. Thousands of companies from all over the world participated in the Programme, and the scheme involved tens of thousands of criminal acts from approximately June 1999 to March 2003.

The Complaint's allegations therefore establish a "closed-ended" pattern of racketeering.

### 4.    *The Complaint alleges a RICO conspiracy under 1962(d).*

As the Defendants are well aware, the Republic's section 1962(d) claim is a huge part of this case. It is chiefly by this claim that the Defendants will be held responsible for the billions lost through the overall conspiracy, rather than the hundreds of millions directly attributable to the Defendants. Yet, the Defendants' response to this claim comprises three paragraphs covering less than two pages. DML at 72-73. The obvious reason for the abbreviated argument is that it does not withstand analysis.

Conspiracy Not Dependent on the 1962(c) Claim. The Defendants first assert that the 1962(d) conspiracy claim must be dismissed if the 1962(c) claim is dismissed, but this is true only if the Republic's 1962(c) claim were entirely insupportable.

A defendant can be liable for conspiracy under section 1962(d) without being liable under section 1962(c). *Salinas v. United States*, 522 U.S. 52 (1997). In *Salinas*, a crooked sheriff accepted bribes to allow an inmate conjugal visits. The government also charged the sheriff's deputy, Mario Salinas, with violations of sections 1962(c) and (d), because, when the sheriff was not around, Salinas arranged the visits and occasionally stood watch, for which he received a pair of designer watches and a pickup truck. The jury found Salinas not guilty of violating section 1962(c) but guilty of conspiracy under section 1962(d).

Salinas challenged his conviction on the basis that, to join a RICO conspiracy, he needed to have violated section 1962(c).  *Id.* at 53.  The Supreme Court unanimously rejected the argument:

> In the case before us, even if Salinas did not accept or agree to accept two bribes, there was ample evidence that he conspired to violate subsection (c).  The evidence showed that [the Sheriff] committed at least two acts of racketeering activity when he accepted numerous bribes and that Salinas knew about and agreed to facilitate the scheme.  This is sufficient to support a conviction under § 1962(d).

*Id.* at 66.  Following *Salinas*, the Second Circuit held a defendant "need not be named in a predicate act charged in the indictment to be guilty of a racketeering conspiracy that includes that predicate act."  *United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002).

Thus, the issue is not whether the Republic of Iraq has alleged a section 1962(c) claim against a particular Defendant or even as to any of the Defendants, but rather whether the Complaint plausibly suggests that the conspiracy among the Hussein Regime and all Programme participants violated section 1962(c).  If that is the case, and the Defendants do not even contest the point, then the individual Defendants could be liable under 1962(d) for conspiracy.

The Complaint's Allegations – Not a Conclusory Add-On.  The Defendants also raise a purported pleadings defect, stating that conspiracy allegations "should be more than conclusory add-on at the end of a complaint" and that the Complaint fails to allege facts "supporting an inference that each defendant knowingly agreed to participate in a conspiracy."  DML at 72-73 (internal quotes and citations omitted).

The Complaint's conspiracy allegations are, however, hardly a "conclusory add-on."  Multiple Complaint sections discuss the conspiracy and the Defendants' knowledge:

- "The Oil Purchasing Defendants knew the conspiracy extended to all oil sales under the Programme."  FAC § V.C.2.

- "David B. Chalmers, Jr. admits to joining the conspiracy."  FAC § V.D.1.

- "Chevron admits to joining the conspiracy."  FAC § V.D.2.

- "El Paso admits to joining the conspiracy."  FAC § V.D.3.

- "Vitol admits to joining the conspiracy."  FAC § V.D.4.

- "Wyatt admits to joining the conspiracy."  FAC § V.D.5.

- "The ASSFs required side agreements with the Hussein Regime, which were not disclosed to the UN and which required direct financial transactions with the Regime."  FAC § VI.C.3.

- "The Defendants voluntarily joined the conspiracy to corrupt the Iraq Sanctions Program and the Programme."  FAC § VI.C.7.

- "The Akzo Nobel Defendants admit joining the conspiracy."  FAC § VI.H.1.

- "AWB admits joining the conspiracy."  FAC § VI.H.2.

- "The Flowserve Defendants admit joining the conspiracy."  FAC § VI.H.3.

- "The Ingersoll-Rand Defendants admit joining the conspiracy."  FAC § VI.H.4.

- "Novo Nordisk admits joining the conspiracy."  FAC § VI.H.5.

- "The Siemens Defendants admit joining the conspiracy."  FAC § VI.H.6.

- "The Textron Defendants admit joining the conspiracy."  FAC § VI.H.7.

- "The Volvo Defendants admit joining the conspiracy."  FAC § VI.H.8.

- "The Weir Group admits joining the conspiracy."  FAC § VI.H.9.

- "York admits joining the conspiracy."  FAC § VI.H.10.

- "BNP's Entry into the Conspiracy to Withhold Information from the UN."  FAC § VII.C.

- "BNP's Participation in the Conspiracy to Corrupt the Programme."  FAC § VII.G.

- "Conspiracy and Interrelation Among the Defendants."  FAC § VIII.

- "The Conspiracy Among the Defendants and the Hussein Regime."  FAC § VIII.B.

- "The Oil Purchasing and Vendor Defendants agreed to join the conspiracy."  FAC § VIII.B.1.

