UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE REPUBLIC OF IRAQ, including as
PARENS PATRIAE on behalf of the
CITIZENS of the REPUBLIC OF IRAQ,

              Plaintiff,

      - against -

ABB AG et al.,

           Defendants.

08-CV-05951 (SHS)


ECF CASE


ELECTRONICALLY FILED


**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION TO COMPEL ARBITRATION AND IN SUPPORT OF THE
MOTION OF BNP PARIBAS TO ENJOIN ARBITRATION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ..........................................................................................1

BACKGROUND ..................................................................................................................2

ARGUMENT ........................................................................................................................4

I.      THE BANKING SERVICES AGREEMENT PROVIDES NO BASIS FOR
        COMPELLING THE BANK TO SUBMIT TO ARBITRATION WITH IRAQ ..............4

        A.      The Plain Language Of The Arbitration Provision Demonstrates That Only
                Disputes Between The U.N. And The Bank May Be Referred To Arbitration .......4

        B.      Iraq's Efforts To Avoid The Limitations In The Arbitration Provision Of The
                Banking Services Agreement Fail As A Matter Of Law .......................................7

                1.      Iraq Cannot Avoid The Limitations In The Arbitration Provision By
                        Characterizing Its Motion As Raising A Question Of Arbitrability ..........7

                        (a)     The Arbitration Provision Does Not Encompass Questions Of
                                Arbitrability ...............................................................................7

                        (b)     Iraq, As A Non-Party, Is Not Entitled To Have The Question
                                Of Arbitrability Referred To Arbitration .....................................9

                2.      Iraq Cannot Compel Arbitration Of Its Claims By Claiming To Be A
                        Third-Party Beneficiary .........................................................................13

        C.      Iraq Cannot Delay The Resolution Of This Matter By Seeking Discovery .........19

II.     IRAQ IS PRECLUDED FROM PURSUING ARBITRATION BECAUSE IT HAS
        ENGAGED IN SUBSTANTIAL LITIGATION IN COURT .......................................21

III.    THE COURT SHOULD ENJOIN IRAQ FROM PURSUING ARBITRATION ...........23

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

### Cases

*Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*,
   637 F. Supp. 2d 185 (S.D.N.Y 2009) .................................................................. 16, 17

*Apple & Eve, LLC v. Yantai North Andre Juice Co.*, 610 F. Supp. 2d 226 (E.D.N.Y. 2009)....... 21

*Arthur Andersen LLP v. Carlisle*, 129 S. Ct. 1896 (2009) .......................................... 13

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986)........................................ 7

*Banco Espirito Santo De Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537 (MBM),
   2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003)................................................. 17

*Bensadoun v. Jobe-Riat*, 316 F.3d 171 (2d Cir. 2003)................................................ 20

*Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293 (S.D.N.Y. 1997)............... 13, 19

*Caribbean Steamship Co. v. Sonmez Denizcilik Ve Ticaret A.S.*,
   598 F.2d 1264 (2d Cir. 1979)............................................................................ 8

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217 (S.D.N.Y. 2004) .......... 23

*Celanese Corp. v. BOC Group PLC*, No. 3:06-CV-1462-P,
   2006 U.S. Dist. LEXIS 88191 (N.D. Tex. Dec. 6, 2006) ...................................... 9, 11, 18

*Citigoup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010)............................................................................. 23

*Collins & Aikman Prods., Co. v. Bldg. Sys., Inc.*, 58 F.3d 16 (2d Cir. 1995) ............................. 10

*Contec Corp. v. Remote Solution Co.*, 398 F.3d 205 (2d Cir. 2005) ........................ 10, 11, 12, 13

*Di Martino v. Dooley*, No. 08 Civ 4606 (DC),
   2009 U.S. Dist. LEXIS 1674 (S.D.N.Y. Jan. 6, 2009) ..............................................*passim*

*Doctor's Assoc. v. Distajo*, 66 F.3d 438 (2d Cir. 1995)............................................ 21

*E.I. Dupont De Nemours & Co. v. Rhone Poulenc Fiber & Resin Int. S.A.S.*,
   269 F.3d 187 (3d Cir. 2001)........................................................................ 13, 14, 19

*Empire State Ethanol & Energy, LLC v. BBI Int'l*, No. 1:08-CV-623,
   2009 U.S. Dist. LEXIS 23701 (N.D.N.Y. Mar. 20, 2009) ..................................... 13

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995).................................... 5, 7

*Fourth Ocean Putnam Corp. v. Interstate Wrecking*, 66 N.Y.2d 38 (1985)..................... 13, 14

*Grynberg v. BP P.L.C.*, 596 F. Supp. 2d 74 (D.D.C. 2009) ........................................................10

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712 (S.D.N.Y. 1989)....................17

*In re Herman Miller, Inc.*, No. 97 Civ. 7878(SAS),
    1998 WL 193213 (S.D.N.Y. Apr. 21, 1998)..................................................................10

*In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 Civ. 6770 (LAP),
    2010 U.S. Dist. LEXIS 12764 (S.D.N.Y. Feb. 8, 2010)............................................21, 22

*John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir. 2001).....................................*passim*

*Karim v. AWB Ltd.*, No. 06 Civ. 15400 (GEL),
    2008 U.S. Dist. LEXIS 76896 (S.D.N.Y Sept. 30, 2008),
    *aff'd*, 2009 US. App. LEXIS 21649 (2d Cir. Oct. 2, 2009)............................................22

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*,
    252 F.3d 218 (2d Cir. 2001)........................................................................................10

*Mastafa v. Australian Wheat Bd. Ltd.*, No. 07 Civ. 7955 (GEL),
    2008 U.S. Dist. LEXIS 73305 (S.D.N.Y. Sept. 25, 2008)............................................22

*McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771 (2d Cir. 1992)........................................6, 19

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125 (2d Cir. 2003)............................23

*Miness v. Ahuja*, --- F. Supp. 2d ---, 2010 WL 2025193 (E.D.N.Y. May 20, 2010) ...................18

*Necchi S.P.A. v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693 (2d Cir. 1965) ...................8

*O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893 (10th Cir. 1992)............................ 13, 14, 15, 16

*Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352 (2d Cir. 1995)....................................................20

*PaineWebber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996)..........................................8, 10, 19

*Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157 (S.D.N.Y. 1998)................16-17

*Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103 (2d Cir. 2009)....................................14

*Proshares Trust v. Schnall*, 09 Civ. 6386 (SHS),
    2010 U.S. Dist. LEXIS 14286 (S.D.N.Y. Feb. 18, 2010)...........................................24

*Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59 (2d Cir. 1983)............................................10

*Rosenthal v. Emanuel, Deetjen & Co.*, 516 F.2d 325 (2d Cir. 1975) ...........................................8

*Ross v. Am. Express Co.*, 547 F.3d 137 (2d Cir. 2008)............................................. 5, 11, 12, 13

*S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80 (2d Cir. 1998).............................21

*Sarhank Group v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005) ......................................................6

*SATCOM Int'l Group PLC v. ORBCOMM Int'l Partners, L.P.*,
    49 F. Supp. 2d 331 (S.D.N.Y. 1999) ........................................................................21, 22

*Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003).................................8, 10

*Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39 (1997)...............................................10

