UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE REPUBLIC OF IRAQ, including as
PARENS PATRIAE on behalf of the CITIZENS
of the REPUBLIC OF IRAQ,

Plaintiff,

– against –

ABB AG, et al.,

Defendants.

08 Civ. 5951 (SHS)

ECF CASE

**THE REPUBLIC OF IRAQ'S FIRST NOTICE OF SUPPLEMENTAL AUTHORITY
AND SUR-REPLY ON THE ISSUE OF EXTRATERRITORIAL JURISDICTION**

At the same time the Defendants were inundating this Court with "supplemental" assertions that this is an entirely foreign matter beyond this Court's jurisdiction, another nine Defendants formally admitted they committed US crimes as part of the conspiracy to corrupt the United Nations Oil for Food Programme (the "Programme"). Per an April 2011 deferred prosecution agreement with the DOJ, the two Johnson & Johnson Defendants will pay a total of approximately $77 million in penalties and disgorgements for their role in the corruption and for similar conduct elsewhere. Exhibit A. Pursuant to an earlier agreement, the seven ABB Defendants will pay more than $58 million in fines, penalties and disgorgements. Exhibit B.

With the additions of the Johnson & Johnson and ABB Defendants, more than 40% of the Defendants have now entered guilty pleas or other binding agreements admitting that the conduct alleged in the Republic of Iraq's First Amended Complaint constitutes *domestic* criminal conduct under US law. *See also* Opp. Exs.[1] 2-16. These admissions contradict entirely the factual assertions and arguments presented in the Defendants' five "supplements," particularly the latest

---

[1] "Opp. Ex." refers to the exhibits attached to the Declaration of Mark Maney in Support of Plaintiff's Opposition to the Defendants' Motion to Dismiss the First Amended Complaint, ECF No. 394.

Reply. Indeed, the arguments presented to this Court violate the Defendants' agreements with US authorities.

1. *The Defendants' admissions are binding in this Court.*

   The Defendants' admissions are binding *in this Court and proceeding*. Johnson & Johnson's agreement is typical: "J&J expressly agrees that it shall not … make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by J&J set forth above or the facts described in the attached Statement of Facts." Exhibit A at ¶15. Certainly in the context of a motion to dismiss, the Defendants should not be allowed to violate their own agreements and admissions in parallel criminal proceedings in an effort to avoid civil liability for their admitted criminal conduct.

2. *The Defendants admit they committed US crimes and targeted property held in the United States—the funds in the UN Escrow Account.*

   In sharp contrast to their supplements, the Defendants have admitted in their criminal cases that they conspired to violate US law and illegally obtain property located in the United States. Their admissions include that they:

   - "stole property from the United Nations" constituting grand larceny under New York law (Opp. Ex. 4);

   - "unlawfully and knowingly [conspired] to … defraud the United Nations and the Oil-for-Food Program and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, through the use of interstate and foreign wire communications, in violation of 18 U.S.C. § 1343" (Opp. Ex. 7, at Information ("Info.") ¶ 21);[2]

   - "caused the U.N., unknowingly, to fund the kickbacks to the [Hussein Regime]" (Opp. Ex. 11, at Statement of Facts ("SOF") ¶ 8);[3]

---

[2] Twenty-seven Defendants have admitted they committed wire fraud for their misrepresentations to the United Nations. Exhibit B; Opp. Exs. 5-7, 10-12, 15-16.

[3] Thirty-four Defendants have made similar admissions that they diverted funds from the Escrow Account to pay kickbacks; for example: Ex. B, at SOF ¶¶ 17-18; Opp. Ex. 16, at Info. ¶ 25; Opp. Ex. 9, at SOF ¶¶ 22, 28; Opp. Ex. 8, SOF at 62; Opp. Ex. 11, at SOF ¶¶ 15, 21, 27; Ex. A, at SOF ¶¶ 102, 109, 113; Opp. Ex. 12, at SOF ¶¶ 17, 19; Opp. Ex. 13, at Statement of Offense ("SOO") ¶ 99; Opp. Ex. 14, at SOF ¶ 11; Opp. Ex. 15, at SOF ¶¶ 8, 17, 44; Opp. Ex. 7, at Info. ¶¶ 9, 23(b).

