UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| THE REPUBLIC OF IRAQ, including as PARENS PATRIAE on behalf of the CITIZENS of the REPUBLIC OF IRAQ, | 08 Civ. 5951 (SHS) |
| Plaintiff, | OPINION & ORDER |
| -against- | |
| ABB AG, et al., | |
| Defendants. | |

1

CONTENTS

I. Background ........................................................................... 5

   A. The Iraqi sanctions ........................................................ 5

   B. The Oil-for-Food Programme in Design ........................... 6

      1. The UN escrow account ........................................... 7

      2. Oil sales ................................................................. 8

      3. Goods purchases ..................................................... 8

   C. The Oil-for-Food Programme in practice ......................... 8

      1. Oil sales ................................................................. 9

      2. Purchases from vendor-defendants ......................... 11

      3. BNP maintained the UN Escrow Account ............... 13

      4. The Programme's end ............................................ 13

   D. This action .................................................................. 13

II. Legal Standard for Motion to Dismiss ................................... 14

III. Justiciability ..................................................................... 15

   A. Article III standing ....................................................... 15

      1. Iraq has standing to recover for an injury to its proprietary interests. ............................................. 16

      2. Iraq has no standing to pursue its quasi-sovereign interests as parens patriae. ....................................... 18

   B. Act of state doctrine ..................................................... 19

   C. Political question doctrine .............................................. 21

IV. The Relationship Between the Current Government of Iraq and the Hussein Regime ........................................................ 23

   A. Sovereigns may be held to account for the wrongful governmental conduct of their governments. ................... 24

   B. Governmental conduct is conduct taken under color of authority. 26

   C. The Complaint alleges that the Hussein Regime's Programme misconduct was governmental. .................... 27

   D. The nature of the Hussein Regime's conduct does not absolve Iraq of responsibility for that conduct. ................ 29

　　　1.　The Complaint does not allege that the Hussein Regime committed acts of personal misconduct as distinct from governmental misconduct.............................................................29

　　　2.　The legitimacy of the Hussein Regime does not determine Iraq's responsibility for the Regime's conduct.........................31

　　　3.　The legality of the Hussein Regime's acts does not determine Iraq's responsibility for the Regime's conduct.........................32

V.　Racketeer Influenced and Corrupt Organizations Act............................34

　A.　Iraq alleges that defendants violated RICO by corrupting the Programme. ...............................................................................34

　B.　Iraq impermissibly attempts to apply the RICO statutes extraterritorially.......................................................................35

　　　1.　RICO claims that focus on an extraterritorial enterprise or concern extraterritorial patterns of racketeering activity are not actionable. ...................................................................35

　　　2.　Iraq's Complaint demonstrates that its claim is extraterritorial. ...............................................................36

　　　3.　Under either test, Iraq calls for an impermissible extraterritorial application of the RICO statute. ......................40

　C.　In pari delicto bars Iraq's RICO claims................................................40

　　　1.　Iraq's allegations bring it within the in pari delicto doctrine.40

　　　2.　Iraq's purported exceptions to in pari delicto do not apply. ..43

　D.　Iraq has failed to allege proximate cause. ...........................................45

VI.　Foreign Corrupt Practices Act....................................................................47

VII.　Common Law Claims ................................................................................47

VIII.　Conclusion..................................................................................................48

SIDNEY H. STEIN, U.S. District Judge.

This action brings to a United States district court a foreign nation's claims concerning the suffering of its people.

The Republic of Iraq has alleged that defendants—numerous business entities that transacted with the Government of Iraq during the rule of Saddam Hussein—conspired with the Hussein Regime to frustrate the United Nation's Oil-for-Food Programme. The conspirators allegedly perverted the Programme into an engine of self-enrichment: the defendants seized tremendous profits and the Hussein Regime solidified its hold on power. All the while, the Iraqi people bore the brunt of the scheme. Their natural resources were plundered and sold at fire-sale prices. Food and medicines the Iraqi people had paid for arrived spoiled, if at all. The international regime designed to protect them utterly failed.

Iraq has attempted to fit this wrongdoing into the mold of a civil action. At its heart, Iraq says, its case amounts to a principal seeking to recover for the harms caused to it by a wayward agent—Saddam Hussein—and his co-conspirators the defendants in this action. Iraq alleges that the defendants have violated the Racketeer Influenced and Corrupt Organizations Act and the Foreign Corrupt Practices Act, and committing numerous torts, including fraud, breach of contract, and aiding and abetting breach of fiduciary duty.

Defendants have now moved to dismiss Iraq's First Amended Complaint ("Complaint") on a variety of theories, almost all of which touch on the relationship of Iraq to the wrongs for which it seeks relief. The parties agree that the injustices alleged were instigated and directed by Hussein and his Regime. But the parties dispute whether the Republic of Iraq must bear responsibility for the acts of the Hussein Regime and, if so, what that responsibility means for this action.

The Court concludes that the Complaint alleges conduct by the Hussein Regime that, as a matter of law, is attributable to plaintiff itself, the Republic of Iraq. The alleged misconduct has a governmental character. Therefore, the conduct comes within the default rule that a regime's governmental conduct redounds to the sovereign. The Court rejects Iraq's view that it may sidestep responsibility because the conduct

was illegal or the actors held power illegitimately. Sovereigns, however, cannot escape the consequences of their representatives' governmental misconduct. Questions of attribution are distinct from questions of lawfulness or legitimacy.

The legal relationship between Iraq and Hussein frames the case, but does not decide it. The issues that do are more commonplace. For example, the core claims of the action—RICO and RICO conspiracy—focus on extraterritorial conduct. And even if those claims were not extraterritorial, they would founder on the defense of in pari delicto or absence of allegations of proximate causation. Having engineered the wrongdoing alleged in the Complaint, and having alleged that the wrongdoing directly harmed the Programme, Iraq cannot recover from that wrongdoing. Further, the only other federal claim, brought under the Foreign Corrupt Practices Act, does not afford private plaintiffs a right of action. Finally, the Court declines to exercise supplemental jurisdiction over the remaining state law claims; they are dismissed as well.

## I. BACKGROUND

The facts below are as set forth in the Complaint and are accepted as true for purposes of this motion.

### A. The Iraqi sanctions

In 1979, Saddam Hussein seized power in Iraq via a military coup. (Compl. ¶ 216.) The administration he put in place, referred to in the Complaint as the "Hussein Regime"[1] (*id.* ¶ 2), wielded absolute control over Iraq and violently suppressed all opposition (*id.* ¶¶ 217-23).

On August 2, 1990, Iraq invaded the neighboring state of Kuwait. (*Id.* ¶ 239.) The United Nations Security Council responded to the invasion by adopting sanctions against Iraq that were designed "to place the Hussein Regime under complete economic isolation." (*Id.* ¶ 243.) Security Council

---

[1]   The government of Iraq during the period of time in which Saddam Hussein was in control will be referred to as the Hussein Regime, the Hussein government, or the Government of Iraq.

Resolution 661 required member states to freeze Iraqi assets and prohibited trade with Iraq. (*Id.* ¶ 242.) Nine days after the invasion, President George H. W. Bush issued an executive order that "align[ed] the sanctions imposed by the United States with Security Council Resolution 661." (*Id.* ¶ 251.) The UN sanctions remained in effect from 1990 until 2003. (*Id.* ¶ 292.)

From the outset, the Security Council sought to "protect the [Iraqi] population from adverse effects of the sanctions policies and from the Hussein Regime itself." (*Id.* ¶¶ 255, 56-64.) The Hussein Regime initially resisted these efforts. It "used the suffering of the innocent as a negotiating tool in an attempt to end the Iraq Sanctions Program." (*Id.* ¶ 265.) The Regime rejected two attempts by the Security Council to authorize the sale of oil in exchange for food and medicine. (*Id.* ¶ 267.) The Hussein Regime eventually shifted course, however, and in 1996 it agreed to participate in the Oil-for-Food Programme that the UN had designed and implemented. (*Id.* ¶ 277.)

### B.   The Oil-for-Food Programme in Design

The UN Oil-for-Food Programme was designed to permit Iraq to sell its oil to third parties, as long as the proceeds were used to purchase food and medical supplies for the Iraqi population. It was an attempt to continue Iraq's economic isolation at the same time as attempting to relieve the suffering of the Iraqi people caused, at least in part, by those sanctions. (*Id.* ¶¶ 274, 296.)

Two documents outlined the core Programme guidelines: UN Security Council Resolution 986 and the Memorandum of Understanding on the Implementation of Security Council Resolution 986 between Iraq and the UN, signed May 20, 1996 ("MOU").

Resolution 986 directly authorized UN member states to import Iraqi oil on condition that the sales be approved by a UN committee created by an earlier regulatory resolution, Resolution 661, and that the purchase price be placed into an escrow account established by the UN Secretary-General. (UN SCOR Res. 986 ¶¶ 1, 6 (adopted Apr. 14, 1995), Ex. 3 to Decl. of Brant W. Bishop dated Jan. 15, 2010.) The Security Council directed the

6

Resolution 661 Committee to verify that the oil sold for a price "reasonable in light of prevailing market conditions." (UN SCOR Res. 986 ¶ 6.) Resolution 986 further provided for escrowed monies to be spent, at "the request of the Government of Iraq," on "medicine, health supplies, foodstuffs," and other materials, such as those "for essential civilian needs." (UN SCOR Res. 986 ¶ 8(a).) The resolution required that Iraq submit to the Secretary-General a plan of distribution and that the Secretary-General receive confirmation that the humanitarian goods arrived in Iraq. (*Id.*)

The MOU, which was signed by a representative of the United Nations and a representative of the Government of Iraq, articulated the Secretary-General's role in negotiating the terms of an escrow account with a "major international bank" (MOU ¶ 12), elaborated the mechanics of exporting oil from Iraq using the pipeline from Kirkuk, Iraq to Yumurtalik, Turkey as well as the Mina al-Bakr oil terminal (MOU ¶ 16), created a mechanism for Iraq to request letters of credit be given to its vendors (MOU ¶ 24), and established a process for observing the distribution of humanitarian aid (MOU ¶¶ 34-36).

### 1. *The UN escrow account*

The Programme "required that *all* financial transactions related to the Programme pass through an [escrow] account established by the UN" (Compl. ¶ 284) to "be used to meet the humanitarian needs of the Iraqi population." (UN SCOR Res. 986 ¶ 8.)

The United Nations created, "controlled[,] and monitored" the escrow account at a New York branch of BNP Paribas, a major international bank. (Compl. ¶¶ 285-87, 975.) BNP and the UN executed an "Agreement for Banking Services" on September 12, 1996. (*Id.* ¶ 976.) BNP promised "not to take any instructions from any person in or acting on behalf of the Government of Iraq, or representing persons or entities in Iraq." (*Id.* ¶ 990 (quotation marks omitted).) In its role as escrow bank, BNP also "confirm[ed] letters of credit issued by banks retained by buyers of oil" and "issu[ed] letters of credit for the purchase of humanitarian goods." (*Id.* ¶¶ 979-81.)

