N.Y.S.D. Case #
08-cv-5951(SHS)

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

_____

MANDATE

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the
Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the
18th day of September, two thousand and fourteen.

Before:        Amalya L. Kearse,
               Ralph K. Winter,
               Christopher F. Droney,
                    *Circuit Judge*s.
_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:        _____
DATE FILED: December 9, 2014

THE REPUBLIC OF IRAQ, including as Parens Patriae on behalf of
the Citizens of the Republic of Iraq,

Plaintiff-Appellant,

**JUDGMENT**
Docket No. 13-0618

v.

ABB AG; ABB AUTOMATION; ABB ELEKTRIC SANAYI AS;
ABB INDUSTRIE AC MACHINES; ABB INDUSTRIE CHAMPAGNE;
ABB NEAR EAST TRADING LTD.; ABB SOLYVENT-VENTEC;
AGCO DENMARK A/S; AGCO S.A.; VALTRA DO BRAZIL; AIR
LIQUIDE ENGINEERING; AKZO NOBEL N.V.; N.V. ORGANON;
INTERVET INTERNATIONAL B.V.; ASTRA ZENECA AB.; MAIS CO.
FOR MEDICAL PRODUCTS; ATLAS COPCO AIRPOWER N.V.;
ATLAS COPCO CMT; AWB, LTD.; B. BRAUN MEDICAL FRANCE;
B. BRAUN MELSUNGEN A.G.; B. BRAUN MEDICAL INDUSTRIES
SDN BHD (MALAYSIA); AESCULAP AG AND KG; AESCULAP
MOTRIC S.A.; AESCULAP SURGICAL INSTRUMENTS SDN; BOSTON
SCIENTIFIC S.A.; BNP PARIBAS USA; BNP PARIBAS (SUISSE) SA;
BNP PARIBAS HONG KONG; BNP PARIBAS PARIS; BNP PARIBAS
UK HOLDINGS LIMITED; BNP PARIBAS LONDON BRANCH;
BNP PARIBAS (SUISSE) SA; BUHLER LTD.; DAVID B. CHALMERS, JR.;
CHEVRON CORP.; DAEWOO INTERNATIONAL CORP.; DAIMLER
CHRYSLER AG; DOW AGROSCIENCES; EASTMAN KODAK S.A.;
EBEWE PHARMA GES M.B.H.; ELI-LILLY EXPORT S.A.; EL PASO
CORP.; EVAPCO EUROPE S.R.L.; FIATAVIO; FLOWSERVE CORP.;
FLOWSERVE POMPES; FLOWSERVE B.V.; GLAXOSMITHKLINE
WALLS HOUSE; GLAXOSMITHKLINE EGYPT SAE; GLAXO
WELLCOME EXPORT LTD.; GLAXO WELLCOME SA (SOUTH AFRICA)
(PRY) LTD.; SMITHKLINE BEECHAM INTERNATIONAL;
ABG ALLGEMEINE BAUMASCHINEN GESELLSCHAFTMBH DRESSER
INTERNATIONAL INGERSOLL-RAND ITALIANA, SPA.; THERMO
KING IRELAND LIMITED; INGERSOLL RAND BENELUX, N.V.;
INGERSOLL-RAND WORLD TRADE LTD.; CILAG AG INTERNATIONAL;
JANSSEN PHARMACEUTICAL; KIA MOTORS; LIEBHERR EXPORT AG;

**MANDATE ISSUED ON 12/09/2014**

LIEBHER FRANCE, SA; SERONO PHARMA INTERNATIONAL;
MERIAL; NOVO NORDISK; PAUWELS; RAILTECH INTERNATIONAL;
F. HOFFMAN LA ROCHE; ROCHE DIAGNOSTICS GMBH; ROHM AND
HAAS FRANCE, S.A.; SECALT S.A.; SIEMENS S.A.A. OF FRANCE;
SIEMENS SANAYI VE TICARET A.S. OF TURKEY; OSRAM MIDDLE
EAST FZE; SOLAR TURBINES EUROPE; ST. JUDE MEDICAL EXPORT
GMBH; SULZER BURCKHARDT ENGINEERING WORKS LTD.;
SULZER PUMPEN DEUTSCHLAND GMBH; SULZER TURBO LTD.;
TEXTRON, INC.; UNION PUMP S.A.S., formerly known as David Brown
Guinard Pumps S.A.S.; DAVID BROWN TRANSMISSIONS OF FRANCE
S.A.; RENAULT TRUCKS SAS; RENAULT AGRICULTURE &
SONALIKA INTERNATIONAL; RENAULT V.I.; VOLVO
CONSTRUCTION EQUIPMENT AB, a successor company to Volvo
Construction Equipment International; THE WEIR GROUP; OSCAR S.
WYATT, JR.; VITOL, S.A.; WOODHOUSE INTERNATIONAL;
YORK AIR CONDITIONING AND REFRIGERATION FZE,

Defendants-Appellees.

_____

      The appeal in the above captioned case from a judgment of the United States District
Court for the Southern District of New York was argued on the district court's record and the
parties' briefs.  Upon consideration thereof,

      IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the
district court is AFFIRMED.

                                 For The Court:

                                 Catherine O'Hagan Wolfe,
                                 Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

13-0618
Republic of Iraq v. ABB AG

1                    UNITED STATES COURT OF APPEALS

2                       FOR THE SECOND CIRCUIT

3                             - - - - - -

4                           August Term, 2013

5    (Argued: February 18, 2014                    Decided: September 18, 2014)

6                          Docket No. 13-0618

7    _____

8    THE REPUBLIC OF IRAQ, including as Parens Patriae on behalf of the Citizens
9    of the Republic of Iraq,

10                             Plaintiff-Appellant,

11                                  - v. -

12   ABB AG; ABB AUTOMATION; ABB ELEKTRIK SANAYI AS; ABB
13   INDUSTRIE AC MACHINES; ABB INDUSTRIE CHAMPAGNE; ABB NEAR
14   EAST TRADING LTD.; ABB SOLYVENT-VENTEC; AGCO DENMARK A/S;
15   AGCO S.A.; VALTRA DO BRAZIL; AIR LIQUIDE ENGINEERING; AKZO
16   NOBEL N.V.; N.V. ORGANON; INTERVET INTERNATIONAL B.V.; ASTRA
17   ZENECA AB.; MAIS CO. FOR MEDICAL PRODUCTS; ATLAS COPCO
18   AIRPOWER N.V.; ATLAS COPCO CMT; AWB, LTD.; B. BRAUN MEDICAL
19   FRANCE; B. BRAUN MELSUNGEN A.G.; B. BRAUN MEDICAL
20   INDUSTRIES SDN BHD (MALAYSIA); AESCULAP AG AND KG;
21   AESCULAP MOTRIC S.A.; AESCULAP SURGICAL INSTRUMENTS SDN;
22   BOSTON SCIENTIFIC S.A.; BNP PARIBAS USA; BNP PARIBAS (SUISSE)
23   SA; BNP PARIBAS HONG KONG; BNP PARIBAS PARIS; BNP PARIBAS
24   UK HOLDINGS LIMITED; BNP PARIBAS LONDON BRANCH; BNP
25   PARIBAS (SUISSE) SA; BUHLER LTD.; DAVID B. CHALMERS, JR.;
26   CHEVRON CORP.; DAEWOO INTERNATIONAL CORP.; DAIMLER-
27   CHRYSLER AG; DOW AGROSCIENCES; EASTMAN KODAK S.A.; EBEWE
28   PHARMA GES M.B.H.; ELI-LILLY EXPORT S.A.; EL PASO CORP.;
29   EVAPCO EUROPE S.R.L.; FIATAVIO; FLOWSERVE CORP.; FLOWSERVE
30   POMPES; FLOWSERVE B.V.; GLAXOSMITHKLINE WALLS HOUSE;
31   GLAXOSMITHKLINE EGYPT SAE; GLAXO WELLCOME EXPORT LTD.;
32   GLAXO WELLCOME SA (SOUTH AFRICA) (PRY) LTD.; SMITHKLINE

1    BEECHAM INTERNATIONAL; ABG ALLGEMEINE BAUMASCHINEN-
2    GESELLSCHAFTMBH DRESSER INTERNATIONAL INGERSOLL-RAND
3    ITALIANA, SPA.; THERMO KING IRELAND LIMITED; INGERSOLL-
4    RAND BENELUX, N.V.; INGERSOLL-RAND WORLD TRADE LTD.; CILAG
5    AG INTERNATIONAL; JANSSEN PHARMACEUTICAL; KIA MOTORS;
6    LIEBHERR EXPORT AG;LIEBHER FRANCE, SA; SERONO PHARMA
7    INTERNATIONAL; MERIAL; NOVO NORDISK; PAUWELS; RAILTECH
8    INTERNATIONAL; F. HOFFMAN LA ROCHE; ROCHE DIAGNOSTICS
9    GMBH; ROHM AND HAAS FRANCE, S.A.; SECALT S.A.; SIEMENS S.A.A.
10   OF FRANCE; SIEMENS SANAYI VE TICARET A.S. OF TURKEY; OSRAM
11   MIDDLE EAST FZE; SOLAR TURBINES EUROPE; ST. JUDE MEDICAL
12   EXPORT GMBH; SULZER BURCKHARDT ENGINEERING WORKS LTD.;
13   SULZER PUMPEN DEUTSCHLAND GMBH; SULZER TURBO LTD.;
14   TEXTRON, INC.; UNION PUMP S.A.S., formerly known as David Brown
15   Guinard Pumps S.A.S.; DAVID BROWN TRANSMISSIONS OF FRANCE S.A.;
16   RENAULT TRUCKS SAS; RENAULT AGRICULTURE & SONALIKA
17   INTERNATIONAL; RENAULT V.I.; VOLVO CONSTRUCTION
18   EQUIPMENT AB, a successor company to Volvo Construction Equipment
19   International; THE WEIR GROUP; OSCAR S. WYATT, JR.; VITOL, S.A.;
20   WOODHOUSE INTERNATIONAL; YORK AIR CONDITIONING AND
21   REFRIGERATION FZE,

22                              <u>Defendants-Appellees</u>.[*]
23   _____


24   Before:  KEARSE, WINTER, and DRONEY, <u>Circuit Judges</u>.

25              Appeal from a judgment of the United States District Court for the Southern District

26   of New York, Sidney H. Stein, <u>Judge</u>, dismissing the amended complaint of plaintiff The Republic

27   of Iraq under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 <u>et seq.</u>, the

28   Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 <u>et seq.</u>, and common law, seeking recovery for

29   defendants' alleged conspiracy with Iraq's then-president Saddam Hussein and Iraq's ministries to

30   corrupt and plunder the Oil-for-Food Programme, an international humanitarian program administered

_____

*      The Clerk of Court is directed to amend the official caption to conform with the
       above.

- 2 -

1    by the United Nations during the final years of Hussein's rule.   The district court dismissed the

2    amended complaint on the grounds, <u>inter alia</u>, that plaintiff was <u>in pari delicto</u> with defendants and

3    that the Foreign Corrupt Practices Act does not confer a private right of action; finding that plaintiff's

4    remaining common-law claims arose under state rather than federal law, the court declined to exercise

5    supplemental jurisdiction over them.   <u>See</u> 920 F.Supp.2d 517 (2013).

6            AFFIRMED.

7            Judge Droney concurs in part and dissents in part, in a separate opinion.

8            MARK MANEY, Houston, Texas (Roliff Purrington, Maney &
9                  González-Félix, Houston, Texas; Stanley D. Bernstein,
10                 Christian Siebott, Bernstein Liebhard, New York, New York,
11                 on the brief), <u>for Plaintiff-Appellant</u>.

12           BRANT W. BISHOP, Washington, D.C. (Thomas D. Yannucci, John
13                 R. Bolton, Robert B. Gilmore, Kirkland & Ellis, Washington,
14                 D.C., on the joint brief), <u>for Defendants-Appellees Siemens</u>
15                 <u>S.A.A. of France, Siemens Sanayi ve Ticaret A.S. of Turkey,</u>
16                 <u>and OSRAM Middle East FZE</u>.

17           ROBERT S. BENNETT, Washington, D.C. (Christopher T. Handman,
18                 Ellen S. Kennedy, Hogan Lovells, Washington, D.C.; Jennifer
19                 L. Spaziano, Skadden, Arps, Slate, Meagher & Flom,
20                 Washington, D.C., on the joint brief), <u>for Defendants-</u>
21                 <u>Appellees BNP Paribas USA, BNP Paribas (Suisse) SA, BNP</u>
22                 <u>Paribas Hong Kong, BNP Paribas Paris, BNP Paribas UK</u>
23                 <u>Holdings Limited, and BNP Paribas London Branch</u>.

24           AXINN, VELTROP & HARKRIDER (John D. Harkrider, New York,
25                 New York, Gail L. Gottehrer, Hartford, Connecticut, on the
26                 joint brief), <u>for Defendant-Appellee Secalt S.A.</u>

27           WILLIAMS & CONNOLLY (Robert A. Van Kirk, Katherine M.
28                 Turner, Washington, D.C., on the joint brief), <u>for Defendants-</u>
29                 <u>Appellees Textron, Inc., Union Pump S.A.S., and David Brown</u>
30                 <u>Transmissions of France, S.A.</u>

31           PILLSBURY WINTHROP SHAW PITTMAN (John F. Pritchard,
32                 Edward Flanders, Ranah L. Esmaili, New York, New York, on

- 3 -

the joint brief), <u>for Defendants-Appellees Atlas Copco Airpower N.V. and Atlas Copco CMT</u>.

KIRKLAND & ELLIS (James P. Gillespie, Karen McCartan DeSantis, Washington, D.C., on the joint brief), <u>for Defendants-Appellees ABB AG, ABB Automation, ABB Elektric Sanayi AS, ABB Industrie AC Machines, ABB Industrie Champagne, and ABB Near East Trading Ltd.</u>

TROUTMAN SANDERS (Elliot Cohen, New York, New York, on the joint brief), <u>for Defendants-Appellees AGCO Denmark A/S, AGCO S.A., and Valtra do Brazil</u>.

LEADER & BERKON (Michael J. Tiffany, New York, New York; Christopher S. Riley, Barnes & Thornburg, Elkhart, Indiana, on the joint brief), <u>for Defendant-Appellee ABB Solyvent-Ventec</u>.

BAKER & McKENZIE (Darrell Prescott, New York, New York, on the joint brief), <u>for Defendant-Appellee Air Liquide Engineering</u>.

COVINGTON & BURLING (Nancy Kestenbaum, New York, New York, Mark H. Lynch, Washington, D.C., on the joint brief), <u>for Defendants-Appellees Akzo Nobel N.V., N.V. Organon, Intervet International B.V., Astra Zeneca AB., Cilag AG International, Janssen Pharmaceutical, and Merial</u>.

ALSTON & BIRD (Karl Geercken, New York, New York, on the joint brief), <u>for Defendants-Appellees B. Braun Medical France, B. Braun Melsungen A.G., B. Braun Medical Industries SDN BHD (Malaysia), Aesculap AG and KG, Aesculap Motric S.A., and Aesculap Surgical Instruments SDN</u>.