- "BNP agreed to join the conspiracy." FAC § VIII.B.2.

- "The Defendants understood the scope of the conspiracy."  FAC § VIII.B.3.

- "The Defendants also entered into separate conspiracies.  FAC § VIII.B.4.

Given the breadth and specificity of the Complaint's conspiracy allegations, to present a plausible pleadings argument, the Defendants have to do far more than state that the Republic's conspiracy allegations are "a conclusory add-on at the end of a complaint."  DML at 72 (citation omitted).

<u>Knowledge of the Scope of the Conspiracy</u>.  The Defendants' final pleading argument comprises half of the third paragraph of this section of the Defendants' memorandum and asserts that "Iraq fails to allege plausibly, as it must, that any particular RICO conspirator understood the nature and scope of the racketeering enterprise and consciously agreed to further the affairs of the enterprise." DML at 73.

As an initial matter, the Defendants overstate the law.  The Republic of Iraq does not need to prove, much less allege, that each Defendant knew the "entire scope of the conspiracy."  DML at 73 (quoting FAC).  The Second Circuit has held that "no rule" requires "the government to prove that a [RICO] conspirator knew of all criminal acts by insiders in furtherance of the conspiracy" as long as it shows that defendant possessed knowledge of "the general contours of the conspiracy." *United States v. Zichettello*, 208 F.3d at 100.

> Although each conspirator need not explicitly enter an agreement with, or even know the identities of, the other conspirators, the complaint must allege that each of the charged conspirators "had sufficient awareness of the existence of other members of the alleged conspiracy to render them part of the 'rim of the wheel to enclose the spokes.'"

*Zito v. Leasecomm Corp.*, 2004 WL 2211650, at *18 (S.D.N.Y.  2004) (citations omitted).

Clearly the Complaint "sufficiently allege[s] that the [Defendants] were aware enough of each other's involvement in the enterprise to know of its general contours.  While the precise

contours of each defendant's knowledge of the scope of the overall conspiracy has yet to be proven, plaintiffs have brought conspiracy allegations against each of the dealer defendants that are sufficient to withstand a motion to dismiss." *Id.* at *19; *see also United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) ("*Salinas* held that to be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme."), *cert. denied*, 129 S. Ct. 1648 (2009); *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989) (defendant may join a RICO conspiracy without knowing the identities of "all the other conspirators" and without "full knowledge of all the details of the conspiracy").

In addition, this argument contradicts the rest of the Defendants' memorandum, which repeatedly alleges the Hussein Regime's receipt of kickbacks from all Programme participants was so systematic and known that (in the Defendants' view) the scheme was automatically legal under Iraqi law. *See, e.g.,* DML at 38 (characterizing bribes and kickbacks as revenue collection). In their limitations section, the Defendants assert the scheme was well known and cites newspaper articles discussing the scheme before it ended. DML at 44 n.36. In contrast, in this half-paragraph argument, the Defendants change course to claim nothing in the Complaint "allege[s] plausibly, as it must, that any particular RICO conspirator understood the nature and scope of the racketeering enterprise and consciously agreed to further the affairs of the enterprise." DML at 73.

Even apart from the contradiction, the argument is plausible only if Court will not trouble to read the Complaint, which, for example, asserts:

> The Hussein Regime told all interested oil purchasers that surcharges were required for any purchases, so all purchasers knew from the start that their conduct was part of a larger conspiracy.

> In December 2000, the 661 Committee began hearing rumors of the surcharge scheme [and] sent a notice to potential oil purchasers that any attempts by SOMO to impose surcharges to be paid to the Hussein Regime violated Programme regulations.

> All of the Oil Purchasing Defendants received that notice.

BNP was also aware of the notice.

FAC ¶¶ 367-71.  Similar allegations are made as to the Vendor Defendants.  FAC ¶¶ 616-17, 662-799, 1074-95.

The Defendants' Judicial Admissions.  The Complaint also sets out judicial admissions of many Defendants that establish their knowledge of the conspiracy's scope.  For example: Chevron acknowledged "that the Hussein Regime was demanding surcharges from oil purchasers, that Chevron knew of such demands, and that Chevron indirectly made such payments."  FAC ¶ 424; *see also* FAC ¶¶ 421-39.  A number of Vendor Defendants made similar agreements, also set out in the Complaint, which prohibit them from denying their knowledge of the overall scheme.  FAC ¶¶ 662-799.

### B.     The Complaint alleges a claim under the Robinson-Patman Act or ("RPA").

### 1.     The Republic of Iraq has standing to sue under the RPA.

Standard.  Robinson-Patman standing is determined by reference to Section 4 of the Clayton Act, which states: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15.  The Supreme Court has interpreted that broad language as indicated that, "Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations."  *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472 (1982) (citations omitted).

With this background, the Supreme Court instructs that RPA standing should be examined based on two factors: (1) "the physical and economic nexus between the alleged violation and the harm to the plaintiff" and, more particularly, (2) "the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4."  *Id.* at 478.  These factors are usually

described as injury in fact and whether the plaintiff is an efficient enforcer of the antitrust laws. *See Associated Gen. Contractors v. Cal. State Council of Carpenters, Inc.*, 459 U.S. 519, 540-45 (1983).