*Solutia v. FMC Corp.*, 385 F. Supp. 2d 324 (S.D.N.Y. 2005) .....................................................14

*Spear, Leeds & Kellogg v. Central Life Assur. Co.*, 85 F.3d 21 (2d Cir. 1996)....................13, 19

*Stechler v. Sidley Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580 (S.D.N.Y. 2005)............19

*Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.* No. 08-1198, --- S. Ct. ---,
    2010 WL 1655826 (Apr. 27, 2010)........................................................................*passim*

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119 (2d Cir. 2005).........................14, 19

*Sunnyside Dev. Co., LLC v. Bank of New York*, 07 Civ. 8825 (LLS),
    2008 U.S Dist. LEXIS 11800 (S.D.N.Y. Feb. 19, 2008)................................................16

*Telenor Mobile Commc'ns v. Storm LLC*, 524 F. Supp. 2d 332 (S.D.N.Y. 2007),
    *aff'd*, 584 F.3d 396 (2d Cir. 2009) ...............................................................................8, 9

*The Common Fund For Non-Profit Orgs. v. KPMG Peat Marwick LLP*,
    951 F. Supp. 498 (S.D.N.Y. 1997) ................................................................................16

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566 (2d Cir. 1991) ........17

*UBS Securities LLC v. Voegeli*, 09 Civ. 8872 (DLC),
    2010 U.S. Dist. LEXIS 6202 (S.D.N.Y. Jan. 26, 2010) .................................................24

*Upper Lakes Towing Co. v. ZF Padova SPA*, No. 2:08-CV-63,
    2009 U.S. Dist. LEXIS 113025 (W.D. Mich. Dec. 4, 2009) .............................................9

*Veera v. Janssen*, No. 05 Civ. 2145 (SHS), 2005 WL 1606054 (S.D.N.Y. July 5, 2005)............20

*Wal-mart Stores, Inc. v. PT Multipolar Corp.*, No. 98-16952,
    1999 WL 1079625 (9th Cir. Nov. 30, 1999)..................................................................10

*Zarepta Chem., K.S. v. Solae, LLC*, 05 CV 8265 (CLB),
    2005 U.S. Dist. LEXIS 43805 (S.D.N.Y. Oct. 26, 2005)................................................24

**<u>Statutes and Rules</u>**

9 U.S.C. § 202.................................................................................................................5

55 Fed. Reg. 37793 (Sept. 13, 1990) ...........................................................................12

BNP Paribas (the "Bank") respectfully submits this memorandum of law in opposition to the motion of the Republic of Iraq to compel arbitration and in support of its cross-motion to enjoin arbitration.  As discussed below, Iraq is not a signatory to any agreement with the Bank and the Bank has not agreed to arbitrate any claims with Iraq.  The Court therefore should deny Iraq's motion to compel arbitration and grant the Bank's cross-motion to enjoin arbitration.[1]

## PRELIMINARY STATEMENT

After nearly two years of litigating this action against the Bank in this Court, Iraq has moved to compel arbitration of two of the nine claims it has asserted against the Bank.  Iraq's motion is based solely on an arbitration provision included in the "Agreement for Banking Services Pursuant to Security Council Resolution 986 (1995)" (the "Banking Services Agreement" or the "Agreement") between the United Nations ("U.N.") and the Bank.  Iraq's motion should be denied because (i) Iraq is not a party to the Banking Services Agreement, (ii) the arbitration provision of the Agreement, by its terms, applies only to the U.N. and the Bank, and (iii) Iraq was a designated state sponsor of terrorism subject to U.N. sanctions at the time the Bank entered into the Agreement and was not intended to have any rights thereunder.  As the Supreme Court reaffirmed just last month, "arbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, No. 08-1198, --- S. Ct. ---, 2010 WL 1655826, at

---

[1]  As set forth in the Corporate Disclosure Statement of BNP Paribas, filed December 1, 2009, four branches of BNP Paribas were separately named in this action as BNP Paribas USA, BNP Paribas Paris, BNP Paribas London Branch and BNP Paribas Hong Kong.  Dkt. No. 281.  Two BNP Paribas subsidiaries – BNP Paribas (Suisse) SA and BNP Paribas UK Holdings Limited – also are named as defendants in this action.  Dkt. Nos. 279, 280.  Plaintiff's Motion to Compel Arbitration does not address any of these six named defendants and instead seeks relief with respect to Banque Nationale de Paris S.A., an entity that merged with Banque Paribas in 2000 to form the Bank.  Because the Bank is the party to the Banking Services Agreement described herein, this brief is filed on its behalf.  The arguments set forth below, however, apply with equal force to BNP Paribas (Suisse) SA and BNP Paribas UK Holdings Limited.

*11 (Apr. 27, 2010) (quotation omitted).  Because the Bank has not agreed to arbitrate *anything* with Iraq, it cannot be compelled to do so.

Iraq itself has tacitly acknowledged this as for two years it has pursued litigation of its claims against the Bank in this Court.  Although it relied on and quoted extensively from the Banking Services Agreement in its pleadings, Iraq did not assert a right to arbitrate until *after* the Bank had expended substantial time and expense to file consolidated and supplemental briefs in support of a motion to dismiss that identified the numerous fatal deficiencies in Iraq's lawsuit. Iraq's two-year effort to litigate its claims against the Bank not only underscores the lack of merit of Iraq's newly-minted effort to avoid dismissal of its claims by seeking to arbitrate them, but also provides a separate and independent basis for denying Iraq's motion to compel arbitration.

For these reasons, Iraq's motion to compel arbitration should be denied and the Bank's cross-motion to enjoin arbitration should be granted.

## BACKGROUND

As a result of Iraq's invasion of Kuwait in August 1990, the U.N. Security Council adopted a sanctions regime that severely restricted transactions between U.N. member states and Iraq, thereby denying Iraq access to hard currency with which to pursue state-sponsored acts of terrorism.  *See* Dkt. No. 357 at Ex. 1 (Resolution 661).  On April 14, 1995, the Security Council passed Resolution 986, which established the Oil-for-Food Program (the "Program") as a limited exception to the sanctions regime.  *See id.* at Ex. 2 (Resolution 986).  In essence, Resolution 986 permitted Iraq to enter into contracts for the sale of Iraqi oil, and for the purchase of humanitarian supplies and certain other goods and services to be paid for from the proceeds of its oil sales, without allowing Iraq access to those proceeds.  *Id.*  Resolution 986 also required that a

percentage of the proceeds of Iraqi oil sales be used to fund a wide range of U.N.-directed activities established under earlier U.N. Resolutions in response to Iraq's invasion of Kuwait, including a compensation system for persons who suffered injury or loss as a result of Iraq's conduct and a weapons inspection program. *Id.* All Program transactions were subject to the unanimous approval of a committee of the Security Council on which the United States and all other members of the Council were represented. *Id.*

In order to facilitate the U.N.'s implementation of Resolution 986, in September 1996, the U.N. entered into the Banking Services Agreement with Banque Nationale de Paris S.A., which subsequently merged with Banque Paribas to form the Bank. Dkt. No. 361 at Ex. 1. Under the terms of the Agreement, the Bank provided non-discretionary banking services to the U.N. as its sole customer thereunder. *Id.* These services included the establishment of an account for the U.N. (the "Program Account"), into which the proceeds of the sale of Iraqi oil were deposited and held, subject to disbursement solely upon direction of the U.N. *See*, *e.g.*, *id.* at Arts. 1.3.1, 1.3.2, 1.4. The Agreement also required the Bank, at the direction of the U.N., to issue letters of credit in favor of the suppliers that, with U.N. approval, had contracted with Iraq to provide it with goods. *Id.* at Part 2. The letters of credit provided suppliers with the assurance that they would receive the U.N.-approved contract price for their goods from funds held in the Program Account, based upon direction to the Bank from the U.N., upon confirmation by the U.N. of the arrival of the goods in Iraq and presentation of specified documentation to the Bank. *Id.* The only parties to the Banking Services Agreement are the Bank and its customer, the U.N.: "The United Nations and the Bank are hereinafter collectively referred to as the 'Parties' and individually as a 'Party.'" *Id.* at 1.