    o   made misrepresentations to the United Nations that caused the UN to authorize
payment from the Oil-for-Food Bank Account in the United States.[4]

3.  *The Republic of Iraq's RICO claim is based entirely on the Defendants' US conduct.*

    The Defendants' admitted US conduct fully supports the Republic of Iraq's RICO claim.
Indeed, the First Amended Complaint does not allege any RICO predicates based on
extraterritorial conduct. Notably, the Republic of Iraq is not "recasting" its allegations in
response to the *Morrison* opinion, as the Defendants contend. Reply at 3. The First Amended
Complaint has always alleged RICO predicate acts based expressly on the Defendants' US
conduct, as explained in the Republic of Iraq's opposition to the Defendants' motion to dismiss.
ECF No. 393 at 53-54.

    a.  *The Defendants admit to committing the predicate acts that base the Republic of*
        *Iraq's RICO claim.*

    The Defendants' binding admissions belie the repeated assertion in their slew of
"supplements" that the Republic of Iraq's RICO claim cannot plausibly be based on domestic
conduct. The Defendants' admissions confirm that US conduct is *the basis of all of the predicate
acts* that support the Republic of Iraq's RICO claim—(a) mail and wire fraud, (b) money
laundering, (c) the Travel Act, and (c) bribery.

      i.  *Mail and Wire Fraud*

    Twenty-seven Defendants have directly conceded that their conduct violated the wire fraud
statute. *See* note 1, *supra*.

---

[4] *See* note 2, *supra*. The Defendants' misrepresentations to the Programme were not limited to lying about
their kickbacks to the Hussein Regime; they also concealed the unconscionable profits they received from
their Programme contracts, funded from the UN Escrow Account in New York. For example, earlier this
month, Johnson & Johnson admitted that the medicine it sold under the Programme cost less than $3
million, but Johnson & Johnson nonetheless walked off with a $6.1 million illegal profit, not including its
$857,387 kickback to its coconspirator—the Hussein Regime. Exhibit A, at SOF ¶ 102. The Akzo Nobel
Defendants admit to making even more, selling medicine at six times its actual value. Opp. Ex. 9, SOF. Yet,
to be approved for payment by the Programme in New York, the Defendants had to represent that their
pricing was "reasonable and acceptable." *See, e.g.*, the approval for one of the Johnson & Johnson
Defendants' contracts, attached as exhibit C.

### ii.  Money Laundering

The Defendants' admissions also confirm the applicability of the money laundering predicates—in at least two ways.

First, thirty-four Defendants concede that their illegal payments to the Hussein Regime were funded by and through the Oil-for-Food Account. For example, the Siemens Defendants' guilty plea states: "In order to generate the funds to pay the kickbacks to the [Hussein Regime] and to conceal those payments, the Siemens entities inflated the price of some contracts by up to 10% before submitting them to the 661 Committee and the U.N. for approval." Opp. Ex. 13, at SOO ¶ 99; *see also* note 2, *supra*.

Second, the same thirty-four Defendants admit that they defrauded the UN into making transfers from the Oil-for-Food Account in New York to them. *See* notes 2-3, *supra*.

Both admissions concede the money laundering predicates. For example, it constitutes criminal money laundering under US law to transfer or attempt to transfer "funds from a place in the United States to or through a place outside the United States … with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956()(a)(2). So, when the Defendants caused the UN to transfer funds to them from the US-based Escrow Account in order to fund their illegal kickbacks, they committed money laundering *under United States law*. Also, since the UN Escrow Account held blocked funds of a designated terrorist state, the account was under the control of the US Treasury Department. As a result, when the Defendants defrauded the UN into making transfers in violation of Programme rules, the transfers *per se* were unlawful activity and money laundering.

Indeed, the entire purpose of the Defendants' scheme was to induce the UN to make transfers out of the UN Escrow Account in New York in violation of Programme rules. No less than 40% of the Defendants have conceded that.