### 2. *Oil sales*

Companies seeking to buy Iraqi oil under the Programme had to enter into a contract directly with the Iraqi State Oil Marketing Organization ("SOMO"). (Compl. ¶ 323.) The standard contract provided that the sale terms were subject to UN approval and relevant Security Council resolutions. (*Id.* ¶ 324.) It also provided that any assignment of rights under the contract was subject to UN approval. (*Id.*) The sale price, known as the Official Selling Price ("OSP") was determined by a UN committee based on available market data and on what participating purchasers were willing to pay. (*Id.* ¶ 321.)

The contracts required the purchasers to deposit the full amount of each purchase into the escrow account. (*Id.* ¶ 325.) To effectuate this, oil purchasers would provide a letter of credit "in favor of the UN Escrow Account" in the amount of the entire purchase price under the contract. (*Id.* ¶ 326.)

### 3. *Goods purchases*

Pursuant to the Memorandum of Understanding, the Government of Iraq retained the right to choose the parties from which it would purchase goods. (MOU ¶ 22; Compl. ¶ 522.)

Companies wishing to sell goods to Iraq under the Programme negotiated contracts directly with the appropriate Iraqi ministry or state-owned enterprise. (*Id.* ¶ 329; MOU ¶ 22.) These contracts required UN approval and conformance with the Programme's regulations. (Compl. ¶¶ 331, 333.)

After the Programme administrators approved a contract, BNP, at the UN's direction, would execute a letter of credit in favor of the supplier of the goods. (*Id.* ¶ 337.) Once the UN verified the goods' arrival in Iraq, it would inform BNP of that fact, and BNP in turn would wire payment from the escrow account to the supplier of the goods. (*Id.* ¶ 338.)

## C. The Oil-for-Food Programme in practice

The Complaint alleges that the Hussein Regime was hostile to the Oil-for-Food Programme because it considered the Programme to be

"economic occupation" (Compl. ¶ 302) as well as a political threat, since it "reduc[ed] the suffering of the Iraqi people," thereby "reduc[ing] the political pressure to remove the Iraq Sanctions Program." (*Id.* ¶ 300.)

With the active assistance of defendants, the Government of Iraq used the Programme to generate hundreds of millions of dollars of cash for itself from both its sales of oil as well as its purchases of food and medicine. The alleged fraud was both intricate and simple: the Hussein Regime priced its oil below the market price in order to facilitate kickback payments from buyers, and it overpaid for food and medicine in order to facilitate side payments to it from sellers in the form of surcharges.[2] The three groups of defendants in this action are alleged to be active participants in Hussein's scheme: (1) The entities that purchased, directly or indirectly, Iraqi crude oil; (2) the vendors that sold humanitarian goods and supplies to Iraq through the Programme; and (3) the BNP entities that administered the UN escrow account. Together, according to the Complaint, the Regime and defendants corrupted the sale of oil, the purchase of goods, and the administration of the UN escrow account.

### 1.   *Oil sales*

By pricing its oil below market value, the Hussein Regime created a differential between the market price and the price it received for the oil. This differential constituted extra profit to the purchasers and was used by Hussein to reward its political allies and to negotiate kickbacks from the oil purchasers to the Regime. Simplicity itself.

---

[2]   The intricacies of the Hussein Regime's efforts are catalogued in the UN post-mortem, entitled Manipulation of the Oil-for-Food Programme by the Iraqi Regime, reported by the UN Independent Inquiry Committee into the United Nations Oil-for-Food Programme on October 27, 2005 ("IIC Report"). (Ex. 7 to Bishop Decl.) Many of the Complaint's allegations come directly from the IIC report; the Court therefore deems the IIC Report integral to the Complaint and considers it on this motion to dismiss. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *Pechinski v. Astoria Fed. Sav. & Loan Ass'n,* 238 F. Supp. 2d 640, 642 (S.D.N.Y. 2003).

### a. *Oil vouchers as political influence*

From the Programme's earliest stages the Hussein Regime allocated Iraqi oil to entities viewed as friendly to the regime and that opposed the sanctions in order to curry and solidify political support. (Compl. ¶ 356-57.) Iraq sold this oil below market price in order to ensure that its allies made an easy profit. (*Id.* ¶ 358.) As a result, "the primary decision-making criteria for allocating vouchers to purchase oil was to gain favor" rather than "to secure the best price to increase the amount of humanitarian aid to the Iraq people." (*Id.* ¶ 357.)

In addition, according to the Complaint, the recipients of Iraqi oil allocations did not have the "financial or business wherewithal" to engage in major crude oil purchases. (*Id.* ¶ 359.) The oil-purchasing defendants and BNP ameliorated that deficit by financing and coordinating the transactions. (*Id.*) Iraq would allocate oil to a particular individual or entity at a below-market contract price unwittingly approved by the UN. That individual or entity, however, was only an intermediary. The ultimate purchaser of the oil would be one of the oil-purchasing defendants. They would pay the intermediary a price greater than that provided for in the intermediary's contract of sale with Iraq. (*Id.* ¶¶ 1017, 1022, 1024.)

For example, Chevron allegedly purchased 78 million barrels of Iraqi crude through intermediaries. (*Id.* ¶ 421.) One of those intermediates was Bulf Drilling and Oil Services, which had been awarded an Iraqi oil allocation in May 2001. (*Id.* ¶ 1029.) Bulf agreed to let Chevron purchase the oil from it, and Chevron agreed to finance Bulf's purchase from Iraq. (*Id.* ¶¶ 1030-31.) To prevent the UN from discovering Chevron's role in the transaction, Chevron and BNP had letters of credit issued for the purchase of Iraqi oil on behalf of Bulf. (*Id.* ¶¶ 1033-34.) In reality, though, those letters of credit were backed by Chevron. (*Id.* ¶ 1034.)

### b. *Surcharges on oil sales*

A few years into the Programme, the Hussein Regime decided to generate income on oil sales outside of the proper channels. To do so, "the Hussein Regime simply demanded that anyone who wanted to purchase oil under the Programme make payments (surcharges) to bank accounts

owned or controlled by the Hussein Regime." (Compl. ¶ 363.) The amount of the surcharges varied over the life of the Programme, ranging from 10 cents to 50 cents per barrel of oil. (*Id.* ¶ 364.)

In the Chevron example, Chevron would pay its intermediaries a premium above the official selling price. (*Id.* ¶ 422.) In turn, the intermediaries would pay a portion of those premiums as surcharges to the Hussein Regime. (*Id.* ¶¶ 422-23.) In this way, Chevron paid out approximately $20 million in indirect surcharge payments in connection with its oil purchases. (*Id.* ¶ 423.)

Defendants made surcharge payments to Hussein Regime-controlled bank accounts in Jordan and Syria. (*Id.* ¶ 473.) In some instances, the surcharges were transferred to accounts of the Central Bank of Iraq, from which Central Bank employees made cash withdrawals and physically transported the cash to Iraq. (*Id.* ¶ 474.) The Hussein Regime ultimately received a total of $228.8 million in oil surcharges. (*Id.* ¶ 1101.)

### 2. *Purchases from vendor-defendants*

As it did for the sale of oil, the Hussein Regime manipulated the prices of the goods it purchased through the Programme. It agreed to overpay for goods in order to create a differential between the market price of a good and the amount of Programme funds expended on the good. The Regime used this differential to obtain unauthorized side-payments from the vendor-defendants.

#### a. *Inland transportation fees*

The Hussein Regime demanded that companies selling goods within the Programme pay a transportation fee on all shipments of humanitarian goods to Iraq. (Compl. ¶ 526.) The Hussein Regime formalized its demand in a June 1999 directive to its ministries. The Regime's Economic and Affairs Committee assigned the fees and the Ministry of Transportation oversaw their collection. (*Id.* ¶ 527.)

The vendors of humanitarian supplies financed the transportation fees by surreptitiously charging them to Iraq's Programme account: vendors negotiated a delivery contract with the Hussein Regime; the Hussein

Regime set a transportation fee; and the vendors and the Hussein Regime consummated a finalized contract that accommodated the transportation fee in the official purchase price. (*Id.* ¶¶ 531, 533-34.) The Hussein Regime generally required vendors to pay the transportation fees directly to it—thus avoiding the UN-controlled escrow account—by demanding the fee before submitting a delivery contract to the UN. (*Id.* ¶¶ 528, 535.) Vendors accomplished this by raising the contract price they had previously negotiated with the Hussein Regime by the value of the fee and submitting to the UN a contract reflecting the above-market price.

    *b. After-sales-service-fees*

 The Hussein Regime directed "Iraqi ministries and agencies" (Compl. ¶ 562) to collect additional kickbacks from vendors in the form of an "after-sales-service-fee" (*id.* ¶ 557). As with the transportation fee, the service fee represented money funneled to Iraq by vendors hidden within inflated contract prices. (*Id.* ¶ 573.) The surcharge ranged from 2% to 30%, though "most contracts carried a 10% surcharge." (*Id.* ¶¶ 561-63.)

 The service fees were "paid directly to the Hussein Regime." (*Id.* ¶ 571.) Vendors paid the surcharge in cash, by transfer to "Regime-controlled accounts," or by payments to "front companies controlled by individuals or companies loyal to the Hussein Regime." (*Id.* ¶ 565.) "Generally, accumulated payments were transferred to Iraq in cash, usually by diplomatic pouch." (*Id.*) An internal government memorandum mandated that all funds collected from the surcharge scheme be transferred to the "general treasury." (*Id.* ¶ 568.)

    *c. Consequences*

 As a result of these fees, over the course of the Programme Iraq substantially overpaid for the goods it received relative to their market price. (Compl. ¶¶ 650-651, 653.) "[B]y the Programme's end, prices were more than double the expected norms." (*Id.* ¶ 652.) The Republic of Iraq estimates that "the Iraqi people lost more than $7 billion worth of humanitarian goods to overpricing." (*Id.* ¶ 655.) Additionally, the vendors shipped Iraq "substandard" goods, including substandard "wheat, medicine, animal feed, chemicals, and vehicles." (*Id.* ¶¶ 641-43.)

### 3.   BNP maintained the UN escrow account

Although the banking agreement prohibited BNP from contravening Programme rules, BNP is alleged to have done so. "BNP knew misleading disclosures were being made to the UN" in order to obtain approval for certain transactions and did not warn the UN (*id*. ¶ 1037), but instead, "in at least 403 instances BNP made payments from the UN Escrow Account to entities other than the named beneficiaries" of the letters of credit. (*Id*. ¶ 1038.) It "agreed with many of its customers to hide the fact that they were financing the purchase of oil . . . by others." (*Id*. ¶ 1022.) BNP's misconduct was motivated by the "financial opportunities from issuing letters of credit to oil purchasers," specifically that it made money by issuing letters of credit and misused its letters of credit authority "to solidify business relationships with the oil purchasers." (*Id*. ¶ 1014.)

### 4.   The Programme's end

Resolution 661 remained in effect until the spring of 2003. UN SCOR Res. 1483 ¶ 10 (May 22, 2003). The Programme—and the alleged conspiracy to undermine and circumvent it—ended when the United States and its allies invaded Iraq and ousted the Hussein Regime by force. (Compl. ¶ 1077.)