CRAVATH, SWAINE & MOORE (Robert H. Baron, Timothy G. Cameron, New York, New York, on the joint brief), <u>for Defendant-Appellee AWB, Ltd.</u>

PARK & JENSEN (Tai H. Park, New York, New York, on the joint brief), <u>for Defendant-Appellee Boston Scientific S.A.</u>

PEPPER HAMILTON (Robert L. Hickok, Barak A. Bassman, Philadelphia, Pennsylvania, Kenneth J. King, New York, New York, on the joint brief), <u>for Defendants-Appellees GlaxoSmithKline Egypt SAE, Glaxo Wellcome Export Ltd.,</u>

- 4 -

1  Glaxo Wellcome SA (South Africa) (PRY) Ltd., and
2  SmithKline Beecham International.

3  SPAGNOLETTI & CO. (Francis I. Spagnoletti, David S. Toy,
4  Houston, Texas, on the joint brief), <u>for Defendant-Appellee</u>
5  <u>David B. Chalmers, Jr.</u>

6  SHEARMAN & STERLING (Philip E. Urofsky, Washington, D.C.,
7  Danforth Newcomb, H. Miriam Farber, New York, New York,
8  on the joint brief), <u>for Defendants-Appellees Buhler Ltd.,</u>
9  <u>Daimler-Chrysler AG, ABG Allgemeine Baumaschinen-</u>
10  <u>GesellschaftmbH, Sulzer Pumpen Deutschland GmbH, Sulzer</u>
11  <u>Turbo Ltd., Renault Trucks SAS, Renault V.I., and Volvo</u>
12  <u>Construction Equipment AB.</u>

13  JONES DAY (Meir Feder, Thomas E. Lynch, New York, New York,
14  on the joint brief), <u>for Defendant-Appellee Chevron Corp.</u>

15  GIBBONS (Thomas R. Valen, Newark, New Jersey, on the joint brief),
16  <u>for Defendants-Appellees Daewoo International Corp. and Kia</u>
17  <u>Motors.</u>

18  FULBRIGHT & JAWORSKI (Mark A. Robertson, New York, New
19  York, on the joint brief), <u>for Defendant-Appellee El Paso Corp.</u>

20  CADWALADER, WICKERSHAM & TAFT (Jason Jurgens, Nathan
21  M. Bull, New York, New York, on the joint brief), <u>for</u>
22  <u>Defendant-Appellee Dow AgroSciences.</u>

23  BOWIE & JENSEN (R. Michael Smith, Towson, Maryland, on the
24  joint brief), <u>for Defendant-Appellee Evapco Europe S.r.l.</u>

25  KELLEY DRYE & WARREN (Thomas B. Kinzler, David Zalman,
26  Melissa E. Byroade, New York, New York, on the joint brief),
27  <u>for Defendants-Appellees Flowserve Corp., Flowserve Pompes,</u>
28  <u>and Flowserve B.V.</u>

29  ROTHWELL, FIGG, ERNST & MANBECK (Robert P. Parker,
30  Washington, D.C., on the joint brief), <u>for Defendant-Appellee</u>
31  <u>Ingersoll-Rand Benelux, N.V.</u>

32  SIDLEY AUSTIN (Richard D. Klingler, Steven J. Horowitz,
33  Washington, D.C., Dorothy J. Spenner, New York, New York,
34  on the joint brief), <u>for Defendants-Appellees Eli-Lilly Export</u>

- 5 -

1    S.A., Ingersoll-Rand Italiana, SpA., Thermo King Ireland
2    Limited, Ingersoll-Rand World Trade Ltd., and Novo Nordisk.

3    WILLCOX & SAVAGE (Brett A. Spain, Norfolk, Virginia, on the
4    joint brief), for Defendants-Appellees Liebherr Export AG and
5    Libher France, SA.

6    NIXON PEABODY (Michael S. Cohen, Jericho, New York, on the
7    joint brief), for Defendant-Appellee Serono Pharma
8    International.

9    EPSTEIN BECKER & GREEN (Peter L. Altieri, David J. Clark, New
10   York, New York, on the joint brief), for Defendant-Appellee
11   Railtech International.

12   HARKINS CUNNINGHAM (John G. Harkins, Jr., Philadelphia,
13   Pennsylvania, on the joint brief), for Defendant-Appellee
14   Rohm and Haas France, S.A.

15   ALSTON & BIRD (John P. Doherty, New York, New York, on the
16   joint brief), for Defendant-Appellee Pauwels.

17   DAVIS POLK & WARDWELL (Brian S. Weinstein, New York, New
18   York, Jason McCullough, Washington, D.C., on the joint
19   brief), for Defendants-Appellees F. Hoffman La Roche and
20   Roche Diagnostics GmbH.

21   BAKER & HOSTETLER (Gregory L. Baker, Washington, D.C., on
22   the joint brief), for Defendant-Appellee Solar Turbines Europe.

23   CARTER LEDYARD & MILBURN (Judith A. Lockhart, New York,
24   New York, on the joint brief), for Defendant-Appellee St. Jude
25   Medical Export GmbH.

26   DRINKER BIDDLE & REATH (Clay J. Pierce, New York, New
27   York, on the joint brief), for Defendant-Appellee Renault
28   Agriculture & Sonalika International.

29   CANALES & SIMONSON (J.A. Canales, Corpus Christi, Texas, on
30   the joint brief), for Defendant-Appellee Oscar S. Wyatt, Jr.

31   BAKER & McKENZIE (Larence Walker Newman, New York, New
32   York, on the joint brief), for Defendant-Appellee Sulzer
33   Burckhardt Engineering Works Ltd.

- 6 -

1                JONES DAY (Michael H. Ginsberg, Pittsburgh, Pennsylvania, on the
2                      joint brief), <u>for Defendant-Appellee The Weir Group</u>.

3                SULLIVAN & CROMWELL (Penny Shane, Andrew P. Giering, New
4                      York, New York, on the joint brief), <u>for Defendant-Appellee</u>
5                      <u>Vitol, S.A.</u>

6                K&L GATES (Walter P. Loughlin, New York, New York; Andrew
7                      Siegel, Christopher A. Payne, Sandler Siegel, Dallas, Texas, on
8                      the joint brief), <u>for Defendant-Appellee Woodhouse</u>
9                      <u>International</u>.

10             REED SMITH (Casey D. Laffey, New York, New York, on the joint
11                   brief), <u>for Defendant-Appellee York Air Conditioning and</u>
12                   <u>Refrigeration FZE</u>.

13      KEARSE, <u>Circuit Judge</u>:

14            Plaintiff The Republic of Iraq (or the "Republic") appeals from a judgment of the

15      United States District Court for the Southern District of New York, Sidney H. Stein, <u>Judge</u>, dismissing

16      its claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

17      §§ 1961 <u>et seq.</u>, the Foreign Corrupt Practices Act (or "FCPA"), 15 U.S.C. §§ 78dd-1 <u>et seq.</u>, and

18      common law, against numerous defendants who are alleged to have conspired in 1997-2003 with

19      Iraq's then-president Saddam Hussein and Iraq's ministries and state-owned enterprises to corrupt and

20      plunder an international humanitarian program administered by the United Nations (or "U.N."),

21      known as the Oil-for-Food Programme (or the "Programme").  Defendants moved to dismiss the

22      Republic's First Amended Complaint (the "Amended Complaint" or "Complaint") principally pursuant

23      to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  They moved to dismiss pursuant to Rule 12(b)(1) on the

24      grounds that the Republic's claims are nonjusticiable by reason of the act-of-state doctrine and the

1    political-question doctrine and on the ground that the Republic lacked standing to seek relief.

2    Defendants moved to dismiss pursuant to Rule 12(b)(6) for, <u>inter alia</u>, failure to state a claim on which

3    relief can be granted, arguing that RICO does not apply to a conspiracy involving primarily foreign

4    actors and foreign acts, that the FCPA does not provide a private right of action, that the Republic was

5    <u>in pari delicto</u> with defendants, and that the Complaint failed to allege proximate causation.  The

6    district court granted the Rule 12(b)(6) motions on those grounds; it also ruled that the Republic's

7    remaining claims arose under state law rather than federal law, and it declined to exercise

8    supplemental jurisdiction over them.

9            On appeal, the Republic challenges these rulings.  As to the <u>in pari delicto</u> ruling, the

10   Republic contends principally that that doctrine was inapplicable on the ground that the conduct of

11   Hussein and Iraq's ministries is not attributable to the Republic because that conduct was adverse to

12   the interests of Iraq and its citizens.  For the reasons that follow, we conclude that (1) the RICO claims

13   were properly dismissed on the basis of <u>in pari delicto</u>; (2) the Republic does not have a right of action

14   under the FCPA; and (3) the common-law claims arose under state law, and the district court properly

15   declined to exercise supplemental jurisdiction over them.  We affirm the judgment on these bases and

16   need not address the Republic's challenges to the district court's other rulings.


17                                    I.  BACKGROUND


18           The principal legal premise of the Republic's Amended Complaint is that the "Hussein

19   Regime," defined as "Saddam Hussein and his representatives" (Amended Complaint ¶ 2), although

20   it "was in <u>de facto</u> control of the nation, . . . was not a <u>de jure</u> or legitimate government" (<u>id</u>. ¶ 220).


- 8 -

1    The factual allegations of the Amended Complaint, together with public documents that were before

2    the district court, may be summarized, as relevant to this appeal, as follows.

3    A.  <u>Saddam Hussein's Regime in Iraq</u>

4          Saddam Hussein, the former president of The Republic of Iraq, rose to power in 1979

5    in a military coup and remained in power for more than two decades.  Hussein consolidated his

6    authority over Iraq by harshly and "systematically remov[ing] all opposition" and "install[ing]

7    officials under his direct control in all areas of the government."  (Amended Complaint ¶¶ 217-218.)

8    The Hussein Regime further suppressed opposition by means of, <u>inter alia</u>, imprisonment and

9    execution of dissidents, and use of chemical weapons and force against civilian opponents, causing

10    birth defects and many thousands of deaths.

11          In 1980, Hussein caused the Iraqi army to invade Iran, staring an eight-year war in

12    which Iraq used chemical weapons against Iranian troops and ballistic missiles against Iranian cities.

13    On August 2, 1990, Iraq invaded Kuwait, beginning a seven-month occupation during which Iraq

14    killed and committed numerous abuses against Kuwaiti civilians.  Ultimately, after his regime was

15    deposed in 2003, Hussein was convicted in an Iraqi court for crimes against humanity, having been

16    found responsible for the systematic and widespread attack on civilian inhabitants of an Iraqi town,

17    and was executed by Iraqi authorities.

18          In the meantime, the international community's reaction to Iraq's invasion of Kuwait

19    was swift and censorious.  The United Nations Security Council ("Security Council"), on the day of

20    the invasion, "[c]ondemn[ed] the Iraqi invasion of Kuwait," "[d]emand[ed] that Iraq withdraw

21    immediately and unconditionally all its forces to the positions in which they were located on 1 August

- 9 -

1    1990," and "[c]all[ed] upon Iraq and Kuwait to begin immediately intensive negotiations for the

2    resolution of their differences."   S.C. Res. 660, ¶¶ 1-3, U.N. Doc. S/RES/660 (Aug. 2, 1990)

3    ("Resolution 660") (italics in original).  On August 3, 1990, the President of the United States--which

4    had established diplomatic relations with the Hussein-led government of Iraq in 1984, see U.S.

5    Department of State, Office of the Historian, A Guide to the United States' History of Recognition,

6    Diplomatic,   and   Consular   Relations,   by   Country,   since   1776:      Iraq,   at

7    http://history.state.gov/countries/iraq (last visited September 16, 2014); 1984 PUBLIC PAPERS OF

8    THE PRESIDENTS OF THE UNITED STATES: RONALD REAGAN 1834 (1987)--issued an

9    Executive Order finding that "the policies and actions of the Government of Iraq constitute an unusual

10   and extraordinary threat to the national security and foreign policy of the United States" and

11   "declar[ing] a national emergency to deal with that threat" (Amended Complaint ¶ 248 (internal

12   quotation marks omitted)).  On August 6, 1990, Iraq not having complied with the Resolution 660

13   demands, the Security Council adopted a resolution to impose on Iraq economic sanctions of

14   "unparalleled" "scope and intensity" (Amended Complaint ¶ 293 (internal quotation marks omitted)),

15   calling on all States to embargo trade and financial transactions with Iraq.  See S.C. Res. 661, ¶¶ 3-5,

16   U.N. Doc. S/RES/661 (Aug. 6, 1990) ("Resolution 661").   The United States government

17   implemented these sanctions, and soon thereafter designated Iraq as a state sponsor of terrorism.

18        In February 1991, an international military coalition repelled Iraqi forces from Kuwait.

19   After United Nations fact-finding missions to Iraq in March 1991 found immense suffering in the

20   Iraqi population, the Security Council adopted a resolution that, while continuing most of the

21   sanctions imposed by Resolution 661, would have allowed the export of foodstuffs to Iraq if Iraq

22   agreed to certain conditions.  See S.C. Res. 687, ¶ 20, U.N. Doc. S/RES/687 (Apr. 3, 1991).  Two

-10-

1   other Security Council resolutions in 1991 would have allowed the Hussein Regime to sell Iraqi oil

2   in return for food and medicine.  The Hussein Regime, however, was unwilling to participate in such

3   humanitarian transactions on the conditions required by the United Nations; instead, it used the

4   suffering of the Iraqi people as a negotiating tool in pressing for an end to the economic sanctions.

5   For years, the Iraqi people continued to suffer and starve.

6   B.  The Oil-for-Food Programme

7            The impasse ended in 1996, when the Hussein Regime agreed, in a Memorandum of

8   Understanding ("MOU"), to participate in a new United Nations plan, the Oil-for-Food Programme.

9   See S.C. Res. 986, U.N. Doc. S/RES/986 (Apr. 14, 1995).  Iraq was to be allowed to sell its petroleum

10  and petroleum products (collectively "oil") to foreign purchasers and to use the proceeds of those sales

11  to purchase from foreign vendors food and other humanitarian goods to benefit Iraq's civilian

12  population.  From the perspective of the United Nations, the Programme was intended "as a means

13  for reconciling strong sanctions against a corrupt Iraqi regime with [the] need[ to get] supplies of food

14  and medicines to an innocent and vulnerable population."  (Amended Complaint ¶ 296 (internal

15  quotation marks omitted).)

16           The Programme, overseen by a United Nations international committee called the

17  "661 Committee"--named in reference to Resolution 661--was designed to prevent Iraqi leaders from

18  using proceeds of oil sales for political and personal ends.  The Programme's features included

19  requirements for U.N. approval of every contract for Iraq's sale of oil and every contract for Iraq's

20  purchase of goods, and for the establishment of an "Escrow Account," at a bank selected by the

21  United Nations, through which all payments to and by Iraq would be made.

-11-

1        Each purchaser of Iraqi oil was required to make full disclosure of the terms of the

2    contract; every contract incorporated U.N. regulations.  The price to be paid, known as the "Official

3    Selling Price" or "OSP," was set monthly by the United Nations in an attempt to reflect fair market

4    value.  The contract price was supposed to represent the entire purchase price for the oil.  The oil

5    purchases were guaranteed by letters of credit in favor of the Escrow Account, into which all moneys

6    would be paid.

7        The Programme permitted Iraq to use Escrow Account funds to purchase "medicine,

8    health supplies, foodstuffs and materials and supplies for essential civilian needs," to be distributed

9    equitably to "the Iraqi population throughout the country."  (Amended Complaint ¶ 280 (internal

10   quotation marks omitted); see id. ¶ 328.)  Iraqi government ministries and state-owned enterprises

11   negotiated contracts for the purchase of these goods.  The 661 Committee or its delegatee reviewed

12   each contract to see that it was in accordance with "normal commercial practice," acceptable "price

13   and value," and United Nations policies.  (Id. ¶¶ 328, 335 (internal quotation marks omitted).)  After

14   each contract was approved, the United Nations authorized the execution of a letter of credit against

15   the Escrow Account, from which payment would be made to the vendor upon delivery of the goods

16   in Iraq.

17       During the Programme's seven years, $64.2 billion was deposited into the Escrow

18   Account from the sale of Iraqi oil.  Approximately $37 billion was spent to purchase humanitarian

19   goods, and another $18 billion was disbursed to satisfy Kuwaiti claims against the Iraqi government.

20   (See id. ¶ 306.)  Following the downfall of the Hussein Regime, the remaining balance in the Escrow

21   Account was transferred to an account owned by the Republic.

-12-

1    C.  Subversion of the Programme

2              Notwithstanding United Nations goals for and oversight of the Programme, the Hussein

3    Regime, which was concerned with maintaining its power, found ways to turn the Programme to its

4    own advantage and to undermine the economic sanctions.  The fact that the Programme permitted the

5    Iraqi government to choose with whom it dealt allowed the Hussein Regime to make covert side

6    arrangements both with foreign buyers of oil and with sellers of humanitarian goods and to divert

7    money intended for the welfare of the Iraqi people.