Injury in Fact. The Defendants claim "Iraq has failed to allege any injury in fact of its own," but as explained repeatedly above, the Defendants' fraudulent scheme targeted the Republic's property held by the Programme. The Defendants' argument is pure Hussein-was-Iraq: "Ultimately, any alleged harm to Iraq or its people was caused by the Iraqi government's manipulation of the Program to its own ends." DML at 74, 75. Any further explanation would be needlessly repetitive.

Efficient Enforcer. The Defendants challenge whether the Republic of Iraq is an inefficient enforcer by claiming that the Defendants' competitors could sue, but that does not mean the Republic of Iraq lacks standing. DML at 75. The Republic's standing is clearly established by the Supreme Court's decision in *Blue Shield of Virginia v. McCready*, 457 U.S. 465. McCready was a participant in a Blue Shield insurance plan. When her visits to a psychiatrist were disallowed, she sued, alleging that Blue Shield's "practice of refusing to reimburse subscribers for psychotherapy performed by psychologists, while providing reimbursement for comparable treatment by psychiatrists, was in furtherance of an unlawful conspiracy to restrain competition in the psychotherapy market." *Id.* at 467. The district court dismissed her suit on the basis that as a consumer, not a competitor, she lacked antitrust standing. *Id.* at 470.

*McCready* establishes that standing is not limited to competitors, but to any party directly injured. *Id.* at 472. McCready had standing because her injury (the denial of her benefits) was neither "fortuitous" nor "incidental." McCready's injury was "clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.* at 477-79. As a consumer of psychotherapy services, "McCready was 'within that area of the economy ... endangered by [that] breakdown of competitive conditions'...." *Id.* at 480-81 (citation omitted).

> Although McCready was not a competitor of the conspirators, the injury she
> suffered was inextricably intertwined with the injury the conspirators sought to inflict

> on psychologists and the psychotherapy market. In light of the conspiracy here
> alleged we think that McCready's injury "flows from that which makes defendants'
> acts unlawful" within the meaning of *Brunswick*, and falls squarely within the area of
> congressional concern.

*Id.* at 483-84 (citations omitted).

The same considerations apply in this case. The Defendants wanted to pocket money held by the Programme but owned by the Republic of Iraq, so the Defendants could effectuate their illicit scheme only by harming the Republic. Indeed, the Republic's injury is more direct than McCready's. Taking the Republic's property was not a "means to defendants' objective" – it was the objective. *See Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 292 (2d Cir. 1983).

<u>Bribery Cases</u>. Sovereigns have been specifically held to be efficient enforcers of the antitrust statutes when they are damaged by the bribery of their officials:

> The Municipality is also well situated to further the deterrent purposes of the
> antitrust laws. The Municipality has the best access to its employees and can most
> easily supervise their performance for signs of wrongdoing. In addition, bribes will
> generally result in either decreased quality or higher prices, and the Municipality is
> the one best able to monitor both quality and price.

*Hitachi,* 547 F. Supp. at 641. Citing *Hitachi,* the Supreme Court stated *in dicta* "that the Robinson-Patman Act may apply where the State, as in *Sterling*, or the municipality, as in *Hitachi*, is the victim of commercial bribery under § 2(c), 15 U.S.C. § 13(c), rather than the favored customer." *Jefferson Co. Pharm.,* 460 U.S. at 183 n.16 (*referring to Sterling*, 235 F. Supp. 393).

### 2. There is subject matter jurisdiction under the RPA.

The Defendants argue that "Iraq does not allege that Defendants … engaged in any U.S.-based transactions 'integral' to the alleged schemes." DML at 76. The Complaint alleges, however, that the Defendants' actions were US-based because all Programme contracts had to be approved by the UN in New York and all Programme payments were from the Escrow Account, blocked as part of US law. Therefore, to participate in the Programme and to effectuate their RPA violation, the Defendants had to act "in commerce," as the Supreme Court defined the phrase. *Gulf Oil Corp. v.*

*Copp Paving Co.*, 419 U.S. 186, 196 (1974); *see also George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir. 1977).  Programme contracts were clearly commercial activities within the United States.  *Hilaturas Miel, S.L.*, 573 F. Supp. 2d at 794.

### 3.      The Republic of Iraq states a viable claim under the RPA.

The Defendants' final RPA argument is the repeated, yet unsupported, allegation that there is no bribery if the recipient asked for the payment, DML at 77, but even the Defendant's sole authority in this section of their memorandum of law notes the obvious: "commercial bribery cannot be committed unilaterally by an alleged bribe receiver: one cannot be guilty of receiving a commercial bribe unless someone else is guilty of paying it."  *Blue Tree Hotels*, 369 F.3d at 222.

The legal issue is whether paying the bribes influenced a government official, not whether it was the official's idea.  "In New York, for instance, commercial bribery is defined as 'confer[ring], or offer[ing] or agree[ing] to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs."  *Id.* (citations omitted).  In this case, the Hussein Regime was the agent; the Republic of Iraq was the principal.  The kickbacks were paid to influence the Hussein Regime's decisions to contract with the Defendants and not others who might be unwilling to defraud a UN humanitarian program.