Iraq's motion to compel arbitration is based solely on an arbitration provision included in the Banking Services Agreement, which provides:

> 1.23.1   Amicable settlement.   *The Parties* shall use their best efforts to settle amicably any dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination or invalidity thereof.  Where *the Parties* wish to seek such an amicable settlement through conciliation, the conciliation shall take place in accordance with the UNCITRAL Conciliation Rules then obtaining, or according to such other procedure as may be agreed between *the Parties*.

> 1.23.2   Arbitration.   Any dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination or invalidity thereof, unless settled amicably under Article 1.23.1 within sixty (60) days after receipt by *one Party* of *the other Party's* request for such amicable settlement, shall be referred *by either Party* to arbitration in accordance with the UNCITRAL Arbitration Rules then obtaining and the directions contained in this Article 1.23.2.  The arbitrators selected shall have a working knowledge of banking practices of major international commercial banks, including the Services.  The arbitration shall take place in New York City, New York.  In connection with the interpretation and application of this Agreement, the arbitrators shall apply (subject to Article 2.1.3) the substantive law of the State of New York relating to banking services practices in the nature of the Services, except to the extent that such law is inconsistent with the privileges and immunities of the United Nations or SCR 986.  The arbitral tribunal shall have no authority to award punitive damages.  The arbitral tribunal shall have authority to award such interest as it considers appropriate in accordance with the UNCITRAL Arbitration Rules.  *The Parties* shall be bound by the arbitration award rendered in accordance with such arbitration as the final adjudication of any such dispute, controversy or claim.

*Id.* (emphasis added).  As shown through the emphasis above, this provision applies only to "the Parties" to the Agreement – the U.N. and the Bank.  There is no indication that the provision was intended to confer rights on any third party, particularly Iraq, which was a pariah in the international community at the time the Banking Services Agreement was executed.

## ARGUMENT

I.   **THE BANKING SERVICES AGREEMENT PROVIDES NO BASIS FOR COMPELLING THE BANK TO SUBMIT TO ARBITRATION WITH IRAQ.**

   A.   **The Plain Language Of The Arbitration Provision Demonstrates That Only Disputes Between The U.N. And The Bank May Be Referred To Arbitration.**

It is axiomatic that arbitration "is a matter of consent, not coercion." *Stolt-Nielsen*, 2010 WL 1655826, at \*11. "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Therefore, "a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." *Ross v. Am. Express Co.*, 547 F.3d 137, 143 (2d Cir. 2008) (quotations omitted). Nor can it be required to submit to arbitration with "*any parties*[] that are not already covered" by an arbitration agreement. *Stolt-Nielsen*, 2010 WL 1655826, at \*12 (quotation omitted).[2]

Moreover, "[j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options*, 514 U.S. at 943. If the parties to the dispute did not "clear[ly] and unmistakab[ly]" agree to submit the question of arbitrability to the arbitration tribunal, "*the court* should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently." *Id.* at 943-44 (emphasis added). The issue of whether a contract manifests a

---

[2]   Because the U.N. is not a U.S. citizen, the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), implemented by Chapter 2 of the Federal Arbitration Act ("FAA"), applies. *See* 9 U.S.C. § 202. The New York Convention requires proof of "an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship" before arbitration may be compelled. New York Convention Art. II(1).

consent to arbitrate any issue, including the question of arbitrability, is governed by ordinary state law contract principles. *See id.* at 944; *accord Stolt-Nielsen*, 2010 WL 1655826, at *11; *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005).

Application of these principles to the Banking Services Agreement compels the conclusion that the Bank did not consent to arbitrate *any* issue or dispute with *any* person other than the U.N. By its express terms, the arbitration provision of the Agreement applies only to *"the Parties,"* defined in the opening paragraph of the Agreement as being limited to "*[t]he United Nations and the Bank.*" Dkt. No. 361 at Ex. 1 (emphasis added). Only those "Parties" are required to use their best efforts to settle disputes arising out of the Agreement or the breach thereof, and only a "Party" is permitted to submit any such dispute to arbitration if it is not settled amicably. *Id.* at Arts. 1.23.1, 1.23.2. Thus, the arbitration provision is unquestionably a strictly *bilateral* arbitration agreement between the Bank and the U.N. and cannot be construed as giving a non-party, such as Iraq, a right to arbitrate. *See McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771, 773 (2d Cir. 1992) (arbitration clause that applied to controversy "between myself and yourself" evinced an intent to limit arbitration to the two enumerated parties); *Di Martino v. Dooley*, No. 08 Civ 4606 (DC), 2009 U.S. Dist. LEXIS 1674, at *17 (S.D.N.Y. Jan. 6, 2009) (noting that the phrase "either party" in an arbitration clause limits application of the arbitration clause to two enumerated parties) (citation omitted).

In short, the plain language of the arbitration provision of the Banking Services Agreement leads to only one conclusion: the Bank did not agree to arbitrate *any* dispute arising out of or relating to the Agreement with *any* third party, including Iraq. Iraq's motion to compel arbitration should therefore be denied.

**B.      Iraq's Efforts To Avoid The Limitations In The Arbitration Provision Of The Banking Services Agreement Fail As A Matter Of Law.**

**1.      Iraq Cannot Avoid The Limitations In The Arbitration Provision By Characterizing Its Motion As Raising A Question Of Arbitrability.**

Iraq's principal argument in support of its motion to compel arbitration is not that its breach of contract and breach of fiduciary duty claims trigger the arbitration provision of the Banking Services Agreement, but rather that an arbitrator, and not the Court, should decide the applicability of the arbitration provision to Iraq's claims.  Dkt. No. 397 ("Pl.'s Br.") at 6-11. This argument is baseless.  As a general rule, the "question of arbitrability . . . is undeniably an issue for judicial determination."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649 (1986); *see also John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 53 (2d Cir. 2001).  The issue of arbitrability may be submitted to an arbitrator *only if* "there is 'clear and unmistakable' evidence that" the parties "agreed to arbitrate arbitrability."  *First Options,* 514 U.S. at 944 (quoting *AT&T Techs., Inc.,* 475 U.S. at 649).  Where there is no "agree[ment] to arbitrate arbitrability," the court must decide whether the claims at issue must be arbitrated.  *Id.*

As discussed in Section I.A, *supra*, the Banking Services Agreement does not manifest *any* agreement to arbitrate between the Bank and Iraq whatsoever, much less a "clear and unmistakable" agreement to submit the question of arbitrability to an arbitration tribunal.  Iraq contends that the Court should ignore this fact, and send the question of Iraq's arbitration rights to an arbitration tribunal, based upon the purported breadth of the arbitration provision and its reference to UNCITRAL rules.  Pl.'s Br. at 7-10.  Iraq's position is untenable.