### iii. The Travel Act

The Travel Act criminalizes "travels in interstate or foreign commerce or uses [of] the mail or any facility in interstate or foreign commerce, with intent to—(1) distribute the proceeds of any unlawful activity;[5] or … (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity …." 18 U.S.C. § 1952(a). Unlawful activities under the Travel Act include money laundering (discussed above) and "bribery … in violation of the laws … of the United States." *Id.* at 1952(b). Bribery in violation of US law, in turn, includes violations of the FCPA. *E.g., United States v. Young & Rubicam, Inc.*, 741 F. Supp. 334, 338-39 (D. Conn. 1990).

At least 28 Defendants have formally admitted to FCPA violations, conceding both (1) that they are subject to the statute and (2) the substantive violations. While the Defendants' admissions are generally to the FCPA's reporting requirements, their failures to report are uniformly related to their bribes towards the Hussein Regime.[6]

### iv. Bribery under New York law

Of course, allegations of bribery under New York law do not assert extraterritorial conduct.

### b. Territoriality is determined by the location of the act or the property affected, not the residence of the actor.

The Defendants try to equate international with extraterritorial, but *Morrison* does not impose strict isolationism on US courts or the RICO statute; it merely confines the RICO statute to its express bounds. The fact that many of the Defendants are "foreign actors" is irrelevant. Nothing in the RICO statute or the *Morrison* opinion immunizes foreign actors for acts within the United States.

---

[5] As a possible exception to the domestic based conduct supporting the RICO claim, the Defendants' transfers to the Hussein Regime clearly fall within the provision "distribute the proceeds of any unlawful activity." The transfers to the Hussein Regime, however, originated in the US in the UN Escrow Account, and therefore, they fall squarely within the provisions of the Travel Act.

[6] Exhibit B; Opp. Exs. 7-13, 15-16.

The proper inquiry is whether the Republic of Iraq's RICO claim is based on conduct illegal under the US predicate statutes set forth in RICO. If the Republic's claim is so based, and it is, then there is no question of extraterritoriality. The United States is exercising its territorial (as opposed to extraterritorial) jurisdiction when it acts "with respect to" (1) "conduct that, wholly or in substantial part, takes place within" the United States or (2) "the status of persons, or interests in things, present within" the United States, *regardless of the nationality of the defendant.* Restatement (Third) of Foreign Relations Law of the United States ("Restatement") § 402;[7] *see also United States v. Yousef,* 327 F.3d 56, 85 n.16 (2d Cir. 2003) ("By 'extraterritorial jurisdiction' we mean subject matter jurisdiction of a United States court to adjudicate conduct committed outside of the United States.").

This case is thus the exact opposite of *Norex Petroleum Ltd. v. Access Indus., Inc.,* 631 F.3d 29, 31 (2d Cir. 2010). The plaintiff, Norex, tried to secure RICO jurisdiction over "a massive racketeering scheme to take over a substantial portion of the Russian oil industry," and a resulting loss of an investment in a Russian oil company. *Id.* at 31. Norex premised its jurisdictional argument on unrelated acts in the United States—including that some defendants were involved in the Programme's corruption. Norex, however, did not base its claim for relief on the US conduct; nor did it seek damages in any way related to the alleged US conduct. Instead, Norex expressly sought extraterritorial application of RICO to a Russian conspiracy aimed at interfering with Norex' Russian interests. A copy of the *Norex* complaint is attached as exhibit D.

In contrast, the Republic of Iraq alleges a domestic conspiracy by the Defendants based on the Defendants' actions within the United States. The incidental bad acts of Saddam Hussein and his regime are not the stated basis of the RICO claim. The Republic of Iraq is not suing Saddam Hussein (he was tried within the Republic), but the Defendants, who sought to obtain, and did

---

[7] In fact, exercising jurisdiction based on intended or substantial effects caused within the United States by conduct outside the United States is also properly characterized (in most instances) as a territorial (and not extraterritorial) application of US law. Restatement § 402, comment d.

obtain, the Republic of Iraq's property physically in the United States. Saddam Hussein might have wanted kickbacks from the Defendants to maintain his tyranny, but the undeniable target of the *Defendants*' RICO conspiracy was the money sitting in the UN Escrow Account. Presumably, the Defendants would have been happy to avoid including Saddam Hussein in their spoils. It is also undeniable that the Programme—the Enterprise—that managed that UN Escrow Account was centered in New York.