### D.   This action

Iraq commenced this action by filing a complaint in the Southern District of New York on June 27, 2008. (Dkt. No. 1.) It filed its First Amended Complaint on July 31, 2009. (Dkt. No. 112.) Iraq channels its charges into nine claims:[3]

1)   The Racketeer Influenced and Corrupt Organization Act ("RICO"), § 1962(c)

2)   RICO § 1962(d)

3)   Foreign Corrupt Practices Act

---

[3]   The Republic of Iraq withdrew its tenth claim, brought pursuant to the Robinson Patman Act § 2(c), 15 U.S.C. § 13. (Dkt. No. 519; Tr. of Oct. 26, 2012 Hr'g on Motion to Dismiss ("Hr'g Tr.") at 4.)

4)  Fraud

5)  Civil Conspiracy

6)  Breach of Fiduciary Duty

7)  Inducement of Breach of Fiduciary Duty

8)  Breach of Contract

9)  Unjust Enrichment

Defendants subsequently moved to dismiss the Amended Complaint on the basis of standing; act of state doctrine; political question doctrine; statute of limitations; in pari delicto; as well as on the merits of each claim. BNP filed a supplemental motion identifying defenses unique to it.

While the motion to dismiss was pending, Iraq moved to compel arbitration against the BNP Paribas affiliates (Dkt. No. 396) and BNP Paribas moved to enjoin any arbitration. (Dkt. No. 413.) This Court denied Iraq's motion to compel arbitration and granted BNP Paribas's motion to enjoin arbitration. *The Republic of Iraq v. ABB AG, et al.*, 769 F. Supp. 2d 605 (S.D.N.Y. 2011). Iraq appealed and the U.S. Court of Appeals for the Second Circuit affirmed this Court's Order on April 30, 2012. *The Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11 (2d Cir. 2012).

## II.  LEGAL STANDARD FOR MOTION TO DISMISS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011). A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 376 (S.D.N.Y. 2011). A complaint demonstrates "facial plausibility" when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

## III. JUSTICIABILITY

Defendants urge the Court to dismiss this action as non-justiciable on the grounds that (1) Iraq lacks standing to seek relief; (2) the act of state doctrine bars adjudication; and (3) the issues are political questions beyond the Court's competence. The Court disagrees. Although Iraq does not have standing to proceed parens patriae, it has alleged an injury to its proprietary interests. And Iraq's claims present legal questions, particularly about attribution, causation, and territoriality, that are neither political nor inappropriate to consider under the act of state doctrine.

### A. Article III standing

Defendants contend that Iraq lacks standing to seek relief. The Court must determine standing at the outset because it is a "threshold question." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). Because "standing is challenged on the basis of the pleadings," the Court "'accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 114 (2d Cir. 2002) (citations and quotation marks omitted). "It bears emphasis that under federal pleading rules, complaints need not be elaborate, and in this respect injury (and thus standing) is no different from any other matter that may be alleged generally." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) (alterations and quotation marks omitted).

"Article III of the Constitution limits the jurisdiction of federal courts to the resolution of 'cases' and 'controversies.'" *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (quoting U.S. Const. art. III, § 2). "In order to ensure that this bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their standing as the proper parties to bring suit." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009) (alterations and quotation marks omitted). The burden is on Iraq as the party invoking federal jurisdiction, to satisfy the three elements of Article III standing, which are as follows:

(1) injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) causation in the form of a 'fairly

traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief.

*Id.* (emphasis omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). If a plaintiff lacks Article III standing, a court has no subject matter jurisdiction to hear its claims. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

In the context of the U.S. federal system, the U.S. Supreme Court has broadly grouped the interests that might support a sovereign's standing into four classes. First, a state may seek to invoke "the power to create and enforce a legal code" or to demand recognition from other sovereigns. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Second, a state is also "bound to have a variety of proprietary interests" that it can protect in the manner of a private litigant. *Id.* Third, a state may "attempt to pursue the interests of a private party" on behalf of that private party. *Id.* at 602; *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). Fourth, and finally, a state may pursue "quasi-sovereign" interests that "consist of a set of interests that the State has in the well-being of its populace." *Alfred L. Snapp*, 458 U.S. at 602.

Iraq invokes the second and fourth interests. It "brings this action in its own right" to redress injury to its proprietary interests. (Compl. ¶ 17.) Iraq also brings this action "parens patriae, for the benefit of the Iraqi people" to redress injury to its quasi-sovereign interests. (*Id.*)

### 1. *Iraq has standing to recover for an injury to its proprietary interests.*

Iraq alleges that defendants harmed its proprietary interests in the Programme account by directing bribes and kickbacks to the Hussein Regime (Compl. ¶¶ 1101-05) and by taking "undue profits" from oil sales in exchange for facilitating the Hussein Regime's schemes (*Id.* ¶¶ 1107-08). Iraq also alleges that defendants "directly deprived the Iraqi people of about $10 billion in essential food, medicine, and other humanitarian goods" through the surcharge-bribe scheme. (*Id.* ¶¶ 1111, 1114.)

Defendants compounded the damage by delivering Iraq substandard or overpriced goods. (*Id*. ¶ 1112.)

Iraq had a proprietary interest in the UN escrow account funds. The account was funded "with the proceeds of the sale of Iraqi petroleum and petroleum products." (MOU ¶ 5.) With narrow exception, those funds could be spent only at Iraq's request. (MOU ¶ 22.) And Iraq ultimately received the balance of the UN escrow account. (UN SCOR Res. 1483 ¶ 17; Hr'g Tr. at 45.)

Wrongful depletion of the UN escrow account could cause both particular and personal harm to Iraq. As compared to individual Iraqi citizens, the Republic of Iraq had a concrete, if not exclusive, interest in the funds contained within the UN escrow account. This distinguishes the Republic of Iraq's interest in the account from the interests of the Kurdish Iraqis who sued for relief in *Karim v. AWB Ltd.*, No. 06 Civ. 15400, 2008 WL 4450265, at *4 (S.D.N.Y. Sept. 30, 2008), *aff'd* 347 F. App'x 714, 715-16 (2d Cir. 2009). The Court cannot say that an injury to the UN escrow account would harm Iraq "in some indefinite way in common" with others, as was the circumstance for the plaintiffs in *Karim*. *See* 2008 WL 4450265, at *4. To the contrary, wrongful depletion of the UN escrow account diminished the value of an account held in Iraq's name and for its proprietary benefit. Therefore, an invasion of the UN escrow account supports standing. *See Alfred L. Snapp*, 458 U.S. at 601-02.

Defendant's separate challenge to the causal component of standing reaches into the merits of Iraq's claims. Iraq has alleged that defendants' fraudulent conduct contributed to the diminution of its Programme account. Defendants caused this harm, for standing purposes, by convincing Iraq to sign contracts containing abusive prices and by having a "determinative or coercive effect" on the UN, which approved them. *See Bennett v. Spear*, 520 U.S. 154, 169 (1997); *Carver v. City of N.Y.*, 621 F.3d 221, 226 (2d Cir. 2010). Thus, Iraq's injury may be fairly traced to defendants within the meaning of Article III. True, defendants' dissection of the causal chain—for example, noting its complexity and the Hussein Regime's prominent role in the sequence—threatens Iraq's ability to recover. But

defendants' attack amounts to an analysis of the merits. *See Carver*, 621 F.3d at 226.

The Court need not consider Iraq's other alleged proprietary injuries for the purpose of Constitutional standing. The injury to the UN escrow account supports each claim alleged by Iraq.

> ### 2. *Iraq has no standing to pursue its quasi-sovereign interests as parens patriae.*

The Republic of Iraq also seeks redress for harms to its quasi-sovereign interests as parens patriae of the Iraqi people. While not a separate cause of action, this theory of recovery rests on injury distinct from that incurred by Iraq's proprietary interests. Specifically, Iraq alleges that "defendants forced the Iraqi people to fund the payments of bribes designed to extend the reign of the tyrannical Regime that subjected them." (Compl. ¶ 1119.) Further, defendants, who "siphoned off" Programme funds, contributed to "shortages of food and medicine" that exacerbated the suffering of the Iraqi people. (*Id.* ¶¶ 1127, 1130.) Lastly, defendants' conduct "eviscerated the effectiveness of the Iraq Sanctions Program and allowed the Hussein Regime to stay in power until Hussein was ousted by military action." (*Id.* ¶ 1132.)

The U.S. Supreme Court has recognized that "a [U.S.] State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp*, 458 U.S. at 607-08; *see generally Purdue Pharma L.P. v. Kentucky*, --- F.3d ---, 2013 WL 85918, *4 (2d Cir. Jan. 9, 2013) (discussing various interests of a U.S. state that can be pursued parens patriae). On this basis, the Supreme Court has endorsed parens patriae standing for states of the Union and for Puerto Rico. *Id.* at 607. But "[t]here is no direct precedent allowing for [foreign states to sue as parens patriae] and the federalism concerns that animate recognition of parens patriae status in the States are simply absent." *Estados Unidos Mexicanos v. Decoster*, 229 F.3d 332, 341 (1st Cir. 2000). Indeed, the U.S. Supreme Court has never recognized a foreign sovereign's standing solely on parens patriae grounds. *Id.* at 336.

Iraq responds that "in appropriate cases" foreign nations may proceed as parens patriae. (Iraq's Opp. 24.) Iraq rests on *DeCoster*, in which the U.S. Court of Appeals for the First Circuit rejected Mexico's efforts to gain parens patriae standing: "parens patriae standing should not be recognized in a foreign nation unless there is a clear indication of intent to grant such standing expressed by the Supreme Court or by the two coordinate branches of government." 229 F.3d at 336. Iraq seizes on that court's use of the word "unless." But whether or not parens patriae would be appropriate after executive or legislative action, this case features no such "clear indication of intent." Therefore, the Court declines to allow the Republic of Iraq to proceed parens patriae.

Anticipating this outcome, Iraq urges the Court to delay reaching this issue, asserting that U.S. State Department representatives have not responded to plaintiff's counsel's request to comment on the parens patriae issue and have told Iraq's counsel that "as a matter of internal policy" the U.S. State Department does not make a Statement of Interest "this early in any litigation." (Decl. of Mark Maney dated April 30, 2010 at 1.) Accordingly, Iraq contends that it is "also too early for this Court to decide there is a conflict under the *DeCoster* rule." (Iraq's Opp. 25.) Of course, the State Department's silence most certainly does not amount to "a clear indication of intent to grant [parens patriae] standing," and the Court will not delay its assessment of standing on the chance that the Executive branch at some point in the future takes a position and that position favors Iraq. *Decoster*, 229 F.3d at 336.

Because the Court has concluded that the Republic of Iraq does not have parens patriae standing, it may not pursue claims in this action for harms to its quasi-sovereign interests or general harm inflicted on the people of Iraq.