8              First, the Hussein Regime "curr[ied] political favor" and rewarded political allies

9    abroad by selling them oil at prices below fair market value.  (Amended Complaint ¶¶ 355-361.)  It

10   accomplished this, in part, by having allies provide a U.N. committee with "false market data" and

11   "lobb[y]" that committee to set an OSP that was artificially low.  (Id. ¶¶ 384-385.)  Such low prices

12   allowed purchasers to assign their interests (which was impermissible without U.N. approval) or to

13   resell at a profit, with no risk or effort.

14             Thereafter, Iraq began requiring that anyone who wanted to purchase oil under the

15   Programme pay "surcharges"--"illicit" side payments added to the per-barrel price of the oil sold.  (Id.

16   ¶ 363; see, e.g., id. ¶¶ 395, 423, 440, 468, 512.)  In addition, the Hussein Regime began imposing new

17   surcharges characterized as "port fees," demanding those payments before permitting cargo ships to

18   load oil at Iraqi ports.  (Id. ¶ 365 (internal quotation marks omitted).)  The purchasers of Iraq's oil paid

19   the surcharges through "bank accounts owned or controlled by the Hussein Regime" in foreign

20   countries.  (Id. ¶ 363; see, e.g., id. ¶¶ 426, 473, 512.)  The approved contract prices for the oil were

21   sufficiently below the market price to allow these kickbacks to be paid and still allow the purchasers

22   to resell the oil and enjoy "excessive profits."  (Id. ¶ 384.)  Thus, instead of negotiating contracts for

-13-

1   the sale of oil at market value, all of the proceeds of which would have gone, via the Escrow Account,

2   toward the purchase of humanitarian goods, the Hussein Regime diverted a portion of that market

3   value into the Regime's coffers.

4       The Complaint alleged that the underpricing of oil ended in 2002 after the United

5   Nations became fully aware of it and instituted "retroactive oil pricing to ensure oil was purchased

6   at market rates." (Amended Complaint ¶ 378; see id. ¶ 1108.)  Before that change, the surcharges that

7   would have been part of a market-value purchase price, but were paid to the Hussein Regime instead

8   of to the Escrow Account, totaled approximately $228.8 million.  (See id. ¶ 1101.)   In all, the

9   underpricing, which ranged from $1 to $4 per barrel, resulted in losses to the Escrow Account of at

10  least $1.8 billion.  (See id. ¶¶ 1103-1104.)

11      The Hussein Regime found even more lucrative ways to profit from the purchasing side

12  of the Programme.  First, the Hussein Regime required all of Iraq's ministries to fabricate "non-

13  negotiable 'transportation fees' on goods requiring inland delivery." (Id. ¶ 527.) Although the vendors

14  included charges for such transportation in their contract prices, and they received payments for those

15  charges from the Escrow Account, no legitimate transportation services were provided, and the fees

16  thus included were kicked back to the Hussein Regime (see id. ¶¶ 530-535).

17      Thereafter, the Hussein Regime added so-called "after-sales-service-fee[s]" on all

18  purchase contracts under the Programme.  (Id. ¶ 558 (internal quotation marks omitted).)  These fees,

19  which were also included in the contract prices, were "mandatory kickback[s]" (id. ¶ 566 (internal

20  quotation marks omitted)) to the Hussein Regime, and ranged from 2 to 30 percent of the purchase

21  price of the goods (see id. ¶¶ 561, 563).

-14-

1          Both sets of fees violated the terms of the Programme, which permitted the payment

2     only of legitimate service fees for "services . . . ancillary to the supply of material goods" (id. ¶ 572

3     (internal quotation marks omitted)).  The suppliers of humanitarian goods paid the kickbacks to the

4     Hussein Regime "in one of three ways:  cash, transfers to Regime-controlled accounts, or payments

5     to front companies controlled by individuals or companies loyal to the Hussein Regime." (Id. ¶ 565;

6     see, e.g., id. ¶ 536 (cash); id. ¶¶ 599, 859 (foreign bank accounts); id. ¶¶ 530, 536 (front companies).)

7     The sham transportation and after-sales-service fees totaled some $1.55 billion.  (See id. ¶¶ 555, 620,

8     1111.)

9          In addition to paying sham fees using escrowed funds, the vendors profited by pricing

10    their goods above fair market value, as well as by delivering substandard goods.  (See Amended

11    Complaint ¶¶ 640-655.)  The Complaint estimated that the cost to the Escrow Account of the delivery

12    of substandard and overpriced goods was at least $7 billion.  (See id. ¶¶ 655, 1112.)

13    D.  The Claims Against Defendants

14         On the basis of these events, the Amended Complaint asserted claims against three

15    groups of defendants.  Five defendants are characterized as "Oil Purchasing Defendants."  They

16    include defendants David B. Chalmers, Jr., and Oscar S. Wyatt, Jr., who had personal ties to the

17    Hussein Regime and who have pleaded guilty to conspiracy offenses related to Programme corruption.

18    (See Amended Complaint ¶¶ 397-407, 478-492.)  The other three Oil Purchasing Defendants are

19    energy firms, one of which was affiliated with Wyatt.  These firms purchased Iraqi oil through the

20    Programme, either directly or indirectly, and paid surcharges, either directly or indirectly, to the Iraqi

21    government.  (See id. ¶¶ 421-475.)  Two of these firms entered into non-prosecution agreements with

-15-

1    the Department of Justice, and the third pleaded guilty in state court to grand larceny, in relation to

2    their roles in the Programme corruption.  (See id. ¶¶ 424, 442, 462-464.)

3            Six other defendants, BNP Paribas USA and five affiliates (collectively "BNP"), are

4    banking entities.  BNP was the bank at which the United Nations established the Escrow Account

5    through which the Oil Purchasing Defendants paid for Iraqi oil and through which Iraq paid for the

6    humanitarian goods it purchased.  The Escrow Account was located at BNP Paribas USA in New

7    York City.  (See Amended Complaint ¶¶ 286, 975, 978.)  Under the terms of its agreement with the

8    United Nations and a United States government license to deal in Iraqi funds, BNP was obligated to

9    conform its conduct to the Programme's rules.  Notwithstanding this obligation, BNP, which issued

10   letters of credit for a majority of the oil purchases under the Programme, contravened Programme

11   regulations and its agreement with the United Nations by, inter alia, "cooperati[ng] with the Oil

12   Purchasing Defendants to hide material information from the UN" including its knowledge that "oil

13   purchasers were paying a substantial premium over the OSP" and that some oil purchasers "were

14   financing the purchase of oil . . . by others" (id. ¶¶ 1022-1024); "ma[king] payments of Escrow funds

15   without proper authorization from the United Nations" (id. ¶ 1038); and being "involved in the

16   transfer of approximately $10 million in illicit surcharges paid to the Hussein Regime" (id. ¶ 1050).

17           All of the remaining defendants discussed in the Complaint are characterized as

18   "Vendor Defendants."  Their businesses involved the sale of foodstuffs, pharmaceuticals, medical and

19   agricultural supplies, industrial machinery, and vehicles; all of these defendants are alleged to have

20   participated in the scheme to overcharge for their products and to pay part of the overage back to the

21   Hussein Regime.  (See Amended Complaint ¶¶ 800-974.)  Several of the Vendor Defendants have

22   admitted--in deferred prosecution agreements, plea agreements, or other public admissions--that they

23   secretly paid illegal kickbacks on Programme contracts.  (See id. ¶¶ 662-799.)

-16-

1    The Complaint principally asserted claims against all defendants under RICO.  It

2    alleged that the Oil-for-Food Programme was a RICO enterprise, either in itself or as associated in

3    fact with, inter alia, defendants and the 661 Committee; the Complaint alleged that defendants

4    conducted or participated in the conduct of the enterprise through a pattern of racketeering activity

5    involving, inter alia, mail and wire fraud, money laundering, and bribery, in violation of 18 U.S.C.

6    § 1962(c), and conspired to do so in violation of id. § 1962(d).  The Complaint also alleged that, by

7    paying kickbacks to the Hussein Regime, the Vendor and Oil Purchasing Defendants violated the

8    Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 et seq.

9    The Complaint asserted, inter alia, common-law claims against BNP for breach of its

10   fiduciary duty to Iraq; claims against two of the Oil Purchasing Defendants for inducing BNP to

11   breach that fiduciary duty; claims against all defendants for fraud and conspiracy to commit fraud in

12   dealing with the United Nations in connection with the Programme, for breach of their contractual

13   commitments to the United Nations, and for unjust enrichment resulting from the excessive profits

14   made as a result of their illegal kickbacks to the Hussein Regime; and claims against all defendants

15   for inducing the Hussein Regime to breach its fiduciary duties to the Iraqi people.


16   E.  The District Court Decision

17   Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(1) on

18   a variety of jurisdictional grounds, and pursuant to Rule 12(b)(6) for failure to state a claim for a

19   variety of reasons.  In a thorough opinion reported at 920 F.Supp.2d 517, the district court rejected

20   defendants' jurisdictional arguments; but it granted defendants' motions to dismiss the Republic's

21   RICO claims on the alternative grounds of (1) lack of extraterritorial applicability of RICO, (2) the

22   defense of in pari delicto, and (3) the Amended Complaint's failure to allege that defendants'

-17-

1  racketeering activity was the proximate cause of the Republic's injuries.  See id. at 542-50.  The court

2  also agreed with defendants that "the FCPA offers no private right of action."  Id. at 551.  And,

3  concluding that the Republic's common-law claims arose under state rather than federal law, the court

4  declined to exercise supplemental jurisdiction as to those claims.  See id.

5      In addressing the in pari delicto defense, the district court stated in part as follows:

6      Iraq has attempted to fit this wrongdoing into the mold of a civil action.
7  At its heart, Iraq says, its case amounts to a principal seeking to recover for the
8  harms caused to it by a wayward agent--Saddam Hussein--and his co-
9  conspirators the defendants in this action. . . .

10      Defendants have now moved to dismiss Iraq's First Amended
11  Complaint ("Complaint") on a variety of theories, almost all of which touch on
12  the relationship of Iraq to the wrongs for which it seeks relief.  The parties
13  agree that the injustices alleged were instigated and directed by Hussein and
14  his Regime.  But the parties dispute whether the Republic of Iraq must bear
15  responsibility for the acts of the Hussein Regime and, if so, what that
16  responsibility means for this action.

17      The Court concludes that the Complaint alleges conduct by the Hussein
18  Regime that, as a matter of law, is attributable to plaintiff itself, the Republic
19  of Iraq.  The alleged misconduct has a governmental character.  Therefore, the
20  conduct comes within the default rule that a regime's governmental conduct
21  redounds to the sovereign.  The Court rejects Iraq's view that it may sidestep
22  responsibility because the conduct was illegal or the actors held power
23  illegitimately.  Sovereigns . . . cannot escape the consequences of their
24  representatives' governmental misconduct.  Questions of attribution are distinct
25  from questions of lawfulness or legitimacy.

26      The legal relationship between Iraq and Hussein frames the case . . . .
27  Having engineered the wrongdoing alleged in the Complaint, and having
28  alleged that the wrongdoing directly harmed the Programme, Iraq cannot
29  recover from that wrongdoing.

30  920 F.Supp.2d at 524 (emphases added).

31      The district court noted that "the U.S. Government treated the Hussein Regime as the

32  effective government during the relevant time period," that "[t]he United Nations also treated the

33  Hussein Regime as the effective Iraqi government," and that plaintiff's counsel during oral argument

-18-

1    stated, <u>inter alia</u>, "'We agree his regime was the president of Iraq, the government of Iraq, the agent

2    of Iraq.'" <u>Id</u>. at 535.

3                     The legal relationship between the sovereign Republic of Iraq, the
4                 Hussein Regime, and the Iraqi people frames this litigation.  That relationship
5                 rests on time-tested principles:

6           ■      The change in governments--from the Hussein Regime; to the
7                 Coalition Provisional Authority that governed subsequent to the fall of
8                 Saddam Hussein; to the contemporary Republic--did not create an
9                 entirely new state.  Rather, those changes altered the leadership and
10               government of a continuously existing state.  Therefore, the Republic
11               of Iraq is the same sovereign entity as the one controlled by the
12               Hussein Regime. . . .

13           ■      [T]he rights of a sovereign state are vested in the state rather than in
14                 any particular government which may purport to represent it. . . .  That
15                 is, Hussein, the Hussein Regime, and the Republic of Iraq are not one
16                 and the same; they are different governments over time that represent
17                 the same sovereign state. . . .

18           ■      Notwithstanding the distinction between a state and its government, a
19                 government may bind the sovereign it represents. . . .

20    920 F.Supp.2d at 535-36 (internal quotation marks omitted).  Based on these principles, the court

21    concluded that "as a matter of law, the Republic of Iraq bears responsibility in this action for the

22    Hussein Regime's corruption of the Programme." <u>Id</u>. at 536.

23                      Because sovereigns operate through their governments, both domestic
24               and international law ordinarily impute to a sovereign the acts of its
25               government. For example, governments set policy, hold property, and conduct
26               foreign affairs.  The consequences of these governmental acts trace back to the
27               sovereign. . . .  So do wrongful acts by those governments.  "A state is
28               responsible for any violation of its obligations under international law resulting
29               from action or inaction by [ ] the government of the state. . . ."  Restatement
30               (Third) of Foreign Relations Law of the United States § 207 (1987) . . . .

31                      Moreover, the consequences of one government's acts may redound to
32               the sovereign even after that government has been replaced.

33    920 F.Supp.2d at 536.  While noting that "it is possible for the persons who comprise the government

-19-

to act without acting as the government," id. at 537, the court recognized that "a sovereign may be held to account for the governmental conduct of the persons serving as its government." Id. (emphasis in original). The court concluded that the "the Hussein Regime's Programme misconduct" alleged in the Amended Complaint was governmental. Id. at 538.

The Complaint alleges conduct by the Hussein Regime done under the color of its authority as the government of Iraq. Therefore, the Programme conduct of the Hussein Regime should be attributed to Iraq for the purposes of this action.

First, the Complaint alleges that the Hussein Regime's "main goal" was to "undermine UN sanctions and the U.S. law prohibiting transactions with State Sponsors of Terrorism." (Compl. ¶ 7.) Hussein declared the Iraq Sanctions Program to be a form of "economic occupation" implemented by the "enemy." (Id. ¶ 302.) Thus, the alleged misconduct represents choices made by the Regime in the conduct of its foreign affairs. . . .

Second, the Complaint alleges that the Hussein Regime implemented its scheme by using its powers to engage with the UN. The Hussein Regime made the corruption possible, not just because it was in a position to corrupt the Programme, but because it agreed to the creation of the Programme in the first place: it did so in its capacity as the Government of Iraq. (See MOU § 10 (signature of Abdul Amir Al-Anbari "for Government of Iraq").) Additionally, the Complaint alleges that the Hussein Regime (and defendants) effectuated their scheme by submitting false contracts to the UN. The Hussein Regime could negotiate those contracts only by virtue of its status as the effective government of Iraq. Thus, the Regime engaged in international transactions of an official character.

Third, the Complaint alleges that the Hussein Regime acted through government offices and officers to pursue its goal of frustrating the Iraq Sanctions Program:

■   Hussein ordered government agencies to effectuate the scheme. "[O]n October 25, 2000, all Iraqi ministries were informed that Saddam Hussein had ordered the imposition of kickbacks of at least 10% in order to subvert the policies of the UN and the United States government." (Compl. ¶ 302.)

■   Government agencies negotiated the transactions. "The Iraqi State Oil Marketing Organization (SOMO) was the legal entity that entered into the contracts with companies purchasing oil under the Programme."

-20-

1        (Id. ¶ 323.)  On the goods side of the Programme, "a company wishing
2        to sell humanitarian goods under the Programme contracted with the
3        appropriate Iraqi Ministry or State-Owned Enterprise. . . ." (Id. ¶ 329.)