### C.      This Court should infer a private right of action under the FCPA.

The Defendants are correct that a number of opinions find no private right of action under the FCPA, but that line of authority is in error, and in general, incorrectly follows one of the first opinions addressing the issue, *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1028-30 (6th Cir. 1990).  The Republic of Iraq respectfully suggests that if this Court analyzes the issue from a fresh perspective, it will reach a different conclusion.  This Court is free to address this argument because none of the previous authority binds this Court.  *See* cases cited at DML at 77 & n. 57.

In deciding whether a statute creates a private remedy "the central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Remington*, 442 U.S. 560, 575 (1979). Significantly, Congressional intent is analyzed in the context of the contemporary legal context of when the statute is passed, not under current law. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698-99 (1979).

In the case of the FCPA, Congressional intent is eminently clear. The FCPA was adopted in 1977 as an amendment to the Securities and Exchange Act (the "SEA"), not long after the Supreme Court had first recognized implied private remedies under the SEA.[33]

An early version of the FCPA contained a provision expressly establishing a private remedy, but the provision was removed. In the usual case, that removal would unequivocally establish that a private remedy was not intended, but not this time. "By deleting the express provision for private remedies, Congress did not intend to eliminate such a right of action. On the contrary, the deletion by Congress was done to ensure that such a right was available under all applicable SEA statutes." Note, *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024: *The Sixth Circuit Gets Sheepish on Foreign Corrupt Practices Act Enforcement*, 5 Transnat'l Law. 533, 554 (1992) ("Note, *Lamb*").

"During Senate committee hearings on Senate Bill 3379, the SEC submitted a report which posited that private actions should be eliminated from the language of the statute because such a provision under one Securities Exchange Act (SEA) statute (in this case, the FCPA) would create a negative inference with respect to all other SEA statutes." *Id.* at 537. Based on the SEC's statements, the Senate Banking Committee believed that an express provision for a private remedy "would have duplicated and possibly confused existing remedies available to shareholders." S. REP. NO. 1031, 94th Cong., 2d Sess. 12, 12-13 (1976).

---

[33] The Supreme Court first addressed implied remedies under the SEA in 1971. *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n. 9 (1971); *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 380 n.10 (1983).

A House Report expressly stated that Congress intended the courts to recognize a private right of action in favor of persons experiencing injury caused by prohibited corporate bribery. H.R. REP. NO. 640, 95th Cong., 1st Sess. 10 (1977).[34]

The contrary line of authority apparently resulted from a series of courts following the first court's lead, and a first court with an admitted bias against implied rights. *Lamb,* 915 F.2d at n.13 ("Speaking only for myself, if writing on a clean slate, I would never infer a private right of action where the legislation itself is silent in that regard."). The *Lamb* court also applied then-current legal norms, which by 1990 had turned increasingly wary of implied remedies compared to 1977 when the FCPA was adopted. *See,* Note, *Lamb,* 5 Transnat'l Law. at 548 n.122. Finally, the *Lamb* court placed undue reliance on the early FCPA draft that contained an express private remedy, without mentioning the SEC's and Congress' reasons for removal – that it did not wish to cause any doubt about the SEA's implied remedies. *See Lamb,* 915 F.2d at 1029.

Given the paucity of the Defendants' argument and the clear express of intent in the Legislative History, this Court should deny this portion of the motion to dismiss.

### D.     The Republic of Iraq's common law claims are more than plausible.

#### 1.     The Complaint states a claim for common law fraud.

##### a.     The Defendants fraud was directed at the UN.

The Defendants mischaracterize the Republic's fraud claim. The Defendants did not defraud the Hussein Regime or the Republic of Iraq; the Defendants conspired with the Hussein Regime to defraud the UN, which damaged the Republic of Iraq. The Fraud Claim recites: "The

---

[34] Two Committee members, Senator John Tower and Congressman Samuel Devine, stated there was no intent to imply a private remedy. Note, *Lamb,* 5 Transnat'l Law. at 555. The persuasiveness of these statement, however, "is severely limited by the rules of statutory construction. Remarks made by persons not involved with the drafting of the bill, as well as comments by opponents of the bill, are entitled to little weight in determining legislative intent." *Id.* "In addition, neither of the Conferees could persuade their brethren to include their statements in the Committee report." *Id.*

Defendants' materially false statements to the United Nations were fraudulent …," FAC ¶ 1159, and that, "The Republic of Iraq and the Iraqi people were direct victims of that fraud," FAC ¶ 1160.[35]

**b.    The Republic of Iraq can base its fraud claim on misrepresentations directed at the UN.**

The Republic of Iraq can properly base a fraud claim on the Defendants' misrepresentations to the UN.  Although the Defendants note that the Second Circuit has held, at least in specific contexts, that a fraud claim cannot be presented under New York law based on third party reliance, those opinions are not binding in this case.  *Cement & Concrete Workers Dist. Council Welfare Fund v. Lallo*, 148 F.3d 194, 196-197 (2d Cir. 1998); *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 454 (2d. Cir. 2008), *rev'd on other grounds*, 130 S. Ct. 983 (2010).  These opinions are not binding in this case because New York law does not apply to the Republic's claims.  Even if New York law did apply, (a) this Court must follow the contrary pronouncements of the New York Court of Appeals, and (b) these opinions are distinguishable.