**(a)      The Arbitration Provision Does Not Encompass Questions Of Arbitrability.**

As an initial matter, the Second Circuit repeatedly has held that a broad arbitration provision alone is insufficient to demonstrate a clear intent to arbitrate the issue of arbitrability,

7

even between the parties. *Caribbean Steamship Co. v. Sonmez Denizcilik Ve Ticaret A.S.*, 598 F.2d 1264, 1266 (2d Cir. 1979) ("broad" arbitration provision covering "any dispute" between the parties "does not expressly vest the arbitrator with the power to determine arbitrability"); *Rosenthal v. Emanuel, Deetjen & Co.*, 516 F.2d 325, 326 (2d Cir. 1975) (court must determine arbitrability under broad arbitration provision applying to "any controversy or claim arising out of or relating to this contract or the breach thereof"); *Necchi S.P.A. v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693, 695-96 (2d Cir. 1965) ("broad" arbitration provision covering "[a]ll matters, disputes or disagreements arising out of or in connection with this Agreement" did not "clearly vest[] the arbitrators with the power to resolve questions of arbitrability").[3] Likewise, this Court has rejected the argument that incorporation of UNCITRAL rules in an arbitration agreement constitutes clear and unmistakable intent to arbitrate the question of arbitrability. *See Telenor Mobile Commc'ns v. Storm LLC*, 524 F. Supp. 2d 332, 350-51 (S.D.N.Y. 2007), *aff'd*, 584 F.3d 396, 406 (2d Cir. 2009).[4]

---

[3]   Although Iraq cited two cases in which the Second Circuit reached a different conclusion (Pl.'s Br. at 8-9), both relied upon additional grounds for referring arbitrability questions to the arbitrator. *See Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir. 2003) (finding that incorporation of ICC rules required reference of arbitrability issues to arbitrator); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199, 1202 (2d Cir. 1996) (same, as to NASD rules, and relying upon the fact that the arbitration clause at issue included disputes over the "construction" of the arbitration agreement). In any event, *Shaw* and *PaineWebber* do not undermine the authority of the earlier Second Circuit decisions and, at best, demonstrate a conflict within the Circuit on this issue.

[4]   Iraq's argument that *Telenor* should not apply here because that case arose in the context of "enforcement of an arbitration award" is baseless. Pl.'s Br. at 10 n.3. *Telenor* rested on interpretation of the plain terms of Article 21 of the UNCITRAL Rules, not on the fact that the case arose in the enforcement context. *See* 524 F. Supp. 2d at 350. Similarly, Iraq's claim that *Telenor* is irrelevant because "BNP's objection falls squarely within the confines of UNCITRAL Rule 21," pertaining to arbitral rulings on objections, misses the point. Pl.'s Br. at 10 n.3. The Bank has not raised any "objections" before the arbitral tribunal. Instead, the Bank has argued *to the Court* that the question of arbitrability should be decided *by the*
*(cont'd)*

8

       **(b)**       **Iraq, As A Non-Party, Is Not Entitled To Have The Question Of Arbitrability Referred To Arbitration.**

These issues, however, do not need to be addressed to resolve Iraq's motion because, *even if* the arbitration provision in the Agreement could be read to encompass the issue of arbitrability *between the Bank and the U.N.*, that would not mean that *Iraq*, as a *non-party*, would be entitled to have the question of arbitrability referred to arbitration. *See Di Martino*, 2009 U.S. Dist. LEXIS 1674, at *7-9 (distinguishing cases "where the dispute concerns whether a certain *issue* is subject to a valid arbitration clause" from those where "the dispute concerns whether a certain *party* is subject to an arbitration clause"); *see also id.* at *16-17 (non-party could not compel arbitration despite the incorporation of AAA Commercial Arbitration Rules); *Upper Lakes Towing Co. v. ZF Padova SPA*, No. 2:08-CV-63, 2009 U.S. Dist. LEXIS 113025, at *11-12 (W.D. Mich. Dec. 4, 2009) (incorporation of ICC arbitration rules does not "evince an intent to refer to an arbitrator the issue of whether it applies to a dispute between Plaintiff and a non-party to the agreement"); *Celanese Corp. v. BOC Group PLC*, No. 3:06-CV-1462-P, 2006 U.S. Dist. LEXIS 88191, at *9 (N.D. Tex. Dec. 6, 2006) ("[T]he arbitrator in the pending ICC arbitration has jurisdiction to decide issues of arbitrability only between the parties to the arbitration agreement."). Indeed, if mere breadth of subject matter of an arbitration clause required submission of all disputes with a party to an arbitrator, any stranger to such an agreement could coerce a signatory into arbitration of any dispute that stranger might have with either party.

---

*(cont'd from previous page)*

    *Court*. *Telenor* confirms that the court must make this determination even where an arbitration agreement incorporates UNCITRAL rules. 524 F. Supp. 2d at 350. Finally, the journal articles and out-of-Circuit cases cited by Iraq concerning the effect of UNCITRAL rules are not persuasive because they do not address – much less refute – *Telenor's* textual basis for interpreting the UNCITRAL rules. Pl.'s Br. at 9-10.

The Second Circuit confirmed that this is not the law in *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 209 (2d Cir. 2005).  In *Contec*, the Court specifically stated that "just because a signatory has agreed to arbitrate issues of arbitrability with another party *does not mean that it must arbitrate with any non-signatory*."  *Id.* at 209 (emphasis added); *see also John Hancock*, 254 F.3d at 57 ("Where the party seeking arbitration is not a party to the arbitration agreement, the question of arbitrability is for the court, not the arbitrator.") (quoting *In re Herman Miller, Inc.*, No. 97 Civ. 7878(SAS), 1998 WL 193213, at *4 (S.D.N.Y. Apr. 21, 1998)); *Di Martino*, 2009 U.S. Dist. LEXIS, at *9 ("[W]here the dispute concerns whether a certain *party* is subject to an arbitration clause . . . the Court – rather than an arbitrator – must decide whether the dispute is arbitrable.").  Rather, the issue of arbitrability with a *non-signatory* may only be referred to arbitration if the non-signatory and the parties "have a sufficient relationship to each other and to the rights created under the agreement."  *Contec*, 398 F.3d at 209.[5]

Although Iraq mentions the "sufficient relationship" requirement in *Contec* in its attempt to invoke estoppel principles, it does not even try to demonstrate how it satisfies this requirement. *See* Pl.'s Br. at 10-11.  This omission is not surprising, as Iraq cannot demonstrate that it had a

---

[5]  For this reason, the cases cited by Iraq in which the court assessed the impact of a broad arbitration clause or rules regarding arbitrability are inapplicable.  In each, the court either had made a threshold determination about the rights of non-parties under the relevant agreement, or did not have to do so because the parties to the dispute were parties to the agreement.  *See Shaw*, 322 F.3d at 119 (recognizing that non-signatory assumed rights of signatory); *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 222-23 (2d Cir. 2001) (involving contract signed by parties to the dispute); *PaineWebber*, 81 F.3d at 1196 (same); *Collins & Aikman Prods., Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 18 (2d Cir. 1995) (same); *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 60-61 (2d Cir. 1983) (same); *Wal-mart Stores, Inc. v. PT Multipolar Corp.*, No. 98-16952, 1999 WL 1079625, at *1 (9th Cir. Nov. 30, 1999) (same); *Grynberg v. BP P.L.C.*, 596 F. Supp. 2d 74, 76-77 (D.D.C. 2009) (same); *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 43 (1997) (same).

relationship with either party to the Banking Services Agreement sufficient to permit it to invoke the Agreement's arbitration provision.