Thus, while a RICO conspiracy cannot be premised on foreign acts, the existence of foreign acts and actors does not immunize domestic conduct that does support a RICO claim. The rule suggested by the Defendants would gut RICO. According to the Defendants' rule, a South American drug cartel that sells its drugs in New York is outside a RICO count based solely on the cartel's US crimes simply because the cartel has to pay part of its illegal gains to local Columbian officials to maintain its control within its home base. That is not the law. Foreign criminals are liable for their US crimes.

> c.  *The Defendants' admissions also refute their claim that their actions are outside the United States because of UN privilege.*

Although they try to downplay the argument, the Defendants continue to assert that their UN-related conduct cannot base jurisdiction. Reply at 3 n.1. In support, the Defendants cite opinions holding that political conduct within the UN cannot support general personal jurisdiction, but those opinions are based on the privileges and immunities of the UN and its participants.[8] The Defendants, however, did not participate in the UN's immunized or privileged conduct; they defrauded the UN into paying them Iraq's money. Nor do the Defendants claim they have standing to raise the UN's immunity or privileges before this Court.

In any event, once again, the Defendants' admissions in their criminal cases disprove the assertion.

---

[8] *See* Reply at 3 n.1 (citing *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991) (analyzing PLO's role as a UN permanent observer).

### i.   The Defendants' Admissions

As demonstrated by Vitol's guilty plea in 2007, diverting funds from the "United Nations trust account maintained at BNP Paribas in New York, New York" constitutes theft under New York law punishable in US courts. Opp. Ex. 4, at Plea Agreement ¶ 3(a).

As demonstrated by the guilty pleas and other agreements of at least 27 Defendants, defrauding the UN into authorizing payment from the Oil-for-Food Account constitutes mail and wire fraud. *See* note 1, *supra*.

### ii.   The Headquarters Treaty

The Defendants also disingenuously assert that the Republic's argument "is based solely on two state court criminal cases from 1962 and 1976."  Reply at 3 n.1. Apart from the admissions, the core support for this Court's jurisdiction over acts within the UN is the UN Headquarters Treaty that provides:

- o "Except as otherwise provided in this agreement or in the General Convention, the federal, state and local law of the United States shall apply within the headquarters district."

- o "Except as otherwise provided in this agreement or in the General Convention, the federal, state and local courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district as provided in applicable federal, state and local laws."

Treaty at Art. III § 7 (b), (c) (*available at* http://avalon.law.yale.edu/20th_century/decad036.asp).

The Defendants cite no opinions that alter these clear provisions.

### 4.   *The Defendants played an integral role in the Programme's operations.*

The Defendants' latest submission also attempts to reopen the briefing on whether the Defendants operated or managed the Programme—the Enterprise. Reply at 2. This time, the Defendants do not even purport to have an excuse for reopening briefing outside the agreed schedule. The briefing on this issue, described by the Second Circuit as "a relatively low hurdle for plaintiffs to clear . . . especially at the pleading stage," needs no further explanation. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (citation omitted).

The Defendants' Motion to Dismiss should be denied.

Dated: April 25, 2011

Respectfully submitted,

By: _____ /s/ *Mark Maney* _____

Mark Maney[*] *(mmaney@burfordmaney.com)*
Roliff Purrington[*] *(rpurr@purrlegal.com)*
1000 Louisiana Street, Suite 2800
Houston, Texas 77002
Telephone: (713) 425-8469

- and -

BERNSTEIN LIEBHARD LLP
Stanley D. Bernstein *(bernstein@bernlieb.com)*
Rebecca M. Katz *(katz@bernlieb.com)*
Christian Siebott *(siebott@bernlieb.com)*
Brian Lehman[*] *(lehman@bernlieb.com)*
10 East 40th Street, Floor 22
New York, New York 10016
Telephone: (212) 779-1414
Fax: (212) 779-1414

*Counsel for the Republic of Iraq*

---

[*] Admitted *pro hac vice*.