### B.   Act of state doctrine

Defendants next contend that the act of state doctrine bars this Court from considering Iraq's claims. The act of state doctrine traditionally precludes courts of the United States from examining the validity of public acts committed by a foreign sovereign government within its own territory. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964);

*Konowaloff v. Metropolitan Museum of Art*, 702 F.3d 140, 145-46 (2d Cir. 2012). "Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *W.S. Kirkpatrick v. Envtl. Tectonics*, 493 U.S. 400, 406 (1990) (emphasis original). As a result, in every case in which the U.S. Supreme Court has applied the doctrine, "the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *Id.* at 405.

Whether or not the issues in this case come within the act of state doctrine, the policy reasons for the doctrine counsel against its application here. The doctrine serves domestic separation of powers by restraining the judiciary from interfering with the Executive Branch's conduct of foreign affairs. *Konowaloff*, 702 F.3d at 145-46. Accordingly, "its proper application requires a balancing of interests" and it "should not be invoked if the policies underlying the doctrine do not justify its application." *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 452 (2d Cir. 2000) (citations omitted).

The policies justifying the act of state doctrine do not favor its application here. In this action, the current government of Iraq itself has sought out United States courts. The acts at the center of this dispute occurred under a prior government led by a now-deposed ruler. And, to the extent that any party has called into question the validity of the prior government's acts, it is the current government of Iraq that has done so. These factors all tilt against the doctrine's application. *See Bigio*, 239 F.3d at 452-53; *Republic of Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir. 1986). Indeed, the circumstances here resemble those in *Bigio*. There the Second Circuit declined to invoke the act of state doctrine and instead reviewed certain acts taken by a prior government of Egypt, now "long gone," when the current government had "repudiated the acts in question." 239 F.3d at 453. Those same features distinguish this case from *Konowaloff*, where the contemporary Russian government had not renounced a predecessor's acts. 702 F.3d at 147. Because the Republic of Iraq attempts to repudiate the acts of the Hussein Regime, the Court finds no basis to invoke the act of state doctrine.

### C.   Political question doctrine

Defendants' next challenge to justiciability rests on the political question doctrine. "In general, the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (quotation marks omitted). The political question doctrine excepts from this rule certain cases that transgress the separation of powers and fall beyond the court's competence:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). When a case turns on the answer to a political question, a "court lacks the authority to decide the dispute before it." *Zivotofsky*, 132 S. Ct. at 1427.

Defendants contend that Iraq's claims present a non-justiciable political question because the Complaint "calls into question the former Iraqi government's legitimacy." (Defs.' Reply Mem. in Support of Motion to Dismiss ("Defs.' Reply") at 25.) True, the Complaint alleges that the Hussein Regime "was not a de jure or legitimate government." (Compl. ¶ 220.) And the conduct of foreign affairs—including whether to recognize diplomatically a foreign government—rests with the Executive. *See* U.S. Const. art. II, §§ 2, 3; *United States v. Pink*, 315 U.S. 203, 229 (1942). But "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211.

This action does not require the Court to decide questions that have been deemed political. For example, the Court does not need to decide whether or not to recognize the Republic of Iraq as a sovereign state. *See Can v. United States*, 14 F.3d 160, 162-63 (2d Cir. 1994) ("[O]fficial recognition of a foreign sovereign is solely for the President to determine . . . .") Indeed, the Executive already has recognized the Republic of Iraq. Nor is the Court called to apportion property rights in the aftermath of state succession. *Cf. 767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia*, 218 F. 3d 152, 160-61 (2d Cir. 2000) ("[T]he federal courts do not have the authority or the means to determine the equitable distribution of the public debt of a foreign state among several successor states.") The Republic of Iraq is not a successor state. Most of the issues here—causation, territoriality, private rights of action—fall squarely within the Court's competence but happen to involve international and political actors.

Analyzing whether the Hussein Regime's acts may be attributed to Iraq does not raise political questions, either. First, accepting that the Hussein Regime governed Iraq during the Programme period raises no political question because the Complaint alleges that the Hussein Regime controlled Iraq (Compl. ¶¶ 216, 219; *see also* Hr'g Tr. 17 ("We agree his regime was the president of Iraq, the government of Iraq, the agent of Iraq.")) and defendants do not dispute that fact. (*E.g.*, Defs.' Mem. 12; Defs.' Reply 25-26.) Moreover, the U.S. Government treated the Hussein Regime as the effective government during the relevant time period. A U.S. law, the Iraqi Liberation Act of 1998, stated that "[i]t should be the policy of the United States to support efforts to remove the regime headed by Saddam Hussein from power in Iraq and to promote the emergence of a democratic government to replace that regime." Pub. L. No. 105-338 § 3, 112 Stat. 3178. The United Nations also treated the Hussein Regime as the effective Iraqi government. *See* UN SCOR Res. 661 & 986 (referring to the Hussein Regime as the "Government of Iraq.") Thus, the Court confronts no controversy—political or otherwise—regarding which government controlled Iraq during the Programme.

Second, analyzing whether or not a former government's conduct can be attributed to its sovereign is a legal question. It turns on the manageable

principles discussed below, and is necessarily decided in some form in any case applying the Foreign Sovereign Immunities Act ("FSIA") or the act of state doctrine, and many that do not. *See, e.g.*, *Konowaloff*, 702 F.3d at 147 (recognizing government's seizure of painting as act of state); *Marcos*, 806 F.2d at 358-59 (discussing acts of governmental character). The predicate question to FSIA and the act of state doctrine—whether conduct can be attributed to a government—cannot sensibly be labeled non-justiciable.

* * *

The Court concludes that this action is justiciable. Although Iraq has not demonstrated that it should be allowed to proceed parens patriae, Iraq has alleged an injury to its proprietary interest in the UN escrow account. Additionally, whether or not an act of state issue must be decided in this case, the policy rationale underlying the act of state doctrine does not support applying the doctrine to this suit. Additionally, the central questions of this case are not political. Rather, they are legal questions that involve political actors.

## IV. THE RELATIONSHIP BETWEEN THE CURRENT GOVERNMENT OF IRAQ AND THE HUSSEIN REGIME

The legal relationship between the sovereign Republic of Iraq, the Hussein Regime, and the Iraqi people frames this litigation. That relationship rests on time-tested principles:

- The change in governments—from the Hussein Regime; to the Coalition Provisional Authority that governed subsequent to the fall of Saddam Hussein; to the contemporary Republic—did not create an entirely new state. Rather, those changes altered the leadership and government of a continuously existing state. Therefore, the Republic of Iraq is the same sovereign entity as the one controlled by the Hussein Regime. (Iraq's Mem. in Opposition to Motion to Dismiss ("Iraq's Opp.") at 9; *see* Defs.' Mem. in Support of Motion to Dismiss ("Defs.' Mem.") at 12 (same).)

- "[T]he rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it." *Guar. Trust Co. v. United States*, 304 U.S. 126, 137 (1938). That is, Hussein, the Hussein Regime, and the Republic of Iraq are not one

and the same; they are different governments over time that represent the same sovereign state. (Iraq's Opp. 9; Defs.' Mem. 12-13.)

- Notwithstanding the distinction between a state and its government, a government may bind the sovereign it represents. *See, e.g., The Sapphire*, 78 U.S. (11 Wall) 164, 168 (1870); *Lehigh Valley R.R. Co. v. Russia*, 21 F.2d 396, 401 (2d Cir. 1927).

These lines of agreement encircle the root conflict of this motion to dismiss: whether, as a matter of law, the Republic of Iraq bears responsibility in this action for the Hussein Regime's corruption of the Programme. This Court concludes that it does.

### A. Sovereigns may be held to account for the wrongful governmental conduct of their governments.

Because sovereigns operate through their governments, both domestic and international law ordinarily impute to a sovereign the acts of its government. For example, governments set policy, hold property, and conduct foreign affairs. The consequences of these governmental acts trace back to the sovereign. *E.g., The Sapphire*, 78 U.S. (11 Wall) at 167; *Guar. Trust Co.*, 304 U.S. at 137; *Lehigh Valley*, 21 F.2d at 401. So do wrongful acts by those governments. "A state is responsible for any violation of its obligations under international law resulting from action or inaction by [] the government of the state . . . ." Restatement (Third) of Foreign Relations Law of the United States § 207 (1987); *accord* Articles of Responsibility for States for Internationally Wrongful Acts, art. 4 § 1, annexed to UN GAOR Res. 56/83 (2001), *available at* http://www.un.org/law/ilc ("The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.").

Moreover, the consequences of one government's acts may redound to the sovereign even after that government has been replaced.

> Changes in the government or the internal policy of a state do not as a rule affect its position in international law. A monarchy may be transformed into a republic, or a republic into a monarchy; absolute principles may be substituted for constitutional, or the reverse; but, though the government changes, the nation remains, with rights and obligations unimpaired.

*Lehigh Valley*, 21 F.2d at 401 (quoting 1 Moore's Digest of Int'l Law 249). Thus, a change in government will not ordinarily relieve a sovereign of responsibility for its former government's acts.[4]

Of course, it is possible for the persons who comprise the government to act without acting as the government. How to identify that circumstance divides the parties to this litigation. The Court follows the rule that a sovereign may be held to account for the *governmental* conduct of the persons serving as its government.

This rule is not new. Sovereigns usually have immunity in U.S. courts for "sovereign" or "public" conduct, as opposed to "commercial" or "private" conduct. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993); *Themis Capital, LLC v. Democratic Republic of Congo*, --- F. Supp. 2d ---, No. 09 Civ. 1652, 2012 WL 3114732, at *14 (S.D.N.Y. July 26, 2012) (reviewing FSIA consequences for public and private acts of governmental agents). Similarly, "public" acts of a government, as distinguished from "private" acts, trace to a sovereign and may justify the application of the act of state doctrine. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 703-706 (1976). Additionally, when determining whether an Alien Tort

---

[4]   *See, e.g., Guar. Trust Co.*, 304 U.S. at 137 (Soviet Russia's claim time-barred notwithstanding Imperial Russia's failure to act); *The Sapphire*, 78 U.S. (11 Wall) at 167 (concluding that France maintained rights and obligations concerning a maritime lawsuit filed by its former government); *Socialist Republic of Romania v. Wildenstein & Co.*, 147 F.R.D. 62, 65 (S.D.N.Y. 1993) (prior government's default binding on successor); *Trans-Orient Marine Corp. v. Star Trading Marine, Inc.*, 731 F. Supp. 619, 622-23 (S.D.N.Y. 1990), *aff'd in pertinent part*, 925 F.2d 566 (2d Cir. 1991) (Republic of Sudan liable for former government's contractual obligations); *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 633 (1983) ("Cuba cannot escape liability for acts in violation of international law simply by retransferring the assets to separate juridical entities.").

Claims Act defendant has engaged in state action, a relevant guide is whether he or she acted under "color of law" in the foreign state. *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995). These categories of cases rest implicitly on the idea that *governmental* conduct is attributed to the sovereign.