4    ■    Government agents and agencies received the illicit funds. The
5        Hussein Regime collected surcharges in accounts held "under the
6        names of two SOMO employees" and then transferred the funds to
7        "accounts of the Central Bank of Iraq." (Id. ¶¶ 473-74.)  [The
8        Complaint] alleges that the Iraqi vice president directed that the after-
9        sales-service fee revenue "be transferred to general treasury." (Id.
10        ¶ 568.)  It also alleges that various governmental units or government-
11        owned businesses collected fees and bribes. (E.g., id. ¶ 546 (Iraqi
12        Ministry of Transportation); ¶ 550 (payments "going back to the Iraq
13        Government"); ¶ 565 ("payments were transferred to Iraq in cash").)

14        In sum, Iraq alleges that its injuries resulted from the Hussein Regime's
15        prosecution of its foreign affairs policy.  The Complaint alleges a public goal,
16        undertaken with public resources, pursued for political purposes, and using
17        means available only to state actors.  These features lead the Court to conclude
18        the Hussein Regime acted under the color of its authority as the government
19        of Iraq for the purposes of this motion.

20    920 F.Supp.2d at 538-39.

21        The district court concluded that "the Complaint alleges that the Hussein Regime

22    conceived and orchestrated the wrongful conduct with defendants' assistance and thus it cannot

23    proceed due to the defense of in pari delicto." Id. at 550.

24                               II.  DISCUSSION

25        On appeal, the Republic challenges most of the district court's unfavorable rulings.

26    With respect to the dismissal of its RICO claims on the basis of in pari delicto, the Republic contends

27    principally that that doctrine was inapplicable, arguing that the conduct of the Hussein Regime is not

28    attributable to the Republic because that conduct was adverse to the interests of Iraq and its citizens.

29    The Republic also argues that the question of comparative fault is a fact question that could not

-21-

1    properly be resolved on a Rule 12(b)(6) motion; alternatively, it argues that the district court should

2    have allowed it to amend its Amended Complaint.  The Republic challenges the dismissal of its claims

3    under the Foreign Corrupt Practices Act, arguing that the "line of authority" relied on by the district

4    court for the proposition that the FCPA does not provide an implied private right of action "is in error"

5    (Republic brief on appeal at 56) and that the legislative history demonstrates that Congress intended

6    that such an implied right of action be recognized by the courts.  The Republic also contends that,

7    given the interest of the United States in speaking with a single voice on matters affecting foreign

8    relations, the district court erred in ruling that the Republic's nonstatutory claims arose under state law

9    rather than federal common law.

10        Defendants, in addition to endorsing the district court's Rule 12(b)(6) rulings, renew

11    their challenge to the Republic's standing under Article III of the Constitution to recover for injuries

12    to the Republic's proprietary interests, arguing that "Iraq itself instigated the alleged wrongs and

13    received the illicit payments" (Defendants' brief on appeal at 31).  We reject this standing argument

14    for substantially the reasons stated by the district court, see 920 F.Supp.2d at 531-32.

15        With respect to the RICO claims, we affirm the district court's dismissal on the basis

16    of the in pari delicto doctrine, and we thus need not address the Republic's challenges to the other

17    grounds on which the district court dismissed those claims.  This dismissal was properly based on the

18    Republic's pleading, and we see no abuse of discretion in the district court's denial of leave to amend

19    the Amended Complaint.  We also reject the Republic's challenges to the dismissal of its FCPA claims

20    and its nonstatutory claims.

21    A.  The RICO Claims

22        The doctrine of in pari delicto, a term meaning "of equal fault," reflects the principle

23    that a plaintiff who has participated in wrongdoing equally with another person may not recover from

-22-

1    that other person damages resulting from the wrongdoing.  The principal contexts in which the

2    Supreme Court has discussed the applicability of in pari delicto to a cause of action created by federal

3    statutes are the antitrust laws, see Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134

4    (1968) ("Perma Life"), overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.,

5    467 U.S. 752 (1984), and the securities laws, see Bateman Eichler, Hill Richards, Inc. v. Berner, 472

6    U.S. 299 (1985) ("Bateman Eichler"); Pinter v. Dahl, 486 U.S. 622 (1988) ("Pinter").

7              In Perma Life, the Supreme Court reversed lower-court rulings that had upheld an in

8    pari delicto defense asserted by a franchisor, Midas Muffler ("Midas"), against franchisees who

9    alleged that their franchise agreements violated the antitrust laws.  While stating that "the doctrine of

10   in pari delicto, with its complex scope, contents, and effects, is not to be recognized as a defense to

11   an antitrust action," 392 U.S. at 140, the Court noted that even a narrower defense of shared fault

12   would have been inapplicable in the case before it because the record showed that "the illegal scheme

13   was thrust upon the[ franchisees] by Midas," id. at 141.  Five Justices, however, opined that a defense

14   to an antitrust claim should be recognized if the plaintiff really bore at least substantially equal

15   responsibility for the violation.  See id. at 146 (White, J., concurring); id. at 147 (Fortas, J., concurring

16   in result); id. at 149 (Marshall, J., concurring in result); id. at 156 (Harlan, J., joined by Stewart, J.,

17   concurring in relevant part and dissenting in part).

18              In Bateman Eichler, the Supreme Court described Perma Life in part as follows:

19              In reversing . . . , the opinion for this Court emphasized that there was no
20              indication that Congress had intended to incorporate the defense into the
21              antitrust laws, which "are best served by insuring that the private action will
22              be an ever-present threat to deter anyone contemplating [illegal] business
23              behavior."  [392 U.S.] at 139.  Accordingly, the opinion concluded that "the
24              doctrine of in pari delicto, with its complex scope, contents, and effects, is not
25              to be recognized as a defense to an antitrust action."  Id., at 140.  The opinion
26              reserved the question whether a plaintiff who engaged in "truly complete
27              involvement and participation in a monopolistic scheme"--one who
28              "aggressively support[ed] and further[ed] the monopolistic scheme as a
29              necessary part and parcel of it"--could be barred from pursuing a damages

-23-

1    action, finding that the muffler dealers had relatively little bargaining power
2    and that they had been coerced by the franchisor into agreeing to many of the
3    contract's provisions.  Ibid.

4           In separate opinions, five Justices agreed that the concept of "equal
5    fault" should be narrowly defined in litigation arising under federal regulatory
6    statutes.  "[B]ecause of the strong public interest in eliminating restraints on
7    competition, . . . many of the refinements of moral worth demanded of
8    plaintiffs by . . . many of the variations of in pari delicto should not be
9    applicable in the antitrust field."  Id., at 151 (MARSHALL, J., concurring in
10   result).  The five Justices concluded, however, that where a plaintiff truly bore
11   at least substantially equal responsibility for the violation, a defense based on
12   such fault--whether or not denominated in pari delicto--should be recognized
13   in antitrust litigation.

14   Bateman Eichler, 472 U.S. at 308-09 (footnote omitted) (emphases added).

15          The Bateman Eichler Court concluded that "the views expressed in Perma Life apply

16   with full force to implied causes of action under the federal securities laws."  472 U.S. at 310; see also

17   Pinter, 486 U.S. at 635 (same with respect to express causes of action).  The Bateman Eichler Court

18   distilled a two-pronged standard incorporating both consideration of the plaintiff's relative degree of

19   fault and concern for minimizing the frustration of law-enforcement goals.  Thus, it stated that "a

20   private action for damages" under the securities laws

21          may be barred on the grounds of the plaintiff's own culpability only where (1)
22          as a direct result of his own actions, the plaintiff bears at least substantially
23          equal responsibility for the violations he seeks to redress, and (2) preclusion
24          of suit would not significantly interfere with the effective enforcement of the
25          securities laws and protection of the investing public.

26   472 U.S. at 310-11.  As the Court noted in Pinter, "[t]he first prong of this test captures the essential

27   elements of the in pari delicto doctrine," 486 U.S. at 633.  Not only must the plaintiff "be an active,

28   voluntary participant in the unlawful activity that is the subject of the suit," but it is necessary that

29   "the degrees of fault [be] essentially indistinguishable or the plaintiff's responsibility [be] clearly

30   greater."  Id. at 636.  "The second prong . . . embodies the doctrine's traditional requirement that

-24-

1    public policy implications be carefully considered before the defense is allowed," thus "ensur[ing] that

2    . . . judge-made law does not undermine . . . congressional policy." Id. at 633.

3            Applying its two-part test in the context of claims for violations of federal securities

4    laws, the Supreme Court in Bateman Eichler affirmed the rejection of an in pari delicto defense

5    against plaintiff investors who claimed that a broker-dealer gave them false and misleading

6    information that was represented to be accurate inside information.  It concluded that an investor who

7    engaged in trading on the basis of an insider tip is not necessarily as blameworthy as a corporate

8    insider or broker-dealer who discloses the information for personal gain.  See 472 U.S. at 312-14.  In

9    Pinter, considering claims between sellers of unregistered securities, the Court remanded for a

10   determination of relative fault.  See 486 U.S. at 639-41.  Comparison of the parties' degree of fault,

11   and thus the applicability of the first prong of the Bateman Eichler test, will often depend on findings

12   of fact as to the circumstances plaintiff's involvement.  See, e.g., id.; Gatt Communications, Inc. v.

13   PMC Associates, L.L.C., 711 F.3d 68, 80-81 (2d Cir. 2013) (noting that "several of our sister circuits

14   [that] have recognized an in pari delicto defense in civil antitrust litigation . . . have generally done

15   so on appeal from summary judgment or after trial, when the extent and circumstances of the culpable

16   plaintiff's involvement have been factually developed, and the possibility that the plaintiff's behavior

17   was motivated by economic duress--a factor that could relieve the plaintiff of an in pari delicto bar--

18   has been examined").  But a court may "appl[y] the in pari delicto doctrine at the pleadings stage . . . .

19   where . . . the outcome is plain on the face of the pleadings."  In re Bernard L. Madoff Investment

20   Securities LLC., 721 F.3d 54, 65 (2d Cir. 2013), cert. denied, 134 S. Ct. 2895 (2014).

21           Neither the Supreme Court nor this Court has decided whether in pari delicto is a valid

22   defense to a civil RICO claim.  The courts of appeals that have reached this question have concluded

23   that it is.  See Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145,

-25-

1    1152-56 (11th Cir.) ("Edwards"), cert. denied, 549 U.S. 811 (2006); Rogers v. McDorman, 521 F.3d

2    381, 387-91 (5th Cir. 2008).

3           RICO itself, while expressly authorizing a person injured in its business or property

4    to bring a civil action for treble damages, see 18 U.S.C. § 1964(c), is silent as to the availability of

5    any common-law defense.  Such silence does not necessarily mean that such defenses are unavailable,

6    however, because "Congress is understood to legislate against a background of common-law

7    adjudicatory principles."  Astoria Federal Savings & Loan Ass'n v. Solimino, 501 U.S. 104, 108

8    (1991).  "Thus, where a common-law principle is well established, . . . the courts may take it as given

9    that Congress has legislated with an expectation that the principle will apply except when a statutory

10    purpose to the contrary is evident."  Id. (internal quotation marks omitted).

11           The in pari delicto principle is well established.  The Bateman Eichler Court traced the

12    "classic formulation" of the doctrine back to the eighteenth century.  472 U.S. at 306-07 & n.12; see,

13    e.g., Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006) (in pari delicto "has long been woven

14    into the fabric of federal law"), cert. denied, 550 U.S. 918 (2007).  The Pinter Court noted that the in

15    pari delicto defense "traditionally has been applied in any action based on conduct that transgresses

16    statutory prohibitions," 486 U.S. at 634 (internal quotation marks omitted), and stated that it will be

17    "available when Congress expressly provides for private remedies," id. at 635, so long as application

18    of the defense would not frustrate the purpose of the federal statute in question, see id. at 633, 637-38.

19           Applying the Bateman Eichler test to the Republic's RICO claims in the present action,

20    we have no difficulty concluding that the district court's dismissal on the basis of in pari delicto was

21    correct.

1.  <u>Prong One:  Responsibility</u>

The very premise of the Republic's Complaint is that the Hussein Regime "designed and instigated" the corruption of the Oil-for-Food Programme.  (Amended Complaint ¶ 4.)  The Complaint is replete with descriptions of demands made on the Oil Purchasing Defendants and the Vendor Defendants to pay all manner of "mandatory kickback[s]" (<u>id</u>. ¶ 566 (internal quotation marks omitted)) and illicit surcharges.  (<u>See</u> Part I.C. above.)  Even a defendant who had close personal ties to the Hussein Regime was forced against his will to pay illegal kickbacks in order to do business with Iraq in the Oil-for-Food Programme.  (<u>See</u> Amended Complaint ¶¶ 352, 499-503.)  Under the Hussein Regime's policy, "[n]o company [was to] be exempted for any reason."  (<u>Id</u>. ¶ 502 (internal quotation marks omitted).)  The Complaint portrays BNP as having concealed from the United Nations information about contract irregularities and having facilitated improper payments of escrowed funds, thereby assisting the Hussein Regime to achieve its "corrupt and wrongful intentions" (<u>id</u>. ¶ 980; <u>see</u>, <u>e.g.</u>, <u>id</u>. ¶¶ 1022-1024, 1038).  Because it is evident from the face of the Complaint that the Hussein Regime was the instigator and dominant force behind the scheme to subvert the Programme, the conclusion is inescapable that the Hussein Regime bears at least substantially equal responsibility for the Programme's corruption.

The Republic attempts to escape the ramifications of this responsibility through an argument that the Regime's wrongdoing should not be attributed to the Republic.  That argument is meritless.  Our law has long recognized that the legal position of a foreign state survives changes in its government.  Thus, a foreign state's proprietary rights, and its causes of action in our courts, persist following a change in its form of government.  <u>See</u> <u>The Sapphire</u>, 78 U.S. (11 Wall.) 164, 168 (1871); <u>Lehigh Valley R. Co. v. State of Russia</u>, 21 F.2d 396, 399-401 (2d Cir.), <u>cert. denied</u>, 275 U.S. 571 (1927).  Similarly, the obligations of a foreign state are unimpaired by a change in that state's

-27-

1    government.  See Comanche County v. Lewis, 133 U.S. 198, 205 (1890).  Because "the rights of a

2    sovereign state are vested in the state rather than in any particular government which may purport to

3    represent it," Guaranty Trust Co. v. United States, 304 U.S. 126, 137 (1938) ("Guaranty Trust"), when

4    a foreign "government changes, the nation remains, with rights and obligations unimpaired," United

5    States ex rel. Kessler v. Watkins, 163 F.2d 140, 143 (2d Cir.) (internal quotation marks omitted), cert.

6    denied, 332 U.S. 838 (1947).

7           The Republic's own allegations demonstrate that, during the times relevant to the

8    Complaint, Saddam Hussein's regime constituted the government of Iraq.  The Complaint alleged that

9    Hussein and his political party "controlled Iraq" from the time of a 1979 "military coup" until the

10   regime was "ousted" in 2003. (Amended Complaint ¶¶ 7, 216, 219.)  During his years of power,

11   Hussein--whose title was President--"installed officials under his direct control in all areas of the

12   government" (id. ¶ 218), whom he used to control "all Iraqi ministries and agencies" (id. ¶ 562; see

13   id. ¶ 302).  As described in the Complaint, these included the ministries of oil (see id. ¶¶ 412, 490,

14   575, 742, 747), transportation (see id. ¶ 527), finance (see id. ¶ 569), and defense (see id. ¶¶ 569, 656).

15   The Hussein Regime also controlled the State Oil Marketing Organization (see, e.g., id. ¶ 323), which

16   was integral to the scheme to corrupt the Programme, and various state-owned enterprises that

17   purchased goods from the Vendor Defendants (see id. ¶ 329).  The Hussein Regime acted as the

18   "Government of Iraq" (id. ¶ 490), as the United Nations and the United States acknowledged, and as

19   was universally understood.  As the Republic acknowledged before the district court, the Hussein

20   Regime was "the president of Iraq[ and] the government of Iraq."  920 F.Supp.2d at 535 (internal

21   quotation marks omitted).