**(1)    The Republic's fraud claims are governed by general common law rules, not New York law.**

Because of this case's relation to the United Nations and international relations, this Court should apply federal common law and not New York law.  *See Republic of the Philippines*, 806 F.2d at 354 ("an action brought by a foreign government against its former head of state arises under federal common law because of the necessary implications of such an action for United States foreign relations"); *Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47, 50 (2d Cir. 1965) (Friendly, J.) (enforceability of a confiscatory decree by the Republic of Iraq on New York against assets of its late king was a matter of federal law, because nation must "speak with a united voice" on such questions to avoid "needlessly complicat[ing] the handling of . . . foreign relations").

---

[35] *See also* FAC § V.B.3 ("The Oil Purchasing Defendants defrauded the UN regarding the surcharges."); § V.B.4 ("The Oil Purchasing Defendants defrauded the UN as to the OSP."); § VI.B.3 ("Payment of the transportation fees defrauded the UN."); § VI.C.5 ("Paying the ASSF's defrauded the UN."); § VI.C.6 ("Some Vendor Defendants made affirmative misrepresentations to the UN.").

In 2008, the Supreme Court held: "There is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it." *Bridge*, 128 S. Ct. at 2143. The Court based its statement of law on the Restatement of Torts and New York law.

> The Restatement [(Second) of Torts § 548A] provides only that the plaintiff's loss must be a foreseeable result of *someone's* reliance on the misrepresentation. It does not say that only those who rely on the misrepresentation can suffer a legally cognizable injury. And any such notion would be contradicted by the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation.

*Id.* (footnotes omitted). The first of the "long line of cases" mentioned was an 1876 New York Court of Appeals opinion that permitted "plaintiffs who had arranged to buy a large quantity of cheese to recover against a defendant who induced the vendor to sell him the cheese by falsely representing to the vendor that plaintiffs no longer wished to purchase it." *Id.* at 2143 & n.7 (citing *Rice v. Manley*, 66 N.Y. 82 (1876)).

### (2) Even if New York law applies, this Court is bound by decisions of the New York Court of Appeals.

As recognized by the Supreme Court in *Bridge*, the New York Court of Appeals holds that New York law allows fraud claims even when the fraud is directed at a third party. 128 S. Ct. at 2143.

The rule stated in *Rice v. Manley* is still New York law. *E.g., Levine v. Michael Ashton, Inc.*, 2010 WL 128077, at *8 (Sup. Ct. N.Y. Co. 2010) ("Generally, the injured party is required to show that the misrepresentation was made to him, either directly or indirectly through a third party. However, the Courts have made exceptions in certain circumstances.") (citations omitted); *N.B. Garments*, 2004 WL 444555, at *3:

> [T]he fact that the First and Second Departments have, subsequent to the Second Circuit's decision in *Cement & Concrete Workers*, altered their stance, and held in accord with the *Eaton* line – even citing to the century old Court of Appeals decisions, lends further support for the determination that New York law has, since the 1800's, allowed for fraud claims based on third-party reliance.

*Id.* at n. 5.

The New York rule is well-established.  *See Cooper v. Weisblatt,* 154 Misc. 522, 526 (Sup. Ct. N.Y. Co. 1935) ("[I]t is not necessary that the deceit should have been practiced directly upon the plaintiff.  It is sufficient if the initial fraud intended to injure the plaintiff caused him damage through intermediate agencies thereby set in motion."); *Buxton Mfg. Co. v. Valient Moving & Storage, Inc.,* 239 A.D.2d 452 (2d Dept 1997) (citations omitted; emphasis supplied):

> It is generally the case that a cause of action to recover damages for fraud requires, *inter alia*, a showing that a false representation was made to the injured party, for the purpose of inducing reliance thereon, and reasonable reliance by the injured party. *Fraud, however, may also exist where a false representation is made to a third party, resulting in injury to the plaintiff.*

In *Buxton Manufacturing,* in order to get paid on a government contract, the defendant lied to the US Department of Agriculture claiming that all of its subcontractors had been paid.  The plaintiff was a subcontractor that did not get paid.  *Id.* at 450-52.

In another New York case, the plaintiff alleged the defendant had misrepresented to Chemical Bank that a purchase money mortgage had been paid in full, "and thus induced Chemical to issue a satisfaction of the mortgage wrongfully extinguishing plaintiff's interest therein."  *Desser v. Schatz,* 182 A.D.2d 478, 479 (1st Dept 1992).  The appellate court held that the plaintiff had alleged a fraud claim "with compelling clarity" – "Reliance by Chemical, to the clear detriment of plaintiff, is manifest, and *it is of no moment, in this context, that the false representation was not made directly to plaintiff.*"  *Id.* at 479-80 (emphasis added).

Because the Erie Doctrine calls for reliance on the highest state court's interpretation of state law, this Court is required to resolve the conflict between the New York authority and the Second Circuit's ruling by following the New York line of authority:

> While this Court is bound by the Second Circuit's holdings, "a federal court sitting in diversity must apply the law of the forum state and it must defer to the voice of that state's highest court – however antiquated its view of the law may seem" because

"[t]he highest state court is the final authority on state law." Therefore, NB Garments' fraud claim, though deficiently pled, raises a cognizable claim under New York law.

*N.B. Garments*, 2004 WL 444555, at *3 (citing, *Field v. Fid. Union Trust Co.*, 311 U.S. 169, 177 (1940)).