Under Second Circuit precedent, a "sufficient relationship" between a non-signatory and a party to an arbitration agreement has been found to exist only where the non-signatory (i) has "some sort of *corporate* relationship to a signatory party" or (ii) qualifies as "an entity that was, or would predictably become, with the knowledge and consent of the party opposing arbitration, *affiliated or associated with the other signatory* in such a manner as to make it unfair to allow the party opposing arbitration to avoid its commitment" to arbitrate. *Ross*, 547 F.3d at 144-46 (emphasis added) (quotation omitted); *see also Celanese Corp.*, 2006 U.S. Dist. LEXIS 88191, at *10 (noting, based on an analysis of case law, including *Contec*, that a sufficient relationship has been found to exist only where the non-signatory "essentially stood in the shoes of a signatory").

Iraq meets neither of these requirements. First, it is undisputed that Iraq has no corporate relationship with the Bank or the U.N. – it is not a subsidiary, affiliate, agent or related business entity of either party. *Ross*, 547 F.3d at 144. Thus, *Contec*, the case on which Iraq principally relies, is wholly distinguishable. In *Contec*, it was accepted fact that the non-signatory resisting arbitration, "Contec Corporation," was a corporate successor to the signatory, "Contec L.P." 398 F.3d at 207. The court found that the threshold requirement of a "sufficient relationship" was satisfied because "there is or was an *undisputed* relationship between each corporate form of Contec and Remote Solution" and because "the dispute at issue arose because [Contec Corporation and Remote Solution] apparently continued to conduct themselves as subject to the [agreement at issue] regardless of change in corporate form." *Id.* at 209. *Contec* simply does not support the conclusion that a non-signatory to an agreement with *no corporate relationship* to

either party, such as Iraq here, may avoid judicial review merely by raising a purported "genuine dispute" over a theory of non-signatory rights to a contract.  Pl.'s Br. at 11.[6]

Second, Iraq cannot show that, at the time of the execution of the Banking Services Agreement, it would "predictably become . . . affiliated or associated with the [U.N.]," much less "with the knowledge and consent of the [Bank]."  *Ross*, 547 F.3d at 145.  Instead, at the time the Bank entered into the Agreement, the U.N. was in a quintessentially arm's-length, confrontational posture toward Iraq, in that the U.N. had imposed and overseen international economic sanctions against Iraq, a designated state sponsor of terrorism, essentially to deny it access to hard currency with which it could pursue its abhorrent practices.  *See* Dkt. No. 357 at Ex. 1 (Resolution 661); 55 Fed. Reg. 37793 (Sept. 13, 1990).  Given Iraq's status as a pariah in the international community at the time of the Agreement's execution, there is no basis to conclude that the U.N. and Iraq had an "affiliate" or "associated" relationship "in such a manner as to make it unfair" to allow the Bank to resist arbitration with Iraq.  *See id.*  To the contrary, the notion that Iraq was intended to have any rights under the Banking Services Agreement, which was designed to deny it access to funds that were being held thereunder by the Bank for the U.N. as its sole customer, is irrational.

Nor can Iraq satisfy this requirement by invoking its purported status as a third-party beneficiary of the Agreement.  As explained in more detail below, there is no basis to conclude that Iraq has such status in the first place.  *See* Section II.B.2, *infra*.  In any event, Iraq has cited no authority, and the Bank is aware of none, to support the proposition that third-party

---

[6]  Iraq cannot avoid this fatal flaw in its argument by asserting that "courts are more willing to send the arbitrability question to arbitrators when the party opposing arbitration signed the arbitration agreement."  Pl.'s Br. at 10.  The treatise cited in support of this view cites only *Contec* in support of the quoted language.  As explained above, *Contec* itself makes no such sweeping proclamation.

beneficiary status constitutes a "sufficient relationship" with the parties to the agreement as required by *Contec*. In fact, all of the third-party beneficiary cases cited by Iraq involve situations in which *the court* – not the arbitrator – addressed the question of arbitrability. *See Arthur Andersen LLP v. Carlisle*, 129 S. Ct. 1896, 1902 (2009); *John Hancock*, 254 F.3d at 57-60; *E.I. Dupont De Nemours & Co. v. Rhone Poulenc Fiber & Resin Int. S.A.S.*, 269 F.3d 187, 195-99 (3d Cir. 2001); *Spear, Leeds & Kellogg v. Central Life Assur. Co.*, 85 F.3d 21, 25 (2d Cir. 1996); *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 902 (10th Cir. 1992); *Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 301 (S.D.N.Y. 1997). Likewise here, the question of arbitrability is for this Court – not an arbitration tribunal – to decide.[7]

### 2. Iraq Cannot Compel Arbitration Of Its Claims By Claiming To Be A Third-Party Beneficiary.

Iraq's effort to invoke the arbitration provision of the Banking Services Agreement by claiming to be a third-party beneficiary is fatally flawed for two reasons. First, as a matter of law, Iraq is not a third-party beneficiary of the Agreement. As the Bank demonstrated in its supplemental brief in support of its motion to dismiss, (Dkt. No. 358), the plain language of the Agreement evinces no intention to give *any* person other than the U.N. "the benefit of the promised performance." *Fourth Ocean Putnam Corp. v. Interstate Wrecking*, 66 N.Y.2d 38, 44 (1985) (quotation omitted). Rather, the Bank's commitments under the Banking Services Agreement run exclusively to the U.N.: The Agreement required the Bank to open the Program

---

[7]   For the same reasons that Iraq cannot rely upon estoppel principles to arbitrate the issue of arbitrability (Pl.'s Br. at 10-11), Iraq cannot rely on estoppel principles to compel the Bank to arbitrate. *See Ross*, 547 F.3d at 144 (explaining the limited circumstances under which a non-party can invoke estoppel against a party to an arbitration agreement); *see also Empire State Ethanol & Energy, LLC v. BBI Int'l*, No. 1:08-CV-623, 2009 U.S. Dist. LEXIS 23701, at *12-14 (N.D.N.Y Mar. 20, 2009) (finding that non-signatory could not compel signatory to arbitrate on the basis of estoppel).

Account "on behalf of the United Nations," to provide "necessary documentation to the United Nations and its auditors," and to follow "binding instructions" from the U.N. with respect to financial services provided under the Agreement.  Dkt. No. 361 at Ex. 1 at Arts. 1.3.1, 1.3.4, 1.3.7.  Indeed, the Bank could not "seek nor accept instructions from any authority external to the United Nations," and expressly was *forbidden* from complying with procedures or accepting information from sources "in or acting on behalf of the Government of Iraq or representing persons or entities in Iraq."  *Id.* at Art. 1.8.  In its response to the Bank's supplemental brief, Iraq does not dispute – nor can it – that the banking services set forth in the Agreement were to be performed on behalf of the U.N., the Bank's sole customer under the Agreement.  Dkt. No. 395 ("Pl.'s Opp.").