## B. Governmental conduct is conduct taken under color of authority.

The U.S. Court of Appeals for the Second Circuit has held that a "governmental act" is an act "physically taken by persons capable of exercising the sovereign authority of the foreign nation," as long as the persons "purported to act in their official capacity." *Banco de Espana v. Fed. Reserve Bank of N.Y.*, 114 F.2d 438, 444 (2d Cir. 1940). That understanding comports with the International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts. Those Articles state that when "a person acts in an apparently official capacity, or under colour of authority, the actions in question will be attributable to the State." Articles on Responsibility, art. 4 cmt. 13. Similarly, the Restatement (Third) of Foreign Relations Law of the United States has identified several indicia of attribution:

> In determining whether an act was within the authority of an official or an official body, or was done under color of such authority . . . , one must consider all of the circumstances, including whether the affected parties reasonably considered the action to be official, whether the action was for public purpose or for private gain, and whether the persons acting wore official uniforms or used official equipment.

Restatement (Third) of Foreign Relations Law § 207 cmt. d (1987).

In the context of an ambassador whose actions injured his or her government, the Second Circuit has concluded that an ambassador binds his or her government when he or she possesses the actual or apparent authority to do so. *First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 192-94 (2d Cir. 1989) (distinguishing the Restatement (Third) of U.S. Foreign Relations Law). In the context of FSIA, however, courts have interpreted that rule to permit apparent authority to

bind a sovereign engaged in private conduct but to demand actual authority to bind a sovereign engaged in public conduct. *See Themis* Capital, 2012 WL 3114732, at *13 (reviewing authorities).

Neither the *First Fidelity* rule nor its permutations ought to obtain here. Unlike the Hussein Regime, the ambassador in *First Fidelity* was but one person in a larger government. By contrast, there is no entity to answer for Iraq but its government, which necessarily has certain inherent authority to conduct Iraq's affairs. *Cf. First Fid. Bank*, 877 F.2d at 198 (discussing ambassador's inherent agency power in dissent). If a government is alleged to act pursuant to its official duties or for an official purpose, those acts should be attributed to the sovereign.

Accordingly, the Court decides that the Hussein Regime's conduct was "governmental" if it was undertaken in the purported or apparent execution of official duties.

### C.   The Complaint alleges that the Hussein Regime's Programme misconduct was governmental.

The Complaint alleges conduct by the Hussein Regime done under the color of its authority as the government of Iraq. Therefore, the Programme conduct of the Hussein Regime should be attributed to Iraq for the purposes of this action.

First, the Complaint alleges that the Hussein Regime's "main goal" was to "undermine UN sanctions and the US law prohibiting transactions with State Sponsors of Terrorism." (Compl. ¶ 7.) Hussein declared the Iraq Sanctions Program to be a form of "economic occupation" implemented by the "enemy." (*Id*. ¶ 302.) Thus, the alleged misconduct represents choices made by the Regime in the conduct of its foreign affairs. *See* IIC Rep. 9 ("Two overriding factors determined Iraq's choice of oil recipients. The first factor was influencing foreign policy and international public opinion in favor of ending sanctions against Iraq. Later . . . Iraq sought to generate illicit income outside of the United Nation's oversight.").

Second, the Complaint alleges that the Hussein Regime implemented its scheme by using its powers to engage with the UN. The Hussein Regime made the corruption possible, not just because it was in a position

to corrupt the Programme, but because it agreed to the creation of the Programme in the first place: it did so in its capacity as the Government of Iraq. (*See* MOU § 10 (signature of Abdul Amir Al-Anbari "for Government of Iraq").) Additionally, the Complaint alleges that the Hussein Regime (and defendants) effectuated their scheme by submitting false contracts to the UN. The Hussein Regime could negotiate those contracts only by virtue of its status as the effective government of Iraq. Thus, the Regime engaged in international transactions of an official character.

Third, the Complaint alleges that the Hussein Regime acted through government offices and officers to pursue its goal of frustrating the Iraq Sanctions Program:

- Hussein ordered government agencies to effectuate the scheme. "[O]n October 25, 2000, all Iraqi ministries were informed that Saddam Hussein had ordered the imposition of kickbacks of at least 10% in order to subvert the policies of the UN and the United States government." (Compl. ¶ 302.)

- Government agencies negotiated the transactions. "The Iraqi State Oil Marketing Organization (SOMO) was the legal entity that entered into the contracts with companies purchasing oil under the Programme." (*Id*. ¶ 323.) On the goods side of the Programme, "a company wishing to sell humanitarian goods under the Programme contracted with the appropriate Iraqi Ministry or State-Owned Enterprise . . . ." (*Id*. ¶ 329.)

- Government agents and agencies received the illicit funds. The Hussein Regime collected surcharges in accounts held "under the names of two SOMO employees" and then transferred the funds to "accounts of the Central Bank of Iraq." (*Id*. ¶¶ 473-74.) It alleges that the Iraqi vice president directed that the after-sales-service fee revenue "be transferred to general treasury." (*Id*. ¶ 568.) It also alleges that various governmental units or government-owned businesses collected fees and bribes. (*E.g.*, *id*. ¶ 546 (Iraqi Ministry of Transportation); ¶ 550 (payments "going back to the Iraq Government"); ¶ 565 ("payments were transferred to Iraq in cash").)

In sum, Iraq alleges that its injuries resulted from the Hussein Regime's prosecution of its foreign affairs policy. The Complaint alleges a public goal, undertaken with public resources, pursued for political purposes, and using means available only to state actors. These features lead the Court to conclude the Hussein Regime acted under the color of its authority as the government of Iraq for the purposes of this motion.

### D. The nature of the Hussein Regime's conduct does not absolve Iraq of responsibility for that conduct.

Iraq contends that it does not bear responsibility for the conduct of the Hussein Regime because the Hussein Regime did not act in a way that benefitted the Iraqi people. Rather than ask whether the conduct of the Hussein Regime was governmental, Iraq would have the court ask "Was [Hussein] acting for or against the interests of the Iraqi nation?" (Hr'g Tr. at 22.) Iraq offers three permutations of this argument: (1) Hussein's conduct was private, self-serving conduct and thus not governmental conduct that can be attributed to Iraq; (2) the Hussein Regime was not the legitimate government of Iraq and therefore its actions cannot be imputed to Iraq; and (3) the Hussein Regime committed unlawful conduct that, because it is unlawful, cannot be attributed to Iraq. The Court rejects each of these arguments because none demonstrates that the alleged conduct of the Hussein Regime is non-governmental.

### 1. The Complaint does not allege that the Hussein Regime committed acts of personal misconduct as distinct from governmental misconduct.

Iraq urges the Court to accept that the Hussein Regime's Programme misdeeds were "personal acts" taken "against the public interest" and thus, in its view, not attributable to Iraq. Iraq rests its theory on five cases that comment on the private nature of a former governmental leader's corrupt conduct.[5] Those cases analyze whether certain misconduct was

---

[5]    *The Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1358 (9th Cir. 1988); *Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir. 1962); *The Republic of the Philippines v. Westinghouse Elec. Corp.*, 774 F. Supp. 1438 (D.N.J. 1991); *United States v. Noriega*, 746 F.

"private" or "public" within the rubric of the act of state doctrine or the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq*.

But a state's responsibility for the acts of its government does not coincide with the application of the act of state doctrine or the FSIA. To the contrary, often it is when neither apply—and thus when a civil action against a sovereign may proceed—that a state will face liability for its acts. For example, the act of state doctrine does not bar adjudication of the consequences of a foreign act. *See United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 248 (S.D.N.Y. 2009). And the FSIA does not allow foreign states to avoid the legal repercussions of their official, but commercial, activities. *See NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 260 (2d Cir. 2012). Therefore, while relevant, the application or non-application of FSIA or the act of state doctrine does not determine legal responsibility.

In any event, none of the authorities plaintiff proffers suggest that the alleged misconduct here amounts to private action. In *The Republic of the Philippines v. Marcos*, the Ninth Circuit, sitting en banc, reasoned that the former leader of the government of the Philippines had been accused of committing private misconduct because the complaint stated that he used "his position of power and authority to convert . . . to his use and that of his friends, family, and associates, money, funds, and property belonging to the Philippines and its people." 862 F.2d 1355, 1359 (9th Cir. 1988) (quoting complaint). Similarly, in *Jimenez v. Aristeguieta*, a sovereign accused its former leader of embezzlement and fraud for his private financial benefit. 311 F.2d 547, 557-58 (5th Cir. 1962). And so, too, in *Republic of Haiti v. Duvalier*, where Haiti sought to recover public funds deposited by its former dictator into a personal account. 211 A.D.2d 379, 380-81 (1st Dep't 1995). By contrast, Iraq has not alleged that Hussein funneled money into personal bank accounts in foreign countries, as the Philippines did of the Marcoses, Venezuela did of Jimenez, or Haiti did of Duvalier. Rather, Iraq has alleged that the Hussein Regime directed the kickbacks and bribes into government accounts.

---

Supp. 1506 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997); *Republic of Haiti v. Duvalier*, 211 A.D.2d 379 (1st Dep't 1995).

The personal bank account fact pattern merely points to the bigger difference: the misconduct in *Marcos*, *Jimenez*, and *Duvalier* was undertaken by each ruler and his close associates or family; the scheme alleged by Iraq was directed by the entire Hussein *Regime*. Iraq's argument founders on this fact because it defies reason to label conduct allegedly undertaken by the whole of the public apparatus as "private."

Iraq's other authorities have little relevance. In *The Republic of the Philippines v. Westinghouse Electric Corp.*, the court considered a foreign state's suit against a third party for bribing the state's former government. 774 F. Supp. 1438 (D.N.J. 1991). While similar in posture to this action, *Westinghouse* considered whether the Philippines had stated a claim pursuant to Philippine law. *Id.* at 1464. Iraq has not similarly suggested that it may recover here for defendants' violations of Iraqi law. Last, in *United States v. Noriega*, the defendant failed to persuade the court that the cocaine he trafficked into the United States for his "personal financial enrichment" came within the act of state doctrine. 746 F. Supp. 1506, 1522 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997). Unlike the indictment in the *Noriega* case, the Complaint here does allege that the Hussein Regime pursued wrongful conduct "in furtherance of [] state policy or to serve some overriding national interest." *Compare id. with* Compl. ¶¶ 2, 7.

### 2.    *The legitimacy of the Hussein Regime does not determine Iraq's responsibility for the Regime's conduct.*

The legitimacy or illegitimacy of the Hussein Regime's rule does not affect whether the Regime's acts may be attributed to the Republic of Iraq. Indeed, Courts have attributed conduct of allegedly unlawful regimes to the states they purported to represent. *E.g.*, *The Sapphire*, 78 U.S. (11 Wall) 164, 167 (1870) (Napoleonic France); *Guar. Trust Co. v. United States*, 304 U.S. 126, 137 (1938) (Provisional Government of Russia). And attribution operates independently of diplomatic recognition. "[A] state is responsible for the conduct of its effective government, whether or not that government was recognized by other states." Restatement (Third) of Foreign Relations Law of the United States § 207 cmt. b. What matters is control.