22          The Republic insists that although the Hussein Regime "was in de facto control of the

23   nation, it was not a de jure or legitimate government."  (Amended Complaint ¶ 220.)  It alleged that

-28-

1    the Hussein Regime assumed and retained power in contravention of domestic laws, and committed

2    vile and genocidal acts, thereby making the Regime "[il]legitimate" from domestic and international

3    perspectives (id. ¶¶ 220, 223).  These allegations, however, are irrelevant to the question of whether

4    the acts of the Hussein Regime were acts of Iraq.  A foreign government's actions are attributed to the

5    state regardless of whether they are "legal under the municipal law of the foreign state," Banco de

6    Espana v. Federal Reserve Bank of New York, 114 F.2d 438, 443 (2d Cir. 1940); see, e.g., Bernstein

7    v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246, 248-49 (2d Cir.), cert. denied, 332 U.S. 772

8    (1947); Westfield v. Federal Republic of Germany, 633 F.3d 409, 418 (6th Cir. 2011), and whether

9    they "are done by the authority of a de jure or titular, or of a de facto, government," Underhill v.

10   Hernandez, 65 F. 577, 582 (2d Cir. 1895), aff'd, 168 U.S. 250 (1897).  Thus, the district court properly

11   ruled that the actions of the Hussein Regime, while it acted as the government of Iraq, are to be

12   attributed to The Republic of Iraq.

13            Of course, not every action that happens to be taken by officials of a foreign state is

14   properly attributable to that state.  For instance, in considering the applicability of the act-of-state

15   doctrine--the affirmative defense that "precludes the courts of this country from inquiring into the

16   validity of the public acts a recognized foreign sovereign power committed within its own territory,"

17   Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964) ("Sabbatino")--courts distinguish

18   "between public and private acts of a foreign official," Republic of the Philippines v. Marcos, 806

19   F.2d 344, 359 (2d Cir. 1986) ("Marcos"), cert. denied, 481 U.S. 1048 (1987); see, e.g., Jimenez v.

20   Aristeguieta, 311 F.2d 547, 557-58 (5th Cir. 1962), cert. denied, 373 U.S. 914 (1963).

21            But this distinction, although useful in determining whether a foreign official's conduct

22   is attributable to his government or sovereign state, is beside the point where the alleged acts are those

23   not of an individual governmental official, but instead acts coordinated pursuant to the policies of an

-29-

1    entire government.  It is apparent from the Complaint that the Hussein Regime's effort to subvert the

2    Programme was the policy of the Iraqi government.  The Republic alleged that "the fundamental goal

3    of the Hussein Regime [was] to maintain and extend its power."  (Amended Complaint ¶ 299.)  "From

4    the perspective of the Hussein Regime, the main goal of the conspiracy was to undermine UN

5    sanctions" and thus to obtain foreign currency that would allow the Regime to "remain[] in power."

6    (Id. ¶ 7; see also id. ¶ 362 (referring to Hussein Regime goal of "generat[ing] . . . illicit income . . . ,

7    which the Regime could use for non-humanitarian purposes").)  As the district court aptly concluded,

8    "[t]he Complaint allege[d] a public goal, undertaken with public resources, pursued for political

9    purposes, and using means available only to state actors." 920 F.Supp.2d at 539.  We agree, and thus

10   conclude that the actions of the Hussein Regime are attributable to The Republic of Iraq.

11           We are not persuaded by the Republic's argument that, under general principles of

12   agency law, a government's actions should not be attributed to the state it governs when the

13   government abuses its power to contravene the national interest.  As a preliminary matter, we note

14   that the question of whether to attribute the conduct of a foreign government and its officials to their

15   state is a matter of federal law because "all questions relating to an act of state are questions of federal

16   law," Republic of Iraq v. First National City Bank, 353 F.2d 47, 51 (2d Cir. 1965) ("First National"),

17   cert. denied, 382 U.S. 1027 (1966).  The parties here, who are in agreement that this issue is a matter

18   of federal law, have not identified material differences between state and federal law, and we are not

19   aware of any.

20           General principles of agency law, such as those upon which the Republic relies, are

21   relevant to the question of whether the conduct of an official should be attributed to the state he

22   represents.  See First Fidelity Bank, N.A. v. Government of Antigua & Barbuda--Permanent Mission,

23   877 F.2d 189, 193 (2d Cir. 1989).  However, we are not aware of any cases in which agency principles

-30-

1    of attribution were deemed relevant to the relationship between a government and its state.  The

2    Republic relies on the case of The Sapphire, which incidentally used the word "agent" while holding

3    that a successor government stands in the legal shoes of its predecessor, see 78 U.S. (11 Wall.)

4    at 168-69.  But that case does not stand for the proposition that a government is to be treated as a

5    separate entity that is an agent of its state.  Nor should it be, because a government and the sovereign

6    state it rules do not have separate legal personalities.  See Guaranty Trust, 304 U.S. at 137 ("the rights

7    of a sovereign state are vested in the state rather than in any particular government which may purport

8    to represent it").

9           Even assuming that Iraq could be regarded as a principal and the Hussein Regime its

10   agent, under the general rule of agency the agent's actions are normally attributed to the principal.

11   To escape application of this general rule, the Republic seeks to invoke what is known as the "'adverse

12   interest' exception," under which "acts of the agent will not be charged to the [principal] if although

13   the agent purportedly acts for the [principal], he is really committing a fraud for his own benefit," In

14   re Bennett Funding Group, Inc., 336 F.3d 94, 100 (2d Cir. 2003) (internal quotation marks omitted).

15   However, "this [is the] most narrow of exceptions," "reserve[d] . . . for those cases--outright theft or

16   looting or embezzlement--where the insider's misconduct benefits only himself or a third party; i.e.,

17   where the fraud is committed against a [principal] rather than on its behalf."  Kirschner v. KPMG

18   LLP, 15 N.Y.3d 446, 466-67, 912 N.Y.S.2d 508, 519 (2010) ("Kirschner") (emphasis in original).

19           "To come within the exception, the agent must have totally abandoned his
20           principal's interests and be acting entirely for his own or another's purposes.
21           It cannot be invoked merely because he has a conflict of interest or because he
22           is not acting primarily for his principal" . . . .

23   Id. at 466, 912 N.Y.S.2d at 519 (quoting Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 784-85,

24   497 N.Y.S.2d 898, 900 (1985)) (emphases in Kirschner).  "Thus, [s]hould the agent act[ ] both for

-31-

1    himself and for the principal, . . . application of the exception would be precluded . . . ."  <u>Kirschner</u>,

2    15 N.Y.3d at 467, 912 N.Y.S.2d at 519 (internal quotation marks omitted).  "This rule avoids

3    ambiguity where there is a benefit to both the [agent] and the [principal] . . . ."  <u>Id</u>. at 466, 912

4    N.Y.S.2d at 519 (internal quotation marks omitted).

5           The adverse-interest exception is inapplicable to the Republic in light of the

6    Complaint's allegations of Hussein Regime conduct that, rather than totally abandoning Iraq's

7    interests, in part benefited Iraq.  The Complaint alleged, for example, that millions of dollars of secret

8    illegal surcharges were paid "to the Government of Iraq" (Amended Complaint ¶ 483 (internal

9    quotation marks omitted)) to enable "the Government of Iraq to achieve its objective of collecting the

10    illegal surcharges on oil" (<u>id</u>. ¶ 482 (internal quotation marks omitted)).  The Complaint also alleged

11    that the Vice President of the Hussein Regime had ordered that all of the sham after-sales-service

12    fees--which totaled "about $1.02 billion . . . by March 2003" (<u>id</u>. ¶ 620)--"'be transferred <u>to general</u>

13    <u>treasury</u>'" (<u>id</u>. ¶ 568 (emphasis added)).  Thus, even if Iraq were regarded as a principal and the

14    Hussein Regime its agent, the adverse-interest rule would be inapplicable because some of the

15    misconduct was committed on behalf of Iraq.

16           The Republic argues that in order to "support application of the adverse interest

17    exception," it should have been allowed to amend the Amended Complaint to clarify and amplify

18    allegations that "Hussein utilized his control over the Iraqi government to serve his personal goals."

19    (Republic brief on appeal at 31.)  But even in making that argument the Republic reveals its futility.

20    The Republic states that it would allege that "Hussein and his family stole a material <u>portion</u> of the

21    funds paid illegally to the Hussein Regime by the Defendants."  (Republic brief on appeal at 35

22    (emphasis added).)  As the Republic has alleged that the Hussein Regime ordered some of the illegally

23    obtained funds to be deposited in Iraq's treasury and used for political purposes, the interests of Iraq

-32-

1    were not totally abandoned.  The adverse-interest exception cannot apply to allegations that Saddam

2    Hussein's government and its coconspirators obtained funds by fraud on behalf of, among others, the

3    Iraqi State.

4            Finally, the fact that Saddam Hussein's government was deposed in favor of a

5    constitutional democracy provides no basis to avoid imputing its conduct to the Republic.  The change

6    in the structure of a foreign government "works no change in the national sovereignty or its rights,"

7    The Sapphire, 78 U.S. (11 Wall.) at 168, because those "rights . . . are vested in the state rather than

8    in any particular government which may purport to represent it," Guaranty Trust, 304 U.S. at 137.

9    Likewise, where a plaintiff in Iraq's position bears fault, it does not escape the consequence of its

10   wrongdoing on the basis of a change in leadership.  Cf. Baena v. KPMG LLP, 453 F.3d 1, 9-10 (1st

11   Cir. 2006) (doubting an exception to in pari delicto for cases "where prior management was at fault"

12   even where "the claim [is] asserted on behalf of [innocent] creditors or shareholders").

13           In sum, the Complaint reveals that the government of Iraq was the instigator and

14   dominant party in the frauds and breaches that corrupted the Oil-for-Food Programme.   Its

15   responsibility for the wrongs perpetrated was at least as great as that of any defendant.  The district

16   court properly attributed that responsibility to the Republic.


17       2.  Prong Two:  Policy

18           The second prong of the Bateman Eichler test asks whether recognition of the in pari

19   delicto defense to a federal statutory cause of action would comport with the purposes of the statute.

20   The Eleventh Circuit has aptly explained why "the application of in pari delicto to bar [a

21   coconspirator's RICO claim] advances the policy of civil liability under the federal RICO statute,"

22   Edwards, 437 F.3d at 1155:

-33-

1       Under RICO, "[i]t shall be unlawful for <u>any person</u> employed by or associated
2       with <u>any enterprise</u> . . . to conduct or participate . . . in the conduct of such
3       enterprise's affairs through a pattern of racketeering activity or collection of
4       unlawful debt."  18 U.S.C. § 1962(c) (emphas[e]s added).  It would be
5       anomalous, to say the least, for the RICO statute to make racketeering
6       unlawful in one provision, yet award the violator with treble damages in
7       another provision of the same statute.  Congress intended RICO's civil
8       remedies to help eradicate organized crime from the social fabric by divesting
9       the association of the fruits of ill-gotten gains. . . . [Plaintiff]'s recovery under
10       RICO would not divest RICO violators of their ill-gotten gains; it would result
11       in a wealth transfer among similarly situated conspirators.

12 437 F.3d at 1155 (other internal quotation marks omitted).  We agree.  Thus, it is consistent with the

13 purpose of RICO to recognize an <u>in pari delicto</u> defense in cases where, as a direct result of the

14 plaintiff's "affirmative wrongdoing," <u>id.</u>, the plaintiff bears "at least substantially equal responsibility,"

15 <u>Bateman Eichler</u>, 472 U.S. at 310, for the RICO violations for which it complains.

16      We see no error in the district court's ruling that application of the <u>in pari delicto</u>

17 doctrine in the present case does not offend public policy.  We conclude that the Republic's RICO

18 claims were properly dismissed on the basis of that doctrine.

19     3. <u>A Few Words About the Dissent</u>

20      Our dissenting colleague's disagreement with our affirmance of the district court's

21 dismissal of the Republic's RICO claims on the basis of the <u>in pari delicto</u> defense prompts us to make

22 several observations as to the dissent's analysis of that defense and of the effect of its application.

23      a. <u>The Dissent's Interpretation of</u> Bateman Eichler

24      The dissent appears to accept that, in determining whether "the <u>in pari delicto</u> defense

25 is allowed," we should look to the two-pronged test set out in <u>Bateman Eichler</u>, Dissenting Opinion

26 <u>post</u> at 20-21.  However, we disagree with the dissent's interpretation of each prong of that test.

-34-

1    As to the first prong, we do not agree that the in pari delicto defense--as contrasted

2    with the doctrine of unclean hands--is "founded 'upon the court's repugnance to the suitor personally,'"

3    id. at 27 (quoting Art Metal Works, Inc. v. Abraham & Straus, Inc., 70 F.2d 641, 646 (2d Cir. 1934)

4    ("Art Metal Works I") (L. Hand, J., dissenting), on reconsideration, dissent adopted by Art Metal

5    Works, Inc. v. Abraham & Straus, Inc., 107 F.2d 944 (2d Cir.) ("Art Metal Works II"), cert. denied,

6    308 U.S. 621 (1939) (collectively "Art Metal Works")), or with our dissenting colleague's view that

7    "in pari delicto 'has nothing do with the rights or liabilities of the parties,'" Dissenting Opinion post

8    at 22 (quoting Art Metal Works I, 70 F.2d at 646 (L. Hand, J., dissenting).  Art Metal Works I was

9    decided on the basis of the doctrine of unclean hands.  See 70 F.2d at 644 (majority opinion)

10   ("[a]pplying th[e] principle of equity" that "one coming into a court of equity must do so with clean

11   hands"); id. at 646 (L. Hand, J., dissenting) ("The doctrine is confessedly derived from the

12   unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief

13   to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities

14   of the judge.").

15        Although the doctrines of unclean hands and in pari delicto are often mentioned in the

16   same breath, they are "distinct terms for . . . distinct situations," Perma Life, 392 U.S. at 153 n.1

17   (Harlan, J., concurring in part and dissenting in part).  Only the former was at issue in Art Metal

18   Works, and only the latter is at issue here.  The in pari delicto doctrine was not mentioned in any of

19   the Art Metal Works opinions, and indeed could not have had application in that case.  As the

20   Supreme Court has described the Bateman Eichler test, the in pari delicto doctrine does not depend

21   upon the plaintiff's morality, but instead permits the "defendant [to] escape liability" to the plaintiff

22   based on the plaintiff's "at least substantially equal responsibility for the underlying illegality," Pinter,

23   486 U.S. at 635-36 (emphasis added); see id. at 636 ("Plaintiffs who are truly in pari delicto are those

-35-

1    who have themselves violated the law in cooperation with the defendant." (internal quotation marks

2    omitted) (emphasis ours)).  In Art Metal Works, a case involving patent infringement, there was no

3    suggestion that the plaintiff shared any responsibility for the defendant's infringement.

4         We agree, of course, that the in pari delicto "doctrine[] require[s] that the plaintiff be

5    . . . 'an active, voluntary participant in the unlawful activity that is subject of the suit,'" Dissenting

6    Opinion post at 27 (quoting Pinter, 486 U.S. at 636).  But we are aware of no authority in federal law

7    requiring such responsibility to be "personal[]" rather than "derivative," Dissenting Opinion post at

8    27 (internal quotation marks omitted), especially in the context of a government's action, given the

9    principle, discussed above, that the rights and liabilities of a sovereign state are unaltered by the

10   upheaval of its government.

11        We also disagree with the dissent's interpretation of the second prong of the Bateman

12   Eichler test.  The dissent focuses on the United States policy interest in providing humanitarian aid

13   to the people of Iraq.  However, the appropriate focus for a court considering the applicability of the

14   in pari delicto defense to a federal cause of action is the public policy that underlies the particular

15   statute that provides that cause of action.  See, e.g., Pinter, 486 U.S. at 638 (considering "the

16   underlying statutory policies . . . . of the Securities Act"); Bateman Eichler, 472 U.S. at 315

17   (considering "the primary objective of the federal securities laws"); Edwards, 437 F.3d at 1155

18   (considering "the policy of civil liability under the federal RICO statute").  The dissent's approach

19   would free courts to disregard the in pari delicto defense on the basis of any "policy" articulable by

20   a creative plaintiff.