In addition, the rule of *Cement & Concrete Workers* can be distinguished. The opinions allowing third-party reliance have a common theme – the defendant made misrepresentations to a third-party (1) with a pre-existing relationship with the plaintiff, (2) with the intent to injure the plaintiff, and (3) the party relying on the misrepresentation was not injured. In *Buxton Manufacturing*, the defrauded entity, the US Department of Agriculture, was protecting subcontractors like the plaintiff by requiring parties to represent that subcontractors had been paid. 239 A.D.2d at 452. In the *Rice* opinion described in *Bridge*, the defendant did not desire to damage the cheese seller when it convinced it that the plaintiff no longer needed the cheese; the defendant wanted the plaintiff's cheese. *Bridge*, 128 S. Ct. at 2143 n.7.

The "rule stated in the cases cited above is all the more forceful ... in a case involving injuries suffered by an entity whose well being is so intimately intertwined with the well being of the 'third-person' to whom the fraudulent misrepresentation is made ...." *Ruffing v. Union Carbide Corp.*, 308 A.D.2d 526, 529 (2d Dept 2003). In *Ruffing*, the defendant allegedly misrepresented to a pregnant woman that her job would not risk her child. When the child was born with birth defects, the court held that the child could bring a fraud claim even though the misrepresentations were made to the mother. *Id.* at 528 ("Fraud ... may ... exist where a false representation is made to a third party, resulting in injury to the plaintiff.") (citations omitted); *see also Hyosung Am., Inc. v. Sumagh Textile Co.*, 25 F. Supp. 2d 376 (S.D.N.Y. 1998), *aff'd*, 189 F.3d 461 (2d Cir. 1999). In *Hyosung America*, a supplier fraudulently induced a third party bank to pay on a letter of credit. Based on the New York cases cited above, while noting the *Cement & Concrete Workers* line of authority, the Court ruled: "Under these circumstances, Hyosung has satisfied the reliance element of fraud, although the

fraudulent documents were submitted to the Bank rather than to Hyosung." *Id.* at 384 (emphasis added).

In contrast, in *Cement Contractors* and *Smokes-Spirits*, the plaintiffs' injuries were merely incidental to the fraud directed at the recipient of the representations. In both cases, the direct recipient of the misrepresentation was also injured. In *Cement Contractors*, the plaintiffs were claiming that a fraud directed at others ultimately diminished the contributions to the ERISA plan of which they were beneficiaries, but there was no intent to defraud the ERISA plan of funds (unlike the case here). 148 F.3d at 195. In *Smoke-Spirits*, the defendants allegedly defrauded the State of New York out of taxes on cigarette sales. The City of New York alleged that the fraud also cost it taxes, because the City of New York depended on state records to impose its own taxes. 541 F.3d at 432-33. Once again, the fraud was directed at and directly injured the third party.

Here, the Defendants defrauded a UN Programme that was designed to protect the interest of the Iraqi people and nation from the Defendants' co-conspirator – the Hussein Regime. The Defendants should not be able to avoid the consequences of their fraud because the Plaintiff could not protect itself.

> c.   ***In the alternative, the Republic of Iraq seeks leave to amend to restate its common law fraud claim as claims for money had and received and conversion.***

The Republic of Iraq alleges the Defendants obtained the Republic of Iraq's money by lying to the UN. If the Defendants are right, and that factual scenario does not state a claim for common law fraud, the conduct is still actionable under the some common law remedy –at least money had and received and conversion. A claim for money had and received has three elements: "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 125 (2d Cir.

1984).  The Defendants obtained the Republic's money through fraud, clearly benefited from the money, and should not be able to keep the fruits of their fraud.  While similar to a claim for unjust enrichment, the claim is legal not equitable.  *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*, 2007 WL 1687044, at *10 (S.D.N.Y. 2007) ("although a claim for 'money had and received' rests on equitable principles, it has been 'considered an action at law'").  A conversion claim would also lie. *See Federal Ins. Co. v. Argitakos*, 637 F. Supp. 814, (S.D.N.Y. 1986) ("There is little question but that defendants' convictions for bank robbery and concealment of stolen money establish their civil liability for conversion of the goods that were stolen or concealed."); *Man Radio & Elect., Ltd. v. Von Cseh*, 12 Misc. 435 (Sup. Ct. N.Y. Co. 1958) (Complaint seeking to recover money claimed to have been stolen stated a claim for conversion.).

### 2.   The Defendants conspired to defraud the UN.

The "pleading of a conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a)." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990).  With the fraud claim properly read as directed at the UN, the conspiracy claim follows.  Indeed, the Defendants concede their conspiracy challenge repeats the argument made in relation to RICO section 1962(d).  DML at 81.  As explained above, the Complaint's conspiracy allegations are neither "conclusory" nor mere "boilerplate."  *See id.*

### 3.   The Republic of Iraq adequately pleaded its fiduciary duty claims.

The Complaint alleges interference with two fiduciary duties owed to the Republic of Iraq and the Iraqi people by (1) BNP and (2) the Hussein Regime.

BNP.  Whether BNP owed a fiduciary duty is addressed in response to BNP's supplemental memorandum.

The Complaint asserts that Chevron and Vitol participated with, and induced, BNP's breaches of duty.  According to the Complaint, Chevron and Vitol knew BNP owed duties of

candor to the UN and that they induced breaches of those duties by entering into specific agreements with BNP to hide material information from the UN.  FAC ¶¶ 1025, 1029-36.