Similarly, Iraq does not dispute that the language of the arbitration provision itself – the most probative text on the issue of arbitration rights – is a direct indication that the parties did not intend for any third party to have any right of recourse under the Agreement.  *Id.* at 16.  As the Second Circuit has stated, "[a] clause requiring arbitration of disputes that does not include third parties suggests the parties to the contract did not envision that third parties would be in a position to bring suit under the contract."  *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 125 (2d Cir. 2005); *see also Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (non-party lacks standing to enforce an agreement "in the absence of terms that '*clearly evidence* an intent to permit enforcement by the third party'") (quoting *Fourth Ocean*, 66 N.Y.2d at 45) (emphasis added).  In fact, Iraq itself cites two other circuit court opinions that reached the same conclusion.  In *E.I. Dupont*, the Third Circuit found that an arbitration clause limited to disputes between "*one Party*" and "*the other Parties*" demonstrated that the signatories "anticipated only three beneficiaries to the Agreement."  269 F.3d at 196.

14

Similarly, in *O'Connor*, the Tenth Circuit rejected a third-party beneficiary claim where an arbitration provision was limited to controversies between "you" and "the undersigned." 965 F.2d at 902.

Unable to avoid this direct evidence of the parties' intent *not* to extend the benefits of the Banking Services Agreement to any third parties, Iraq argues that the Court should give this evidence little weight because of "other indicia" of an intent to confer benefits upon Iraq. Pl.'s Opp. at 15. For example, Iraq claims that "the principal purpose of the Agreement was to establish an escrow account to hold the Republic's money *so that* both Resolution 986 and the MOU could be implemented . . . *so that* the Republic could sell its oil and purchase humanitarian goods to alleviate the suffering of the Iraqi people." *Id.* (emphasis added); *see also* Pl.'s Br. at 1-3. In so arguing, Iraq ignores both crucial language in the text of the Banking Services Agreement – that the Bank was to "open the account provided for in SCR 986 *on behalf of the United Nations*" – and a central purpose of the Program – to *preserve* the U.N. sanctions against Iraq. Dkt. No. 361 at Ex. 1 at Art.1.3.1 (emphasis added); Dkt. No. 357 at Ex. 2. Iraq's characterization of the purpose of the Agreement thus is inaccurate. Moreover, only benefits to a third party that are "explicit and direct" may support a finding that a third party is an intended beneficiary of a contract. *Solutia v. FMC Corp.*, 385 F. Supp. 2d 324, 337 (S.D.N.Y. 2005). Attenuated inferences like those proffered by Iraq are not sufficient. *Id.*[8]

Iraq's reliance on the Agreement's "repeated[] mention [of] Iraq," such as in the name of the "United Nations Iraq Account" and in prohibitions on diversions of funds from the Account,

---

[8]   Iraq lends no support to its argument through its observation that the MOU required the U.N. to "keep the Government of Iraq fully informed of [the Secretary-General's] actions in choosing the bank and opening the account." Pl.'s Opp. at 15. Information flow antecedent to the commencement of an agreement cannot be a direct intended benefit of the agreement.

is similarly misplaced.  Pl.'s Opp. at 15.  Mere mention of a third party, however often, does not evince an intention to make it a third-party beneficiary.  *See, e.g., O'Connor*, 965 F.2d at 902 (third party stamped at top of agreement); *The Common Fund For Non-Profit Orgs. v. KPMG Peat Marwick LLP*, 951 F. Supp. 498, 500 (S.D.N.Y. 1997) (contract provided for audit of third party's financial reports and procedures).  That is especially true here, where the references to Iraq are essentially restrictive in nature, and the setup of the "United Nations Iraq Account" itself illustrates that funds were intended to be segregated *from* Iraq.  *See, e.g.,* Dkt. No. 361 at Ex. 1 at Art. 1.8 (forbidding actions in accordance with procedures from sources "in or acting on behalf of the Government of Iraq or representing persons or entities in Iraq"); *id.* at 1.18.1 (forbidding disclosure of Agreement to third parties); *id.* at 1.18.2 (restricting communications about the banking services provided under the Agreement); *id.* at 1.3.7 (U.N. "has the right to and control of funds in the United Nations Iraq Account").

Finally, Iraq cannot sustain its position by arguing that, notwithstanding a lack of textual support, its purported third-party beneficiary status may be based on "the surrounding circumstances" of the Banking Services Agreement.  Dkt. No. 395 at 12.  As a threshold matter, many cases have held without qualification that "[t]he intention to benefit the third party must appear from the four corners of the instrument."  *Sunnyside Dev. Co., LLC v. Bank of New York,* 07 Civ. 8825 (LLS), 2008 U.S. Dist. LEXIS 11800, at *6 (S.D.N.Y. Feb. 19, 2008) (quotation omitted); *see also Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 191 (S.D.N.Y. 2009) ("New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract.") (citations omitted); *Piccoli A/S v. Calvin Klein Jeanswear*

*Co.*, 19 F. Supp. 2d 157, 163 (S.D.N.Y. 1998) (same); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 733 (S.D.N.Y. 1989) (same).[9]

In any event, there are no "surrounding circumstances" that support Iraq's position given that all the pertinent aspects of the Program, as set forth in applicable Security Council Resolutions and U.N. reports, establish that Iraq was *not* an intended beneficiary.  The Program was described as a measure to provide for the humanitarian needs of the Iraqi people while maintaining the sanctions that had been imposed as a punitive measure against Iraq following its invasion of Kuwait.  Dkt. No. 357 at Ex. 2 (Resolution 986).  The U.N. exclusively was charged with maintaining control over Program funds and monitoring transactions with Iraq, and the Program could be terminated at any point at the discretion of the Security Council.  *Id.* ¶ 8; *Id.* at Ex. 4 (MOU ¶¶ 16, 24-27 & Annex II ¶ 4); Dkt. No. 361 at Ex. 1 at Arts. 1.3.7, 1.21.8.  The "surrounding circumstances" thus point to only one conclusion – that the Program was not

---

[9]   "[W]hile it may be appropriate to look to the 'surrounding circumstances' when a contract's literal terms are ambiguous or provide latitude," such analysis is inappropriate where, as here, the language of the agreement demonstrates that the parties did not intend for the non-signatory to be a third-party beneficiary to the Agreement.  *Air Atlanta*, 637 F. Supp. 2d at 194.  This case thus is distinguishable from *Trans-Orient*, cited by Iraq, where the court analyzed a contract that provided for no mutual consideration and looked to evidence of an implied promise of forbearance and other circumstances bearing on the course of conduct of the parties.  *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573-74 (2d Cir. 1991).  Iraq makes no similar allegation that the basic elements of the Agreement must be supplied by implication.  Moreover, as noted above, the plain language of the Agreement makes clear that Iraq is not a third-party beneficiary, and any circumstances surrounding the Agreement only further support this point.  *See also Banco Espirito Santo De Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537 (MBM), 2003 WL 23018888, at *9 & 10 (S.D.N.Y. Dec. 22, 2003) (holding that language of contract demonstrated plaintiff was not a third-party beneficiary and that plaintiff had failed to identify any circumstances to the contrary).