Here, Iraq has alleged that the Hussein Regime was "in *de facto* control of the nation" and that control can hardly be disputed. (*See* Compl. ¶ 220 (emphasis original).) This control had legal significance. The parties do not dispute that the Hussein Regime could create rights and obligations within the Programme that reach the Republic of Iraq today. For example, the UN Security Council decided that, "in connection with the dissolution of the Coalition Provisional Authority, the Interim Government of Iraq and its successors shall assume the rights, responsibilities and obligations relating to the Oil-for-Food-Programme that were transferred to the Authority . . . ." (UN SCOR Res. 1546 (June 8, 2004), Ex. 10 to Bishop Decl.) The Republic of Iraq has entered into a treaty with the United States of America to settle "certain claims of United States nationals arising from actions of the former Iraqi regime." Claims Settlement Agreement Between the Government of the United States and the Government of the Republic of Iraq (September 2, 2010). The Republic of Iraq has invoked sovereign immunity in response to suits concerning certain Hussein Regime conduct related to the Programme corruption. *E.g., Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1139 (9th Cir. 2012) (sovereign immunity from breach of contract claims concerning contracts canceled due to plaintiff's refusal to pay a bribe); *see also Republic of Iraq v. Beaty*, 556 U.S. 848, 865-66 (2009) (invoking sovereign immunity for abuse and mistreatment of American nationals during or after the 1991 Gulf War). And the Republic of Iraq now, by this action, seeks to recover for harms stemming from oil sales and goods purchases made by the Hussein Regime.

### 3. *The legality of the Hussein Regime's acts does not determine Iraq's responsibility for the Regime's conduct.*

Iraq next distinguishes the Programme corruption from other Regime acts on the grounds that the challenged conduct was unlawful or against UN regulation. For example, Iraq attempts to exclude from the definition of "official governmental purposes" any activity or purpose that violated the MOU. (*See* Compl. § 1200.) But "[t]o show that conduct is attributable to the State says nothing, as such, about the legality or otherwise of that conduct . . . ." Articles on Responsibility of States for Internationally Wrongful Acts, art. II cmt. 4.

Indeed, if states only bore responsibility for lawful acts they would, perversely, bear no responsibility for unlawful acts. The law is otherwise. A state cannot ordinarily escape liability "for acts of officials and official bodies, national or local, even if the acts were not authorized by or known to the responsible national authorities," or acts "expressly forbidden by law, decree, or instruction." Restatement (Third) of Foreign Relations Law of the United States § 207 cmt. d (1987). Nor can a state avoid responsibility for acts that violate its own laws. *Banco de Espana v. Fed. Reserve Bank of New York*, 114 F.2d 438, 444 (2d Cir. 1940) ("It should make no difference whether the foreign act is, under local law, partially or wholly, technically or fundamentally, illegal."); *see also Westfield v. Fed. Republic of Germany*, 633 F.3d 409, 418 (6th Cir. 2011) (seizure of property by Nazi regime "governmental" within the meaning of FSIA even though the seizures were voided by subsequent government). Moreover, if courts had to examine whether a government's act was lawful in order to decide whether it was attributable to the state, they would often run afoul of the act of state doctrine; the "lawfulness" of a foreign government's internal acts "is precisely what the act of state doctrine bars United States courts from determining." *Konowaloff*, 702 F.3d at 147; *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 431 (1964) ("[T]he act of state doctrine is applicable even if international law has been violated.").

Iraq elsewhere has acknowledged and settled claims against United States nationals for wrongful conduct during the Hussein Regime. *See* U.S.-Iraq Claims Settlement Agreement; Hr'g Tr. 20 ("We as a nation, the Republic of Iraq, as a nation, have been held responsible for the wrongs of Saddam Hussein just like principals are every day."). Thus, as the Republic of Iraq has itself recognized, it may not avoid responsibility for the Hussein Regime's acts on the basis of their illegality.

One final note: To say that Iraq may not avoid responsibility in this action for the Hussein Regime's unlawful conduct is not to deny that the Regime's conduct was unlawful. Unlike Judge Debevoise in *Republic of the Philippines v. Westinghouse Electric Corp.*, 774 F. Supp. 1438, 1452 (D.N.J. 1991), cited by Iraq, the Court does not consider that question, or need to. Nor does holding Iraq responsible for the Hussein Regime's acts imply

that Saddam Hussein was the law. It simply accepts what the Complaint alleges—that the Hussein Regime acted as the Iraqi government.

* * *

The Court concludes that the Programme-related misdeeds of the Hussein Regime alleged in the Complaint may be attributed to the Republic of Iraq. The Complaint alleges that the misconduct occurred pursuant to official policy and in apparent pursuit of political goals. The ethicality, illegitimacy, or illegality of the acts does not immunize the Republic of Iraq from responsibility. Instead, the Republic of Iraq bears responsibility for the Hussein Regime's conduct alleged here because that conduct was governmental.

## V.   RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

Iraq seeks relief principally for defendants' alleged violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S. §§ 1961-1968. The focus of its allegations is on a foreign enterprise and a pattern of racketeering and corruption that occurred most meaningfully abroad. Because civil RICO does not provide a cause of action for extraterritorial offenses, the Court dismisses plaintiff's civil RICO claims. The Court also dismisses the RICO claims on the grounds that Iraq is barred from recovery by the doctrine of in pari delicto and also has not alleged proximate causation.

### A.   Iraq alleges that defendants violated RICO by corrupting the Programme.

Iraq alleges that defendants used the Programme's structure to maintain its fraud, bribery, and money-laundering scheme. (Compl. ¶¶ 1136, 1140-50.) Although the Complaint alleges that defendants' "conduct had a central purpose of diverting funds from their intended humanitarian purposes to the Hussein Regime and to the Defendants" (*id.* ¶ 1151), Iraq has since explained that its "RICO claims are based on diversions of its oil wealth, not reductions in the humanitarian aid received by its citizens." (Iraq's Opp. 50.) The diversions injured Iraq by, among other things,

facilitating defendants' "excessive profits." (*Id.*; Compl. ¶ 1107.) Plaintiff alleges that this conduct violates subsections 1962(c) and 1962(d) of the RICO statute. (Compl. ¶¶ 1135-58.)

Pursuant to 18 U.S.C. § 1962(c), it is unlawful for a person to "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." In the civil context, "the compensable injury flowing from a violation of that provision necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 321 (2d Cir. 2011) (quotation marks omitted).

Pursuant to 18 U.S.C. § 1962(d), a person may not "conspire to violate" any of the substantive provisions of RICO, including section 1962(c). In the civil context, "a RICO conspiracy plaintiff [must] allege injury from an act that is analogous to an act of a tortious character, meaning an act that is independently wrongful under RICO." *Beck v. Prupis*, 529 U.S. 494, 505-06 (2000) (citations and quotation marks omitted).

## B. Iraq impermissibly attempts to apply the RICO statutes extraterritorially.

The scheme described by Iraq is primarily foreign, focused on a multinational organization, engineered by a foreign government, and concerned with Iraqi oil, goods, and contracts. Applying the RICO statute to these allegations would be applying the statute to extraterritorial conduct, which is not permitted under the case law.

### 1. RICO claims that focus on an extraterritorial enterprise or concern extraterritorial patterns of racketeering activity are not actionable.

The RICO statutes do not apply extraterritorially. *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) (per curiam); *see Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). "[S]imply alleging that some domestic conduct occurred cannot support a claim of domestic application." *Norex*, 631 F.3d at 33. Accordingly, peripheral contacts with the United States—up to and including the use of a domestic bank account—do not bring an otherwise foreign scheme within the reach

of the RICO statutes. *Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010), *aff'd sub nom.*, *Cedeño v. Castillo*, 457 F. App'x 35 (2d Cir. 2012).

To determine whether a plaintiff has alleged an extraterritorial claim, the Supreme Court has examined the locus of the actions that are the "objects of the statute's solicitude." *Morrison*, 130 S. Ct. at 2884 (analyzing the Exchange Act). The U.S. Court of Appeals for the Second Circuit has not yet determined the objects of the RICO statute's solicitude. *E.g., Cedeño*, 457 F. App'x at 37 ("[I]t is unnecessary for us to decide what constitutes the object of RICO's solicitude.") (quotation marks and brackets omitted). The district judges in this circuit have not reached agreement on the issue, either. Certain district judges have concluded that the statute "seeks to regulate 'enterprises' by protecting them from being victimized by or conducted through racketeering activity." *European Cmty. v. RJR Nabisco, Inc.*, No. 02 Civ. 5771, 2011 WL 843957, at *5 (E.D.N.Y. Mar. 8, 2011); *Cedeño*, 733 F. Supp. 2d at 473 ("[I]t is plain on the face of the statute that the statute is focused on how a pattern of racketeering affects an enterprise."). Another district judge has concluded that "the focus properly is on the pattern of racketeering activity and its consequences," not on the enterprise. *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 245 (S.D.N.Y. 2012).

### 2. Iraq's Complaint demonstrates that its claim is extraterritorial.

Whether assessed by the enterprise or the pattern of racketeering activity, the RICO allegations of the Complaint most certainly describe a foreign scheme, not a domestic one.

#### a. The alleged enterprise is not domestic.

The enterprise here is not located in the United States. Iraq asserts that "[t]he Enterprise was the Programme" (Compl. ¶ 1136) and that the "Oil for Food Programme itself [was] centered and located in New York" (Iraq's Response to Defs.' 6th Notice of Auth., Dkt. No. 501, at 2). In the alternative, Iraq alleges as the Enterprise an association-in-fact of various UN committees and defendants. (Compl. ¶ 1137.) This view of

territoriality elevates form over substance. The Programme was "in New York" inasmuch as it operated through UN committees and agencies that worked in the UN Headquarters District, a physical area located within New York City. The United Nations is, however, a united group of sovereign nations, not the United States. And the Programme is not United States territory, but an administrative creature of the UN, conceived, maintained, and staffed by a multinational intergovernmental organization.

Iraq responds that, in certain circumstances, United States courts have jurisdiction over actions taken within the United Nations Headquarters District. (Iraq's Opp. 54-56.) That certain crimes committed within the Headquarters District may be prosecuted by United States authorities subject to UN approval, however, does not transform the United Nations, or its subgroups, into a domestic RICO enterprise. The Headquarters District is functionally distinct from the natural territory of the United States because the United States has ceded control and primacy of the Headquarters District to the UN. *See* Agreement respecting the headquarters of the United Nations, June 26, 1947, 61 Stat. 3416, T.I.A.S. No. 1676 (entered into force Nov. 21, 1947). Indeed, the UN Headquarters Agreement "effectively removes control over the UN Headquarters and related areas from the jurisdiction of the United States." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 51 (2d Cir. 1991).

In any event, the territoriality of the Headquarters District is beside the point: the UN, which operated the Programme, and its inner-workings are not "places over which the United States has sovereignty or has some measure of legislative control" and therefore are not United States territories. *See E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). Classifying UN organs as U.S. domestic entities risks the very sort of international discord that the rule against extraterritorial application aims to avoid.

> b. *The alleged pattern of racketeering is concentrated abroad.*

Moreover, key aspects of the alleged scheme were focused abroad. The oil was clearly located in Iraq. (*See* Compl. ¶¶ 350-351; MOU ¶ 16.)