21             b.  Additional Observations

22        We are compelled to make three additional observations as to views expressed by the

23   dissent as to the effect of our decision.  First, the view that our decision "deprive[s] the ultimate

-36-

1    victims of the defendants' conduct of any remedy," Dissenting Opinion post at 5 (emphasis added),

2    appears to focus on the Republic's original attempt to pursue this action in parens patriae. The district

3    court ruled that the Republic "does not have parens patriae standing, [and] it may not pursue claims

4    in this action for harms to its quasi-sovereign interests or general harm inflicted on the people of Iraq,"

5    920 F.Supp.2d at 533 (emphases added). The Republic has not challenged this ruling on appeal.

6            Second, the dissent appears to endorse the view of the Republic "that it was the victim

7    of a fraud," Dissenting Opinion post at 37 (emphasis added). However, as the Amended Complaint

8    reveals, the government of Iraq was not the fraud's victim but its perpetrator and enforcer.

9            Finally, we reject the dissent's notion that our decision "release[s]" and "immunize[s]"

10   the defendants from liability for conduct that was illegal under U.S. law," Dissenting Opinion post

11   at 5, 36. Plainly, our conclusion--that RICO's treble damages provision is not meant to enrich the

12   entity that instigated and coordinated the illegal scheme--does not preclude either more appropriate

13   civil lawsuits or the criminal prosecution of lawbreakers.


14   B.  The Foreign Corrupt Practices Act

15           The Amended Complaint alleged that the surcharges and kickbacks paid by the Vendor

16   and Oil Purchasing Defendants violated the antibribery provisions of the FCPA. The Republic

17   contends that the district court should have recognized an implied private right of action for violations

18   of those provisions despite a consistent line of cases holding to the contrary. The Republic is

19   particularly critical of Lamb v. Phillip Morris, Inc., 915 F.2d 1024 (6th Cir. 1990) ("Lamb"), cert.

20   denied, 498 U.S. 1086 (1991), the leading case declining to recognize such a cause of action. The

21   Republic argues that Lamb erred in its analysis of the legislative history of the FCPA and that that

22   history suggests that the reason Congress did not expressly provide for a private right of action was

23   to avoid creating a "negative inference" (Republic brief on appeal at 58 (internal quotation marks

-37-

1    omitted)), that would dissuade judicial recognition of implied private rights of action under other

2    provisions of the Securities Exchange Act of 1934, to which the FCPA was an amendment.  We are

3    unpersuaded.

4              "[P]rivate rights of action to enforce federal law must be created by Congress."

5    Alexander v. Sandoval, 532 U.S. 275, 286 (2001) ("Sandoval").  A federal statute may create a private

6    right of action either expressly or, more rarely, by implication.  In considering whether a statute

7    confers an implied private right of action, "[t]he judicial task is to interpret the statute Congress has

8    passed to determine whether it displays an intent to create not just a private right but also a private

9    remedy."  Id.  To discern Congress's intent, "we look first to the text and structure of the statute."

10   Lindsay v. Association of Professional Flight Attendants, 581 F.3d 47, 52 (2d Cir. 2009), cert. denied,

11   130 S. Ct. 3513 (2010).  To "illuminate" this analysis, id. at 52 n.3, we also consider factors

12   enumerated in Cort v. Ash, 422 U.S. 66 (1975), which include the following:

13              First, is the plaintiff one of the class for whose especial benefit the statute was
14              enacted, . . . --that is, does the statute create a federal right in favor of the
15              plaintiff?  Second, is there any indication of legislative intent, explicit or
16              implicit, either to create such a remedy or to deny one?  . . . .  Third, is it
17              consistent with the underlying purposes of the legislative scheme to imply such
18              a remedy for the plaintiff?

19   Id. at 78 (emphasis in Cort v. Ash) (internal quotation marks omitted).  In our analysis, we are mindful

20   that "the Supreme Court has come to view the implication of private remedies in regulatory statutes

21   with increasing disfavor."  Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 286 F.3d 613,

22   618 (2d Cir. 2002).

23              The antibribery provisions of the FCPA prohibit certain entities and persons from, inter

24   alia, corruptly making payments to foreign officials for the purpose of influencing official action in

25   order to obtain business.  See 15 U.S.C. §§ 78dd-1(a), 78dd-2(a), 78dd-3(a).  The text of the statute

26   contains no explicit provision for a private right of action, although it does provide for civil and

-38-

1     criminal penalties, see id. §§ 78dd-2(g), 78dd-3(e), 78ff(c), and permits the Attorney General to seek

2     injunctive relief, see id. §§ 78dd-2(d), 78dd-3(d).  Because "[t]he express provision of one method

3     of enforcing a substantive rule suggests that Congress intended to preclude others," Sandoval, 532

4     U.S. at 290, the structure of the statute, by focusing on public enforcement, tends to indicate the

5     absence of a private remedy.

6              The Cort v. Ash factors also do not support recognition of a private right.  The statute's

7     prohibitions focus on the regulated entities; the FCPA contains no language expressing solicitude for

8     those who might be victimized by acts of bribery, or for any particular class of persons.  "Statutes that

9     focus on the person regulated rather than the individuals protected create no implication of an intent

10    to confer rights on a particular class of persons." Sandoval, 532 U.S. at 289 (internal quotation marks

11    omitted).

12             Nor does the legislative history of the FCPA demonstrate an intention on the part of

13    Congress to create a private right of action.  As discussed in Lamb, 915 F.2d at 1029, a bill introduced

14    by Senator Church in the 94th Congress included an express right of action for competitors of those

15    who bribed foreign officials, see S. 3379, 94th Cong. § 10, 122 Cong. Rec. 12,605, 12,607 (1976);

16    that provision, however, was deleted by a committee of the Senate, see S. Rep. No. 94-1031, at 13

17    (1976).

18             In the 95th Congress, which finally enacted the FCPA, a committee of the House of

19    Representatives, in reporting out a bill that did not provide expressly for a private right of action,

20    made a statement that the House "Committee intends that the courts shall recognize a private cause

21    of action based on this legislation . . . on behalf of persons who suffer injury as a result of prohibited

22    corporate bribery," H.R. Rep. No. 95-640, at 10 (1977).  We have three main problems with the

23    Republic's reliance on this statement, and other aspects of the FCPA's legislative history, as

24    justification for judicial implication of a private right of action in its favor.

-39-

1           First, the House committee's statement was not repeated (and no endorsement of its

2    substance was in any way suggested) in the reports of either the Senate committee considering the

3    FCPA or the conference committee that reconciled the views of the House and Senate to produce the

4    language of the FCPA as it was ultimately enacted.  <u>See</u> S. Rep. No. 95-114 (1977); H.R. Rep. 95-831

5    (1977).  Indeed, in the debate on the conference committee report, one conferee stated that the

6    question of whether "courts will recognize [an] implied private right of action . . . . was not considered

7    in the Senate or during the conference, and thus <u>[it] cannot be said that any intent is expressed at all</u>

8    <u>on this issue</u>."  123 Cong. Rec. 38,601, 38,602 (1977) (statement of Sen. Tower) (emphasis added).

9           Second, although the legislative history contains additional references to the

10    desirability of a private right of action, they do not provide any clear indication of congressional intent

11    to create one.  <u>See generally</u> Siegel, The Implication Doctrine and the Foreign Corrupt Practices Act,

12    79 Colum. L. Rev. 1085, 1105-12 (1979) (canvassing the legislative history in detail and finding "no

13    conclusive evidence of congressional intent to grant private actions").

14           Third, we note that this case illustrates the wisdom of <u>Lamb</u>, which avoids the question

15    of what class of parties the FCPA was designed to protect.  Although we agree that the statute was

16    "primarily designed to protect the integrity of American foreign policy and domestic markets," <u>Lamb</u>,

17    915 F.3d at 1029, one might argue that it is principally the foreign governments whose processes

18    might be corrupted.  The Republic's claim highlights the obvious problem with the latter concern here:

19    The foreign government supposedly to be "protect[ed]" by the FCPA was the entity that demanded

20    the bribes in the first place.

21           Finally, we note that although it has been nearly a quarter of a century since <u>Lamb</u> was

22    decided, and although Congress has more recently amended the FCPA, <u>see</u> International Anti-Bribery

23    and Fair Competition Act of 1998, Pub. L. No. 105-366, 112 Stat. 3302 (1998), Congress has not

24    chosen to override <u>Lamb</u>.  We conclude that there is no private right of action under the antibribery

1  provisions of the FCPA and that the district court did not err in dismissing the Republic's FCPA

2  claims.


3  C.  The Common-Law Causes of Action

4  The nonstatutory causes of action asserted in the Amended Complaint included claims

5  of fraud, breach of fiduciary duty, breach of contract, and unjust enrichment.  The district court,

6  having dismissed the Republic's statutory causes of action, declined to exercise supplemental

7  jurisdiction over these common-law claims.  The Republic, citing First National, 353 F.2d 47, and

8  Marcos, 806 F.2d 344, contends that the court should have entertained the nonstatutory claims as a

9  matter of federal common law, in the interest of having "the nation . . . speak with a united voice" in

10  order avoid complicating "foreign relations."  (Republic brief on appeal at 59 (internal quotation

11  marks omitted).)  The Republic's reliance on these cases is misplaced.

12  "There is no federal general common law," Erie R. Co. v. Tompkins, 304 U.S. 64, 78

13  (1938), although federal common law has been held to displace state law in a few "narrow areas"

14  involving "uniquely federal interests," including where the "international nature of the controversy

15  makes it inappropriate for state law to control," Texas Industries, Inc. v. Radcliff Materials, Inc., 451

16  U.S. 630, 641-42 (1981) (internal quotation marks omitted).  However, courts are to recognize the

17  "judicial creation of a special federal rule" only in those rare "situations where there is a significant

18  conflict between some federal policy or interest and the use of state law."  O'Melveny & Myers v.

19  FDIC, 512 U.S. 79, 87 (1994) (internal quotation marks omitted).

20  In First National, we simply applied the existing rule that the applicability of the act-

21  of-state doctrine is a question of federal law.  See 353 F.2d at 50-51.  It has long been established that

22  the question of whether to "pass[] on the validity of foreign acts of state" is a "uniquely federal" issue,

23  Sabbatino, 376 U.S. at 423-24.  In Marcos, we concluded that there was federal jurisdiction over a suit

-41-

1    brought by a foreign state against its former president to "regain proper[t]y allegedly obtained as the

2    result of acts when he was head of state"; we so held for a number of reasons, one of which was "the

3    necessary implications of such an action for United States foreign relations." 806 F.2d at 354. Such

4    a consideration, quite similar to that underlying the act-of-state doctrine, is not present here.

5              In the present case, the Complaint's assertion of nonstatutory wrongs describes

6    traditional types of torts by private entities. The Republic identifies no uniquely federal interest in

7    the rules of decision to be applied, nor any conflict between a federal policy or interest and the use

8    of state law. We conclude that the district court correctly determined that these claims arose under

9    state law rather than federal common law. And having dismissed the federal statutory claims "at the

10   very beginning of the case," Brzak v. United Nations, 597 F.3d 107, 114 (2d Cir.), cert. denied, 131

11   S. Ct. 151 (2010), the district court properly declined to exercise supplemental jurisdiction over the

12   state-law claims.


13                                              CONCLUSION


14             The Republic of Iraq's allegations in this case paint a sorry portrait of a greedy and

15   ruthless government colluding with venal individuals and business firms to divert funds intended for

16   the benefit of a suffering population, and using those funds to cement political power while scoffing

17   at the humanitarian concerns of the international community and the laws of the United States. The

18   principal question here, however, has been whether United States law permits the Republic, through

19   its present government, to recover damages from its former government's coconspirators on the basis

20   of the actions that they took in response to that former government's demands. Applying settled

21   principles of state responsibility and statutory interpretation, we have concluded that it does not.


                                                  -42-

1                    Having considered all of the Republic's arguments on this appeal, we find in them no

2        basis for reversal.  The judgment of the district court dismissing the Amended Complaint is affirmed.

-43-

1    DRONEY, *Circuit Judge*, concurring in part and dissenting in part:

2        In response to Iraq's 1990 invasion of Kuwait, the United

3    Nations Security Council implemented economic sanctions—widely

4    characterized as the most far-reaching in history—against the

5    regime of Saddam Hussein (the "Hussein Regime" or the "Regime").

6    The U.S. Congress enforced the sanctions through the Iraq Sanctions

7    Act of 1990, which made all trade for economic gain with the

8    Hussein Regime a criminal offense. Pub. L. No. 101-513, §

9    586E(2)(B), 104 Stat. 1979, 2049, 50 U.S.C. § 1701, note. To

10   "reconcile[e] strong sanctions against a corrupt Iraqi regime with

11   [the] need[] . . . [to provide] food and medicines to an innocent and

12   vulnerable population," the U.N. Security Council then

13   implemented—again with the U.S.'s support—the Oil-for-Food

14   Programme (the "Programme"). The Programme permitted Iraq to

15   sell oil on the international market on the condition that all of the

16   proceeds were placed into a U.N. escrow account established at the

1 New York branch of the Banque Nationale de Paris ("BNP"), to be

2 used only for the humanitarian needs of the Iraqi people,

3 administrative costs for the Programme, and war reparations to

4 Kuwait.

5 The invasion of Iraq and overthrow of the Hussein Regime by

6 a U.S.-led coalition of forces in the spring of 2003 revealed pervasive

7 corruption in the Programme, described by some as the "largest

8 financial fraud in human history." The corruption of the Programme

9 was documented in detail in a report of the U.N. Independent

10 Inquiry Committee into the United Nations Oil-for-Food

11 Programme. Based largely on this report, the defendants in this

12 litigation—two individuals, along with numerous business

13 entities—are alleged to have conspired with the Hussein Regime to

14 violate the sanctions and subvert the Programme. By purchasing oil

15 from the Regime at below-market prices or selling humanitarian

16 supplies (often of sub-standard quality) to it at above-market prices

2

1    while making side-payments to the Regime—or, in the case of the

2    BNP defendants, facilitating such payments—the defendants

3    allegedly diverted at least ten billion dollars intended for

4    humanitarian aid to the Regime. The two individual defendants

5    named here have already pled guilty to criminal charges relating to

6    their role in corrupting the Programme, and many of the business

7    entity defendants have entered into non-prosecution or deferred

8    prosecution agreements with the U.S. Department of Justice in

9    which they admit to involvement in the scheme.

10       The majority nevertheless concludes that the Republic of Iraq

11   (the "Republic") may not bring suit, through its current government,

12   to recover funds allegedly unlawfully siphoned off from the U.N.

13   escrow account. Because the Hussein Regime orchestrated the fraud,

14   the majority reasons, the Republic participated in the fraud as well,

15   and thus stands in equal fault (*in pari delicto*) with the defendants. I

16   disagree. *In pari delicto* is an "equitable defense . . . [,] rooted in the

1    common-law notion that a plaintiff's recovery may be barred by his

2    own wrongful conduct." *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). But

3    the majority's analysis does not rest on the Republic's "own

4    wrongful conduct." Instead, the majority begins its analysis with a

5    general principle of state responsibility under which "the obligations

6    of a foreign state are unimpaired by a change in that state's

7    government," Maj. Op., *ante*, at 28—a principle that we have never

8    before recognized in this context, where the conduct that the

9    defendants are alleged to have engaged in with a foreign

10   government was illegal under U.S. law from the beginning. The

11   majority then concludes, based on this purported principle of state

12   responsibility, that the post-Hussein Republic should be treated as

13   complicit in the Regime's fraud on a humanitarian relief program

14   specifically designed to aid the civilian population while *not*

15   enriching the Regime. The *in pari delicto* defense is founded on the

16   twin premises that "courts should not lend their good offices to

4

1    mediating disputes among wrongdoers . . . [and] that denying

2    judicial relief to an admitted wrongdoer is an effective means of

3    deterring illegality." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472

4    U.S. 299, 306 (1985). Yet here it functions to release defendants of

5    liability for conduct that, if true, constituted a clear violation of U.S.