The UN Report was the chief source of the Complaint's allegations as to BNP's duties and Chevron's and Vitol's participation in the breach of those duties.  The UN Report recognizes both the duty and explains how Chevron's and Vitol's actions "demonstrate the potential conflict of interest faced by the Bank, and describe the manner in which the United Nations' interest were not fully honored as a result of BNP's competing interests."  UN Report at 443.  The Complaint tracks the UN Report's conclusion related to the agreements to hide information at ¶ 1025 (Vitol and BNP) and ¶¶ 1029-36 (Chevron and BNP).  Per those allegations, Chevron and Vitol directly aided BNP's violations.  To hide their involvement as middlemen (in violation of Programme rules), both Chevron and Vitol, on one hand, and BNP, on the other, agreed not to disclose material information to the UN, despite their independent promises to the contrary.

<u>The Hussein Regime</u>.  The Defendants question whether "***Iraq*** owed or breached any fiduciary duty to the Iraqi people," DML at 82 (emphasis added), but the Complaint clearly alleges that Hussein Regime, the nation's agent, owed and breached duties to the nation and its citizens.

Agents of foreign governments owe their principals fiduciary duties.  *Gov't of Rwanda v. Johnson*, 409 F.3d 368, 372 (D.C. Cir. 2005); *Philippines v. Westinghouse*, 774 F. Supp. at 1452-58.

Consistently with the well established rule that government officials owe fiduciary duties to the sovereign, the Complaint alleges that the "Hussein Regime, as the self-proclaimed ruler of Iraq, owed fiduciary duties to the people of Iraq."  FAC ¶ 1177.  Saddam Hussein's duties owed to the nation and the people were confirmed in Hussein's conviction when the tribunal held that Hussein could not claim "his actions are outside the reach of the law."  Ex. 26 (Translation of Appellate Opinion Affirming Saddam Hussein's Death Sentence) ¶ 15.

The Defendants' denial that they aided any breach of duty depends on the same assumption as above – that a bribe to a government official is a mere arms-length transaction that cannot damage the sovereign.  DML at 85.  The claim is discussed above and does not absolve the Defendants' criminal conduct.  As the Complaint explains, the Defendants actively assisted the Hussein Regime in stealing funds owned by the Republic of Iraq.  Without the Defendants' assistance, the scheme would not have worked.

### 4.      The Defendants breached their contracts.

<u>Nature of the Contract Claims</u>.  The Complaint does not allege the Defendants breached their contracts with the Hussein Regime.  The Complaint alleges the Defendants "breached their contractual commitments to the UN," FAC ¶ 1182, and explains that to buy or sell under the Programme, the Defendants "had to voluntarily agree to participate in the Programme and abide by all Programme rules and regulations, including the rules requiring that dealings with the Hussein Regime follow normal commercial practice and that the Vendor Defendants provide full disclosure of all contract details to the 661 Committee," FAC ¶ 331.  The Complaint further explains the Defendants had to submit each individual contract for approval, again agreeing to comply with the Programme.  FAC ¶¶ 325, 330-31.

When the Complaint is properly read, the Defendants' arguments are easily addressed, because the Defendants' challenges are uniformly premised on interpreting the Republic's claims as alleging breaches of contracts with the Hussein Regime, not the UN.

<u>Waiver</u>.  The Hussein Regime could not waive breaches of contractual promises to the UN. The Regime had agreed in the MOU to the Programme's parameters.  Moreover, based on the MOU and the Programme rules themselves, the Defendants knew the Hussein Regime had no authority to waive UN Programme rules, incorporated into all of their contracts, so they cannot claim waiver based on the approval of, or participation by, the Hussein Regime.

Purported Iraqi Breaches.  The same analysis defeats the Defendants' second argument –
"To the extent that payments breached applicable contracts, they were at Iraq's insistence, and
therefore preclude Iraq's claims."  DML at 86.  The Defendants do not explain how the Hussein
Regime "brought about [the] breach" of any Programme contract.  DML at 86 (citation omitted).
The Defendants agreed to pay the illicit kickbacks before they promised the UN they would follow
Programme rules and would provide all relevant information about their dealings with the Hussein
Regime.

Third-Party Beneficiary.  The Defendants decry as "pure sophistry" the allegation that the
Republic of Iraq and the Iraqi people were third-party beneficiaries of the Defendants' contracts,
because, the Defendants argue, the Defendants had no contracts with the UN and it is illogical to be
a third-party beneficiary of your own contract.  DML at 87.

The Restatement (Second) of Contracts § 302 (1981) states:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a
> promise is an intended beneficiary if recognition of a right to performance in the
> beneficiary is appropriate to effectuate the intention of the parties and … the
> circumstances indicate that the promisee intends to give the beneficiary the benefit
> of the promised performance.

The Complaint clearly alleges those elements.  The Defendants promised the UN they would
follow Programme rules.  FAC ¶¶ 325, 330-31.  Those contractual commitments were expressly
intended to protect and benefit the Iraqi nation and people, which was the chief, if not sole goal, of
the Programme itself.  The UN did not require the Defendants to follow Programme rules to benefit
the UN, but to protect the Republic of Iraq and the Iraqi people from the corrupt Hussein Regime.