designed to *benefit* Iraq, but rather to facilitate a comprehensive system of punitive sanctions and monitoring *against* Iraq, while mitigating adverse impacts on its people.[10]

Even if Iraq were a third-party beneficiary of the Banking Services Agreement – which it is not – Iraq still would not be entitled to compel arbitration of its claims because the arbitration provision is expressly limited to the defined "Parties." The mere assertion of third-party beneficiary status does not give the alleged third party a right to invoke an arbitration provision in the contract. *See Miness v. Ahuja*, --- F. Supp. 2d ---, 2010 WL 2025193, at *3 (E.D.N.Y. May 20, 2010) (third-party beneficiary of contract would not be entitled to compel arbitration where arbitration clause was limited to disputes "between the parties hereto"); *see also McPheeters,* 953 F.2d at 773 ("[E]ven if [the party seeking arbitration] were party to the Agreement, it is not included within the scope of the arbitration clause."); *Di Martino*, 2009 U.S. Dist. LEXIS 1674, at *15 ("Even if petitioners are parties to the [contract] . . . the issue remains as to whether they are bound by the Arbitration Clause."); *Celanese*, 2006 U.S Dist. LEXIS, at *20-21 (finding that *signatory to agreement* did not have right to invoke arbitration provision that was limited to two other "Parties" as expressly defined in the agreement). Where, as here,

---

[10]   Nor can Iraq assert third-party beneficiary status as *parens patriae* on behalf of the Iraqi people. *See* Dkt. No. 395 at 15 & 16. Promises or aspirational language in connection with international humanitarian relief efforts do not bestow individual rights of redress, much less private causes of action for the states involved. *See* Dkt. No. 358 at 12-13. It is even more absurd to suggest that the entire citizenry of Iraq somehow would have had a right *to arbitrate* under the Banking Services Agreement. *Cf. Stolt-Nielsen*, 2010 WL 1655826, at *13 ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so.").

an arbitration provision is expressly limited to certain parties, a third-party beneficiary not included within the scope of the arbitration provision may not invoke the provision. *See id.*[11]

### C.     Iraq Cannot Delay The Resolution Of This Matter By Seeking Discovery.

Iraq's effort to avoid denial of its motion to compel arbitration by asserting a need for discovery also fails. Pl.'s Br. at 12. Where, as here, a party "relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant," the matter should be determined by the Court based on no more than the plain terms of the agreement. *Subaru*, 425 F.3d at 124-25; *see also McPheeters*, 953 F.2d at 773 (affirming denial of motion to compel arbitration by alleged third-party beneficiary on basis of contract terms); *E.I. Dupont*, 269 F.3d at 196-97 (affirming denial of motion to compel arbitration against non-signatory on basis of contract terms and allegations); *Stechler v. Sidley Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 591-92 (S.D.N.Y. 2005) (denying non-signatory defendant's motion to compel arbitration based upon language in complaint); *PaineWebber*, 81 F.3d at 1199 (court can "ascertain the intent of the parties from the plain meaning of the language employed" and "where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law").

---

[11]   The cases cited by Iraq do not hold otherwise. In the two Circuit Court cases in which the Court found that a third-party beneficiary had a right to arbitrate, the arbitration provisions were not limited in any respect to "the parties" to the contract. *Spear, Leeds & Kellogg*, 85 F.3d at 26 (standard form NYSE arbitration provisions applied to "any controversy between a member . . . and any other person arising out of the business of such member"); *John Hancock*, 254 F.3d at 58 (standard form NASD arbitration provisions applied to a "dispute . . . between a customer and a member and/or associated person"). *Borsack* is distinguishable because the party resisting arbitration was the same party that was trying to bring suit under the contract. *See* 974 F. Supp. at 299 (non-signatory plaintiff sought "enforcement of one portion of the [contract], while seeking to avoid another provision of the [contract], namely the arbitration clause").

The *Bensadoun* and *Oppenheimer* cases cited by Iraq do not compel a different conclusion, as both involved situations where the party opposing arbitration relied on circumstances extrinsic to its agreement. *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 178 (2d Cir. 2003) (remanding for further factual development where arbitration agreement provided for arbitration between a stock broker and its "customers," and broker resisting arbitration submitted affidavits that "raise[d] factual issues" as to whether plaintiffs were customers under the agreement); *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995) (interpreting same arbitration provision as in *Bensadoun*, but affirming judgment compelling arbitration where broker failed to raise any evidence showing plaintiffs were not customers). Here, Iraq has not identified any purported extrinsic circumstances that would support its position – what it is asking for is a pure fishing expedition. For this reason, this situation is more like *Veera*, also cited by Iraq (Pl.'s Br. at 12), where this Court stayed arbitration because the party seeking to arbitrate had proffered no evidence supporting alternative theories of agency or estoppel. *See Veera v. Janssen*, No. 05 Civ. 2145 (SHS), 2005 WL 1606054, at *4-5 (S.D.N.Y. July 5, 2005).

In sum, discovery is neither necessary nor appropriate to resolve the question of the arbitrability of Iraq's claims against the Bank.

\*   \*   \*

For all these reasons, the Bank has not agreed to arbitrate *any* of the claims asserted by Iraq in this action, let alone clearly and unmistakably agreed to submit the issue of arbitrability to an arbitrator. Accordingly, this Court should decide the question of arbitrability and it should deny Iraq's motion to compel arbitration.

## II.   IRAQ IS PRECLUDED FROM PURSUING ARBITRATION BECAUSE IT HAS ENGAGED IN SUBSTANTIAL LITIGATION IN COURT.

In addition to lacking any contractual basis to arbitrate its claims against the Bank, Iraq is, by virtue of its own conduct, precluded from arbitrating its claims.[12]   A party seeking to arbitrate is precluded from arbitration when it "actively participates in a lawsuit or takes other action inconsistent with that right."  *Apple & Eve, LLC v. Yantai North Andre Juice Co.*, 610 F. Supp. 2d 226, 229 (E.D.N.Y. 2009); *see also SATCOM*, 49 F. Supp. 2d at 341 ("The touchstone of waiver is the taking of action inconsistent with the right to arbitrate . . . . Rarely does a plaintiff begin a litigation on the merits and then alter course and attempt to compel an arbitration."). Such conduct is a complete bar to arbitration even where an agreement to arbitrate is established, because it renders the alleged agreement to arbitrate "null and void."  *Apple & Eve*, 610 F. Supp. 2d at 234.