The Hussein Regime, in Iraq, negotiated directly with defendants for the sale of the oil and the receipt of bribes. (Compl. ¶¶ 323, 363, 379, 384.) Defendants sent bribes and kickbacks directly to the Hussein Regime or its agents, in Iraq and abroad, and defendants received Iraqi oil in return. (*Id.* ¶¶ 351, 356, 363, 365.) Similarly, vendor defendants paid surcharges and fees directly to the Hussein Regime and its agents. (*Id.* ¶¶ 522, 528, 535, 538, 511.)

Certain aspects of the alleged scheme were focused at the UN. Defendants and the Hussein Regime submitted the oil and vending contracts to the UN for approval. (*Id.* ¶¶ 325, 333; MOU ¶¶ 17, 21-25.) Those negotiated contracts contained the under- or over-pricing that facilitated the bribery and kickback scheme. (Compl. ¶¶ 383, 387, 528, 574.) Payments by defendants for oil were made into a UN escrow account (*id.* ¶¶ 284-85; UN SCOR Res. 986 ¶ 1(b)), and payments to vendors were made from that account (Compl. ¶ 338; UN SCOR Res. 986 ¶ 8) and BNP maintained the escrow account at its Manhattan branch (Compl. ¶ 286).

From this universe of allegations, Iraq highlights particular elements as the core of its RICO claims. Iraq contends that defendants' racketeering activities sought "to obtain the Republic of Iraq's property held by the UN in New York." (Iraq's Opp. 49.) Defendants accomplished this scheme by diverting money away from the Programme and into defendants' pockets in the form of "excessive profits." (Iraq's Opp. 50.) Iraq lodges that scheme in the New York area by alleging that "the Programme was administered in New York, all of the funds of the Programme were supposed to pass through an escrow account in New York, and all contracts under the Programme were approved by the United Nations in New York." (Compl. ¶ 16.) At heart, Iraq writes, "[d]efendants and their co-conspirators decided to rob the bank" in New York. (Iraq's Opp. 53.)

Iraq's analogy falls short for at least two reasons:

First, the scheme alleged in the Complaint sought to divert money around the Programme, not out of it. According to the Complaint, the kickbacks paid in connection with the sale of oil circumvented the UN escrow account. (*E.g.*, Compl. ¶¶ 363, 380, 382.) Indeed, Iraq alleges that the full purchase price for oil was not being paid into the escrow account:

"direct financial transfers were being made to the Hussein Regime outside the UN Escrow Account" (*id.* ¶¶ 380, 382), and the Hussein Regime coordinated the fraud directly with defendants (*id.* ¶ 382). To borrow Iraq's analogy, defendants' heist occurred well before the money made it to the bank. Accordingly, the bank account's presence in the United States is an insufficient contact to make the scheme territorial. *See Cedeño*, 733 F. Supp. 2d at 472.

Second, Iraq has not, by virtue of alleging predicate acts in the United States, alleged a domestic RICO claim. Iraq contends that "all of the RICO predicate acts alleged in the complaint occurred in New York," so it has alleged a domestic pattern of racketeering activity. (Iraq's Response to Defs.' 6th Notice of Auth. at 2.) But the presence of domestic predicate acts does not necessarily mean a given application of the RICO statute is territorial. *Norex* rejected a RICO claim premised on "numerous acts in the United States . . . including mail and wire fraud, money laundering, Hobbs Act violations, Travel Act violations[,] and bribery." *Norex*, 631 F.3d at 31.

As in *Norex*, it is implausible to accept that the thrust of the pattern of racketeering activity was directed at New York, as Iraq urges in its papers. (*See* Dkt. No. 501.) For example, the Complaint alleges racketeering activity of money laundering and bribery. (Compl. ¶¶ 1144-49.) The money laundering alleged took the form of kickbacks paid to Iraq from payments defendants received from Iraq through the UN escrow account. (*Id.* ¶ 1144.) The bribery included the kickbacks, surcharges, and oil allocations exchanged between Hussein's allies and defendants. (*Id.* ¶ 1150.) The scheme subverted an international sanctions regime and inflicted suffering on a foreign people. (*E.g.*, *id.* ¶¶ 1099-1110, 1119-20, 1122.) That activity focused on the Hussein Regime in Iraq, not the United States.

The foreign focus of this case distinguishes it from *GCG Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193 (D. Colo. 2011). There, the district court concluded that a scheme orchestrated by foreign defendants nevertheless constituted a domestic offense. *Id.* at 1209-10. In particular, the fact that defendants aimed to "extract monies from victims in the United States" and engaged in conduct in the United States—including dispatching an

agent of the scheme to Colorado and perhaps Florida and Illinois—brought the Canadian defendants' offense within the domestic reach of the RICO statute. *Id.* at 1197, 1210. Here, the victims and victimizers are foreign, and the means of the offense involve false representations to a multinational organization. This is not the domestic offense of *GCG Holding*.

### 3. Under either test, Iraq calls for an impermissible extraterritorial application of the RICO statute.

At bottom, the application of the RICO statute to the alleged facts would be extraterritorial. The Complaint describes a scheme directed by a foreign government, involving international conduct, and exacting a toll on a foreign plaintiff, which is itself a foreign state. The most domestic feature of the claim is that it involved a multinational organization headquartered in New York, connected to this case by dint of the fact that the organization enforced an internationally mandated sanctions regime abroad. When foreign actors were the primary operators, victims, and structure of a RICO claim, courts in this Circuit have properly concluded that the claims were extraterritorial. *Norex Petroleum Ltd.*, 631 F.3d at 32; *Cedeño*, 733 F. Supp. 2d at 472. *Cf. Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 253 (S.D.N.Y. 2008) (finding Oil-for-Food RICO claim to be extraterritorial under conduct-and- effects test). By contrast, when a scheme is conceived and orchestrated by United States persons, directed at United States corporations, and involving United States conduct, the claim is domestic, notwithstanding the presence of foreign conduct. *Chevron Corp. v. Donziger*, 871 F. Supp. 2d at 245-46; *see also GCG Holding Co.*, 824 F. Supp. 2d at 1209-10.

## C. In pari delicto bars Iraq's RICO claims.

### 1. Iraq's allegations bring it within the in pari delicto doctrine.

The doctrine of in pari delicto is an equitable defense reflecting the idea that "'[i]n a case of equal or mutual fault the position of the defending party is the better one.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (alterations omitted) (quoting Black's Law Dictionary 711 (5th ed. 1979)); *Buckley ex rel. DVI Liquidating Trust v. Deloitte & Touche*

*USA LLP*, No. 06 Civ 3291, 2007 WL 1491403, at *5 (S.D.N.Y. May 22, 2007). Therefore, the defense should not be allowed "[u]nless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater." *Pinter v. Dahl*, 486 U.S. 622, 636 (1988). When it applies, "the plaintiff should not [] recover, and the parties should be left where they are." *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990).

The in pari delicto doctrine may compel the dismissal of a complaint when the plaintiff's culpability appears on the face of the complaint. *E.g.*, *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand LLP*, 322 F.3d 147, 157, 164 (2d Cir. 2003) (applying Texas law). Courts may only apply in pari delicto to federal claims where (1) "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress" and (2) the application of the doctrine does not offend public policy by interfering with the enforcement of a federal statute. *Bateman Eichler*, 472 U.S. at 306. Iraq's Complaint satisfies both criteria.

> a. *The Complaint alleges that the Hussein Regime bears equal or greater responsibility for the alleged racketeering activity than defendants.*

The allegations in the Complaint include that "as a direct result of [its] own actions, the [Republic of Iraq] bears at least substantially equal responsibility for the violations [it] seeks to redress." *Bateman Eichler*, 472 U.S. at 306. For example:

- "[T]he corruption was designed and instigated by the Hussein Regime." (Compl. ¶ 4.)

- "The Hussein Regime could choose to whom it sold oil." (*Id.* ¶ 351.)

- "The Hussein Regime began directing oil allocations to particular countries and individuals it viewed as supportive of the Regime, and particularly of the Regime's desire to eliminate UN sanctions." (*Id.* ¶ 356.)

- "To generate . . . illicit income, the Hussein Regime simply demanded that anyone who wanted to purchase oil under the

Programme make payments (surcharges) to bank accounts owned or controlled by the Hussein Regime." (*Id.* ¶ 363.)

- "[T]he Hussein Regime demanded that additional "transportation fees" be paid directly to the Hussein Regime on all shipments of humanitarian goods to Iraq." (*Id.* ¶ 526.)

- "[T]he Hussein Regime decided to impose what it called an 'after-sales-service-fee' or ASSF on all Programme contracts." (*Id.* ¶ 558.)

In sum, the Complaint affirmatively—and emphatically—alleges that the Hussein Regime orchestrated the wrongful conduct with defendants' assistance. Defendants certainly do not cavil with the allegations that the Hussein Regime committed wrongful conduct and the Court accepts the Complaint's allegations for the purposes of this motion. Because this Court has concluded as a legal matter that the Hussein Regime's acts are attributable to plaintiff, the Republic of Iraq, the Complaint's allegations bring the Complaint within the scope of the in pari delicto doctrine. *Bateman Eichler*, 472 U.S. at 306.

> b.   *Application of the in pari delicto doctrine does not offend public policy.*

"[T]he application of the doctrine does not offend public policy by interfering with the enforcement of [the RICO] statute." *See id.* Other courts have already determined that in pari delicto may bar recovery pursuant to the RICO statutes without hindering the statutes' enforcement. *See Rogers v. McDorman*, 521 F.3d 381, 389 (5th Cir. 2008) ("*[I]n pari delicto* is a cognizable defense to a civil RICO claim."); *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1153-56 (11th Cir. 2006); *Acme Am. Repairs, Inc. v. Katzenberg*, No. 03 Civ. 4740, 2012 WL 3307426, at *1 (E.D.N.Y. Aug. 13, 2012). This Court joins them. The scheme alleged here involved both defendants and Iraq, acting together to frustrate an international sanctions regime. "It would be anomalous, to say the least, for the RICO statute to make racketeering unlawful in one provision, yet award the violator with treble damages in another provision of the same statute." *Edwards*, 437 F.3d at 1155.

### 2.  Iraq's purported exceptions to in pari delicto do not apply.

The Republic of Iraq attempts to forestall the application of the defense of in pari delicto by invoking various exceptions. None saves its claims.

### a.  The adverse interest exception does not allow Iraq to sever itself from Hussein's acts.

Iraq contends that the Complaint contains allegations that, if read in Iraq's favor, would suffice to reach the discovery stage because of the "adverse interest exception." (Iraq's Opp. 29.) The adverse interest exception shields a corporation from the consequences of its agent's acts in narrow circumstances: "the agent must have *totally abandoned* his principal's interests and be acting *entirely* for his own or another's purposes. It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466 (2010) (quoting *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 785 (1985)).