6    law and subversion of U.S. policy, and to deprive the ultimate

7    victims of the defendants' conduct of any remedy.

8         I therefore concur only in the majority's holding that the

9    Foreign Corrupt Practices Act does not create a private right of

10    action; otherwise, I respectfully dissent.

11                                    **I.**

12         The majority presents its decision as deriving from the long-

13    established principle that "the legal position of a foreign state

14    survives changes in its government." Maj. Op., *ante*, at 28. In

15    articulating this principle, the majority draws on two distinct lines of

16    cases. The first concerns foreign sovereigns' conduct within the U.S.:

5

1    it holds that, when a foreign sovereign acts under U.S. law—such as

2    by litigating in U.S. courts or entering into transactions—it does so

3    through its then-recognized government and the government's

4    designated representatives, such as ambassadors. *See, e.g., Guar.*

5    *Trust Co. of N.Y. v. United States*, 304 U.S. 126, 137-41 (1938). The

6    second—the act of state doctrine—concerns foreign governments'

7    conduct within their own territory: it holds that generally "the

8    courts of this country [will not] inquir[e] into the validity of the

9    public acts [of] a recognized foreign sovereign power committed

10   within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376

11   U.S. 398, 401 (1964). Neither of these doctrines applies here.

12                                   **A.**

13       The principle that a foreign state acts under U.S. law through

14   its recognized government has long been established. In *The*

15   *Sapphire*, the Supreme Court held that the deposition of Emperor

16   Napoleon III did not abate a tort suit previously brought by France

6

1   to recover for damages caused to a French ship in a collision in San

2   Francisco harbor. 78 U.S. 164, 168 (1870). "The reigning Emperor, or

3   National Assembly, or other actual person or party in power, is but

4   the agent and representative of the national sovereignty," the

5   Supreme Court held, such that "[a] change in such representative

6   works no change in the national sovereignty or its rights." *Id.* at 168.

7   Similarly, in *Lehigh Valley Railroad Co. v. Russia*, this Court held that

8   the then-recognized representative of the provisional Russian

9   government could bring suit to recover for the destruction of

10  Russian-owned ammunition and explosives while in transit in the

11  United States. 21 F.2d 396, 401 (2d Cir. 1927). Although the explosion

12  occurred in 1916, under the Imperial Russian Government, we held

13  that "[t]he suit did not abate by the change in the form of

14  government in Russia; the state is perpetual, and survives the form

15  of its government." *Id.* at 401. Finally, and by the same logic, in

16  *Guaranty Trust Co. of New York v. United States*, the Supreme Court

7

1  held that, where the prior recognized government of a foreign

2  sovereign allowed the statute of limitations for a claim to run, the

3  U.S.'s subsequent recognition of a new government did not revive

4  the time-barred claim. 304 U.S. at 141. Again, because "the rights of a

5  sovereign state are vested in the state rather than in any particular

6  government which may purport to represent it," the change in the

7  recognized government effected no change in the time-barred claim.

8  *Id.* at 137.

9      The majority identifies no decisions, however, in which this

10  principle of state "responsibility" operates—as it does here—to

11  release a *non-state* defendant from liability for conduct that was

12  illegal under U.S. law from its inception. Such a conclusion is

13  inconsistent with the premise underlying the rule articulated in

14  *Guaranty Trust.* There the Supreme Court rejected the argument that

15  recognition of a new government of a foreign sovereign "renders of

16  no effect transactions here with a prior recognized government in

8

1    conformity to the declared policy of our own government." *Id.* at

2    140. It rooted this conclusion both in the separation of powers and in

3    the need to protect legitimate reliance on the finality of a recognized

4    government's acts. "What government is to be regarded here as

5    representative of a foreign sovereign state is a political rather than a

6    judicial question, and is to be determined by the political

7    department of the government," the Court observed. *Id.* at 137. "The

8    very purpose of the recognition by our government," the Court

9    continued, "is that our nationals may be conclusively advised with

10    what government they may safely carry on business transactions

11    and who its representatives are. If those transactions, valid when

12    entered into, were to be disregarded after the later recognition of a

13    successor government," the Court concluded, "recognition would be

14    but an idle ceremony, yielding none of the advantages of established

15    diplomatic relations in enabling business transactions to proceed,

9

1    and affording no protection to our own nationals in carrying them

2    on." *Id.* at 140-41.

3        Here, however, the United States had no diplomatic relations

4    with the Regime during the relevant time, and the side-agreements

5    allegedly entered into between the defendants and the Hussein

6    Regime were not in any sense "valid when entered into" or "in

7    conformity [with] the declared policy of our own government." On

8    the contrary, the side-agreements stood in clear violation of U.S. law

9    and violated the U.S.'s trade embargo policy towards Iraq. The rule

10   articulated in *Guaranty Trust* serves to prevent courts from

11   questioning determinations properly left to the political branches,

12   and to protect legitimate reliance "upon the finality and legality of

13   [a] government's acts." *Banco de Espana v. Fed. Reserve Bank of N.Y.*,

14   114 F.2d 438, 444 (2d Cir. 1940). But the political branches prohibited

15   transactions with the Hussein Regime, except those that took place

16   through the Programme. The defendants here could have no

10

1    legitimate expectations in the "finality" or "legality" of a side-

2    agreement with the Hussein Regime. Indeed, attempting to enforce

3    one of these alleged agreements in a U.S. court would likely entail

4    admitting to a felony. Under these circumstances, the rule

5    articulated in *Guaranty Trust* has no application.

6                                              **B.**

7         The majority further asserts that the actions of the Hussein

8    Regime are properly attributed to the Republic because the Regime

9    "acted as the government of Iraq." Maj. Op., *ante*, at 30. This

10   conclusion again relies on a principle that does not apply to this

11   case. The decisions that the majority cites in support of this assertion

12   primarily involve the act of state doctrine, which, in its traditional

13   formulation, holds that "the courts of one country will not sit in

14   judgment on the acts of the government of another, done within its

15   own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The

16   court below, however, found that the act of state doctrine did not

11

1   preclude the Republic's claims, *Republic of Iraq v. ABB AG*, 920 F.

2   Supp. 2d 517, 533-34 (S.D.N.Y. 2013), and the majority does not reject

3   this conclusion.

4       The district court was correct in its determination that the act

5   of state doctrine does not preclude the Republic's claims.

6   Adjudicating Iraq's claim would not require a court to "inquir[e]

7   into the validity of the public acts a recognized foreign sovereign

8   power committed within its own territory." *Banco Nacional de Cuba*,

9   376 U.S. at 401. In *W.S. Kirkpatrick & Co. v. Environmental Techtonics*

10  *Corp., International*, an unsuccessful bidder for a contract with the

11  Nigerian government sued a successful bidder, contending that the

12  successful bidder violated RICO, the Robinson-Patman Act, and

13  New Jersey state anti-racketeering laws in procuring the contract by

14  paying bribes to Nigerian officials. 493 U.S. 400, 402 (1990). The

15  successful bidder argued that the act of state doctrine precluded the

16  litigation, since the facts necessary to establish that the bribery

12

1   occurred would also "support a finding that the contract [was]

2   invalid under Nigerian law." *Id.* at 406. The Supreme Court rejected

3   this argument. *Id.* "Act of state issues only arise when a court *must*

4   *decide*—that is, when the outcome of the case turns upon—the effect

5   of official action by a foreign sovereign," the Court found. *Id.*

6   (emphasis in original). "When that question is not in the case,

7   neither is the act of state doctrine." *Id.*

8        Here, similarly, although a finding against the defendants

9   would tend to imply that the Hussein Regime violated its

10  international obligations by corrupting the Programme (a conclusion

11  that, in any event, seems beyond dispute), no aspect of the

12  Republic's claims turns on the validity of the Hussein Regime's

13  conduct. The Republic's complaint challenges the conduct of *non-*

14  *state* defendants under *U.S. law*.[1] Indeed, if adjudicating the

---

[1] That the Republic's claims are based on domestic law, and are asserted against non-state defendants, also explains the inapplicability of the rule that "[a] state is responsible for any violation of its obligations under international law resulting from action or inaction by [] the government of the state." Restatement (Third) of Foreign Relations Law of the United States § 207 (1987). The district court cited this rule in support of its

13

1    Republic's claims against the defendants required an inquiry into

2    the validity of the Hussein Regime's official acts, then the criminal

3    convictions of the two individual defendants and the non-

4    prosecution agreements entered into between the Department of

5    Justice and various corporate defendants would stand on faulty

6    premises: a U.S. court could never adjudicate such charges without

7    violating the act of state doctrine.

8         Furthermore, the Republic's claims do not implicate acts by

9    the Hussein Regime performed solely on Iraqi territory. *See*

10   *Underhill*, 168 U.S. at 252; *Banco de Espana*, 114 F.2d at 443 ("It has

11   been squarely held that the courts of this country will not examine

12   the acts of a foreign sovereign *within its own borders*, in order to

---

conclusion that the Hussein Regime's conduct redounds to the Republic, *see Republic of Iraq*, 920 F. Supp. 2d at 536, but the majority does not appear to rely on it. The majority is correct not to base its decision on this rule. The rule governs state responsibility for violations of "obligations under international law"; it is a rule of international law. As the Third Restatement observes, "[t]he principal persons under international law are states," and it is primarily states that "have legal personality and rights and duties under international law." Restatement (Third) of Foreign Relations Law of the United States pt. II, intro. note (1987). I see no basis for applying a principle of state responsibility under international law to immunize non-state defendants from liability for conduct under domestic law.

14

1    determine whether or not those acts were legal under the municipal

2    law of the foreign state." (emphasis added)); *see also Bernstein v. Van*

3    *Heyghen Freres Societe Anonyme*, 163 F.2d 246, 249 (2d Cir. 1947)

4    (barring, under the act of state doctrine, U.S. court from hearing

5    claim based on conversion of property committed in Germany by

6    German officials). Instead, the Republic contends that the

7    defendants—individuals and corporations located outside of Iraq—

8    conspired with the Hussein Regime to subvert an international

9    humanitarian relief program, run out of the U.N. headquarters in

10   New York, in ways that diverted money that would otherwise have

11   been placed in an escrow account established at a bank branch in

12   New York. Indeed, the requirement that all transactions be

13   approved by the U.N. and pass through an escrow account outside

14   of Iraqi control was plainly crucial to the functioning Programme,

15   since it was designed to ensure that the proceeds of oil sales were

16   not diverted from humanitarian uses. Because "[a]cts of foreign

15

1    governments purporting to have extraterritorial effect . . . by

2    definition[] fall[] outside the scope of the act of state doctrine," the

3    conduct of the Hussein Regime in subverting the Programme cannot

4    be encompassed by the doctrine. *Allied Bank Int'l v. Banco Credito*

5    *Agricola de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985).

6          Even if the act of state doctrine were implicated in this case,

7    that would not end the analysis. Once a court determines the

8    doctrine's "technical availability," it then considers whether "the

9    policies underlying the act of state doctrine" indicate that it "should

10    nonetheless not be invoked." *W.S. Kirkpatrick & Co.*, 493 U.S. at 409.

11    Key among these considerations is whether "the government that

12    committed the challenged act of state is no longer in existence." *Id.*

13    (internal quotation marks omitted). Even in cases that—unlike this

14    case—*do* require a U.S. court to assess the validity of a foreign

15    government's acts within its own territory, therefore, we do not

16    apply an inflexible rule that imputes the conduct of a former

16

1    government to a current government. Because the act of state

2    doctrine protects against litigation that would "embarrass or hinder

3    the executive in the realm of foreign relations," it would contravene

4    the doctrine's purpose to prevent the current government of a

5    foreign state from repudiating the conduct of a prior government on

6    the foreign state's territory. *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 452

7    (2d Cir. 2000). In *Bigio v. Coca-Cola Co.*, for instance, we found that

8    the act of state doctrine did not bar plaintiffs' action to recover

9    property that a former Egyptian government had confiscated

10   because the plaintiffs' were Jewish. 239 F.3d at 453. We noted that

11   the Nasser regime, which effected the property seizure, was "long

12   gone," and that "the current government . . . has apparently

13   repudiated the acts in question and has sought to have the property

14   or its proceeds returned to the [plaintiffs]." *Id.* Here, not only is the

15   regime that committed the wrongdoing no longer in existence, but

16   its successor government is *itself* the plaintiff in this matter. Indeed,

17

1    a conclusion that the Republic is barred from seeking redress against

2    these defendants in the U.S. courts—even as the U.S. government

3    itself extracts fines from many of the same defendants for the same

4    conduct—arguably poses a greater risk of "interfer[ing] with the

5    relationship between [the Republic of Iraq] and the United States"

6    than allowing the litigation to proceed. *Id.*

7        Because the Republic's claims do not require that the court

8    assess the validity of the Iraqi government's acts on Iraqi territory,

9    the act of state doctrine does not apply to this case. And because the

10   act of state doctrine does not apply, the fact that "the Hussein

11   Regime's effort to subvert the Programme was the policy of the Iraqi

12   government" does not preclude the Republic's claims. Maj. Op., *ante*,

13   at 30. Indeed, the majority's reliance on act of state case law leads to

14   the paradoxical conclusion that defendants are insulated from

15   liability to the Republic for their conduct precisely *because* they did

16   not merely aid a single corrupt Iraqi official in embezzling funds for

18

1   personal benefit, but instead conspired with an entire authoritarian

2   regime in a concerted scheme to violate U.S. law and subvert U.S.

3   foreign policy. In concluding that the alleged conspiracy pursued a

4   "public goal," the majority notes that the Hussein Regime regarded

5   the corruption of the Oil-for-Food Programme as crucial to

6   undermining the sanctions and remaining in power. Maj. Op., *ante*,

7   at 31. But it was the public goal of *our* government to weaken the

8   Hussein Regime through economic sanctions while minimizing,

9   through the Oil-for-Food Programme, the suffering of the Iraqi

10  civilian population. I see no basis in our law for treating the

11  defendants' conduct differently simply because they conspired with

12  a foreign government to achieve a "public goal" that was directly at

13  odds with U.S. policy.

14                                   **II.**

15          The absence of a rule that treats the Republic as complicit in

16  the Regime's wrongdoing and the deleterious impact of the

19

1   defendants' alleged actions on U.S. policy have special salience here.

2   The doctrinal mechanism through which Iraq's purported

3   "participation" in the Regime's conduct operates to bar the

4   Republic's claims—*in pari delicto*—has been recognized under

5   federal law only in its traditional formulation, in which it "was

6   narrowly limited to situations where the plaintiff truly bore at least

7   substantially equal responsibility for his injury." *Bateman Eichler*, 472

8   U.S. at 307. The Supreme Court has emphasized, moreover, that

9   "public policy implications [must] be carefully considered before the

10   defense is allowed" to "ensure[] that the broad judge-made law does

11   not undermine the congressional policy favoring private suits as an

12   important mode of enforcing federal [] statutes." *Pinter*, 486 U.S. at

13   633 (internal citation omitted). Under federal law, therefore, the *in*

14   *pari delicto* defense is allowed "only where (1) as a direct result of his

15   own actions, the plaintiff bears at least substantially equal

16   responsibility for the violations he seeks to redress, and (2)

20

1    preclusion of suit would not significantly interfere with the effective

2    enforcement of the . . . laws." *Id.* at 310-11. The defendants here

3    satisfy neither of these two prongs.

4         To satisfy the first prong, the defendant must establish that

5    the plaintiff was an "an active, voluntary participant in the unlawful

6    activity that is subject of the suit." *Pinter*, 486 U.S. at 636. This

7    requirement reflects the *in pari delicto* doctrine's equitable origins in

8    the idea that a party that has morally tainted itself in a matter cannot

9    invoke the court's equitable powers. For instance, Judge Learned

10   Hand wrote for this Court that the closely related "unclean hands"

11   defense is "derived from the unwillingness of a court . . . to give its

12   peculiar relief to a suitor who in the very controversy has so

13   conducted himself as to shock the moral sensibilities of the judge."