Damages.  As explained in the Factual Background section, the Defendants' breaches of
their commitments to follow Programme rules injured the Republic of Iraq and the Iraqi people by
diverting funds and property from their intended purposes to the Defendants and to the Hussein
Regime's illicit purposes.

Rescission for Illegality.  Finally, the Defendants contest the Republic's right of rescission, arguing solely that the "FAC is devoid of facts supporting" either – "fraud in making the contract" or "a breach that substantially defeats the purpose of the contract."  DML at 88.

Frankly, the Republic of Iraq doubts the Complaint could be clearer on either point.  The Complaint details how, to participate in the Programme, the Defendants had to lie to the UN – affirmatively representing that they were providing the full commercial details of their contracts with the Hussein Regime while hiding their illegal kickbacks – and that they did this to avoid a stated Programme purpose – to keep Programme funds out of the hands of the Hussein Regime.  *E.g.*, FAC ¶¶ 378-82, 586-601.

The Defendants also try to rewrite the Republic's rescission request as a direct claim under the IEEPA, which prohibited transfers of Programme funds in violation of Programme rules.  The Republic, however, is not asserting a direct claim under the IEEPA, but is seeking rescission of transfers of its own property because the transfers were illegal.  "Rescission for illegality" was discussed at length in *Dornberger v. Metropolitan Life Insurance Co.*, 961 F. Supp. 506, 532 (S.D.N.Y. 1997).  "[W]here one of the parties to an illegal contract is innocent of wrongdoing, courts have allowed such party to seek relief in the form of rescission based on the illegal conduct of the other party to the agreement."  *Id.* at 533.

Rescission for illegality is not a direct claim on the statute that makes the conduct illegal; it is a rescission under contract law based on the illegality of the contract.  *Kashani v. Tsann Kuen China Enter. Co.*, 13 Cal. Rptr. 3d 174, 189-90 (Ct. App. 2004).  In this case, a contract to build a computer manufacturing plant in Iran was superseded by Iranian sanctions.  The plaintiff claimed that, because the sanctions order expressly declared that it created no private rights or benefits, the defendants could not raise the defense of illegality.  *Id.* at 189.  The court stated:

> To conclude that the President intended to preclude any civil consequence of
> the Orders would lead to far-reaching and absurd results.  For example, to read the

Orders to preclude any "right or benefit" that arose from any other law would mean that a party could not rely upon the Orders for purposes of invoking such traditional contract principles as impossibility, impracticality, frustration, force majeure, and unclean hands. ....

Here, defendants rely on state law principles of illegality; that illegality is based on a violation of the Orders and Regulations.   It is not the Orders or Regulations that provide the affirmative defense.   It is state law.

*Id.* at 190.[36]

The Defendants obtained their contracts in violation of the IEEPA.   The contracts are therefore illegal, void and subject to rescission.

### 5.   The Complaint alleges an unjust enrichment claim.

The Defendants stole and helped the Hussein Regime steal billions from the Programme, every dime of which was owned by the Republic of Iraq, and which an entire UN bureaucracy was created to guard.   In the face of that factual scenario, the Defendants can hardly claim they see no plausible basis for a claim that "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another."   *IDT Corp. v. Morgan Stanley Dean Witter & Co., Inc.*, 12 N.Y.3d 132, 142 (2009)(citation omitted).

Once again, the Defendants are free to argue they were working with the Hussein Regime to benefit the nation and the Iraqi people, but that is the factual scenario that is implausible.

### Leave to Amend

To the extent that the Republic's Complaint is deemed to be insufficient in any respects, the Republic of Iraq seeks leave to amend its Complaint pursuant to Rule 15.   Rule 15(a) states that leave to amend "shall be freely given when justice so requires," and the Supreme Court instructs that "this mandate is to be heeded."   *Foman v. Davis*, 371 U.S. 178, 183 (1962).   "If the underlying facts or

---

[36] The Republic of Iraq recognizes, in keeping with *Dornberger*, that its rescissionary damages will be offset by the value of humanitarian goods and services actually received and distributed, but that is a matter of damages, and not the claim, and given the substantial evidence recited in the Complaint, there is ample damage here.   *See Dornberger*, 961 F. Supp. at 532.

circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." FEDERAL PRACTICE at § 1487. Furthermore, "Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (citations omitted).

Accordingly, should this Court hold that the Complaint is in any respect deficient, the Republic of Iraq respectfully requests leave to amend.

### *Conclusion*

For these reasons, the Republic of Iraq requests that the Defendants' motion to dismiss be denied, so that the Republic and its citizens can have their day in court.

Dated: April 30, 2010
New York, New York

BURFORD & MANEY, L.L.P.

By: _____
Mark Maney* (mmaney@burfordmaney.com)
Roliff Purrington* (rpurr@burfordmaney.com)
1221 McKinney Street, Suite 3150
Houston, Texas 77010
(713) 658-9001 Telephone
(713) 658-9011 Facsimile

BERNSTEIN LIEBHARD LLP

By: _____
Stanley D. Bernstein (bernstein@bernlieb.com)
Rebecca M. Katz (katz@bernlieb.com)
Christian Siebott (siebott@bernlieb.com)
10 East 40th Street
New York, New York 10016
(212) 779-1414 Telephone
(212) 779-3218 Facsimile

**COUNSEL FOR THE REPUBLIC OF IRAQ**

_____

*Admitted *pro hac vice*.