A finding of preclusion is particularly appropriate where, as here, the party seeking to arbitrate is a plaintiff that has pursued litigation over a long period of time, including through court filings and negotiation of scheduling orders which invite defendants to submit detailed responses in court.  Such activities "illustrate [plaintiff's] unmistakable intent to litigate rather than arbitrate its claims."  *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 Civ. 6770 (LAP), 2010 U.S. Dist. LEXIS 12764, at *12  (S.D.N.Y. Feb. 8, 2010) (holding that plaintiff waived its right to arbitrate following eleven months of pre-trial litigation, including filing amended

---

[12]   The question of whether Iraq is precluded from arbitrating its claims is a matter for the Court and not an arbitrator to decide.  *See Doctor's Assoc. v. Distajo*, 66 F.3d 438, 456 & n.12 (2d Cir. 1995) ("the court should decide the issue of waiver" when "the waiver defense [is] based on prior litigation by the party seeking arbitration"); *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83 (2d Cir. 1998) (same, finding that incorporation of AAA rules in arbitration provision did not change result); *SATCOM Int'l Group PLC v. ORBCOMM Int'l Partners, L.P.*, 49 F. Supp. 2d 331, 339 (S.D.N.Y. 1999) (finding that waiver "is appropriately decided by the Court").

complaints and stipulating to a scheduling order resulting in defendant's submission of a pre-answer letter response); *see also SATCOM*, 49 F. Supp. 2d at 335 & 341 (holding that plaintiff waived its right to pursue arbitration following four months of litigation and a court ruling denying plaintiff's motion for preliminary injunction). This is plainly the case here.

Iraq filed this action on June 27, 2008, almost *two years ago* – significantly longer than the time elapsed in both *Merrill Lynch* and *SATCOM*. Its initial complaint included the same breach of contract and breach of fiduciary duty claims that it now seeks to arbitrate. In March 2009, Iraq informed counsel for the Bank and other defendants that it intended to file an amended complaint, and it negotiated an additional extension of time so that it could finish gathering materials from the U.N. *See* Dkt. No. 14 at 3-4. In its amended complaint, Iraq not only reasserted its breach of contract and breach of fiduciary duty claims, but quoted extensively from several nonpublic provisions of the Banking Services Agreement and paraphrased several others. *See, e.g.*, Am. Compl. ¶¶ 978, 983-986, 988-992, 1003 (quoting nonpublic provisions); *id.* ¶¶ 1001, 1047-1048, 1053, 1186 (paraphrasing nonpublic provisions).[13] Yet, Iraq did not cite the Agreement's arbitration provision or mention that it might seek to arbitrate its claims.

In fact, Iraq asserted a desire to arbitrate only *after* the Bank submitted extensive briefs setting forth multiple grounds for dismissal, and only *after* other similar lawsuits brought by citizens of Iraq in this Court had been dismissed.[14] Moreover, Iraq has continued to litigate all of

---

[13]   The nonpublic provisions of the Agreement quoted and/or paraphrased include Sections 1.3.1, 1.3.3, 1.3.5, 1.3.6, 1.6, 1.8, 1.9, 1.13.1, 1.13.2 and one recital.

[14]   *See Mastafa v. Australian Wheat Bd. Ltd.*, No. 07 Civ. 7955 (GEL), 2008 U.S. Dist. LEXIS 73305, at *37 (S.D.N.Y. Sept. 25, 2008); *Karim v. AWB Ltd.*, No. 06 Civ. 15400 (GEL), 2008 U.S. Dist. LEXIS 76896 (S.D.N.Y. Sept. 30, 2008), *aff'd*, 2009 U.S. App. LEXIS 21649  (2d Cir. Oct. 2, 2009).

its claims against the Bank to this day, by filing detailed response briefs to the Bank's motion to dismiss, which will require yet further briefing on the part of the Bank.

These facts support only one conclusion – that Iraq purposefully led the Bank to believe that it intended to litigate its breach of contract and breach of fiduciary duty claims, which in turn caused the Bank to expend considerable time and resources in litigation.  Iraq's belated request to proceed on a dual track, ostensibly in an effort to pursue its claims in a second forum in the event they do not survive here, should be rejected.[15]

## III.    THE COURT SHOULD ENJOIN IRAQ FROM PURSUING ARBITRATION.

Because an order denying Iraq's motion to compel arbitration, by itself, may not prevent Iraq from taking further action with respect to arbitration, a separate order enjoining arbitration also is necessary.  Under Chapter 2 of the FAA, which gives the district court power to direct arbitration, the Court has "a concomitant power to enjoin arbitration where arbitration is inappropriate." *SATCOM*, 49 F. Supp. 2d at 342.  An injunction is warranted if the party seeking injunctive relief demonstrates that it will be irreparably harmed if an injunction is not granted. *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 240 (S.D.N.Y. 2004) (citations omitted); *see also Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 & 39 (2d Cir. 2010) (affirming grant of preliminary injunction enjoining arbitration).

---

[15]   The gamesmanship inherent in Iraq's position is perhaps best illustrated by its assertion that it should be permitted to continue litigating *some* of its claims against the Bank in this Court even if its breach of contract and breach of fiduciary duty claims are sent to arbitration.  Pl.'s Br. at 13-14.  Iraq contends throughout most of its brief that the arbitration provision is written so broadly that it unmistakably gives Iraq the right to arbitrate, but when addressing severance, it argues that the provision is not broad enough to include other claims arising out of the Bank's performance of the Agreement.

This court repeatedly has recognized that "[a] person against whom an arbitration has been initiated, who has not agreed to arbitrate, directly or by operation of law, is deemed to be irreparably damaged." *Zarepta Chem., K.S. v. Solae, LLC*, 05 CV 8265 (CLB), 2005 U.S. Dist. LEXIS 43805, at *7 (S.D.N.Y. Oct. 26, 2005); *see also Proshares Trust v. Schnall*, 09 Civ. 6386 (SHS), 2010 U.S. Dist. LEXIS 14286, at *8 (S.D.N.Y. Feb. 18, 2010) ("a party necessarily suffers irreparable harm if forced to expend time and resources arbitrating an issue that is not arbitrable") (quotation omitted); *UBS Securities LLC v. Voegeli*, 09 Civ. 8872 (DLC), 2010 U.S. Dist. LEXIS 6202, at *8 (S.D.N.Y. Jan. 26, 2010) (enjoining arbitration and stating that "[i]t is beyond dispute that irreparable harm would result if [plaintiff] were compelled to arbitrate defendants' claims without having agreed to arbitration").

Applying these rules to the present case, the Bank necessarily will suffer irreparable harm if Iraq is not enjoined from pursuing arbitration of claims which, as explained above, Iraq has no right to arbitrate. Exposing the Bank to the prospect of arbitration for a dispute that it did not agree to arbitrate would deprive the Bank of the important "right to have [Iraq's] claims adjudicated in a court of law, rather than in an arbitral forum to whose jurisdiction [it has] not consented." *UBS Securities*, 2010 U.S. Dist. LEXIS 6202, at *9. Accordingly, in addition to denying Iraq's motion to compel arbitration, the Court also should enjoin Iraq from arbitrating any of its claims against the Bank.

# CONCLUSION

For all the foregoing reasons, Iraq's motion to compel arbitration should be denied and the Bank's motion to enjoin arbitration should be granted.

Dated:  May 28, 2010
        Washington, DC

/s/ Jennifer L. Spaziano
Jennifer L. Spaziano (admitted *pro hac vice*)
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue NW
Washington, DC 20005
(202) 371-7000
jen.spaziano@skadden.com

Robert S. Bennett
Ellen S. Kennedy
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600
robert.bennett@hoganlovells.com
ellen.kennedy@hoganlovells.com

William J. O'Brien, III
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000
wobrien@skadden.com

Attorneys for the BNP Paribas Defendants