Even if this rule were available to sovereigns, and there is no case law that suggests it is, it would not aid the plaintiff. The Complaint does not allege the type of abandonment contemplated by the exception. For instance, Iraq analogizes its position to that of the trustee in *Buckley ex rel. DVI Liquidating Trust v. Deloitte & Touche USA LLP*, 2007 WL 1491403. In that decision, this Court allowed the trustee's claim to proceed despite indications in the complaint that the company shared blame for the harms it attributed to its auditors. *Id.* at *1. But Iraq's Complaint here does not allege that its agent's actions were taken for the exclusive benefit of the agent, as did the complaint in *Buckley*. To the contrary, the Complaint indicates that Hussein Regime pursued the corruption as an official policy. (*E.g.*, Compl. ¶ 7.) Further, the examples of self-dealing highlighted by Iraq all relate, in one way or another, to Saddam Hussein's efforts to "solidify" his own power. (Iraq's Opp. 30 (citing Compl. ¶¶ 7, 1178, 1200).) But "[t]o allow a corporation to avoid the consequences of corporate acts simply because an employee performed them with his personal profit in mind would enable the corporation to disclaim, at its convenience, virtually every act its officers undertake." *Kirschner*, 15 N.Y.3d at 467. Accordingly,

the Hussein Regime's actions are not "adverse" within the meaning of this doctrine simply because the actions solidified the Regime's power.

Finally, Iraq urges that sovereigns are permitted to remedy the harm caused by bribes paid to their agents. Yet the presence of bribery allegations in this action does not change the result. For example, in *City of New York v. Corwen*, relied on by Iraq, the Appellate Division, First Department rejected the argument that the municipality was in pari delicto with a defendant who bribed a city official. Iraq contends that it similarly cannot be barred by in pari delicto. 164 A.D.2d 212, 218 (1st Dep't 1990), *abrogated on other grounds by City of N.Y. v. Keene Corp.*, 304 A.D.2d 119 (1st Dep't 2003). But the court in *Corwen* concluded that there were no allegations of "any fault on the city's part equal to the alleged fault of defendants" and that the bribed official had "totally abandoned" the City's interests. *Corwen*, 164 A.D.2d at 218. The court made no special exception for cases involving governments and bribery. Accordingly, Iraq's allegations—which demonstrate the equal fault of Iraq by virtue of the acts of its government—do not fall beyond the scope of in pari delicto simply because they concern bribery.

> b.  *In pari delicto may be asserted against foreign states that litigate as plaintiffs in United States courts.*

Iraq next contends that "the *in pari delicto* defense is inapplicable when the government is acting in its sovereign capacity to exercise public rights to protect the public interest." (Iraq's Opp. 30 (quotation marks omitted).) Iraq attributes this proposition to *United States v. Philip Morris*, where the U.S. District Court for the District of Columbia wrote that "when, as here, the Government acts in the public interest the unclean hands doctrine is unavailable as a matter of law." 300 F. Supp. 2d 61, 75 (D.D.C. 2004).

The court's observation does not aid Iraq. First, the "Government" the district court was referring to was the government of the United States of America, not a foreign government. Iraq points the Court to no rule of law that exempts *foreign* governments from equitable defenses when they purport to act on behalf of their people. Second, the statement did not concern in pari delicto, but unclean hands. As to in pari delicto, the court concluded that "there is no claim that the Government has violated the

law in cooperation with the defendants." *Id.* at 76 (quotation marks omitted). By contrast, Iraq has alleged that its former government did conspire with the defendants to violate numerous domestic, international, and UN regulations.

### D.   Iraq has failed to allege proximate cause.

To state a claim for civil RICO, "the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp. v. City of N.Y.*, 559 U.S. 1, 130 S. Ct. 983, 989 (2010) (quotation marks omitted). The Complaint lacks these allegations. Therefore, even if Iraq's application of the RICO statute were not extraterritorial, it would nevertheless fail for want of proximate causation.

Iraq's alleged injury is the diversion of its oil wealth. But to connect that injury to the predicate acts here, Iraq traces defendants' conduct into the Programme, through the Programme apparatus, and then out again. It also omits its own conduct from the causal chain. This creates two grounds for concern:

First, Iraq's injury results from Iraq's and defendants' representations to the UN, the UN's approval of the contracts, the UN's directing BNP to accept or release escrow funds, and defendants' capturing or diverting profit from Iraq pursuant to an illicit agreement with the Hussein Regime. All told, the UN approval and letter of credit process required at least eleven different steps by five different entities: the UN, the U.S. Treasury Department, BNP, Iraq, and a defendant. (Compl. ¶ 340.) Thus, any injury caused by defendants' fraudulent wires and mailings—that is, the harm of the predicate acts—happens after being instigated by the Hussein Regime and then mediated through the UN, its bank, and the U.S. government. The causal chain's reliance on the actions of Iraq and third-parties indicates that it is too attenuated to support recovery. *See Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 271 (1992).

Second, and most significantly, the Complaint alleges that defendants' racketeering activity harmed plaintiff indirectly. In an effort to cast its RICO claim as not extraterritorial, plaintiff only focuses on racketeering

activity directed at the Programme to obtain unwarranted contract approval and fund transfers. This racketeering activity caused "[d]iversions of payments from the Escrow Account [that] deprived the Programme of needed funds" (Compl. ¶ 390) and "severely damaged the UN's ability to use economic sanctions as a nonviolent means of inducing change in tyrannical and terrorist regimes" (*id.* ¶1132). Put this way, the direct victim of defendants' racketeering activity is the UN. Because defendants' predicate acts were only an indirect cause of Iraq's injury, the Republic of Iraq may not recover pursuant to RICO. *See Hemi*, 130 S. Ct. at 990; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).

True for all defendants, this causal remoteness even more significantly alienates BNP from liability. Iraq does not allege that BNP purchased oil or sold goods. It does not allege that BNP approved the contracts for oil or goods negotiated between the other defendants and Iraq. Rather, it alleges that BNP maintained the UN escrow account and, in doing so, violated mail fraud, wire fraud, and travel act prohibitions. Because BNP released and accepted funds into the UN escrow account at the UN's direction, however, BNP's servicing of that account cannot have been the proximate cause of Iraq's injury; the harmfulness of BNP's actions is contingent on whether the UN's directions were premised on a fraudulent submission by others. Contingent relationships of this sort are too indirect to support RICO recovery. *Holmes*, 503 U.S. at 271.

\* \* \*

In sum, Iraq's two RICO claims fail for three reasons. First, application of the RICO statute would be extraterritorial and thus impermissible. The Complaint alleges a scheme directed by a foreign government, conducted through and around a multinational organization, exacting a toll on a foreign plaintiff. Second, the Complaint alleges that the Hussein Regime conceived and orchestrated the wrongful conduct with defendants' assistance and thus it cannot proceed due to the defense of in pari delicto. Third, the Complaint fails to allege the pattern of racketeering activity was the proximate cause of Iraq's injury.

The Court thus need not reach the other asserted bases for dismissal of Iraq's RICO claims, including statute of limitations, the adequacy of Iraq's

allegations with respect to the "operating" of the enterprise, and the sufficiency of its allegations with respect to each defendant's role in the conspiracy.

## VI. FOREIGN CORRUPT PRACTICES ACT

Iraq alleges that defendants violated the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, *et seq*. Numerous authorities have concluded that the FCPA offers no private right of action. *E.g., RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 412 (S.D.N.Y. 2009); *J.S. Serv. Ctr. Corp. v. Gen. Elec. Tech. Servs. Co.*, 937 F. Supp. 216, 226-27 (S.D.N.Y. 1996); *Citicorp Int'l. Trading Co. v. W. Oil & Ref. Co.*, 771 F. Supp. 600, 607 (S.D.N.Y. 1991). In fact, Iraq points to no jurist—of any court—who has concluded otherwise. This Court agrees with the weight of authority. Accordingly, Iraq's FCPA claim is dismissed pursuant to Rule 12(b)(6).

## VII.   COMMON LAW CLAIMS

Having dismissed Iraq's federal claims, the Court declines to exercise supplemental jurisdiction over the remaining common law claims pursuant to 28 U.S.C. § 1367(c)(3). *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F. 3d 1182, 1187 (2d Cir. 1996).

To the extent that Iraq contends that its fraud claim rests on federal common law, rather than New York common law, the Court disagrees. Iraq purports to invoke federal common law because of "this case's relation to the United Nations and international relations." (Iraq's Opp. 84.) But relation to international entities does not mandate the application of federal common law. If it did, all cases with foreign sovereigns would apply federal common law. Moreover, Iraq has sued corporations, not current or former officials. A foreign government's dispute with a private enterprise over corruption in their relationship does not implicate "uniquely federal interests," nor does New York's common law of fraud conflict in this circumstance with any federal policy. *See, e.g., Boyle v. United Tech. Corp.*, 487 U.S. 500, 504, 507 (1988). Thus, this is "not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted." *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 89 (1994).

Nor do the remaining state law claims contain a "question qualified as substantial," the resolution of which would be "dispositive of the case and would be controlling in numerous other cases" sufficient to create an independent basis of federal jurisdiction pursuant to 28 U.S.C. § 1331. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700 (2006) (quotation marks omitted). That was the circumstance in *Republic of the Philippines v. Marcos*, which sought to uniformly resolve a foreign state's action to seize property located in the United States. 806 F.2d 344, 354 (2d Cir. 1986). It is not so here.

Accordingly, the Court declines to exercise jurisdiction over the state law claims. If those claims did arise under federal law, the Court would dismiss them on the grounds that Iraq has failed to allege causation and is barred by the in pari delicto doctrine.

## VIII.   CONCLUSION

The grave allegations of the Complaint paint a picture of a people oppressed and of a repressive government resolved to frustrate the international community's efforts to intervene to assist the Iraqi people. While the Court has concluded that the Republic of Iraq does not have standing to recover as parens patriae for injuries to its people, Iraq does have standing to recover for harms to its proprietary interests in the UN escrow account. Additionally, adjudication of Iraq's claims does not run afoul of the act of state or political question doctrines. The issues decided here are legal, not political, notwithstanding the international political context of the action.

The first issue concerns attribution. The Complaint alleges injustices instigated and in large measure directed by Saddam Hussein and his Regime. But the Complaint unmistakably alleges that the wrongful conduct of the Hussein Regime was of a governmental character, pursued for purportedly public purposes, and undertaken by the governmental authorities in Iraq. As a result, that government, however deplorable it may have been, represented Iraq and its acts, however allegedly depraved, are attributable to the sovereign.

The second issue concerns territoriality. The RICO and RICO conspiracy claims focus on a multinational enterprise—the UN Oil-for-Food Programme—and concern, in large part, activity occurring in Iraq. As a result, these claims are dismissed as impermissible extraterritorial applications of the RICO statute. In the alternative, these claims would fail on the basis of the in pari delicto doctrine and the absence of allegations of proximate causation.

The third issue is the existence vel non of a private right of action pursuant to the Foreign Corrupt Practices Act. That claim fails because the statute does not afford a private remedy.

The final issue is supplemental jurisdiction. The remaining claims arise under state law and the Court has declined to exercise supplemental jurisdiction over them.

These holdings—on attribution, territoriality, private remedies, and supplemental jurisdiction—resolve the action. Accordingly, the Complaint is dismissed with prejudice. In reaching this result, the Court does not reach the various issues raised by defendants as to whether the claims are otherwise pled adequately or whether the statute of limitations bars recovery on any or all causes of action.

Dated:   New York, New York
         February 6, 2013

SO ORDERED:

Sidney H. Stein, U.S.D.J.

49