14   *Art Metal Works, Inc. v. Abraham & Straus*, 70 F.2d 641, 646 (2d Cir.

15   1934) (Hand, J., dissenting), *original decree vacated and dissent adopted*

16   *as opinion of the court on reh'g*, 107 F.2d 944 (2d Cir. 1939) (per

21

1    curiam). Accordingly, for "immoral conduct to be relevant," it "must

2    touch and taint the plaintiff personally"; actions that are "imputed to

3    [the plaintiff] legally[] do not impugn his conscience vicariously." *Id.*

4        The Republic's supposed participation in the fraud derives, in

5    the majority's analysis, from the principle that "the obligations of a

6    foreign  state  are  unimpaired  by  a  change  in  that  state's

7    government." Maj. Op., *ante*, at 28. But, like the unclean hands

8    defense, *in pari delicto* "has nothing to do with the rights or liabilities

9    of the parties." *Art Metal Works*, 70 F.2d at 646 (Hand, J., dissenting).

10   Even  if  the  principle  of  state  responsibility  that  the  majority

11   identifies  had  any  applicability  under  the  circumstances  of  this

12   case—where the agreements that the foreign government allegedly

13   entered into were illegal under U.S. law from the very beginning—it

14   does  not  establish  the  direct  responsibility  demanded  by  the  first

15   prong of the *in pari delicto* defense.

22

1        To apply the defense in the absence of direct conduct is

2    especially inappropriate here, where the "agent" is an authoritarian

3    regime and the "principal"—to which the agent's "sins" are

4    imputed—is the state that the regime tyrannized. The majority does

5    not cite to—nor do I know of—any decisions where the *in pari delicto*

6    defense has been applied against a foreign sovereign based on its

7    prior government's conduct, much less under the extraordinary

8    circumstances as issue here, where the wrongful conduct imputed to

9    the foreign sovereign involved the subversion of a humanitarian

10    relief program designed to benefit the people of the foreign

11    sovereign. Courts have, however, long rejected efforts to invoke

12    equitable defenses against the U.S. government and its agencies,

13    concluding that such defenses may not be "applied to frustrate the

14    purpose of [the United States'] laws or to thwart public policy." *Pan-*

15    *Am. Petroleum & Transp. Co. v. United States*, 273 U.S. 456, 506 (1927);

23

1    *see, e.g.*, *United States v. Philip Morris, Inc.*, 300 F. Supp. 2d 61, 75-76

2    (D.D.C. 2004).

3            The majority cites to New York case law holding that the

4    wrongdoing of corporate managers and agents may be imputed to

5    the corporation in the application of the *in pari delicto* defense. *See*

6    Maj. Op. at 32-33 (discussing *Kirschner v. KPMG LLP*, 15 N.Y.3d 446,

7    466-67 (2010). But even in that context courts are not uniform in their

8    views. In deciding whether to give effect to the *in pari delicto*

9    doctrine, other states have "draw[n] a sharp distinction between

10   those who deal in good faith with the principal-corporation . . . and

11   those who do not," concluding that "the ordinary rationale

12   supporting imputation breaks down completely in scenarios

13   involving secretive, collusive conduct between corporate agents and

14   third parties," such as where an auditor conspires with corporate

15   management to defraud a corporation. *Official Comm. of Unsecured*

16   *Creditors of Allegheny Health Educ. & Research Found. v.*

24

1    *PricewaterhouseCoopers, LLP*, 605 Pa. 269, 305-06 (2010). "[B]ecause

2    imputation rules justly operate to protect third parties on account of

3    their reliance on an agent's actual or apparent authority," these

4    courts reason, "such principles do not (and should not) apply . . .

5    where both the agent and the third party know very well that the

6    agent's conduct goes unsanctioned by one or more of the tiers of

7    corporate governance." *Id.* at 307; *see also NCP Litig. Trust v. KPMG*

8    *LLP*, 187 N.J. 353, 371 (2006) ("[T]he imputation defense exists to

9    protect *innocent third parties* from being sued by corporations whose

10   agents have engaged in malfeasant behavior against those third

11   parties." (emphasis added)). The same logic applies here, where the

12   defendants allegedly engaged in secretive, collusive conduct with

13   the Hussein Regime, while knowing full well that their conduct was

14   illegal under U.S. law.

15        The relationship between a corporation and its officers also

16   differs in several obvious respects from the relationship between a

25

1   sovereign state and its government—particularly where that

2   government is an authoritarian regime—rendering the policy

3   justifications that might support imputation in the former context

4   altogether inapplicable in the latter. The New York Court of Appeals

5   has justified imputing the acts of corporate officers to the

6   corporation itself by observing that "imputation fosters an incentive

7   for a principal to select honest agents and delegate duties with care."

8   *Kirschner*, 15 N.Y.3d at 466. But Saddam Hussein seized power in a

9   military coup; his regime maintained its control over the Iraqi state

10   through "extensive, systematic, and continuing human rights abuses

11   . . . , including summary executions, mass political killings,

12   disappearances, widespread use of torture, arbitrary arrest and

13   prolonged detention without trial of thousands of political

14   opponents, forced relocation and deportation, denial of nearly all

15   civil and political rights such as freedom of association, assembly,

16   speech, and the press, and the imprisonment, torture, and execution

1    of children." § 586F(a)(4), 164 Stat. at 250. Allowing the *in pari delicto*

2    defense under these circumstances excises the doctrine's

3    requirement that the plaintiff be an "an active, voluntary participant

4    in the unlawful activity that is subject of the suit," *Pinter*, 486 U.S. at

5    636—transforming a defense founded "upon the court's repugnance

6    to the suitor personally," *Art Metal Works*, 70 F.2d at 646 (Hand, J.

7    dissenting), into a rule of derivative guilt.

8          Insulating the defendants from liability to the Republic for

9    their alleged wrongdoing is, moreover, contrary to public policy, the

10   second prong of the *in pari delicto* test. RICO's express private right

11   of action is designed to aid "in eradicating organized crime from the

12   social fabric" by "divest[ing] the [defendant] of the fruits of its ill-

13   gotten gains." *United States v. Turkette*, 452 U.S. 576, 585 (1981). This

14   goal is especially important when the alleged conspiracy

15   undermined a trade embargo established—with the support of both

16   political branches—in response to "an unusual and extraordinary

27

1    threat to the national security and foreign policy of the United

2    States," Exec. Order No. 12,722, 55 Fed. Reg. 31,803 (Aug. 2, 1990); §

3    586C, 104 Stat. at 2048, and corrupted a humanitarian relief program

4    designed to alleviate the "near apocalyptic results" that the embargo

5    and the Hussein Regime's ongoing brutality had on the Iraqi people.

6    The *in pari delicto* defense is "based not on solicitude for the

7    defendant, but on concern for the public welfare, and thus when

8    application of the doctrine would not be in the public interest, the

9    courts will permit recovery." *In re Leasing Consultants Inc.*, 592 F.2d

10   103, 110 (2d Cir. 1979). Accordingly, I do not believe that we should

11   allow the defense where it leads to results so clearly at odds with

12   U.S. public policy.

13         Indeed, the application of the *in pari delicto* defense in this case

14   leads to a result that directly contradicts U.S. policy towards Iraq

15   throughout the relevant time. U.S. policy towards Iraq did not treat

16   the Iraqi state as collectively complicit in the Hussein Regime's

28

1    conduct. From the beginning, the economic sanctions recognized an

2    exception for "donations of articles intended to relieve human

3    suffering, such as food, clothing, medicine and medical supplies

4    intended strictly for medical purposes." Exec. Order No. 12,722 §

5    2(b); *see also* § 586C(b), 104 Stat. at 2048; Exec. Order No. 12,724 §

6    2(b), 55 Fed. Reg. 33,089 (Aug. 9, 1990); S.C. Res. 661, para. 4, U.N.

7    Doc. S/RES/661 (Aug. 6, 1990) (recognizing exception for "payments

8    exclusively for strictly medical or humanitarian purposes"). The core

9    premise of the Oil-for-Food Programme was that the Hussein

10    Regime should be permitted to sell its oil on the international

11    market, provided "that all States . . . take any steps that may be

12    necessary . . . to ensure that the proceeds of the sale [were] not

13    diverted from" the authorized purposes. S.C. Res. 986, paras. 8, 14,

14    U.N. Doc. S/RES/986 (Apr. 14, 1995). Far from treating the entire

15    state as complicit in the Regime's conduct, in 1998, in the midst of

16    the trade embargo, the U.S. Congress approved the appropriation of

29

1  five million dollars to support "Iraqi democratic opposition"

2  through "such activities as organization, training, communication

3  and dissemination of information, developing and implementing

4  agreements among opposition groups, [and] compiling information

5  to support the indictment of Iraqi officials for war crimes . . . ." 1998

6  Supplemental Appropriations and Rescission Act, Pub. L. No. 105–

7  174, § 10008, 112 Stat. 58, 101.

8     The majority's discussion of the second prong of the *in pari*

9  *delicto* defense concludes in general terms that "it is consistent with

10  the purpose of RICO to recognize an *in pari delicto* defense in cases

11  where, as a direct result of the plaintiff's affirmative wrongdoing,

12  the plaintiff bears at least substantially equal responsibility for the

13  RICO violations of which it complains." Maj. Op., *ante*, at 35

14  (internal citations and quotation marks omitted). Other circuits that

15  have recognized the *in pari delicto* defense in the RICO context,

16  however, did so in circumstances where allowing the plaintiff to

1    recover "under RICO would not divest RICO violators of their ill-

2    gotten gains; it would result in a wealth transfer among similarly

3    situated conspirators." *Official Comm. of Unsecured Creditors of PSA,*

4    *Inc. v. Edwards*, 437 F.3d 1145, 1155 (11th Cir. 2006); *see also Rogers v.*

5    *McDorman*, 521 F.3d 381, 391 (5th Cir. 2008) (recognizing *in pari*

6    *delicto* defense to RICO claims where the "scheme could not work

7    without [the plaintiffs'] active participation," and observing that

8    "[t]his is not a situation where an innocent or passive victim is being

9    deprived of a RICO remedy"). Here, by contrast, allowing the

10   Republic to recover under RICO from the individuals and

11   corporations that allegedly conspired to subvert the Programme

12   *would* divest RICO violators of their illegal profits, and would allow

13   compensation for the ultimate victims of the defendants' alleged

14   fraud.

15        The application of the *in pari delicto* defense demands that

16   courts carefully scrutinize the specific plaintiff's alleged conduct in

31

1   relation to the relevant public policy. In *Perma Life Mufflers, Inc. v.*

2   *International Parts Corp.*, for instance, the Supreme Court addressed

3   the question of whether Midas Muffler franchisees who knew about

4   allegedly anti-competitive clauses in their franchise agreements

5   could later bring an antitrust claim. 392 U.S. 134, 140 (1968).

6   Observing that "the purposes of the antitrust laws are best served by

7   insuring that the private action will be an ever-present threat to

8   deter anyone contemplating business behavior in violation of the

9   antitrust laws," the Court declined to bar antitrust plaintiffs' claims,

10  concluding that, in light of the economic power of the franchisor, the

11  franchisees' "participation was not voluntary in any meaningful

12  sense." *Id.* at 139-40. In *Bateman Eichler, Hill Richards, Inc. v. Berner*,

13  the Supreme Court again declined to apply the *in pari delicto* defense,

14  this time in the context of a securities action brought by investors

15  who made trades on the basis of "inside information" that turned

16  out to be false. 472 U.S. at 301-02, 317. Noting the important role that

32

1    private actions play in the securities enforcement system, the Court

2    rejected the suggestion "that an investor who engages in [insider]

3    trading is necessarily as blameworthy as a corporate insider or

4    broker-dealer who discloses the information for personal gain,"

5    concluding that such a finding would ignore "important distinctions

6    between the relative culpabilities of tippers, securities professionals,

7    and tippees." *Id.* at 312-13. Finally, in *Pinter v. Dahl*—another

8    securities action, this time involving claims based on the unlawful

9    sale of unregistered securities—the Supreme Court rejected the

10   suggestion that "a purchaser's knowledge that the securities are

11   unregistered can[], by itself, constitute equal culpability, even where

12   the investor is a sophisticated buyer who may not necessarily need

13   the protection of the Securities Act." 486 U.S. at 636. "Because the

14   [Securities] Act is specifically designed to protect investors," the

15   Court reasoned, "even where a plaintiff actively participates in the

16   distribution of unregistered securities, his suit should not be barred"

33

1  except where his role was "more as a promoter than as an investor."

2  *Id.* at 638-39.

3      Aside from demonstrating how narrowly the *in pari delicto*

4  defense is circumscribed in light of public policy considerations,

5  these decisions reflect the specificity with which the Supreme Court

6  determines the defense's availability. The question answered in

7  these decisions is not simply whether the *in pari delicto* defense

8  operates in the context of an antitrust or securities claim. Rather, the

9  question is whether the Court should recognize a "broad rule of

10 *caveat tippee*," *Bateman Eichler*, 472 U.S. at 315, or whether the *in pari*

11 *delicto* defense bars a claim by "a plaintiff [who] actively participates

12 in the distribution of unregistered securities" but whose

13 "promotional efforts are incidental to his role as an investor," *Pinter*,

14 486 U.S. 638-39.

15     Even if the *in pari delicto* defense may properly be applied to

16 bar a plaintiff's RICO claims in some circumstances, therefore, I do

34

1    not believe that it should here. The U.S. public policy behind the

2    economic sanctions against Iraq and the Programme was critically

3    important to our national interests. There are, moreover, "important

4    distinctions between the relative culpabilities" of the defendants,

5    which allegedly participated in the fraud of their own choosing and

6    for vast profits, and the Republic, whose "responsibility" for a

7    scheme that deprived its own civilian population of desperately

8    needed humanitarian relief is entirely derivative of an authoritarian

9    regime that has now been overthrown. *Bateman Eichler*, 472 at 312-13.

10                              *       *       *

11        Courts should proceed cautiously in cases that implicate

12    foreign relations, cognizant that the "courts['] . . . powers to further

13    the national interest in foreign affairs are necessarily circumscribed

14    as compared with those of the political branches." *Banco Nacional de*

15    *Cuba*, 376 U.S. at 412. But allowing the Republic's claims to proceed

16    in this case would not cross the guideposts that have long operated

35

1    to ensure that the courts do not encroach on areas properly reserved

2    for the political branches. Allowing the Republic's claims to proceed

3    would not violate the doctrine that U.S. nationals may safely carry

4    on business transactions with the recognized government of a

5    foreign state, confident that the validity of such agreements will not

6    be called into question based on the legitimacy of the government or

7    its subsequent overthrow. *See Guar. Trust Co. of N.Y.*, 304 U.S. at 137.

8    Nor would allowing the Republic's claims to proceed in any way

9    conflict with the act of state doctrine, since adjudicating the case

10   would not "require[] a court in the United States to declare invalid

11   the official act of a foreign sovereign performed within its own

12   territory." *W.S. Kirkpatrick & Co.*, 493 U.S. at 405.

13        But I see no reason to embrace a novel application of the *in*

14   *pari delicto* defense to immunize the defendants from liability for

15   conduct that was illegal under U.S. law from the very beginning and

16   that undermined an important U.S. policy. The Supreme Court has

36

1    cautioned against "expanding judicial incapacities" to hearing cases

2    simply because they have an international dimension, observing that

3    "[c]ourts in the United States have the power, and ordinarily the

4    obligation, to decide cases and controversies properly presented to

5    them." *Id.* at 409. The plaintiff here alleges that it was the victim of a

6    fraud. The vast scale of the alleged fraud does not render the

7    Republic's allegations any less proper for judicial resolution, and I

8    believe it is more consistent with principles of equity to hold the

9    defendants accountable for their own role than to impute to the

10    plaintiff the wrongdoing of its former authoritarian regime.